UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF NEW YORK

In the Matter of
Eric Adams 2025, Eric Adams, Sharon
Adams, as Treasurer of Eric Adams 2025,
Marietta Rozental, Joe Shanie, and Malcolm
Adams,

                    Petitioners-Plaintiffs,

    - against -

New York City Campaign Finance Board,

                    Respondent-Defendant.

CIVIL ACTION NO. 25-cv-3380 (NGG)

## DECLARATION OF PAUL S. RYAN IN SUPPORT OF ANSWER

I, Paul S. Ryan, make the following declaration pursuant to 28 U.S.C. § 1746:

1.      I am Executive Director of the New York City Campaign Finance Board (the "Board" or "Respondent"). I am familiar with the facts underlying this action, and I make this declaration on personal knowledge in support of the Answer to the Amended Article 78 Petition/Complaint ("the Amended Complaint") of Eric Adams 2025 (the "Adams Campaign"), Eric Adams, Marietta Rozental, Joe Shanie, and Malcolm Adams (collectively, "Plaintiffs").

**Background on the Campaign Finance Board and Voluntary Campaign Finance Program**

2.      The Board is an independent, non-partisan agency of the City of New York established in 1988 by the New York City Campaign Finance Act (the "Act") as codified in the New York City Administrative Code (the "Admin. Code") Title 3, Chapter 7, sections 3-701 *et seq.* and the New York City Charter (the "Charter"), Chapter 46, with its principal place of business at 100 Church Street, New York, New York 10007. The Board consists of five members

1

who are appointed by the Mayor and the Speaker of the New York City Council. Admin. Code. § 3-708(1).

3. The Board has rule making authority pursuant to Admin. Code § 3-708(8) and N.Y.C. Charter §§ 1051-52 to "promulgate such rules and regulations . . . as it deems necessary for the administration of this chapter." With that authority, the Board has promulgated the New York City Campaign Finance Board Rules (the "Board Rules"). Copies of the Board Rules in effect between March 17, 2023 and December 18, 2024 and in effect between December 19, 2024 and the present are attached hereto as Exhibits 1 and 2 respectively.

4. Pursuant to the Charter, the Act, and the Board Rules, the Board administers New York City's voluntary Campaign Finance Program (the "Program"), which seeks to limit the role and corrupting influence of private money in the political process by providing public matching funds to candidates running for New York City public office (Mayor, Comptroller, Public Advocate, Borough President, and City Council) who satisfy various eligibility requirements. *See* Admin. Code §§ 3-702(3), 3-703, 3-705.

5. The Board's mission statement is "to mak[e] our local democracy more open, transparent, and equitable" and to "eliminate barriers to participation by providing access to the information and resources New Yorkers need to vote or run for office, and reduce the corrupting influence of money in politics by enhancing the impact of New Yorkers' small dollar contributions." As stated on its website, "NYC's matching funds program amplifies the voice of average New Yorkers in city elections by matching their small contributions with public funds. By increasing the value of small-donor contributions, the program reduces the possibility and perception of corruption from large contributions and unlimited campaign spending, and encourages citizens from all walks of life to run for office. Through its rigorous oversight and

enforcement efforts, the [Board] holds candidates accountable for using public funds responsibly."[1]

6.      To qualify for public matching funds under the Program, a participating candidate running for Mayor must, *inter alia*, meet all the requirements for placement on the ballot, be opposed by another candidate, and demonstrate significant support from the public by meeting a two-part fundraising threshold: (1) collecting at least 1,000 "matchable contributions"[2] (of $10 or more) from New York City residents and (2) raising at least $250,000 in matchable contributions. Admin. Code § 3-703(1), (2).

7.      To qualify for public matching funds under the Program, participating candidates must also file a written certification stating that they are choosing to participate in the Program and agree to comply with the requirements for the provision of such funds (i.e., the Act and the Board Rules), which include, but are not limited to: (a) obtaining and furnishing to the Board accurate information relating to campaign expenditures or contributions; (b) not accepting over-the-limit contributions; (c) not accepting prohibited corporate contributions; (d) responding to Board staff's requests for information and documentation; and (e) fulfilling the requirements of section 12-110 of the Admin. Code, relating to the filing of disclosures with the New York City Conflicts of Interest Board ("COIB"). *See* Admin. Code §§ 3-703(1)(c), (1)(d), (1)(f), (1)(g), (1)(l), (6).

8.      The Board Rules further provide additional mandatory and discretionary eligibility criteria for public matching funds. *See* Board Rules Ch. 3. Pertinent here:

---

[1] *See* NYC Campaign Finance Board, "About the CFB," https://www.nyccfb.info/about.

[2] Matchable contributions are defined in Admin. Code § 3-702.

a. Rule 3-01(d)(i)(A)(2) provides that "public funds will not be paid to a candidate" who fails to "provide to the Board, upon its request and by the deadline set forth by the Board, documents or records required by Chapter 4 of these rules, or other information that verifies campaign activity."

b. Rule 3-01(d)(i)(A)(3) provides for mandatory ineligibility for public funds where "the difference between the candidate's reported receipts and documented receipts . . . exceeds a maximum threshold percentage," which is set by the Board "on or before July 11 in the year before the year of the election. For the 2025 election cycle, the maximum threshold percentage for a variance in receipts is 10%.[3]

c. Rule 3-01(d)(ii)(A)(4) provides for mandatory ineligibility for public funds where "the candidate fails to demonstrate compliance with § 12-110 of the [Admin.] Code, as required pursuant to § 3-703(1)(m) of the [Admin.] Code and section 3-05." Rule 3-05 provides, in relevant part, that a candidate "must demonstrate compliance with" those provisions of the Code "3 days prior to the next [matching funds] payment date."

d. Rule 3-01(d)(i)(B) provides that the Board may deny a public funds payment "to a candidate if there is reason to believe that the candidate has committed a violation of the Act or these rules not otherwise enumerated in paragraph (ii) of this subdivision, and which is not a basis for withholding pursuant to section 7-06."

e. Rule 3-01(d)(ii)(B) provides that the Board may deny a public funds payment "to a candidate if there is reason to believe that, in the course of Program

---

[3] *See* New York City Campaign Finance Board, "2025 Elections: What Participating Candidates Need to Know About Public Funds Payments," at 11, available at https://www.nyccfb.info/candidate-services/guidance/ (noting the 10% threshold).

participation, the candidate has engaged in conduct detrimental to the Program that is in violation of any other applicable law."

9.     Before a candidate can receive matching funds, the Board must determine that the candidate has "met all eligibility requirements set forth in the Act and [the Board Rules]." Board Rule 3-01(a).

10.     Board Rule 7-09 provides that, "[a]fter the Board provides a written determination to a candidate specifying the basis for payment or non-payment of public funds prior to the election, the candidate may petition the Board in writing for reconsideration of such determination." It also states that the petition must "include either a request to appear before the Board concerning the petition or a statement that the candidate waives such candidate's right to appear."

11.     Participating candidates who qualify for matching funds receive $8 in public funds for every dollar a New York City resident gives, up to $250 per contributor. Admin. Code §§ 3-705(1), (2).

12.     There are 13 payment dates for the 2025 election cycle. All Program participants may qualify for public funds on five payment dates before the ballot is set. For the remaining eight payments, a Program participant must have an opponent in the primary and/or general election to be eligible.

13.     On each payment date, the Board reassesses the participant's eligibility for public matching funds (including funds that may have been disbursed on a prior payment date). This means that the most recent payment determination is considered the operative determination by the Board and the only determination ripe for review. With respect to the Adams Campaign, the

payment determination made in April 2025 is the operative determination because it is the most recent.

14.    Mayor Adams was a Program participant from June 10, 2013 (the date on which he certified into the Program as a candidate for Brooklyn Borough President in the 2013 election) through December 31, 2017 (the end of his first term as Brooklyn Borough President, an office that he achieved as a Program participant) and from September 18, 2019 (the date on which he certified into the Program as a candidate for Mayor in the 2021 election) onward.

15.    On each of the four payment dates mentioned in the Amended Complaint (December 16, 2024, January 15, 2025, March 17, 2025, and April 15, 2025), the Board determined that several candidates, including Mayor Adams, had not yet demonstrated their eligibility for payment as of that day.

**Adams Campaign Nonpayment Determinations**

16.    On September 26, 2024, a five-count indictment (the "Indictment") against Eric Adams was unsealed in the Southern District of New York.[4] The Indictment charged Mayor Adams with wire fraud, bribery, campaign finance violations involving contributions from foreign nationals, and conspiracy to commit the aforementioned crimes. Among other things, the Indictment alleged that Mayor Adams was part of a scheme to use straw donors as a way to hide illegal contributions and get matching funds. A copy of the Indictment is attached as Exhibit 3.

17.    On November 15, 2024, Jesse Schaffer, Director of Special Compliance for the Board, sent a letter to Vito Pitta, counsel to the Adams Campaign, requesting documents and information related to the allegations in the Indictment, to verify campaign activity described in

---

[4] U.S. Attorney's Office, Southern District of New York, "New York City Mayor Adams Charged with Bribery and Campaign Finance Offenses," https://www.justice.gov/usao-sdny/pr/new-york-city-mayor-eric-adams-charged-bribery-and-campaign-finance-offenses.

the Indictment, and to better inform the Board's decision regarding public funding eligibility. A copy of this letter is attached as Exhibit 4 (the "November 15th Request"). Mr. Schaffer stated, that "[b]ased on the indictment, there is reason to believe that the [2021 and 2025] Campaigns committed violations of various federal statutes, Campaign Finance Act provisions, and Board Rules, which would make the 2025 Campaign ineligible to receive a public funds payment on December 16, 2024. In connection with the Board's consideration of this issue, please provide the documents listed below, as well as any other documents, affidavits or arguments that support the 2025 Campaign's eligibility to receive public funds." The letter required a response by December 6, 2024.

18.    On December 5, 2024, Mr. Pitta left Mr. Schaffer a voicemail stating, "I'm calling regarding your November 15th letter requesting additional information from Eric Adams 2021 and 2025. After consultation with criminal counsel, given that the requests relate specifically to events that were referenced in the Indictment, this is not something that we can respond to at this time. If you want to discuss further please give me a call at 212-652-3881. I'll also send you an email confirming that I left you this voice mail, but wanted to let you know that we won't be able to submit a response by the requested deadline tomorrow." Shortly thereafter, Mr. Pitta sent Mr. Schaffer an email confirming that he had left a voicemail regarding the November 15th Request. Mr. Schaffer responded the same day confirming receipt of the voicemail. A copy of this email exchange is attached as Exhibit 5.

19.    On December 6, 2024, Board staff submitted to the Board a privileged and confidential legal memorandum analyzing the implications of the Indictment on the Adams Campaign's public funding eligibility.

20.     On December 6, 2024, Board staff also informed the Board that, on December 5, 2024, the Adams Campaign had informed Board staff that it would not be responding to the November 15th Request for the reasons stated in Mr. Pitta's December 5, 2024 voicemail.

21.     On December 13, 2024, I participated in a virtual meeting in which the Board staff briefed the Board on the staff's public funds payment recommendation with respect to the Adams Campaign. At that meeting, the staff recommended that the Board determine the Adams Campaign to be ineligible for payment because: (1) there was reason to believe that Mayor Adams, in the course of Program participation, had engaged in conduct detrimental to the Program and in violation of law, including the Campaign Finance Act and Board Rules; and (2) the Adams Campaign had failed to provide documents and information verifying campaign activity that had been requested by the Board.

22.     On December 16, 2024, the Board held a public meeting in which they voted to deny public funds to the Adams Campaign. As reflected in a Board press release issued on the same day, Board Chair Frederick Schaffer stated at the meeting: "After thoroughly reviewing all available information, including the details of the indictment of Mayor Adams, the Board has determined there is reason to believe the Adams campaign has engaged in conduct detrimental to the matching funds program, in violation of law, including the Campaign Finance Act and Board Rules. His campaign also failed to provide documents and information requested by the Board. Accordingly, Mayor Adams's campaign for reelection has failed to demonstrate eligibility for public funds payment at this time… Our priority remains achieving an equitable and transparent

democracy that is accountable to all New Yorkers." A copy of this press release is attached as Exhibit 6.[5]

23.    On December 16, 2024, Board staff issued an Early Public Funds Nonpayment Determination to the Adams Campaign. A copy of that document is attached as Exhibit 7 (the "December 16th Nonpayment Determination").[6]

24.    On December 18, 2024, the Board's Director of Auditing and Accounting sent the Adams Campaign a Supplemental Notice regarding the nonpayment determination. A copy of

---

[5] For ease of reference, some exhibits that were attached to the original Petition/Complaint have been attached to this Declaration since those exhibits were not reattached to the Amended Complaint.

[6] The December 16th Nonpayment Determination mistakenly did not include the correct reasons for the nonpayment determination. It says instead, "[t]he Campaign is not eligible for payment because of preliminary findings of substantial violations which may result in penalties" and cites to Board Rules 3-01(d)(i)(G), (ii)(H), and 3-01(e), which were not the basis for the Board's nonpayment determination. The Early Public Funds Nonpayment Determinations that are sent to candidates by Board staff are automatically generated based on codes that the Board staff uses in making their payment recommendations to the Board, which are adopted or rejected when the Board votes. Here, the code at issue was "Withholding For Non Compliance," which automatically generated the language in the December 16th Nonpayment Determination. This mistake also appears in the Early Public Funds Nonpayment Determinations that were issued on January 15, 2025, February 18, 2025, March 17, 2025, and April 15, 2025. Each of these documents should have said (in addition to other reasons for nonpayment correctly described):

- "The Campaign is not eligible because the Board has reason to believe that the Candidate has, in the course of public funds program participation, engaged in conduct detrimental to the Program that is in violation of law, including the Campaign Finance Act and Board Rules."

- "The Campaign is not eligible for payment because it failed to provide to the Board, upon its request, documents, records, or other information that verifies campaign activity by the deadline set forth by the Board."

The mistake was corrected as to the April 15, 2025 Early Public Funds Nonpayment Determination after the Adams Campaign filed a petition for reconsideration of the April determination. The December 18th Notice contained the correct bases for the Board's December 2024 determination.

that document is attached as Exhibit 8 (the "December 18th Notice"). The December 18th

Notice,[7] states, in relevant part:

> The Board has reason to believe that Eric Adams (the "Candidate") has, in the course of public funds program (the "Program") participation, engaged in conduct detrimental to the Program that is in violation of federal and City law, including the Campaign Finance Act and Board Rules, as described in the September 26, 2024 indictment of Eric Adams (*see United States v. Adams*, 24 CR 556), and is therefore ineligible for a public funds payment. Pursuant to Board Rules 3-0l(d)(i)(G) and (ii)(I), the Board's reason to believe that the Candidate has violated federal and City laws is a basis for ineligibility for public funds.

> The indictment details and establishes probable cause that the Candidate committed the federal law crimes alleged in the indictment and, therefore, establishes reason to believe that, in the course of Program participation in the 2021 and 2025 election cycles, the Candidate engaged in conduct detrimental to the Program in violation of applicable laws, including:

> - Conspiracy to commit wire fraud to obtain matching funds, accept a campaign contribution by a foreign national, and commit bribery.
> - Wire fraud to obtain matching funds.
> - Solicitation, acceptance or receipt of contributions by foreign nationals.
> - Bribery.

> The indictment details New York City law violations that were necessary predicates to the alleged federal crimes and, therefore, establishes reason to believe that, in the course of Program participation in the 2021 and 2025 election cycles, the Candidate engaged in conduct detrimental to the Program in violation of the Campaign Finance Act and Board Rules. Campaigns are required to report and document contributions accurately and completely and file accurate disclosure statements, and are prohibited from accepting contributions in violation of amount limits and source restrictions. The indictment details instances of the Adams campaigns concealing straw donations and contributions from foreign nationals, submitting these contributions for match, and filing false disclosure statements. Therefore, there is reason to believe that the Candidate and his campaigns were in violation of numerous provisions of the Campaign Finance Act and Board Rules, among other City laws.

---

[7] The December 18th Notice cites to Board Rules 3-01(d)(i)(G) and (ii)(I), which were in effect at that time. *See* Ex. 1. On December 19, 2024, an amended version of the Board Rules went into effect. Nearly identical versions of the rules cited in the December 18th Notice can now be found at Board Rule 3-01(d)(i)(B) and 3-01(d)(ii)(B). *See* Ex. 2.

25.     Further, the December 18th Notice states, "[c]ampaigns must provide to the Board, upon its request, documents, records, or other information that verifies campaign activity and failure to respond can make a campaign ineligible for public funds pursuant to Board Rule 3-01(d)(i)(B)."[8] It explained that the Adams Campaign had not responded to the Board's November 15th Request and stated, "[t]his failure to respond to a request for information is a basis for ineligibility for public funds."

26.     The December 18th Notice and the December 16th Nonpayment Determination advised the Adams Campaign of its right to submit a petition for reconsideration to the Board, and of Mayor Adams's right to appear before the Board regarding the petition, pursuant to Board Rule 7-09. They further advised that if the petition was denied, the Campaign would have four months to challenge the Board's determination in New York State Supreme Court pursuant to Article 78 of the Civil Practice Law and Rules. The December 16th Nonpayment Determination also stated that, pursuant to Admin. Code §§ 3-710 and Board Rule 3-01(c), "[t]his nonpayment of public funds is not a final determination by the Board, but rather is a preliminary determination subject to review of ongoing financial activity and final audit."

27.     The Adams Campaign did not file a petition for reconsideration of the December 2024 nonpayment determination.

28.     On the morning of January 15, 2025, I attended a meeting in which the Board staff briefed the Board on the staff's public funds payment recommendation with respect to the Adams Campaign. At that meeting, the staff recommended that the Board determine the Adams Campaign to be ineligible for payment because: (1) there was reason to believe that Mayor

---

[8] The December 18th Notice cited to the version of Board Rule 3-01(d)(i)(B) which was in effect at the time. An updated version of this rule appears at Board Rule 3-01(d)(i)(A)(2).

Adams, in the course of Program participation, had engaged in conduct detrimental to the Program and in violation of law, including the Campaign Finance Act and Board Rules; and (2) the Adams Campaign had failed to provide documents and information verifying campaign activity that had been requested by the Board.

29.     Later that day, the Board held a public meeting in which they voted to deny public funds to the Adams Campaign.

30.     On that same day, Board staff issued another nonpayment determination to the Adams Campaign. A copy of this nonpayment determination is attached as Exhibit 9 (the "January 15th Nonpayment Determination"). The next day, Board staff sent the Adams Campaign a Supplemental Notice regarding the denial of public funds (the "January 16th Notice"). A copy of the January 16th Notice is attached as Exhibit 10.

31.     The January 16th Notice referred to the same Board Rules governing eligibility for public funds payment as the December 18th Notice and referred back to the December 18th Notice for an explanation regarding the nonpayment determination.[9]

32.     The January 15th Nonpayment Determination and the January 16th Notice again advised the Adams Campaign of its right to petition for reconsideration of the determination and to appear before the Board regarding the same.

33.     The Adams Campaign did not file a petition for reconsideration of the January 2025 nonpayment determination.

---

[9] In its citation to the Board Rules, the January 15th Nonpayment Determination and January 16th Notice mistakenly cited to the rules in effect between March 17, 2023 and December 18, 2024. The nonpayment determinations issued to the Adams Campaign in February, March, and April, and the supplemental notice issued in February also contained this mistake.

34.     On the morning of February 18, 2025, I attended a meeting in which the Board staff briefed the Board on the staff's public funds payment recommendation with respect to the Adams Campaign. At that meeting, the staff recommended that the Board determine the Adams Campaign to be ineligible for payment because: (1) there was reason to believe that Mayor Adams, in the course of Program participation, had engaged in conduct detrimental to the Program and in violation of law, including the Campaign Finance Act and Board Rules; (2) the Adams Campaign had failed to provide documents and information verifying campaign activity that had been requested by the Board; (3) the Adams Campaign had not demonstrated compliance with Admin. Code § 12-110, as determined by the COIB; and (4) the difference between the Adams Campaign's reported receipts and documented receipts was equal to or greater than 10%.

35.     Later that day, the Board held a public meeting in which they voted to deny public funds to the Adams Campaign.

36.     On February 18, 2025, Board staff issued another Early Public Funds Nonpayment Determination to the Adams Campaign. A copy of that document is attached as Exhibit 11 (the "February 18th Nonpayment Determination"). On the same day, staff also issued a Supplemental Notice regarding the nonpayment determination (the "February 18th Notice"). A copy of the February 18th Notice is attached as Exhibit 12.

37.     The February 18th Nonpayment Determination and the February 18th Notice collectively explained that the Adams Campaign was not eligible for payment for four reasons[10] – the two reasons previously described in the December 18th Notice, and:

---

[10] As mentioned *supra* footnote 6, one additional reason for nonpayment appeared in the February 18th Nonpayment Determination but inclusion of that reason was a mistake.

    a.   The Adams Campaign had not demonstrated compliance with Admin. Code § 12-110, as determined by the COIB. *See* Admin. Code. § 3-703(1)(m).

    b.   The difference between the Adams Campaign's reported receipts and documented receipts was equal to or greater than 10%. *See* Admin. Code §§ 3-703(1)(d), (6).

38.    Like the prior nonpayment determinations and notices, the February 18th Nonpayment Determination and the February 18th Notice also advised the Adams Campaign of its right to submit a petition for reconsideration to the Board, and of Mayor Adams's right to appear before the Board regarding the petition, pursuant to Board Rule 7-09.

39.    The Adams Campaign did not file a petition for reconsideration of the February 18th nonpayment determination.

40.    On the morning of March 17, 2025, I attended a meeting in which the Board staff briefed the Board on the staff's public funds payment recommendation with respect to the Adams Campaign. At that meeting, the staff recommended that the Board determine the Adams Campaign to be ineligible for payment because: (1) there was reason to believe that Mayor Adams, in the course of Program participation, had engaged in conduct detrimental to the Program and in violation of law, including the Campaign Finance Act and Board Rules; (2) the Adams Campaign had failed to provide documents and information verifying campaign activity that had been requested by the Board; (3) the Adams Campaign had not demonstrated compliance with Admin. Code § 12-110, as determined by the COIB; and (4) the difference between the Adams Campaign's reported receipts and documented receipts was equal to or greater than 10%.

41.    Later that day, the Board held a public meeting in which they voted to deny public funds to the Adams Campaign.

42.     On that same day, the Board issued another Early Public Funds Nonpayment Determination to the Adams Campaign. A copy of that document is attached as Exhibit 13 (the "March 17th Nonpayment Determination").

43.     The March 17th Nonpayment Determination cited three reasons for the nonpayment determination. First, the Adams Campaign had not demonstrated compliance with Admin. Code § 12-110, as determined by the COIB. *See* Admin. Code. § 3-703(1)(m). Second, the difference between the Adams Campaign's reported receipts and documented receipts was equal to or greater than 10%. *See* Admin. Code §§ 3-703(1)(d), (6). Third, as explained, *supra* footnote 6, the document mistakenly referred to preliminary findings of substantial violations and failed to reference two reasons for the nonpayment determination: (1) the Board had reason to believe that the Candidate had, in the course of public funds program participation, engaged in conduct detrimental to the Program that was in violation of law, including the Act and Board Rules; and (2) the Adams Campaign had failed to provide the Board, upon its request, documents, records, or other information that verified campaign activity by the deadline set forth by the Board.

44.     The March 17th Nonpayment Determination advised the Adams Campaign of its right to submit a petition for reconsideration to the Board, and of Mayor Adams's right to appear before the Board regarding the petition, pursuant to Board Rule 7-09.

45.     The Adams Campaign did not file a petition for reconsideration of the March 17th nonpayment determination.

46.     On April 2, 2025, the Adams Indictment was dismissed with prejudice.

47.     On April 14, 2025, the Board's staff provided a privileged and confidential memorandum to the Board analyzing the legal effect of the dismissal of the Indictment on the

question of whether there was reason to believe that, in the course of Program participation, Mayor Adams engaged in conduct detrimental to the Program and in violation of law. In addition, the staff provided to the Board numerous publicly available documents related to the allegations in the Indictment and the dismissal:

a.  the Indictment;

b.  a federal criminal complaint alleging crimes committed by Mayor Adams's associate Mohamed Bahi in connection with an alleged straw donation scheme for Mayor Adams's 2021 mayoral campaign (a copy of the complaint is attached as Exhibit 14);

c.  a February 7, 2025 letter from former United States Attorney for the Southern District of New York Danielle Sassoon to Judges Dale E. Ho and Analisa Torres of the Southern District of New York, notifying them of Bahi's alleged intent to plead guilty to conspiracy to commit wire fraud (a copy of the letter is attached as Exhibit 15);

d.  a federal criminal information alleging that Mayor Adams's associate Erden Arkan committed wire fraud, in connection with an alleged straw donation scheme for Mayor Adams's 2021 mayoral campaign (a copy of the information is attached as Exhibit 16);

e.  the transcript of Arkan's allocution in which he pled guilty to that crime (a copy of the transcript of the plea hearing is attached as Exhibit 17);

f.  Acting Deputy Attorney General Emil Bove's February 10, 2025 memorandum to the U.S. Attorney's Office for the Southern District of New York, instructing

prosecutors to dismiss the charges against Adams without prejudice (a copy of the memorandum is attached as Exhibit 18);

g.   former United States Attorney for the Southern District of New York Danielle Sassoon's February 12, 2025 resignation letter (a copy of the letter is attached as Exhibit 19);

h.   Bove's February 13, 2025 letter accepting Sassoon's resignation (a copy of the letter is attached as Exhibit 20); and

i.   Judge Ho's April 2, 2025 Opinion and Order dismissing the charges against Adams with prejudice (a copy of the Opinion and Order is attached as Exhibit 21).

48.   At 10:38 p.m. on April 14, 2025, Vito Pitta emailed Jesse Schaffer a letter responding to the November 15th Request. A copy of the email and attached letter are attached as Exhibit 22. In the letter, Mr. Pitta states that Eric Adams 2021 and Eric Adams 2025 (the "Committees") had reviewed their records and found no responsive documents that had not already been submitted to the Board. The letter stated that "additionally, in preparing this response to the request for documentation, Counsel to the Committees identified past and current employees, consultants, and agents of the Committees who potentially could be in possession of documentation responsive to the CFB's request . . . These individuals all advised Counsel that they were in possession of no records which have not previously been provided to the [Board] by the Committees." The letter did not say that Mayor Adams himself had reviewed his records for responsive documents. This is a significant gap in the effort to respond to the Board's long-outstanding request for documents and information.

49.     On the morning of April 15, 2025, I attended a meeting in which the Board staff briefed the Board on the staff's public funds payment recommendation with respect to the Adams Campaign. At that meeting, the Board staff recommended that the Board determine the Adams Campaign to be ineligible for payment because: (1) there was reason to believe that Mayor Adams, in the course of Program participation, had engaged in conduct detrimental to the Program and in violation of law, including the Campaign Finance Act and Board Rules; (2) the Adams Campaign had failed to provide documents and information verifying campaign activity that had been requested by the Board by the deadline set by the Board; (3) the Adams Campaign had not demonstrated compliance with Admin. Code § 12-110, as determined by the COIB; and (4) the difference between the Adams Campaign's reported receipts and documented receipts was equal to or greater than 10%. Board staff also informed the Board that the Adams Campaign had submitted a response to the November 15th request the night before, months after the deadline set by the Board.

50.     At around 10:00 a.m., later that same day, the Board held a public meeting in which they voted to deny public funds to the Adams Campaign.

51.     Also on April 15, 2025, Board staff issued an Early Public Funds Nonpayment Determination to the Adams Campaign. A copy of that document is attached as Exhibit 23 (the "First April 15th Nonpayment Determination"). Later that day, the staff issued a revised Early Public Funds Nonpayment Determination to the Adams Campaign. A copy of that document is attached as Exhibit 24 (the "Second April 15th Nonpayment Determination"). On the same day, the staff also issued a Supplemental Notice regarding the nonpayment determination (the "April 15th Notice"). A copy of the April 15th Notice is attached as Exhibit 25.

52.     The Second April 15th Nonpayment Determination and the April 15th Notice explained that the Adams Campaign was not eligible for payment for three reasons[11]:

    a.  The Adams Campaign had not demonstrated compliance with Admin. Code § 12-110, as determined by the COIB. *See* Admin. Code. § 3-703(1)(m).

    b.  The Adams Campaign had failed to respond to the November 15th Request by the December 6, 2024 deadline set by the Board and in time for the Board to review the response prior to its April 15th meeting.

    c.  The Board had reason to believe that Mayor Adams had, in the course of public funds program participation, engaged in conduct detrimental to the Program that is in violation of federal, state, and/or city law, including the Act and the Board Rules.

53.     The April 15th Notice noted that the Board had reviewed all of the documents listed in Paragraph 47 related to the allegations in the Indictment and its dismissal.

54.     On April 21, 2025, Board staff member Hanna Egerton emailed Holli Hellman and Katherine Miller of the New York City COIB to ask for a list of incumbent candidates who had submitted their 2024 annual COIB disclosure reports. That same day, Holli Hellman responded and attached a list of incumbent candidates who had filed their reports. The list showed that Mayor Adams had submitted an initial filing on April 14, 2025 but that it had not been accepted by the COIB because it was not in compliance with Section 12-110 of the Admin.

---

[11] As noted *supra* footnote 6, the Second April 15th Nonpayment Determination mistakenly cited one incorrect reason for nonpayment and omitted two of the correct reasons for nonpayment. These errors were subsequently corrected in response to the Adams Campaign's 7-09 Petition.

Code, and therefore was not completed. A copy of the April 21, 2025 email chain and attachment are attached as Exhibit 26.

55.    On April 25, 2025 at 12:25 p.m., Ms. Hellman emailed Ms. Egerton an updated list of incumbent candidates who had submitted their 2024 annual COIB disclosure reports. A copy of the email and list are attached as Exhibit 27. The list again showed that Mayor Adams's filing had not been accepted by COIB and was not complete.

56.    At 4:39 p.m. on that same day, Ms. Miller responded to Ms. Egerton and Ms. Hellman and stated that Mayor Adams had filed an amendment to his disclosure and COIB had then accepted the disclosure filing as complete. A copy of this email is attached as Exhibit 28.

57.    At 7:32 p.m. on April 25, 2025, the Adams Campaign filed a petition for reconsideration pursuant to Board Rule 7-09 (the "7-09 Petition"). A copy of the email and attached 7-09 Petition is attached as Exhibit 29.

58.    The 7-09 Petition principally argued that:

a.    The Second April 15th Nonpayment Determination and the April 15th Notice did not adequately identify the basis for the Board's reason to believe that the candidate had engaged in conduct in violation of a law.

b.    It was improper for the Board to rely upon an indictment, an information, a complaint, the assertions of former prosecutors, or "dicta" in a judicial order to form the basis of their "reason to believe" under Board Rule 3-01(d)(ii)(B).

c.    The April 15th Notice included a "gratuitous reference" to Board Rule 3-01(d)(i)(A)(2) relating to the candidate's obligation to provide to the Board a response to the November 15th Request, since the Adams Campaign had submitted a response on the night of April 14, 2025.

d. There were discrepancies in the rules and statutes cited to support the nonpayment determination in the Second April 15th Nonpayment Determination and the April 15th Notice, thereby creating a lack of clarity as to the basis for the determination.

e. There was no basis to find the Adams Campaign ineligible for public funds based on its failure to timely file its annual Conflict of Interest Board disclosure because Mayor Adams filed the disclosure at 8:03 p.m. on April 14, 2025.

59. The 7-09 Petition further noted that Mayor Adams "waive[d] his right to appear before the Board in connection with [the] petition."

60. Board Rule 7-09(c) provides that if a petition is not "moot, facially meritless, or not in substantial compliance with the requirements of [7-09] . . . the Board will review the determination that is the subject of the petition within five business days of the filing of such petition." Board Rule 7-09(c)(i) further provides that where a candidate waives the right to appear before the Board, "[i]f the Board is unable to convene within five business days of receipt of the petition . . . then the Board may delegate to the Chair of the Board or the Chair's designee authority to make a determination regarding the petition."

61. The Board was unable to convene within five business days of receipt of the petition and therefore delegated to the Chair of the Board, Frederick Schaffer, the authority to make a determination regarding the petition.

62. On May 2, 2025, Board staff provided Chair Schaffer with a privileged and confidential legal memorandum analyzing the merits of the arguments presented in the 7-09 Petition. The memorandum attached the Second April 15th Nonpayment Determination, the April 15th Notice, the 7-09 Petition, and another privileged and confidential legal memorandum from the Board staff analyzing the standards for reviewing a 7-09 petition.

63.     On May 2, 2025, Chair Schaffer, using the authority given to him by the Board Rules, denied the Adams Campaign's 7-09 Petition.

64.     On that same day, Joseph Gallagher, the Board's General Counsel, emailed Mr. Pitta notifying him of Chair Schaffer's determination and responding to arguments in the 7-09 Petition. A copy of Mr. Gallagher's May 2nd email to Mr. Pitta is attached as Exhibit 30.

65.     Mr. Gallagher also attached to his email a corrected April 15th Nonpayment Determination (the "Corrected April 15th Nonpayment Determination") and an amended April 15th Notice (the "Amended April 15th Notice"). Copies of these documents are attached as Exhibits 31 and 32, respectively. The Corrected April 15th Nonpayment Determination corrected the mistakes referenced *supra* footnote 6, that were in the Second April 15th Nonpayment Determination and the Amended April 15th Notice provided additional detail on the violations of law which the Board had reason to believe had occurred.

66.     In his May 2nd email, Mr. Gallagher explained, *inter alia*, that:

   a.  The disclosure that Adams filed with the COIB on April 14, 2025 was incomplete and the Board understood that Mayor Adams only completed his disclosure on April 25, 2025. Further, Board Rule 3-05(b) requires candidates to "demonstrate" compliance with the COIB requirement at least "3 days prior to the next payment date." Not only had Mayor Adams failed to complete his COIB disclosure until ten days after the payment date, but also: (1) even his incomplete April 14th filing was done less than 3 days before the April 15th payment; and (2) the Adams Campaign had not submitted proof of the filing until April 25th.

   b.  The deadline set by the Board for a response to the November 15th Request was December 6, 2024. The Adams Campaign submitted a response 130 days after the

initial due date and less than 12 hours before the payment determination was to be made. Not only had the Adams Campaign failed to provide a response "by the deadline set forth by the Board," as required by Board Rule 3-01(d)(i)(A)(2), but also the "late response gave [Board] staff insufficient time to evaluate the sufficiency of the response or whether the contents might have an impact on the Campaign's eligibility, and the Campaign [had] not offered good cause for why it was unable to comply with the request earlier."

c.  The Board had already provided the Adams Campaign with a list of publicly available documents containing information indicating possible violations of federal, state, and/or City law by the candidate in the 2021 and 2025 election cycle but, pursuant to the Adams Campaign's request, the Board was providing the Amended April 15th Notice to give additional detail on the violations of law at issue.

67.  In his May 2nd email, Mr. Gallagher also invited the Adams Campaign "to provide any and all documentation and/or explanations to demonstrate to the Board that there is no reason to believe that the Candidate, in the course of public funds program participation, engaged in conduct detrimental to the public funds program that is in violation of Federal, State, and/or City Law, including the Campaign Finance Act and Board Rules."

68.  On May 5, 2025, the staff provided the Board with a privileged and confidential legal memorandum analyzing the merits of the arguments presented in the 7-09 Petition. The memorandum attached the Second April 15th Nonpayment Determination, the April 15th Notice, the 7-09 Petition, and another privileged and confidential legal memorandum from the Board staff analyzing the standards for reviewing a 7-09 petition.

69.    At a meeting on May 12, 2025, the Board voted to ratify Chair Schaffer's denial of the 7-09 Petition.

70.    On May 13, 2025, Mr. Gallagher sent the Adams Campaign a letter notifying them of the Board's May 12th determination. A copy of the letter is attached as Exhibit 33.

71.    The next opportunity for the Adams Campaign to demonstrate its eligibility for public matching funds is the July 15, 2025 payment date.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: June 20, 2025
        New York, NY

By:    _____
        Paul S. Ryan