# Exhibit 1

# NEW YORK CITY CAMPAIGN FINANCE BOARD | RULES

This booklet contains the rules adopted by the New York City Campaign Finance Board, as last revised on March 17, 2023. Campaign Finance Board rules are codified in Title 52 of the official compilation of the Rules of the City of New York (RCNY) (Lenz & Riecker, Inc.).

For more information about the Campaign Finance Program, please contact:

New York City Campaign Finance Board
100 Church Street, 12th Floor
New York, New York 10007
(212) 409-1800

New York City Campaign Finance Board
(Effective March 17, 2023)

i

# <u>Table of Contents</u>

Table of Contents .................................................................................................................... ii

**Chapter 1: Definitions and General Provisions** ................................................................ 1

§ 1-01 Scope of Rules. ............................................................................................................ 1

§ 1-02 Definitions. ................................................................................................................. 1

"Act" ...................................................................................................................................... 1

"Administrative law judge" .................................................................................................. 2

"Advance" ............................................................................................................................. 2

"Authorized committee" ....................................................................................................... 2

"Board" .................................................................................................................................. 2

"Board of Elections" ............................................................................................................. 2

"Business dealings with the city" ......................................................................................... 2

"Candidate" ........................................................................................................................... 2

"CAPA" .................................................................................................................................. 2

"Certification" ....................................................................................................................... 2

"Charter" ............................................................................................................................... 2

"Code" .................................................................................................................................... 2

"Contribution" ....................................................................................................................... 2

"Covered election" ................................................................................................................ 2

"Disclosure statement" ......................................................................................................... 2

"Doing business database" .................................................................................................... 2

"Domestic partner" ............................................................................................................... 2

"Donation" ............................................................................................................................. 2

"Election" .............................................................................................................................. 3

"Election cycle" ..................................................................................................................... 3

"Electronic means" ............................................................................................................... 3

"Entity" .................................................................................................................................. 3

"Expenditure" ........................................................................................................................ 3

"Fair market value" ............................................................................................................... 3

"Filer Registration" .............................................................................................................. 3

"Fund" .................................................................................................................................... 3

"Fundraising agent" .............................................................................................................. 3

"Hearing officer" ................................................................................................................... 4

"Inauguration expenses" ....................................................................................................... 4

"In-kind contribution" ........................................................................................................... 4

"Intermediary" ....................................................................................................................... 4

"Labor organization" ............................................................................................................ 4

"Loan" ................................................................................................................................... 4

"Matchable contribution" ..................................................................................................... 4

"Mobile fundraising vendor" ................................................................................................ 4

"Non-participant" ................................................................................................................. 4

"OATH" ................................................................................................................................. 4

"On the ballot" ..................................................................................................................... 4

"Optional early public funds payment" ................................................................................ 4

"Other receipts" .................................................................................................................... 4

"Participant" ......................................................................................................................... 5

"Political committee" ............................................................................................................ 5

"Principal committee" ........................................................................................................... 5

"Program" ............................................................................................................................. 5

"Public funds" ....................................................................................................................... 5

"Receipts" .............................................................................................................................. 5

"Registered user" .................................................................................................................. 5

"Reporting period" ................................................................................................................ 5

"Segregated account" ........................................................................................................... 5

"Single source" ...................................................................................................................... 5

"Text message contribution" ................................................................................................. 5

"Transfer" .............................................................................................................................. 5

"Transition and inauguration entity" or "TIE" ...................................................................... 5

"Transition expenses" ........................................................................................................... 5

"Treasurer" ............................................................................................................................ 6

§ 1-03 The Board. ........................................................................................................................ 6

(a) The Board is nonpartisan. ............................................................................................... 6

(b) Board members and staff are governed by ethical standards .......................................... 6

(c) Board administration of the Fund .................................................................................... 6

(d) Advisory opinions ............................................................................................................ 7

(e) Public petitions for rulemaking ....................................................................................... 7

§ 1-04 Deadlines. ......................................................................................................................... 8

(a) Computation of days ........................................................................................................ 8

(b) Meeting Board deadlines ................................................................................................. 8

§ 1-05 Legibility of submissions. ................................................................................................. 9

§ 1-06 Severability. ...................................................................................................................... 9

**Chapter 2: Registration and Certification** ................................................................... 9

§ 2-01 Filer Registration. .......................................................................................... 9

(a) Not a statement of intent ............................................................................ 9

(b) Applicable requirements ........................................................................... 9

(c) Deadline ..................................................................................................... 10

(d) Form .......................................................................................................... 10

(e) Contents .................................................................................................... 10

(f) Small campaign registration. ................................................................... 10

§ 2-02 Certification. .................................................................................................. 11

(a) Applicability ............................................................................................. 11

(b) Deadlines ................................................................................................... 11

(c) Failure to timely certify ........................................................................... 11

(d) Rescission ................................................................................................. 12

(e) Form .......................................................................................................... 12

(f) Contents .................................................................................................... 12

(g) Legal effect ............................................................................................... 12

§ 2-03 Amendments to Filer Registration or Certification. ...................................... 12

§ 2-04 Non-participants. ........................................................................................... 13

§ 2-05 Petition for extraordinary circumstances ...................................................... 13

§ 2-06 Training. .......................................................................................................... 14

**Chapter 3: Eligibility to Receive Public Funds** ....................................................... 14

§ 3-01 Candidates must demonstrate eligibility. ....................................................... 14

§ 3-02 Disqualification from ballot. .......................................................................... 17

(a) Notice of appeal ........................................................................................ 17

(b) Disqualification reversed ......................................................................... 17

§ 3-03 Write-in candidates. ....................................................................................... 17

§ 3-04 Termination of candidacies. ........................................................................... 17

§ 3-05 Proof of filing with the Conflicts of Interest Board; payment of penalties. ... 18

(a) Requirements ............................................................................................. 18

(b) Due dates .................................................................................................. 18

**Chapter 4: Records and Reporting** .......................................................................... 18

§ 4-01 Records to be kept. ......................................................................................... 18

(a) Generally ................................................................................................... 18

(b) Receipts .................................................................................................... 19

(c) Disbursements .......................................................................................... 24

(d) Bank records ............................................................................................. 27

(e) Fundraisers ......................................................................................................... 27

(f) Campaign offices ................................................................................................. 27

§ 4-02 Record retention ................................................................................................ 27

§ 4-03 Assistance to candidates. .................................................................................. 27

§ 4-04 Failure to maintain or provide records. ............................................................ 28

§ 4-05 Disclosure statements. ...................................................................................... 28

§ 4-06 Daily disclosures during the two weeks preceding the election. ...................... 35

§ 4-07 Final Statement. ................................................................................................ 36

§ 4-08 Write-in candidates. .......................................................................................... 36

§ 4-09 Candidates not in primary or general elections. ............................................... 36

(a) Not in primary election ........................................................................................ 36

(b) Not in general election ......................................................................................... 37

§ 4-10 Other political committees. ............................................................................... 37

**Chapter 5: Contributions, Loans, and Other Receipts** ................................................ 37

§ 5-01 Contribution limits. ........................................................................................... 37

§ 5-02 Solicitation of contributions. ............................................................................ 37

(a) Fundraising solicitations ...................................................................................... 37

(b) Solicitation of contributions for elections not subject to the Act ........................ 38

§ 5-03 Prohibited contributions and loans. .................................................................. 38

(a) Contributions and loans from corporations, limited liability companies, and partnerships, including professional corporations and limited liability partnerships ........................... 38

(b) Nominee contributions ......................................................................................... 38

(c) Anonymous contributions ..................................................................................... 38

(d) Contributions from foreign nationals ................................................................... 38

(e) Cash contributions in excess of $100 ................................................................... 38

(f) Contributions in violation of state or federal law ................................................. 38

§ 5-04 Contributions subject to special requirements. ................................................ 39

(a) Contributions from political committees .............................................................. 39

(b) Contributions from minors ................................................................................... 40

(c) Contributions from joint contributors ................................................................... 40

(d) Post-election contributions ................................................................................... 40

(e) Text message contributions .................................................................................. 40

§ 5-05 Non-matchable contributions ........................................................................... 41

(a) In-kind contributions and loans ............................................................................ 41

(b) Purchase price ....................................................................................................... 41

(c) Certain contributions from vendors ...................................................................... 41

(d) Doing business, lobbyist, and lobbyist-related contributions.....................................41

(e) Contributions intermediated by a person doing business with the city .....................41

(f) Contributions from business accounts .........................................................................41

(g) Prohibited or excess contributions .............................................................................41

(h) Returned contributions ...............................................................................................41

(i) Unitemized contributions ............................................................................................41

(j) Contributions with unreported occupation, employer, and business address............42

(k) Contributions from minors .........................................................................................42

(l) Contributions in violation of law ................................................................................42

(m) Contributions from entities........................................................................................42

(n) Contributions not from New York City residents ......................................................42

(o) Contributions made after the election year.................................................................42

(p) Contributions for other elections ...............................................................................42

(q) Claims exceeding the gross amount of the contribution ...........................................42

(r) Excess matching claims ..............................................................................................42

(s) Contributions made with checks drawn by someone other than the contributor ......42

(t) Contributions to other committees ..............................................................................42

(u) Contributions not timely and properly reported ........................................................43

(v) Contributions claimed after the year of the election .................................................43

(w) Contributions not properly documented....................................................................43

(x) Contributions made with consecutively numbered cashier's checks or money orders ............43

(y) Cash, money order, or cashier's check contributions exceeding $100.......................43

(z) Withdrawn matching claims .......................................................................................43

(aa) Non-matchable contributions ...................................................................................43

(bb) Additional factors .....................................................................................................43

§ 5-06 In-kind contributions. ...........................................................................................43

(a) An in-kind contribution is an expenditure .................................................................43

(b) The value of an in-kind contribution .........................................................................44

(c) Good or service purchased below fair market value ..................................................44

(d) Extension of credit that is not commercially reasonable is an in-kind contribution ................44

(e) Debt forgiven is an in-kind contribution ...................................................................44

(f) Failing to report a liability leads to a presumption of an in-kind contribution .........45

§ 5-07 Refunding prohibited and over-the-limit contributions. .......................................45

(a) Generally ....................................................................................................................45

(b) Contribution refunds must be timely..........................................................................45

(c) Contribution refunds must be documented and reported...........................................45

(d) Restrictions on return ....................................................................................................... 46

(e) Where refund is impracticable ......................................................................................... 46

(f) Over-the-limit contributions from contributors doing business with the city ........................... 46

§ 5-08 Contributions originally received for other elections. ............................................................ 47

(a) Transfers ......................................................................................................................... 47

(b) Surplus funds .................................................................................................................. 47

(c) Additional requirements for transfers and surplus funds ................................................... 47

(d) Related expenditures ....................................................................................................... 48

§ 5-09 Loans. ...................................................................................................................................... 48

(a) Deposit ............................................................................................................................ 48

(b) Loans over $100 may not be made by cash or credit card ................................................. 48

(c) Loans forgiven ................................................................................................................ 48

(d) Third party repayment of loan ......................................................................................... 49

(e) Repayment by next election ............................................................................................. 49

(f) Loans made in regular course of business ......................................................................... 49

(g) Loans not made in regular course of business ................................................................... 49

(h) Attributing a loan to an election ...................................................................................... 49

(i) Post-election loans ........................................................................................................... 49

§ 5-10 Attributing contributions. ........................................................................................................ 50

(a) Attributing a contribution to an election ........................................................................... 50

(b) Attributing multiple contributions to a single source and contribution limit ...................... 50

(c) Attributing contribution amount for fundraiser ticket or fundraising item ........................... 51

§ 5-11 Use of receipts. ....................................................................................................................... 51

(a) Bank accounts .................................................................................................................. 51

(b) Receipts may be only used for the covered election .......................................................... 52

(c) Post-election use of receipts ............................................................................................. 53

§ 5-12 Court ordered rerun elections. ................................................................................................. 53

(a) No contributions may be accepted until court contest has begun ....................................... 53

(b) Where rerun election is canceled, contributions must be reasonably related to expenditures .. 53

**Chapter 6: Expenditures** ............................................................................................................... **54**

§ 6-01 Expenditure limits ................................................................................................................... 54

§ 6-02 Restrictions on expenditures .................................................................................................... 59

§ 6-03 Joint expenditures; endorsements. ........................................................................................... 62

(a) Generally ......................................................................................................................... 62

(b) Candidates must pay proportionally .................................................................................. 62

(c) Non-proportional payment may lead to in-kind contribution .............................................. 62

(d) Not joint expenditures ............................................................................................ 62

§ 6-04 Independent expenditures. ................................................................................ 63

(a) Factors for determining independence ................................................................. 63

(b) Board determination ............................................................................................. 64

(c) Presumed non-independent expenditures ............................................................ 64

(d) Non-independent expenditures are contributions and expenditures.................... 64

(e) Expenditures made by party committees or constituted committees.................... 64

(f) Running as a "ticket." ............................................................................................ 65

(g) Certain routine interactions with entities............................................................. 65

§ 6-05 Expenditures made by other committees established for the candidate........................ 66

§ 6-06 Identification of communications. .................................................................... 66

(a) "Paid for by." ......................................................................................................... 66

(b) "Authorized by." .................................................................................................... 66

(c) Form ...................................................................................................................... 67

(d) Languages other than English .............................................................................. 67

(e) Where identification would be impracticable......................................................... 67

§ 6-07 Routine communication sent by a political club to its members. ...................... 67

**Chapter 7: Pre-Election Public Funds Payments............................................................. 68**

§ 7-01 Eligibility. ....................................................................................................... 68

§ 7-02 Timing. ........................................................................................................... 69

(a) Payment Dates. ..................................................................................................... 69

(b) Preliminary review of disclosure statements; reasons for delay........................... 70

(c) Preliminary review of matching claims ................................................................. 70

(d) No candidate shall receive more than the maximum public funds payable amount for a single election, pursuant to § 3-705(2)(b) of the Code, any earlier than the day after the day of the primary election ...................................................................................................... 71

§ 7-03 Payment by electronic funds transfer............................................................... 71

§ 7-04 Public funds cap.............................................................................................. 71

§ 7-05 Small primaries. .............................................................................................. 72

§ 7-06 Withholdings.................................................................................................... 72

§ 7-07 Deductions from payments. ............................................................................. 73

§ 7-08 Notice to candidates. ....................................................................................... 75

§ 7-09 Petitions for review. ......................................................................................... 75

§ 7-10 Review of contributions and expenditures......................................................... 76

(a) Facial Determinations .......................................................................................... 76

(b) Petitions for reconsideration................................................................................. 76


**Chapter 8: Post-Election Public Funds Payments** ........................................................ 79

§ 8-01 Payment determinations ......................................................................................... 79

§ 8-02 Amount of post-election payment ........................................................................... 80

    (a) Reasons for post-election payment .......................................................................... 80

    (b) Statutory maximum .................................................................................................. 80

§ 8-03 Use of final post-election payment. ........................................................................ 80

§ 8-04 Disclosure statement amendments ......................................................................... 81

§ 8-05 Post-election petitions for review. .......................................................................... 81

**Chapter 9: Public Funds Repayments** ....................................................................... 81

§ 9-01 ....................................................................................................................................... 81

§ 9-02 Reasons for repayment. ........................................................................................... 82

    (a) Overpayment of public funds .................................................................................. 82

    (b) Qualified expenditure deficit ................................................................................... 82

    (c) Final bank balance ................................................................................................... 82

    (d) Breach of certification ............................................................................................. 84

    (e) Ballot disqualification .............................................................................................. 84

    (f) Ballot fraud ............................................................................................................... 84

    (g) Failure to actively campaign. ................................................................................... 84

    (h) Ceasing to campaign. ............................................................................................... 84

    (i) Other reasons for repayment ................................................................................... 84

    (j) Repayment is largest amount. .................................................................................. 85

**Chapter 10: Audit and Enforcement** ......................................................................... 85

§ 10-01 Audits ........................................................................................................................ 85

§ 10-02 Audit deadlines; optional post-election training. ................................................. 86

    (a) Candidates who attend a post-election training ...................................................... 86

    (b) Candidates who do not attend a post-election training............................................ 86

    (c) Deadline for attending post-election training .......................................................... 86

§ 10-03 Board determinations concerning violations, infractions, penalties, and repayment of public funds ....................................................................................................... 86

    (a) Notice and opportunity to contest ........................................................................... 86

    (b) Response to the notice ............................................................................................. 87

    (c) Final Board determination ....................................................................................... 87

    (d) Payment .................................................................................................................... 87

    (e) Penalty Guidelines ................................................................................................... 87

§ 10-04 Submission of false information. ............................................................................ 87

**Chapter 11: Procedural Rules for Formal Adjudications** .................................................................. 88

§ 11-01 Definitions. ........................................................................................................................ 88

"Case" ................................................................................................................................... 88

"Filing" ................................................................................................................................. 88

"Petition" .............................................................................................................................. 88

"Petitioner" ........................................................................................................................... 88

"Respondent" ........................................................................................................................ 88

§ 11-02 Applicability. ..................................................................................................................... 88

§ 11-03 Proceedings before designation of hearing officer. ........................................................... 88

§ 11-04 Designation of hearing officer. .......................................................................................... 88

§ 11-05 Commencement of proceedings and pleadings .................................................................. 88

(a) The petition .................................................................................................................... 88

(b) Service of the petition .................................................................................................... 89

(c) Answer ........................................................................................................................... 89

(d) Amendment of Pleadings ............................................................................................... 90

§ 11-06 Filing of Papers. ................................................................................................................ 90

(a) Generally ........................................................................................................................ 90

(b) Headings ........................................................................................................................ 90

(c) Means of service on adversary ....................................................................................... 90

(d) Proof of service ............................................................................................................. 90

§ 11-07 Docketing the Case at OATH. ........................................................................................... 90

§ 11-08 Disqualification of hearing officers. .................................................................................. 91

§ 11-09 Conferences. ...................................................................................................................... 91

§ 11-10 Notice of conference or hearing ........................................................................................ 91

§ 11-11 Adjournments. ................................................................................................................... 92

§ 11-12 Discovery. .......................................................................................................................... 92

§ 11-13 Pre-hearing motions. ......................................................................................................... 92

§ 11-14 Appearances at OATH ....................................................................................................... 92

§ 11-15 Ex-parte communications. ................................................................................................. 92

§ 11-16 Role of the hearing officer. ............................................................................................... 92

§ 11-17 Consolidation; separate hearings. ..................................................................................... 93

§ 11-18 Witnesses and documents. ................................................................................................. 93

§ 11-19 Subpoenas. ........................................................................................................................ 93

§ 11-20 Order of proceedings. ........................................................................................................ 93

§ 11-21 Interpreters. ....................................................................................................................... 93

§ 11-22 Failure to appear. .............................................................................................................. 93

§ 11-23 Evidence at the hearing.........................................................................93

§ 11-24 Official notice.....................................................................................94

§ 11-25 Public access to proceedings..................................................................94

§ 11-26 Hearing motions..................................................................................94

§ 11-27 Transcript...........................................................................................94

§ 11-28 Decision made on the record..................................................................94

§ 11-29 Written comments................................................................................94

§ 11-30 Final determination..............................................................................95

**Chapter 12: Investigations and Complaints** ..................................................95

§ 12-01 Investigations.....................................................................................95

§ 12-02 Complaints.........................................................................................95

(a) Filing a complaint................................................................................95

(b) Complaint requirements.........................................................................95

(c) Initial review of complaint.....................................................................96

(d) Response to complaint; possible dismissal ..............................................96

(e) Board action.......................................................................................97

**Chapter 13: Transition and Inauguration Entities** .......................................97

§ 13-01 Registration........................................................................................97

§ 13-02 Periodic disclosure reports....................................................................97

§ 13-03 Limits and requirements.......................................................................99

(a) Donations and receipts .........................................................................99

(b) Expenditures....................................................................................101

(c) Termination......................................................................................102

§ 13-04 Records and audit...............................................................................102

§ 13-05 Other provisions concerning TIEs..........................................................103

**Chapter 14: Disclosure of Independent Expenditures**...................................104

§ 14-01 Definitions.......................................................................................104

"Authorized representative"......................................................................104

"Ballot proposal"...................................................................................104

"Clearly identified".................................................................................104

"Contribution".......................................................................................104

"Covered communication".........................................................................104

"Covered election"..................................................................................104

"Covered expenditure".............................................................................104

"Electioneering communication"..................................................................104

"Entity" .................................................................................................................................... 104

"Express advocacy communication" ....................................................................................... 105

"Independent expenditure" ...................................................................................................... 105

"Independent spender" ............................................................................................................. 105

"Mass mailing" ......................................................................................................................... 105

"Principal owner" ..................................................................................................................... 105

"Telephone communication" .................................................................................................... 105

"Text message communication" ............................................................................................... 105

§ 14-02 Disclosure statements. ...................................................................................................... 105

(a) Filer information. .................................................................................................................. 105

(b) Communications. ................................................................................................................. 106

(c) Expenditures. ....................................................................................................................... 107

(d) Contributions. ...................................................................................................................... 108

(e) Verification. .......................................................................................................................... 109

(f) Format. .................................................................................................................................. 109

§ 14-03 Disclosure dates. ............................................................................................................... 109

(a) Filing dates. .......................................................................................................................... 109

(b) Reporting periods. ............................................................................................................... 109

§ 14-04 Identification of communications. .................................................................................... 110

(a) Independent spender identification. .................................................................................... 110

(b) "Top donor(s)" identification ............................................................................................. 111

(c) Languages other than English. ............................................................................................ 111

(d) Modification ........................................................................................................................ 111

§ 14-05 Non-independent expenditures. ........................................................................................ 112

§ 14-06 Guidance for independent spenders. ................................................................................. 112

§ 14-07 Document retention. .......................................................................................................... 112

§ 14-08 Penalties. ............................................................................................................................ 113

§ 14-09 Other provisions concerning independent expenditures. ................................................. 113

**Chapter 15: Special Elections** ...................................................................................................... 113

§ 15-01 Special requirements and procedures. .............................................................................. 113

§ 15-02 Filing requirements. .......................................................................................................... 113

(a) Certification .......................................................................................................................... 113

(b) Filer Registration ................................................................................................................. 113

(c) Candidates raising funds for other elections within the same election cycle ......................... 113

(d) Disclosure statements .......................................................................................................... 113

§ 15-03 Expenditures. ..................................................................................................................... 115

§ 15-04 Contributions. .................................................................................................................. 116

§ 15-05 Training........................................................................................................................... 117

§ 15-06 Independent expenditure disclosure................................................................................ 117

§ 15-07 Transition and inauguration entities. ............................................................................. 118

**Chapter 16: Voter Education and Engagement** ...................................................................... **118**

§ 16-01 Definitions. .................................................................................................................... 118

"Ballot proposal" .................................................................................................................. 118

"Candidate print statement" ................................................................................................. 118

"Candidate video statement".................................................................................................. 118

"Election".............................................................................................................................. 118

"Registered candidate".......................................................................................................... 118

§ 16-02 Contents of the Voter Guide. ........................................................................................ 119

(a) Generally ......................................................................................................................... 119

(b) Candidate statements ...................................................................................................... 119

(c) Ballot proposals .............................................................................................................. 123

§ 16-03 Voter Guide publication and distribution. ..................................................................... 124

§ 16-04 Elections not held as scheduled. .................................................................................... 125

**Chapter 17: Public Access to Information** ............................................................................. **125**

§ 17-01 Records available to the public....................................................................................... 125

§ 17-02 Records access officer. ................................................................................................... 125

§ 17-03 Requesting records......................................................................................................... 125

§ 17-04 Appealing a denial of access to records.......................................................................... 126

§ 17-05 Fees................................................................................................................................ 127

Back to TOC

# Chapter 1: Definitions and General Provisions

**§ 1-01 Scope of Rules.**

**Chapters 1 through 8** contain requirements applicable to candidates seeking nomination or election to the office of mayor, comptroller, public advocate, borough president, or member of the City Council ("Council member") during the pre-election period.

**Chapters 9 through 11** pertain to post-election audit and enforcement of candidates seeking nomination or election to the office of mayor, comptroller, public advocate, borough president, or Council member, as well as independent spenders.

**Chapter 12** pertains to investigations conducted by, and complaints filed with, the Board.

**Chapter 13** contains requirements for transition and inauguration entities ("TIEs"), which apply to all candidates elected to the office of mayor, comptroller, public advocate, borough president, or Council member, regardless of whether the elected candidate is a participant in the voluntary Campaign Finance Program.

**Chapter 14** contains requirements for disclosure of independent expenditures related to candidates seeking nomination or election to the office of mayor, comptroller, public advocate, borough president, or Council member, as well as ballot proposals.

**Chapter 15** contains requirements for special elections for the office of mayor, comptroller, public advocate, borough president, or Council member.

**Chapter 16** pertains to the Voter Guide and voter engagement and applies to candidates seeking nomination or election to the office of mayor, comptroller, public advocate, borough president, or Council member, as well as city ballot proposals or referenda.

**Chapter 17** contains requirements for public access to information as provided by the Freedom of Information Law.

Except as otherwise specified, the requirements of these rules related to authorized committees do not apply to an authorized committee that does not, at any time, aid or otherwise take part in an election in which the candidate is a participant or non-participant. Aiding or otherwise taking part in an election includes accepting contributions, loans, or other receipts, and making expenditures, including expenditures of surplus funds, for such election.

**§ 1-02 Definitions.**

**"Act"** means the New York City Campaign Finance Act, codified in Chapter 7 of Title 3 of the Code (§ 3-701, et seq.).

**"Administrative law judge"** means the hearing officer assigned to preside over a case that is referred to the Office of Administrative Trials and Hearings.

**"Advance"** means a payment for goods or services on behalf of a candidate made with the expectation that the payment will be reimbursed by the candidate.

**"Authorized committee"** means an authorized committee as defined in the Act.

**"Board"** means the Campaign Finance Board.

**"Board of Elections"** means the New York City Board of Elections, unless otherwise specified as the New York State ("State") Board of Elections.

**"Business dealings with the city"** means business dealings with the City of New York as defined in the Act.

**"Candidate"** means a candidate as defined in Article 14 of the New York State Election Law. Except as otherwise provided in these rules, a "candidate" includes every authorized committee of the candidate, the treasurer of each such committee, and any other agent of the candidate.

**"CAPA"** means the City Administrative Procedure Act, §§ 1041 to 1047 of the Charter.

**"Certification"** means the submission of the information required pursuant to section 2-02 in order to join the Program.

**"Charter"** means the New York City Charter.

**"Code"** means the Administrative Code of the City of New York.

**"Contribution"** means a contribution as defined in the Act.

**"Covered election"** means any election for the office of mayor, public advocate, comptroller, borough president, or Council member.

**"Disclosure statement"** means the campaign finance disclosure statement filed with the Board under Chapter 4 of these rules.

**"Doing business database"** means the computerized database containing the names of individuals and entities engaged in business dealings with the city as defined in the Act.

**"Domestic partner"** means a domestic partner as defined in § 1-112(21) of the Code.

**"Donation"** means a gift, subscription, advance, payment, or deposit of money or any thing of value, made by an individual or entity, in connection with the transition or inauguration expenses of an elected candidate, including but not limited to compensation for the personal

services rendered in connection with such transition or inauguration expenses without charge. A loan is deemed to be a donation, subject to the limits and restrictions of the Act, to the extent the loan is not repaid by the date that the elected candidate is sworn into office. The term "donation" shall not include:

(a) The value of personal services provided without compensation by individuals volunteering a portion or all of their time on behalf of a TIE, provided that such an individual may not provide any paid services to a TIE at the same time as such individual serves as a volunteer for that TIE;

(b) The use of real or personal property and the cost of invitations, food, and beverages voluntarily provided by an individual to a TIE on the individual's residential premises for TIE-related activities to the extent such services do not exceed $500 in value; and

(c) The travel expenses of any individual who, on the individual's own behalf, volunteers personal services to any TIE to the extent such expenses are unreimbursed and do not exceed $500 in value.

**"Election"** means any primary, special, or general election for nomination or election.

**"Election cycle"** means the period beginning on the first January 12 following the most recent general election for the specific office to which a candidate is seeking nomination or election and ending on the first January 11 following the next general election for that office.

**"Electronic means"** means facsimile transmission, email, or any other electronic manner of communication that shall be prescribed by the Board.

**"Entity"** means any organization of one or more individuals, and includes any parent, subsidiary, branch, division, department, or local unit thereof.

**"Expenditure"** means an expenditure as defined in the Act.

**"Fair market value"** means: (1) for goods, the price of those goods when received in the market in which they ordinarily would have been purchased; and (2) for services, other than those provided by an unpaid volunteer, the hourly or piecework charge for the services at a commercially reasonable rate prevailing when the services were rendered.

**"Filer Registration"** means the submission of the information required pursuant to section 2-01 prior to the filing of disclosure statements.

**"Fund"** means the New York City Election Campaign Finance Fund established by the Act.

**"Fundraising agent"** means any of the following individuals or entities that have accepted or may accept contributions on behalf of the candidate: (1) paid or volunteer full-time campaign workers; or (2) commercial fundraising firms retained by the candidate and the agents thereof.

**"Hearing officer"** means the person assigned to preside over a case before OATH.

**"Inauguration expenses"** means expenses for an inaugural event held within seven days before or 30 days after the elected candidate is officially sworn into office. Factors used by the Board in determining whether an event is an inaugural event include but are not limited to: (1) the celebratory or commemorative nature of the event; (2) the location of the event in relation to the geography of the elected official's district; and (3) the inclusion of non-celebratory and/or commemorative functions, including but not limited to constituent outreach or services. The burden of proving that an event is an inaugural event rests with the TIE.

**"In-kind contribution"** means: (1) a gift, subscription, loan, advance of, or payment for, any thing of value (other than money) made to or for any candidate; or (2) the payment by any individual or entity other than an authorized committee of compensation for the personal services of another individual or entity which are rendered to the candidate without charge. "In-kind contribution" does not include personal services provided without compensation by individuals volunteering a portion or all of their time on behalf of a candidate.

**"Intermediary"** means an intermediary as defined in the Act.

**"Labor organization"** means a labor organization as defined in the Act.

**"Loan"** means a monetary payment made to an authorized committee with the expectation that the funds will be repaid by such committee.

**"Matchable contribution"** means a matchable contribution as defined in the Act.

**"Mobile fundraising vendor"** means any persons or entities that provided services to a candidate related to the processing or receipt of any text message contribution.

**"Non-participant"** means a candidate for nomination or election to a covered office who has not filed a Certification as a participant. Except as otherwise provided in these rules, a "non-participant" includes the candidate, every political committee authorized by the candidate for the covered election, the treasurer of each such committee, and any other agent of the candidate.

**"OATH"** means the Office of Administrative Trials and Hearings.

**"On the ballot"** means on the ballot as provided in Article 6 of the New York State Election Law and as recorded on the Board of Elections nomination or designation ledgers or contest lists.

**"Optional early public funds payment"** means a disbursement of optional public financing occurring prior to two weeks after the last day to file designating petitions for a primary election.

**"Other receipts"** means payments received by a candidate that are not contributions or loans, such as interest, dividends, proceeds from sales or leases of assets, and any other sources of income.

"**Participant**" means a candidate for nomination or election to a covered office who has chosen to join the Program for an election by submitting a Certification pursuant to § 3-703(1)(c) of the Code. Except as otherwise provided in these rules, a "participant" includes the candidate, the principal committee authorized by the candidate pursuant to § 3-703(1)(e) of the Code, the treasurer of such committee, and any other agent of the candidate.

"**Political committee**" means a political committee as defined in the Act.

"**Principal committee**" means the principal committee as defined in the Act.

"**Program**" means the New York City Campaign Finance Program established by the Act.

"**Public funds**" means monies disbursed from the Fund.

"**Receipts**" means monetary and in-kind contributions, loans, and any other payment received by a candidate.

"**Registered user**" means the individual registered with the wireless carrier to use the specific mobile device from which a contribution made via text message was initiated.

"**Reporting period**" means a time period covered by a disclosure statement, as described in section 4-05.

"**Segregated account**" means a bank account that may be established by a participating candidate in accordance with section 7-07(b).

"**Single source**" means any individual, individuals in combination, entity, or entities in combination that establish, maintain, or control another entity and every entity so established, maintained, or controlled, including every political committee established, maintained, or controlled by the same individual, individuals in combination, entity, or entities in combination.

"**Text message contribution**" means a text message contribution as defined in the Act.

"**Transfer**" means any exchange of funds or any other thing of value between political committees, other than multicandidate committees, authorized by the same candidate pursuant to § 14-112 of the New York State Election Law.

"**Transition and inauguration entity**" or "**TIE**" means an entity established by an elected candidate to raise and spend private funds for transition or inauguration expenses.

"**Transition expenses**" means expenses relating to an elected candidate's transition into office for goods and services received, used, or rendered before the elected candidate's date of inauguration. Transition expenses shall be limited to those incurred solely for the purpose of preparing to take office, such as those listed in section 13-03(b)(i). Incumbent elected candidates shall not incur transition expenses, except for expenditures made for the purpose of furthering the elected candidate's selection as Speaker of the City Council.

"**Treasurer**" means the treasurer of any authorized committee involved in a covered election, except as otherwise provided in these rules.

## § 1-03 The Board.

(a) The Board is nonpartisan.

(i) Pursuant to § 3-708 of the Code, the Board consists of five members.

(A) Two Board members are appointed by the Speaker of the City Council ("Speaker"). No more than one of them shall be enrolled in any one political party.

(B) Two Board members are appointed by the Mayor. No more than one of them shall be enrolled in any one political party.

(C) The chair of the Board is appointed by the Mayor in consultation with the Speaker.

(ii) The Board shall conduct all its activities in a strictly nonpartisan manner.

(b) Board members and staff are governed by ethical standards.

(i) The Act and the Charter. Board members and staff are subject to the standards set forth in the Act and in Chapter 46 of the Charter.

(ii) Ethical guidelines. The Board shall establish and publish ethical guidelines governing the conduct of its members and staff.

(iii) Additional city ethical guidelines. Board members and staff are subject to the standards set forth in Chapter 68 of the Charter.

(c) Board administration of the Fund. To safeguard the administration of the Fund and assure candidates that sufficient public funds will be available to make all payments required by the Act in upcoming elections, the Board shall:

(i) make budget requests for the Fund sufficient to cover all anticipated Fund obligations in the upcoming fiscal year and to maintain a reserve for contingencies;

(ii) when it has determined that monies in the Fund are insufficient or likely to be insufficient for payments to candidates, report this determination to the Commissioner of Finance and provide its estimate of the additional amount which will be necessary to make such payments pursuant to the Act (together with a detailed statement of the assumptions and methodologies on which the estimate is based), as required by § 1052(a)(10) of the Charter, not more than four days after which the Commissioner of

Finance is required by § 1052(a)(10) of the Charter to transfer an amount equal to the Board's estimate from the city's general fund to the Fund;

(iii) take steps to ensure that the Fund is maintained in a separate account, credited with all sums appropriated therefor and all earnings accruing thereon, in the custody of the comptroller on behalf of the Board, as required by § 1052(a)(10) of the Charter;

(iv) take steps to ensure that the Fund and its administration are insulated from the risk of improper action by any city official or agency or any agent or contractor thereof;

(v) subject the Fund to periodic audits by independent outside auditors; and

(vi) take such other actions as are necessary and proper to ensure the integrity of the Fund.

**(d) Advisory opinions.** Upon the written request of a candidate or any other individual or entity, the Board shall issue an advisory opinion interpreting the Act and these rules, or otherwise respond in writing to the request, within 30 days of receipt of such request, or within 10 business days of receipt if such request is received less than 30 days before a covered election, to the extent practicable. At its discretion, the Board may issue advisory opinions in the absence of a request. The Board shall make public its advisory opinions and the questions of interpretation for which advisory opinions will be considered by the Board, including by publication on its website.

(e) Public petitions for rulemaking.

(i) Procedures for submitting petitions.

(A) Any individual or entity may petition the Board to consider the adoption of a rule. The request must be sent to the Executive Director and contain the following information:

(1) the rule to be considered, with proposed language for adoption;

(2) a statement of the Board's authority to promulgate the rule and its purpose;

(3) arguments in support of adoption of the rule;

(4) the period of time the rule should be in effect; and

(5) the name, address, telephone number, and signature of the petitioner or the petitioner's authorized representative.

(B) Any change in the information provided pursuant to clause (5) of subparagraph (A) must be communicated promptly in writing to the Executive Director.

(C) All requests should be typewritten or submitted electronically, if possible, but handwritten petitions will be accepted, provided they are legible.

**(ii) Responses to petitions.** Within 60 days from the date the petition was received, the Board shall either deny such petition in a written statement containing the reasons for denial, or shall state in writing the Board's intention to grant the petition and to initiate rulemaking by a specified date. In proceeding with such rulemaking, the Board shall not be bound by the language proposed by petitioner, but may amend or modify such proposed language at the Board's discretion. The Board's decision to grant or deny a petition is final.

## § 1-04 Deadlines.

(a) Computation of days.

**(i) Counting calendar days.** Where a number of days is specified as a period from a certain day, the days will be counted as the number of calendar days except for the first day of the counting period.

**(ii) Where holiday falls within two-day counting period.** If the counting period is two days in duration, then Saturday, Sunday, or a legal holiday must be excluded if it falls on the first or last day of the counting period.

**(iii) Weekends and holidays.** If the scheduled date of a public funds payment, or the deadline for submitting a Certification or for filing a disclosure statement, other than a daily pre-election disclosure statement, falls on a Saturday, Sunday, or legal holiday, the next business day becomes the deadline or scheduled payment date.

(b) Meeting Board deadlines.

**(i) Submission in person.** Submissions filed in person on weekdays between the hours of 9:00 a.m. and 5:00 p.m. at the offices of the Board, unless otherwise provided, are deemed submitted upon receipt, subject to review and acceptance.

(ii) Submission by electronic means, non-electronic mail or common carrier.

**(A) Electronic submissions.** A submission sent electronically shall be deemed filed when received by the Board, subject to review and acceptance.

(B) Non-electronic submissions.

**(1) With postmark.** A submission sent by non-electronic mail or common carrier shall be deemed to have been received, subject to review and acceptance, on the date it was postmarked or date stamped by the carrier.

**(2) Without postmark.** Submissions sent by non-electronic mail in an envelope without a postmark will be presumed to have been sent three days prior to receipt, subject to review and acceptance, unless evidence presented to the Board, such as a post office receipt with a date stamp indicating when the submission was sent, demonstrates otherwise.

**(iii) Board evaluation of submissions that arrive after the deadline.** Submissions of disclosure statement documentation that arrive after 5:00 p.m. on the date of the deadline, even if submitted on or before 11:59 p.m. on such date, may prevent the Board from making a timely determination regarding payment of public funds. The Board shall make such a determination at such time as is practicable.

## § 1-05 Legibility of submissions.

The Board will not accept any electronic disclosure statement or other document, or any part thereof, that is infected with a virus, damaged, blank, improperly formatted, or otherwise unreadable or illegible.

## § 1-06 Severability.

(a) If any provision of these rules or portion thereof is adjudged invalid by a court of competent jurisdiction, such determination shall not affect or impair the validity of the remainder of these rules.

(b) If the application of any provision of these rules or portion thereof to any individual, entity, or circumstances is adjudged invalid by a court of competent jurisdiction, such determination shall not affect or impair the application thereof to other individuals, entities, and circumstances.

# Chapter 2: Registration and Certification

## § 2-01 Filer Registration.

A candidate must submit a Filer Registration, prior to filing disclosure statements, in the form and manner required by the Board, unless such candidate has previously submitted a Certification for the same election.

**(a) Not a statement of intent.** The submission of a Filer Registration shall not be construed as a statement of intent to join the Program.

**(b) Applicable requirements.** Because the requirements of the Act and these rules apply to financial transactions that take place before a candidate joins the Program, the Board advises candidates to begin compliance with all applicable requirements set forth in the Act and these rules prior to joining the Program.

**(c) Deadline.** A candidate must submit a complete Filer Registration no later than the day that the candidate files the first disclosure statement for an election.

**(d) Form.** The Filer Registration must contain any signatures and notarizations as may be required by the Board.

**(e) Contents.** The Filer Registration must include:

(i) the candidate's name, residential address information and telephone numbers, email address, and employment information;

(ii) a sworn statement from the candidate authorizing the committee to make, on the candidate's behalf, any filings as may be required by the Board to disclose all financial activity, including that of the candidate, related to the candidate's campaign;

(iii) the name and mailing address, and treasurer name, treasurer residential address information and telephone numbers, treasurer email address, and treasurer employment information, of every political committee authorized by the candidate that has not been terminated, and, in the case of a participant or limited participant, an indication of which such committee is the principal committee, and a sworn statement from the treasurer of such committee that the candidate has authorized the committee to aid or take part in this election;

(iv) the name, mailing address, email address, and telephone number of any person designated by the candidate to act as liaison with the Board for each committee filing disclosure statements;

(v) by the earlier of the candidate's first required disclosure statement filing or 15 business days following submission of the Filer Registration, identification of all bank accounts and other depository accounts, including merchant and payment processor accounts, into which receipts have been, or will be, deposited, and all bank accounts used for the purpose of repaying debt from a previous election; all bank accounts used for the purpose of repaying debt from a previous election;

(vi) the specific office to which the candidate is seeking nomination or election; and

(vii) other information as required by the Board.

**(f) Small campaign registration.**

(i) If neither the expected total cumulative receipts nor the expected total cumulative expenditures of a campaign, including expenditures made with the candidate's personal funds, exceeds an amount equal to the amount applicable to qualify for the exception provided in § 14-124(4) of the New York State Election Law, the candidate may, instead of submitting a Filer Registration, submit a small campaign registration form, which must

contain such information as may be required by the Board. The small campaign registration form must also include an affirmation stating that neither the total cumulative receipts nor the total cumulative expenditures of the campaign, including expenditures made with the candidate's personal funds, will exceed the amount applicable to qualify for the exception provided in § 14-124(4) of the New York State Election Law, and that if such amount is exceeded, beginning on or before the deadline to file the next disclosure statement, the candidate will submit a Filer Registration and all subsequent required disclosure statements, which must include all prior financial activity beginning at the inception of the campaign.

(ii) A candidate who has filed a small campaign registration form pursuant to this section need not submit disclosure statements. If a candidate who has filed a small campaign registration form raises or spends an amount exceeding the amount necessary to qualify for the exception provided in § 14-124(4) of the New York State Election Law, the candidate must submit a Filer Registration and all subsequent required disclosure statements, beginning on or before the deadline to file the next disclosure statement. The first such statement filed must include all prior financial activity beginning at the inception of the campaign.

## § 2-02 Certification.

To join the Program, a candidate must submit a Certification by the deadline as provided in §§ 3-703(1)(c) and 3-705(4) of the Code. A candidate may submit a Certification, instead of the Filer Registration, before filing disclosure statements.

**(a) Applicability.** The Certification applies to all covered elections that are held in the same calendar year or to a special election to fill a vacancy in an office covered by the Act. A candidate only needs to file one Certification for the primary and general elections. Special elections and all other elections require separate Certifications.

**(b) Deadlines.**

(i) For primary and general elections, the deadline for filing a Certification is the later of the ninth Monday preceding the primary election or the thirtieth day after a special election is held to fill a vacancy for the office sought by the candidate. To be eligible to receive an optional early public funds payment, candidates must file a Certification no less than fifteen business days before the date on which the payment is scheduled to be made.

(ii) If the Board declares an extraordinary circumstance, the deadline for filing a Certification will be the seventh day following the declaration.

**(c) Failure to timely certify.** A candidate who does not file a timely Certification is a non-participant.

**(d) Rescission.** A candidate who files a Certification prior to the deadline may rescind the Certification by submitting a Certification rescission form on or before the deadline or prior to receiving public funds, whichever happens first. A candidate who timely rescinds a Certification is a non-participant and may not submit an additional Certification for the same election cycle.

**(e) Form.** The Certification must contain any signatures and notarizations required by the Board. Certifications submitted non-electronically must contain original notarized signatures from both the candidate and the principal committee treasurer.

**(f) Contents.** The Certification must include all filer registration information required by section 2-01 and such other information as required by the Board, including all information necessary to receive payment by electronic funds transfer. In the Certification, the candidate shall designate a principal committee.

**(g) Legal effect.** The candidate must comply fully with Program requirements in all elections for which the Certification is submitted, regardless of the office sought and regardless of whether the candidate: (1) meets all the requirements of law to have such candidate's name on the ballot in the election; (2) meets the Act's threshold for eligibility for public funds; (3) accepts public funds; or (4) is otherwise eligible to receive public funds in the election.

## § 2-03 Amendments to Filer Registration or Certification.

(a) The candidate must notify the Board of any material change in the information required to be listed on the candidate's Filer Registration or Certification, including any new information or any change to any required information, concerning any political committee, bank account, merchant or payment processor account, candidate or treasurer employment, address, telephone number, or email address, in such manner as may be provided by the Board, if such change occurs prior to the covered election or within a period of five years from the filing of a final statement showing satisfaction of all liabilities and disposition of all assets arising from the covered election, including payment of any penalties or repayment of public funds owed to the Board. Such notification must be submitted no later than the next deadline for filing a disclosure statement, or, in the case of changes that occur after the deadline for the final disclosure statement required to be filed, no later than 30 days after the date of the change.

(b) A candidate may amend the Certification with regard to the specific office sought on or before the certification deadline or prior to receiving public funds, whichever happens first.

(i) A candidate may amend the Certification with regard to the specific office sought if the Board declares an extraordinary circumstance pursuant to § 3-703(1)(c)(iii) of the Code, provided that such declaration pertains to the election for either the candidate's original office sought or the candidate's new office sought. The candidate must refund the excess portion of any contributions that exceed the limits applicable to the new office

sought, raise additional funds required to meet the threshold applicable to the new office sought, and repay any amount of public funds previously received that exceeds the amount the candidate is eligible to receive for the new office sought. A candidate who fails to promptly satisfy the requirements of this paragraph may be required to repay all public funds previously received for the covered election.

(ii) Absent a declaration of an extraordinary circumstance, a candidate who amends the Certification with regard to the specific office sought after receiving public funds shall remain a participant, but shall be ineligible to receive additional public funds for the covered election and shall be required to repay all public funds previously received for that election.

(c) If the treasurer of a candidate's principal committee resigns or is removed, the Board will consider the candidate to be the treasurer of the principal committee until the candidate submits an amended Filer Registration or Certification that designates a new treasurer.

## § 2-04 Non-participants.

A non-participant is not eligible to receive public funds pursuant to § 3-705 of the Code and shall not be subject to the expenditure limitations provided in § 3-706 of the Code. A non-participant is not subject to the contribution limitations set forth in §§ 3-703(1)(f) and (1-a) of the Code when such contributions are made from the non-participant's personal funds or personal property, including funds or property jointly held with the non-participant's spouse, domestic partner, or unemancipated children. A non-participant is subject to the contribution and disclosure requirements provided in § 3-718 of the Code, and may be subject to penalties pursuant to §§ 3-710.5 and 3-711 of the Code for violations of the Act and of these rules.

## § 2-05 Petition for extraordinary circumstances

(a) Pursuant to § 3-703(1)(c) of the Code, a Certification may be filed on or before the seventh day after the occurrence of an extraordinary circumstance in a covered election. A candidate in such election may file a petition setting forth facts alleged to constitute an extraordinary circumstance within seven days of the date on which the candidate reasonably believes that the extraordinary circumstance occurred. The Board, following review of the petition, or on its own initiative, may declare an extraordinary circumstance.

(b) An "extraordinary circumstance" includes: (i) the death of a candidate in an election, (ii) the resignation or removal of the person holding the office sought, and (iii) the submission to the Board of a written declaration, sworn to or affirmed by the holder of the office sought, terminating such officeholder's campaign for reelection (which may be submitted together with a petition under subdivision (a)).

Back to TOC

**§ 2-06 Training.**

A candidate or the candidate's representative must attend a training provided by the Board concerning compliance with the requirements of the Program and use of the disclosure software. The training must be completed on or before the final day of the 32-day pre-primary election disclosure period; provided, however, that for the candidate to be eligible to receive a public funds payment, such training must be completed on or before the final day of the 32-day pre-primary election disclosure period or the 15th business day before the payment is scheduled to be made, whichever is earlier. The individual attending the training may be the candidate, the candidate's campaign manager or treasurer, or another individual with significant managerial control over the campaign. For this section, campaign consultants are not individuals with significant managerial control over the campaign. The training attendee must be listed on the candidate's Filer Registration or Certification.

# Chapter 3: Eligibility to Receive Public Funds

**§ 3-01 Candidates must demonstrate eligibility.**

(a) No payments from the Fund shall be made to a candidate unless the Board has determined that such candidate has demonstrated that such candidate has met all eligibility requirements set forth in the Act and these rules, including the threshold for eligibility pursuant to § 3-703(2) of the Code.

**(b) Ballot status.** In order to be eligible to receive public funds, a candidate in a covered election must meet all of the requirements to appear on the ballot as provided in Article 6 of the New York State Election Law, and be opposed by at least one other candidate on the ballot, or, for an optional early public funds payment, certify that the candidate intends to meet all the requirements of law to have such candidate's name on the ballot for the primary or general election.

**(c) Preliminary determinations.** Throughout the audit process or as a result of an investigation, the Board may make a preliminary determination that a candidate is ineligible to receive public funds. In the event of a preliminary determination of ineligibility, the Board will send written notification to the candidate and the candidate may request reconsideration of such determination pursuant to section 7-09.

(d) Basis for ineligibility determination.

   **(i) Pre-election.** The Board may determine that a pre-election public funds payment will not be paid to a candidate if:

      (A) the candidate fails to submit a disclosure statement required by these rules;

(B) the candidate fails to provide to the Board, upon its request, documents or records required by Chapter 4 of these rules, or other information that verifies campaign activity;

(C) the difference between the candidate's reported receipts and documented receipts, or between the candidate's reported expenditures and documented expenditures, exceeds a maximum threshold percentage. The threshold percentage for each election cycle will be determined and publicized by the Board on or before July 11 in the year before the year of the election;

(D) the number of matching claims for which a candidate has failed to provide complete and accurate documentation exceeds a maximum threshold percentage of such candidate's total matching claims. The threshold percentage for each election cycle will be determined and publicized by the Board on or before July 11 in the year before the year of the election;

(E) the number of contributions for which a candidate has failed to report employer information as required by section 4-05(c)(ii)(A) exceeds a maximum threshold percentage of the total number of contributions exceeding $99 received by such candidate. The threshold percentage for each election cycle will be determined and publicized by the Board on or before July 11 in the year before the year of the election;

(F) the candidate or such candidate's representative fails to attend a compliance training by the deadline provided in section 2-06; or

(G) there is reason to believe that the candidate has committed a violation of the Act or these rules not otherwise enumerated in paragraph (ii) of this subdivision, and which is not a basis for withholding pursuant to section 7-06.

**(ii) Pre-election or post-election.** The Board may determine that neither a pre-election nor a post-election public funds payment shall be paid to a candidate if:

(A) the candidate has failed to meet one of the eligibility criteria of the Act or these rules;

(B) the candidate is required to repay public funds previously received, as described in sections 9-01 and 9-02, or the candidate has failed to pay any outstanding claim of the Board for the payment of civil penalties or the repayment of public funds against such candidate or such candidate's authorized committee or an authorized committee of such candidate from a prior covered election, provided that the candidate has received written notice of the potential payment obligation and potential ineligibility determination in advance of the certification deadline for the current covered election and an opportunity to present reasons for such candidate's eligibility for public funds to the Board;

(C) previous public funds payments to the candidate for the election equal the maximum permitted by the Act;

(D) the candidate fails to demonstrate compliance with § 12-110 of the Code, as required pursuant to § 3-703(1)(m) of the Code and section 3-05;

(E) the candidate endorses or publicly supports such candidate's opponent for election pursuant to § 3-705(9) of the Code;

(F) the candidate loses in the primary election but remains on the ballot for the general election and fails to certify to the Board, as required by § 3-705(10) of the Code, that such candidate will actively campaign for office in the general election, provided that such certification must be complete on or before the 32-day pre-general election disclosure statement deadline; or the candidate certifies to the Board that such candidate will actively campaign for office in the general election but thereafter fails to engage in campaign activity that shall include but not be limited to, raising and spending funds, and broadly soliciting votes;

(G) the candidate has exceeded the applicable expenditure limits provided in § 3-706 of the Code;

(H) the candidate has been found by the Board, in the course of Program participation, to have committed fraud or material misrepresentation or to be in breach of certification pursuant to section 3-01(e); or

(I) there is reason to believe that, in the course of Program participation, the candidate has engaged in conduct detrimental to the Program that is in violation of any other applicable law.

**(e) Breach of certification.**

(i) The Board considers any of the following to be a fundamental breach of a candidate's certification:

(A) the submission to the Board of documentation or information that the candidate knew or should have known was false or fictitious in whole or in part, including a disclosure statement which the candidate knew or should have known includes substantial fraudulent matchable contribution claims;

(B) the misrepresentation of a material fact in any submission of such documentation or information to the Board;

(C) the falsifying or concealment of any such documentation or information;

(D) the use of public funds to make or reimburse substantial campaign expenditures that the candidate knew or should have known were fraudulent;

(E) coordination in alleged independent expenditures, whereby material or activity that directly or indirectly assists or benefits a candidate's nomination or election, which is purported to be paid by independent expenditures, was in fact authorized, requested, suggested, fostered, or cooperated in by the candidate; and

(F) the use of a political committee or other entity over which a candidate exercises authority to conceal from the Board expenditures that directly or indirectly assist or benefit the candidate's nomination or election.

(ii) In the event of a fundamental breach of a candidate's certification, the candidate will be deemed by the Board to be ineligible for public funds for the covered election and to have forfeited all public funds previously received for the elections covered by the Certification. Additionally, the candidate will be subject to such civil and criminal sanctions as are applicable under § 3-711 of the Code and other applicable law.

(iii) This section is not intended to be an enumeration of all circumstances that may constitute a fundamental breach of a candidate's certification, as may be determined by the Board.

## § 3-02 Disqualification from ballot.

**(a) Notice of appeal.** The candidate must notify the Board immediately, in writing, if the disqualified candidate is seeking to appeal or otherwise remedy a disqualification. This notice must say whether a judicial appeal is being taken as of right or by permission and the specific nature of any judicial remedy sought.

**(b) Disqualification reversed.** The candidate must immediately inform the Board, in writing, if the disqualification of the candidate or the opponent is reversed by a court.

## § 3-03 Write-in candidates.

A candidate who is seeking nomination or election to a covered office as a write-in candidate must promptly notify the Board in writing.

## § 3-04 Termination of candidacies.

(a) The Board may send a notice to a candidate that such candidate's candidacy has been deemed terminated if such candidate is not on the ballot for that election.

(b) If the terminated candidate is seeking nomination or election as a write-in candidate, or, in the case of a participant, intends to submit a petition for public funds pursuant to section 7-



01(e)(ii), the candidate must notify the Board within five business days after receiving the notice of termination, in which case the Board may reverse the termination.

(c) A candidate may also request that the Board deem such candidate's candidacy terminated because such candidate has ceased campaigning and has verified that fact in a written request for termination submitted in the form and manner required by the Board.

(d) Terminated candidates are required to abide by Program obligations, such as maintaining requisite records, submitting documentation or information in response to requests by the Board, and paying penalties for violations of the Act and these rules. Terminated candidates must continue to file all required disclosure statements.

## § 3-05 Proof of filing with the Conflicts of Interest Board; payment of penalties.

**(a) Requirements.** In order to be eligible to receive public funds, a candidate must comply with the requirements in § 12-110 of the Code, including payment of any penalties assessed by the conflicts of interest board. The Board may confirm the candidate's compliance with the conflicts of interest board. The failure of a candidate to demonstrate compliance by the deadline established pursuant to §§ 3-703(1)(m) and 12-110 of the Code may result in a delay of any payment by the Board.

**(b) Due dates.** A candidate may submit proof of compliance to the Board. Proof is timely if it is submitted to the Board on or before the deadline to file a Certification for the covered election, except as provided by subdivision (a).

# Chapter 4: Records and Reporting

## § 4-01 Records to be kept.

**(a) Generally.**

(i) Candidates must keep records that enable the Board to verify the accuracy of disclosure statements, substantiate that expenditures were made in furtherance of the campaign, were qualified expenditures, or were permissible post-election expenditures, and confirm any matchable contributions claimed. Candidates must maintain and may be required to produce originals and copies of checks, bills, or other documentation to verify contributions, expenditures, or other transactions reported in their disclosure statements. Candidates must maintain clear and accurate records sufficient to show an audit trail that demonstrates compliance with the Act and these rules. The records must be made and maintained contemporaneously with the transactions recorded, and maintained and organized in a manner that facilitates expeditious review by the Board. Nothing in this chapter shall be construed to modify the requirements of § 14-118 of the New York State Election Law. The records maintained for each campaign finance transaction, whether

maintained on paper or electronically, must be accurate and, if necessary, modified promptly to ensure continuing accuracy.

(ii) If at any time a candidate becomes aware that a record of an expenditure is missing or incomplete, the candidate may create a new record or modify an existing record, provided that the record so created or modified is clearly identified by the candidate as such, and provided that the candidate also creates a record, in the form of a signed, dated, and notarized statement by the candidate, treasurer, or other campaign representative having first-hand knowledge of the matter, explaining the reasons for and the circumstances of the creation or modification of the missing or incomplete record. If the missing or incomplete record is an invoice or contract from a vendor, the candidate must in the first instance attempt to get a duplicate or more complete record directly from such vendor. The Board reserves the right not to accept such non-contemporaneous record created or modified pursuant to this paragraph if it deems that the record is not sufficient to document the actual transaction.

**(b) Receipts.**

**(i) Deposit slips.** Candidates must maintain copies of all deposit slips. The deposit slips must be grouped together with the monetary instruments representing the receipts deposited into the bank or other depository accounts held by the candidate for an election. Where the bank or depository does not provide itemized deposit slips, candidates must make a contemporaneous written record of each deposit. Such written record must indicate the date of the deposit, the amount of each item deposited, whether each item deposited was a check, a cashier's check, a money order, or cash, and the total amount deposited.

**(ii) Contribution and loan records.**

**(A) Generally.** For each contribution received, all candidates must maintain records demonstrating the source and details of the contribution as described herein. All records required to be maintained must be provided to the Board upon request.

**(1) Cash contributions.** For each contribution received from an individual contributor via cash, the record must be in the form of a contribution card.

**(2) Money order and cashier's check contributions.**

(I) For each contribution received via cashier's check or money order, the record must include a copy of the cashier's check or money order made out to the authorized committee.

(II) The candidate must also maintain a contribution card, if the contributor's name and residential address are not printed on the cashier's check or money order by the issuer.

Back to TOC

**(3) Check contributions.**

(I) For each contribution received via check, the record must include a copy of the check made out to the authorized committee and signed by the contributor.

(II) For each contribution received from an individual contributor via check, the candidate must also maintain a contribution card, if the check used to make the contribution is not signed by the contributor.

**(4) Credit card contributions.**

(I) For each contribution received via credit card, including contributions received over the internet, the record must have been provided by the merchant or processor and must contain: the contributor's name, residential address, credit card account type, credit card account number, credit card expiration date, the amount of the contribution, and an indicator showing that the contribution was charged to the contributor's account and processed. In the case of credit card contributions made over the internet, the contributor must actively agree online to an affirmation statement, as required by subparagraph (C)(1) of this paragraph, and the candidate must maintain a copy of all website content concerning the solicitation and processing of credit card contributions.

(II) The candidate must also maintain copies of the merchant account or payment processor agreement, all merchant account statements, credit card processing company statements and correspondence, transaction reports, or other records demonstrating that the credit card used to process the transaction is that of the individual contributor (including proof of approval by the credit card processor for each contribution and proof of real time address verification), the account's fee schedule, and the opening and closing dates of the account. Merchant account statements must be provided in such form as may be required by the Board.

**(5) Text message contributions.** For each contribution received via text message, the record must have been provided by the mobile fundraising vendor and must contain: the contributor's name, residential address, and phone number; the amount of the contribution; and the name, residential address, and phone number of the registered user of the specific mobile device used to initiate the contribution, to the extent that such information may be reasonably obtained under law. The candidate must also maintain the following records for each text message contribution received:

(I) copies of all relevant third-party vendor agreements between the candidate and mobile fundraising vendor, copies of records maintained by a mobile

fundraising vendor listing contributors and amounts pledged and paid, receipts indicating fees paid by the candidate to a mobile fundraising vendor and fees deducted by such vendor, and similar records relating to the solicitation or receipt of text message contributions;

(II) copies of any content used by the candidate to solicit text message contributions; and

(III) copies of any templates or scripts used by a mobile fundraising vendor to communicate with a contributor in facilitating and processing a text message contribution.

**(6) Segregated account documentation.**

(I) Segregated account contribution cards. For each contribution from an individual contributor that the candidate deposits into a segregated bank account pursuant to section 7-07(b), the record must be in the form of a contribution card.

(II) Segregated account bank statements, contribution cards, and checks. Candidates seeking to comply with the exception contained in section 7-07(b) must submit segregated account contribution cards and copies of segregated account bank statements and checks to the Board in the manner and to the extent provided by section 7-07 with each disclosure statement filing.

**(7) Intermediaries.** For each contribution accepted from an intermediary, including any contributions delivered to a fundraising agent, or solicited by an intermediary where such solicitation is known to the candidate, the candidate must maintain a separate record in the form of an intermediary statement. The intermediary statement must contain: the intermediary's name, residential address, employer and business address; the names of the contributors; and the amounts contributed. This record must be signed by the intermediary, or if the intermediary is unable to sign such intermediary's name, marked with an "X" by the intermediary and signed by a witness. Adjacent to the signature or mark, the intermediary must write the date on which such intermediary signed or marked the form.

**(B) Contribution cards.**

(1) Contribution cards must contain the contributor's name and residential address, the amount of the contribution, the authorized committee's name, and the contributor's selection of an instrument code corresponding to the instrument used to make the contribution. Credit card contribution cards must also contain the credit card account type, account number, and expiration date.

(2) Contribution cards must be signed by the contributor or, if the contributor is unable to sign such contributor's name, marked with an "X" by the contributor and signed by a witness to the contribution. Adjacent to the signature or mark, the contributor must write the date on which such contributor signed or marked the contribution card.

(3) After a contribution card has been signed, it may not be corrected, modified, or altered by anyone other than the contributor.

(4) The Board shall provide a template of all contribution cards required to be maintained pursuant to this subparagraph.

(5) A contribution card that contains any additional information and signatures required by section 7-07(b) must also satisfy the requirements of that section.

**(C) Affirmation statements.**

(1) Unless otherwise specified herein, above the line for the contributor's signature, contribution cards must state: "I understand that State law requires that a contribution be in my name and be from my own funds. I hereby affirm that I was not, nor, to my knowledge, was anyone else, reimbursed in any manner for this contribution; that this contribution is not being made as a loan; and that this contribution is being made from my personal funds or my personal account, which has no corporate or business affiliation."

(2) For text message contributions, the candidate must maintain records demonstrating that the contributor has certified via text message the following statement: "I certify I am the registered user of this phone and will pay the amount specified from my personal funds."

(3) Segregated account contribution cards must state, above the line for the contributor's signature: "I understand that this entire contribution will be used only (i) to pay expenses or debt from a previous election; (ii) by the candidate for an election other than the election for which this contribution is made; or (iii) to support candidates other than the candidate to whose campaign this contribution is made, political party committees, or political clubs. I further understand that this contribution will not be matched with public funds. I understand that State law requires that a contribution be in my name and be from my own funds. I hereby affirm that I was not, nor, to my knowledge, was anyone else, reimbursed in any manner for this contribution; that this contribution is not being made as a loan; and that this contribution is being made from my personal funds or my personal account, which has no corporate affiliation."

(4) Intermediary statements must state, above the line for the intermediary's signature: "I hereby affirm that I did not, nor, to my knowledge, did anyone else,

reimburse any contributor in any manner for a contribution, and that none of the submitted contributions were made by the contributor as a loan. The making of false statements in this document, which will be submitted to the Campaign Finance Board, is punishable as a class E felony pursuant to § 175.35 of the Penal Law or a Class A misdemeanor pursuant to § 210.45 of the Penal Law."

**(D) Transfers.** Candidates must maintain all records specified by the Board regarding transfers. In the case of a transfer to an authorized committee from a committee not otherwise involved in the covered election, unless the transferring committee is another authorized committee of the same candidate that has filed contemporaneous disclosure statements with the Board in a timely manner, the candidate must maintain records demonstrating that the funds underlying the transfer derive from contributions intended for the committee receiving the transfer. Such records must include, for each contribution to be transferred, a record indicating the contributor's intent to designate the contribution for the covered election. The record must be obtained prior to receipt of the transfer and must be signed by the contributor, or, if the contributor is unable to sign such contributor's own name, marked with an "X" and signed by a witness. Adjacent to the signature or mark, the contributor must write the date of the contribution. Above the line for the contributor's signature, the record must state: "I understand that this contribution will be used by the candidate for an election other than that for which the contribution was originally made. I further understand that State law requires that a contribution be in my name and be from my own funds. I hereby affirm that I was not, nor, to my knowledge, was anyone else, reimbursed in any manner for this contribution; that this contribution is not being made as a loan; and that this contribution is being made from my personal funds or my personal account, which has no corporate or business affiliation."

**(E) In-kind contributions.** For each in-kind contribution, candidates must maintain a written record that provides the date the contribution was made, the name and residential address of the contributor, a detailed description of the goods or services provided, the fair market value of the contribution, and such further information and documentation necessary to show how the fair market value of the contribution was determined. The Board shall provide a specimen of such a record.

**(F) Loans.** For each loan received, including loans made by the candidate, candidates must maintain a loan agreement, documentation of each loan repayment, and, if applicable, documentation that shows that the loan has been forgiven. The loan agreement must be contemporaneous and in writing, must be signed and dated by both parties, and must provide all terms and conditions of the loan, including the amount and term of the loan and whether interest is being charged. The candidate must retain copies of loan and loan repayment checks and records of electronic transactions showing the source of the funds.

Back to TOC

**(G) Business dealings with the city.** For each individual or entity making a contribution, loan, guarantee or other security for such loan in excess of the amounts set forth in § 3-703(1-a) of the Code, candidates must maintain all records specified by the Board concerning whether such individual or entity has business dealings with the city.

**(iii) Photocopies of checks and other monetary instruments.** Candidates must maintain a photocopy of each check or other monetary instrument, other than cash, representing a contribution or other monetary receipt. In order for a contribution in the form of a check signed by an authorized agent of the contributor to be matchable, candidates must maintain:

(A) a copy of the check upon which is printed the name of the actual contributor; and

(B) a document, signed by the contributor, which indicates:

(1) that the person signing the check is authorized to do so;

(2) the date and amount of the contribution; and

(3) the principal committee's name.

**(c) Disbursements.**

**(i) By check or debit.** Candidates must make all disbursements by check or debit from the committee bank account, except for petty cash.

**(ii) Petty cash.** Candidates may maintain a petty cash fund of no more than $500 out of which they may make disbursements not in excess of $100 to any individual or entity per purchase or transaction. If a petty cash fund is maintained, the candidate must maintain a petty cash journal in C-SMART including the name of every individual or entity to whom any disbursement is made, as well as the date, amount, and purpose of the disbursement.

**(iii) Credit card purchases.** Candidates must maintain a monthly billing statement and customer receipt for each disbursement from a committee credit card showing the underlying purchases, including the vendor for each charge.

**(iv) Bills.**

(A) Candidates must maintain bills for disbursements for goods or services provided.

(B) Documentation for goods or services must be contemporaneous and must provide the date the vendor was retained or the date the goods or services were provided, the vendor's name and address, the amount of the expenditures, and a detailed description of the goods and services provided. If the invoice supplied by the vendor does not meet these requirements, the vendor may provide an additional, more detailed

document or replacement document with sufficient detail. If the vendor does not provide such a document, the candidate must create an additional record containing the necessary information, and such record must be signed by the candidate, treasurer, or other representative of the candidate. The newly created record must satisfy the requirements of section 4-01(a).

(C) For wages, salaries, and consulting fees, candidates must maintain a contemporaneous record, signed by the employee or consultant and the candidate, and dated, providing the name and address of the employee or consultant, a detailed description of the services, the amount of the wages, salary or consulting fees, the date(s) on which the work was performed, the period for which the individual was retained, and, if applicable, a detailed breakdown of the number of hours worked. The Board shall provide specimens of records for employees and consultants, including timesheets for election day workers and consultant agreements.

(D) Candidates must maintain written documentation showing that a bill has been forgiven or settled for a lesser amount.

**(v) Vendors.** In addition to obtaining and keeping contemporaneous documentation (such as bills) for all goods and services provided by vendors, including campaign consultants and attorneys, and employees, when a candidate retains or otherwise authorizes an individual or entity (including an employee) to provide goods or services to the campaign, and the candidate knows or has reason to believe that the goods or services to be provided directly or indirectly by this vendor will exceed $1,000 in value during the campaign, the candidate must:

(A) keep a copy of the contemporaneously written contract with the vendor, which must, at a minimum, provide the name and address of the vendor, be signed and dated by both parties, state the terms of the contract including the terms of payment and a detailed description of the goods or services to be provided, and must include, if the contract was at any time amended, a contemporaneously written amendment, signed and dated by both parties and describing in detail the changes to the terms and conditions of the contract, or

(B) if no contemporaneously written contract has been entered into, keep a contemporaneously written record that includes the date the vendor is retained or otherwise authorized by the candidate, the name and address of the vendor, and the terms of the agreement or understanding between the candidate and the vendor including the terms of payment and a detailed description of the goods or services the vendor is expected to provide. If the agreement or understanding was at any time amended, the candidate must create and maintain a contemporaneously written record describing in detail the changes to the terms and conditions of the agreement or understanding.

(C) In addition to the records to be kept pursuant to subparagraphs (A) or (B) above, the candidate must keep evidence sufficient to demonstrate that the work described in the contract was in fact performed and completed. Such evidence may include samples or copies of work product, emails, time records, phone records, and photographs or other documentary evidence. Where such evidence is nonexistent or unavailable, the candidate must maintain affidavits signed by the vendor and either the candidate, treasurer, or other campaign representative having first-hand knowledge, describing the goods or services provided and the reason(s) why documentary evidence is nonexistent or unavailable.

**(vi) Advance purchases and reimbursement of advances.** Candidates must maintain records of advances, which must include the name and address of each individual or entity that made an advance on behalf of the campaign, the amount so advanced, the date of the advance, the name and address of the payee to whom advanced funds were paid, the amount paid, the purpose of the payment, and the manner of payment, including check number, credit card name, or cash. The record of the advance must be signed by the individual making the advance purchase. A receipt, bill, or invoice from the vendor must be attached to the record.

**(vii) Subcontracted goods and services.** Candidates required to itemize the cost of subcontracted goods and services pursuant to section 4-05(c)(iv)(D) must obtain and maintain documentation from the vendor, consultant, or other individual or entity who or which subcontracts, containing all information required to be disclosed pursuant to that section.

**(viii) Political advertisements and literature.** Pursuant to § 14-106 of the New York State Election Law, candidates must maintain copies of all broadcast, cable, or satellite schedules and scripts; paid internet or digital, print, and other types of advertisements; pamphlets, circulars, flyers, brochures, letterheads and other printed matter purchased or produced; and reproductions of statements or information published to 500 or more members of a general public audience by computer or other electronic device, including but not limited to electronic mail or text message.

**(ix) Travel.** Candidates must obtain and maintain copies of all checks, bills, or other documentation to verify campaign-related travel transactions reported in disclosure statements. In addition to the above, for all travel candidates must create and maintain a contemporaneous record describing the campaign-related purpose of the travel, the complete travel itinerary, the dates of the travel, and the names of all individuals who participated in the travel; provided, however, that such records shall not be required for travel by public transportation within New York City, with the exception of unlimited-use MetroCards, for which candidates must create and maintain a contemporaneous record containing the dates on which each such card was purchased and, if a card is assigned to a single individual, the name of each such individual. For travel by private car, candidates must create and maintain a contemporaneous travel log providing, for

each trip and each vehicle, the names of the driver and passengers, the date(s) and purpose of each trip, the itinerary, including all the locations of any campaign events and other stops, the beginning and ending mileage, and the total mileage. Travel between two stops is considered an individual trip for logging purposes even if the stops are part of a multi-stop itinerary. For the purposes of reporting and reimbursing campaign expenditures, candidates must calculate expenditures for travel by private car based on mileage according to the provisions of Directive Six of the New York City Comptroller.

**(d) Bank records.** Candidates must maintain the following records received from or in connection with banks and other depositories relating to accounts, and must submit with each disclosure statement a copy of all such records not previously provided:

(i) all periodic bank or other depository statements in chronological order, maintained with any other related correspondence received with those statements, such as credit and debit memos, deposit slips, and contribution checks returned because of insufficient funds; and

(ii) the front and back of all returned and cancelled disbursement checks, including substitute checks which may be returned by the bank in lieu of cancelled checks.

**(e) Fundraisers.** Candidates must maintain records for all fundraising events, which must contain: the date and location of the event; the individual(s) or organization(s), other than the candidate's authorized committee, hosting the event; an itemized list of all expenses incurred in connection with the event, including all expenses whether or not paid or incurred by the authorized committee; and the contributor name and amount of each contribution received at or in connection with the event. This subdivision does not apply to activities at an individual's residential premises, including house parties, to the extent that the total costs of such activities do not exceed $500 and are not contributions pursuant to § 3-702(8)(ii) of the Code.

**(f) Campaign offices.** Candidates shall maintain a list identifying the address of each campaign office.

## § 4-02 Record retention.

The candidate must retain all records and documents required to be kept under section 4-01 for five years from the filing of a final statement showing satisfaction of all liabilities and disposition of all assets resulting from the applicable election including payment of any penalties or repayment of public funds owed to the Board.

## § 4-03 Assistance to candidates.

In order to promote compliance with the requirements of the Act and these rules, the Board's staff shall offer assistance to candidates in developing campaign procedures for gathering

campaign finance information and keeping records and shall, to the extent feasible, provide model recordkeeping forms and templates.

## § 4-04 Failure to maintain or provide records.

A candidate's failure to keep or provide records or other information to the Board, upon its request or as required by these rules, may result in a determination that matchable contribution claims are invalid; a determination that the candidate must repay public funds to the Board; the withholding of all or a portion of a public funds payment; and the assessment of penalties.

## § 4-05 Disclosure statements.

**(a) Form.** Disclosure statements must be generated by C-SMART, and such statements, as well as all supporting documentation, including bank statements, must be submitted using C-SMART. Daily pre-election disclosure statements must be submitted using C-SMART within 24 hours after a contribution, loan, or expenditure that meets the pre-election daily disclosure requirement has been accepted or made.

**(i) Deficient submissions.** A submission is deficient and may be rejected or deemed incomplete if: (1) it is not submitted in a format or manner authorized by the Board; (2) it is not submitted with the backup documentation substantiating each matchable contribution claimed within the particular statement, or said records are not accessible or legible; or (3) it is not submitted with all of the committee's bank statements from the applicable disclosure period. Any document that is illegible, improperly annotated, damaged, blank, improperly formatted, or otherwise unreadable by the Board, shall be deemed not to have been submitted.

**(ii) C-SMART upgrades.** The Board may issue upgrades or system improvements of C-SMART or its user instructions. To the extent reasonably practicable, the Board shall provide candidates with reasonable advance notice of such upgrades.

**(iii) Verification.** The candidate or treasurer must verify that the submission is true and complete to the best of such candidate's or treasurer's knowledge, information, or belief. The disclosure statement must contain such signatures as may be required by the Board.

**(iv) Exceptions.** Any candidate who seeks to submit disclosure statements, or a portion thereof, in any format or manner other than that permitted by this section, including but not limited to non-electronic formats and electronic formats not generated by C-SMART, must submit a written request for authorization to the Board no later than four weeks before the filing date for the first disclosure statement for which the candidate desires an exception from such requirements, or in the case of a special election, as soon as possible but no later than seven days before such disclosure statement filing date. Such written request must be in a form and manner as prescribed by the Board. Candidates who demonstrate that submission of disclosure statements in an electronic format would pose

a substantial hardship shall be permitted, upon request, to submit disclosure statements to the Board in non-electronic formats. Board authorization shall be in writing and shall apply only to the candidate, paper forms, and electronic submission form and manner specified therein. The authorization shall indicate whether it applies to one or more disclosure statements.

(b) Timing of submissions.

(i) Disclosure statements must be received by the Board no later than 11:59 p.m. on the due date.

(ii) **Filing dates.** The Board will publish a schedule of disclosure statement filing dates on its website on or before March 1 in the first year of each election cycle, or as soon as is practicable after the State Board of Elections has published its schedule.

(A) Semi-annual disclosure statements are due on January 15 and July 15 in each year of the election cycle and each year thereafter, until a campaign submits a final statement showing satisfaction of all liabilities and disposition of all assets.

(B) Pre-election disclosure statements are due:

(i) 32 and 11 days before the election;

(ii) at the Board's discretion, on October 15 in the year before the year of the election; and

(iii) at the Board's discretion, on March 15 and the fourth Friday in August in the year of the election.

(C) Post-election disclosure statements are due 10 days after a primary election and 27 days after a general election.

(D) **Weekends and holidays.** The Board's published schedule of disclosure statement filing dates will reflect that if a disclosure statement deadline falls on a Saturday, Sunday, or legal holiday, the next business day becomes the deadline.

(E) As provided pursuant to New York State Election Law, if the filing date of any disclosure statement scheduled pursuant to subparagraphs (B) or (C) otherwise falls within five days of a semi-annual disclosure statement scheduled pursuant to subparagraph (A), candidates may file a single combined disclosure statement on the date on which the latter of the two disclosure statements is due.

(iii) **Reporting period.** The Board shall publish a schedule of the reporting periods for each disclosure statement.



**(A) First disclosure statement.** The reporting period for a candidate's first disclosure statement shall begin on the day the candidate first raises or spends funds in furtherance of the candidate's election for a covered office.

**(B) All subsequent disclosure statements.** The reporting period for each disclosure statement shall: (i) begin on the third day before the deadline for the submission of the candidate's preceding disclosure statement; and (ii) conclude on and include the fourth day before the deadline for the submission of that disclosure statement.

**(c) Content.**

**(i) Summary information.** Each disclosure statement must include the following information about the committee involved in the election: (A) the cash balance at the beginning and end of the reporting period; (B) total itemized and unitemized contributions, loans, and other receipts accepted during the reporting period; and (C) total itemized and unitemized expenditures made during the reporting period. A separate disclosure statement must be submitted for each committee involved in the election. All data reported in disclosure statements and amendments must be accurate as of the last day of the reporting period.

**(ii) Contributions.**

**(A) Reporting requirements.** To fully report a contribution accepted during the reporting period, the candidate must report, for each contribution:

(1) the contributor's and intermediary's (if any) full name, residential address, occupation, employer, and business address;

(2) the date the contribution was received by the candidate;

(3) the amount of the contribution;

(4) the form of the contribution (cash, check, cashier's check, money order, credit card, text, or other);

(5) the number of the check, cashier's check, or money order, if applicable;

(6) the date and amount of each contribution returned to a contributor, the account from which the funds used to make the return originated, and, if applicable, the number of the check used to issue the return of funds;

(7) each previously reported contribution for which the check was returned unpaid;

(8) whether the contribution was accepted for a rerun election in accordance with section 5-12;

(9) whether the contribution was accepted to be deposited into a segregated bank account in accordance with section 7-07(b); and

(10) such other information as the Board may require.

**(B) Matchable contribution claims.**

(1) Contemporaneous reporting. Matchable contributions must be reported in the disclosure statement covering the reporting period in which they were received. The candidate's disclosure statement must state the amount of matchable contributions claimed in a reporting period, and must indicate which contributions are claimed for match.

(2) Backup documentation. For each matchable contribution claimed in the disclosure statement, candidates must submit a copy of the records required to be maintained pursuant to section 4-01(b).

**(C) Contributions totaling $99 or less from a single source.** Contributions totaling $99 or less from a single source need not be separately itemized in a disclosure statement, unless such contributor is an employee of the candidate or of the spouse, or domestic partner of such candidate or of a business entity in which such candidate, spouse, or domestic partner has an ownership interest of 10% or more or in which such candidate, spouse or domestic partner holds a management position, such as the position of officer, director, or trustee; provided, however, that contributions that are not itemized shall not be matchable.

**(D) Must itemize all contributions from a single source that exceeds $99.** If a candidate has accepted contributions totaling more than $99 from a single source, all contributions comprising the total (including previously unitemized contributions) must be fully reported (i.e., itemized) in the same disclosure statement. All subsequent contributions from that single source must be fully reported as well.

**(E) Affiliated contributors.** Affiliated contributors considered to be a "single source" under sections 1-02 and 5-10(b) must be reported.

**(iii) Other receipts.** To fully report other receipts accepted during the reporting period, the candidate must report, for each receipt:

(A) the date of receipt;

(B) the amount of the receipt;

(C) the type of receipt; and

(D) such other information as the Board may require.

**(iv) Expenditures.**

**(A) Reporting requirements.** To fully report expenditures, including outstanding liabilities, made by the candidate during the reporting period, the disclosure statement must be itemized to include the following information:

(1) the name and address of each vendor or payee;

(2) the bill or invoice date and amount;

(3) the purpose code and explanation of each expenditure;

(4) the exempt code, if any; and

(5) such other information as the Board may require.

**(B)** In addition to the information required in subparagraph (A), candidates must provide the following information concerning each payment:

(1) the date and amount of each payment, including exempt amount, if any;

(2) the payment method, including check number and committee bank account; and

(3) the amount of remaining outstanding liability to the vendor or payee; and

(4) such other information as the Board may require.

**(C) Expenditures of less than $50.** Expenditures of less than $50 do not need to be separately itemized in a disclosure statement; however, public funds may not be used to pay for unitemized expenditures.

**(D) Subcontractors.**

(1) In addition to reporting any expenditures to the vendor, if aggregate payments by the vendor to a subcontractor exceed $5,000, the candidate must report:

(I) the name and address of that subcontractor;

(II) the amount(s) expended to the subcontractor; and

(III) the purpose code(s) of the subcontracted goods or services.

(2) Disclosure must occur either beginning in the reporting period in which such cost first exceeds $5,000 or in the first post-election disclosure statement for the election to which the expenditure relates.

**(E) Credit card purchases.** For expenditures paid with a credit card, the candidate must report the vendor and purchase price of any goods or services purchased. Disbursements to credit card accounts must not be itemized as such.

**(F) Contributions to political committees.** Contributions to political committees that support or oppose candidates in New York City (except political committees of other candidates), including state party committees, that are made by a candidate with the candidate's personal funds and that, in the aggregate for any single political committee, exceed $1,000, are presumed to be expenditures in furtherance of the candidate's campaign and contributions from the candidate to the candidate's campaign and must be reported to the Board. The candidate may rebut this presumption by providing evidence that the contributions were not in furtherance of the candidate's campaign. These contributions are subject to all applicable expenditure and contribution limits, except that contributions made to committees registered with the State Board of Elections or the Federal Election Commission as independent expenditure committees are not subject to such limits. Candidates must create and maintain records of such contributions. Contributions made with a candidate's personal funds as provided in this subparagraph are not a basis for a deduction from the candidate's public funds payment pursuant to section 7-07(a).

**(G) Expenditure refunds.** For expenditures of which all or a portion was refunded to the candidate by the vendor, the candidate must report the refund and provide an amended invoice or other documentation from the vendor specifying the amount, date, and reason for the refund, as well as proof of receipt of the refund in the form of a check, bank statement, or other financial documentation.

**(v) Intermediaries.** In addition to fully reporting contributions, candidates must fully report any intermediary that solicited or delivered a contribution as provided in paragraph (ii) of this subdivision.

**(A) Exceptions.**

(1) The candidate need not report an intermediary for aggregate contributions of $500 or less collected from a contributor in connection with an event held at an individual's residence, unless the expenses related to such event exceed $500.

(2) The candidate need not report an intermediary for contributions collected at an event organized by a candidate to raise funds for such candidate and paid for in whole or in part by such candidate's authorized committee.

(3) The candidate need not report an intermediary who is a spouse, domestic partner, parent, child, or sibling of the candidate.

**(B) Contributions collected at a non-campaign sponsored fundraising event with multiple hosts.** In the case of contributions collected at a fundraising event neither

organized by the candidate nor paid for in whole or in part by such candidate's authorized committee, where there are multiple hosts, the hosts must designate one host who must be reported by the candidate as the intermediary for all such contributions.

**(C) Contributions delivered by an intermediary's agent.** The candidate must report as the intermediary an individual who solicits contribution(s) and directs such individual's agent to deliver them to the candidate or fundraising agent. The candidate must not report the agent as an intermediary.

**(vi) Transfers.**

(A) Candidates must report contemporaneously: (1) the aggregate amount of each transfer to an authorized committee from a committee not otherwise involved in the covered election, and, unless the transferring committee is another authorized committee of the same candidate that has filed contemporaneous disclosure statements with the Board in a timely matter, (2) each contribution the transfer consists of (using a last-in/first out attribution), including the name and residential address of the contributor and the amount and date of the contribution.

(B) In the case of a transfer to an authorized committee from a committee not otherwise involved in the covered election, unless the transferring committee is another authorized committee of the same candidate that has filed contemporaneous disclosure statements with the Board in a timely manner, participants must (1) report to the Board, in the same disclosure statement in which the transfer is reported, any expenditures incurred by the transferor committee in connection with raising or administering the transferred contributions, regardless of when the expenditures were incurred, and (2) upon request by the Board, disclose all expenditures made by the transferor committee during the covered election cycle for purposes other than raising or administering the transferred contributions. Candidates must also contemporaneously submit the records required to be maintained pursuant to section 4-01(b)(ii)(D).

**(vii) Advances and reimbursements.**

(A) For advance payments, the candidate must report in each disclosure statement:

(1) the name and address of each individual or entity, including the candidate, that has made purchases on behalf of the committee during the reporting period with the expectation of being reimbursed by the committee;

(2) the date and amount of each purchase;

(3) the name and address of the individual or entity from whom the purchase has been made;

(4) the payment method;

(5) the purpose code and explanation of the purchase; and

(6) such other information as the Board may require.

(B) For advance reimbursements, the candidate must report in each disclosure statement:

(1) the name of each individual or entity, including the candidate, whom the candidate reimbursed for purchases made on behalf of the committee during the reporting period;

(2) the date and amount of each reimbursement;

(3) the payment method of each reimbursement, provided that, if the reimbursement is done by check, the candidate must also report the bank account and check number from which the check was issued; and

(4) such other information as the Board may require.

**(viii) Loans.** Each disclosure statement shall include the following information about loans accepted, forgiven, or repaid by the candidate during the reporting period:

(A) for each loan accepted, the lender's, guarantor's or other obligor's full name, residential address, occupation, employer, and business address;

(B) the date and amount of each loan, guarantee, or other security for a loan accepted;

(C) for each loan repayment made, the date, amount, check number, name of bank account or credit card, and name of any third party payor; and

(D) the date and amount of any portion of a loan which has been forgiven.

**(ix) Documentation.** Together with each disclosure statement, the candidate must submit documentation to verify the accuracy of the data reported, including all bank records and deposit slips required to be maintained pursuant to sections 4-01(b)(i) and 4-01(d)(i) not previously submitted.

(d) Amendments to disclosure statements are prohibited unless expressly authorized or requested by the Board.

## § 4-06 Daily disclosures during the two weeks preceding the election.

If a candidate, during the 14 days preceding an election, accepts aggregate contributions and/or loans from a single source of $1,000 or more or makes aggregate expenditures to a single

payee of $20,000 or more, the candidate must report, in a disclosure to the Board, all contributions and loans accepted from such source or expenditures made to such payee during that 14-day period. The first such disclosure must be received by the Board within 24 hours after the contribution or loan that causes the total to reach $1,000 is accepted or the expenditure that causes the total to reach $20,000 is made. Each subsequent disclosure must be received by the Board within 24 hours after any additional contribution or loan is accepted or expenditure is made. Information reported in these disclosures must also be included in the candidate's next post-election disclosure statement.

## § 4-07 Final Statement.

(a) A candidate must file all disclosure statements required under section 4-05(b) until such time as the candidate files a final statement demonstrating the disposition of all committee assets and satisfaction of all committee liabilities, including the payment of any penalties or repayment of public funds owed to the Board; provided, however, that any financial activity occurring after the final statement has been filed must be reported in the next semi-annual disclosure statement.

(b) A candidate whose candidacy has been deemed terminated, as described in section 3-04(a), must continue to file all required disclosure statements; provided, however, that the Board may deem a candidate who has not received public funds for the current election cycle and is not seeking reconsideration of a public funds determination exempt from such filing requirements upon the filing of a signed, notarized statement from the candidate and treasurer indicating that the candidate has ceased campaigning and does not intend to raise or spend additional funds in connection with the covered election. Candidates who receive such an exemption are nevertheless required to abide by all other Program obligations, including maintaining records, submitting documentation or information in response to requests by the Board, and paying penalties for violations of the Act and Rules. If a candidate who has received an exemption under this subdivision resumes raising or spending funds in connection with the covered election, the candidate must immediately notify the Board in writing and such candidate will be subject to all requirements applicable to a candidate whose candidacy has been terminated, as described in section 3-04.

## § 4-08 Write-in candidates.

Any candidate who is seeking nomination or election as a write-in candidate must file all disclosure statements for the election as required by section 4-05(b).

## § 4-09 Candidates not in primary or general elections.

**(a) Not in primary election.** A candidate need not submit the two pre-primary and the 10 day post-primary election disclosure statements if the candidate is not a candidate in a primary election unless the candidate is a participant claiming that expenditures are subject to

a primary election spending limit, pursuant to section 6-01(h)(iii)(A) or 6-01(h)(iv). If the candidate is not a candidate in the primary, daily disclosures during the two weeks preceding the primary need not be submitted.

**(b) Not in general election.** A candidate need not submit the two pre-general election and 27 day post-general election disclosure statements or daily disclosures during the two weeks preceding the general election, if the candidate is not a candidate in the general election.

## § 4-10 Other political committees.

The financial records of any committees of a candidate are subject to Board review for purposes of monitoring the candidate's compliance with the requirements of the Act and these rules and must be made available to the Board upon its request.

# Chapter 5: Contributions, Loans, and Other Receipts

## § 5-01 Contribution limits.

(a) Candidates may not accept contributions from a single source in excess of the limits set forth in § 3-703(1)(f) of the Code.

**(b) Adjustment.** Pursuant to § 3-703(7) of the Code, not later than the first day of March in the year 2022, and every fourth year thereafter, the Board will adjust the contribution limits. The adjustment will follow changes in the consumer price index for the metropolitan New York-New Jersey region published by the United States Bureau of Labor Statistics. The adjustment is the difference between the average consumer price index over the 12 months preceding the calendar year of such adjustment, and either (a) the calendar year preceding the year of the last such adjustment or (b) such other calendar year as may be appropriate pursuant to any amendment to the Act.

**(c) Contributions received prior to January 12, 2019.** For candidates in covered elections held before the year 2022 who choose Option A, as defined in § 3-720(e)(1) of the Code, the contribution limits as stated in § 3-703(1)(f) of the Code will apply to all contributions received during the 2021 election cycle, regardless of when they are received. Such candidates shall refund the portion of any contribution that exceeds the limits, as provided in section 5-07 of this chapter, even if the contribution was received before January 12, 2019. Failure to timely issue required refunds will be considered a violation of the Act and these rules.

## § 5-02 Solicitation of contributions.

**(a) Fundraising solicitations.** Each written solicitation of contributions (including, but not limited to, letters, contribution cards, flyers, and other invitations to contribute or attend events) by or on behalf of a candidate, whether in paper or electronic format, must include

the following statement, written in a conspicuous and clearly recognizable manner: "State law prohibits making a contribution in someone else's name, reimbursing someone for a contribution made in your name, being reimbursed for a contribution made in your name, or claiming to have made a contribution when a loan is made." If the solicitation is written in a language other than English, the statement must be written in the same language as the solicitation.

**(b) Solicitation of contributions for elections not subject to the Act.** If a candidate makes a solicitation for a contribution for an election not subject to the requirements of the Act, the solicitation must specify that the contribution is being solicited for an election that is not subject to the requirements of the Act.

## § 5-03 Prohibited contributions and loans.

**(a) Contributions and loans from corporations, limited liability companies, and partnerships, including professional corporations and limited liability partnerships.**

(i) A candidate may not accept a contribution from a prohibited organization, i.e., a corporation, limited liability company, or partnership, including professional corporations and limited liability partnerships.

(ii) A candidate may not accept a loan from a prohibited organization unless the loan is made in the regular course of the lender's business.

(iii) A candidate may not accept a guarantee or other security for a loan from a prohibited organization.

(iv) This prohibition does not apply to contributions by political committees.

**(b) Nominee contributions.** A candidate may not accept a contribution made in the name of an individual or entity for which the source of the funds is a different individual or entity.

**(c) Anonymous contributions.** A candidate may not accept a contribution from an unidentified source.

**(d) Contributions from foreign nationals.** A candidate may not accept a contribution from a person who is not a naturalized U.S. citizen or a holder of a green card.

**(e) Cash contributions in excess of $100.** A candidate may not accept cash receipts aggregating in excess of $100 from a single source.

**(f) Contributions in violation of state or federal law.** A candidate may not accept a contribution that was made, received, solicited, or otherwise obtained in violation of any local, state, or federal law.

## § 5-04 Contributions subject to special requirements.

### (a) Contributions from political committees.

(i) A candidate may accept a contribution from a political committee, provided that the political committee:

(A) was registered with the Board for the period that includes the candidate's next covered election at the time the contribution was received; or

(B) registers with the Board within 10 days of receipt of the contribution.

(ii) A political committee must register in such form and manner as shall be determined by the Board. Such registration shall include but is not limited to:

(A) the name and address of the committee, and the name, address, and employer of the chairperson, treasurer, and liaison of the committee;

(B) an indication whether the committee is a political action committee, a candidate committee (and if so, identification of the candidates supported by the committee), or another kind of political committee;

(C) identification of the governmental agency or agencies with which the committee files disclosure statements;

(D) an indication whether the committee makes monetary contributions, in-kind contributions, or independent expenditures, and the name, address, and employer of each individual or entity with the authority to determine the candidates for whom the committee makes contributions or independent expenditures; and

(E) an indication whether the committee accepts contributions from corporations, limited liability companies, or partnerships, and an agreement not to use funds from such entities for contributions to candidates.

(iii) A list of registered political committees for each election cycle will be maintained on the Board's website. Candidates have the burden to check the list of registered political committees published by the Board to ensure that each political committee contribution accepted is from a registered committee.

(iv) The registration shall remain in effect through the end of the election cycle, unless there has been a material change in the information included in the registration.

(v) Political committees that do not submit the information required by the Board, or any required signatures or notarizations, will not be considered to be registered.

### (vi) Earmarked contributions from political committees.

(A) A candidate may accept a contribution given to a political committee by a contributor who limited the committee's choice or directed the selection of the recipient, but the contribution shall be considered to be from both the original contributor and from the political committee.

(B) A contribution that a political committee has received solely because of its actions as an intermediary as defined in these rules is not an earmarked contribution.

(C) A nominee contribution is not an earmarked contribution.

**(b) Contributions from minors.** A candidate may accept a contribution from an individual under 18 years of age, provided that:

(i) the decision to contribute was made knowingly and voluntarily by the minor;

(ii) the funds, goods, or services contributed were owned and controlled exclusively by the minor, such as income earned by the minor, or a bank account opened and maintained exclusively in the minor's name; and

(iii) the contribution was not made from the proceeds of a gift, the purpose of which was to provide funds to be contributed.

**(c) Contributions from joint contributors.**

(i) A candidate may accept a single contribution made jointly by two or more individuals or entities, provided that the contribution check or monetary instrument includes the signature and pre-printed information of each individual making the contribution or, in the case of an entity contribution, the signature of each authorized individual.

(ii) If a check or other monetary instrument representing a joint contribution, or a contribution card or other contemporaneous document related to the contribution, does not indicate the amount to be attributed to each contributor, the contribution shall be attributed equally to each contributor.

**(d) Post-election contributions.** Contributions accepted after an election may be used to pay liabilities incurred in that election, subject to the applicable contribution limit and prohibitions, only if deposited in and disbursed from an account established and maintained for that election, as provided in sections 5-11(a)(iii) and (iv).

**(e) Text message contributions.** A text message contribution is received on the date it is delivered to the candidate, after payment of the contributor's wireless bill, by a wireless carrier or other mobile fundraising vendor.

**§ 5-05 Non-matchable contributions.**

The following are not matchable:

**(a) In-kind contributions and loans.** In-kind contributions and loans, regardless of whether such loans are considered contributions pursuant to § 3-702(8) of the Code.

**(b) Purchase price.** Contributions in the form of the purchase price paid for an item with significant intrinsic and enduring value, or paid for or otherwise induced by a chance to participate in a raffle, lottery, or a similar drawing for valuable prizes.

**(c) Certain contributions from vendors.** Contributions from individuals, other than employees of the candidate's principal committee, who are vendors to the committee or individuals who have an interest in a vendor to the committee, unless the expenditure to the vendor is reimbursement for an advance. For the purposes of this subdivision, "individuals who have an interest in a vendor" means individuals having an ownership interest of 10% or more in a vendor or control over the vendor. An individual shall be deemed to have control over the vendor firm if the individual holds a management position, such as the position of officer, director or trustee.

**(d) Doing business, lobbyist, and lobbyist-related contributions.** Contributions from individuals having business dealings with the city as defined in § 3-702(18) of the Code, and contributions from lobbyists as defined in § 3-211 of the Code, or persons required to be included in a statement of registration filed pursuant to §§ 3-213(c)(1) or 3-213(d) of the Code.

**(e) Contributions intermediated by a person doing business with the city.** Contributions for which any individual or entity listed in the doing business database at the time of the contribution acted as an intermediary.

**(f) Contributions from business accounts.** Contribution checks drawn on business accounts, or accounts that bear indicia of being business accounts, such as the contributor's professional title.

**(g) Prohibited or excess contributions.** Contributions from contributors subject to the prohibitions of §§ 3-703(1)(k) or (l) of the Code or that are otherwise prohibited by these rules, or that, in the aggregate for a given contributor, exceed the contribution limits applicable under the Act.

**(h) Returned contributions.** Contributions that are returned or refunded to, or not paid by, the contributor.

**(i) Unitemized contributions.** Contributions for which required information is missing from or illegible in a disclosure statement.

**(j) Contributions with unreported occupation, employer, and business address.** Contributions for which the candidate has not reported the contributor's occupation, employer, and business address, where such contributions: (i) total more than $99; or (ii) total $99 or less, and the contributor is an employee of the candidate, of the spouse or domestic partner of such candidate, or of an entity in which such candidate, spouse, or domestic partner has an ownership interest of 10% or more or in which such candidate, spouse, or domestic partner holds a management position, such as the position of officer, director, or trustee.

**(k) Contributions from minors.** Contributions from individuals under 18 years of age.

**(l) Contributions in violation of law.** Contributions that were made, received, solicited, or otherwise obtained in violation of any federal, state, or local law, including the Act and these rules.

**(m) Contributions from entities.** Contributions received from entities other than individuals, including political committees.

**(n) Contributions not from New York City residents.** Contributions from contributors whose residential addresses are not within New York City, or for whom other indicia exist that the contributor is not an individual New York City resident.

**(o) Contributions made after the election year.** Contributions made later than December 31 of the year of the covered election in which the participant is a candidate.

**(p) Contributions for other elections.** Contributions originally received for elections other than the election in which the participant is currently a candidate, as described in section 5-08.

**(q) Claims exceeding the gross amount of the contribution.** Matchable contribution claims that exceed the gross amount of the contribution.

**(r) Excess matching claims.** Matchable contribution claims that would yield more than the maximum public funds payment per contributor as provided in § 3-705(2)(a) of the Code.

**(s) Contributions made with checks drawn by someone other than the contributor.** Checks drawn by an individual or entity other than the contributor, except for checks signed by a contributor's authorized agent, where the documentation required under sections 4-01(b)(ii)(A)(3) and 4-01(b)(iii) has been maintained and provided.

**(t) Contributions to other committees.** Contributions made payable to, or originally received by, entities other than the principal committee, including committees not otherwise involved in the covered election;

**(u) Contributions not timely and properly reported.** Contributions that were not timely reported and itemized in disclosure statements, or that were reported for the first time in an amendment to a disclosure statement.

**(v) Contributions claimed after the year of the election.** Contributions not claimed as matchable on or before January 15 in the year after the year of the election.

**(w) Contributions not properly documented.** Contributions for which a record required under Chapter 4 was not kept or provided upon request, for which complete supporting documentation required by section 4-05(c)(ii)(B)(2) has not been submitted, or for which the information on such documentation is not consistent with the information reported in the disclosure statement.

**(x) Contributions made with consecutively numbered cashier's checks or money orders.** Contributions purportedly from different contributors that were made by cashier's checks or money orders bearing consecutive serial numbers, or other indicia that they were purchased simultaneously.

**(y) Cash, money order, or cashier's check contributions exceeding $100.** Cash, money order, or cashier's check contributions from any one contributor that are greater than $100 in the aggregate.

**(z) Withdrawn matching claims.** Contributions for which a matching claim was previously withdrawn by the candidate.

**(aa) Non-matchable contributions.** Contributions that are otherwise not matchable contributions within the meaning of the Act.

**(bb) Additional factors.** In addition, the Board will consider the following factors in determining whether matchable contribution claims are invalid and in projecting a rate of invalid matchable contribution claims:

    (i) any information that suggests that a contribution has not been processed or reported in accordance with Program requirements;

    (ii) any other information that suggests that matchable contribution claims may be invalid; and

    (iii) calculation errors in totals reported.

## § 5-06 In-kind contributions.

**(a) An in-kind contribution is an expenditure.** An in-kind contribution to a candidate's authorized committee is also considered an expenditure made by such committee, and the amount of the in-kind contribution thus counts toward the candidate's contribution and

expenditure limits. An in-kind contribution is received on the date the goods or services are received or rendered, which is presumed to be the date of the associated expenditure, unless the candidate provides evidence to demonstrate that the contribution should be deemed received on a different date.

**(b) The value of an in-kind contribution.**

(i) Candidates must maintain invoices or other written records supporting the valuation of all in-kind contributions.

(ii) If no invoice is available and obtaining an invoice is not practicable, a candidate must use a reasonable estimate of value in documenting the fair market value of an in-kind contribution.

(A) The fair market value of goods is the price of those goods in the market from which they ordinarily would have been purchased when the goods were received.

(B) The fair market value of services is the hourly or piecework charge for the services at a commercially reasonable rate prevailing when the services were rendered.

**(c) Good or service purchased below fair market value.** Where goods or services are purchased by a candidate for less than fair market value, the difference between the fair market value when they were received, including any applicable tax, and the amount charged to the candidate is an in-kind contribution.

**(d) Extension of credit that is not commercially reasonable is an in-kind contribution.**

**(i) Generally.** A creditor that extends credit to a candidate for a period beyond 90 days has made a contribution equal in value to the credit extended, unless the creditor is making a commercially reasonable attempt to collect the debt.

**(ii) Prohibited in-kind contribution.** Extension of credit by a corporation, limited liability company, or partnership that is not commercially reasonable and is not made in the regular course of business is presumed to be a prohibited in-kind contribution.

**(e) Debt forgiven is an in-kind contribution.**

**(i) Generally.** A debt owed by a candidate, which is forgiven or settled for less than the amount owed, is an in-kind contribution, unless the debt was forgiven or settled by the creditor in a commercially reasonable manner.

**(ii) Commercially reasonable treatment of debts.** The Board will consider as evidence of commercially reasonable treatment that: (A) all commercially reasonable efforts have

been taken to satisfy the outstanding debt; and (B) the creditor has pursued its remedies in the same manner as that customarily employed by creditors of other debtors.

**(iii) Advances.** An advance is considered to be an in-kind contribution from the individual or entity making the advance until it has been reimbursed by the candidate, and a candidate may not accept an advance from a prohibited source.

**(f) Failing to report a liability leads to a presumption of an in-kind contribution.** An outstanding liability not contemporaneously reported as outstanding by a candidate may be presumed to be an in-kind contribution to the candidate, if other indicia of a contribution exist.

## § 5-07 Refunding prohibited and over-the-limit contributions.

**(a) Generally.** When a candidate knows or has reason to know that the candidate has accepted a contribution or aggregate contributions from a single source in excess of the applicable contribution limit, including a contribution or contributions from a contributor having business dealings with the city, or from a source prohibited by the Act or the Charter or by state or federal law, the candidate must promptly refund the excess portion or prohibited contribution to the contributor or to the Fund. When a candidate knows or has reason to know that the candidate has accepted a nominee or anonymous contribution, the candidate must promptly disgorge the contribution to the comptroller of the state of New York for deposit in the general treasury of the state.

**(b) Contribution refunds must be timely.**

(i) When a candidate knows or has reason to know that the candidate has accepted a prohibited or over-the-limit contribution, the candidate must return or refund the contribution, or the over-the-limit portion, on or before the next disclosure statement filing deadline or the deadline set by the Board.

(ii) When a candidate is notified by the Board that the candidate has accepted a prohibited or over-the-limit contribution, the candidate must return the contribution or the over-the-limit portion by the date specified in the notice sent by the Board.

(iii) A contribution refund is made on the date on which the funds cleared the committee account.

**(c) Contribution refunds must be documented and reported.** If a candidate issues a refund for a contribution after it has been deposited in the committee's account, the contribution and corresponding refund must be documented and reported to the Board. The documentation must demonstrate that the refund cleared the committee account and was cashed or deposited by the reported contributor.

Back to TOC

**(d) Restrictions on return.** Unless directed to do so by the Board, a candidate may not return a contribution after receiving public funds for an election until any required repayments to the Fund have been made. A contribution may be returned if it: (i) exceeds the contribution limit, including the limit applicable to contributors having business dealings with the city, (ii) is otherwise illegal, or (iii) is returned because of the candidate's reputational interest in light of the particular source or intermediary involved.

**(e) Where refund is impracticable.** If a timely refund of a contribution to the contributor is impracticable, the candidate may pay the Fund an amount equal to the amount of the refund.

**(f) Over-the-limit contributions from contributors doing business with the city.**

(i) When a candidate reports an over-the-limit contribution from a contributor having business dealings with the city:

(A) The Board will provide such notification to the candidate within 20 days of the reporting of the contribution; provided, however, that if such twentieth day is a Saturday, Sunday, or legal holiday, notification by the Board on the next business day shall be considered timely. In the case of a contribution reported during the six weeks preceding the candidate's next covered election, the Board shall provide such notification within three business days.

(B) The candidate must:

(1) refund the excess portion of the contribution within 20 days of the date of the notice; or

(2) demonstrate to the Board, within 20 days of notification, that the contributor identified by the Board as having business dealings with the city has applied to the Mayor's Office of Contract Services for removal from the doing business database and that such application is pending.

(C) For purposes of calculating compliance with the limits applicable to contributors having business dealings with the city, contributions accepted from a contributor who appears on the doing business database shall be aggregated with all other contributions accepted from such contributor during the same election cycle; provided, however, that contributions accepted while the contributor did not appear on such database shall not be required to be refunded pursuant to this section.

(ii) Where a contributor has made an application for removal from the doing business database, the candidate may retain any contribution received from the contributor until the Board notifies the candidate that the Mayor's Office of Contract Services has denied the application for removal, in which case the candidate shall have 20 days from the date of such second notice to refund the excess portion of the contribution.



(iii) Contributions from or intermediated by individuals who have applied for removal from the doing business database shall not be considered matchable unless and until the contributor or intermediary is removed from the doing business database.

## § 5-08 Contributions originally received for other elections.

**(a) Transfers.**

**(i) Generally.** Notwithstanding section 5-11(a), participants may transfer funds previously received for another election to the principal committee. Additionally, participants may transfer funds from the principal committee to another authorized committee, after all excess funds have been returned to the Board as provided by sections 5-11(c)(ii) and 9-02(c).

**(ii) Segregated accounts.** Notwithstanding paragraph (i) of this subdivision, if a candidate has funds remaining in a segregated account after the election for which the account was established, such funds must be refunded to the contributors or paid to the Fund, or used to pay outstanding liabilities related to such election. Such funds may not be transferred into any other account or used for any future election.

**(b) Surplus funds.** The cash balance reported in a non-participant's first semi-annual Board disclosure statement at the beginning of the first reporting period for an election is the total amount of surplus funds the committee had from a previous election; except that the amount deemed to be surplus funds may be reduced by the following:

(i) the total amount of debts and obligations outstanding at the beginning of the reporting period;

(ii) the total amount subsequently transferred to a political committee that is not involved in a covered election; and

(iii) if the candidate was a participant in the previous election, the total amount of public funds subsequently repaid.

**(c) Additional requirements for transfers and surplus funds.**

(i) Candidates have the burden of demonstrating that surplus funds and transfers of funds from a committee not otherwise involved in the covered election, other than another authorized committee of the same candidate that has filed contemporaneous disclosure statements with the Board in a timely manner, do not derive from:

(A) contributions in excess of the Act's contribution limits, including contributions that would exceed the Act's contribution limits when aggregated with other contributions accepted from the same source; or

(B) contributions from sources prohibited by the Act, the Charter, or state or federal law.

(ii) Participants have the burden of demonstrating that funds transferred from a committee, other than another authorized committee of the same candidate that has filed contemporaneous disclosure statements with the Board in a timely manner, derive solely from contributions for which records demonstrating the contributors' intent to designate the contributions for the covered election have been submitted and maintained as required pursuant to sections 4-05(c)(vi) and 4-01(b)(ii)(D), respectively.

(iii) For purposes of enforcing the contribution limit and contribution prohibitions, the Board shall attribute surplus funds and such transfers to the last monetary contributions, loans, and other receipts received by:

(A) the candidate on or before the date of the cash balance described in subdivision (b), in the case of surplus funds; or

(B) the transferor committee before making the transfer.

(iv) For any prohibited or over-the-limit contribution, the candidate must either:

(A) promptly refund the excess portion or amount of the prohibited contribution, or

(B) keep the excess portion or amount of the prohibited contribution in the transferor committee bank account, not to be used in a covered election.

(d) Related expenditures. Expenditures incurred in connection with raising or administering funds transferred from a committee not otherwise involved in a covered election, other than from another principal committee of the same candidate, are presumed to be subject to the expenditure limits of the Act. Participants have the burden of demonstrating that any such expenditures are not subject to the expenditure limits of the Act, as provided in section 6-01(j).

## § 5-09 Loans.

**(a) Deposit.** All loans must be accepted and deposited, or rejected and returned, within 10 business days after receipt.

(b) Loans over $100 may not be made by cash or credit card.

**(c) Loans forgiven.** Any portion of a loan that is forgiven is a monetary contribution from the source of the loan, subject to the contribution limits and prohibitions.

**(d) Third party repayment of loan.** If any portion of a loan is repaid by an individual or entity other than the committee that received the loan, the portion thus repaid is a contribution by that individual or entity.

**(e) Repayment by next election.** If a loan is not repaid by the date of the next election in which the candidate appears on the ballot, the loan, guarantee, or other security for the loan will be considered a contribution subject to the Act's contribution limits and prohibitions.

**(f) Loans made in regular course of business.** A loan made in the regular course of the lender's business shall be deemed, to the extent not repaid by the date of the next election in which the candidate appears on the ballot, a contribution by the lender and by any other individual or entity endorsing, cosigning, guaranteeing, collateralizing, or otherwise providing security for the loan.

**(g) Loans not made in regular course of business.** A loan not made in the regular course of the lender's business shall be deemed, to the extent not repaid by the date of the next election in which the candidate appears on the ballot, a contribution by the lender.

**(h) Attributing a loan to an election.** A loan is presumed to be accepted for the next election in which the candidate seeks nomination or election following the day that the loan is received, except as otherwise provided in section 5-09(i), and except that:

(i) in the case of a state or local election, loans received before the first January 12 after an election will be presumed to be accepted for that election; and

(ii) in the case of a federal election, loans received before the first January 1 after the election will be presumed to be accepted for that election, except as may otherwise be provided under federal law and regulations.

**(i) Post-election loans.**

(i) Loans received after an election are considered contributions attributed to the previous election, and may be used for such election as provided in this section.

(ii) Loans received after an election must be deposited in the committee bank account for that election.

(iii) A loan to a candidate's principal committee made from such candidate's personal funds, after a final determination of the Board has been issued with respect to such committee, for the purpose of paying penalties or making required repayments to the Fund pursuant to such determination, is not subject to the contribution limit, even if such loan is subsequently forgiven by such candidate.

## § 5-10 Attributing contributions.

**(a) Attributing a contribution to an election.** A contribution is presumed to be accepted for the first covered election in which the candidate seeks nomination or election following the day that the contribution is received, unless the contribution was properly transferred to the committee from another committee of the candidate for a different election, and except that:

(i) in the case of a state or local election, contributions received before the first January 12 after the election will be presumed to be accepted for that election; and

(ii) in the case of a federal election, contributions received before the first January 1 after the election will be presumed to be accepted for that election, except as may otherwise be provided under federal law and regulations.

**(b) Attributing multiple contributions to a single source and contribution limit.**

(i) Multiple contributions from a single source will be totaled to determine the candidate's compliance with the applicable contribution limits.

**(ii) General factors for determining a "single source."** Factors for determining whether an individual, individuals in combination, entity, or entities in combination establish, maintain, or control another entity include, but are not limited to:

(A) whether the persons or entities make decisions or establish policy for the other entity, including determinations of the recipients of its contributions and the purposes of its expenditures;

(B) whether the persons or entities have the authority to hire, appoint, discipline, discharge, demote, remove, or otherwise influence other persons who make decisions or establish policies for the other entity;

(C) whether contributions made by the persons or entities and the other entity reflect a similar pattern; and

(D) whether the persons or entities know of and have acquiesced in public representations by the other entity that it is acting on their behalf or under their direction.

**(iii) Attributing single source contributions from labor organizations.** Notwithstanding paragraph (i), different labor organizations shall not be considered to be a single source for the purpose of compliance with the applicable contribution limit if the candidate demonstrates that the contributors satisfy the four criteria below:

(A) the labor organizations do not share a majority of members of their governing boards;

(B) the labor organizations do not share a majority of the officers of their governing boards;

(C) the labor organizations maintain separate accounts with different signatories; and

(D) the labor organizations make contributions from separate accounts.

**(iv) Attributing single source "doing business" contributions.** If a candidate accepts multiple contributions from a single source consisting of at least one contribution from an individual having business dealings with the city and one or more contributions from an entity established, maintained, or controlled by that individual, the limit applicable to persons having business dealings with the city shall apply.

**(v) Burden is on the candidate.** If multiple contributions appear to be from a single source in excess of the contribution limit, the candidate has the burden of demonstrating that they are from different sources. Candidates must review the relationship between contributors who appear to constitute a single source before accepting and depositing contributions.

**(c) Attributing contribution amount for fundraiser ticket or fundraising item.**

**(i) Fundraiser ticket.** When attendees purchase entrance to a fundraiser, the entire amount paid to attend a fundraising event is a contribution.

**(ii) Fundraising item.** When an individual buys an item sold by a candidate to raise funds, the entire amount paid as the purchase price for such item is a contribution.

## § 5-11 Use of receipts.

**(a) Bank accounts.**

(i) Candidates must maintain a committee account with check writing privileges. Checks issued from such account must be signed by the candidate or an individual so authorized by the candidate.

(ii) Candidates must maintain a bank account in the name of the principal or authorized committee. Such bank account:

(A) must be used for the deposit of receipts, including public funds, and the making of expenditures, for the covered election;

(B) must be used exclusively for the purpose of furthering the candidate's nomination or election in the covered election, and for post-election expenditures as provided in subdivision (c) of this section; and

---

(C) must not contain personal, business, or other non-campaign funds.

(iii) Receipts accepted by a participant for one election may not be commingled in an account with receipts accepted for another election, with receipts accepted for a TIE, or with personal or business funds. Notwithstanding the foregoing, participants:

(A) may use one account for both the primary and general election in the same calendar year;

(B) may open a segregated account pursuant to section 7-07(b);

(C) must use a court-ordered rerun account for public funds received for a court-ordered rerun election; and

(D) must use a merchant account for the purpose of accepting credit card contributions pursuant to section 4-01(b)(ii)(A)(4)(II).

**(iv) Separate accounts for different elections.** A candidate seeking election both to an office subject to the Act and to a state or federal office may maintain a separate allocation account for shared expenses in accordance with Advisory Opinion No. 1996-2 (July 18, 1996).

**(v) Deposit of receipts.** All monetary contributions must be accepted and deposited into the account(s) listed on the candidate's Filer Registration or Certification and in disclosure statements filed with the Board, or rejected and returned to a contributor, within 20 business days after receipt, except contributions made in the form of cash must be accepted and deposited, or rejected and returned to a contributor, within 10 business days after receipt. All monetary receipts accepted for an election must be deposited into the candidate's authorized committee bank account. A monetary receipt is received on the date it is delivered to the candidate.

**(b) Receipts may be only used for the covered election.** A candidate may use receipts only for the covered election for which that account was established.

**(i) Expenditures not in furtherance of the campaign.** In determining whether or not an expenditure is in furtherance of a candidate's nomination or election, the Board may consider the factors from the following non-exhaustive list:

(A) the timing of the expenditure;

(B) whether the candidate has already purchased duplicative services or equipment;

(C) the nature of the goods or services purchased;

(D) whether an unusually high proportion of funds was spent on a specific category of expenditure;

(E) whether a high total dollar amount or proportion of payments was made to individuals rather than to entities;

(F) whether the candidate has demonstrated a pattern of making other expenditures not in furtherance of the campaign or impermissible post-election expenditures; and

(G) whether an expenditure made less than one month prior to the election, or after the election, is accompanied by the reporting of a corresponding outstanding liability.

**(c) Post-election use of receipts.**

(i) After the last day of the final reporting period of a covered election, a candidate in that election may not expend, transfer, or use receipts accepted for another election, unless the receipts have been deposited in and are disbursed from a separate account, as provided in sections 5-11(a)(iii) and (iv). Funds accepted and separately deposited for the previous election may be transferred to this account only after any required repayments to the Fund have been made and any fines or civil penalties assessed pursuant to the Act have been paid. Contributions and loans accepted for the previous election after such election are subject to sections 5-04(d) and 5-09(i).

(ii) A participant may not use receipts for any purpose other than disbursements in the preceding election until all unspent campaign funds have been repaid, except as otherwise provided in subparagraph (i) of this paragraph and section 5-07(d). Notwithstanding the presumption of section 6-01(h)(i), a participant has the burden of demonstrating that a post-election expenditure is for the preceding election.

## § 5-12 Court ordered rerun elections.

**(a) No contributions may be accepted until court contest has begun.** A candidate may not accept contributions for a court-ordered rerun election until a complaint has been filed in a court of competent jurisdiction concerning the canvass of returns or the conduct of the election.

**(b) Where rerun election is canceled, contributions must be reasonably related to expenditures.** If a rerun election is ordered by a court but subsequently canceled, a candidate who would have been on the ballot has the burden of demonstrating that any portion of contributions raised may be reasonably attributed to expenses incurred for the rerun election before its cancellation.

# **Chapter 6: Expenditures**

**§ 6-01 Expenditure limits.**

(a) Participants may not exceed the applicable expenditure limits provided in § 3-706 of the Code.

**(b) Adjustment.** Pursuant to § 3-706(1) of the Code, not later than the first day of March in the year 2010, and every fourth year thereafter, the Board shall adjust the expenditure limits. Such adjustment shall be made in accordance with changes in the consumer price index for the metropolitan New York-New Jersey region published by the United States Bureau of Labor Statistics. The adjustment shall be based on the difference between the average consumer price index over the 12 months preceding the calendar year of such adjustment, and either (a) the calendar year preceding the year of the last such adjustment or (b) such other calendar year as may be appropriate pursuant to any amendment to the Act.

(c) Participants have the burden of monitoring their expenditures to be sure that they do not exceed the limit.

**(d) Applicability.** All expenditures made by a participant to further the participant's nomination or election, including expenditures made for the purpose of furthering or facilitating the defeat of the nomination or election of an opponent or prospective opponent, are subject to the expenditure limit applicable under the Act. All expenditures made by the participant shall be totaled to determine the participant's compliance with the applicable expenditure limit. Expenditures incurred after the last election in an election year in which the participant is a candidate, or a special election, are not subject to the expenditure limits for that election.

**(e) Expenditures made during the three calendar years preceding the election.** Expenditures made by a participant during the three calendar years preceding the year of a covered election are subject to the applicable expenditure limit set forth in § 3-706(2) of the Code. A participant is permitted to make expenditure in excess of this limit. However, pursuant to § 3-706(2a)(a), the amount by which the limits of § 3-706(2) are exceeded will be counted against the participant's first election year expenditure limit under § 3-706(1).

**(f) Expenditures made during the year of the election.** Expenditures made on or after the first day of January in the year of a covered election, and expenditures attributed to the year of the election pursuant to paragraph (v) of subdivision (h) of this section, are subject to the applicable expenditure limit set forth in § 3-706(1) of the Code.

**(g) Expenditures for or against a ballot proposal.** Expenditures made by a participant's principal committee for the purpose of advocating a vote for or against a proposal on the ballot in an election that is also a covered election, regardless of whether the expenditures



were also made to further or facilitate the participant's nomination or election, shall be subject to the contribution and expenditure limits applicable to such covered election.

**(h) Attributing an expenditure.**

(i) An expenditure is presumed to be made for the first covered election in which the candidate seeks nomination or election following the day that the expenditure is made, except:

(A) expenditures made before the first January 12 after a state or local election will be presumed to be made for that election; and

(B) expenditures made before the first January 1 after a federal election will be presumed to be made for that election, except as may otherwise be provided under federal law and regulations.

**(ii) No contested primary.** If there is no contested primary election in any party for an office, expenditures made by a candidate seeking that office will be entirely attributed to the general election.

**(iii) Contested primary or write-in primary.**

(A) If there is a contested or write-in primary election in any party for an office, every participant or limited participant seeking that office, regardless of whether the participant or limited participant is in the primary election, may make expenditures subject to the primary election expenditure limit of § 3-706(1) of the Code, provided the participant or limited participant files the two pre-primary and 10 day post-primary election disclosure statements and daily disclosures pursuant to sections 4-05(b)(ii)(B), (C), and 4-06 in a timely manner. In this case, the general election expenditure limit will first apply after the date of the primary election.

(B) Expenditures incurred after the date of the contested or write-in primary election will be attributed to the general election.

(C) Expenditures incurred before the primary election by a candidate in a contested primary election are attributed to the primary election, regardless of whether the candidate also received the nomination of another party without a primary election.

**(iv) Reasonably anticipated primary.** Expenditures may be attributed to a primary election that the Board has determined is reasonably anticipated.

(A) If a participant demonstrates to the Board that for a period preceding the primary election the participant had reasonably anticipated a primary election in any party for the office the participant seeks, the participant may attribute expenditures made before and during that period to the primary election expenditure limit of § 3-706(1)

of the Code, provided the participant files the two pre-primary and 10 day post-primary election disclosure statements and daily disclosures pursuant to sections 4-05(b)(ii)(B), (C), and 4-06 in a timely manner. In this case, the general election expenditure limit will first apply after that period.

(B) In order to demonstrate to the Board that for a period preceding the primary election the participant had reasonably anticipated a primary election, the participant must file a petition, consisting of an affidavit with supporting documentation, with the Board no later than 10 business days following the date the last remaining candidate other than the participant was finally disqualified from the ballot as set forth in section 7-01(e)(i).

(1) The affidavit must:

(I) be sworn to or affirmed by the candidate;

(II) specify the period of time during which it was reasonable to anticipate that a primary election would be held;

(III) identify the prospective candidate(s); and

(IV) provide a factual basis for the participant's belief that a primary election was reasonably anticipated during the specified period of time.

(2) The supporting documentation must demonstrate that the prospective candidate(s) engaged in activities that would lead a reasonable person to believe that such candidate(s) would participate in the primary election. Such activities may include:

(I) authorizing a political committee with the Board for the primary election;

(II) filing a Filer Registration or Certification with the Board;

(III) engaging in petitioning activity, including the filing of petitions with the Board of Elections;

(IV) producing and/or distributing campaign communications related to the primary election; and

(V) campaigning for office or otherwise publicly declaring an intent to participate in the primary election.

(C) Once it is determined that no primary election will be held for nomination to an office, or that such primary election is no longer reasonably anticipated, subsequent expenditures will be subject to the general election expenditure limit.

Back to TOC

**(v) Timing of expenditures.** As provided and described in §§ 3-706 (1) and (2) of the Code, an expenditure for goods or services is made when the goods or services are received, used, or rendered, regardless of when payment is made. Expenditures for goods or services received, used, or rendered in more than one year, including campaign websites, shall be attributed in a reasonable manner to the expenditure limits of § 3-706(1) or (2) of the Code, as appropriate.

(A) Expenditures for campaign advertising or other campaign communications shall be attributed to the expenditure limit in effect when the advertisement or communication is distributed, broadcast, or published. For the purposes of this paragraph, "campaign advertising or other campaign communications" shall not include a campaign website. A communication that is mailed shall be considered to have been "distributed" on the date on which it was postmarked.

(B) Expenditures for services performed or deliverables provided over a period that includes both the primary and the general elections shall be attributed in a reasonable manner to the expenditure limits of §§ 3-706(1) and (2) of the Code, as appropriate.

(C) Notwithstanding the requirements of this subdivision, the Board may require a candidate to demonstrate that an expenditure should be attributed to the expenditure limit provided in § 3-706(1) or (2) of the Code, as appropriate, based on the timing, nature, and purpose of the expenditure.

**(i) Exempt expenditures.**

(i) The following shall not be subject to the expenditure limits:

(A) expenses made for the purpose of bringing or responding to any action, proceeding, claim, or suit before any court or arbitrator or administrative agency to determine a candidate's or political committee's compliance with the requirements of this chapter, including eligibility for public funds payments, or pursuant to or with respect to election law or other law or regulation governing candidate or political committee activity or ballot status;

(B) expenses to challenge or defend the validity of petitions of designation or nomination or certificates of nomination, acceptance, authorization, declination or substitution, and expenses related to the canvassing or re-canvassing of election results;

(C) expenses related to the post-election audit, except as provided in paragraph (ii) of this subdivision; and

(D) expenditures for childcare services made pursuant to § 3-702(21)(a)(13) of the Code for an aggregate amount of $20,000 or less.

(ii) Exempt expenses related to the post-election audit shall include pre-election expenses for organizing and copying existing records in preparation for submission during the post-election audit, but shall not include pre-election expenses for:

(A) Ordinary compliance activities, such as the review of records to identify missing documents, evaluating whether documents meet Board standards, and identifying, preventing, and correcting any potential violation;

(B) Post-election work for which an invoice is issued or paid prior to the election;

(C) Salaries or other payments to campaign managers, finance chairpersons, treasurers, accountants, advisors, or other consultants;

(D) Legal or accounting fees;

(E) Costs associated with record creation and retention;

(F) Costs associated with running an office or business, such as standard bookkeeping, maintaining checkbook registers, petty cash journals, bank records, and loan records;

(G) Bookkeeping for payroll or vendor payments; and

(H) Other standard practices that political committees routinely perform as entities that raise and spend funds.

(iii) Candidates have the burden of demonstrating that expenditures are exempt pursuant to § 3-706(4) of the Code. To meet this burden, a candidate must maintain contemporaneous, detailed records that demonstrate that each individual expenditure is exempt in accordance with the Act and these rules, and submit such documentation as required. Expenditures not demonstrated to be exempt will be included in the expenditure limit calculation.

(iv) Notwithstanding anything otherwise provided for in this subdivision, the reimbursement of an advance shall not be considered an exempt expenditure.

(v) For purposes of this subdivision, in determining whether a participant's total expenditures exceed the expenditure limits of § 3-706(1) or § 3-706(3)(a) of the Code, as appropriate, expenditures made in the first three years of the election cycle, to the extent such expenditures do not exceed the limit applicable under § 3-706(2) of the Code, shall be excluded.

**(j) Expenditure limit compliance for a transfer between political committees.**

(i) A committee of a participant that receives a transfer of funds from another political committee, other than another principal committee of the same candidate, must:

(A) allocate to the transferred contributions any expenditures incurred by the transferor committee in connection with raising transferred contributions, and any expenditures incurred by the transferor committee during the covered election cycle in connection with administering transferred contributions; and

(B) upon request, provide documentation related to any such expenditures, including copies of federal forms or disclosure statements filed with the New York State Board of Elections on behalf of the transferor committee.

(ii) Expenditures will be applied towards the expenditure limit in effect at the time of the transfer; provided, however, that in the case of transfers made prior to the covered election cycle, expenditures will be applied towards the expenditure limits of § 3-706(2) of the Code.

(iii) The participant has the burden of demonstrating, for the purpose of compliance with the expenditure limits, that an expenditure made by the transferor committee was not made in connection with raising or administering the transferred contributions.

**(k) Expenditure limit relief.**

(i) Pursuant to § 3-706(3)(a) of the Code, where the Board has determined that a non-participating candidate has spent or contracted or become obligated to spend, or received in loans or contributions, an amount which, in the aggregate, exceeds half the applicable expenditure limit pursuant to § 3-706(1)(a) of the Code, the expenditure limit applicable to participating candidates in the election for that office will be increased to 150% of the expenditure limit.

(ii) Pursuant to § 3-706(3)(b) of the Code, where the Board has determined that a non-participating candidate has spent or contracted or become obligated to spend, or received in loans or contributions, an amount which, in the aggregate, exceeds three times the applicable expenditure limit pursuant to § 3-706(1)(a) of the Code, the expenditure limit will no longer apply to participating candidates in the election for that office.

**(l) Delayed or postponed elections.** The expenditure limit applicable to candidates in an election that is delayed or otherwise postponed shall be increased by 0.5% of the original limit for each day by which the election is delayed or postponed; provided, however, that such increase shall not exceed 30% of the original limit.

## § 6-02 Restrictions on expenditures

**(a) Spending public funds; qualified expenditures.**

(i) Public funds may be used only for qualified expenditures.

(ii) The following are not considered qualified expenditures:

(A) expenditures for any purpose other than to further the candidate's nomination or election;

(B) expenditures not incurred between December 15 in the year preceding the year of the election in which the participant is a candidate, and the date of such election;

(C) expenditures in violation of any law;

(D) payments to the candidate or a spouse, domestic partner, child, grandchild, parent, grandparent, or sibling of the candidate or spouse or domestic partner of such child, grandchild, parent, grandparent, or sibling, or to an entity in which the candidate or any such person has a 10% or greater ownership interest;

(E) payments in excess of the fair market value of services, materials, facilities, or other things of value received;

(F) expenditures made after the candidate has been finally disqualified or such candidate's petitions have been finally declared invalid by the Board of Elections or a court of competent jurisdiction, except that such expenditures may be made (1) as otherwise permitted pursuant to § 3-709(7) of the Code, or (2) for a different election (other than a special election to fill a vacancy) held later in the same calendar year in which the candidate seeks election for the same office, unless the candidate is seeking election exclusively as a write-in candidate in such later election;

(G) expenditures made after the only remaining opponent of the candidate has been finally disqualified or such opponent's petitions have been finally declared invalid by the Board of Elections or a court of competent jurisdiction, except that such expenditures may be made for a different election (other than a special election to fill a vacancy) held later in the same calendar year in which the candidate seeks election for the same office, unless the candidate is seeking election exclusively as a write-in candidate in such later election;

(H) expenditures made for any other election, if the public funds were originally received for a special election to fill a vacancy;

(I) payments in cash;

(J) contributions, transfers, or loans made to another candidate or political committee;

(K) gifts, except brochures, buttons, signs, and other printed campaign material;

(L) expenditures to challenge the validity of petitions of designation or nomination, or of certificates of nomination, acceptance, authorization, declination, or substitution, and expenses related to the canvassing of election results;

(M) expenditures for which records required by section 4-01 are not maintained or obtained by the candidate and submitted to the CFB;

(N) expenditures that are not itemized in a disclosure statement;

(O) payments that are not made or reimbursed from an account disclosed by the candidate pursuant to section 2-01 or 2-02(e);

(P) reimbursement for advances, except in the case of individual purchases in excess of $250, provided that the individual purchase is not otherwise not a qualified expenditure on the basis of any of the other subparagraphs of paragraph (ii);

(Q) expenditures made in connection with any action, claim, or suit before any court or arbitrator;

(R) expenditures made primarily for the purpose of expressly advocating a vote for or against a ballot proposal, unless such expenditures were also made to further the participating candidate's nomination or election;

(S) payments of any penalty or fine imposed pursuant to federal, state, or local law;

(T) payments for services that were never received, including payments for legal services pursuant to a retainer agreement to the extent payments for such services exceed the value of the services rendered;

(U) expenditures to facilitate, support, or otherwise assist in the execution or performance of the duties of public office;

(V) expenditures related to childcare services;

(W) payments for liabilities that were not reported in the disclosure statement covering the reporting period in which the liability was incurred; or

(X) expenditures in excess of $5,000 made by a candidate in a small primary election as defined in section 7-05(a).

**(b) Expenditures in cash.** A candidate may not use cash for an expenditure of more than $100.

**(c) Volunteer services.** Candidates may not pay volunteers for services already performed on a voluntary basis for that election, but may hire them as paid employees or retain them as consultants for future services. Candidates may not accept professional services on a volunteer basis from individuals who previously provided, on a paid basis, services of a similar nature to the same candidate during the same election cycle. Candidates may not accept volunteer services from any entity, or from an individual having an ownership interest of 10% or more in, or control over, any entity that provided paid services to the same

candidate during the same election cycle. Notwithstanding the foregoing, after the election, candidates may accept volunteer services from individuals who previously provided paid services.

**(d)** Candidates may not enter into contracts or agreements that provide for payments to vendors or employees that are conditional upon the receipt of public funds.

## § 6-03 Joint expenditures; endorsements.

**(a) Generally.** Candidates may engage in joint campaign activities, including joint fundraising, joint petitioning, and the production of joint campaign literature, subject to applicable expenditure limits.

**(b) Candidates must pay proportionally.** A candidate must pay for the portion of the joint expenditure that is proportionally equivalent to such candidate's campaign's exposure in or benefit from the joint activity, unless the benefit is de minimis.

(i) Candidates and other individuals or entities may present information to the Board establishing such a de minimis benefit pursuant to section 12-02.

**(ii) Factors for proportional payment.** Among the factors the Board will consider in determining whether the benefit to a candidate is proportionally equivalent to its expenditure or is de minimis are:

(A) the geographic distribution or location of the material or activity;

(B) the subject matter of the communication;

(C) the references to the candidate or the candidate's appearances therein;

(D) the relative prominence of a candidate's references or appearances in the communication, including the size and location of references to the candidate and any photographs of the candidate;

(E) the timing of the communication; and

(F) other circumstances of the communication.

**(c) Non-proportional payment may lead to in-kind contribution.** To the extent a candidate does not pay for the proportional benefit it receives, the candidate is considered to have received an in-kind contribution from the other candidate. An in-kind contribution is also an expenditure by the candidate receiving the contribution.

**(d) Not joint expenditures.** The following activities, by themselves, are not joint expenditures:

(i) the act of appearing with another candidate;

(ii) endorsing a candidate, or communicating about an endorsement or appearance in an insubstantial way, such as where the endorser's name is one of several names appearing on a communication and is of equivalent prominence as the other names; and

(iii) giving fundraising assistance to another candidate in the form of de minimis written communications, such as allowing the use of one's name or signature on a letter soliciting funds for another candidate or on fundraising material where the endorser's name appears alone or with other names and is of equivalent prominence as the other names.

## § 6-04 Independent expenditures.

**(a) Factors for determining independence.** In determining whether an expenditure is independent, the Board may consider any of the factors from the following non-exhaustive list:

(i) whether the person or entity making the expenditure is also an agent of a candidate;

(ii) whether any person authorized to accept receipts or make expenditures for the person or entity making the expenditure is also an agent of a candidate;

(iii) whether a candidate has authorized, requested, suggested, fostered, or otherwise cooperated in any way in the formation or operation of the person or entity making the expenditure;

(iv) whether the person or entity making the expenditure has been established, financed, maintained, or controlled by any of the same persons or entities as those that have established, financed, maintained, or controlled a political committee authorized by the candidate;

(v) whether the candidate shares or rents space for a campaign-related purpose with or from the person or entity making the expenditure;

(vi) whether the candidate has solicited or collected funds on behalf of the person or entity making the expenditure, during the same election cycle in which the expenditure is made;

(vii) whether the candidate, or any public or private office held or entity controlled by the candidate, including any governmental agency, division, or office, has retained the professional services of the person making the expenditure or a principal member or professional or managerial employee of the entity making the expenditure, during the same election cycle in which the expenditure is made; and

(viii) whether the candidate and the person or entity making the expenditure have each consulted or otherwise been in communication with the same third party or parties, if the candidate knew or should have known that the candidate's communication or relationship to the third party or parties would inform or result in expenditures to benefit the candidate.

**(b) Board determination.** Upon consideration of the factors described in subdivision (a), the Board may determine by a preponderance of evidence that an expenditure was not independent. Prior to such determination, the candidate and/or the person or entity making the expenditure shall have an opportunity to provide evidence indicating that such expenditure was independent.

**(c) Presumed non-independent expenditures.** Financing the dissemination, distribution, or republication of any broadcast or any written, graphic, or other form of campaign materials prepared by a candidate is presumed to be a non-independent expenditure, unless the candidate can show that the activity was not in any way undertaken, authorized, requested, suggested, fostered, or otherwise cooperated in by the candidate.

**(d) Non-independent expenditures are contributions and expenditures.** An expenditure for the purpose of furthering or facilitating the nomination or election of a candidate which is determined not to be an independent expenditure, is a contribution to, and an expenditure by, the candidate.

**(e) Expenditures made by party committees or constituted committees.** Communication between, or common agents shared by, parties and their nominees will not require a conclusion that all spending by the party's constituted committees and party committees in an election is an in-kind contribution to the nominee.

(i) The following expenditures made by party committees or constituted committees are not considered in-kind contributions to a candidate unless it is demonstrated that the candidate in some way cooperated in the expenditure and that the expenditure was intended to benefit that candidate:

(A) materials or activities that promote the party, or oppose another party, by name, platform, principles, history, theme, slogans, issues, or philosophy, without reference to particular candidates in an upcoming election subject to the requirements of the Act.

(B) materials or activities in connection with candidates and elections not subject to the requirements of the Act.

(C) training, compensating, or providing materials for poll watchers appointed by the party pursuant to § 8-500 of the New York State Election Law.

(D) promoting party enrollment or voter turnout without reference to particular candidates in an upcoming election subject to Program requirements, including research, polling, recruitment of party employees and volunteers, and development and maintenance of voter and contributor lists.

(E) raising funds for the party without reference to particular candidates in an upcoming election subject to the requirements of the Act.

(F) mailing of absentee ballot applications in a special or general election in which an office not subject to the requirements of the Act is on the ballot.

(ii) The Board may require a candidate to demonstrate that expenditures made by a party committee or constituted committee for the purpose of furthering or facilitating the nomination or election of a candidate, including expenditures for the purpose of furthering or facilitating the defeat of the nomination or election of such candidate's opponent or prospective opponent, are not in-kind contributions to the candidate.

(iii) Where a candidate has, without making public disclosure of an outstanding liability in a timely manner, promised or made reimbursement or other payment to a party committee or constituted committee for an expenditure, such expenditure will be considered an in-kind contribution to the candidate during the time preceding the reimbursement or other payment by the candidate.

**(f) Running as a "ticket."** If candidates announce they are running together as a "ticket" for which they have chosen to join together in a broad spectrum of activities to promote each other's election, the Board will presume that expenditures made by one candidate's campaign for materials or activities that clearly identify the other candidate are in-kind contributions to the second candidate. If the expenditures are in-kind contributions, the expenditures are subject to apportionment requirements as joint expenditures. The following factors would increase the burden a candidate would have in overcoming this presumption:

(i) the campaigns have staff, consultants, office space, or telephone lines in common; and

(ii) other in-kind contributions, expenditure refunds, advances, or joint expenditures have been made between these candidates, or one of the candidates has reported a liability owed to the other candidate(s).

**(g) Certain routine interactions with entities.** Certain routine interactions with entities, absent other indicia of non-independence, will not in themselves lead to a determination of non-independence pursuant to section 6-04(b), including:

(i) Discussions of logistics, including scheduling, regarding a non-fundraising event hosted by the entity;

(ii) Communications directly related to an entity's endorsement process, including questionnaires and interviews; and

(iii) Requesting, obtaining, or distributing publicly available materials such as a candidate's photograph, biography, position paper, or press release, but not including leaflets, posters, or other similar materials, nor video or audio materials.

## § 6-05 Expenditures made by other committees established for the candidate.

(a) A candidate has the burden of demonstrating that expenditures made by a committee authorized by such candidate for a different election should not be attributed to the covered election.

(b) Failure to meet this burden will result in the application of all Program requirements to these committees for the covered election, including attribution of expenditures to the covered election.

(c) **Expenditures for fundraising for more than one election.** When a candidate makes expenditures for a single event or other activity to raise funds for more than one office, and the next election that will be held is:

(i) a covered election, the full amount of such expenditures is subject to the expenditure limit.

(ii) not a covered election, a portion of such expenditures will be subject to the expenditure limit in the same proportion as the funds raised for the covered election bears to the total funds raised, unless the candidate can demonstrate to the Board that a different apportionment is applicable.

## § 6-06 Identification of communications.

(a) **"Paid for by."** When a candidate makes expenditures for any literature, advertisement, or other communication, the communication must include the words "paid for by" followed by the first and last name of the candidate or the name of the authorized committee that made the expenditures; provided that, if the name of the committee does not include the first or last name of the candidate, the words "paid for by" must be followed by the first and last name of the candidate, either instead of or in addition to the name of the committee.

(b) **"Authorized by."** When a candidate authorizes any individual or entity, other than the candidate, to pay for any literature, advertisement, or other communication in support of or in opposition to any candidate in any covered election, the communication must include the words "authorized by" followed by the first and last name of the candidate or the name of the candidate's authorized committee; provided that, if the name of the committee does not include the first or last name of the candidate, the words "authorized by" must be followed

by the first and last name of the candidate, either instead of or in addition to the name of the committee.

**(c) Form.** The identification required by subdivision (a) or (b) of this section must be in the following form:

(i) For printed material, an internet text advertisement, or a website, the identification must be written in a font of conspicuous size and style and contained in a box within the borders of the communication.

(ii) For an audio communication broadcast on radio or over the internet, the identification must be clearly spoken at the beginning or end of the communication.

(iii) For a video communication broadcast by television, satellite, cable, internet, or similar medium, the identification must be clearly spoken at the beginning or end of the communication and, simultaneous with the spoken disclosure, written in a font of conspicuous size and style contained in a box within the borders of the communication.

(iv) For a telephone communication, the identification must be clearly spoken at the beginning or end of the communication. If the identification is spoken at the end of the communication, the name of the candidate must also be clearly spoken at the beginning of the call.

(v) For a text message communication, the identification must be written at the beginning or end of the communication. If the identification is written at the end of the communication, the name of the candidate must also be clearly written at the beginning of the communication.

**(d) Languages other than English.** For communications primarily in a language other than English, all required written or spoken identification required by this section must be in such language.

**(e) Where identification would be impracticable.** This requirement may be modified by the Board concerning items upon which identification would be impracticable.

## § 6-07 Routine communication sent by a political club to its members.

A routine communication sent by a political club to its members that includes the name of a candidate is not an in-kind contribution to such candidate, provided that:

(a) the candidate is already a member of the club;

(b) the club has fewer than 500 members; and

(c) the communication does not solicit funds on behalf of or otherwise promote the candidate's campaign for a covered election.

# Chapter 7: Pre-Election Public Funds Payments

## § 7-01 Eligibility.

(a) A determination that a candidate has met all eligibility requirements of the Act and these rules, as of the date on which payment is to be made, shall not constitute the Board's final determination of the amount, if any, for which the candidate qualifies. The Board shall provide specific notice of any such final determination.

(b) Failure to respond to a request for audit documentation or information by the Board may be a basis for a non-payment determination.

(c) **Payment amount.** A candidate in any covered primary, general, or special election, having demonstrated eligibility to receive public funds, including by meeting the threshold for eligibility for public funding pursuant to § 3-703(2) of the Code, may receive public matching funds based on valid matchable contribution claims and the matching rate set forth in § 3-705(2)(a) of the Code, up to the maximum amount set forth in § 3-705(2)(b) or § 3-705(7) of the Code, as applicable. Payments are subject to withholdings and deductions as set forth in the Act and these rules. For an election that is delayed or otherwise postponed, the maximum amount of public funds payable shall be calculated as stated in § 3-720(e) of the Code, provided that the expenditure limit used as the basis for such calculation shall be the increased expenditure limit pursuant to section 6-01(l).

(d) **Approval by Board subject to correction of limited, isolated, and easily corrected compliance issues.** The Board may, at its discretion, approve a public funds payment to a candidate, notwithstanding limited, isolated, and easily corrected compliance issues, conditioned upon a demonstration by the candidate that such candidate has taken the action specified by the Board, by the deadline specified by the Board, to correct the compliance issues. The candidate shall have the burden of demonstrating to the Board that such candidate has taken the action specified by the Board by the applicable deadline.

(e) **Ballot disqualification; unopposed candidates.** Pursuant to §§ 3-703(1)(a) and (5) of the Code, the Board will not pay any candidate disqualified from the ballot by the Board of Elections or by a court, or any candidate for an election in which all other candidates have been disqualified from the ballot by the Board of Elections or by a court, until such candidate or other candidate is restored to the ballot by a court. A candidate who does not appear on the ballot in an election, or who appears as the only candidate on the ballot in an election, is not eligible to receive public funds, notwithstanding any write-in candidates in that election, except as otherwise provided in paragraph (ii) below, and may be required to return any public funds received. Notwithstanding § 3-704(2)(d) of the Code, such a candidate shall be ineligible to receive additional public funds for a later election held in the same calendar year

unless the candidate demonstrates that they will appear on the ballot in that election. A candidate who appears on the ballot for a single election in an election cycle may not receive public funds exceeding the maximum public funds payable amount for a single election, pursuant to § 3-705(2)(b) of the Code, for that election cycle; provided, however, that a candidate who receives public funds based on a reasonably anticipated primary election that is not held, or for which such candidate does not appear on the ballot, such candidate may receive additional public funds for a different election held later in the same calendar year as provided in section 9-02(i)(iii).

(i) The Board will consider a candidate to be finally disqualified from the ballot on the earlier of the date of an administrative or judicial determination disqualifying the candidate for which there is no appeal as of right (unless the disqualification is reversed on appeal or otherwise) or of the election.

(ii) **Payment petition.** Payment may be made to a candidate who was temporarily on the ballot or opposed in an election, pursuant to a determination of the Board of Elections or a court of competent jurisdiction, but then ultimately disqualified from the ballot or unopposed in that election, only when the Board's audit of the candidate's campaign has been completed and only if the candidate has, within 30 days after the date of the final disqualification, as provided herein, filed a written petition, sworn to or affirmed, and supporting documentation that demonstrates that: (1) liabilities in qualified campaign expenditures incurred before the date of final disqualification remain unpaid; (2) the total amount of cash on hand is insufficient to pay these liabilities; (3) all expenditures made and liabilities incurred after the final disqualification were reasonable and necessary; and (4) the candidate was otherwise eligible and in compliance with all other Program requirements as of the date of final disqualification and has remained in compliance at all times since that date. The petition must also include an undertaking to use all public funds received to extinguish the liabilities enumerated pursuant to subparagraph (1) of this paragraph.

**(f) Write-in candidates.** A candidate who is seeking election exclusively as a write-in candidate, or who is only opposed by a candidate who is seeking election exclusively as a write-in candidate, is not eligible to receive public funds.

(g) Pursuant to §§ 3-703(1)(a) and (5) of the Code, public funds are not payable to a participant who has not met the legal requirements to have the participant's name on the ballot, or, for an optional early public funds payment, who has not certified that the participant intends to meet all the requirements of law to have the participant's name on the ballot and stated the specific office to which the participant is seeking nomination or election.

## § 7-02 Timing.

**(a) Payment Dates.**

Back to TOC

(i) The Board will schedule at least three payment dates in the 45 days before a covered primary election and at least four payment dates in the 90 days prior to a covered general election.

(ii) No public funds will be paid to candidates in a primary or general election any earlier than two weeks after the last day to file designating petitions for the primary election, except that optional early public funds payments may be made no earlier than December 15 in the year before the year of the election. For a candidate to receive an optional early public funds payment, the Board must determine that one of the conditions set forth in § 3-705(7)(a)(2) or (3) of the Code is satisfied, or the candidate must submit a certified signed statement attesting to the need for such public funds and demonstrating that at least one of the conditions set forth in § 3-705(7)(a)(1) of the Code is satisfied. The statement must be accompanied by supporting documentation and must be submitted to the Board at least 15 business days before the optional early public funds payment is scheduled to be made.

**(b) Preliminary review of disclosure statements; reasons for delay.** In order to enable payment within four business days after receipt of disclosure statements, or as soon thereafter as is practicable, pursuant to § 3-705(4) of the Code, the Board shall conduct a preliminary review of all disclosure statements filed.

(i) If a candidate's complete disclosure statement is not actually received by 5:00 p.m. on the due date, or if the candidate submits a disclosure statement that fails to comply substantially with the requirements of the Act or these rules, the Board may be unable to make payment within four business days, and may review the disclosure statement for possible payment determinations at the next payment date.

(ii) A preliminary review may also be delayed for reasons including, but not limited to, consideration of whether a basis exists for an ineligibility determination. A delayed preliminary review may result in a payment determination being delayed until such time as it is practicable.

**(c) Preliminary review of matching claims.**

(i) Before making a pre-election payment determination, the Board may issue a report to the candidate indicating any matching claims determined to be invalid based on preliminary review of each disclosure statement and of the matchable contribution claims reported. The candidate may respond to the report by providing information or documentation demonstrating that any of the matching claims should be considered valid. Failure by the candidate to respond to such report by the deadline set by the Board may delay payment of public matching funds.

(ii) Pursuant to 3-703(12)(b) of the Code, the Board will not invalidate a matching claim in a review of any disclosure statement filed after the statement in which such claim was

submitted, unless the Board learns of new information relevant to the eligibility of the claim that was not available to the Board at the time of the initial review. Such new information may include: (1) information related to the candidate's eligibility to receive public funds generally, including the submission of a Certification as provided in Rule 2-02, where the submission had not been made at the time of the initial review, and (2) information related to the contribution limit applicable to the candidate, including a declaration or change of the office sought by the candidate.

(d) No candidate shall receive more than the maximum public funds payable amount for a single election, pursuant to § 3-705(2)(b) of the Code, any earlier than the day after the day of the primary election.

## § 7-03 Payment by electronic funds transfer.

All payments of public funds shall be by electronic funds transfer unless the Board determines, at its sole discretion, to use an alternative payment method. In order to receive prompt payment, the participating candidate must provide the Board with a voided committee check and such additional information as shall be required by the Board.

## § 7-04 Public funds cap.

(a) A candidate shall not be eligible to receive more than one quarter of the applicable maximum pursuant to § 3-705(2)(b) of the Code unless the Board determines that one of the conditions set forth in § 3-705(7)(a)(2) or (3) of the Code is satisfied, or the candidate submits a certified signed statement attesting to the need for additional public funds and demonstrating that at least one of the conditions set forth in §3-705(7)(a)(1) of the Code is satisfied. The statement must be filed with the Board no later than the due date of the applicable disclosure statements as follows, except that, if the basis for filing the statement arises after the due date, and no basis existed prior to such due date, then the statement shall be due by the deadline for the disclosure statement immediately preceding the next date on which a public funds payment is scheduled to be made:

(i) Candidates in the primary election must file the statement of need no later than the due date of the 32-day pre-primary election disclosure statement.

(ii) Candidates in the general election must file the statement of need no later than the due date of the 32-day pre-general election disclosure statement.

(b) The Board shall verify the truthfulness of any certified signed statement submitted pursuant to § 3-705(7)(a)(1) of the Code and determine whether supporting documentation demonstrates the existence of the condition or conditions described in such statement. For the purposes of making a determination pursuant to § 3-705(7)(a)(1)(A) of the Code, a non-participating candidate shall be presumed to have the ability to self-finance when it is demonstrated through supporting documentation that such candidate has readily available

funds in excess of one fifth of the applicable expenditure limit and that such candidate can reasonably be expected to spend such funds for such candidate's election.

## § 7-05 Small primaries.

(a) A candidate on the ballot in one or more primary election(s) in which the number of persons eligible to vote for party nominees in each such election totals fewer than 1,000 shall not receive public funds in excess of $5,000 for qualified campaign expenditures in such election or elections; provided, however, that the foregoing limitation shall not apply to such candidate if the candidate is opposed in a primary election by (i) a participant who is not subject to such limitation or (ii) a non-participant who has spent or contracted or become obligated to spend in excess of $10,000 for such primary election. The Board shall determine whether a non-participant has exceeded such $10,000 level pursuant to § 3-705(6) of the Code.

(b) For the purposes of subdivision (a), the number of persons eligible to vote for party nominees in a primary election shall be as determined by the Board of Elections for the calendar year of the primary election pursuant to § 5-604 of the New York State Election Law. If such determination for any primary election is not available from the Board of Elections as of the day before the due date for filing a Certification pursuant to § 3-703(1)(c) of the Code, the most recent determination by the Board of Elections of the persons eligible to vote for party nominees for the office for which such primary election is held shall be relied upon.

**(c) Public funds exceeding $5,000.** If a candidate in a small primary receives public funds payments aggregating in excess of $5,000 for the covered election, the candidate must return the excess funds to the Board; provided, however, that the candidate may use the excess funds for a different election (other than a special election to fill a vacancy) held later in the same calendar year in which the candidate seeks election for the same office, unless the candidate is seeking election exclusively as a write-in candidate in such later election. The amount of any excess funds used for a later election will be deducted from the total amount of public funds the candidate is eligible to receive for that election.

## § 7-06 Withholdings.

(a) The Board shall withhold 5% of the amount of public funds payable to a candidate until the final pre-election payment for any election in which the candidate is eligible to receive public funds. Such withheld funds shall not be payable to any candidate who is not otherwise eligible to receive a payment, or who fails to provide, to the satisfaction of the board, such submissions as may be requested by the board for the purpose of publishing a video statement in the voter guide pursuant to chapter 16 of these rules.

(b) In addition, the Board may withhold from pre-election public funds payments: (a) a percentage equal to the projected rate of invalid matching claims; (b) an amount equal to any

contributions made, received, solicited, or otherwise obtained in violation of any law, pending disgorgement of such contributions to the Fund or refund to the contributor; and (c) up to an additional 5% if the Board determines that there is reason to believe that the candidate has failed to comply with the Act, including by failing to adequately respond to a Board request for information or documentation. Withholdings shall be subject to post-election audit.

## § 7-07 Deductions from payments.

(a) The total amount of public funds payable to a participant for a covered primary, general, or special election shall be reduced by the sum of the following:

(i) the amount of outstanding civil penalties assessed by the Board as a result of the participant's failure to comply with the Act and these rules during the current covered election; and

(ii) the amount of the participant's:

(A) transfers and other disbursements from a political committee that is involved in an election in which the candidate is currently a participant, to a political committee that is not involved in that election;

(B) expenditures made to pay expenses for or debt from a previous election, including repayments of public funds and payment of penalties owed to the Board for a previous election;

(C) contributions to other political committees that do not meet the requirements provided in § 3-705(8) of the Code for contributions that shall not be a basis for reducing public funds payments;

(D) loans to other candidates that are not repaid within 30 days or by the date of the election, whichever is earlier, or spending for other candidates, including joint expenditures, to the extent such expenditures benefit another candidate, and independent expenditures; provided that independent expenditures made by the principal committee of a candidate shall not be a basis for reducing public funds payments to that candidate, where such expenditures do not, in the aggregate, exceed the amount provided in §§ 3-705(8)(i), (ii), or (iii) of the Code, as applicable, for contributions to political committees;

(E) loans to or spending for political party committees and political clubs that are not reimbursed within 30 days or by the date of the election, whichever is earlier, provided that if the candidate demonstrates that the expenditure was for a tangible item that directly promotes the candidate's election, such as an advertisement in a fundraising journal, this subparagraph shall not apply to the fair market value of that item; and

(F) expenditures made for the purpose of furthering the candidate's selection as Speaker of the City Council.

(b) Disbursements that would otherwise result in a deduction pursuant to paragraph (ii) of subdivision (a) of this section shall not result in any such deduction if:

(i) such disbursements are made out of a segregated bank account;

(ii) at no time does the segregated bank account contain any funds other than contributions received by the candidate and deposited directly into the account pursuant to this section, and bank interest paid thereon;

(iii) funds deposited into the segregated bank account are not used for any purpose other than disbursements governed by paragraph (ii) of subdivision (a) above or payment of bank fees associated with the segregated bank account;

(iv) contributors whose contributions are deposited into the segregated bank account have confirmed in writing, pursuant to section 4-01(b)(ii)(B), that they understand that these contributions will only be used for such disbursements and will not be matched with public funds;

(v) copies of such written confirmations are submitted to the Board by the due date of the disclosure statement in which such contributions are required to be reported pursuant to these rules;

(vi) copies of checks for each disbursement out of the segregated bank account are submitted to the Board by the due date of the disclosure statement in which such disbursements are required to be reported pursuant to these rules;

(vii) a copy of each bank statement for the segregated bank account is submitted to the Board by the due date of the next disclosure statement; and

(viii) for each individual contribution deposited into the segregated bank account, and each disbursement out of the segregated bank account, the candidate has complied with all other applicable provisions of the Act and these rules, including but not limited to the record keeping and reporting provisions.

(c) Candidates must deposit the entire amount of a contribution into the segregated bank account provided for in subdivision (b), and may not divide the contribution between different accounts.

(d) Contributions deposited into a segregated bank account pursuant to this section will not be matched with public funds.

(e) Any funds remaining in a segregated bank account after the election must be returned to the contributors whose contributions were deposited into the account, or, if that is impracticable, to the Fund, on or before December 31 in the year following the year of the election; provided, however, that expenditures made for the purpose of furthering the candidate's selection as Speaker of the City Council may be made from a segregated bank account after the election, but no later than the financial disclosure cut-off date of the first semi-annual disclosure statement in the year following the year of the election; provided, however, that expenditures made for the purpose of furthering the candidate's selection as Speaker of the City Council may be made from a segregated bank account after the election, but no later than the financial disclosure cut-off date of the first semi-annual disclosure statement in the year following the year of the election.

(f) A candidate who establishes a segregated bank account pursuant to this section, but fails to comply with any provision of subdivisions (b), (c), (d), or (e) of this section, shall no longer be entitled to the exception from subdivision (a) contained in subdivision (b) of this section.

(g) Funds deposited into, and disbursements made from, a segregated bank account established and maintained in compliance with this section for the purpose of making expenditures to pay expenses for or debt from a previous election, including repayments of public funds owed to the Board, will not be considered to be raised or spent for the current covered election for purposes of the participant's expenditure limit calculation.

## § 7-08 Notice to candidates.

The Board shall notify the candidate in writing of any non-payment determination or of the difference between the amount of public funds claimed and the amount paid.

## § 7-09 Petitions for review.

(a) After the Board provides a candidate a written determination specifying the basis for payment or non-payment of public funds prior to the election, the candidate may petition the Board in writing for reconsideration of such determination. Such petition must state the grounds for reconsideration and must also include either a request to appear before the Board concerning the petition or a statement that the candidate waives such candidate's right to appear. The Board shall review the determination that is the subject of the petition within five business days of the filing of such petition. If the Board is unable to convene within five business days, the Board may delegate to the Chair of the Board or the Chair's designee authority to make a determination regarding the petition.

(b) To be considered by the Board, a petition for review of a pre-election payment or non-payment determination must not include any documentation or factual information not submitted to the Board prior to the determination under review, unless the participating

candidate can demonstrate good cause for the previous failure to submit such documentation or information and for any failure to communicate on a timely basis with the Board.

(c) The Board shall timely issue a written determination on the subject of the petition. If the petition is denied, the determination shall inform the candidate of the right to appeal such determination pursuant to Article 78 of the Civil Practice Law and Rules.

## § 7-10 Review of contributions and expenditures.

**(a) Facial Determinations.** The Board may find that a candidate's registration and financial disclosure submitted to the Board or to the State Board of Elections provide on their face a sufficient basis for a determination of the amount such candidate has spent or contracted or become obligated to spend, or received in loans or contributions. The Board will presume that contributions and loans are accepted, disbursements are made, and liabilities are incurred by a candidate for such candidate's next election. In the absence of contrary evidence, the Board will rely upon the date of contributions, loans, disbursements, and liabilities as they appear on disclosure statements filed with the Board or the State Board of Elections.

**(b) Petitions for reconsideration.**

**(i) Contents.** A candidate may file a petition for reconsideration of a preliminary Board determination made pursuant to subdivision (a). Such petition must be written and must:

(A) be sworn to or affirmed;

(B) indicate on whose behalf the petition is being submitted;

(C) contain sufficient specificity and detail for the Board to make a decision, including:

(1) if alleging that information submitted to the Board or the State Board of Elections is inaccurate or incomplete, the petition must describe the inaccuracies or omissions in detail, or the Board may presume that any information on file is true and complete;

(2) if alleging fundraising or spending activities to have taken place after the close of a reporting period, the petition must describe the activities in detail;

(3) if alleging that a third party is providing unreported contributions, goods, services, or benefits to a candidate in coordination with that candidate, the petition must include all relevant names, dates, and amounts, including information concerning the fair market value of services, materials, facilities, advertising, or other things of value reported to have been received or expended; and

(4) if alleging that statements have been made, the petition must include content of statements, name, dates, how speaker is affiliated with a candidate or other actor, and any other relevant information.

(D) include a request for a hearing, if desired;

(E) be submitted no later than 10 days after the determination or decision; and

(F) be accompanied by evidence that supports the allegations made in the petition. The petitioner has the burden of demonstrating a sufficient basis for a determination.

**(ii) Notice of petition.**

(A) The Board shall send a copy of the petition to any opposing entities named in the petition or known by the Board to have an opposing interest in the petition.

(B) The notice shall specify:

(1) the deadline for the opposing entities to submit a response; and

(2) the date and time at which the Board will conduct a hearing on the petition, if any.

**(iii) Response to the petition.** The opposing entities may submit a response to the petition. A failure to submit a response may be deemed an admission of the allegations in the petition and sufficient reason to deny a request to reconsider any determination based on the petition. The response must:

(A) be submitted in the manner and by the deadline set forth by the Board;

(B) be sworn to or affirmed;

(C) either acknowledge that fundraising or spending on behalf of the respondent is sufficient to permit the Board to make a determination, regardless of the merit of the petitioning candidate's particular allegations, or contend that a determination would be inappropriate and specify the allegations in the petition that are denied and those that are admitted;

(D) explain any failure to disclose any information to the Board or the City or State Board of Elections;

(E) include evidence that supports the response, including, but not limited to, all relevant names, dates, and amounts, including information concerning the fair market value of services, materials, facilities, advertising, or other things of value reported to have been received or expended;

Back to TOC

(F) include a request for a hearing, if desired; and

(G) be signed by the opposing entity.

**(iv) Hearing.**

(A) The Board may decide to conduct a hearing upon request or on its own initiative.

(B) The hearing date will be no earlier than 10 days after the petition is received, except:

(1) for good cause shown; or

(2) for petitions received less than 30 days before the election, in which case the hearing date will be no earlier than three days after the petition is received.

(C) The respondent and each opposing candidate must notify the Board no less than one day in advance whether they will be represented at the hearing. Representation of a party at a hearing must be by a person with knowledge of the facts at issue.

(D) At the hearing, testimony given may be under oath and no new documentary evidence will be considered unless good cause is shown for the party's failure to submit it with its petition or response.

**(v) Notice of determination.** Following the review of disclosure statement filings; the petition and response, if any; and testimony and evidence presented at a hearing, if any, the Board will:

(A) decide whether there is a sufficient basis for a determination; and

(B) provide written notice to the petitioner and opposing entities, if any, of its determination.

**(vi) New petition for a preliminary public funds determination may be submitted based on new evidence.** The Board's decision not to award public funds shall not be construed to preclude the subsequent submission of any petition based on new evidence for a determination respecting that candidate.

**(vii) Request for reconsideration.** The petitioner or an opposing party may request reconsideration of a preliminary public funds determination.

(A) A request for reconsideration must be made in writing no later than 10 days after the determination, and must include:

(1) an affidavit of the party affirming that neither fundraising nor spending on behalf of the respondent that has taken place after the close of the most recent reporting period is sufficient to permit the Board to make a determination; and

(2) an undertaking by the respondent to notify the Board immediately in writing if and when either fundraising or spending on behalf of the respondent becomes sufficient to permit the Board to make a determination pursuant to subdivision (a).

(B) The Board shall consider the evidence, may conduct a hearing, and shall notify the petitioner of its determination.

(C) The Board may consider a respondent's failure to respond to the petition, or the failure of the party requesting reconsideration to be represented at a hearing on the petition, to be a sufficient basis for denying a request for reconsideration. The Board shall notify the respondent, all opposing candidates, and the petitioner whether it will reconsider the determination pursuant to subdivision (a) or decision not to make such a determination, as the case may be.

(D) The Board will respond within five business days of the filing of such petition.

**(viii) Appeal.** A party may bring a special proceeding as set forth in Article 78 of the Civil Practice Law and Rules within four months of the Board's final determination denying the petition for reconsideration.

## Chapter 8: Post-Election Public Funds Payments

### § 8-01 Payment determinations.

(a) Candidates who fail to demonstrate compliance with the Act and these rules, including candidates who satisfy one or more criteria for ineligibility as provided in section 3-01(d), are not eligible to receive a post-election public funds payment.

(b) Candidates have the burden of demonstrating eligibility to retain public funds received prior to the election and to receive additional public funds after the election. Candidates who fail to demonstrate eligibility to retain all or a portion of the public funds previously received may be required to repay such amount to the Fund.

(c) A candidate's post-election payment, if any, will be reduced by the amount of any applicable deductions pursuant to section 7-07(a), if such amounts were not deducted from pre-election public funds payments.

(d) The post-election payment, repayment, or nonpayment determination shall be the final determination regarding that candidate's public funds payment status, except as provided in section 8-05.

**§ 8-02 Amount of post-election payment.**

(a) **Reasons for post-election payment.** A post-election payment shall only be made if, at the conclusion of the post-election audit, a candidate has demonstrated unpaid matching claims, a qualified expenditure surplus, and documented outstanding liabilities.

(i) **Unpaid matching claims.** Candidates may be entitled to receive a post-election payment equal to the amount by which the candidate's total valid matchable claims multiplied by the applicable matching rate pursuant to § 3-705(2)(a) of the Code exceed the total pre-election payments received by the candidate.

(ii) **Qualified expenditure surplus.** Candidates may be entitled to receive a post-election payment equal to the amount by which the candidate's total qualified expenditures exceed the total pre-election payments received by the candidate.

(iii) **Documented outstanding liabilities.** Candidates may be entitled to receive a post-election payment equal to the amount of the candidate's properly reported and documented liabilities that remain outstanding, less the amount remaining in the candidate's principal committee bank account.

(A) Prior to issuing a post-election payment, the Board may require the candidate to submit any bank statements not previously provided.

(B) In order to be the basis for a post-election payment, an outstanding liability must be reported on or before the due date for the final disclosure statement required to be submitted for the covered election to which the liability relates.

(C) To document an outstanding liability for the purpose of receiving a post-election payment, the candidate must provide documentation demonstrating that the reported payee has made a commercially reasonable attempt to collect the debt.

(iv) **Post-election payment is smallest amount.** The amount of the post-election payment shall be the lowest of the three amounts detailed in paragraphs (i), (ii), and (iii) of this subdivision. If any of these amounts is zero, the candidate is not entitled to receive a post-election public funds payment.

(b) **Statutory maximum.** Combined with the total pre-election payments received by the candidate, the post-election payment shall not exceed the maximum payment allowed for each election in which the candidate was a participant pursuant to § 3-705(2)(b) of the Code.

**§ 8-03 Use of final post-election payment.**

Before the Board makes the final post-election payment determination, if eligible, the candidate must submit to the Board bills or other documentation of outstanding debt for which such payment will be used. Within 60 days after the final public funds payment, the candidate



must demonstrate that the public funds were used to pay such outstanding debt. If such demonstration is not made, the candidate must repay the public funds to the Board.

### § 8-04 Disclosure statement amendments.

The Board shall not make payments based on disclosure statement amendments filed after January 15 in the year following the year of the election; provided, however, that the Board may make payments based upon such amendments solely if they are made in response to invalid matching claims reports or expenditure sample reports to which the Board has requested a response after January 15 in the year following the year of the election.

### § 8-05 Post-election petitions for review.

(a) After the Board provides a candidate a written determination specifying the basis for payment or non-payment of public funds after the election, the candidate may petition the Board in writing for reconsideration of such determination.

(b) A petition for review of a post-election payment determination must be submitted within 30 days of the candidate's final audit report, and must include:

(i) a statement of the grounds for reconsideration;

(ii) information or documentation that was unavailable to the Board previously and is material to such determination;

(iii) a showing that the candidate had good cause for the previous failure to provide such information or documentation; and

(iv) either a request to appear before the Board concerning the petition or a statement that the candidate waives such candidate's right to appear.

(c) The Board shall timely issue a written determination on the subject of the petition. If the petition is denied, the determination shall inform the candidate of the right to appeal such determination pursuant to Article 78 of the Civil Practice Law and Rules.

## Chapter 9: Public Funds Repayments

### § 9-01

Candidates must promptly repay public funds upon a determination made by the Board that a repayment is required. Candidates returning public funds must make a check payable to the "New York City Election Campaign Finance Fund." Candidates may not reclaim public funds they have returned. Public funds must be repaid to the Board separately from, and in addition to, any penalties owed by the candidate.

**§ 9-02 Reasons for repayment.**

The Board shall determine whether a candidate or such candidate's principal committee is required to repay public funds previously received as follows:

**(a) Overpayment of public funds.** Pursuant to § 3-710(2)(a) of the Code, the candidate's principal committee is required to pay to the Board an amount equivalent to the amount of public funds received in excess of the amount which the candidate is eligible to receive.

**(b) Qualified expenditure deficit.** Pursuant to § 3-710(2)(b) of the Code, the candidate's principal committee is required to pay to the Board an amount equivalent to the amount of public funds paid to the candidate that were not spent on qualified expenditures.

**(i) Determination of personal liability.** A candidate may be personally liable for paying to the Board the amount of public funds not spent on qualified expenditures, or a portion of that amount. In considering whether and to what extent a participating candidate shall be personally liable for repayment of public funds, the Board shall act in accordance with the following:

(A) where credible documentation supporting each qualified expenditure exists but is incomplete, the Board shall not impose such liability for such expenditure;

(B) where there is an absence of credible documentation for each qualified expenditure, the Board may impose such liability upon a showing that such absence of credible documentation for such expenditure arose from a lack of adequate controls including, but not limited to, trained staff, internal procedures for following Board guidelines and internal procedures for employing standard financial controls.

**(c) Final bank balance.** Pursuant to § 3-710(2)(c) of the Code, the candidate and the principal committee are required to pay to the Board an amount equivalent to the campaign funds remaining in such candidate's principal committee account. The candidate must promptly pay to the Board such remaining funds; provided, however, that all remaining funds for a candidate shall be immediately due and payable to the Board upon a determination by the Board that the candidate has delayed the post-election audit process. The candidate must promptly pay to the Board any additional remaining campaign funds based upon a determination made by the Board at a subsequent date. The amount of remaining campaign funds shall be presumed to be equal to the candidate's authorized committee bank account balance on January 11 in the year following the election, or for special elections, on the last day of the reporting period for the later of the 27 day post-election disclosure statement or the first semi-annual disclosure statement the candidate is required to file with the Board following the date of such election, less any permissible documented post-election expenditures pursuant to paragraph (i) of this subdivision. The Board may also consider information revealed in the course of an audit or investigation in making a remaining funds determination, including, but not limited to, the fact that campaign expenditures were made in violation of law, that expenditures were made for any purpose other than the furtherance of

the candidate's nomination or election, or that the candidate has not maintained or provided requested documentation. If a candidate repays to the Fund all funds remaining in such candidate's authorized committee bank account on or before December 31 in the year of the election, or, for special elections, on or before the last day of the month following the month in which the election took place, such candidate shall be presumed not to owe additional remaining funds, provided that any contributions received and expenditures made after such funds are repaid must be raised and spent in compliance with the Act and these rules.

(i) Before repaying campaign funds remaining in the committee bank account, a candidate may make post-election expenditures only for routine activities involving nominal cost associated with winding down a campaign and responding to the post-election audit. Such expenditures may include: payment of utility bills and rent; reasonable staff salaries and consultancy fees for responding to a post-election audit; reasonable staff salaries and legal fees incurred prior to the date of the issuance of the candidate's final audit report and associated with defending against a claim that public funds must be repaid; a post-election event for staff, volunteers, or supporters held within 30 days of the election; reasonable moving expenses related to closing the campaign office; a holiday card mailing to contributors, campaign volunteers, and staff; thank you notes to contributors, campaign volunteers, and staff; payment of taxes and other reasonable expenses for compliance with applicable tax laws; and interest expense. Routine post-election expenditures that may be paid for with remaining campaign funds do not include such items as post-election mailings other than as specifically provided for in this paragraph; making contributions; or making bonus payments or gifts to staff or volunteers. Campaign funds remaining in the committee account may not be used for transition and inauguration activities.

(ii) Notwithstanding the restriction on the use of receipts provided in subdivision (c)(i), a candidate who has outstanding liabilities from the election, including a candidate who owes public funds or penalties to the Board, may make post-election expenditures for the purpose of raising funds to repay such debt, provided, however, that such expenditures and any contributions received shall be included in the calculation of the candidate's remaining funds, unless such expenditures and contributions are incurred or received after the date of the issuance of the candidate's final audit report.

(iii) Notwithstanding the prohibition on post-election bonus payments provided in subdivision (c)(i), a bonus payment to an employee may be considered a permissible pre-election expenditure, even if paid after the election, provided that:

(A) the bonus is paid pursuant to a contract executed before the services that serve as the basis for the bonus are performed;

(B) such contract states in detail the amount of the bonus and the criteria that must be satisfied in order for the bonus to be paid;

(C) such criteria are quantifiable, merit-based, and related to services provided prior to the election;

(D) the bonus is not conditioned, either in existence or amount, on the result of the election, the amount of funds remaining in the committee account, or whether the candidate received public funds; and

(E) the bonus does not constitute more than 10% of the total amount paid to the employee.

**(d) Breach of certification.** A candidate found to have breached such candidate's certification pursuant to section 3-01(e) may be deemed ineligible to receive public funds and may be required to return all public funds previously received.

**(e) Ballot disqualification.** Pursuant to § 3-709(7) of the Code, a candidate who has been finally disqualified or whose designating or nominating petitions have been finally declared invalid by the Board of Elections or a court, or whose only remaining opponent has been finally disqualified or whose designating or nominating petitions have been finally declared invalid by the Board of Elections or a court, may not spend public funds for any purpose other than the payment of previous liabilities incurred in qualified campaign expenditures, except as provided in section 9-02(i)(iii). All public funds in excess of those liabilities previously incurred shall be promptly repaid to the Board. The amount to be repaid will be determined in accordance with § 3-710(2)(b) of the Code and subdivision (b) of this section. A repayment made pursuant to § 3-709(7) does not prevent the Board from determining that an additional repayment is required.

**(f) Ballot fraud.** Pursuant to § 3-710(3)(a) of the Code, a candidate who has been disqualified by a court on the grounds that the candidate committed fraudulent acts in order to obtain a place on the ballot must pay to the Board an amount equal to the total public funds paid to the candidate. Repayments pursuant to this subdivision must be made promptly upon the court's determination of disqualification. No repayment is required if the decision is reversed.

**(g) Failure to actively campaign.** Pursuant to § 3-710(3)(b) of the Code, a candidate who fails to actively campaign for a covered office may be required to repay an amount equal to the total public funds received.

**(h) Ceasing to campaign.** Pursuant to § 3-710(3)(c) of the Code, a candidate who ceases to actively campaign for a covered office may be required to repay an amount equivalent to the amount of public funds paid to the candidate that were not spent on qualified expenditures. Only expenditures incurred prior to the date on which the candidate ceased actively campaigning may be considered qualified expenditures.

**(i) Other reasons for repayment.** The Board may require a candidate to repay public funds because:

(i) the candidate failed to maintain copies of checks or contribution cards that document matchable contributions;

(ii) the public funds paid were based on contributions that were returned or contribution checks that have not been paid;

(iii) the candidate has failed to demonstrate eligibility for the public funds paid or compliance with Program requirements, including the requirement to appear on the ballot and to be opposed by at least one other candidate on the ballot. The Board may seek immediate repayment of the difference between the amount of public funds received by a candidate and the total amount spent by the candidate as of the date on which the candidate ceases to be on the ballot or ceases to be opposed on the ballot; provided, however, that the candidate may retain public funds previously received for that anticipated election to be used in furtherance of a different election (other than a special election to fill a vacancy) held later in the same calendar year in which the candidate seeks election for the same office, unless the candidate is seeking election exclusively as a write-in candidate in such later election; and further provided that the amount of such public funds retained for a later election will be deducted from the total amount of public funds the candidate is eligible to receive for such later election; or

(iv) a determination pursuant to §§ 3-705(6) or (7) of the Code is reversed following reconsideration pursuant to section 7-10(b)(vii).

**(j) Repayment is largest amount.** Where more than one grounds for repayment exists as provided in this section, the amount to be paid to the Board shall be the largest of the amounts.

# Chapter 10: Audit and Enforcement

**§ 10-01 Audits.**

(a) The Board shall conduct desk and field audits of participants and non-participants, regardless of whether the candidates receive public funds. Field audits may be conducted before or after an election, as the Board deems appropriate. In conducting audits, the Board may use random sampling of data and other analytic techniques, as appropriate. The Board shall conduct campaign audits in accordance with generally accepted government auditing standards.

(b) Candidates are required to respond to all Board requests for information and documentation during the audit process. Failure to respond in a timely fashion may cause delay in the issuance of a final audit report. In addition, the Board may assess penalties for failing to respond or responding late to requests for documentation or information pursuant to § 3-711 of the Code.

**§ 10-02 Audit deadlines; optional post-election training.**

The Board shall issue all draft and final audit reports in accordance with the deadlines provided in § 3-710(1)(a) and (b) of the Code subject to any applicable exceptions to those deadlines provided in § 3-710(1)(d), (e), and (f) of the Code.

**(a) Candidates who attend a post-election training.** Pursuant to § 3-710(1) of the Code, where the candidate, the campaign manager, or the treasurer has attended a post-election audit training provided by the Board, the Board will issue the candidate's enforcement notice or final audit report within 14 months after the deadline for submission of the final disclosure report for the covered election, in the case of city council and borough-wide races, and within 16 months after the deadline for submission of the final disclosure report for the covered election in the case of citywide races.

**(b) Candidates who do not attend a post-election training.** For candidates who do not attend a post-election training, the Board will issue an enforcement notice or final audit report:

(i) For City Council and borough-wide races, within 16 months after the deadline for submission of the final disclosure report for the covered election; and

(ii) For citywide races, within 18 months after the deadline for submission of the final disclosure report for the covered election.

**(c) Deadline for attending post-election training.** To be subject to the deadlines provided in subdivision (a) of this section, candidates must attend a post-election training on or before the earlier of 20 days following issuance of the candidate's draft audit report or one year after the deadline for submission of the final disclosure report for the covered election.

**§ 10-03 Board determinations concerning violations, infractions, penalties, and repayment of public funds.**

**(a) Notice and opportunity to contest.** The Board will notify the candidate, the TIE, or the independent spender and its authorized representative, as applicable, in writing of any infractions or violations alleged to have been committed by such party, as well as any corresponding recommended penalties, and any recommended public funds repayment. Such notice shall:

(i) set forth in detail the factual and legal basis for staff's recommendation that a violation, infraction, or public funds repayment obligation be found;

(ii) inform the party that hearings are conducted in accordance with the requirements for adjudications contained in § 1046 of the Charter unless such procedures are waived by, as applicable: the participant or nonparticipant, the elected candidate, the independent spender or authorized representative, or an agent thereof;

(iii) notify the party of the opportunity to submit information and documentation for the Board's consideration within a time period to be specified in such notice; and

(iv) notify the party of the opportunity to appear at a hearing before the Board or an administrative law judge to contest the alleged violations or infractions, penalties, and public funds repayment obligation.

**(b) Response to the notice.**

(i) The noticed party must submit a complete response to the notice by the due date. Extensions may be granted for good cause shown. Extension requests must be made in writing and must be submitted prior to the deadline.

(ii) Unless specifically notified to the contrary by the Board, the opportunity to submit information and documentation in response to the notice shall be the only such opportunity, and any information and documentation that is not timely received by the Board shall be disregarded. Under extraordinary circumstances, the Board may, at its sole discretion, choose to accept information or documentation not timely received.

**(c) Final Board determination.** Based on the evidence, the Board will make a final Board determination as to the party's violations or infractions, penalties, and public funds repayment obligation, and shall provide the party with a written copy of its determination. Such determination shall notify the party that it may be appealed within four months as set forth in Article 78 of the Civil Practice Law and Rules.

**(d) Payment.** If the Board has determined that the party must pay penalties or repay public funds, the party must make payment by the deadline set forth in the final Board determination. If these amounts are not paid by the payment deadline, they may be sought through appropriate legal action or, in the case of civil penalties against participants, by deduction from any public funds otherwise due for any election.

**(e) Penalty Guidelines.** The Board shall publicize staff guidelines for presumptive penalties to be recommended for certain violations of the Charter, Act, and these rules, subject to consideration of aggravating and mitigating factors that may be considered in determining the appropriate penalty assessment for the violation.

## § 10-04 Submission of false information.

If the Board has reason to believe that any individual or entity has knowingly submitted false information or fabricated evidence or has knowingly withheld or concealed information in a written or oral submission or representation to the Board, the Board may refer the matter to the appropriate agency for criminal prosecution and may commence a civil action to recover public funds and/or civil penalties, if appropriate.

# Chapter 11: Procedural Rules for Formal Adjudications

## § 11-01 Definitions.

Except as otherwise provided, the definitions set forth in section 1-02 apply in this chapter. In addition, the following terms mean:

**"Case"** means an adjudication pursuant to CAPA, § 1046 of the Charter.

**"Filing"** means submitting papers to the hearing officer, whether in person, by mail, or by electronic means, for inclusion in the record of proceedings in a case.

**"Petition"** means a document filed by the Board, analogous to a complaint in a civil action, which states the claims to be adjudicated.

**"Petitioner"** means the Board.

**"Respondent"** means a party against whom claims are asserted by the Board.

## § 11-02 Applicability.

(a) This chapter applies solely to cases that are subject to CAPA, including hearings, pre-hearing and post-hearing matters, brought by the Board pursuant to the Act or the Charter.

(b) In the event of any inconsistency between this chapter, other chapters of this title, and the rules of OATH, this chapter shall govern.

## § 11-03 Proceedings before designation of hearing officer.

Proceedings before the case is referred to a hearing officer shall be governed by § 1046 of the Charter and Chapters 9 and 10 of the Board rules.

## § 11-04 Designation of hearing officer.

The Board shall designate, at its sole discretion, one or more hearing officers to preside over cases pursuant to this chapter. The designated hearing officer(s) shall be: (i) one or more members of the Board; (ii) another person or persons assigned by the Board; or (iii) the chief administrative law judge of OATH or such administrative law judge as the chief administrative law judge may assign.

## § 11-05 Commencement of proceedings and pleadings.

**(a) The petition.**

(i) The Board shall institute proceedings pursuant to this chapter by serving a petition, sworn to or affirmed as to the truth thereof, on the respondent(s). The petition shall comply with the requirements in OATH Rules of Practice § 1-22. The petition shall set forth the facts which, if proved, constitute violations of the Act or these rules or require repayment of public funds.

(ii) The petition shall be accompanied by the following: notice of the respondent's right to file an answer, the deadline to file an answer, and the place(s) to serve and file an answer; notice that failure to serve and file a timely answer shall be deemed an admission of all allegations contained in the petition; notice of the respondent's right to representation by an attorney or other representative; and notice that a person representing the respondent(s) must file a notice of appearance with the hearing officer.

**(b) Service of the petition.**

(i) The Board shall serve the petition upon the respondent(s).

(ii) Service of the petition may be made by regular first-class mail or electronic means to the respondent's last known residential or business address or last known email address or fax number.

(iii) Service of the petition shall be complete upon mailing, if service was by first-class mail, or upon the date of transmission, if service was by electronic means.

**(c) Answer.**

(i) The respondent(s) must file an answer to the petition with the hearing officer and serve the same answer on the Board.

(ii) If the petition was served on the respondent(s) by regular first-class mail, the answer must be filed and served within 26 calendar days of the date the petition was postmarked. If the petition was served on the respondent(s) by electronic means, the answer must be filed and served within 21 calendar days of the date of the transmission of the petition.

(iii) The answer may include affidavits or affirmations, documentary exhibits, or other evidentiary material in rebuttal of the petition. The answer may be accompanied by a memorandum of law.

(iv) If the respondent fails to serve and file a timely answer, all allegations of the petition shall be deemed admitted, and the case shall proceed as scheduled. If the answer fails to specifically address any allegation in the petition, such allegation shall be deemed admitted.

(v) The time to serve and file an answer may be extended only upon the consent of all parties or upon application to the hearing officer for good cause shown.

**(d) Amendment of Pleadings.** Pleadings shall be amended in accordance with OATH Rules of Practice § 1-25.

## § 11-06 Filing of Papers.

**(a) Generally.** The notice accompanying the petition shall notify the parties of the designated hearing officer(s) and of the place to file papers. Papers may be filed with the hearing officer in person, by mail or by electronic means.

**(b) Headings.** If an OATH index number has been assigned pursuant to section 11-07(c), the subject matter heading for each document must indicate the OATH index number.

**(c) Means of service on adversary.** Submission of papers to the hearing officer by electronic means, mail, or personal delivery without providing equivalent method of service to all other parties shall be deemed to be an ex parte communication.

**(d) Proof of service.** Proof of service must be maintained by the parties for all papers filed with the hearing officer. Proof of service must be in the form of an affidavit by the person effecting service, or in the form of a signed acknowledgement of receipt by the person receiving the papers. A written acknowledgment of service by the person served is adequate proof of service. Proof of service for papers served by electronic means, in addition to the foregoing, may be in the form of a record confirming delivery or acknowledging receipt of the electronic transmission.

## § 11-07 Docketing the Case at OATH.

(a) Only cases referred to OATH must be docketed, and only the Board may docket a case at OATH.

(b) Following service of the petition upon the respondent, the Board shall docket a case by delivering to OATH a completed intake sheet, with a petition and appropriate proof of service of the petition.

(c) When a case is docketed, OATH shall place it on the trial calendar, the conference calendar, or on open status. Cases involving the same respondent(s) shall be scheduled for joint hearings or conferences. The case shall be given an index number and assigned to a hearing officer pursuant to OATH Rules of Practice § 1-26(b).

(d) After docketing the case at OATH and selecting a hearing or conference date, the Board shall serve a notice of hearing or notice of conference on the respondent within five business days. The notice shall be served by first class mail or electronic means, and appropriate proof of service shall be maintained by the Board.

(e) A conference or hearing shall be scheduled for a date that is at least two weeks after the date the answer must be served and filed.



(f) The administrative law judge may determine that the case is not ready for a conference or hearing and may adjourn the conference or hearing, or may remove the case from the conference or hearing calendar and place it on open status.

### § 11-08 Disqualification of hearing officers.

Motions for disqualification of administrative law judges serving as hearing officers must be filed in accordance with OATH Rules of Practice § 1-27.

### § 11-09 Conferences.

(a) Only cases referred to OATH are eligible for conferences.

(b) Conferences may be held for the formulation and simplification of issues, the possibility of obtaining admissions or stipulations of fact and of admissibility and authenticity of documents, the order of proof and of witnesses, discovery issues, legal issues, pre-hearing applications, scheduling, and settlement of the case.

(c) Conferences may be scheduled at the discretion of the administrative law judge, whether or not a case has been placed on the OATH conference calendar, on the application of either party or sua sponte. At the discretion of the administrative law judge, conferences may be conducted by telephone.

(d) All parties are required to attend conferences as scheduled unless timely application for additional time is made to the administrative law judge.

(e) Settlement conferences and agreements must be conducted in accordance with OATH Rules of Practice § 1-31.

(f) If the case is not settled at the conference, outstanding pre-hearing matters, including discovery issues, must be raised during the conference. If the case is not settled at the conference, a hearing date may be set. The parties must know their availability and the availability of their witnesses for a hearing.

### § 11-10 Notice of conference or hearing.

(a) When a case is placed on either the conference calendar or the trial calendar, the Board shall serve the respondent(s) with notice in accordance with OATH Rules of Practice § 1-28.

(b) The notice of conference or hearing shall be served by first class mail or electronic means, and appropriate proof of service shall be maintained.

## § 11-11 Adjournments.

Applications for adjournments of conferences or hearings before OATH shall be governed by OATH Rules of Practice § 1-32.

## § 11-12 Discovery.

Discovery in OATH proceedings shall be conducted in accordance with OATH Rules of Practice § 1-33.

## § 11-13 Pre-hearing motions.

Pre-hearing motions pursuant to OATH proceedings shall be filed in accordance with OATH Rules of Practice § 1-34.

## § 11-14 Appearances at OATH.

Appearances at OATH shall comply with the requirements set forth in OATH Rules of Practice § 1-11.

## § 11-15 Ex-parte communications.

No ex parte communications, other than those related to ministerial matters regarding a conference or hearing, shall be made to a hearing officer.

## § 11-16 Role of the hearing officer.

In the conduct of an adjudication, a hearing officer may:

(a) administer oaths and affirmations, examine witnesses, rule upon offers of proof, receive written and oral testimony, and oversee and regulate discovery procedures;

(b) upon the request of any party, or subject to the hearing officer's discretion, subpoena the attendance of witnesses and the production of books, records, or other information;

(c) regulate the course of the hearing in accordance with section 11-20;

(d) dispose of procedural requests or similar matters;

(e) make findings of fact or decisions, determinations or orders, as authorized by law; and

(f) take any other action authorized by law or agency rule consistent therewith.

### § 11-17 Consolidation; separate hearings.

All or portions of separate cases may be consolidated for the hearing, or portions of a single case may be severed for separate hearings, in accordance with OATH Rules of Practice § 1-41.

### § 11-18 Witnesses and documents.

The parties must have all of their witnesses available on the hearing date. A party intending to introduce documents into evidence must bring to the hearing copies of those documents for the hearing officer, the witness, and the other parties. Repeated failure to comply with this section may be cause for sanctions, as set forth in OATH Rules of Practice § 1-13(e).

### § 11-19 Subpoenas.

Subpoenas may be issued in accordance with OATH Rules of Practice § 1-43.

### § 11-20 Order of proceedings.

Testimony and argument on the law and facts shall be presented in the following order: petitioner; witnesses called by the petitioner, if any; cross-examination; the respondent(s); witnesses called by the respondent(s); cross-examination; and closing statements. Each party shall be afforded an opportunity to present rebuttal testimony, if deemed appropriate by the hearing officer. Closing statements, if any, shall be made first by petitioner. The order of proceedings may be modified at the discretion of the hearing officer.

### § 11-21 Interpreters.

The hearing officer will make reasonable efforts to provide language assistance services to a party or its witnesses who are in need of an interpreter to communicate at a hearing or conference.

### § 11-22 Failure to appear.

All parties, counsel and other representatives are required to be present at the hearing and prepared to proceed at the time scheduled for commencement of the hearing, subject to the requirements set forth in OATH Rules of Practice § 1-45.

### § 11-23 Evidence at the hearing.

Evidence shall be governed by OATH Rules of Practice §§ 1-46 and 1-47.

**§ 11-24 Official notice.**

(a) In reaching a decision, the hearing officer may take official notice, before or after submission of the case for decision, on request of a party or sua sponte on notice to the parties, of any fact which may be judicially noticed by the courts of this state, pursuant to OATH Rules of Practice § 1-48(a).

(b) Official notice may be taken, without notice to the parties, of rules published in the Rules of the City of New York or in The City Record, pursuant to OATH Rules of Practice § 1-48(b).

**§ 11-25 Public access to proceedings.**

Other than conferences, all proceedings shall be open to the public, in accordance with OATH Rules of Practice § 1-49.

**§ 11-26 Hearing motions.**

Motions may be made during the hearing orally or in writing, in accordance with OATH Rules of Practice § 1-50.

**§ 11-27 Transcript.**

Hearings shall be stenographically or electronically recorded, and the recordings shall be transcribed, in accordance with OATH Rules of Practice § 1-51.

**§ 11-28 Decision made on the record.**

The hearing officer may conclude a case by making a report and recommendation on the record.

**§ 11-29 Written comments.**

Once the hearing officer has issued a recommended final determination, each party shall have 20 days from issuance of the recommendation to submit written comments to the Board. The comments should raise any objections to the recommended determination, and objections not raised in the comments will be deemed waived in any further proceedings. Comments shall be limited to the record of the adjudicatory proceeding. Comments shall be served upon all other parties. Upon application filed with the Board's General Counsel, the General Counsel may shorten or extend the time for comments for good cause shown. No personal appearances shall be made before the Board unless the Board specifically requests that the parties appear.

## § 11-30 Final determination.

The Board shall provide a final determination affirming, rejecting, or modifying the hearing officer's recommended final determination within 30 days of the conclusion of the written comments period, or as soon thereafter as is practicable. The final determination shall notify the candidate of the commencement of the four-month period during which a special proceeding may be brought to challenge the Board's determination pursuant to Article 78 of the Civil Practice Law and Rules. If the Board rejects or modifies the hearing officer's recommended final determination, the Board shall provide a written determination stating the basis for any assessed penalty or public funds determination, including any findings of fact and conclusions of law. Determinations made by the Board pursuant to this chapter may not be appealed to the Board unless the Board specifically provides otherwise in its determination.

# Chapter 12: Investigations and Complaints

## § 12-01 Investigations.

The Board may conduct an investigation into possible violations of the Charter, Act, or these rules. In its investigation, the Board may use its investigative powers pursuant to § 1052(a)(5) of the Charter and §§ 3-708(5) and 3-710(1) of the Code. An investigation may include, but is not limited to, field investigations, desk and field audits, the issuance of subpoenas, the taking of sworn testimony, the issuance of document requests and interrogatories, and other methods of information gathering.

## § 12-02 Complaints.

**(a) Filing a complaint.** A complaint must be filed by hand delivery, mail, fax, or scanned and sent as an attachment via email to the Board's offices.

**(b) Complaint requirements.** Complaints must:

(i) be made in writing;

(ii) be sworn to or affirmed;

(iii) be based on personal knowledge, if possible, and if a complaint is based on information and belief, the complainant must state the source of that information and belief;

(iv) specify the conduct alleged to be in violation of the Charter, Act, or these rules, and to the extent known:

(A) the date(s) and time(s) of the conduct,

(B) the place(s) the conduct occurred, and

(C) the names of witnesses, if any.

(v) be accompanied by copies of all documentary evidence available to the complainant; and

(vi) contain the complainant's full name, current address, telephone number, and email address.

**(c) Initial review of complaint.**

**(i) If in compliance.** Upon receipt, the complaint will be reviewed for substantial compliance with the above requirements. If the complaint is in compliance, the Board shall, within 10 days of receipt, send each party complained about a copy of the complaint.

**(ii) Deficient complaints.**

(A) If the complaint is moot, facially meritless, or not in substantial compliance, it may be rejected and the complainant so notified.

(B) If the complaint is not in substantial compliance, the Board may investigate the subject matter of the complaint, but need not follow the procedural requirements of this chapter.

**(d) Response to complaint; possible dismissal.**

(i) The party complained about may submit an answer to the complaint:

(A) within 20 days of the date the complaint was sent by the Board, or

(B) within such lesser time as may be specified by the Board for complaints received less than 90 days before an election.

(ii) The answer must:

(A) be sworn to and affirmed,

(B) set forth a response to the allegations contained in the complaint, including any reasons why the Board should dismiss the complaint in full or in part, if applicable, and

(C) be accompanied by copies of all documentary evidence available to the respondent.

(iii) Based on the answer, a complaint may be dismissed as moot.

**(e) Board action.** Based on its review of the complaint and any answer filed, and of any investigation it chooses to conduct, the Board may:

(i) determine the complaint to be moot or lacking in merit and dismiss the complaint; or

(ii) determine that violations or infractions of the Charter, Act, or these rules have been substantiated, and initiate an enforcement proceeding pursuant to the procedures outlined in Chapter 10.

# Chapter 13: Transition and Inauguration Entities

## § 13-01 Registration.

(a) Before any private funds are raised or spent for transition or inauguration into office, the elected candidate must register a TIE with the Board; provided, however, that donations may be accepted prior to the registration of the TIE for the purpose of paying fees and depositing any minimum balance required to open a bank account for the TIE.

(b) The registration may be submitted at any time between the day after the general election and the due date of the first disclosure statement following the date of the candidate's election, at such time as the form is made available by the Board.

(c) The elected candidate must register no more than one TIE per election, and such TIE must have no more than one bank account. The elected candidate may not use any other bank accounts, including those of the candidate or any political committee.

(d) The registration must be submitted in such form and manner as shall be provided by the Board and must contain all information required by the Board, including: (i) the name and address of the elected candidate and of the TIE; (ii) the name, address, and employment information of the treasurer and of the liaison, if any; (iii) information about the TIE's bank account and merchant account; and (iv) any signatures and notarizations as may be required by the Board.

## § 13-02 Periodic disclosure reports.

**(a) Required information.** Disclosure reports must contain all information for the reporting period required by the Board, including:

(i) the cash balance at the beginning and end of the reporting period;

(ii) total itemized and unitemized donations, loans, and other receipts accepted during the reporting period;

(iii) total itemized and unitemized expenditures made during the reporting period;

(iv) for each donation accepted in excess of $99, the contributor's and intermediary's (if any) full name, residential address, occupation, employer, and business address;

(v) the date and amount of each donation accepted or other receipt;

(vi) the form of the donation (cash, check, cashier's check, money order, credit card, text, or other);

(vii) the number of the check, cashier's check, or money order, if applicable;

(viii) the date and amount of each donation returned to a donor, the account from which the funds used to make the return originated, and, if applicable, the number of the check used to issue the return of funds;

(ix) each previously reported donation for which the check was returned unpaid;

(x) for each loan accepted, the lender's, guarantor's or other obligor's full name, residential address, occupation, employer, and business address;

(xi) the date and amount of each loan, guarantee, or other security for a loan accepted;

(xii) for each loan repayment made, the date, amount, check number, name of bank account or credit card, and name of any third party payor;

(xiii) the date and amount of any portion of a loan which has been forgiven;

(xiv) the bill or invoice date and amount, name and address of the vendor or payee, the purpose code and explanation of each expenditure;

(xv) the date and amount of each payment;

(xvi) the payment method, including check number and committee bank account;

(xvii) the amount of remaining outstanding liability to the vendor or payee;

(xviii) for each in-kind donation, the date the donation was made, the name and residential address of the donor, a detailed description of the goods or services provided, the amount of the fair market value of the donation, and such further information and documentation as necessary to show how the fair market value of the donation was determined; and

(xix) such other information as the Board may require.

**(b) Unitemized expenditures.** Expenditures of less than $50 do not need to be separately itemized in a disclosure statement.

(c) All information reported in disclosure reports and amendments must be accurate as of the last day of the reporting period.

**(d) Electronic submissions.** Disclosure report submissions must follow the submission standards applicable to candidates under Chapter 4 of these rules.

**(e) Monthly reports.**

(i) The first report is due on the fifth business day of the month immediately following the month during which the TIE first registers.

(ii) The first report must cover the period from the day of the first financial activity of the TIE through the last day of the calendar month immediately preceding the month in which the report is due. Each subsequent report shall cover the next consecutive calendar month, and shall be due on the fifth business day of the subsequent month.

(iii) The final report must cover the period from the day after the conclusion of the preceding report through the day the TIE terminates its activities and must be filed within five business days of such termination.

(iv) Disclosure reports that fail to comply substantially with the disclosure requirements described in the Act or these rules will not be accepted by the Board. Amendments to disclosure reports are prohibited unless expressly authorized or requested by the Board.

(v) The disclosure report must contain a verification from the elected candidate, treasurer, or other officer designated in the registration that the disclosure report is true and complete to the best of such elected candidate, treasurer, or other designee's knowledge, information, and belief, and must contain such signatures as may be required by the Board.

## § 13-03 Limits and requirements.

The following limits and requirements apply pursuant to § 3-801 of the Code.

**(a) Donations and receipts.**

(i) An elected candidate must not: (A) authorize or register a political committee to raise or spend funds for transition or inauguration into office; (B) use funds accepted by a political committee authorized by the candidate for transition or inauguration into office; (C) authorize or register a previously existing entity to raise or spend funds for transition or inauguration into office; (D) continue a TIE in existence after it has paid all liabilities it incurred for transition and inauguration into office and otherwise has disposed of all funds pursuant to paragraph (ii) of subdivision (c) below; or (E) continue in existence an entity registered under section 13-01 after (1) April 30 in the year following the year of the election, or (2) in the case of a special election, 60 days after inauguration.

(ii) A TIE must not:

(A) accept donations or other receipts from any political committee authorized by the elected candidate;

(B) accept donations from a political committee that has not registered with the Board under § 3-801(3) of the Code on a form that includes the information set forth in section 5-04(a) (political committees registered for an election cycle pursuant to § 3-707 of the Code shall be deemed registered for purposes of § 3-801(3) of the Code with respect to transition and inauguration expenditures immediately following an election held in that cycle);

(C) accept donations in excess of the donation limits set forth in § 3-801(2)(b) of the Code;

(D) accept cash donations totaling more than $100 from a single donor;

(E) accept any donations after all liabilities are paid;

(F) accept any donations from any corporation, limited liability company, limited liability partnership, or partnership;

(G) accept any donations from any individual or entity whose name appears in the doing business database as of the date of such donation; provided, however, that this limitation on donations shall not apply to any donation made by a natural person who has business dealings with the city where such donation is from the elected candidate, or from the elected candidate's parent, spouse, domestic partner, sibling, child, grandchild, aunt, uncle, cousin, niece or nephew by blood or by marriage; or

(H) commingle receipts in any account with personal or business funds, or funds accepted for an election.

(iii) An elected candidate may donate to such elected candidate's TIE with such elected candidate's personal funds or property, make in-kind donations to such elected candidate's TIEs with such elected candidate's personal funds or property, and make advances to such TIE with such elected candidate's personal funds or property, without regard to the donation limits of § 3-801(2)(b) of the Code. An elected candidate's personal funds or property shall include such elected candidate's funds or property jointly held with such elected candidate's spouse, domestic partner, or unemancipated children.

(iv) In determining compliance with the donation limits of § 3-801(2)(b) of the Code, the Board shall total all donations from a single source to the TIE, using the definition of "single source," and the factors for so determining, pursuant to sections 1-02 and 5-10(b).

(v) Any donation, loan, or other receipt received by a TIE after January 31 in the year following the date of a regularly scheduled general election shall be presumed to be for the next election in which the elected candidate is a candidate following the day that it is received, and not received for the purposes of transition or inauguration.

(vi) Loans are deemed to be donations, subject to the limits and restrictions of the Act, to the extent the loan is not repaid by, or is made after, the date of the elected candidate's inauguration into office.

**(b) Expenditures.**

(i) Funds raised for a TIE may not be used for any purpose other than transition or inauguration expenses. Expenses related to the holding of office, or related to any past or future election, are prohibited. The following are examples of types of expenditures that are presumed to be TIE-related:

(A) Transition.

(1) Conferences and seminars related to city government and elected service;

(2) Costs related to seeking and selecting city office staff;

(3) Payroll and consulting fees directly related to transition;

(4) Costs related to fundraising to pay for transition expenses; and

(5) Expenditures made for the purpose of furthering the elected candidate's selection as Speaker of the City Council.

**(B) Inauguration.**

(1) Payroll and consulting fees directly related to holding an inauguration event;

(2) Printing and postage for inauguration event invitations;

(3) Inauguration event site and equipment rental;

(4) Inauguration event catering, decoration, entertainment, and photography; and

(5) Costs related to fundraising to pay for inauguration event.

(ii) There is a rebuttable presumption that the purchase of durable goods is not TIE-related.

(iii) Transition expenditures may not be incurred after the elected candidate assumes office, and inauguration expenditures may not be incurred after January 31 in the year after the year of the election, except for:

(A) expenditures related to fundraising to satisfy transition liabilities incurred on or before the elected candidate assumes office or inauguration liabilities incurred on or before January 31, and

(B) routine and nominal expenditures associated with and necessary for satisfying such liabilities, terminating the entity, and responding to the post-election audit.

(iv) Unless permitted by paragraph (iii) of subdivision (b) above, any expenditure incurred after January 31 in the year following the date of a regularly scheduled general election by a TIE shall be presumed to be for the next election in which the elected candidate is a candidate following the day that it is incurred, and not incurred for the purposes of transition or inauguration.

(v) A TIE may maintain a petty cash fund of no more than $500 out of which it may make disbursements not in excess of $100 per transaction. The TIE must maintain a petty cash journal including the name of every individual or entity to whom any disbursement is made, as well as the date, amount, and purpose of the disbursement.

**(vi) Single inaugural event.** No more than one inaugural event shall be presumed to be TIE-related.

**(c) Termination.**

(i) The TIE must be terminated after it has paid all liabilities and otherwise disposed of all funds pursuant to paragraph (ii) below and, in any event, no later than April 30 in the year following the election.

(ii) If a TIE has funds remaining after all liabilities have been paid, it shall refund such funds to one or more of its donors, or if that is impracticable, issue a payment to the Fund.

## § 13-04 Records and audit.

(a) Each TIE must keep records that enable the Board to verify the accuracy of disclosure reports and compliance with all requirements of § 3-801 of the Code and this chapter. The records kept must be clear, accurate, and sufficient to demonstrate compliance. The records must be made and maintained contemporaneously with the transactions recorded, and maintained and organized in a manner that facilitates expeditious review by the Board.

(b) The records that must be kept include:

(i) Copies of all deposit slips;

(ii) A copy of each check or other monetary instrument, other than cash, representing a donation or other monetary receipt;

(iii) For each cash, credit card, cashier's check, or money order donation received, a written record containing (i) the donor's residential address, employer, business address, and occupation, (ii) the date and amount of the donation, (iii) if any, the intermediary's name, address, employer, business address, and occupation, and (iv) for cash, cashier's check, and money order donations, the donor's signature;

(iv) For each in-kind donation, a receipt or other written record showing how the value of the donation was determined;

(v) Each contract, invoice, bill, and receipt for goods or services provided;

(vi) Written documentation for each loan received, loan repayment, and loan forgiven;

(vii) A monthly billing statement or customer receipt for each disbursement to a TIE credit card account showing vendors underlying the disbursement; and

(viii) The following from banks and other depositories relating to accounts:

(A) all periodic bank or other depository statements in chronological order, maintained with any other related correspondence received with those statements, such as credit and debit memos and donation checks returned because of insufficient funds; and

(B) the front and back of all returned and cancelled disbursement checks.

(c) All of the TIE's records are subject to Board review and must be made available to the Board upon its request, within such time as shall be specified by the Board.

(d) Each TIE must retain all records and documents required to be kept pursuant to section 13-04 for five years after the date of its registration.

## § 13-05 Other provisions concerning TIEs.

*See* sections 9-02(c)(i) (Final bank balance); 10-03 (Enforcement); 15-07 (Special elections); Chapter 12 (Complaints).

# Chapter 14: Disclosure of Independent Expenditures

**§ 14-01 Definitions.**

Except as otherwise provided, the definitions set forth in section 1-02 apply in this chapter. In addition, the following terms mean:

**"Authorized representative"** means an officer or owner of an independent spender who is authorized to submit, and is jointly responsible with the spender for, independent expenditure reports.

**"Ballot proposal"** means a municipal ballot proposal, initiative, measure, or referendum. Activities associated with ballot proposals initiated by petition include the circulation of petitions to place the proposal on the ballot. Activities associated with ballot proposals not initiated by petition include those conducted after the measure or language is filed with the City Clerk.

**"Clearly identified"** means: (1) the name of the candidate or ballot proposal appears; (2) a photograph or drawing of the candidate appears; or (3) the identity of the candidate or ballot proposal is otherwise apparent by unambiguous reference.

**"Contribution"** means any monetary gift made to an entity. Contributions do not include membership dues paid by an individual or revenue from goods and services.

**"Covered communication"** means an express advocacy communication or electioneering communication.

**"Covered election"** means a covered election as defined in § 1052(a)(15)(a)(iii) of the Charter.

**"Covered expenditure"** means an expenditure directly related to the design, production, or distribution of a covered communication. An expenditure made during the ordinary conduct of business in connection with covering or carrying a news story, commentary, or editorial by any broadcasting station (including a cable television operator, programmer, or producer), website, newspaper, magazine, or other periodical publication, including any internet or electronic publication, is not a covered expenditure.

**"Electioneering communication"** means a communication that: (1) is disseminated by radio, television, cable, or satellite broadcast, is a paid advertisement, or is a mass mailing; (2) is disseminated within 60 days of a covered primary, general, or special election; and (3) refers to one or more clearly identified ballot proposals or candidates for a covered election. Electioneering communication does not include a candidate-related communication made by an organization operating and remaining in good standing under § 501(c)(3) of the Internal Revenue Code of 1986.

**"Entity"** means an entity as defined in § 1052(a)(15)(a)(ii) of the Charter.

**"Express advocacy communication"** means a communication that contains a phrase including, but not limited to, "vote for," "re-elect," "support," "cast your ballot for," "[Candidate] for [elected office]," "vote against," "defeat," "reject," or "sign the petition for," or a campaign slogan or words that in context and with limited reference to external events, such as the proximity to the election, can have no reasonable meaning other than to advocate the election, passage, or defeat of one or more clearly identified ballot proposals or candidates in a covered election, and is disseminated by: (1) radio, television, cable, or satellite broadcast; (2) telephone communication; (3) mass mailing; (4) other printed material; or (5) any other form of paid electoral advertising. Paid electoral advertising shall not include communications over the internet, except for: (1) communications placed for a fee on another individual or entity's website; or (2) websites formed primarily for, or whose primary purpose is, the election, passage, or defeat of a candidate in a covered election or of a ballot proposal.

**"Independent expenditure"** means an independent expenditure as defined in § 1052(a)(15)(a)(i) of the Charter.

**"Independent spender"** means an individual or entity that makes an independent expenditure, or an agent of such individual or entity.

**"Mass mailing"** means a mailing by United States mail, common carrier, or facsimile of more than 500 pieces of mail matter of an identical or substantially similar nature within any 30-day period.

**"Principal owner"** means an individual or entity that owns or controls 10% or more of an entity, including stockholders and partners.

**"Telephone communication"** means 500 or more telephone calls, whether live or recorded, of an identical or substantially similar nature within any 30-day period.

**"Text message communication"** means 500 or more text messages of an identical or substantially similar nature sent within any 30-day period.

## § 14-02 Disclosure statements.

Each disclosure statement must include the following information:

**(a) Filer information.**

    (i) All independent spenders must provide their:

        (A) name, mailing address, telephone number, email address, and employer information;

        (B) contact person's name, mailing address, email address, telephone number, and employer information; and

(C) other similar information that may be required by the Board.

(ii) Independent spenders that are entities must also provide their:

(A) website URL;

(B) authorized representative's name, mailing address, email address, telephone number, and employer information;

(C) type of organization;

(D) name(s) of principal owners, and employer information for any such owners who are individuals; and

(E) name and employer information of board members and officers or their equivalents.

(iii) Independent spenders that are individuals must also provide their occupation and employer information.

**(b) Communications.**

(i) When an independent spender makes covered expenditures aggregating $1,000 or more during an election cycle for communications that refer to a specific candidate or ballot proposal, it must report these communications and each future communication associated with an expenditure of $100 or more that refers to that candidate or ballot proposal. Expenditures of less than $100 shall not be covered expenditures for the purposes of this subdivision. Each communication must be disclosed in the reporting period in which it is first published, aired, or otherwise distributed, except that no communication is required to be disclosed before the $1,000 threshold has been reached. For each communication, the independent spender must provide:

(A) The type of communication;

(B) Its distribution date;

(C) The names of the candidates and/or ballot proposals referred to in the communication;

(D) For a printed communication, an electronic or paper copy of the communication as it was distributed to the public;

(E) For a broadcast or internet communication, an audio, video, or source file of the communication as it was distributed to the public, except that if a source file is not available for an audio communication then a script will be accepted; and

(F) Such other similar information as the Board may require.

(ii) A mass mailing shall be considered to have been distributed on the date on which it was postmarked, or accepted by a common carrier.

**(c) Expenditures.**

(i) When a covered communication has been reported, each covered expenditure of $100 or more associated with that communication must be reported. If the communication refers to more than one candidate or ballot proposal, only those expenditures for candidates or ballot proposals that have met the $1,000 threshold need be reported. Each expenditure must be disclosed in the reporting period in which the expenditure is incurred, except that no expenditure is required to be disclosed prior to the reporting of its associated communication. For each expenditure, the independent spender must provide:

(A) The names of the candidates or ballot proposals referred to by the associated communication;

(B) The name of the vendor;

(C) The date, amount, and purpose;

(D) The names of the individuals or entities paying for the expenditure, if not the independent spender;

(E) The itemized invoice detailing the expenditure, when it becomes available; and

(F) Such other similar information as the Board may require.

**(ii) Valuation.** All expenditures must be reported at their fair market value. If it is not practicable to obtain an invoice, the independent spender must use a reasonable estimate of fair market value and must provide a written record supporting the estimate.

**(iii) Apportionment.** For reporting purposes, an expenditure associated with a communication that refers to more than one candidate or ballot proposal shall be apportioned among the candidates or ballot proposals based on the following factors:

(A) The focus of the communication;

(B) The geographic distribution or location of the communication;

(C) The subject matter of the communication;

(D) The relative prominence of references to or the appearance of a candidate or ballot proposal in the communication, including the size and location of references to the candidate or ballot proposal and any photographs of the candidate;

(E) The timing of the communication; and

(F) Other circumstances of the communication.

**(d) Contributions.**

(i) When an independent spender that is an entity makes covered expenditures of $100 or more aggregating $5,000 or more in the 12 months preceding the election for communications that refer to any single candidate, it is required to report:

(A) All contributions accepted from other entities since the first day of the calendar year preceding the year of the covered election; and

(B) All contributions aggregating $1,000 or more accepted from an individual during the 12 months preceding the election.

(ii) Each contribution must be disclosed in the reporting period in which it was received. For each contribution, the independent spender must provide:

(A) For each contribution accepted from another entity, the entity's name, address, and type of organization and the names of the entity's principal owners, partners, board members and officers, or their equivalents, or, if no natural persons exist in any such role, the name of at least one natural person who exercises control over the activities of such entity;

(B) For each entity from which contributions aggregating $50,000 or more have been accepted in the 12 months preceding the election (the "major contributor"), (A) the name, address, and type of each entity that contributed $25,000 or more to the major contributor in the 12 months preceding the election; and (B) the name, residential address, occupation, and employer of each individual who contributed $25,000 or more to the major contributor in the 12 months preceding the election;

(C) For each contribution accepted from an individual, the individual's name, residential address, occupation, and employer;

(D) The date of receipt and amount of each such contribution accepted by the independent spender or the major contributor; and

(E) Such other similar information as the Board may require.

(iii) Exemption for earmarked contributions. Contributions to independent spenders or major contributors that are earmarked for an election that is not a covered election, or for an explicitly stated non-electoral purpose, are not required to be reported; provided, however that records of such contributions to independent spenders must be maintained and may be requested by the Board to verify their qualification for this exemption.



**(e) Verification.** Each independent spender filing a disclosure statement must verify that each reported expenditure referring to a candidate was not authorized, requested, suggested, fostered, or cooperated in by such candidate, an agent of such candidate, an opponent of such candidate, or an agent of such opponent. The independent spender must verify that the disclosure statement is true and complete to the best of the filer's knowledge, information, and belief. The disclosure statement must contain such signatures or notarizations and other verifications as may be required by the Board.

**(f) Format.** All disclosure statements must be submitted electronically as specified by the Board. Supporting documents must be submitted electronically, by hand, or by common carrier.

## § 14-03 Disclosure dates.

### (a) Filing dates.

(i) Disclosure statements are due every Monday of the election year until and including the fourth Monday after the general election.

(ii) During the 14 days before a primary or general election, an independent spender must submit a disclosure statement to the Board within 24 hours of distributing any reportable communication, making any reportable expenditure, or receiving any reportable contribution.

(iii) An independent spender that has not distributed any reportable communications, made any reportable expenditures, or received any reportable contributions within a reporting period is not required to file a disclosure statement for that period.

### (b) Reporting periods.

#### (i) First disclosure statement.

(A) The reporting period for the first disclosure statement containing communications or expenditures related to candidates in a primary or general election begins on the first day of the election cycle.

(B) The reporting period for the first disclosure statement for communications or expenditures related to ballot proposals begins on the first day of January in the year in which the proposal appears on the ballot.

**(ii) Each subsequent disclosure statement.** The reporting period for each subsequent disclosure statement begins on the preceding Monday.

**(iii) Conclusion of reporting period.** The reporting period for all disclosure statements concludes on and includes the day before the filing due date.

---

## § 14-04 Identification of communications.

**(a) Independent spender identification.** When an independent spender makes covered expenditures of $100 or more aggregating $1,000 or more during an election cycle, the communication associated with the expenditure that meets the $1,000 threshold and all subsequent communications, regardless of dollar value, must include:

**(i) Printed material.** For printed material, the words "Paid for by" must appear, followed by (i) the name of the independent spender; (ii) if the spender is an entity: (A) the name of any individual or entity that owns or controls more than 50% of the independent spender, (B) the name of the independent spender's chief executive officer or equivalent, if any, and (C) the independent spender's top donors as described in subdivision (b) of this section; and (iii) the words "Not expressly or otherwise authorized or requested by any candidate or the candidate's committee or agent. More information at nyc.gov/FollowTheMoney". Such words must appear in a conspicuous size and style and must be enclosed in a box within the borders of the communication.

**(ii) Television, internet video, other video.** For television, internet videos, or other types of video communications, the words "Paid for by" followed by the name of the independent spender must be clearly spoken at the beginning or end of the communication in a pitch and tone substantially similar to the rest of the communication. Additionally, simultaneous with the spoken disclosure, in a conspicuous size and style and enclosed in a box, the words "Paid for by" must appear followed by: (i) the name of the independent spender; (ii) if the spender is an entity, the spender's top donors as described in subdivision (b) of this section; and (iii) the words "Not expressly or otherwise authorized or requested by any candidate or the candidate's committee or agent. More information at nyc.gov/FollowTheMoney".

**(iii) Radio, internet audio, automated telephone calls.** For radio, internet audio, or automated telephone calls, the words "Paid for by" followed by (i) the name of the independent spender; (ii) if the spender is an entity, the spender's top donors as described in subdivision (b) of this section; and (iii) the words "Not expressly or otherwise authorized or requested by any candidate or the candidate's committee or agent. More information at nyc.gov/FollowTheMoney", must be clearly spoken at the end of the communication in a pitch and tone substantially similar to the rest of the communication. For radio and internet audio communications of 30 seconds in duration or shorter, subparagraph (ii) of this paragraph may be omitted.

**(iv) Non-automated telephone calls longer than 10 seconds.** For non-automated telephone calls lasting longer than 10 seconds, the words "This call is paid for by" followed by the name of the independent spender and the words "Not expressly or otherwise authorized or requested by any candidate or the candidate's committee or agent. More information is available at nyc.gov/FollowTheMoney" must be clearly spoken during the call in a pitch and tone substantially similar to the rest of the call.

**(v) Text message communications.** For text message communications, the words "Paid for by" must appear, followed by: (i) the name of the independent spender; and (ii) the words "Not authorized or requested by any candidate, their committee, or agent. More information at nyc.gov/FollowTheMoney." Such words must be written at the beginning or end of the communication.

**(b) "Top donor(s)" identification.** Identification of an independent spender's top donors in a communication shall be as follows:

(i) A spender's top donors are its largest aggregate contributors during the 12 months preceding the election, in descending order by aggregate amount, who have contributed at least $5,000.

(ii) If there are at least three such donors:

(A) Printed identification shall be the words "Top Three Donors" followed by the names of such donors;

(B) Video identification shall be the words "The top three donors to the organization responsible for this advertisement are" followed by the names of such donors;

(C) Audio identification shall be the words "with funding provided by" followed by the names of such donors;

(D) If the third largest donor has donated the same amount as the fourth largest donor, the independent spender may choose which three donors to include, so long as no donor is included that has donated less than any other donor that is not included.

(iii) If there are only two such donors, the words "Top Donors" must replace "Top Three Donors."

(iv) If there is only one such donor, the words "Top Donor" must replace "Top Three Donors."

(v) If there are no such donors, all references to donors must be removed from the identification.

**(c) Languages other than English.** All written or spoken identification required by this section must be in the primary language of the communication, except that the web address nyc.gov/FollowTheMoney, if required to be written or spoken in the identification, must be in English.

**(d) Modification.** The requirements of this section may be modified by the Board concerning items upon which disclosures cannot be reasonably printed, pursuant to § 1052(a)(15)(c)(i) of

the Charter or any other items whose disclosures are not otherwise provided for in § 1052(a)(15)(c) of the Charter.

(e) This section shall not apply to communications required to include a disclosure pursuant to § 3-703(16) of the Code.

## § 14-05 Non-independent expenditures.

An expenditure by an individual or entity referring to a candidate, that was authorized, requested, suggested, fostered by, or cooperated in by such candidate or the opponent of such candidate, or their agents, is not an independent expenditure and is not governed by this Chapter. Factors used by the Board to determine whether an expenditure is independent or non-independent are referenced in section 6-04(a).

## § 14-06 Guidance for independent spenders.

Prior to dissemination of a communication, an individual or entity may seek guidance regarding whether the communication would be subject to these rules by submitting a written request in the form and manner prescribed by the Board, including a description or sample of the proposed communication and a description of its proposed dissemination. If the request is received more than 14 days before the election, guidance shall be provided within seven days, and if such request is received during the 14 days prior to the election, guidance shall be provided within 24 hours. Such guidance applies only to the communication exactly as submitted and disseminated exactly as described, and constitutes neither approval nor disapproval of the content, appropriateness, or accuracy of the communication.

## § 14-07 Document retention.

Independent spenders must provide documentation to the Board upon request, and must maintain for three years after the date of the election to which they apply:

(a) records that enable the Board to verify the accuracy of disclosure statements, including bills for goods or services used to produce and disseminate a communication, as well as records of all contributions received by independent spenders that are entities; and

(b) copies of all advertisements, pamphlets, circulars, flyers, brochures, and other printed communications disseminated, and a schedule of all radio or television time purchased, and scripts used therein or the audio or video source files. Documents previously provided to and received by the Board do not need to be maintained by the independent spender.

### § 14-08 Penalties.

Any independent spender who violates any provision of this chapter, and any agent of an independent spender who commits such a violation, shall be subject to a civil penalty in an amount not in excess of $10,000.

### § 14-09 Other provisions concerning independent expenditures.

*See* sections 15-06 (Special elections); 10-03 (Enforcement); Chapter 12 (Complaints).

# Chapter 15: Special Elections

### § 15-01 Special requirements and procedures.

If a special election to fill a vacancy is declared, the Board, after considering the date of the election and any other relevant factors, may provide for special requirements and procedures for candidates, including:

(a) a standard by which contributions, loans, and expenditures are presumed to be accepted or made for the special election, notwithstanding sections 5-10(a), 5-09(h), and 6-01(h)(i); and

(b) such other requirements and procedures as the Board may deem necessary to implement the provisions of the Act in the special election fully and effectively.

### § 15-02 Filing requirements.

**(a) Certification.** Candidates who wish to participate in the Program for a special election must file a Certification with the Board specifically for such election. The Certification must be filed on or before the 14th day after the proclamation of such election and may not be rescinded.

**(b) Filer Registration.** Candidates who do not wish to participate in the Program are not required to file a Certification, but must file a Filer Registration specifically for the special election with the Board.

**(c) Candidates raising funds for other elections within the same election cycle.** Candidates who have already been raising funds for other elections occurring after the special election, but within the same election cycle, may use their existing committee bank accounts in the special election, provided that they submit a new Filer Registration or Certification with the Board to reflect the change in election, and further provided that once such committee and account have been used for the special election, they must not be used for any future election, including any other elections during the same election cycle.

**(d) Disclosure statements.**

---

**(i) Post-election financial activity.** Financial activity that occurred after a candidate's most recent election prior to a special election will be considered to be for such special election.

**(ii) First disclosure statement.** The first disclosure statement for a special election is due 32 days before the election unless otherwise provided by New York State Election Law. As provided pursuant to New York State Election Law, if the first disclosure statement for a special election is otherwise due within a period of five days of a required semi-annual disclosure statement, the candidate may file a single combined statement on the date on which the latter of the two separate statements is required to be filed.

> (A) The reporting period for the first disclosure statement shall conclude on the 36th day before the election, unless otherwise provided pursuant to New York State Election Law. If a candidate is already registered for a future election and an intervening special election is called, the candidate is required to re-register with the Board for the special election and re-submit all of the candidate's financial activity with such candidate's first special election disclosure statement.

> (B) Submissions required by paragraph (ii) above shall cover the reporting periods of the missing disclosure.

**(iii) Semi-annual disclosure statements.** Semi-annual disclosure statements are due on January 15 and July 15 in each year of the election cycle and in each year thereafter, until the candidate files a disclosure statement showing satisfaction of all liabilities and disposition of all assets.

**(iv) Daily disclosures during the two weeks preceding the election.** If a candidate, during the 14 days preceding an election, accepts aggregate contributions and/or loans from a single source in excess of $1,000 or makes aggregate expenditures to a single vendor in excess of $20,000, the candidate must report, in a disclosure to the Board, all contributions and loans accepted from such source or expenditures made to such vendor during that 14-day period. The first such disclosure must be received by the Board within 24 hours after the contribution or loan that causes the total to exceed $1,000 is accepted or the expenditure that causes the total to exceed $20,000 is made. Each subsequent disclosure must be received by the Board within 24 hours after any additional contribution or loan is accepted or expenditure is made. Information reported in these disclosures must also be included in the candidate's next post-election disclosure statement.

**(v) Post-election disclosure statements.** Post-election disclosure statements must be filed 27 days after the special election and on each January 15 and July 15 following the election until the candidate files a final statement showing satisfaction of all liabilities and disposition of all assets. If the disclosure statement due 27 days after the special election is otherwise due within five days of a required disclosure statement, a single

combined statement may be filed on the date on which the latter of the two separate disclosure statements is required to be filed.

**(vi) Disclosure statement amendments.** The Board shall not make payments based on disclosure statement amendments filed after the final disclosure statement; provided, however, that the Board may make payments based upon such amendments solely if they are made in response to invalid matching claims reports to which the Board has requested a response after the final disclosure statement.

**(vii) Bank statements.** Each disclosure statement submitted by the candidate must include a copy of the most recent bank statements for the candidate's special election account.

**(viii) Special election due dates for compliance with § 12-110 of the Code.** The candidate's compliance with the requirements in § 12-110 of the Code shall be considered timely demonstrated to the Board if the Board receives confirmation of the candidate's compliance on or prior to the due date of the first disclosure statement required to be filed with the Board pursuant to section 15-02(d)(ii).

## § 15-03 Expenditures.

**(a) Limit.** The expenditure limit for a special election is the same as the limit for a primary or general election.

(b) Expenditures are presumed to be subject to the special election expenditure limit on and after the date a special election was first reasonably anticipated, as determined by the Board. Expenditures incurred prior to the date such election was reasonably anticipated may also be presumed to be subject to the special election expenditure limit beginning when a candidate committee has already registered for the covered office that is the subject of such special election, or has begun raising or spending funds.

(c) Candidates may present evidence to the Board demonstrating the date a special election was first reasonably anticipated.

(d) Candidates who have received public funds for a special election may not make expenditures after such election, except for narrowly defined purposes as provided in section 9-02(c), until any required public funds repayments are made to the Board. Expenditures made after a special election by the special election committee are presumed to be for the next election and are covered by the expenditure limit applicable to such election, pursuant to section 6-01(h)(i).

**(e) Qualified expenditures.**

(i) Public funds received for a special election to fill a vacancy may be used only for expenditures made by a candidate to further the candidate's nomination or election to fill

Back to TOC

such vacancy, and may not be used for any expenditure that is not qualified as defined in § 3-704 of the Code and section 6-02(a). An expenditure made prior to the date on which a vacancy was declared shall be presumed not to be in furtherance of the candidate's nomination or election, unless the candidate provides evidence demonstrating that the vacancy was reasonably anticipated when the expenditure was made.

(ii) Expenditures incurred outside of the calendar year in which the special election is held are presumed not to be qualified, unless the proclamation and the special election occur in different calendar years.

(iii) It is presumed that the following bills for goods and services are not qualified campaign expenditures:

> (A) bills for a special election that are first reported in a disclosure statement submitted later than the first post-election disclosure statement applicable to that special election; and

> (B) bills first reported in an amendment to a disclosure statement that is made after the special election.

## § 15-04 Contributions.

**(a) Limit.** The contribution limit for a special election is one half of the contribution limit applicable to the office for which the special election is occurring.

(b) Contributions received after a candidate's most recent election and prior to a special election are presumed to be for such special election, except that contributions received on or before the date the special election was first reasonably anticipated, which do not exceed the applicable contribution limit, will not be presumed to be for the special election.

(c) For contributions received on or before the date the special election was first reasonably anticipated which are in excess of the contribution limit for the special election, the authorized committee established for such special election must refund the excess portion to the contributor.

(d) Candidates may present evidence to the Board demonstrating the date a special election was first reasonably anticipated.

**(e) Public funds.** To receive public matching funds, candidates in a special election must meet the same threshold and eligibility requirements as candidates in a primary or general election; provided, however, that the threshold dollar amount of summed matchable contributions shall be halved in a special election for mayor, public advocate, or comptroller. A candidate in a special election shall respond to an invalid matching claims report no later than the deadline set by the Board. The Board shall schedule at least three payment dates in the 30 days prior to a special election.

Back to TOC

**(f) Bank account.** Candidates must use a special election account.

(g) Receipts accepted for a special election may not be commingled in any account with receipts accepted for another election, with receipts accepted for a TIE, or with personal or business funds, and may not be used for any other election until after the special election is actually held.

## § 15-05 Training.

A candidate in a special election, or such candidate's representative, must attend a compliance training session designed specifically for such election. Such training must be completed on or before the financial disclosure cut-off date of the 11-day pre-election disclosure statement.

## § 15-06 Independent expenditure disclosure.

(a) Disclosure statements are due every Monday until and including the fourth Monday after the special election.

**(b) Reporting period.**

**(i) Candidate elections.** For candidates anticipated to be voted on in a special election, the reporting period for the first independent expenditure disclosure statement begins on the day the vacancy is declared. The reporting period for each subsequent disclosure statement begins on the preceding Monday.

**(ii) Ballot proposals.** For ballot proposals anticipated to be voted on in a special election, the reporting period for the first independent expenditure disclosure statement begins on the date the first reportable expenditure is incurred. The reporting period for each subsequent disclosure statement begins on the preceding Monday.

**(iii) Conclusion of reporting period.** The reporting period for all disclosure statements concludes on and includes the day before the filing due date.

**(c) Daily disclosure.** During the 14 days before the election, an independent spender must submit a disclosure statement to the Board within 24 hours of distributing any reportable communication, making any reportable expenditure, or receiving any reportable contribution.

(d) An independent spender that has not distributed any reportable communications, made any reportable expenditures, or received any reportable contributions within a reporting period is not required to file a disclosure statement for that period.

**§ 15-07 Transition and inauguration entities.**

(a) A special election TIE must not make expenditures after 30 days following the candidate's inauguration, except for expenditures related to fundraising to satisfy liabilities incurred within 30 days of inauguration, or expenditures related to terminating the entity or responding to the post-election audit.

(b) Unless permitted by subdivision (a) above, any donation or other receipt received after 30 days following the date of the elected candidate's inauguration by a TIE shall be presumed to be for the next election in which the elected candidate is a candidate following the day that it is received, and not received for the purposes of transition or inauguration.

(c) Unless permitted by subdivision (a) above, any expenditure incurred after 30 days following the date of the elected candidate's inauguration by a TIE shall be presumed to be for the next election in which the elected candidate is a candidate following the day that it is incurred, and not incurred for the purposes of transition or inauguration.

(d) The TIE must be terminated after it has paid all liabilities and otherwise disposed of all funds pursuant to the requirements set forth in this chapter and, in any event, no later than 60 days after inauguration.

# Chapter 16: Voter Education and Engagement

**§ 16-01 Definitions.**

Except as otherwise provided, the definitions set forth in section 1-02 apply in this chapter. In addition:

**"Ballot proposal"** means any proposition, referendum, or other question submitted to New York City voters pursuant to the Charter, the New York Municipal Home Rule Law, or any other law.

**"Candidate print statement"** means the document filed by a candidate containing biographical and other information requested by the Board, and a photograph of the candidate, for inclusion in the printed or online Voter Guide.

**"Candidate video statement"** means a video-recorded statement by the candidate for inclusion in the video and online edition of the Voter Guide.

**"Election"** means any election for the office of mayor, public advocate, comptroller, borough president, or Council member, or a general election in which a ballot proposal is on the ballot, and does not include any election held pursuant to court order.

**"Registered candidate"** means an individual who has registered or filed a Certification with the Board pursuant to section 2-01 or 2-02 and § 3-703 of the Code.

**§ 16-02 Contents of the Voter Guide.**

**(a) Generally.** In addition to any information that the Board determines to be useful for promoting public awareness of the voting process, city government, and the candidates and ballot proposals in an election, the printed and online Voter Guides for an election will contain: (1) the date of the election; (2) the hours during which the polls will be open; (3) an explanation of the voter registration process, including deadlines to register for both the primary and general elections; (4) an explanation of how to obtain and cast or mark an absentee ballot; (5) an explanation of how to cast a vote, including write-in votes; (6) information about the boundaries of City Council districts to aid voters in determining their appropriate district; and (7) tables of contents, graphics, and other materials which the Board determines will make the Voter Guide easier to understand or more useful for the average voter.

**(b) Candidate statements.**

    **(i) Candidate print statements.**

        (A) Candidate print statements contain the following biographical information:

            (1) the name of the candidate;

            (2) the political party, if any, in which the candidate is enrolled, and for which party lines the candidate's name will appear on the ballot;

            (3) the previous and current public offices held by the candidate;

            (4) the current occupation and employer of the candidate;

            (5) prior employment and positions held by the candidate;

            (6) the experience the candidate has had in public service;

            (7) the educational background of the candidate;

            (8) a list of the candidate's major organizational affiliations;

            (9) information about the candidate's principles, platform, or views, in a form prescribed by the Board; and

            (10) such other information as may be determined by the Board and requested of the candidate.

        (B) The candidate print statement must be submitted in English.

(C) The photograph of the candidate submitted as part of a candidate print statement must:

(1) be a recent photograph;

(2) have a plain background;

(3) show only the face or the head, neck, and shoulders of the candidate;

(4) not include the hands or anything held in the hands of the candidate;

(5) not show the candidate wearing any distinctive uniform, including a judicial robe, or a military, police, or fraternal uniform; and

(6) comply with the size and resolution requirements as determined by the Board.

(D) Candidate print statements may not:

(1) refer to any opposing candidate by name;

(2) contain profanity or statements that are patently offensive, obscene, libelous, or defamatory;

(3) assert facts that the candidate knows or should know to be false; or

(4) violate any city, state, or federal law, including regulations of the New York State Public Service Commission.

(E) A candidate print statement that violates any of the requirements outlined in this chapter, as determined by the Board at its sole discretion, will not be included in the Voter Guide.

**(F) Timing of submission.**

(1) In the election year, all registered candidates considering filing designating petitions must submit their complete and final print statements in accordance with a deadline set by the Board.

(2) A candidate not named in a filed designating petition who anticipates filing an independent nominating petition for the general election must submit a candidate print statement on or before the "independent candidates" submission deadline set by the Board.

**(ii) Candidate video statements.**

(A) Candidate video statements must contain the same biographical information as the candidate print statements, and may contain such other information as the candidate may choose, including a concise audio description of the candidate; provided, however, that the candidate may not:

(1) refer to any opposing candidate by name;

(2) use profanity, or statements, gestures, or materials that are patently offensive, obscene, or pornographic;

(3) make statements that are slanderous, or defamatory, or assert facts that the candidate knows or should know to be false;

(4) engage in any commercial programming or advertising;

(5) display any literature, graphs, or props; or

(6) violate any city, state, or federal law, including regulations of the New York State Public Service Commission and the Federal Communications Commission.

(B) Candidates recording video statements may dress as they choose and are responsible for their own clothing, make-up and hairdressing, except that when recording a video statement, candidates may not:

(1) be fully or partially nude;

(2) wear any distinctive uniform, including a judicial robe, or a military, police, or fraternal uniform; or

(3) violate any city, state or federal law, including regulations of the New York State Public Service Commission and the Federal Communications Commission.

(C) To ensure that candidate scripts meet the requirements of this section, candidate video statement scripts must be submitted for Board approval before the candidate's scheduled recording session, and on or before the script submission deadline set by the Board. Candidates must follow their approved video statement script during the recording. Recorded statements will not be edited by the Board or any entity participating in the production of the video edition of the Voter Guide, except that candidate identification and other election information may be displayed.

(D) Only the candidate may appear on camera, and only the candidate may record a candidate video statement.

(E) Candidates may sit or stand while recording statements. Reasonable accommodations for candidates with special needs will be made.

**(F) Video statements shall be recorded in English.** Candidates may record a portion of their video statements in a language other than English if the script submitted for Board approval contains both the English and non-English text and an English translation of all non-English text. No additional time will be allotted for statements recorded in multiple languages. The Board will take such measures as it deems reasonable and necessary to ensure that an American Sign Language translation is available for each video statement and that captions are available for each video statement in English and other languages required by law.

(G) Candidate video statements that violate any of the requirements outlined in this chapter, as determined by the Board as its sole discretion, will not be included in the Voter Guide.

**(H) Timing of candidate video statement recordings.** In the election year, the recording schedule for candidates' video statements will be given to registered candidates in advance. Appointments for candidate video statement recordings will be during the production schedule. A candidate who fails to appear at the scheduled time waives participation in the video edition of the Voter Guide.

(I) The Board will take such measures as it deems reasonable and necessary to ensure that candidate video statements included in the Voter Guide are accessible to individuals with vision disabilities.

**(iii) Inclusion of candidate statements in Voter Guide editions.**

**(A) Primary election edition.** Only registered candidates who have met the requirements of this chapter and who are on the ballot in a contested primary will have their candidate print and video statements included in primary election editions of the Voter Guide. Candidates anticipated to appear on the ballot in a contested primary on the date that the primary election print edition goes to press, based on the Board's assessment of information available from the Board of Elections, will have their print statements included in printed editions of the Voter Guide.

**(B) General election edition.** Only registered candidates who have met the requirements of this chapter and who are on the general election ballot will have their candidate print and video statements included in general election editions of the Voter Guide. Candidates who are seeking nomination or election exclusively as write-in candidates will not be included in the Voter Guide. Candidates anticipated to appear on the general election ballot on the date that the general election print edition goes to press, based on the Board's assessment of information available from the Board of Elections, will have their print statements included in printed editions of the Voter Guide. Candidates running unopposed in the general election will be included in general election editions of the Voter Guide, except where the only election being

covered is uncontested, in which case the Board will not produce or distribute print or video editions of the Voter Guide, but will produce an online Voter Guide.

(C) If a candidate in the general election was included in the primary election Voter Guide, then that candidate's primary election Voter Guide statement will be included in the general election Voter Guide, unless the candidate submits a general election Voter Guide statement on or before the deadline set by the Board.

(D) Candidates' print statements will be included in the primary and general election online editions following the requirements in paragraphs (i), (ii), and (iii).

(E) The Board will not accept a candidate print or video statement unless it is submitted in the form required by the Board, including any signatures or notarizations, and unless the candidate has verified that the contents of the submission are true to the best of the candidate's knowledge. The Board may reject any portion of a candidate's print or video statement that it decides is obscene, libelous, slanderous, defamatory, or otherwise in violation of these rules.

(iv) Candidate statements must not exceed the length and space limitations provided by the Board. The Board may require that candidate print statements follow a consistent format, and may edit statements to make them similar in presentation and length and consistent with existing law. Candidate video statements that exceed their allotted statement time, as determined by the Board, will be cut off at the time limit.

(v) A candidate print statement or video script is a written instrument which becomes part of the Board's records when filed. A candidate may not include any false information in the print statement or video script. The candidate must verify that the print statement and video script are true, to the best of the candidate's knowledge.

(vi) The Board will publish one of the following notices with each candidate print statement:

(A) In the case of a participant: "Participant in the Campaign Finance Program" or similar language.

(B) In the case of a non-participant: "Not a participant in the Campaign Finance Program" or similar language.

**(c) Ballot proposals.**

(i) The print and online editions of the Voter Guide for a general election in which a city ballot proposal is anticipated to appear on the ballot will contain: (A) the form of each ballot proposal as it will appear on the ballot in the general election; (B) a plain-language abstract of each ballot proposal; and (C) to the extent feasible, clearly-labeled major arguments for and against the passage of each ballot proposal. If feasible, the Board will

solicit public statements for and against passage of each ballot proposal for possible inclusion in the Voter Guide for the general election.

(ii) A public statement will not be accepted by the Board unless it: (A) is submitted in a form the Board requires, including any signatures; (B) conforms to the length and space limitations; (C) identifies the organization, if any, on whose behalf the statement is made; and (D) clearly argues for or against passage of the proposal. No person may submit more than one statement per ballot proposal.

**(iii) Board determines whether to publish statements for and against ballot proposals.** With respect to statements for or against passage of ballot proposals, the Board may determine: (A) not to publish any such statements; (B) not to publish any statement submitted pursuant to paragraph (i) of subdivision (c); (C) to publish any portion of a statement submitted pursuant to paragraph (i) of subdivision (c); and (D) to compose and publish such statements as it deems appropriate

**(iv) State ballot proposals.** The Board will include information about state ballot proposals in Voter Guides for a covered office or a city ballot proposal. The Board may produce an online Voter Guide to provide information about state ballot proposals during an election for which no print Voter Guide is produced.

## § 16-03 Voter Guide publication and distribution.

(a) The Board will publish printed Voter Guides in English and Spanish, and in other languages required by law. The Voter Guide will be distributed by mail to each city household in which there is at least one registered voter eligible to vote in the primary or general election, as applicable.

(b) The Board will produce an online Voter Guide in English and Spanish, and in other languages required by law.

(c) The Board may produce a video edition of the Voter Guide for citywide elections. The Board will seek partners for the production, marketing, and broadcasting of video editions of the Voter Guide. The Board will post online the scripts provided pursuant to section 16-02(b)(ii)(C), along with translations of those scripts into Spanish and other languages required by law.

(d) Any conflicts related to the submission or public release of candidate print or video statements will be decided by the Board.

(e) All decisions made by the Board with respect to any edition of the Voter Guide, including resolution of conflicts, are final.

(f) The Board has ownership of and distribution rights to all Voter Guide content, including candidate statements. Unedited candidate statements may be republished or broadcast with the Board's permission.

## § 16-04 Elections not held as scheduled.

Notwithstanding any other provision of this chapter, the Board will take such actions as are practicable to prepare, publish, and distribute a Voter Guide in a timely manner for an election that is not held as initially scheduled.

# Chapter 17: Public Access to Information

## § 17-01 Records available to the public.

The New York State Freedom of Information Law (FOIL) (Public Officers Law, Article 6, § 84 et seq.) governs public access to the Board's records. The Board may deny access to records or portions of records that are exempted from disclosure by state or federal law.

## § 17-02 Records access officer.

The Board's records access officer is designated by the Executive Director and is responsible for ensuring appropriate agency response to public requests for access to records.

## § 17-03 Requesting records.

(a) A candidate may request access to records such candidate submitted to the Board by contacting the Candidate Guidance and Policy Unit, which may provide access to such records without a FOIL request.

(b) To request access to Board records, a member of the public must:

(i) make a written FOIL request in person, by mail, or by email, addressed to the Board's records access officer;

(ii) reasonably describe the records sought;

(iii) provide the requestor's name and mailing or email address; and

(iv) specify preference for inspection of records or copies of records.

(c) Within five business days of receipt of a FOIL request made in accordance with subdivision (b) above, the Board will:

(i) grant or deny the request, in whole or in part, in writing; or

(ii) provide:

    (A) a written acknowledgment of the request and state the approximate date on which the request will be granted or denied; or

    (B) where circumstances prevent granting or denying the request within 20 business days of the written acknowledgment,

        (1) a written statement of the reasons for the delay in making a determination; and

        (2) a date, within a reasonable period depending on the circumstances, when the request will be granted or denied.

(d) Where the Board is unable to locate records responsive to the request, the Board, upon request, will certify that:

    (i) the Board is not the custodian of such records; or

    (ii) such records cannot be found after a diligent search.

(e) Where the request is granted, the Board will:

    (i) make records available for inspection:

        (A) between the hours of 10:00 a.m. and 4:00 p.m., on business days, Monday through Friday;

        (B) at the offices of the Board or another location chosen by the Board;

        (C) in quantities that may be limited to the amount available at the time; and

        (D) contingent on the requester's promise that the records will not be removed, damaged, marked, or changed in any way during the inspection; or

    (ii) make copies of records available in the medium requested, where practicable, upon payment of fees as described in this Chapter, and provide, on request, a certification that the copies are true copies;

(f) Where a request is denied, the Board will explain the reasons for the denial in writing and set forth the right to appeal.

## § 17-04 Appealing a denial of access to records.

(a) To appeal a denial of access to records, the requester must, within 30 days of the denial, submit a written appeal to the Board's General Counsel including:

(i) a copy of the original request;

(ii) a reasonable description of the records to which access was denied; and

(iii) the name and address of the requester.

(b) Upon receipt of an appeal, the Board's General Counsel shall, within 10 business days:

(i) decide the appeal and send a copy of the written decision to the requester; and

(ii) send a copy of the appeal and a copy of the written decision to the Committee on Open Government of the Department of State of the State of New York.

## § 17-05 Fees.

The Board may require payment for copies of records, as follows:

(a) 25 cents per page for photocopies not exceeding 8-1/2 inches by 14 inches; or

(b) the actual cost of reproducing any other record, in accordance with § 87 of the New York Public Officers Law.

# Exhibit 2

# NEW YORK CITY CAMPAIGN FINANCE BOARD | RULES

This booklet contains the rules adopted by the New York City Campaign Finance Board, as last revised on December 19, 2024. Campaign Finance Board rules are codified in Title 52 of the official compilation of the Rules of the City of New York (RCNY) (Lenz & Riecker, Inc.).

For more information about the Campaign Finance Program, please contact:

New York City Campaign Finance Board
100 Church Street, 12th Floor
New York, New York 10007
(212) 409-1800

New York City Campaign Finance Board
(Effective December 19, 2024)


# **Table of Contents**

Table of Contents ...................................................................................................................... ii

**Chapter 1: Definitions and General Provisions** ................................................................. 1

  § 1-01 Scope of Rules. ............................................................................................................. 1

  § 1-02 Definitions. ...................................................................................................................... 1

  § 1-03 The Board. ........................................................................................................................ 6

  § 1-04 Deadlines. ........................................................................................................................ 8

  § 1-05 Legibility of submissions. ............................................................................................... 9

  § 1-06 Severability. ..................................................................................................................... 9

**Chapter 2: Registration and Certification** .......................................................................... 9

  § 2-01 Registration. ..................................................................................................................... 9

  § 2-02 Certification. ................................................................................................................... 11

  § 2-03 Amendments to Registration. ....................................................................................... 12

  § 2-04 Non-participants. ........................................................................................................... 13

  § 2-05 Petition for extraordinary circumstances ..................................................................... 13

  § 2-06 Training. .......................................................................................................................... 13

**Chapter 3: Eligibility to Receive Public Funds** ................................................................ 14

  § 3-01 Candidates must demonstrate eligibility. ...................................................................... 14

  § 3-02 Disqualification from ballot. ......................................................................................... 18

  § 3-03 Write-in candidates. ....................................................................................................... 18

  § 3-04 Termination of candidacies. .......................................................................................... 18

  § 3-05 Proof of filing with the Conflicts of Interest Board; payment of penalties.................. 19

**Chapter 4: Records and Reporting** ..................................................................................... 19

  § 4-01 Records to be kept. ......................................................................................................... 19

  § 4-02 Record retention. ............................................................................................................ 28

  § 4-03 Assistance to candidates. ............................................................................................... 28

  § 4-04 Failure to maintain or provide records. ......................................................................... 29

  § 4-05 Disclosure statements. ................................................................................................... 29

  § 4-06 Daily disclosures during the two weeks preceding the election. ................................... 36

  § 4-07 Final Statement. ............................................................................................................. 37

  § 4-08 Write-in candidates. ....................................................................................................... 37

  § 4-09 Candidates not in primary or general elections............................................................. 37

**Chapter 5: Contributions, Loans, and Other Receipts**..................................................**38**

§ 5-01 Contribution limits................................................................................. 38

§ 5-02 Solicitation of contributions................................................................ 38

§ 5-03 Prohibited contributions and loans..................................................... 39

§ 5-04 Contributions subject to special requirements................................... 39

§ 5-05 Non-matchable contributions............................................................. 41

§ 5-06 In-kind contributions........................................................................... 44

§ 5-07 Refunding prohibited and over-the-limit contributions.  46

§ 5-08 Contributions originally received for other elections........................ 47

§ 5-09 Loans.................................................................................................. 49

§ 5-10 Attributing contributions..................................................................... 50

§ 5-11 Use of receipts................................................................................... 52

§ 5-12 Court ordered rerun elections............................................................ 54

**Chapter 6: Expenditures** ..........................................................................................**54**

§ 6-01 Expenditure limits.............................................................................. 54

§ 6-02 Restrictions on expenditures.............................................................. 60

§ 6-03 Joint expenditures; endorsements..................................................... 62

§ 6-04 Independent expenditures.................................................................. 64

§ 6-05 Expenditures made by other committees established for the candidate....... 67

§ 6-06 Identification of communications........................................................ 68

§ 6-07 Routine communication sent by a political club to its members......... 69

**Chapter 7: Pre-Election Public Funds Payments**...................................................**69**

§ 7-01 Eligibility............................................................................................. 69

§ 7-02 Timing. ............................................................................................... 71

§ 7-03 Payment by electronic funds transfer................................................ 72

§ 7-04 Public funds cap................................................................................. 72

§ 7-05 Small primaries.................................................................................. 73

§ 7-06 Withholdings....................................................................................... 74

§ 7-07 Deductions from payments................................................................. 74

§ 7-08 Notice to candidates.......................................................................... 76

§ 7-09 Petitions for review............................................................................. 77

§ 7-10 Review of contributions and expenditures......................................... 77

**Chapter 8: Post-Election Public Funds Payments** ........................................................... 81

§ 8-01 Payment determinations. ........................................................................................... 81

§ 8-02 Amount of post-election payment. ............................................................................ 81

§ 8-03 Use of final post-election payment. .......................................................................... 82

§ 8-04 Disclosure statement amendments. ........................................................................... 82

§ 8-05 Post-election petitions for review. ............................................................................ 83

**Chapter 9: Public Funds Repayments** ............................................................................... 83

§ 9-01 ............................................................................................................................... 83

§ 9-02 Reasons for repayment. ............................................................................................ 83

**Chapter 10: Audit and Enforcement** .................................................................................. 87

§ 10-01 Audits. ..................................................................................................................... 87

§ 10-02 Audit deadlines; optional post-election training. ..................................................... 87

§ 10-03 Board determinations concerning violations, infractions, penalties, and repayment of public funds. ................................................................................................................................... 88

§ 10-04 Submission of false information. ............................................................................. 89

**Chapter 11: Procedural Rules for Formal Adjudications** ................................................. 89

§ 11-01 Definitions. ............................................................................................................. 89

§ 11-02 Applicability. .......................................................................................................... 90

§ 11-03 Proceedings before designation of hearing officer. ................................................. 90

§ 11-04 Designation of hearing officer. ............................................................................... 90

§ 11-05 Commencement of proceedings and pleadings. ....................................................... 90

§ 11-06 Filing of Papers. ..................................................................................................... 92

§ 11-07 Docketing the Case at OATH. ................................................................................ 92

§ 11-08 Disqualification of hearing officers. ........................................................................ 93

§ 11-09 Conferences. ........................................................................................................... 93

§ 11-10 Notice of conference or hearing ............................................................................. 93

§ 11-11 Adjournments. ........................................................................................................ 94

§ 11-12 Discovery. ............................................................................................................... 94

§ 11-13 Pre-hearing motions. .............................................................................................. 94

§ 11-14 Appearances at OATH. ........................................................................................... 94

§ 11-15 Ex-parte communications. ...................................................................................... 94

§ 11-16 Role of the hearing officer. ..................................................................................... 94

§ 11-17 Consolidation; separate hearings. ........................................................................... 95

§ 11-18 Witnesses and documents. ...................................................................................... 95

§ 11-19 Subpoenas. .............................................................................................................. 95

§ 11-20 Order of proceedings. .............................................................................................. 95

§ 11-21 Interpreters. ................................................................................................. 95

§ 11-22 Failure to appear. ........................................................................................ 95

§ 11-23 Evidence at the hearing. .............................................................................. 95

§ 11-24 Official notice. ............................................................................................. 95

§ 11-25 Public access to proceedings. ...................................................................... 96

§ 11-26 Hearing motions. ......................................................................................... 96

§ 11-27 Transcript. ................................................................................................... 96

§ 11-28 Decision made on the record. ...................................................................... 96

§ 11-29 Written comments. ...................................................................................... 96

§ 11-30 Final determination. .................................................................................... 96

**Chapter 12: Investigations and Complaints** ............................................................ **97**

§ 12-01 Investigations. ............................................................................................ 97

§ 12-02 Complaints. ................................................................................................. 97

**Chapter 13: Transition and Inauguration Entities** .................................................. **99**

§ 13-01 Registration. ............................................................................................... 99

§ 13-02 Periodic disclosure reports. ........................................................................ 99

§ 13-03 Limits and requirements. .......................................................................... 101

§ 13-04 Records and audit. .................................................................................... 104

§ 13-05 Other provisions concerning TIEs. ............................................................ 105

**Chapter 14: Disclosure of Independent Expenditures** ........................................... **105**

§ 14-01 Definitions. ............................................................................................... 105

§ 14-02 Disclosure statements. .............................................................................. 107

§ 14-03 Disclosure dates. ...................................................................................... 110

§ 14-04 Identification of communications. ............................................................. 111

§ 14-05 Non-independent expenditures. ................................................................ 113

§ 14-06 Guidance for independent spenders. ......................................................... 113

§ 14-07 Document retention. ................................................................................. 114

§ 14-08 Penalties. .................................................................................................. 114

§ 14-09 Other provisions concerning independent expenditures. ........................... 114

**Chapter 15: Special Elections** ................................................................................ **114**

§ 15-01 Special requirements and procedures. ....................................................... 114

§ 15-02 Filing requirements. .................................................................................. 115

§ 15-03 Expenditures. ............................................................................................ 116

§ 15-04 Contributions. ........................................................................................... 117

§ 15-05 Training. .................................................................................................... 118

§ 15-06 Independent expenditure disclosure...........................................................118

§ 15-07 Transition and inauguration entities. .......................................................119

**Chapter 16: Voter Education and Engagement ...................................................120**

§ 16-01 Definitions. ....................................................................................120

§ 16-02 Contents of the Voter Guide. ...............................................................120

§ 16-03 Voter Guide publication and distribution. ...............................................125

§ 16-04 Elections not held as scheduled. ..........................................................126

**Chapter 17: Public Access to Information.........................................................126**

§ 17-01 Records available to the public............................................................126

§ 17-02 Records access officer. .....................................................................126

§ 17-03 Requesting records...........................................................................127

§ 17-04 Appealing a denial of access to records.................................................128

§ 17-05 Fees..............................................................................................128

Back to TOC

# Chapter 1: Definitions and General Provisions

## § 1-01 Scope of Rules.

**Chapters 1 through 8** contain requirements applicable to candidates seeking nomination or election to the office of mayor, comptroller, public advocate, borough president, or member of the City Council ("Council member") during the pre-election period.

**Chapters 9 through 11** pertain to post-election audit and enforcement of candidates seeking nomination or election to the office of mayor, comptroller, public advocate, borough president, or Council member, as well as independent spenders.

**Chapter 12** pertains to investigations conducted by, and complaints filed with, the Board.

**Chapter 13** contains requirements for transition and inauguration entities ("TIEs"), which apply to all candidates elected to the office of mayor, comptroller, public advocate, borough president, or Council member, regardless of whether the elected candidate is a participant in the voluntary Campaign Finance Program.

**Chapter 14** contains requirements for disclosure of independent expenditures related to candidates seeking nomination or election to the office of mayor, comptroller, public advocate, borough president, or Council member, as well as ballot proposals.

**Chapter 15** contains requirements for special elections for the office of mayor, comptroller, public advocate, borough president, or Council member.

**Chapter 16** pertains to the Voter Guide and voter engagement and applies to candidates seeking nomination or election to the office of mayor, comptroller, public advocate, borough president, or Council member, as well as city ballot proposals or referenda.

**Chapter 17** contains requirements for public access to information as provided by the Freedom of Information Law.

Except as otherwise specified, the requirements of these rules related to authorized committees do not apply to an authorized committee that does not, at any time, aid or otherwise take part in an election in which the candidate is a participant or non-participant. Aiding or otherwise taking part in an election includes accepting contributions, loans, or other receipts, and making expenditures, including expenditures of surplus funds, for such election.

## § 1-02 Definitions.

**"Act"** means the New York City Campaign Finance Act, codified in Chapter 7 of Title 3 of the Code (§ 3-701, et seq.).



**"Administrative law judge"** means the hearing officer assigned to preside over a case that is referred to the Office of Administrative Trials and Hearings.

**"Advance"** means a payment for goods or services on behalf of a candidate made with the expectation that the payment will be reimbursed by the candidate.

**"Authorized committee"** means an authorized committee as defined in the Act.

**"Board"** means the Campaign Finance Board.

**"Board of Elections"** means the New York City Board of Elections, unless otherwise specified as the New York State ("State") Board of Elections.

**"Business dealings with the city"** means business dealings with the City of New York as defined in the Act.

**"Candidate"** means a candidate as defined in Article 14 of the New York State Election Law. Except as otherwise provided in these rules, a "candidate" includes every authorized committee of the candidate, the treasurer of each such committee, and any other agent of the candidate.

**"CAPA"** means the City Administrative Procedure Act, §§ 1041 to 1047 of the Charter.

**"Certification"** means the submission of the information required pursuant to section 2-02 in order to join the Program.

**"Charter"** means the New York City Charter.

**"Code"** means the Administrative Code of the City of New York.

**"Contribution"** means a contribution as defined in the Act.

**"Covered election"** means any election for the office of mayor, public advocate, comptroller, borough president, or Council member.

**"Disclosure statement"** means the campaign finance disclosure statement filed with the Board under Chapter 4 of these rules.

**"Doing business database"** means the computerized database containing the names of individuals and entities engaged in business dealings with the city as defined in the Act.

**"Domestic partner"** means a domestic partner as defined in § 1-112(21) of the Code.

**"Donation"** means a gift, subscription, advance, payment, or deposit of money or any thing of value, made by an individual or entity, in connection with the transition or inauguration expenses of an elected candidate, including but not limited to compensation for the personal services rendered in connection with such transition or inauguration expenses without charge. A

loan is deemed to be a donation, subject to the limits and restrictions of the Act, to the extent the loan is not repaid by the date that the elected candidate is sworn into office. The term "donation" shall not include:

(a) The value of personal services provided without compensation by individuals volunteering a portion or all of their time on behalf of a TIE, provided that such an individual may not provide any paid services to a TIE at the same time as such individual serves as a volunteer for that TIE;

(b) The use of real or personal property and the cost of invitations, food, and beverages voluntarily provided by an individual to a TIE on the individual's residential premises for TIE-related activities to the extent such services do not exceed $500 in value; and

(c) The travel expenses of any individual who, on the individual's own behalf, volunteers personal services to any TIE to the extent such expenses are unreimbursed and do not exceed $500 in value.

**"Election"** means any primary, special, or general election for nomination or election.

**"Election cycle"** means the period beginning on the first January 12 following the most recent general election for the specific office to which a candidate is seeking nomination or election and ending on the first January 11 following the next general election for that office.

**"Electronic means"** means facsimile transmission, email, or any other electronic manner of communication that shall be prescribed by the Board.

**"Entity"** means any organization of one or more individuals, and includes any parent, subsidiary, branch, division, department, or local unit thereof.

**"Expenditure"** means an expenditure as defined in the Act.

**"Fair market value"** means: (1) for goods, the price of those goods when received in the market in which they ordinarily would have been purchased; and (2) for services, other than those provided by an unpaid volunteer, the hourly or piecework charge for the services at a commercially reasonable rate prevailing when the services were rendered.

**"Filer Registration"** means the submission of the information required pursuant to section 2-01 prior to the filing of disclosure statements.

**"Fund"** means the New York City Election Campaign Finance Fund established by the Act.

**"Fundraising agent"** means any of the following individuals or entities that have accepted or may accept contributions on behalf of the candidate: (1) paid or volunteer full-time campaign workers; or (2) commercial fundraising firms retained by the candidate and the agents thereof.

**"Hearing officer"** means the person assigned to preside over a case before OATH.

Back to TOC

"**Inauguration expenses**" means expenses for an inaugural event held within seven days before or 30 days after the elected candidate is officially sworn into office. Factors used by the Board in determining whether an event is an inaugural event include but are not limited to: (1) the celebratory or commemorative nature of the event; (2) the location of the event in relation to the geography of the elected official's district; and (3) the inclusion of non-celebratory and/or commemorative functions, including but not limited to constituent outreach or services. The burden of proving that an event is an inaugural event rests with the TIE.

"**In-kind contribution**" means: (1) a gift, subscription, loan, advance of, or payment for, any thing of value (other than money) made to or for any candidate; or (2) the payment by any individual or entity other than an authorized committee of compensation for the personal services of another individual or entity which are rendered to the candidate without charge. "In-kind contribution" does not include personal services provided without compensation by individuals volunteering a portion or all of their time on behalf of a candidate.

"**Intermediary**" means an intermediary as defined in the Act.

"**Labor organization**" means a labor organization as defined in the Act.

"**Loan**" means a monetary payment made to an authorized committee with the expectation that the funds will be repaid by such committee.

"**Matchable contribution**" means a matchable contribution as defined in the Act.

"**Mobile fundraising vendor**" means any persons or entities that provided services to a candidate related to the processing or receipt of any text message contribution.

"**Non-participant**" means a candidate for nomination or election to a covered office who has not filed a Certification as a participant. Except as otherwise provided in these rules, a "non-participant" includes the candidate, every political committee authorized by the candidate for the covered election, the treasurer of each such committee, and any other agent of the candidate.

"**OATH**" means the Office of Administrative Trials and Hearings.

"**On the ballot**" means on the ballot as provided in Article 6 of the New York State Election Law and as recorded on the Board of Elections nomination or designation ledgers or contest lists.

"**Optional early public funds payment**" means a disbursement of optional public financing occurring prior to two weeks after the last day to file designating petitions for a primary election.

"**Other receipts**" means payments received by a candidate that are not contributions or loans, such as interest, dividends, proceeds from sales or leases of assets, and any other sources of income.


Back to TOC

**"Participant"** means a candidate for nomination or election to a covered office who has chosen to join the Program for an election by submitting a Certification pursuant to § 3-703(1)(c) of the Code. Except as otherwise provided in these rules, a "participant" includes the candidate, the principal committee authorized by the candidate pursuant to § 3-703(1)(e) of the Code, the treasurer of such committee, and any other agent of the candidate.

**"Political committee"** means a political committee as defined in the Act.

**"Principal committee"** means the principal committee as defined in the Act.

**"Program"** means the New York City Campaign Finance Program established by the Act.

**"Public funds"** means monies disbursed from the Fund.

**"Receipts"** means monetary and in-kind contributions, loans, and any other payment received by a candidate.

**"Registered user"** means the individual registered with the wireless carrier to use the specific mobile device from which a contribution made via text message was initiated.

**"Reporting period"** means a time period covered by a disclosure statement, as described in section 4-05.

**"Segregated account"** means a bank account that may be established by a participating candidate in accordance with section 7-07(b).

**"Single source"** means any individual, individuals in combination, entity, or entities in combination that establish, maintain, or control another entity and every entity so established, maintained, or controlled, including every political committee established, maintained, or controlled by the same individual, individuals in combination, entity, or entities in combination.

**"Text message contribution"** means a text message contribution as defined in the Act.

**"Transfer"** means any exchange of funds or any other thing of value between political committees, other than multicandidate committees, authorized by the same candidate pursuant to § 14-112 of the New York State Election Law.

**"Transition and inauguration entity" or "TIE"** means an entity established by an elected candidate to raise and spend private funds for transition or inauguration expenses.

**"Transition expenses"** means expenses relating to an elected candidate's transition into office for goods and services received, used, or rendered before the elected candidate's date of inauguration. Transition expenses shall be limited to those incurred solely for the purpose of preparing to take office, such as those listed in section 13-03(b)(i). Incumbent elected candidates shall not incur transition expenses, except for expenditures made for the purpose of furthering the elected candidate's selection as Speaker of the City Council.


Back to TOC

"**Treasurer**" means the treasurer of any authorized committee involved in a covered election, except as otherwise provided in these rules.

## § 1-03 The Board.

**(a) The Board is nonpartisan.**

**(i)** Pursuant to § 3-708 of the Code, the Board consists of five members.

(A) Two Board members are appointed by the Speaker of the City Council ("Speaker"). No more than one of them shall be enrolled in any one political party.

(B) Two Board members are appointed by the Mayor. No more than one of them shall be enrolled in any one political party.

(C) The chair of the Board is appointed by the Mayor in consultation with the Speaker.

**(ii)** The Board shall conduct all its activities in a strictly nonpartisan manner.

**(b) Board members and staff are governed by ethical standards.**

**(i) The Act and the Charter.** Board members and staff are subject to the standards set forth in the Act and in Chapter 46 of the Charter.

**(ii) Ethical guidelines.** The Board shall establish and publish ethical guidelines governing the conduct of its members and staff.

**(iii) Additional city ethical guidelines.** Board members and staff are subject to the standards set forth in Chapter 68 of the Charter.

**(c) Board administration of the Fund.** To safeguard the administration of the Fund and assure candidates that sufficient public funds will be available to make all payments required by the Act in upcoming elections, the Board shall:

**(i)** make budget requests for the Fund sufficient to cover all anticipated Fund obligations in the upcoming fiscal year and to maintain a reserve for contingencies;

**(ii)** when it has determined that monies in the Fund are insufficient or likely to be insufficient for payments to candidates, report this determination to the Commissioner of Finance and provide its estimate of the additional amount which will be necessary to make such payments pursuant to the Act (together with a detailed statement of the assumptions and methodologies on which the estimate is based), as required by § 1052(a)(10) of the Charter, not more than four days after which the Commissioner of Finance is required by § 1052(a)(10) of the Charter to transfer an amount equal to the Board's estimate from the city's general fund to the Fund;

**(iii)** take steps to ensure that the Fund is maintained in a separate account, credited with all sums appropriated therefor and all earnings accruing thereon, in the custody of the comptroller on behalf of the Board, as required by § 1052(a)(10) of the Charter;

**(iv)** take steps to ensure that the Fund and its administration are insulated from the risk of improper action by any city official or agency or any agent or contractor thereof;

**(v)** subject the Fund to periodic audits by independent outside auditors; and

**(vi)** take such other actions as are necessary and proper to ensure the integrity of the Fund.

**(d) Advisory opinions.** Upon the written request of a candidate or any other individual or entity, the Board shall issue an advisory opinion interpreting the Act and these rules, or otherwise respond in writing to the request, within 30 days of receipt of such request, or within 10 business days of receipt if such request is received less than 30 days before a covered election, to the extent practicable. At its discretion, the Board may issue advisory opinions in the absence of a request. The Board shall make public its advisory opinions and the questions of interpretation for which advisory opinions will be considered by the Board, including by publication on its website.

**(e) Public petitions for rulemaking.**

    **(i) Procedures for submitting petitions.**

        (A) Any individual or entity may petition the Board to consider the adoption of a rule. The request must be sent to the Executive Director and contain the following information:

            (1) the rule to be considered, with proposed language for adoption;

            (2) a statement of the Board's authority to promulgate the rule and its purpose;

            (3) arguments in support of adoption of the rule;

            (4) the period of time the rule should be in effect; and

            (5) the name, address, telephone number, and signature of the petitioner or the petitioner's authorized representative.

        (B) Any change in the information provided pursuant to clause (5) of subparagraph (A) must be communicated promptly in writing to the Executive Director.

        (C) All requests should be typewritten or submitted electronically, if possible, but handwritten petitions will be accepted, provided they are legible.

Back to TOC

**(ii) Responses to petitions.** Within 60 days from the date the petition was received, the Board shall either deny such petition in a written statement containing the reasons for denial, or shall state in writing the Board's intention to grant the petition and to initiate rulemaking by a specified date. In proceeding with such rulemaking, the Board shall not be bound by the language proposed by petitioner, but may amend or modify such proposed language at the Board's discretion. The Board's decision to grant or deny a petition is final.

## § 1-04 Deadlines.

### (a) Computation of days.

**(i) Counting calendar days.** Where a number of days is specified as a period from a certain day, the days will be counted as the number of calendar days except for the first day of the counting period.

**(ii) Where holiday falls within two-day counting period.** If the counting period is two days in duration, then Saturday, Sunday, or a legal holiday must be excluded if it falls on the first or last day of the counting period.

**(iii) Weekends and holidays.** If the scheduled date of a public funds payment, or the deadline for submitting a Certification or for filing a disclosure statement, other than a daily pre-election disclosure statement, falls on a Saturday, Sunday, or legal holiday, the next business day becomes the deadline or scheduled payment date.

### (b) Meeting Board deadlines.

**(i) Submission in person.** Submissions filed in person on weekdays between the hours of 9:00 a.m. and 5:00 p.m. at the offices of the Board, unless otherwise provided, are deemed submitted upon receipt, subject to review and acceptance.

**(ii) Submission by electronic means, non-electronic mail or common carrier.**

**(A) Electronic submissions.** A submission sent electronically shall be deemed filed when received by the Board, subject to review and acceptance.

**(B) Non-electronic submissions.**

**(1) With postmark.** A submission sent by non-electronic mail or common carrier shall be deemed to have been received, subject to review and acceptance, on the date it was postmarked or date stamped by the carrier.

**(2) Without postmark.** Submissions sent by non-electronic mail in an envelope without a postmark will be presumed to have been sent three days prior to receipt, subject to review and acceptance, unless evidence presented to the Board, such as

a post office receipt with a date stamp indicating when the submission was sent, demonstrates otherwise.

**(iii) Board evaluation of submissions that arrive after the deadline.** Submissions of disclosure statement documentation that arrive after 5:00 p.m. on the date of the deadline, even if submitted on or before 11:59 p.m. on such date, may prevent the Board from making a timely determination regarding payment of public funds. The Board shall make such a determination at such time as is practicable.

### § 1-05 Legibility of submissions.

The Board will not accept any electronic disclosure statement or other document, or any part thereof, that is infected with a virus, damaged, blank, improperly formatted, or otherwise unreadable or illegible.

### § 1-06 Severability.

(a) If any provision of these rules or portion thereof is adjudged invalid by a court of competent jurisdiction, such determination shall not affect or impair the validity of the remainder of these rules.

(b) If the application of any provision of these rules or portion thereof to any individual, entity, or circumstances is adjudged invalid by a court of competent jurisdiction, such determination shall not affect or impair the application thereof to other individuals, entities, and circumstances.

## Chapter 2: Registration and Certification

### § 2-01 Registration.

A candidate in a covered election must register in the form and manner required by the Board, prior to conducting financial activity or within 10 business days of filing a petition or certificate of nomination of substitution to get on the ballot in a covered election, whichever is earlier.

**(a) Not a statement of intent.** The submission of a Registration shall not be construed as a statement of intent to join the Program.

**(b) Applicable requirements.** Because the requirements of the Act and these rules apply to financial transactions that take place before a candidate registers, the Board advises candidates to begin compliance with all applicable requirements set forth in the Act and these rules prior to registering.

**(c) Deadline.** A candidate must submit a complete Registration prior to conducting financial activity and within 10 business days of filing a petition or a certificate of nomination or substitution to get on the ballot in a covered election.

**(d) Form.** The Registration must contain any verifications of identity and affirmation as may be required by the Board.

**(e) Contents.** The Registration must include:

(i) the candidate's name, residential address information and telephone numbers, email address, and employment information;

(ii) a sworn statement from the candidate authorizing the committee to make, on the candidate's behalf, any filings as may be required by the Board to disclose all financial activity, including that of the candidate, related to the candidate's campaign;

(iii) the name and mailing address, and treasurer name, treasurer residential address information and telephone numbers, treasurer email address, and treasurer employment information, of every political committee authorized by the candidate that has not been terminated, and, in the case of a participant or limited participant, an indication of which such committee is the principal committee, and a sworn statement from the treasurer of such committee that the candidate has authorized the committee to aid or take part in this election;

(iv) the name, mailing address, email address, and telephone number of any person designated by the candidate to act as liaison with the Board for each committee filing disclosure statements;

(v) by the earlier of the candidate's first required disclosure statement filing or 15 business days following submission of the Registration, identification of all bank accounts and other depository accounts, including merchant and payment processor accounts, into which receipts have been, or will be, deposited, and all bank accounts used for the purpose of repaying debt from a previous election;

(vi) the specific office to which the candidate is seeking nomination or election; and

(vi) other information as required by the Board.

**(f) Small campaign registration.**

(i) If neither the expected total cumulative receipts nor the expected total cumulative expenditures of a campaign, including expenditures made with the candidate's personal funds, exceeds an amount equal to the amount applicable to qualify for the exception provided in § 14-124(4) of the New York State Election Law, the candidate may register as a small campaign by submitting such information as may be required by the Board. The

small campaign registration must also include an affirmation stating that neither the total cumulative receipts nor the total cumulative expenditures of the campaign, including expenditures made with the candidate's personal funds, will exceed the amount applicable to qualify for the exception provided in § 14-124(4) of the New York State Election Law, and that if such amount is exceeded, beginning on or before the deadline to file the next disclosure statement, the candidate amend the Registration and submit all subsequent required disclosure statements, which must include all prior financial activity beginning at the inception of the campaign.

(ii) A candidate who has registered as small campaign pursuant to this section need not submit disclosure statements. If a candidate who has registered as a small campaign raises or spends an amount exceeding the amount necessary to qualify for the exception provided in § 14-124(4) of the New York State Election Law, the candidate must amend their Registration and submit all subsequent required disclosure statements, beginning on or before the deadline to file the next disclosure statement. The first such statement filed must include all prior financial activity beginning at the inception of the campaign.

## § 2-02 Certification.

To join the Program, a candidate must register as a participant by submitting a Certification by the deadline as provided in §§ 3-703(1)(c) and 3-705(4) of the Code. A candidate may register as a participant before filing disclosure statements.

**(a) Applicability.** The Certification applies to all covered elections that are held in the same calendar year or to a special election to fill a vacancy in an office covered by the Act. A candidate only needs to file one Certification for the primary and general elections. Special elections and all other elections require separate Certifications.

**(b) Deadlines.**

(i) For primary and general elections, the deadline for filing a Certification is the later of the ninth Monday preceding the primary election or the thirtieth day after a special election is held to fill a vacancy for the office sought by the candidate. To be eligible to receive an optional early public funds payment, candidates must file a Certification no less than fifteen business days before the date on which the payment is scheduled to be made.

(ii) If the Board declares an extraordinary circumstance, the deadline for filing a Certification will be the seventh day following the declaration.

**(c) Failure to timely certify.** A candidate who does not file a timely Certification is a non-participant.

**(d) Rescission.** A candidate who files a Certification prior to the deadline may rescind the Certification by submitting a Certification rescission form on or before the deadline or prior to receiving the public funds, whichever happens first. A candidate who timely rescinds a

Certification is a non-participant and may not submit an additional Certification for the same election cycle.

**(e) Form.** The Certification must contain any verifications of identity and affirmations required by the Board.

**(f) Contents.** The Certification must include all registration information required by section 2-01 and such other information as required by the Board, including all information necessary to receive payment by electronic funds transfer. In the Certification, the candidate shall designate a principal committee.

**(g) Legal effect.** The candidate must comply fully with Program requirements in all elections for which the Certification is submitted, regardless of the office sought and regardless of whether the candidate: (1) meets all the requirements of law to have such candidate's name on the ballot in the election; (2) is eligible to receive public funds in the election; or (3) accepts public funds.

## § 2-03 Amendments to Registration.

(a) The candidate must notify the Board of any material change in the information required to be listed on the candidate's registration including any new information or any change to any required information, concerning any political committee, bank account, merchant or payment processor account, candidate or treasurer employment, address, telephone number, or email address, in such manner as may be provided by the Board, if such change occurs prior to the covered election or within a period of five years from the filing of a final statement showing satisfaction of all liabilities and disposition of all assets arising from the covered election, including payment of any penalties or repayment of public funds owed to the Board. Such notification must be submitted no later than the next deadline for filing a disclosure statement, or, in the case of changes that occur after the deadline for the final disclosure statement required to be filed, no later than 30 days after the date of the change.

(b) A candidate may amend the Certification with regard to the specific office sought on or before the certification deadline or prior to receiving public funds, whichever happens first.

(i) A candidate may amend the Certification with regard to the specific office sought if the Board declares an extraordinary circumstance pursuant to § 3-703(1)(c)(iii) of the Code, provided that such declaration pertains to the election for either the candidate's original office sought or the candidate's new office sought. The candidate must refund the excess portion of any contributions that exceed the limits applicable to the new office sought, raise additional funds required to meet the threshold applicable to the new office sought, and repay any amount of public funds previously received that exceeds the amount the candidate is eligible to receive for the new office sought. A candidate who fails to promptly satisfy the requirements of this paragraph may be required to repay all public funds previously received for the covered election.

(ii) Absent a declaration of an extraordinary circumstance, a candidate who amends the Certification with regard to the specific office sought after receiving public funds shall remain a participant, but shall be ineligible to receive additional public funds for the covered election and shall be required to repay all public funds previously received for that election.

(c) If the treasurer of a candidate's principal committee resigns or is removed, the Board will consider the candidate to be the treasurer of the principal committee until the candidate submits an amended Registration that designates a new treasurer.

## § 2-04 Non-participants.

A non-participant is not eligible to receive public funds pursuant to § 3-705 of the Code and shall not be subject to the expenditure limitations provided in § 3-706 of the Code. A non-participant is not subject to the contribution limitations set forth in §§ 3-703(1)(f) and (1-a) of the Code when such contributions are made from the non-participant's personal funds or personal property, including funds or property jointly held with the non-participant's spouse, domestic partner, or unemancipated children. A non-participant is subject to the contribution and disclosure requirements provided in § 3-718 of the Code, and may be subject to penalties pursuant to §§ 3-710.5 and 3-711 of the Code for violations of the Act and of these rules.

## § 2-05 Petition for extraordinary circumstances

(a) Pursuant to § 3-703(1)(c) of the Code, a Certification may be filed on or before the seventh day after the occurrence of an extraordinary circumstance in a covered election. A candidate in such election may file a petition setting forth facts alleged to constitute an extraordinary circumstance within seven days of the date on which the candidate reasonably believes that the extraordinary circumstance occurred. The Board, following review of the petition, or on its own initiative, may declare an extraordinary circumstance.

(b) An "extraordinary circumstance" includes: (i) the death of a candidate in an election, (ii) the resignation or removal of the person holding the office sought, and (iii) the submission to the Board of a written declaration, sworn to or affirmed by the holder of the office sought, terminating such officeholder's campaign for reelection (which may be submitted together with a petition under subdivision (a)).

## § 2-06 Training.

(a) Campaigns must attend training as follows:

(i) The candidate must attend a training provided by the Board concerning compliance with the requirements of the Act and Rules

(ii) Upon registration or replacement, any treasurer must attend training concerning compliance with the requirements of the Act and Rules and use of disclosure software. If the treasurer is replaced before the election, the new treasurer must complete the training requirement.

(b) Training must be completed:

(i) Prior to an election year, the training requirement must be completed within 45 days of registration or upon replacement of a treasurer, or by the last day or the reporting period for the next disclosure statement, whichever is later;

(ii) During an election year, the training requirement must be completed within 30 days of registration or upon replacement of a treasurer, or by the last day of the reporting period for the next disclosure statement, whichever is later;

(iii) Provided that for a candidate to be eligible to receive a public funds payment, such training requirements must be completed on or before the 15th business day before the payment is scheduled to be made and for a post-election payment, training must be completed prior to election day;

(iv) For a primary or general election the election year is the calendar year in which the election occurs; for a special election the election year begins on the date the special election is proclaimed.

## Chapter 3: Eligibility to Receive Public Funds

### § 3-01 Candidates must demonstrate eligibility.

(a) No payments from the Fund shall be made to a candidate unless the Board has determined that such candidate has demonstrated that such candidate has met all eligibility requirements set forth in the Act and these rules, including the threshold for eligibility pursuant to § 3-703(2) of the Code.

(b) **Ballot status.** In order to be eligible to receive public funds, a candidate in a covered election must meet all of the requirements to appear on the ballot as provided in Article 6 of the New York State Election Law, and be opposed by at least one other candidate on the ballot, or, for an optional early public funds payment, certify that the candidate intends to meet all the requirements of law to have such candidate's name on the ballot for the primary or general election.

(c) **Preliminary determinations.** Throughout the audit process or as a result of an investigation, the Board may make a preliminary determination that a candidate is ineligible to receive public funds. In the event of a preliminary determination of ineligibility, the Board

will send written notification to the candidate and the candidate may request reconsideration of such determination pursuant to section 7-09.

(d) Basis for ineligibility determination.

**(i) Pre-election**

(A) **Mandatory ineligibility.** Prior to the election, public funds will not be paid to a candidate if:

(1) the candidate fails to submit a disclosure statement requirement required by these rules;

(2) the candidate fails to provide to the Board, upon its request and by the deadline set forth by the Board, documents or records required by Chapter 4 of these rules, or other information that verifies campaign activity. The Board may determine that public funds can be paid to a candidate if the candidate provides the requested documents, records, or other information requested by the Board, or demonstrates that there is good cause that they cannot be provided, or if the Board determines a requested document, record, or other information is immaterial to public funds eligibility;

(3) the difference between the candidate's reported receipts and documented receipts, or between the candidate's reported expenditures and documented expenditures, exceeds a maximum threshold percentage. The threshold percentage for each election cycle will be determined and publicized by the Board on or before July 11 in the year before the year of the election;

(4) the number of matching claims for which a candidate has failed to provide complete and accurate documentation exceeds a maximum threshold percentage of such candidate's total matching claims. The threshold percentage for each election cycle will be determined and publicized by the Board on or before July 11 in the year before the year of the election;

(5) the number of contributions for which a candidate has failed to report employer information as required by section 4-05(c)(ii)(A) exceeds a maximum threshold percentage of the total number of contributions exceeding $99 received by such candidate. The threshold percentage for each election cycle will be determined and publicized by the Board on or before July 11 in the year before the year of the election; or

(6) either the candidate treasurer fails to attend a compliance training or a campaign finance software training by the deadline provided in section 2-06.

(B) **Discretionary ineligibility.** Prior to the election, the Board may determine that public funds will not be paid to a candidate if there is reason to believe that the candidate has committed a violation of the Act or these rules not otherwise enumerated in paragraph (ii) of this subdivision, and which is not a basis for withholding pursuant to section 7-06.

**(ii) Pre-election or post-election.**

**(A) Mandatory ineligibility.** Neither a pre-election nor a post-election public funds payment shall be paid to a candidate if:

(1) the candidate has failed to meet one of the eligibility criteria of the Act or these rules;

(2) the candidate is required to repay public funds previously received, as described in sections 9-01 and 9-02, or the candidate has failed to pay any outstanding claim of the Board for the payment of civil penalties or the repayment of public funds against such candidate or such candidate's authorized committee or an authorized committee of such candidate from a prior covered election, provided that the candidate has received written notice of the potential payment obligation and potential ineligibility determination 90 days in advance of the first payment for the election and an opportunity to present reasons for such candidate's eligibility for public funds to the Board;

(3) previous public funds payments to the candidate for the election equal the maximum permitted by the Act;

(4) the candidate fails to demonstrate compliance with § 12-110 of the Code, as required pursuant to § 3-703(1)(m) of the Code and section 3-05;

(5) the candidate fails to demonstrate compliance with the training requirement of § 3-703(15) of the Code and Sections 2-06 or 15-05 of these rules;

(6) the candidate endorses or publicly supports such candidate's opponent for election pursuant to § 3-705(9) of the Code;

(7) the candidate loses in the primary election but remains on the ballot for the general election and fails to certify and demonstrate to the Board, as required by § 3-705(10) of the Code, that such candidate will actively campaign for office in the general election, provided that such certification must be complete on or before the 32-day pre-general election disclosure statement deadline; or the candidate certifies and demonstrates to the Board that such candidate will actively campaign for office in the general election but thereafter fails to engage in campaign activity that shall include but not be limited to;

(I) The candidate is required to demonstrate an aggregate of three times the participant contribution limit for the office sought in funds raised or spent by such candidate's authorized committee in the disclosure following the certification of the primary election.

(II) The candidate is required to provide links to any campaign website or social media sites used during the primary election to demonstrate that such sites have been updated to reflect the ballot line the candidate is running on in the general election.

(III) The candidate is required to provide at least one of the following: (1) evidence of seeking or obtaining endorsements relating specifically to the general election campaign or (2) campaign literature, documentation of campaign events or fundraisers held by the candidate, or other advertising soliciting support of the candidate specifically for the general election and listing the ballot line on which the candidate is running in the general election.

(8) the candidate has exceeded the applicable expenditure limits provided in § 3-706 of the Code;

(9) the candidate has been found by the Board, in the course of Program participation, to have committed fraud or material misrepresentation or to be in breach of certification pursuant to section 3-01(e).

(B) **Discretionary ineligibility.** The Board may determine that neither a pre-election nor post-election public funds payment will be paid to a candidate if there is reason to believe that, in the course of Program participation, the candidate has engaged in conduct detrimental to the Program that is in violation of any other applicable law.

**(e) Breach of certification.**

(i) The Board considers any of the following to be a fundamental breach of a candidate's certification:

(A) the submission to the Board of documentation or information that the candidate knew or should have known was false or fictitious in whole or in part, including a disclosure statement which the candidate knew or should have known includes substantial fraudulent matchable contribution claims;

(B) the misrepresentation of a material fact in any submission of such documentation or information to the Board;

(C) the falsifying or concealment of any such documentation or information;

(D) the use of public funds to make or reimburse substantial campaign expenditures that the candidate knew or should have known were fraudulent;

(E) coordination in alleged independent expenditures, whereby material or activity that directly or indirectly assists or benefits a candidate's nomination or election, which is purported to be paid by independent expenditures, was in fact authorized, requested, suggested, fostered, or cooperated in by the candidate; and

(F) the use of a political committee or other entity over which a candidate exercises authority to conceal from the Board expenditures that directly or indirectly assist or benefit the candidate's nomination or election.

(ii) In the event of a fundamental breach of a candidate's certification, the candidate will be deemed by the Board to be ineligible for public funds for the covered election and to have forfeited all public funds previously received for the elections covered by the Certification. Additionally, the candidate will be subject to such civil and criminal sanctions as are applicable under § 3-711 of the Code and other applicable law.

(iii) This section is not intended to be an enumeration of all circumstances that may constitute a fundamental breach of a candidate's certification, as may be determined by the Board.

## § 3-02 Disqualification from ballot.

**(a) Notice of appeal.** The candidate must notify the Board immediately, in writing, if the disqualified candidate is seeking to appeal or otherwise remedy a disqualification. This notice must say whether a judicial appeal is being taken as of right or by permission and the specific nature of any judicial remedy sought.

**(b) Disqualification reversed.** The candidate must immediately inform the Board, in writing, if the disqualification of the candidate or the opponent is reversed by a court.

## § 3-03 Write-in candidates.

A candidate who is seeking nomination or election to a covered office as a write-in candidate must promptly notify the Board in writing.

## § 3-04 Termination of candidacies.

(a) The Board may send a notice to a candidate that such candidate's candidacy has been deemed terminated if such candidate is not on the ballot for that election.

(b) If the terminated candidate is seeking nomination or election as a write-in candidate, or, in the case of a participant, intends to submit a petition for public funds pursuant to section 7-

01(e)(ii), the candidate must notify the Board within five business days after receiving the notice of termination, in which case the Board may reverse the termination.

(c) A candidate may also request that the Board deem such candidate's candidacy terminated because such candidate has ceased campaigning and has verified that fact in a written request for termination submitted in the form and manner required by the Board.

(d) Terminated candidates are required to abide by Program obligations, such as maintaining requisite records, submitting documentation or information in response to requests by the Board, and paying penalties for violations of the Act and these rules. Terminated candidates must continue to file all required disclosure statements.

## § 3-05 Proof of filing with the Conflicts of Interest Board; payment of penalties.

**(a) Requirements.** In order to be eligible to receive public funds, a candidate must comply with the requirements in § 12-110 of the Code, including payment of any penalties assessed by the conflicts of interest board. The Board confirm the candidate's compliance with the conflicts of interest board. The failure of a candidate to demonstrate compliance by the deadline established pursuant to §§ 3-703(1)(m) and 12-110 of the Code may result in a delay of any payment by the Board.

**(b) Due dates.** A candidate must demonstrate compliance with the requirements of subdivision (a) of this section 3 days prior to the next payment date. Failure to demonstrate compliance may result in a delay of any payment by the Board.

# Chapter 4: Records and Reporting

## § 4-01 Records to be kept.

**(a) Generally.**

(i) Candidates must keep records that enable the Board to verify the accuracy of disclosure statements, substantiate that expenditures were made in furtherance of the campaign, were qualified expenditures, or were permissible post-election expenditures, and confirm any matchable contributions claimed. Candidates must maintain and may be required to produce originals and copies of checks, bills, or other documentation to verify contributions, expenditures, or other transactions reported in their disclosure statements. Candidates must maintain clear and accurate records sufficient to show an audit trail that demonstrates compliance with the Act and these rules. The records must be made and maintained contemporaneously with the transactions recorded, and maintained and organized in a manner that facilitates expeditious review by the Board. Nothing in this chapter shall be construed to modify the requirements of § 14-118 of the New York State Election Law. The records maintained for each campaign finance transaction, whether

maintained on paper or electronically, must be accurate and, if necessary, modified promptly to ensure continuing accuracy.

(ii) If at any time a candidate becomes aware that a record of an expenditure is missing or incomplete, the candidate may create a new record or modify an existing record, provided that the record so created or modified is clearly identified by the candidate as such, and provided that the candidate also creates a record, in the form of a signed, dated, and notarized statement by the candidate, treasurer, or other campaign representative having first-hand knowledge of the matter, explaining the reasons for and the circumstances of the creation or modification of the missing or incomplete record. If the missing or incomplete record is an invoice or contract from a vendor, the candidate must in the first instance attempt to get a duplicate or more complete record directly from such vendor. The Board reserves the right not to accept such non-contemporaneous record created or modified pursuant to this paragraph if it deems that the record is not sufficient to document the actual transaction.

**(b) Receipts.**

**(i) Deposit slips.** Candidates must maintain copies of all deposit slips. The deposit slips must be grouped together with the monetary instruments representing the receipts deposited into the bank or other depository accounts held by the candidate for an election. Where the bank or depository does not provide itemized deposit slips, candidates must make a contemporaneous written record of each deposit. Such written record must indicate the date of the deposit, the amount of each item deposited, whether each item deposited was a check, a cashier's check, a money order, or cash, and the total amount deposited.

**(ii) Contribution and loan records.**

**(A) Generally.** For each contribution received, all candidates must maintain records demonstrating the source and details of the contribution as described herein. All records required to be maintained must be provided to the Board upon request.

**(1) Cash contributions.** For each contribution received from an individual contributor via cash, the record must be in the form of a contribution card.

**(2) Money order and cashier's check contributions.**

(I) For each contribution received via cashier's check or money order, the record must include a copy of the cashier's check or money order made out to the authorized committee.

(II) The candidate must also maintain a contribution card, if the contributor's name and residential address are not printed on the cashier's check or money order by the issuer.

**(3) Check contributions.**

(I) For each contribution received via check, the record must include a copy of the check made out to the authorized committee and signed by the contributor.

(II) For each contribution received from an individual contributor via check, the candidate must also maintain a contribution card, if the check used to make the contribution is not signed by the contributor.

**(4) Credit card contributions.**

(I) For each contribution received via credit card, including contributions received over the internet, the record must have been provided by the merchant or processor and must contain: the contributor's name, residential address, credit card account type, credit card account number, credit card expiration date, the amount of the contribution, and an indicator showing that the contribution was charged to the contributor's account and processed. In the case of credit card contributions made over the internet, the contributor must actively agree online to an affirmation statement, as required by subparagraph (C)(1) of this paragraph, and the candidate must maintain a copy of all website content concerning the solicitation and processing of credit card contributions.

(II) The candidate must also maintain copies of the merchant account or payment processor agreement, all merchant account statements, credit card processing company statements and correspondence, transaction reports, or other records demonstrating that the credit card used to process the transaction is that of the individual contributor (including proof of approval by the credit card processor for each contribution and proof of real time address verification), the account's fee schedule, and the opening and closing dates of the account. Merchant account statements must be provided in such form as may be required by the Board.

**(5) Text message contributions.** For each contribution received via text message, the record must have been provided by the mobile fundraising vendor and must contain: the contributor's name, residential address, and phone number; the amount of the contribution; and the name, residential address, and phone number of the registered user of the specific mobile device used to initiate the contribution, to the extent that such information may be reasonably obtained under law. The candidate must also maintain the following records for each text message contribution received:

(I) copies of all relevant third-party vendor agreements between the candidate and mobile fundraising vendor, copies of records maintained by a mobile fundraising vendor listing contributors and amounts pledged and paid, receipts

indicating fees paid by the candidate to a mobile fundraising vendor and fees deducted by such vendor, and similar records relating to the solicitation or receipt of text message contributions;

(II) copies of any content used by the candidate to solicit text message contributions; and

(III) copies of any templates or scripts used by a mobile fundraising vendor to communicate with a contributor in facilitating and processing a text message contribution.

**(6) Segregated account documentation.**

(I) Segregated account contribution cards. For each contribution from an individual contributor that the candidate deposits into a segregated bank account pursuant to section 7-07(b), the record must be in the form of a contribution card.

(II) Segregated account bank statements, contribution cards, and checks. Candidates seeking to comply with the exception contained in section 7-07(b) must submit segregated account contribution cards and copies of segregated account bank statements and checks to the Board in the manner and to the extent provided by section 7-07 with each disclosure statement filing.

**(7) Intermediaries.** For each contribution accepted from an intermediary, including any contributions delivered to a fundraising agent, or solicited by an intermediary where such solicitation is known to the candidate, the candidate must maintain a separate record in the form of an intermediary statement. The intermediary statement must contain: the intermediary's name, residential address, employer and business address; the names of the contributors; and the amounts contributed. This record must be signed by the intermediary, or if the intermediary is unable to sign such intermediary's name, marked with an "X" by the intermediary and signed by a witness. Adjacent to the signature or mark, the intermediary must write the date on which such intermediary signed or marked the form.

**(B) Contribution cards.**

(1) Contribution cards must contain the contributor's name and residential address, the amount of the contribution, the authorized committee's name, and the contributor's selection of an instrument code corresponding to the instrument used to make the contribution. Credit card contribution cards must also contain the credit card account type, account number, and expiration date.

(2) Contribution cards must be signed by the contributor or, if the contributor is unable to sign such contributor's name, marked with an "X" by the contributor and

signed by a witness to the contribution. Adjacent to the signature or mark, the contributor must write the date on which such contributor signed or marked the contribution card.

(3) After a contribution card has been signed, it may not be corrected, modified, or altered by anyone other than the contributor.

(4) The Board shall provide a template of all contribution cards required to be maintained pursuant to this subparagraph.

(5) A contribution card that contains any additional information and signatures required by section 7-07(b) must also satisfy the requirements of that section.

**(C) Affirmation statements.**

(1) Unless otherwise specified herein, above the line for the contributor's signature, contribution cards must state: "I understand that State law requires that a contribution be in my name and be from my own funds. I hereby affirm that I was not, nor, to my knowledge, was anyone else, reimbursed in any manner for this contribution; that this contribution is not being made as a loan; and that this contribution is being made from my personal funds or my personal account, which has no corporate or business affiliation."

(2) For text message contributions, the candidate must maintain records demonstrating that the contributor has certified via text message the following statement: "I certify I am the registered user of this phone and will pay the amount specified from my personal funds."

(3) Segregated account contribution cards must state, above the line for the contributor's signature: "I understand that this entire contribution will be used only (i) to pay expenses or debt from a previous election; (ii) by the candidate for an election other than the election for which this contribution is made; or (iii) to support candidates other than the candidate to whose campaign this contribution is made, political party committees, or political clubs. I further understand that this contribution will not be matched with public funds. I understand that State law requires that a contribution be in my name and be from my own funds. I hereby affirm that I was not, nor, to my knowledge, was anyone else, reimbursed in any manner for this contribution; that this contribution is not being made as a loan; and that this contribution is being made from my personal funds or my personal account, which has no corporate affiliation."

(4) Intermediary statements must state, above the line for the intermediary's signature: "I hereby affirm that I did not, nor, to my knowledge, did anyone else, reimburse any contributor in any manner for a contribution, and that none of the submitted contributions were made by the contributor as a loan. The making of

false statements in this document, which will be submitted to the Campaign Finance Board, is punishable as a class E felony pursuant to § 175.35 of the Penal Law or a Class A misdemeanor pursuant to § 210.45 of the Penal Law."

**(D) Transfers.** Candidates must maintain all records specified by the Board regarding transfers. In the case of a transfer to an authorized committee from a committee not otherwise involved in the covered election, unless the transferring committee is another authorized committee of the same candidate that has filed contemporaneous disclosure statements with the Board in a timely manner, the candidate must maintain records demonstrating that the funds underlying the transfer derive from contributions intended for the committee receiving the transfer. Such records must include, for each contribution to be transferred, a record indicating the contributor's intent to designate the contribution for the covered election. The record must be obtained prior to receipt of the transfer and must be signed by the contributor, or, if the contributor is unable to sign such contributor's own name, marked with an "X" and signed by a witness. Adjacent to the signature or mark, the contributor must write the date of the contribution. Above the line for the contributor's signature, the record must state: "I understand that this contribution will be used by the candidate for an election other than that for which the contribution was originally made. I further understand that State law requires that a contribution be in my name and be from my own funds. I hereby affirm that I was not, nor, to my knowledge, was anyone else, reimbursed in any manner for this contribution; that this contribution is not being made as a loan; and that this contribution is being made from my personal funds or my personal account, which has no corporate or business affiliation."

**(E) In-kind contributions.** For each in-kind contribution, candidates must maintain a written record that provides the date the contribution was made, the name and residential address of the contributor, a detailed description of the goods or services provided, the fair market value of the contribution, and such further information and documentation necessary to show how the fair market value of the contribution was determined. The Board shall provide a specimen of such a record.

**(F) Loans.** For each loan received, including loans made by the candidate, candidates must maintain a loan agreement, documentation of each loan repayment, and, if applicable, documentation that shows that the loan has been forgiven. The loan agreement must be contemporaneous and in writing, must be signed and dated by both parties, and must provide all terms and conditions of the loan, including the amount and term of the loan and whether interest is being charged. The candidate must retain copies of loan and loan repayment checks and records of electronic transactions showing the source of the funds.

**(G) Business dealings with the city.** For each individual or entity making a contribution, loan, guarantee or other security for such loan in excess of the amounts set forth in § 3-703(1-a) of the Code, candidates must maintain all records specified by

the Board concerning whether such individual or entity has business dealings with the city.

**(iii) Photocopies of checks and other monetary instruments.** Candidates must maintain a photocopy of each check or other monetary instrument, other than cash, representing a contribution or other monetary receipt. In order for a contribution in the form of a check signed by an authorized agent of the contributor to be matchable, candidates must maintain:

(A) a copy of the check upon which is printed the name of the actual contributor; and

(B) a document, signed by the contributor, which indicates:

(1) that the person signing the check is authorized to do so;

(2) the date and amount of the contribution; and

(3) the principal committee's name.

**(c) Disbursements.**

**(i) By check or debit.** Candidates must make all disbursements by check or debit from the committee bank account, except for petty cash.

**(ii) Petty cash.** Candidates may maintain a petty cash fund of no more than $500 out of which they may make disbursements not in excess of $100 to any individual or entity per purchase or transaction. If a petty cash fund is maintained, the candidate must maintain a petty cash journal in C-SMART including the name of every individual or entity to whom any disbursement is made, as well as the date, amount, and purpose of the disbursement.

**(iii) Credit card purchases.** Candidates must maintain a monthly billing statement and customer receipt for each disbursement from a committee credit card showing the underlying purchases, including the vendor for each charge.

**(iv) Bills.**

(A) Candidates must maintain bills for disbursements for goods or services provided.

(B) Documentation for goods or services must be contemporaneous and must provide the date the vendor was retained or the date the goods or services were provided, the vendor's name and address, the amount of the expenditures, and a detailed description of the goods and services provided. If the invoice supplied by the vendor does not meet these requirements, the vendor may provide an additional, more detailed document or replacement document with sufficient detail. If the vendor does not provide such a document, the candidate must create an additional record containing the necessary information, and such record must be signed by the candidate, treasurer, or other

representative of the candidate. The newly created record must satisfy the requirements of section 4-01(a).

(C) For wages, salaries, and consulting fees, candidates must maintain a contemporaneous record, signed by the employee or consultant and the candidate, and dated, providing the name and address of the employee or consultant, a detailed description of the services, the amount of the wages, salary or consulting fees, the date(s) on which the work was performed, the period for which the individual was retained, and, if applicable, a detailed breakdown of the number of hours worked. The Board shall provide specimens of records for employees and consultants, including timesheets for election day workers and consultant agreements.

(D) Candidates must maintain written documentation showing that a bill has been forgiven or settled for a lesser amount.

**(v) Vendors.** In addition to obtaining and keeping contemporaneous documentation (such as bills) for all goods and services provided by vendors, including campaign consultants and attorneys, and employees, when a candidate retains or otherwise authorizes an individual or entity (including an employee) to provide goods or services to the campaign, and the candidate knows or has reason to believe that the goods or services to be provided directly or indirectly by this vendor will exceed $1,000 in value during the campaign, the candidate must:

(A) keep a copy of the contemporaneously written contract with the vendor, which must, at a minimum, provide the name and address of the vendor, be signed and dated by both parties, state the terms of the contract including the terms of payment and a detailed description of the goods or services to be provided, and must include, if the contract was at any time amended, a contemporaneously written amendment, signed and dated by both parties and describing in detail the changes to the terms and conditions of the contract, or

(B) if no contemporaneously written contract has been entered into, keep a contemporaneously written record that includes the date the vendor is retained or otherwise authorized by the candidate, the name and address of the vendor, and the terms of the agreement or understanding between the candidate and the vendor including the terms of payment and a detailed description of the goods or services the vendor is expected to provide. If the agreement or understanding was at any time amended, the candidate must create and maintain a contemporaneously written record describing in detail the changes to the terms and conditions of the agreement or understanding.

(C) In addition to the records to be kept pursuant to subparagraphs (A) or (B) above, the candidate must keep evidence sufficient to demonstrate that the work described in the contract was in fact performed and completed. Such evidence may include samples

or copies of work product, emails, time records, phone records, and photographs or other documentary evidence. Where such evidence is nonexistent or unavailable, the candidate must maintain affidavits signed by the vendor and either the candidate, treasurer, or other campaign representative having first-hand knowledge, describing the goods or services provided and the reason(s) why documentary evidence is nonexistent or unavailable.

**(vi) Advance purchases and reimbursement of advances.** Candidates must maintain records of advances, which must include the name and address of each individual or entity that made an advance on behalf of the campaign, the amount so advanced, the date of the advance, the name and address of the payee to whom advanced funds were paid, the amount paid, the purpose of the payment, and the manner of payment, including check number, credit card name, or cash. The record of the advance must be signed by the individual making the advance purchase. A receipt, bill, or invoice from the vendor must be attached to the record.

**(vii) Subcontracted goods and services.** Candidates required to itemize the cost of subcontracted goods and services pursuant to section 4-05(c)(iv)(D) must obtain and maintain documentation from the vendor, consultant, or other individual or entity who or which subcontracts, containing all information required to be disclosed pursuant to that section.

**(viii) Political advertisements and literature.** Pursuant to § 14-106 of the New York State Election Law, candidates must maintain copies of all broadcast, cable, or satellite schedules and scripts; paid internet or digital, print, and other types of advertisements; pamphlets, circulars, flyers, brochures, letterheads and other printed matter purchased or produced; and reproductions of statements or information published to 500 or more members of a general public audience by computer or other electronic device, including but not limited to electronic mail or text message.

**(ix) Travel.** Candidates must obtain and maintain copies of all checks, bills, or other documentation to verify campaign-related travel transactions reported in disclosure statements. In addition to the above, for all travel candidates must create and maintain a contemporaneous record describing the campaign-related purpose of the travel, the complete travel itinerary, the dates of the travel, and the names of all individuals who participated in the travel; provided, however, that such records shall not be required for travel by public transportation within New York City, with the exception of unlimited-use MetroCards, for which candidates must create and maintain a contemporaneous record containing the dates on which each such card was purchased and, if a card is assigned to a single individual, the name of each such individual. For travel by private car, candidates must create and maintain a contemporaneous travel log providing, for each trip and each vehicle, the names of the driver and passengers, the date(s) and purpose of each trip, the itinerary, including all the locations of any campaign events and other stops, the beginning and ending mileage, and the total mileage. Travel between two stops is considered an

individual trip for logging purposes even if the stops are part of a multi-stop itinerary. For the purposes of reporting and reimbursing campaign expenditures, candidates must calculate expenditures for travel by private car based on mileage according to the provisions of Directive Six of the New York City Comptroller.

**(d) Bank records.** Candidates must maintain the following records received from or in connection with banks and other depositories relating to accounts, and must submit with each disclosure statement a copy of all such records not previously provided:

(i) all periodic bank or other depository statements in chronological order, maintained with any other related correspondence received with those statements, such as credit and debit memos, deposit slips, and contribution checks returned because of insufficient funds; and

(ii) the front and back of all returned and cancelled disbursement checks, including substitute checks which may be returned by the bank in lieu of cancelled checks.

**(e) Fundraisers.** Candidates must maintain records for all fundraising events, which must contain: the date and location of the event; the individual(s) or organization(s), other than the candidate's authorized committee, hosting the event; an itemized list of all expenses incurred in connection with the event, including all expenses whether or not paid or incurred by the authorized committee; and the contributor name and amount of each contribution received at or in connection with the event. This subdivision does not apply to activities at an individual's residential premises, including house parties, to the extent that the total costs of such activities do not exceed $500 and are not contributions pursuant to § 3-702(8)(ii) of the Code.

**(f) Campaign offices.** Candidates shall maintain a list identifying the address of each campaign office.

## § 4-02 Record retention.

The candidate must retain all records and documents required to be kept under section 4-01 for five years from the filing of a final statement showing satisfaction of all liabilities and disposition of all assets resulting from the applicable election including payment of any penalties or repayment of public funds owed to the Board.

## § 4-03 Assistance to candidates.

In order to promote compliance with the requirements of the Act and these rules, the Board's staff shall offer assistance to candidates in developing campaign procedures for gathering campaign finance information and keeping records and shall, to the extent feasible, provide model recordkeeping forms and templates.

## § 4-04 Failure to maintain or provide records.

A candidate's failure to keep or provide records or other information to the Board, upon its request or as required by these rules, may result in a determination that matchable contribution claims are invalid; a determination that the candidate must repay public funds to the Board; the withholding of all or a portion of a public funds payment; and the assessment of penalties.

## § 4-05 Disclosure statements.

**(a) Form.** Disclosure statements must be generated by C-SMART, and such statements, as well as all supporting documentation, including bank statements, must be submitted using C-SMART. Daily pre-election disclosure statements must be submitted using C-SMART within 24 hours after a contribution, loan, or expenditure that meets the pre-election daily disclosure requirement has been accepted or made.

**(i) Deficient submissions.** A submission is deficient and may be rejected or deemed incomplete if: (1) it is not submitted in a format or manner authorized by the Board; (2) it is not submitted with the backup documentation substantiating each matchable contribution claimed within the particular statement, or said records are not accessible or legible; or (3) it is not submitted with all of the committee's bank statements from the applicable disclosure period. Any document that is illegible, improperly annotated, damaged, blank, improperly formatted, or otherwise unreadable by the Board, shall be deemed not to have been submitted.

**(ii) C-SMART upgrades.** The Board may issue upgrades or system improvements of C-SMART or its user instructions. To the extent reasonably practicable, the Board shall provide candidates with reasonable advance notice of such upgrades.

**(iii) Verification.** The candidate or treasurer must verify that the submission is true and complete to the best of such candidate's or treasurer's knowledge, information, or belief. The disclosure statement must contain such signatures as may be required by the Board.

**(iv) Exceptions.** Any candidate who seeks to submit disclosure statements, or a portion thereof, in any format or manner other than that permitted by this section, including but not limited to non-electronic formats and electronic formats not generated by C-SMART, must submit a written request for authorization to the Board no later than four weeks before the filing date for the first disclosure statement for which the candidate desires an exception from such requirements, or in the case of a special election, as soon as possible but no later than seven days before such disclosure statement filing date. Such written request must be in a form and manner as prescribed by the Board. Candidates who demonstrate that submission of disclosure statements in an electronic format would pose a substantial hardship shall be permitted, upon request, to submit disclosure statements to the Board in non-electronic formats. Board authorization shall be in writing and shall apply only to the



candidate, paper forms, and electronic submission form and manner specified therein. The authorization shall indicate whether it applies to one or more disclosure statements.

(b) Timing of submissions.

(i) Disclosure statements must be received by the Board no later than 11:59 p.m. on the due date.

**(ii) Filing dates.** The Board will publish a schedule of disclosure statement filing dates on its website on or before March 1 in the first year of each election cycle, or as soon as is practicable after the State Board of Elections has published its schedule.

(A) Semi-annual disclosure statements are due on January 15 and July 15 in each year of the election cycle and each year thereafter, until a campaign submits a final statement showing satisfaction of all liabilities and disposition of all assets.

(B) Pre-election disclosure statements are due:

(i) 32 and 11 days before the election;

(ii) at the Board's discretion, on October 15 in the year before the year of the election; and

(iii) at the Board's discretion, on March 15 and the fourth Friday in August in the year of the election.

(C) Post-election disclosure statements are due 10 days after a primary election and 27 days after a general election.

**(D) Weekends and holidays.** The Board's published schedule of disclosure statement filing dates will reflect that if a disclosure statement deadline falls on a Saturday, Sunday, or legal holiday, the next business day becomes the deadline.

(E) As provided pursuant to New York State Election Law, if the filing date of any disclosure statement scheduled pursuant to subparagraphs (B) or (C) otherwise falls within five days of a semi-annual disclosure statement scheduled pursuant to subparagraph (A), candidates may file a single combined disclosure statement on the date on which the latter of the two disclosure statements is due.

**(iii) Reporting period.** The Board shall publish a schedule of the reporting periods for each disclosure statement.

**(A) First disclosure statement.** The reporting period for a candidate's first disclosure statement shall begin on the day the candidate first raises or spends funds in furtherance of the candidate's election for a covered office.

**(B) All subsequent disclosure statements.** The reporting period for each disclosure statement shall: (i) begin on the third day before the deadline for the submission of the candidate's preceding disclosure statement; and (ii) conclude on and include the fourth day before the deadline for the submission of that disclosure statement.

## (c) Content.

**(i) Summary information.** Each disclosure statement must include the following information about the committee involved in the election: (A) the cash balance at the beginning and end of the reporting period; (B) total itemized and unitemized contributions, loans, and other receipts accepted during the reporting period; and (C) total itemized and unitemized expenditures made during the reporting period. A separate disclosure statement must be submitted for each committee involved in the election. All data reported in disclosure statements and amendments must be accurate as of the last day of the reporting period.

**(ii) Contributions.**

**(A) Reporting requirements.** To fully report a contribution accepted during the reporting period, the candidate must report, for each contribution:

(1) the contributor's and intermediary's (if any) full name, residential address, occupation, employer, and business address;

(2) the date the contribution was received by the candidate;

(3) the amount of the contribution;

(4) the form of the contribution (cash, check, cashier's check, money order, credit card, text, or other);

(5) the number of the check, cashier's check, or money order, if applicable;

(6) the date and amount of each contribution returned to a contributor, the account from which the funds used to make the return originated, and, if applicable, the number of the check used to issue the return of funds;

(7) each previously reported contribution for which the check was returned unpaid;

(8) whether the contribution was accepted for a rerun election in accordance with section 5-12;

(9) whether the contribution was accepted to be deposited into a segregated bank account in accordance with section 7-07(b); and

(10) such other information as the Board may require.

**(B) Matchable contribution claims.**

**(1) Contemporaneous reporting.** Matchable contributions must be reported in the disclosure statement covering the reporting period in which they were received. The candidate's disclosure statement must state the amount of matchable contributions claimed in a reporting period, and must indicate which contributions are claimed for match.

**(2) Backup documentation.** For each matchable contribution claimed in the disclosure statement, candidates must submit a copy of the records required to be maintained pursuant to section 4-01(b).

**(C) Contributions totaling $99 or less from a single source.** Contributions totaling $99 or less from a single source need not be separately itemized in a disclosure statement, unless such contributor is an employee of the candidate or of the spouse, or domestic partner of such candidate or of a business entity in which such candidate, spouse, or domestic partner has an ownership interest of 10% or more or in which such candidate, spouse or domestic partner holds a management position, such as the position of officer, director, or trustee; provided, however, that contributions that are not itemized shall not be matchable.

**(D) Must itemize all contributions from a single source that exceeds $99.** If a candidate has accepted contributions totaling more than $99 from a single source, all contributions comprising the total (including previously unitemized contributions) must be fully reported (i.e., itemized) in the same disclosure statement. All subsequent contributions from that single source must be fully reported as well.

**(E) Affiliated contributors.** Affiliated contributors considered to be a "single source" under sections 1-02 and 5-10(b) must be reported.

**(iii) Other receipts.** To fully report other receipts accepted during the reporting period, the candidate must report, for each receipt:

(A) the date of receipt;

(B) the amount of the receipt;

(C) the type of receipt; and

(D) such other information as the Board may require.

**(iv) Expenditures.**

**(A) Reporting requirements.** To fully report expenditures, including outstanding liabilities, made by the candidate during the reporting period, the disclosure statement must be itemized to include the following information:

(1) the name and address of each vendor or payee;

(2) the bill or invoice date and amount;

(3) the purpose code and explanation of each expenditure;

(4) the exempt code, if any; and

(5) such other information as the Board may require.

**(B)** In addition to the information required in subparagraph (A), candidates must provide the following information concerning each payment:

(1) the date and amount of each payment, including exempt amount, if any;

(2) the payment method, including check number and committee bank account; and

(3) the amount of remaining outstanding liability to the vendor or payee; and

(4) such other information as the Board may require.

**(C) Expenditures of less than $50.** Expenditures of less than $50 do not need to be separately itemized in a disclosure statement; however, public funds may not be used to pay for unitemized expenditures.

**(D) Subcontractors.**

(1) In addition to reporting any expenditures to the vendor, if aggregate payments by the vendor to a subcontractor exceed $5,000, the candidate must report:

(I) the name and address of that subcontractor;

(II) the amount(s) expended to the subcontractor; and

(III) the purpose code(s) of the subcontracted goods or services.

(2) Disclosure must occur either beginning in the reporting period in which such cost first exceeds $5,000 or in the first post-election disclosure statement for the election to which the expenditure relates.

**(E) Credit card purchases.** For expenditures paid with a credit card, the candidate must report the vendor and purchase price of any goods or services purchased. Disbursements to credit card accounts must not be itemized as such.

**(F) Contributions to political committees.** Contributions to political committees that support or oppose candidates in New York City (except political committees of other candidates), including state party committees, that are made by a candidate with the candidate's personal funds and that, in the aggregate for any single political committee, exceed $1,000, are presumed to be expenditures in furtherance of the candidate's campaign and contributions from the candidate to the candidate's campaign and must be reported to the Board. The candidate may rebut this presumption by providing evidence that the contributions were not in furtherance of the candidate's campaign. These contributions are subject to all applicable expenditure and contribution limits, except that contributions made to committees registered with the State Board of Elections or the Federal Election Commission as independent expenditure committees are not subject to such limits. Candidates must create and maintain records of such contributions. Contributions made with a candidate's personal funds as provided in this subparagraph are not a basis for a deduction from the candidate's public funds payment pursuant to section 7-07(a).

**(G) Expenditure refunds.** For expenditures of which all or a portion was refunded to the candidate by the vendor, the candidate must report the refund and provide an amended invoice or other documentation from the vendor specifying the amount, date, and reason for the refund, as well as proof of receipt of the refund in the form of a check, bank statement, or other financial documentation.

**(v) Intermediaries.** In addition to fully reporting contributions, candidates must fully report any intermediary that solicited or delivered a contribution as provided in paragraph (ii) of this subdivision.

**(A) Exceptions.**

(1) The candidate need not report an intermediary for aggregate contributions of $500 or less collected from a contributor in connection with an event held at an individual's residence, unless the expenses related to such event exceed $500.

(2) The candidate need not report an intermediary for contributions collected at an event organized by a candidate to raise funds for such candidate and paid for in whole or in part by such candidate's authorized committee.

(3) The candidate need not report an intermediary who is a spouse, domestic partner, parent, child, or sibling of the candidate.

**(B) Contributions collected at a non-campaign sponsored fundraising event with multiple hosts.** In the case of contributions collected at a fundraising event neither organized by the candidate nor paid for in whole or in part by such candidate's authorized committee, where there are multiple hosts, the hosts must designate one host who must be reported by the candidate as the intermediary for all such contributions.

**(C) Contributions delivered by an intermediary's agent.** The candidate must report as the intermediary an individual who solicits contribution(s) and directs such individual's agent to deliver them to the candidate or fundraising agent. The candidate must not report the agent as an intermediary.

**(vi) Transfers.**

(A) Candidates must report contemporaneously: (1) the aggregate amount of each transfer to an authorized committee from a committee not otherwise involved in the covered election, and, unless the transferring committee is another authorized committee of the same candidate that has filed contemporaneous disclosure statements with the Board in a timely matter, (2) each contribution the transfer consists of (using a last-in/first out attribution), including the name and residential address of the contributor and the amount and date of the contribution.

(B) In the case of a transfer to an authorized committee from a committee not otherwise involved in the covered election, unless the transferring committee is another authorized committee of the same candidate that has filed contemporaneous disclosure statements with the Board in a timely manner, participants must (1) report to the Board, in the same disclosure statement in which the transfer is reported, any expenditures incurred by the transferor committee in connection with raising or administering the transferred contributions, regardless of when the expenditures were incurred, and (2) upon request by the Board, disclose all expenditures made by the transferor committee during the covered election cycle for purposes other than raising or administering the transferred contributions. Candidates must also contemporaneously submit the records required to be maintained pursuant to section 4-01(b)(ii)(D).

**(vii) Advances and reimbursements.**

(A) For advance payments, the candidate must report in each disclosure statement:

(1) the name and address of each individual or entity, including the candidate, that has made purchases on behalf of the committee during the reporting period with the expectation of being reimbursed by the committee;

(2) the date and amount of each purchase;

(3) the name and address of the individual or entity from whom the purchase has been made;

(4) the payment method;

(5) the purpose code and explanation of the purchase; and

(6) such other information as the Board may require.

(B) For advance reimbursements, the candidate must report in each disclosure statement:

(1) the name of each individual or entity, including the candidate, whom the candidate reimbursed for purchases made on behalf of the committee during the reporting period;

(2) the date and amount of each reimbursement;

(3) the payment method of each reimbursement, provided that, if the reimbursement is done by check, the candidate must also report the bank account and check number from which the check was issued; and

(4) such other information as the Board may require.

**(viii) Loans.** Each disclosure statement shall include the following information about loans accepted, forgiven, or repaid by the candidate during the reporting period:

(A) for each loan accepted, the lender's, guarantor's or other obligor's full name, residential address, occupation, employer, and business address;

(B) the date and amount of each loan, guarantee, or other security for a loan accepted;

(C) for each loan repayment made, the date, amount, check number, name of bank account or credit card, and name of any third party payor; and

(D) the date and amount of any portion of a loan which has been forgiven.

**(ix) Documentation.** Together with each disclosure statement, the candidate must submit documentation to verify the accuracy of the data reported, including all bank records and deposit slips required to be maintained pursuant to sections 4-01(b)(i) and 4-01(d)(i) not previously submitted.

(d) Amendments to disclosure statements are prohibited unless expressly authorized or requested by the Board.

## § 4-06 Daily disclosures during the two weeks preceding the election.

If a candidate, during the 14 days preceding an election, accepts aggregate contributions and/or loans from a single source of $1,000 or more or makes aggregate expenditures to a single payee of $20,000 or more, the candidate must report, in a disclosure to the Board, all contributions and loans accepted from such source or expenditures made to such payee during that 14-day period. The first such disclosure must be received by the Board within 24 hours after the contribution or loan that causes the total to reach $1,000 is accepted or the expenditure that causes the total to reach $20,000 is made. Each subsequent disclosure must be received by the Board within 24 hours

after any additional contribution or loan is accepted or expenditure is made. Information reported in these disclosures must also be included in the candidate's next post-election disclosure statement.

## § 4-07 Final Statement.

(a) A candidate must file all disclosure statements required under section 4-05(b) until such time as the candidate files a final statement demonstrating the disposition of all committee assets and satisfaction of all committee liabilities, including the payment of any penalties or repayment of public funds owed to the Board; provided, however, that any financial activity occurring after the final statement has been filed must be reported in the next semi-annual disclosure statement.

(b) A candidate whose candidacy has been deemed terminated, as described in section 3-04(a), must continue to file all required disclosure statements; provided, however, that the Board may deem a candidate who has not received public funds for the current election cycle and is not seeking reconsideration of a public funds determination exempt from such filing requirements upon the filing of a signed, notarized statement from the candidate and treasurer indicating that the candidate has ceased campaigning and does not intend to raise or spend additional funds in connection with the covered election. Candidates who receive such an exemption are nevertheless required to abide by all other Program obligations, including maintaining records, submitting documentation or information in response to requests by the Board, and paying penalties for violations of the Act and Rules. If a candidate who has received an exemption under this subdivision resumes raising or spending funds in connection with the covered election, the candidate must immediately notify the Board in writing and such candidate will be subject to all requirements applicable to a candidate whose candidacy has been terminated, as described in section 3-04.

## § 4-08 Write-in candidates.

Any candidate who is seeking nomination or election as a write-in candidate must file all disclosure statements for the election as required by section 4-05(b).

## § 4-09 Candidates not in primary or general elections.

(a) Not in primary election. A candidate need not submit the two pre-primary and the 10 day post-primary election disclosure statements if the candidate is not a candidate in a primary election unless the candidate is a participant claiming that expenditures are subject to a primary election spending limit, pursuant to section 6-01(h)(iii)(A) or 6-01(h)(iv). If the candidate is not a candidate in the primary, daily disclosures during the two weeks preceding the primary need not be submitted.

**(b) Not in general election.** A candidate need not submit the two pre-general election and 27 day post-general election disclosure statements or daily disclosures during the two weeks preceding the general election, if the candidate is not a candidate in the general election.

### § 4-10 Other political committees.

The financial records of any committees of a candidate are subject to Board review for purposes of monitoring the candidate's compliance with the requirements of the Act and these rules and must be made available to the Board upon its request.

## Chapter 5: Contributions, Loans, and Other Receipts

### § 5-01 Contribution limits.

(a) Candidates may not accept contributions from a single source in excess of the limits set forth in § 3-703(1)(f) of the Code.

**(b) Adjustment.** Pursuant to § 3-703(7) of the Code, not later than the first day of March in the year 2022, and every fourth year thereafter, the Board will adjust the contribution limits. The adjustment will follow changes in the consumer price index for the metropolitan New York-New Jersey region published by the United States Bureau of Labor Statistics. The adjustment is the difference between the average consumer price index over the 12 months preceding the calendar year of such adjustment, and either (a) the calendar year preceding the year of the last such adjustment or (b) such other calendar year as may be appropriate pursuant to any amendment to the Act.

**(c) Contributions received prior to January 12, 2019.** For candidates in covered elections held before the year 2022 who choose Option A, as defined in § 3-720(e)(1) of the Code, the contribution limits as stated in § 3-703(1)(f) of the Code will apply to all contributions received during the 2021 election cycle, regardless of when they are received. Such candidates shall refund the portion of any contribution that exceeds the limits, as provided in section 5-07 of this chapter, even if the contribution was received before January 12, 2019. Failure to timely issue required refunds will be considered a violation of the Act and these rules.

### § 5-02 Solicitation of contributions.

**(a) Fundraising solicitations.** Each written solicitation of contributions (including, but not limited to, letters, contribution cards, flyers, and other invitations to contribute or attend events) by or on behalf of a candidate, whether in paper or electronic format, must include the following statement, written in a conspicuous and clearly recognizable manner: "State law prohibits making a contribution in someone else's name, reimbursing someone for a contribution made in your name, being reimbursed for a contribution made in your name, or claiming to have made a contribution when a loan is made." If the solicitation is written in a

language other than English, the statement must be written in the same language as the solicitation.

**(b) Solicitation of contributions for elections not subject to the Act.** If a candidate makes a solicitation for a contribution for an election not subject to the requirements of the Act, the solicitation must specify that the contribution is being solicited for an election that is not subject to the requirements of the Act.

## § 5-03 Prohibited contributions and loans.

**(a) Contributions and loans from corporations, limited liability companies, and partnerships, including professional corporations and limited liability partnerships.**

(i) A candidate may not accept a contribution from a prohibited organization, i.e., a corporation, limited liability company, or partnership, including professional corporations and limited liability partnerships.

(ii) A candidate may not accept a loan from a prohibited organization unless the loan is made in the regular course of the lender's business.

(iii) A candidate may not accept a guarantee or other security for a loan from a prohibited organization.

(iv) This prohibition does not apply to contributions by political committees.

**(b) Nominee contributions.** A candidate may not accept a contribution made in the name of an individual or entity for which the source of the funds is a different individual or entity.

**(c) Anonymous contributions.** A candidate may not accept a contribution from an unidentified source.

**(d) Contributions from foreign nationals.** A candidate may not accept a contribution from a person who is not a naturalized U.S. citizen or a holder of a green card.

**(e) Contributions in excess of $100.** A candidate may not accept contributions aggregating in excess of $100 from a single source except by check, money order, cashier's check, or credit card or debit card.

**(f) Contributions in violation of state or federal law.** A candidate may not accept a contribution that was made, received, solicited, or otherwise obtained in violation of any local, state, or federal law.

## § 5-04 Contributions subject to special requirements.

**(a) Contributions from political committees.**

(i) A candidate may accept a contribution from a political committee, provided that the political committee:

(A) was registered with the Board for the period that includes the candidate's next covered election at the time the contribution was received; or

(B) registers with the Board within 10 days of receipt of the contribution.

(ii) A political committee must register in such form and manner as shall be determined by the Board. Such registration shall include but is not limited to:

(A) the name and address of the committee, and the name, address, and employer of the chairperson, treasurer, and liaison of the committee;

(B) an indication whether the committee is a political action committee, a candidate committee (and if so, identification of the candidates supported by the committee), or another kind of political committee;

(C) identification of the governmental agency or agencies with which the committee files disclosure statements;

(D) an indication whether the committee makes monetary contributions, in-kind contributions, or independent expenditures, and the name, address, and employer of each individual or entity with the authority to determine the candidates for whom the committee makes contributions or independent expenditures; and

(E) an indication whether the committee accepts contributions from corporations, limited liability companies, or partnerships, and an agreement not to use funds from such entities for contributions to candidates.

(iii) A list of registered political committees for each election cycle will be maintained on the Board's website. Candidates have the burden to check the list of registered political committees published by the Board to ensure that each political committee contribution accepted is from a registered committee.

(iv) The registration shall remain in effect through the end of the election cycle, unless there has been a material change in the information included in the registration.

(v) Political committees that do not submit the information required by the Board, or any required signatures or notarizations, will not be considered to be registered.

**(vi) Earmarked contributions from political committees.**

(A) A candidate may accept a contribution given to a political committee by a contributor who limited the committee's choice or directed the selection of the

---

recipient, but the contribution shall be considered to be from both the original contributor and from the political committee.

(B) A contribution that a political committee has received solely because of its actions as an intermediary as defined in these rules is not an earmarked contribution.

(C) A nominee contribution is not an earmarked contribution.

**(b) Contributions from minors.** A candidate may accept a contribution from an individual under 18 years of age, provided that:

(i) the decision to contribute was made knowingly and voluntarily by the minor;

(ii) the funds, goods, or services contributed were owned and controlled exclusively by the minor, such as income earned by the minor, or a bank account opened and maintained exclusively in the minor's name; and

(iii) the contribution was not made from the proceeds of a gift, the purpose of which was to provide funds to be contributed.

**(c) Contributions from joint contributors.**

(i) A candidate may accept a single contribution made jointly by two or more individuals or entities, provided that the contribution check or monetary instrument includes the signature and pre-printed information of each individual making the contribution or, in the case of an entity contribution, the signature of each authorized individual.

(ii) If a check or other monetary instrument representing a joint contribution, or a contribution card or other contemporaneous document related to the contribution, does not indicate the amount to be attributed to each contributor, the contribution shall be attributed equally to each contributor.

**(d) Post-election contributions.** Contributions accepted after an election may be used to pay liabilities incurred in that election, subject to the applicable contribution limit and prohibitions, only if deposited in and disbursed from an account established and maintained for that election, as provided in sections 5-11(a)(iii) and (iv).

**(e) Text message contributions.** A text message contribution is received on the date it is delivered to the candidate, after payment of the contributor's wireless bill, by a wireless carrier or other mobile fundraising vendor.

## § 5-05 Non-matchable contributions.

The following are not matchable:

---

**(a) In-kind contributions and loans.** In-kind contributions and loans, regardless of whether such loans are considered contributions pursuant to § 3-702(8) of the Code.

**(b) Purchase price.** Contributions in the form of the purchase price paid for an item with significant intrinsic and enduring value, or paid for or otherwise induced by a chance to participate in a raffle, lottery, or a similar drawing for valuable prizes.

**(c) Certain contributions from vendors.** Contributions from individuals, other than employees of the candidate's principal committee, who are vendors to the committee or individuals who have an interest in a vendor to the committee, unless the expenditure to the vendor is reimbursement for an advance. For the purposes of this subdivision, "individuals who have an interest in a vendor" means individuals having an ownership interest of 10% or more in a vendor or control over the vendor. An individual shall be deemed to have control over the vendor firm if the individual holds a management position, such as the position of officer, director or trustee.

**(d) Doing business, lobbyist, and lobbyist-related contributions.** Contributions from individuals having business dealings with the city as defined in § 3-702(18) of the Code, and contributions from lobbyists as defined in § 3-211 of the Code, or persons required to be included in a statement of registration filed pursuant to §§ 3-213(c)(1) or 3-213(d) of the Code.

**(e) Contributions intermediated by a person doing business with the city.** Contributions for which any individual or entity listed in the doing business database at the time of the contribution acted as an intermediary.

**(f) Contributions from business accounts.** Contribution checks drawn on business accounts, or accounts that bear indicia of being business accounts, such as the contributor's professional title.

**(g) Prohibited or excess contributions.** Contributions from contributors subject to the prohibitions of §§ 3-703(1)(k) or (l) of the Code or that are otherwise prohibited by these rules, or that, in the aggregate for a given contributor, exceed the contribution limits applicable under the Act.

**(h) Returned contributions.** Contributions that are returned or refunded to, or not paid by, the contributor.

**(i) Unitemized contributions.** Contributions for which required information is missing from or illegible in a disclosure statement.

**(j) Contributions with unreported occupation, employer, and business address.** Contributions for which the candidate has not reported the contributor's occupation, employer, and business address, where such contributions: (i) total more than $99; or (ii) total $99 or less, and the contributor is an employee of the candidate, of the spouse or domestic partner of such candidate, or of an entity in which such candidate, spouse, or domestic partner has an

ownership interest of 10% or more or in which such candidate, spouse, or domestic partner holds a management position, such as the position of officer, director, or trustee.

**(k) Contributions from minors.** Contributions from individuals under 18 years of age.

**(l) Contributions in violation of law.** Contributions that were made, received, solicited, or otherwise obtained in violation of any federal, state, or local law, including the Act and these rules.

**(m) Contributions from entities.** Contributions received from entities other than individuals, including political committees.

**(n) Contributions not from New York City residents.** Contributions from contributors whose residential addresses are not within New York City, or for whom other indicia exist that the contributor is not an individual New York City resident.

**(o) Contributions made after the election year.** Contributions made later than December 31 of the year of the covered election in which the participant is a candidate.

**(p) Contributions for other elections.** Contributions originally received for elections other than the election in which the participant is currently a candidate, as described in section 5-08.

**(q) Claims exceeding the gross amount of the contribution.** Matchable contribution claims that exceed the gross amount of the contribution.

**(r) Excess matching claims.** Matchable contribution claims that would yield more than the maximum public funds payment per contributor as provided in § 3-705(2)(a) of the Code.

**(s) Contributions made with checks drawn by someone other than the contributor.** Checks drawn by an individual or entity other than the contributor, except for checks signed by a contributor's authorized agent, where the documentation required under sections 4-01(b)(ii)(A)(3) and 4-01(b)(iii) has been maintained and provided.

**(t) Contributions to other committees.** Contributions made payable to, or originally received by, entities other than the principal committee, including committees not otherwise involved in the covered election;

**(u) Contributions not timely and properly reported.** Contributions that were not timely reported and itemized in disclosure statements, or that were reported for the first time in an amendment to a disclosure statement.

**(v) Contributions claimed after the year of the election.** Contributions not claimed as matchable on or before January 15 in the year after the year of the election.

**(w) Contributions not properly documented.** Contributions for which a record required under Chapter 4 was not kept or provided upon request, for which complete supporting

documentation required by section 4-05(c)(ii)(B)(2) has not been submitted, or for which the information on such documentation is not consistent with the information reported in the disclosure statement.

**(x) Contributions made with consecutively numbered cashier's checks or money orders.** Contributions purportedly from different contributors that were made by cashier's checks or money orders bearing consecutive serial numbers, or other indicia that they were purchased simultaneously.

**(y) Certain contributions exceeding $100.** Contributions from any one contributor that are greater than $100 in the aggregate and are made by any instrument other than check, credit card, or debit card.

**(z) Withdrawn matching claims.** Contributions for which a matching claim was previously withdrawn by the candidate.

**(aa) Non-matchable contributions.** Contributions that are otherwise not matchable contributions within the meaning of the Act.

**(bb) Contributions made by digital assets.** Digital assets, such as cryptocurrencies or non-fungible tokens based upon blockchain or similar software.

**(cc) Additional factors.** In addition, the Board will consider the following factors in determining whether matchable contribution claims are invalid and in projecting a rate of invalid matchable contribution claims:

(i) any information that suggests that a contribution has not been processed or reported in accordance with Program requirements;

(ii) any other information that suggests that matchable contribution claims may be invalid; and

(iii) calculation errors in totals reported.

## § 5-06 In-kind contributions.

**(a) An in-kind contribution is an expenditure.** An in-kind contribution to a candidate's authorized committee is also considered an expenditure made by such committee, and the amount of the in-kind contribution thus counts toward the candidate's contribution and expenditure limits. An in-kind contribution is received on the date the goods or services are received or rendered, which is presumed to be the date of the associated expenditure, unless the candidate provides evidence to demonstrate that the contribution should be deemed received on a different date.

**(b) The value of an in-kind contribution.**

Back to TOC

(i) Candidates must maintain invoices or other written records supporting the valuation of all in-kind contributions.

(ii) If no invoice is available and obtaining an invoice is not practicable, a candidate must use a reasonable estimate of value in documenting the fair market value of an in-kind contribution.

(A) The fair market value of goods is the price of those goods in the market from which they ordinarily would have been purchased when the goods were received.

(B) The fair market value of services is the hourly or piecework charge for the services at a commercially reasonable rate prevailing when the services were rendered.

**(c) Good or service purchased below fair market value.** Where goods or services are purchased by a candidate for less than fair market value, the difference between the fair market value when they were received, including any applicable tax, and the amount charged to the candidate is an in-kind contribution.

**(d) Extension of credit that is not commercially reasonable is an in-kind contribution.**

**(i) Generally.** A creditor that extends credit to a candidate for a period beyond 90 days has made a contribution equal in value to the credit extended, unless the creditor is making a commercially reasonable attempt to collect the debt.

**(ii) Prohibited in-kind contribution.** Extension of credit by a corporation, limited liability company, or partnership that is not commercially reasonable and is not made in the regular course of business is presumed to be a prohibited in-kind contribution.

**(e) Debt forgiven is an in-kind contribution.**

**(i) Generally.** A debt owed by a candidate, which is forgiven or settled for less than the amount owed, is an in-kind contribution, unless the debt was forgiven or settled by the creditor in a commercially reasonable manner.

**(ii) Commercially reasonable treatment of debts.** The Board will consider as evidence of commercially reasonable treatment that: (A) all commercially reasonable efforts have been taken to satisfy the outstanding debt; and (B) the creditor has pursued its remedies in the same manner as that customarily employed by creditors of other debtors.

**(iii) Advances.** An advance is considered to be an in-kind contribution from the individual or entity making the advance until it has been reimbursed by the candidate, and a candidate may not accept an advance from a prohibited source.

**(f) Failing to report a liability leads to a presumption of an in-kind contribution.** An outstanding liability not contemporaneously reported as outstanding by a candidate may be presumed to be an in-kind contribution to the candidate, if other indicia of a contribution exist.

## § 5-07 Refunding prohibited and over-the-limit contributions.

**(a) Generally.** When a candidate knows or has reason to know that the candidate has accepted a contribution or aggregate contributions from a single source in excess of the applicable contribution limit, including a contribution or contributions from a contributor having business dealings with the city, or from a source prohibited by the Act or the Charter or by state or federal law, the candidate must promptly refund the excess portion or prohibited contribution to the contributor or to the Fund. When a candidate knows or has reason to know that the candidate has accepted a nominee or anonymous contribution, the candidate must promptly disgorge the contribution to the comptroller of the state of New York for deposit in the general treasury of the state.

**(b) Contribution refunds must be timely.**

(i) When a candidate knows or has reason to know that the candidate has accepted a prohibited or over-the-limit contribution, the candidate must return or refund the contribution, or the over-the-limit portion, on or before the next disclosure statement filing deadline or the deadline set by the Board.

(ii) When a candidate is notified by the Board that the candidate has accepted a prohibited or over-the-limit contribution, the candidate must return the contribution or the over-the-limit portion by the date specified in the notice sent by the Board.

(iii) A contribution refund is made on the date on which the funds cleared the committee account.

**(c) Contribution refunds must be documented and reported.** If a candidate issues a refund for a contribution after it has been deposited in the committee's account, the contribution and corresponding refund must be documented and reported to the Board. The documentation must demonstrate that the refund cleared the committee account and was cashed or deposited by the reported contributor.

**(d) Restrictions on return.** Unless directed to do so by the Board, a candidate may not return a contribution after receiving public funds for an election until any required repayments to the Fund have been made. A contribution may be returned if it: (i) exceeds the contribution limit, including the limit applicable to contributors having business dealings with the city, (ii) is otherwise illegal, or (iii) is returned because of the candidate's reputational interest in light of the particular source or intermediary involved.

**(e) Where refund is impracticable.** If a timely refund of a contribution to the contributor is impracticable, the candidate may pay the Fund an amount equal to the amount of the refund.

**(f) Over-the-limit contributions from contributors doing business with the city.**

(i) When a candidate reports an over-the-limit contribution from a contributor having business dealings with the city:

(A) The Board will provide such notification to the candidate within 20 days of the reporting of the contribution; provided, however, that if such twentieth day is a Saturday, Sunday, or legal holiday, notification by the Board on the next business day shall be considered timely. In the case of a contribution reported during the six weeks preceding the candidate's next covered election, the Board shall provide such notification within three business days.

(B) The candidate must:

(1) refund the excess portion of the contribution within 20 days of the date of the notice; or

(2) demonstrate to the Board, within 20 days of notification, that the contributor identified by the Board as having business dealings with the city has applied to the Mayor's Office of Contract Services for removal from the doing business database and that such application is pending.

(C) For purposes of calculating compliance with the limits applicable to contributors having business dealings with the city, contributions accepted from a contributor who appears on the doing business database shall be aggregated with all other contributions accepted from such contributor during the same election cycle; provided, however, that contributions accepted while the contributor did not appear on such database shall not be required to be refunded pursuant to this section.

(ii) Where a contributor has made an application for removal from the doing business database, the candidate may retain any contribution received from the contributor until the Board notifies the candidate that the Mayor's Office of Contract Services has denied the application for removal, in which case the candidate shall have 20 days from the date of such second notice to refund the excess portion of the contribution.

(iii) Contributions from or intermediated by individuals who have applied for removal from the doing business database shall not be considered matchable unless and until the contributor or intermediary is removed from the doing business database.

## § 5-08 Contributions originally received for other elections.

**(a) Transfers.**

**(i) Generally.** Notwithstanding section 5-11(a), participants may transfer funds previously received for another election to the principal committee. Additionally, participants may

transfer funds from the principal committee to another authorized committee, after all excess funds have been returned to the Board as provided by sections 5-11(c)(ii) and 9-02(c).

**(ii) Segregated accounts.** Notwithstanding paragraph (i) of this subdivision, if a candidate has funds remaining in a segregated account after the election for which the account was established, such funds must be refunded to the contributors or paid to the Fund, or used to pay outstanding liabilities related to such election. Such funds may not be transferred into any other account or used for any future election.

**(b) Surplus funds.** The cash balance reported in a non-participant's first semi-annual Board disclosure statement at the beginning of the first reporting period for an election is the total amount of surplus funds the committee had from a previous election; except that the amount deemed to be surplus funds may be reduced by the following:

(i) the total amount of debts and obligations outstanding at the beginning of the reporting period;

(ii) the total amount subsequently transferred to a political committee that is not involved in a covered election; and

(iii) if the candidate was a participant in the previous election, the total amount of public funds subsequently repaid.

**(c) Additional requirements for transfers and surplus funds.**

(i) Candidates have the burden of demonstrating that surplus funds and transfers of funds from a committee not otherwise involved in the covered election, other than another authorized committee of the same candidate that has filed contemporaneous disclosure statements with the Board in a timely matter, do not derive from:

(A) contributions in excess of the Act's contribution limits, including contributions that would exceed the Act's contribution limits when aggregated with other contributions accepted from the same source; or

(B) contributions from sources prohibited by the Act, the Charter, or state or federal law.

(ii) Participants have the burden of demonstrating that funds transferred from a committee, other than another authorized committee of the same candidate that has filed contemporaneous disclosure statements with the Board in a timely manner, derive solely from contributions for which records demonstrating the contributors' intent to designate the contributions for the covered election have been submitted and maintained as required pursuant to sections 4-05(c)(vi) and 4-01(b)(ii)(D), respectively.

(iii) For purposes of enforcing the contribution limit and contribution prohibitions, the Board shall attribute surplus funds and such transfers to the last monetary contributions, loans, and other receipts received by:

(A) the candidate on or before the date of the cash balance described in subdivision (b), in the case of surplus funds; or

(B) the transferor committee before making the transfer.

(iv) For any prohibited or over-the-limit contribution, the candidate must either:

(A) promptly refund the excess portion or amount of the prohibited contribution, or

(B) keep the excess portion or amount of the prohibited contribution in the transferor committee bank account, not to be used in a covered election.

**(d) Related expenditures.** Expenditures incurred in connection with raising or administering funds transferred from a committee not otherwise involved in a covered election, other than from another principal committee of the same candidate, are presumed to be subject to the expenditure limits of the Act. Participants have the burden of demonstrating that any such expenditures are not subject to the expenditure limits of the Act, as provided in section 6-01(j).

## § 5-09 Loans.

**(a) Deposit.** All loans must be accepted and deposited, or rejected and returned, within 10 business days after receipt.

(b) Loans over $100 may not be made by cash or credit card.

**(c) Loans forgiven.** Any portion of a loan that is forgiven is a monetary contribution from the source of the loan, subject to the contribution limits and prohibitions.

**(d) Third party repayment of loan.** If any portion of a loan is repaid by an individual or entity other than the committee that received the loan, the portion thus repaid is a contribution by that individual or entity.

**(e) Repayment by next election.** If a loan is not repaid by the date of the next election in which the candidate appears on the ballot, the loan, guarantee, or other security for the loan will be considered a contribution subject to the Act's contribution limits and prohibitions.

**(f) Loans made in regular course of business.** A loan made in the regular course of the lender's business shall be deemed, to the extent not repaid by the date of the next election in which the candidate appears on the ballot, a contribution by the lender and by any other individual or entity endorsing, cosigning, guaranteeing, collateralizing, or otherwise providing security for the loan.



**(g) Loans not made in regular course of business.** A loan not made in the regular course of the lender's business shall be deemed, to the extent not repaid by the date of the next election in which the candidate appears on the ballot, a contribution by the lender.

**(h) Attributing a loan to an election.** A loan is presumed to be accepted for the next election in which the candidate seeks nomination or election following the day that the loan is received, except as otherwise provided in section 5-09(i), and except that:

(i) in the case of a state or local election, loans received before the first January 12 after an election will be presumed to be accepted for that election; and

(ii) in the case of a federal election, loans received before the first January 1 after the election will be presumed to be accepted for that election, except as may otherwise be provided under federal law and regulations.

**(i) Post-election loans.**

(i) Loans received after an election are considered contributions attributed to the previous election, and may be used for such election as provided in this section.

(ii) Loans received after an election must be deposited in the committee bank account for that election.

(iii) A loan to a candidate's principal committee made from such candidate's personal funds, after a final determination of the Board has been issued with respect to such committee, for the purpose of paying penalties or making required repayments to the Fund pursuant to such determination, is not subject to the contribution limit, even if such loan is subsequently forgiven by such candidate.

**(j) Interest.** A candidate's committee shall not pay interest or other finance charges on a loan made from the personal funds of the candidate, from the personal funds of a spouse, domestic partner, child, grandchild, parent, grandparent, or sibling of the candidate or spouse or domestic partner of such child, grandchild, parent, grandparent, or sibling, or from an entity in which the candidate or any such person has a 10% or greater ownership interest.

## § 5-10 Attributing contributions.

**(a) Attributing a contribution to an election.** A contribution is presumed to be accepted for the first covered election in which the candidate seeks nomination or election following the day that the contribution is received, unless the contribution was properly transferred to the committee from another committee of the candidate for a different election, and except that:

(i) in the case of a state or local election, contributions received before the first January 12 after the election will be presumed to be accepted for that election; and

(ii) in the case of a federal election, contributions received before the first January 1 after the election will be presumed to be accepted for that election, except as may otherwise be provided under federal law and regulations.

**(b) Attributing multiple contributions to a single source and contribution limit.**

(i) Multiple contributions from a single source will be totaled to determine the candidate's compliance with the applicable contribution limits.

**(ii) General factors for determining a "single source."** Factors for determining whether an individual, individuals in combination, entity, or entities in combination establish, maintain, or control another entity include, but are not limited to:

(A) whether the persons or entities make decisions or establish policy for the other entity, including determinations of the recipients of its contributions and the purposes of its expenditures;

(B) whether the persons or entities have the authority to hire, appoint, discipline, discharge, demote, remove, or otherwise influence other persons who make decisions or establish policies for the other entity;

(C) whether contributions made by the persons or entities and the other entity reflect a similar pattern; and

(D) whether the persons or entities know of and have acquiesced in public representations by the other entity that it is acting on their behalf or under their direction.

**(iii) Attributing single source contributions from labor organizations.** Notwithstanding paragraph (i), different labor organizations shall not be considered to be a single source for the purpose of compliance with the applicable contribution limit if the candidate demonstrates that the contributors satisfy the four criteria below:

(A) the labor organizations do not share a majority of members of their governing boards;

(B) the labor organizations do not share a majority of the officers of their governing boards;

(C) the labor organizations maintain separate accounts with different signatories; and

(D) the labor organizations make contributions from separate accounts.

**(iv) Burden is on the candidate.** If multiple contributions appear to be from a single source in excess of the contribution limit, the candidate has the burden of demonstrating that they are from different sources. Candidates must review the relationship between



Back to TOC

contributors who appear to constitute a single source before accepting and depositing contributions.

**(c) Attributing contribution amount for fundraiser ticket or fundraising item.**

**(i) Fundraiser ticket.** When attendees purchase entrance to a fundraiser, the entire amount paid to attend a fundraising event is a contribution.

**(ii) Fundraising item.** When an individual buys an item sold by a candidate to raise funds, the entire amount paid as the purchase price for such item is a contribution.

## § 5-11 Use of receipts.

**(a) Bank accounts.**

(i) Candidates must maintain a committee account with check writing privileges. Checks issued from such account must be signed by the candidate or an individual so authorized by the candidate.

(ii) Candidates must maintain a bank account in the name of the principal or authorized committee. Such bank account:

(A) must be used for the deposit of receipts, including public funds, and the making of expenditures, for the covered election;

(B) must be used exclusively for the purpose of furthering the candidate's nomination or election in the covered election, and for post-election expenditures as provided in subdivision (c) of this section; and

(C) must not contain personal, business, or other non-campaign funds.

(iii) Receipts accepted by a participant for one election may not be commingled in an account with receipts accepted for another election, with receipts accepted for a TIE, or with personal or business funds. Notwithstanding the foregoing, participants:

(A) may use one account for both the primary and general election in the same calendar year;

(B) may open a segregated account pursuant to section 7-07(b);

(C) must use a court-ordered rerun account for public funds received for a court-ordered rerun election; and

(D) must use a merchant account for the purpose of accepting credit card contributions pursuant to section 4-01(b)(ii)(A)(4)(II).

**(iv) Separate accounts for different elections.** A candidate seeking election both to an office subject to the Act and to a state or federal office may maintain a separate allocation account for shared expenses in accordance with Advisory Opinion No. 1996-2 (July 18, 1996).

**(v) Deposit of receipts.** All monetary contributions must be accepted and deposited into the account(s) listed on the candidate's Filer Registration or Certification and in disclosure statements filed with the Board, or rejected and returned to a contributor, within 20 business days after receipt, except contributions made in the form of cash must be accepted and deposited, or rejected and returned to a contributor, within 10 business days after receipt. All monetary receipts accepted for an election must be deposited into the candidate's authorized committee bank account. A monetary receipt is received on the date it is delivered to the candidate.

**(b) Receipts may be used only for the covered election.** A candidate may use receipts only for the covered election for which that account was established.

**(i) Expenditures not in furtherance of the campaign.** In determining whether or not an expenditure is in furtherance of a candidate's nomination or election, the Board may consider the factors from the following non-exhaustive list:

(A) the timing of the expenditure;

(B) whether the candidate has already purchased duplicative services or equipment;

(C) the nature of the goods or services purchased;

(D) whether an unusually high proportion of funds was spent on a specific category of expenditure;

(E) whether a high total dollar amount or proportion of payments was made to individuals rather than to entities;

(F) whether the candidate has demonstrated a pattern of making other expenditures not in furtherance of the campaign or impermissible post-election expenditures; and

(G) whether an expenditure made less than one month prior to the election, or after the election, is accompanied by the reporting of a corresponding outstanding liability.

**(c) Post-election use of receipts.**

(i) After the last day of the final reporting period of a covered election, a candidate in that election may not expend, transfer, or use receipts accepted for another election, unless the receipts have been deposited in and are disbursed from a separate account, as provided in sections 5-11(a)(iii) and (iv). Funds accepted and separately deposited for the previous

election may be transferred to this account only after any required repayments to the Fund have been made and any fines or civil penalties assessed pursuant to the Act have been paid. Contributions and loans accepted for the previous election after such election are subject to sections 5-04(d) and 5-09(i).

(ii) A participant may not use receipts for any purpose other than disbursements in the preceding election until all unspent campaign funds have been repaid, except as otherwise provided in subparagraph (i) of this paragraph and section 5-07(d). Notwithstanding the presumption of section 6-01(h)(i), a participant has the burden of demonstrating that a post-election expenditure is for the preceding election.

### § 5-12 Court ordered rerun elections.

**(a) No contributions may be accepted until court contest has begun.** A candidate may not accept contributions for a court-ordered rerun election until a complaint has been filed in a court of competent jurisdiction concerning the canvass of returns or the conduct of the election.

**(b) Where rerun election is canceled, contributions must be reasonably related to expenditures.** If a rerun election is ordered by a court but subsequently canceled, a candidate who would have been on the ballot has the burden of demonstrating that any portion of contributions raised may be reasonably attributed to expenses incurred for the rerun election before its cancellation.

## Chapter 6: Expenditures

### § 6-01 Expenditure limits.

(a) Participants may not exceed the applicable expenditure limits provided in § 3-706 of the Code.

**(b) Adjustment.** Pursuant to § 3-706(1) of the Code, not later than the first day of March in the year 2010, and every fourth year thereafter, the Board shall adjust the expenditure limits. Such adjustment shall be made in accordance with changes in the consumer price index for the metropolitan New York-New Jersey region published by the United States Bureau of Labor Statistics. The adjustment shall be based on the difference between the average consumer price index over the 12 months preceding the calendar year of such adjustment, and either (a) the calendar year preceding the year of the last such adjustment or (b) such other calendar year as may be appropriate pursuant to any amendment to the Act.

(c) Participants have the burden of monitoring their expenditures to be sure that they do not exceed the limit.

**(d) Applicability.** All expenditures made by a participant to further the participant's nomination or election, including expenditures made for the purpose of furthering or

facilitating the defeat of the nomination or election of an opponent or prospective opponent, are subject to the expenditure limit applicable under the Act. All expenditures made by the participant shall be totaled to determine the participant's compliance with the applicable expenditure limit. Expenditures incurred after the last election in an election year in which the participant is a candidate, or a special election, are not subject to the expenditure limits for that election.

**(e) Expenditures made during the three calendar years preceding the election.** Expenditures made by a participant during the three calendar years preceding the year of a covered election are subject to the applicable expenditure limit set forth in § 3-706(2) of the Code. A participant is permitted to make expenditure in excess of this limit. However, pursuant to § 3-706(2a)(a), the amount by which the limits of § 3-706(2) are exceeded will be counted against the participant's first election year expenditure limit under § 3-706(1).

**(f) Expenditures made during the year of the election.** Expenditures made on or after the first day of January in the year of a covered election, and expenditures attributed to the year of the election pursuant to paragraph (v) of subdivision (h) of this section, are subject to the applicable expenditure limit set forth in § 3-706(1) of the Code.

**(g) Expenditures for or against a ballot proposal.** Expenditures made by a participant's principal committee for the purpose of advocating a vote for or against a proposal on the ballot in an election that is also a covered election, regardless of whether the expenditures were also made to further or facilitate the participant's nomination or election, shall be subject to the contribution and expenditure limits applicable to such covered election.

**(h) Attributing an expenditure.**

(i) An expenditure is presumed to be made for the first covered election in which the candidate seeks nomination or election following the day that the expenditure is made, except:

(A) expenditures made before the first January 12 after a state or local election will be presumed to be made for that election; and

(B) expenditures made before the first January 1 after a federal election will be presumed to be made for that election, except as may otherwise be provided under federal law and regulations.

**(ii) No contested primary.** If there is no contested primary election in any party for an office, expenditures made by a candidate seeking that office will be entirely attributed to the general election.

**(iii) Contested primary or write-in primary.**

(A) If there is a contested or write-in primary election in any party for an office, every participant or limited participant seeking that office, regardless of whether the participant or limited participant is in the primary election, may make expenditures subject to the primary election expenditure limit of § 3-706(1) of the Code, provided the participant or limited participant files the two pre-primary and 10 day post-primary election disclosure statements pursuant to sections 4-05(b)(ii)(B) and (C) in a timely manner. In this case, the general election expenditure limit will first apply after the date of the primary election.

(B) Expenditures incurred after the date of the contested or write-in primary election will be attributed to the general election.

(C) Expenditures incurred before the primary election by a candidate in a contested primary election are attributed to the primary election, regardless of whether the candidate also received the nomination of another party without a primary election.

**(iv) Reasonably anticipated primary.** Expenditures may be attributed to a primary election that the Board has determined is reasonably anticipated.

(A) If a participant demonstrates to the Board that for a period preceding the primary election the participant had reasonably anticipated a primary election in any party for the office the participant seeks, the participant may attribute expenditures made before and during that period to the primary election expenditure limit of § 3-706(1) of the Code, provided the participant files the two pre-primary and 10 day post-primary election disclosure statements and daily disclosures pursuant to sections 4-05(b)(ii)(B), (C), and 4-06 in a timely manner. In this case, the general election expenditure limit will first apply after that period.

(B) In order to demonstrate to the Board that for a period preceding the primary election the participant had reasonably anticipated a primary election, the participant must file a petition, consisting of an affidavit with supporting documentation, with the Board no later than 10 business days following the date the last remaining candidate other than the participant was finally disqualified from the ballot as set forth in section 7-01(e)(i).

(1) The affidavit must:

(I) be sworn to or affirmed by the candidate;

(II) specify the period of time during which it was reasonable to anticipate that a primary election would be held;

(III) identify the prospective candidate(s); and

(IV) provide a factual basis for the participant's belief that a primary election was reasonably anticipated during the specified period of time.

(2) The supporting documentation must demonstrate that the prospective candidate(s) engaged in activities that would lead a reasonable person to believe that such candidate(s) would participate in the primary election. Such activities may include:

(I) authorizing a political committee with the Board for the primary election;

(II) filing a Filer Registration or Certification with the Board;

(III) engaging in petitioning activity, including the filing of petitions with the Board of Elections;

(IV) producing and/or distributing campaign communications related to the primary election; and

(V) campaigning for office or otherwise publicly declaring an intent to participate in the primary election.

(C) Once it is determined that no primary election will be held for nomination to an office, or that such primary election is no longer reasonably anticipated, subsequent expenditures will be subject to the general election expenditure limit.

**(v) Timing of expenditures.** As provided and described in §§ 3-706 (1) and (2) of the Code, an expenditure for goods or services is made when the goods or services are received, used, or rendered, regardless of when payment is made. Expenditures for goods or services received, used, or rendered in more than one year, including campaign websites, shall be attributed in a reasonable manner to the expenditure limits of § 3-706(1) or (2) of the Code, as appropriate.

(A) Expenditures for campaign advertising or other campaign communications shall be attributed to the expenditure limit in effect when the advertisement or communication is distributed, broadcast, or published. For the purposes of this paragraph, "campaign advertising or other campaign communications" shall not include a campaign website. A communication that is mailed shall be considered to have been "distributed" on the date on which it was postmarked.

(B) Expenditures for services performed or deliverables provided over a period that includes both the primary and the general elections shall be attributed in a reasonable manner to the expenditure limits of §§ 3-706(1) and (2) of the Code, as appropriate.

(C) Notwithstanding the requirements of this subdivision, the Board may require a candidate to demonstrate that an expenditure should be attributed to the expenditure limit provided in § 3-706(1) or (2) of the Code, as appropriate, based on the timing, nature, and purpose of the expenditure.

**(i) Exempt expenditures.**

(i) The following shall not be subject to the expenditure limits:

(A) expenses made for the purpose of bringing or responding to any action, proceeding, claim, or suit before any court or arbitrator or administrative agency to determine a candidate's or political committee's compliance with the requirements of this chapter, including eligibility for public funds payments, or pursuant to or with respect to election law or other law or regulation governing candidate or political committee activity or ballot status;

(B) expenses to challenge or defend the validity of petitions of designation or nomination or certificates of nomination, acceptance, authorization, declination or substitution, and expenses related to the canvassing or re-canvassing of election results;

(C) expenses related to the post-election audit, except as provided in paragraph (ii) of this subdivision; and

(D) expenditures for childcare services made pursuant to § 3-702(21)(a)(13) of the Code for an aggregate amount of $20,000 or less.

(E) expenses for credit card processing fees paid by a campaign for contributions received by the campaign; and

(F) expenses for fees charged by a banking or financial institution on demand deposit account holders for regular use or maintenance of an account, including check fees, monthly fees, overdraft fees, and wire fees.

(ii) Exempt expenses related to the post-election audit shall include pre-election expenses for organizing and copying existing records in preparation for submission during the post-election audit, but shall not include pre-election expenses for:

(A) Ordinary compliance activities, such as the review of records to identify missing documents, evaluating whether documents meet Board standards, and identifying, preventing, and correcting any potential violation;

(B) Post-election work for which an invoice is issued or paid prior to the election;

(C) Salaries or other payments to campaign managers, finance chairpersons, treasurers, accountants, advisors, or other consultants;

(D) Legal or accounting fees;

(E) Costs associated with record creation and retention;

(F) Costs associated with running an office or business, such as standard bookkeeping, maintaining checkbook registers, petty cash journals, bank records, and loan records;

(G) Bookkeeping for payroll or vendor payments; and

(H) Other standard practices that political committees routinely perform as entities that raise and spend funds.

(iii) Candidates have the burden of demonstrating that expenditures are exempt pursuant to § 3-706(4) of the Code. To meet this burden, a candidate must maintain contemporaneous, detailed records that demonstrate that each individual expenditure is exempt in accordance with the Act and these rules, and submit such documentation as required. Expenditures not demonstrated to be exempt will be included in the expenditure limit calculation.

(iv) Notwithstanding anything otherwise provided for in this subdivision, the reimbursement of an advance shall not be considered an exempt expenditure.

(v) For purposes of this subdivision, in determining whether a participant's total expenditures exceed the expenditure limits of § 3-706(1) or § 3-706(3)(a) of the Code, as appropriate, expenditures made in the first three years of the election cycle, to the extent such expenditures do not exceed the limit applicable under § 3-706(2) of the Code, shall be excluded.

**(j) Expenditure limit compliance for a transfer between political committees.**

(i) A committee of a participant that receives a transfer of funds from another political committee, other than another principal committee of the same candidate, must:

(A) allocate to the transferred contributions any expenditures incurred by the transferor committee in connection with raising transferred contributions, and any expenditures incurred by the transferor committee during the covered election cycle in connection with administering transferred contributions; and

(B) upon request, provide documentation related to any such expenditures, including copies of federal forms or disclosure statements filed with the New York State Board of Elections on behalf of the transferor committee.

(ii) Expenditures will be applied towards the expenditure limit in effect at the time of the transfer; provided, however, that in the case of transfers made prior to the covered election cycle, expenditures will be applied towards the expenditure limits of § 3-706(2) of the Code.



(iii) The participant has the burden of demonstrating, for the purpose of compliance with the expenditure limits, that an expenditure made by the transferor committee was not made in connection with raising or administering the transferred contributions.

**(k) Expenditure limit relief.**

(i) Pursuant to § 3-706(3)(a) of the Code, where the Board has determined that a non-participating candidate has spent or contracted or become obligated to spend, or received in loans or contributions, an amount which, in the aggregate, exceeds half the applicable expenditure limit pursuant to § 3-706(1)(a) of the Code, the expenditure limit applicable to participating candidates in the election for that office will be increased to 150% of the expenditure limit.

(ii) Pursuant to § 3-706(3)(b) of the Code, where the Board has determined that a non-participating candidate has spent or contracted or become obligated to spend, or received in loans or contributions, an amount which, in the aggregate, exceeds three times the applicable expenditure limit pursuant to § 3-706(1)(a) of the Code, the expenditure limit will no longer apply to participating candidates in the election for that office.

**(l) Delayed or postponed elections.** The expenditure limit applicable to candidates in an election that is delayed or otherwise postponed shall be increased by 0.5% of the original limit for each day by which the election is delayed or postponed; provided, however, that such increase shall not exceed 30% of the original limit.

## § 6-02 Restrictions on expenditures

**(a) Spending public funds; qualified expenditures.**

(i) Public funds may be used only for qualified expenditures.

(ii) The following are not considered qualified expenditures:

(A) expenditures for any purpose other than to further the candidate's nomination or election;

(B) expenditures not incurred between December 15 in the year preceding the year of the election in which the participant is a candidate, and the date of such election;

(C) expenditures in violation of any law;

(D) payments to the candidate or a spouse, domestic partner, child, grandchild, parent, grandparent, or sibling of the candidate or spouse or domestic partner of such child, grandchild, parent, grandparent, or sibling, or to an entity in which the candidate or any such person has a 10% or greater ownership interest;

(E) payments in excess of the fair market value of services, materials, facilities, or other things of value received;

(F) expenditures made after the candidate has been finally disqualified or such candidate's petitions have been finally declared invalid by the Board of Elections or a court of competent jurisdiction, except that such expenditures may be made (1) as otherwise permitted pursuant to § 3-709(7) of the Code, or (2) for a different election (other than a special election to fill a vacancy) held later in the same calendar year in which the candidate seeks election for the same office, unless the candidate is seeking election exclusively as a write-in candidate in such later election;

(G) expenditures made after the only remaining opponent of the candidate has been finally disqualified or such opponent's petitions have been finally declared invalid by the Board of Elections or a court of competent jurisdiction, except that such expenditures may be made for a different election (other than a special election to fill a vacancy) held later in the same calendar year in which the candidate seeks election for the same office, unless the candidate is seeking election exclusively as a write-in candidate in such later election;

(H) expenditures made for any other election, if the public funds were originally received for a special election to fill a vacancy;

(I) payments in cash;

(J) contributions, transfers, or loans made to another candidate or political committee;

(K) gifts, except brochures, buttons, signs, and other printed campaign material;

(L) expenditures to challenge the validity of petitions of designation or nomination, or of certificates of nomination, acceptance, authorization, declination, or substitution, and expenses related to the canvassing of election results;

(M) expenditures for which records required by section 4-01 are not maintained or obtained by the candidate and submitted to the CFB;

(N) expenditures that are not itemized in a disclosure statement;

(O) payments that are not made or reimbursed from an account disclosed by the candidate pursuant to section 2-01 or 2-02(e);

(P) reimbursement for advances, except in the case of individual purchases in excess of $250, provided that the individual purchase is not otherwise not a qualified expenditure on the basis of any of the other subparagraphs of paragraph (ii);

(Q) expenditures made in connection with any action, claim, or suit before any court or arbitrator;

(R) expenditures made primarily for the purpose of expressly advocating a vote for or against a ballot proposal, unless such expenditures were also made to further the participating candidate's nomination or election;

(S) payments of any penalty or fine imposed pursuant to federal, state, or local law;

(T) payments for services that were never received, including payments for legal services pursuant to a retainer agreement to the extent payments for such services exceed the value of the services rendered;

(U) expenditures to facilitate, support, or otherwise assist in the execution or performance of the duties of public office;

(V) expenditures related to childcare services;

(W) payments for liabilities that were not reported in the disclosure statement covering the reporting period in which the liability was incurred; or

(X) expenditures in excess of $5,000 made by a candidate in a small primary election as defined in section 7-05(a).

**(b) Expenditures in cash.** A candidate may not use cash for an expenditure of more than $100.

**(c) Volunteer services.** Candidates may not pay volunteers for services already performed on a voluntary basis for that election, but may hire them as paid employees or retain them as consultants for future services. Candidates may not accept professional services on a volunteer basis from individuals who previously provided, on a paid basis, services of a similar nature to the same candidate during the same election cycle. Candidates may not accept volunteer services from any entity, or from an individual having an ownership interest of 10% or more in, or control over, any entity that provided paid services to the same candidate during the same election cycle. Notwithstanding the foregoing, after the election, candidates may accept volunteer services from individuals who previously provided paid services.

**(d)** Candidates may not enter into contracts or agreements that provide for payments to vendors or employees that are conditional upon the receipt of public funds.

## § 6-03 Joint expenditures; endorsements.

**(a) Generally.** Candidates may engage in joint campaign activities, including joint fundraising, joint petitioning, and the production of joint campaign literature, subject to applicable expenditure limits.

**(b) Candidates must pay proportionally.** A candidate must pay for the portion of the joint expenditure that is proportionally equivalent to such candidate's campaign's exposure in or benefit from the joint activity, unless the benefit is de minimis.

(i) Candidates and other individuals or entities may present information to the Board establishing such a de minimis benefit pursuant to section 12-02.

**(ii) Factors for proportional payment.** Among the factors the Board will consider in determining whether the benefit to a candidate is proportionally equivalent to its expenditure or is de minimis are:

(A) the geographic distribution or location of the material or activity;

(B) the subject matter of the communication;

(C) the references to the candidate or the candidate's appearances therein;

(D) the relative prominence of a candidate's references or appearances in the communication, including the size and location of references to the candidate and any photographs of the candidate;

(E) the timing of the communication; and

(F) other circumstances of the communication.

**(c) Non-proportional payment may lead to in-kind contribution.** To the extent a candidate does not pay for the proportional benefit it receives, the candidate is considered to have received an in-kind contribution from the other candidate. An in-kind contribution is also an expenditure by the candidate receiving the contribution.

**(d) Not joint expenditures.** The following activities, by themselves, are not joint expenditures:

(i) the act of appearing with another candidate;

(ii) endorsing a candidate, or communicating about an endorsement or appearance in an insubstantial way, such as where the endorser's name is one of several names appearing on a communication and is of equivalent prominence as the other names; and

(iii) giving fundraising assistance to another candidate in the form of de minimis written communications, such as allowing the use of one's name or signature on a letter soliciting funds for another candidate or on fundraising material where the endorser's name appears alone or with other names and is of equivalent prominence as the other names.

**§ 6-04 Independent expenditures.**

(a) **Factors for determining independence.** In determining whether an expenditure is independent, the Board may consider whether any of the factors from the following non-exhaustive list apply:

(i) whether the person or entity making the expenditure is also an agent of the candidate;

(ii) a person authorized to accept receipts or make expenditures for the person or entity making the expenditure is also an agent of the candidate;

(iii) the candidate has authorized, requested, suggested, fostered, or otherwise cooperated in any way in the formation or operation of the person or entity making the expenditure;

(iv) the person or entity making the expenditure has been established, financed, maintained, or controlled by any of the same persons or entities as those that have established, financed, maintained, or controlled a political committee authorized by the candidate;

(v) the candidate shares or rents space for a campaign-related purpose with or from the person or entity making the expenditure;

(vi) the candidate has solicited or collected funds on behalf of the person or entity making the expenditure, during the same election cycle in which the expenditure is made;

(vii) the candidate, or any public or private office held or entity controlled by the candidate, including any governmental agency, division, or office, has retained the professional services of the person making the expenditure, or a principal member of the entity making the expenditure, or an individual or entity who has been previously compensated, reimbursed, or retained as a consultant; political, media, or fundraising advisor; employee; vendor; or contractor by the entity making the expenditure, during the same election cycle in which the expenditure is made;

(viii) the candidate serves or has served as a principal member or professional or managerial employee of the entity making the expenditure, or as a professional or managerial employee of the person making the expenditure, during the same election cycle in which the expenditure is made;

(ix) the candidate and the person or entity making the expenditure have each consulted or otherwise been in communication with the same third party or parties, if the candidate knew or should have known that the candidate's communication or relationship to the third party or parties would inform or result in expenditures to benefit the candidate.

(x) the candidate, or an individual or entity who has been previously compensated, reimbursed, or retained by the candidate as a consultant; political, media, or fundraising advisor; employee; vendor; or contractor, has conveyed strategic information not obtained

from a publicly available source to the person or entity making the expenditure or its agent, during the same election cycle in which the expenditure is made, provided that, for purposes of this subdivision, information shall be deemed strategic if it relates to the candidate's or an opponent's electoral campaign plans, projects, or activities;

(xi) the person or entity making the expenditure has utilized strategic information or data that either (A) is not from a publicly available source or otherwise available by subscription, or (B) has been made publicly available by the candidate, or an individual or entity who has been previously compensated, reimbursed, or retained by the candidate as a consultant; political, media, or fundraising advisor; employee; vendor; or contractor, in a manner which the candidate or such individual or entity knew or should have known would facilitate such utilization;

(xii) the person or entity making the expenditure is, or has been established, financed, maintained, or controlled by, the candidate's spouse, domestic partner, child, grandchild, parent, grandparent, aunt, uncle, or sibling, or the spouse, domestic partner, or child of such child, grandchild, parent, grandparent, aunt, uncle, or sibling; or

(xiii) the expenditure is made by an entity in which the candidate, or the candidate's spouse, domestic partner, child, grandchild, parent, grandparent, aunt, uncle, or sibling, or the spouse, domestic partner, or child of such child, grandchild, parent, grandparent, aunt, uncle, or sibling, holds or has held an ownership interest of ten percent or more or a management position, including, but not limited to, being an officer, director, or trustee, during the same election cycle in which the expenditure is made.

**(b) Board determination.** Upon consideration of the factors described in subdivision (a), the Board may determine by a preponderance of evidence that an expenditure was not independent. Prior to such determination, the candidate and/or the person or entity making the expenditure shall have an opportunity to provide evidence indicating that such expenditure was independent.

**(c) Presumed non-independent expenditures.** Financing the dissemination, distribution, or republication of any broadcast or any written, graphic, or other form of campaign materials prepared by a candidate is presumed to be a non-independent expenditure, unless the candidate can show that the activity was not in any way undertaken, authorized, requested, suggested, fostered, or otherwise cooperated in by the candidate.

**(d) Non-independent expenditures are contributions and expenditures.** An expenditure for the purpose of furthering or facilitating the nomination or election of a candidate which is determined not to be an independent expenditure, is a contribution to, and an expenditure by, the candidate.

**(e) Expenditures made by party committees or constituted committees.** Communication between, or common agents shared by, parties and their nominees will not require a conclusion that all spending by the party's constituted committees and party committees in an election is an in-kind contribution to the nominee.

(i) The following expenditures made by party committees or constituted committees are not considered in-kind contributions to a candidate unless it is demonstrated that the candidate in some way cooperated in the expenditure and that the expenditure was intended to benefit that candidate:

(A) materials or activities that promote the party, or oppose another party, by name, platform, principles, history, theme, slogans, issues, or philosophy, without reference to particular candidates in an upcoming election subject to the requirements of the Act.

(B) materials or activities in connection with candidates and elections not subject to the requirements of the Act.

(C) training, compensating, or providing materials for poll watchers appointed by the party pursuant to § 8-500 of the New York State Election Law.

(D) promoting party enrollment or voter turnout without reference to particular candidates in an upcoming election subject to Program requirements, including research, polling, recruitment of party employees and volunteers, and development and maintenance of voter and contributor lists.

(E) raising funds for the party without reference to particular candidates in an upcoming election subject to the requirements of the Act.

(F) mailing of absentee ballot applications in a special or general election in which an office not subject to the requirements of the Act is on the ballot.

(ii) The Board may require a candidate to demonstrate that expenditures made by a party committee or constituted committee for the purpose of furthering or facilitating the nomination or election of a candidate, including expenditures for the purpose of furthering or facilitating the defeat of the nomination or election of such candidate's opponent or prospective opponent, are not in-kind contributions to the candidate.

(iii) Where a candidate has, without making public disclosure of an outstanding liability in a timely manner, promised or made reimbursement or other payment to a party committee or constituted committee for an expenditure, such expenditure will be considered an in-kind contribution to the candidate during the time preceding the reimbursement or other payment by the candidate.

**(f) Running as a "ticket."** If candidates announce they are running together as a "ticket" for which they have chosen to join together in a broad spectrum of activities to promote each

other's election, the Board will presume that expenditures made by one candidate's campaign for materials or activities that clearly identify the other candidate are in-kind contributions to the second candidate. If the expenditures are in-kind contributions, the expenditures are subject to apportionment requirements as joint expenditures. The following factors would increase the burden a candidate would have in overcoming this presumption:

(i) the campaigns have staff, consultants, office space, or telephone lines in common; and

(ii) other in-kind contributions, expenditure refunds, advances, or joint expenditures have been made between these candidates, or one of the candidates has reported a liability owed to the other candidate(s).

**(g) Certain routine interactions with entities.** Certain routine interactions with entities, absent other indicia of non-independence, will not in themselves lead to a determination of non-independence pursuant to section 6-04(b), including:

(i) Discussions of logistics, including scheduling, regarding a non-fundraising event hosted by the entity;

(ii) Communications directly related to an entity's endorsement process, including questionnaires and interviews; and

(iii) Requesting, obtaining, or distributing publicly available materials such as a candidate's photograph, biography, position paper, or press release, but not including leaflets, posters, or other similar materials, nor video or audio materials.

## § 6-05 Expenditures made by other committees established for the candidate.

(a) A candidate has the burden of demonstrating that expenditures made by a committee authorized by such candidate for a different election should not be attributed to the covered election.

(b) Failure to meet this burden will result in the application of all Program requirements to these committees for the covered election, including attribution of expenditures to the covered election.

**(c) Expenditures for fundraising for more than one election.** When a candidate makes expenditures for a single event or other activity to raise funds for more than one office, and the next election that will be held is:

(i) a covered election, the full amount of such expenditures is subject to the expenditure limit.

(ii) not a covered election, a portion of such expenditures will be subject to the expenditure limit in the same proportion as the funds raised for the covered election bears to the total

funds raised, unless the candidate can demonstrate to the Board that a different apportionment is applicable.

## § 6-06 Identification of communications.

**(a) "Paid for by."** When a candidate makes expenditures for any literature, advertisement, or other communication, including by paying an individual or entity to create, publish, or distribute favorable or unfavorable content about a candidate or ballot measure, the communication must include the words "paid for by" followed by the first and last name of the candidate or the name of the authorized committee that made the expenditures; provided that, if the name of the committee does not include the first or last name of the candidate, the words "paid for by" must be followed by the first and last name of the candidate, either instead of or in addition to the name of the committee.

**(b) "Authorized by."** When a candidate authorizes any individual or entity, other than the candidate, to pay for any literature, advertisement, or other communication in support of or in opposition to any candidate in any covered election, the communication must include the words "authorized by" followed by the first and last name of the candidate or the name of the candidate's authorized committee; provided that, if the name of the committee does not include the first or last name of the candidate, the words "authorized by" must be followed by the first and last name of the candidate, either instead of or in addition to the name of the committee.

**(c) Form.** The identification required by subdivision (a) or (b) of this section must be in the following form:

(i) Visual communications. For a visual non-video communication in any medium, the identification must be written in a font of conspicuous size and style and contained in a box within the borders of the communication.

(ii) Video communications. For a video communication in any medium, the identification must be clearly spoken at the beginning or end of the communication and, simultaneous with the spoken disclosure, written in a font of conspicuous size and style contained in a box within the borders of the communication.

(iii) Audio communications. For an audio communication in any medium, including automated telephone calls, the identification must be clearly spoken at the beginning or end of the communication.

(iv) For a non-automated telephone communication, the identification must be clearly spoken at the beginning or end of the communication. If the identification is spoken at the end of the communication, the name of the candidate must also be clearly spoken at the beginning of the call.

**(d) Languages other than English.** For communications primarily in a language other than English, all required written or spoken identification required by this section must be in such language.

**(e) Where identification would be impracticable.** This requirement may be modified by the Board concerning items upon which identification would be impracticable.

### § 6-07 Routine communication sent by a political club to its members.

A routine communication sent by a political club to its members that includes the name of a candidate is not an in-kind contribution to such candidate, provided that:

(a) the candidate is already a member of the club;

(b) the club has fewer than 500 members; and

(c) the communication does not solicit funds on behalf of or otherwise promote the candidate's campaign for a covered election.

## Chapter 7: Pre-Election Public Funds Payments

### § 7-01 Eligibility.

(a) A determination that a candidate has met all eligibility requirements of the Act and these rules, as of the date on which payment is to be made, shall not constitute the Board's final determination of the amount, if any, for which the candidate qualifies. The Board shall provide specific notice of any such final determination.

(b) Failure to respond to a request for audit documentation or information by the Board may be a basis for a non-payment determination.

**(c) Payment amount.** A candidate in any covered primary, general, or special election, having demonstrated eligibility to receive public funds, including by meeting the threshold for eligibility for public funding pursuant to § 3-703(2) of the Code, may receive public matching funds based on valid matchable contribution claims and the matching rate set forth in § 3-705(2)(a) of the Code, up to the maximum amount set forth in § 3-705(2)(b) or § 3-705(7) of the Code, as applicable. Payments are subject to withholdings and deductions as set forth in the Act and these rules. For an election that is delayed or otherwise postponed, the maximum amount of public funds payable shall be calculated as stated in § 3-720(e) of the Code, provided that the expenditure limit used as the basis for such calculation shall be the increased expenditure limit pursuant to section 6-01(l).

**(d) Approval by Board subject to correction of limited, isolated, and easily corrected compliance issues.** The Board may, at its discretion, approve a public funds payment to a

candidate, notwithstanding limited, isolated, and easily corrected compliance issues, conditioned upon a demonstration by the candidate that such candidate has taken the action specified by the Board, by the deadline specified by the Board, to correct the compliance issues. The candidate shall have the burden of demonstrating to the Board that such candidate has taken the action specified by the Board by the applicable deadline.

**(e) Ballot disqualification; unopposed candidates.** Pursuant to §§ 3-703(1)(a) and (5) of the Code, the Board will not pay any candidate disqualified from the ballot by the Board of Elections or by a court, or any candidate for an election in which all other candidates have been disqualified from the ballot by the Board of Elections or by a court, until such candidate or other candidate is restored to the ballot by a court. A candidate who does not appear on the ballot in an election, or who appears as the only candidate on the ballot in an election, is not eligible to receive public funds, notwithstanding any write-in candidates in that election, except as otherwise provided in paragraph (ii) below, and may be required to return any public funds received. Notwithstanding § 3-704(2)(d) of the Code, such a candidate shall be ineligible to receive additional public funds for a later election held in the same calendar year unless the candidate demonstrates that they will appear on the ballot in that election. A candidate who appears on the ballot for a single election in an election cycle may not receive public funds exceeding the maximum public funds payable amount for a single election, pursuant to § 3-705(2)(b) of the Code, for that election cycle; provided, however, that a candidate who receives public funds based on a reasonably anticipated primary election that is not held, or for which such candidate does not appear on the ballot, such candidate may receive additional public funds for a different election held later in the same calendar year as provided in section 9-02(i)(iii).

(i) The Board will consider a candidate to be finally disqualified from the ballot on the earlier of the date of an administrative or judicial determination disqualifying the candidate for which there is no appeal as of right (unless the disqualification is reversed on appeal or otherwise) or of the election.

**(ii) Payment petition.** Payment may be made to a candidate who was temporarily on the ballot or opposed in an election, pursuant to a determination of the Board of Elections or a court of competent jurisdiction, but then ultimately disqualified from the ballot or unopposed in that election, only when the Board's audit of the candidate's campaign has been completed and only if the candidate has, within 30 days after the date of the final disqualification, as provided herein, filed a written petition, sworn to or affirmed, and supporting documentation that demonstrates that: (1) liabilities in qualified campaign expenditures incurred before the date of final disqualification remain unpaid; (2) the total amount of cash on hand is insufficient to pay these liabilities; (3) all expenditures made and liabilities incurred after the final disqualification were reasonable and necessary; and (4) the candidate was otherwise eligible and in compliance with all other Program requirements as of the date of final disqualification and has remained in compliance at all times since that date. The petition must also include an undertaking to use all public funds

received to extinguish the liabilities enumerated pursuant to subparagraph (1) of this paragraph.

**(f) Write-in candidates.** A candidate who is seeking election exclusively as a write-in candidate, or who is only opposed by a candidate who is seeking election exclusively as a write-in candidate, is not eligible to receive public funds.

**(g)** Pursuant to §§ 3-703(1)(a) and (5) of the Code, public funds are not payable to a participant who had not met the legal requirements to have the participant's name on the ballot, or, for an optional early public funds payment, who has not certified that the participant intends to meet all the requirements of law to have the participant's name on the ballot and stated the specific office to which the participant is seeking nomination or election.

## § 7-02 Timing.

**(a) Payment dates.**

(i) The Board will schedule at least three payment dates in the 45 days before a covered primary election and at least four payment dates in the 90 days prior to a covered general election.

(ii) No public funds will be paid to candidates in a primary or general election any earlier than two weeks after the last day to file designating petitions for the primary election, except that optional early public funds payments may be made no earlier than December 15 in the year before the year of the election. For a candidate to receive an optional early public funds payment, the Board must determine that one of the conditions set forth in § 3-705(7)(a)(2) or (3) of the Code is satisfied, or the candidate must submit a certified signed statement attesting to the need for such public funds and demonstrating that at least one of the conditions set forth in § 3-705(7)(a)(1) of the Code is satisfied. The statement must be accompanied by supporting documentation and must be submitted to the Board at least 15 business days before the optional early public funds payment is scheduled to be made.

**(b) Preliminary review of disclosure statements; reasons for delay.** In order to enable payment within four business days after receipt of disclosure statements, or as soon thereafter as is practicable, pursuant to § 3-705(4) of the Code, the Board shall conduct a preliminary review of all disclosure statements filed.

(i) If a candidate's complete disclosure statement is not actually received by 5:00 p.m. on the due date, or if the candidate submits a disclosure statement that fails to comply substantially with the requirements of the Act or these rules, the Board may be unable to make payment within four business days, and may review the disclosure statement for possible payment determinations at the next payment date.

(ii) A preliminary review may also be delayed for reasons including, but not limited to, consideration of whether a basis exists for an ineligibility determination. A delayed preliminary review may result in a payment determination being delayed until such time as it is practicable.

**(c) Preliminary review of matching claims.**

(i) Before making a pre-election payment determination, the Board may issue a report to the candidate indicating any matching claims determined to be invalid based on preliminary review of each disclosure statement and of the matchable contribution claims reported. The candidate may respond to the report by providing information or documentation demonstrating that any of the matching claims should be considered valid. Failure by the candidate to respond to such report by the deadline set by the Board may delay payment of public matching funds.

(ii) Pursuant to § 3-703(12)(b) of the Code, the Board will not invalidate a matching claim in a review of any disclosure statement filed after the statement in which such a claim was submitted, unless the Board learns of new information relevant to the eligibility of the claim that was not available to the Board at the time of the initial review. Such new information may include: (1) information related to the candidate's eligibility to receive public funds generally, including the submission of a Certificate as provided in Rule 2-02, where the submission had not been made at the time of the initial review, and (2) information related to the contribution limit applicable to the candidate, including a declaration or change of the office sought by the candidate.

(d) No candidate shall receive more than the maximum public funds payable amount for a single election, pursuant to § 3-705(2)(b) of the Code, any earlier than the day after the day of the primary election.

## § 7-03 Payment by electronic funds transfer.

All payments of public funds shall be by electronic funds transfer unless the Board determines, at its sole discretion, to use an alternative payment method. In order to receive prompt payment, the participating candidate must provide the Board with a voided committee check and such additional information as shall be required by the Board.

## § 7-04 Public funds cap.

(a) A candidate shall not be eligible to receive more than one quarter of the applicable maximum pursuant to § 3-705(2)(b) of the Code unless the Board determines that one of the conditions set forth in § 3-705(7)(a)(2) or (3) of the Code is satisfied, or the candidate submits a certified signed statement attesting to the need for additional public funds and demonstrating that at least one of the conditions set forth in §3-705(7)(a)(1) of the Code is satisfied. The statement must be filed with the Board no later than the due date of the applicable disclosure

statements or fifteen business days prior to the payment date, whichever is later, except that, if the basis for filing the statement arises after the due date, and no basis existed prior to such due date, then the statement shall be due by the deadline for the disclosure statement immediately preceding the next date on which a public funds payment is scheduled to be made:

(i) Candidates in the primary election must file the statement of need no later than the due date of the 32-day pre-primary election disclosure statement.

(ii) Candidates in the general election must file the statement of need no later than the due date of the 32-day pre-general election disclosure statement.

(b) The Board shall verify the truthfulness of any certified signed statement submitted pursuant to § 3-705(7)(a)(1) of the Code and determine whether supporting documentation demonstrates the existence of the condition or conditions described in such statement. For the purposes of making a determination pursuant to § 3-705(7)(a)(1)(A) of the Code, a non-participating candidate shall be presumed to have the ability to self-finance when it is demonstrated through supporting documentation that such candidate has readily available funds in excess of one fifth of the applicable expenditure limit and that such candidate can reasonably be expected to spend such funds for such candidate's election.

## § 7-05 Small primaries.

(a) A candidate on the ballot in one or more primary election(s) in which the number of persons eligible to vote for party nominees in each such election totals fewer than 1,000 shall not receive public funds in excess of $5,000 for qualified campaign expenditures in such election or elections; provided, however, that the foregoing limitation shall not apply to such candidate if the candidate is opposed in a primary election by (i) a participant who is not subject to such limitation or (ii) a non-participant who has spent or contracted or become obligated to spend in excess of $10,000 for such primary election. The Board shall determine whether a non-participant has exceeded such $10,000 level pursuant to § 3-705(6) of the Code.

(b) For the purposes of subdivision (a), the number of persons eligible to vote for party nominees in a primary election shall be as determined by the Board of Elections for the calendar year of the primary election pursuant to § 5-604 of the New York State Election Law. If such determination for any primary election is not available from the Board of Elections as of the day before the due date for filing a Certification pursuant to § 3-703(1)(c) of the Code, the most recent determination by the Board of Elections of the persons eligible to vote for party nominees for the office for which such primary election is held shall be relied upon.

(c) **Public funds exceeding $5,000.** If a candidate in a small primary receives public funds payments aggregating in excess of $5,000 for the covered election, the candidate must return the excess funds to the Board; provided, however, that the candidate may use the excess funds for a different election (other than a special election to fill a vacancy) held later in the same calendar year in which the candidate seeks election for the same office, unless the candidate is

seeking election exclusively as a write-in candidate for such later election. The amount of any excess funds used for a later election will be deducted from the total amount of public funds the candidate is eligible to receive for that election.

## § 7-06 Withholdings.

(a) The Board shall withhold 5% of the amount of public funds payable to a candidate until the final pre-election payment for any election in which the candidate is eligible to receive public funds. Such withheld funds shall not be payable to any candidate who is not otherwise eligible to receive a payment, or who fails to provide, to the satisfaction of the board, such submissions as may be requested by the board for the purpose of publishing a video statement in the voter guide pursuant to chapter 16 of these rules.

(b) In addition, the Board may withhold from pre-election public funds payments: (a) a percentage equal to the projected rate of invalid matching claims; (b) an amount equal to any contributions made, received, solicited, or otherwise obtained in violation of any law, pending disgorgement of such contributions to the Fund or refund to the contributor; and (c) up to an additional 5% if the Board determines that there is reason to believe that the candidate has failed to comply with the Act, including by failing to adequately respond to a Board request for information or documentation. Withholdings shall be subject to post-election audit.

## § 7-07 Deductions from payments.

(a) The total amount of public funds payable to a participant for a covered primary, general, or special election shall be reduced by the sum of the following:

(i) the amount of outstanding civil penalties assessed by the Board as a result of the participant's failure to comply with the Act and these rules during the current covered election; and

(ii) the amount of the participant's:

(A) transfers and other disbursements from a political committee that is involved in an election in which the candidate is currently a participant, to a political committee that is not involved in that election;

(B) expenditures made to pay expenses for or debt from a previous election, including repayments of public funds and payment of penalties owed to the Board for a previous election;

(C) contributions to other political committees that do not meet the requirements provided in § 3-705(8) of the Code for contributions that shall not be a basis for reducing public funds payments;

(D) loans to other candidates that are not repaid within 30 days or by the date of the election, whichever is earlier, or spending for other candidates, including joint expenditures, to the extent such expenditures benefit another candidate, and independent expenditures; provided that independent expenditures made by the principal committee of a candidate shall not be a basis for reducing public funds payments to that candidate, where such expenditures do not, in the aggregate, exceed the amount provided in §§ 3-705(8)(i), (ii), or (iii) of the Code, as applicable, for contributions to political committees;

(E) loans to or spending for political party committees and political clubs that are not reimbursed within 30 days or by the date of the election, whichever is earlier, provided that if the candidate demonstrates that the expenditure was for a tangible item that directly promotes the candidate's election, such as an advertisement in a fundraising journal, this subparagraph shall not apply to the fair market value of that item;

(F) expenditures made for the purpose of furthering the candidate's selection as Speaker of the City Council; and

(G) contributions to charitable organizations designated as 501(c)(3) organizations pursuant to the Internal Revenue Code except the fair market value purchase price of goods or services provided by the charitable organization.

(b) Disbursements that would otherwise result in a deduction pursuant to paragraph (ii) of subdivision (a) of this section shall not result in any such deduction if:

(i) such disbursements are made out of a segregated bank account;

(ii) at no time does the segregated bank account contain any funds other than contributions received by the candidate and deposited directly into the account pursuant to this section, and bank interest paid thereon;

(iii) funds deposited into the segregated bank account are not used for any purpose other than disbursements governed by paragraph (ii) of subdivision (a) above or payment of bank fees associated with the segregated bank account;

(iv) contributors whose contributions are deposited into the segregated bank account have confirmed in writing, pursuant to section 4-01(b)(ii)(B), that they understand that these contributions will only be used for such disbursements and will not be matched with public funds;

(v) copies of such written confirmations are submitted to the Board by the due date of the disclosure statement in which such contributions are required to be reported pursuant to these rules;

(vi) copies of checks for each disbursement out of the segregated bank account are submitted to the Board by the due date of the disclosure statement in which such disbursements are required to be reported pursuant to these rules;

(vii) a copy of each bank statement for the segregated bank account is submitted to the Board by the due date of the next disclosure statement; and

(viii) for each individual contribution deposited into the segregated bank account, and each disbursement out of the segregated bank account, the candidate has complied with all other applicable provisions of the Act and these rules, including but not limited to the record keeping and reporting provisions.

(c) Candidates must deposit the entire amount of a contribution into the segregated bank account provided for in subdivision (b), and may not divide the contribution between different accounts.

(d) Contributions deposited into a segregated bank account pursuant to this section will not be matched with public funds.

(e) Any funds remaining in a segregated bank account after the election must be returned to the contributors whose contributions were deposited into the account, or, if that is impracticable, to the Fund, on or before December 31 in the year following the year of the election; provided, however, that expenditures made for the purpose of furthering the candidate's selection as Speaker of the City Council may be made from a segregated bank account after the election, but no later than the financial disclosure cut-off date of the first semi-annual disclosure statement in the year following the year of the election.

(f) A candidate who establishes a segregated bank account pursuant to this section, but fails to comply with any provision of subdivisions (b), (c), (d), or (e) of this section, shall no longer be entitled to the exception from subdivision (a) contained in subdivision (b) of this section.

(g) Funds deposited into, and disbursements made from, a segregated bank account established and maintained in compliance with this section for the purpose of making expenditures to pay expenses for or debt from a previous election, including repayments of public funds owed to the Board, will not be considered to be raised or spent for the current covered election for purposes of the participant's expenditure limit calculation.

## § 7-08 Notice to candidates.

The Board shall notify the candidate in writing of any non-payment determination or of the difference between the amount of public funds claimed and the amount paid.

## § 7-09 Petitions for review.

(a) After the Board provides a written determination to a candidate specifying the basis for payment or non-payment of public funds prior to the election, the candidate may petition the Board in writing for reconsideration of such determination. Such petition must state one or more specific grounds for reconsideration and must also include either a request to appear before the Board concerning the petition or a statement that the candidate waives such candidate's right to appear.

(b) To be considered by the Board, a petition for review of a pre-election payment or non-payment determination must not include any documentation or factual information not submitted to the Board prior to the determination under review, unless the participating candidate can demonstrate good cause for the previous failure to submit such documentation or information and for any failure to communicate on a timely basis with the Board.

(c) If a petition is moot, facially meritless, or not in substantial compliance with the requirements of this section, it may be rejected, and the candidate will be deemed to have waived the right to appear before the Board. If the petition is not rejected, the Board will review the determination that is the subject of the petition within five business days of the filing of such petition.

**(i) Candidates who waive the right to appear before the Board.** If the Board is unable to convene within five business days of receipt of the petition, or if the petition is filed less than three business days prior to the next scheduled Board meeting, then the Board may delegate to the Chair of the Board or the Chair's designee authority to make a determination regarding the petition.

**(ii) Candidates who exercise the right to appear before the Board.**

(A) If the Board is unable to convene within five business days of receipt of the petition, the candidate may appear at the next scheduled Board meeting.

(B) If the petition is filed less than three business days prior to the next scheduled Board meeting, the Board may make a determination regarding the petition at a subsequent Board meeting occurring no later than the next scheduled public funds payment date.

(d) The Board will timely issue a written determination on the subject of the petition. If the petition is denied or rejected, the determination shall inform the candidate of the right to appeal pursuant to Article 78 of the Civil Practice Law and Rules.

## § 7-10 Review of contributions and expenditures.

**(a) Facial Determinations.** The Board may find that a candidate's registration and financial disclosure submitted to the Board or to the State Board of Elections provide on their face a

sufficient basis for a determination of the amount such candidate has spent or contracted or become obligated to spend, or received in loans or contributions. The Board will presume that contributions and loans are accepted, disbursements are made, and liabilities are incurred by a candidate for such candidate's next election. In the absence of contrary evidence, the Board will rely upon the date of contributions, loans, disbursements, and liabilities as they appear on disclosure statements filed with the Board or the State Board of Elections.

**(b) Petitions for reconsideration.**

**(i) Contents.** A candidate may file a petition for reconsideration of a preliminary Board determination made pursuant to subdivision (a). Such petition must be written and must:

(A) be sworn to or affirmed;

(B) indicate on whose behalf the petition is being submitted;

(C) contain sufficient specificity and detail for the Board to make a decision, including:

(1) if alleging that information submitted to the Board or the State Board of Elections is inaccurate or incomplete, the petition must describe the inaccuracies or omissions in detail, or the Board may presume that any information on file is true and complete;

(2) if alleging fundraising or spending activities to have taken place after the close of a reporting period, the petition must describe the activities in detail;

(3) if alleging that a third party is providing unreported contributions, goods, services, or benefits to a candidate in coordination with that candidate, the petition must include all relevant names, dates, and amounts, including information concerning the fair market value of services, materials, facilities, advertising, or other things of value reported to have been received or expended; and

(4) if alleging that statements have been made, the petition must include content of statements, name, dates, how speaker is affiliated with a candidate or other actor, and any other relevant information.

(D) include a request for a hearing, if desired;

(E) be submitted no later than 10 days after the determination or decision; and

(F) be accompanied by evidence that supports the allegations made in the petition. The petitioner has the burden of demonstrating a sufficient basis for a determination.

**(ii) Notice of petition.**

---

(A) The Board shall send a copy of the petition to any opposing entities named in the petition or known by the Board to have an opposing interest in the petition.

(B) The notice shall specify:

(1) the deadline for the opposing entities to submit a response; and

(2) the date and time at which the Board will conduct a hearing on the petition, if any.

**(iii) Response to the petition.** The opposing entities may submit a response to the petition. A failure to submit a response may be deemed an admission of the allegations in the petition and sufficient reason to deny a request to reconsider any determination based on the petition. The response must:

(A) be submitted in the manner and by the deadline set forth by the Board;

(B) be sworn to or affirmed;

(C) either acknowledge that fundraising or spending on behalf of the respondent is sufficient to permit the Board to make a determination, regardless of the merit of the petitioning candidate's particular allegations, or contend that a determination would be inappropriate and specify the allegations in the petition that are denied and those that are admitted;

(D) explain any failure to disclose any information to the Board or the City or State Board of Elections;

(E) include evidence that supports the response, including, but not limited to, all relevant names, dates, and amounts, including information concerning the fair market value of services, materials, facilities, advertising, or other things of value reported to have been received or expended;

(F) include a request for a hearing, if desired; and

(G) be signed by the opposing entity.

**(iv) Hearing.**

(A) The Board may decide to conduct a hearing upon request or on its own initiative.

(B) The hearing date will be no earlier than 10 days after the petition is received, except:

(1) for good cause shown; or

(2) for petitions received less than 30 days before the election, in which case the hearing date will be no earlier than three days after the petition is received.

(C) The respondent and each opposing candidate must notify the Board no less than one day in advance whether they will be represented at the hearing. Representation of a party at a hearing must be by a person with knowledge of the facts at issue.

(D) At the hearing, testimony given may be under oath and no new documentary evidence will be considered unless good cause is shown for the party's failure to submit it with its petition or response.

**(v) Notice of determination.** Following the review of disclosure statement filings; the petition and response, if any; and testimony and evidence presented at a hearing, if any, the Board will:

(A) decide whether there is a sufficient basis for a determination; and

(B) provide written notice to the petitioner and opposing entities, if any, of its determination.

**(vi) New petition for a preliminary public funds determination may be submitted based on new evidence.** The Board's decision not to award public funds shall not be construed to preclude the subsequent submission of any petition based on new evidence for a determination respecting that candidate.

**(vii) Request for reconsideration.** The petitioner or an opposing party may request reconsideration of a preliminary public funds determination.

(A) A request for reconsideration must be made in writing no later than 10 days after the determination, and must include:

(1) an affidavit of the party affirming that neither fundraising nor spending on behalf of the respondent that has taken place after the close of the most recent reporting period is sufficient to permit the Board to make a determination; and

(2) an undertaking by the respondent to notify the Board immediately in writing if and when either fundraising or spending on behalf of the respondent becomes sufficient to permit the Board to make a determination pursuant to subdivision (a).

(B) The Board shall consider the evidence, may conduct a hearing, and shall notify the petitioner of its determination.

(C) The Board may consider a respondent's failure to respond to the petition, or the failure of the party requesting reconsideration to be represented at a hearing on the petition, to be a sufficient basis for denying a request for reconsideration. The Board



shall notify the respondent, all opposing candidates, and the petitioner whether it will reconsider the determination pursuant to subdivision (a) or decision not to make such a determination, as the case may be.

(D) The Board will respond within five business days of the filing of such petition.

**(viii) Appeal.** A party may bring a special proceeding as set forth in Article 78 of the Civil Practice Law and Rules within four months of the Board's final determination denying the petition for reconsideration.

## Chapter 8: Post-Election Public Funds Payments

### § 8-01 Payment determinations.

(a) Candidates who fail to demonstrate compliance with the Act and these rules, including candidates who satisfy one or more criteria for ineligibility as provided in section 3-01(d), are not eligible to receive a post-election public funds payment.

(b) Candidates have the burden of demonstrating eligibility to retain public funds received prior to the election and to receive additional public funds after the election. Candidates who fail to demonstrate eligibility to retain all or a portion of the public funds previously received may be required to repay such amount to the Fund.

(c) A candidate's post-election payment, if any, will be reduced by the amount of any applicable deductions pursuant to section 7-07(a), if such amounts were not deducted from pre-election public funds payments.

(d) The post-election payment, repayment, or nonpayment determination shall be the final determination regarding that candidate's public funds payment status, except as provided in section 8-05.

### § 8-02 Amount of post-election payment.

**(a) Reasons for post-election payment.** A post-election payment shall only be made if, at the conclusion of the post-election audit, a candidate has demonstrated unpaid matching claims, a qualified expenditure surplus, and documented outstanding liabilities.

**(i) Unpaid matching claims.** Candidates may be entitled to receive a post-election payment equal to the amount by which the candidate's total valid matchable claims multiplied by the applicable matching rate pursuant to § 3-705(2)(a) of the Code exceed the total pre-election payments received by the candidate.

**(ii) Qualified expenditure surplus.** Candidates may be entitled to receive a post-election payment equal to the amount by which the candidate's total qualified expenditures exceed the total pre-election payments received by the candidate.

**(iii) Documented outstanding liabilities.** Candidates may be entitled to receive a post-election payment equal to the amount of the candidate's properly reported and documented liabilities that remain outstanding, less the amount remaining in the candidate's principal committee bank account.

    (A) Prior to issuing a post-election payment, the Board may require the candidate to submit any bank statements not previously provided.

    (B) In order to be the basis for a post-election payment, an outstanding liability must be reported on or before the due date for the final disclosure statement required to be submitted for the covered election to which the liability relates.

    (C) To document an outstanding liability for the purpose of receiving a post-election payment, the candidate must provide documentation demonstrating that the reported payee has made a commercially reasonable attempt to collect the debt.

**(iv) Post-election payment is smallest amount.** The amount of the post-election payment shall be the lowest of the three amounts detailed in paragraphs (i), (ii), and (iii) of this subdivision. If any of these amounts is zero, the candidate is not entitled to receive a post-election public funds payment.

**(b) Statutory maximum.** Combined with the total pre-election payments received by the candidate, the post-election payment shall not exceed the maximum payment allowed for each election in which the candidate was a participant pursuant to § 3-705(2)(b) of the Code.

## § 8-03 Use of final post-election payment.

Before the Board makes the final post-election payment determination, if eligible, the candidate must submit to the Board bills or other documentation of outstanding debt for which such payment will be used. Within 60 days after the final public funds payment, the candidate must demonstrate that the public funds were used to pay such outstanding debt. If such demonstration is not made, the candidate must repay the public funds to the Board.

## § 8-04 Disclosure statement amendments.

The Board shall not make payments based on disclosure statement amendments filed after January 15 in the year following the year of the election; provided, however, that the Board may make payments based upon such amendments solely if they are made in response to invalid matching claims reports or expenditure sample reports to which the Board has requested a response after January 15 in the year following the year of the election.

**§ 8-05 Post-election petitions for review.**

(a) After the Board provides a candidate a written determination specifying the basis for payment or non-payment of public funds after the election, the candidate may petition the Board in writing for reconsideration of such determination.

(b) A petition for review of a post-election payment determination must be submitted within 30 days of the candidate's final audit report or final board determination, whichever is earlier, and must include:

(i) a statement of one or more specific grounds for reconsideration;

(ii) information or documentation that was unavailable to the Board previously and is material to such determination;

(iii) a showing that the candidate had good cause for the previous failure to provide such information or documentation; and

(iv) either a request to appear before the Board concerning the petition or a statement that the candidate waives such candidate's right to appear.

(c) If a petition is moot, facially meritless, or not in substantial compliance with the requirements of this section, it may be rejected, and the candidate will be deemed to have waived the right to appear before the Board. If the petition is not rejected, the Board will timely issue a written determination on the subject of the petition. If the petition is denied, the determination will inform the candidate of the right to appeal such determination pursuant to Article 78 of the Civil Practice Law and Rules.

# Chapter 9: Public Funds Repayments

**§ 9-01**

Candidates must promptly repay public funds upon a determination made by the Board that a repayment is required. Candidates returning public funds must make a check payable to the "New York City Election Campaign Finance Fund." Candidates may not reclaim public funds they have returned. Public funds must be repaid to the Board separately from, and in addition to, any penalties owed by the candidate.

**§ 9-02 Reasons for repayment.**

The Board shall determine whether a candidate or such candidate's principal committee is required to repay public funds previously received as follows:

**(a) Overpayment of public funds.** Pursuant to § 3-710(2)(a) of the Code, the candidate's principal committee is required to pay to the Board an amount equivalent to the amount of public funds received in excess of the amount which the candidate is eligible to receive.

**(b) Qualified expenditure deficit.** Pursuant to § 3-710(2)(b) of the Code, the candidate's principal committee is required to pay to the Board an amount equivalent to the amount of public funds paid to the candidate that were not spent on qualified expenditures.

> **(i) Determination of personal liability.** A candidate may be personally liable for paying to the Board the amount of public funds not spent on qualified expenditures, or a portion of that amount. In considering whether and to what extent a participating candidate shall be personally liable for repayment of public funds, the Board shall act in accordance with the following:

>> (A) where credible documentation supporting each qualified expenditure exists but is incomplete, the Board shall not impose such liability for such expenditure;

>> (B) where there is an absence of credible documentation for each qualified expenditure, the Board may impose such liability upon a showing that such absence of credible documentation for such expenditure arose from a lack of adequate controls including, but not limited to, trained staff, internal procedures for following Board guidelines and internal procedures for employing standard financial controls.

**(c) Final bank balance.** Pursuant to § 3-710(2)(c) of the Code, the candidate and the principal committee are required to pay to the Board an amount equivalent to the campaign funds remaining in such candidate's principal committee account. The candidate must promptly pay to the Board such remaining funds; provided, however, that all remaining funds for a candidate shall be immediately due and payable to the Board upon a determination by the Board that the candidate has delayed the post-election audit process. The candidate must promptly pay to the Board any additional remaining campaign funds based upon a determination made by the Board at a subsequent date. The amount of remaining campaign funds shall be presumed to be equal to the candidate's authorized committee bank account balance on January 11 in the year following the election, or for special elections, on the last day of the reporting period for the later of the 27 day post-election disclosure statement or the first semi-annual disclosure statement the candidate is required to file with the Board following the date of such election, less any permissible documented post-election expenditures pursuant to paragraph (i) of this subdivision. The Board may also consider information revealed in the course of an audit or investigation in making a remaining funds determination, including, but not limited to, the fact that campaign expenditures were made in violation of law, that expenditures were made for any purpose other than the furtherance of the candidate's nomination or election, or that the candidate has not maintained or provided requested documentation. If a candidate repays to the Fund all funds remaining in such candidate's authorized committee bank account on or before December 31 in the year of the election, or, for special elections, on or before the last day of the month following the month in which the election took place, such candidate shall

be presumed not to owe additional remaining funds, provided that any contributions received and expenditures made after such funds are repaid must be raised and spent in compliance with the Act and these rules.

(i) Before repaying campaign funds remaining in the committee bank account, a candidate may make post-election expenditures only for routine activities involving nominal cost associated with winding down a campaign and responding to the post-election audit. Such expenditures may include: payment of utility bills and rent; reasonable staff salaries and consultancy fees for responding to a post-election audit; reasonable staff salaries and legal fees incurred prior to the date of the issuance of the candidate's final audit report and associated with defending against a claim that public funds must be repaid; a post-election event for staff, volunteers, or supporters held within 30 days of the election; reasonable moving expenses related to closing the campaign office; a holiday card mailing to contributors, campaign volunteers, and staff; thank you notes to contributors, campaign volunteers, and staff; payment of taxes and other reasonable expenses for compliance with applicable tax laws; and interest expense. Routine post-election expenditures that may be paid for with remaining campaign funds do not include such items as post-election mailings other than as specifically provided for in this paragraph; making contributions; or making bonus payments or gifts to staff or volunteers. Campaign funds remaining in the committee account may not be used for transition and inauguration activities.

(ii) Notwithstanding the restriction on the use of receipts provided in subdivision (c)(i), a candidate who has outstanding liabilities from the election, including a candidate who owes public funds or penalties to the Board, may make post-election expenditures for the purpose of raising funds to repay such debt, provided, however, that such expenditures and any contributions received shall be included in the calculation of the candidate's remaining funds, unless such expenditures and contributions are incurred or received after the date of the issuance of the candidate's final audit report.

(iii) Notwithstanding the prohibition on post-election bonus payments provided in subdivision (c)(i), a bonus payment to an employee may be considered a permissible pre-election expenditure, even if paid after the election, provided that:

(A) the bonus is paid pursuant to a contract executed before the services that serve as the basis for the bonus are performed;

(B) such contract states in detail the amount of the bonus and the criteria that must be satisfied in order for the bonus to be paid;

(C) such criteria are quantifiable, merit-based, and related to services provided prior to the election;

(D) the bonus is not conditioned, either in existence or amount, on the result of the election, the amount of funds remaining in the committee account, or whether the candidate received public funds; and

(E) the bonus does not constitute more than 10% of the total amount paid to the employee.

**(d) Breach of certification.** A candidate found to have breached such candidate's certification pursuant to section 3-01(e) may be deemed ineligible to receive public funds and may be required to return all public funds previously received.

**(e) Ballot disqualification.** Pursuant to § 3-709(7) of the Code, a candidate who has been finally disqualified or whose designating or nominating petitions have been finally declared invalid by the Board of Elections or a court, or whose only remaining opponent has been finally disqualified or whose designating or nominating petitions have been finally declared invalid by the Board of Elections or a court, may not spend public funds for any purpose other than the payment of previous liabilities incurred in qualified campaign expenditures, except as provided in section 9-02(i)(iii). All public funds in excess of those liabilities previously incurred shall be promptly repaid to the Board. The amount to be repaid will be determined in accordance with § 3-710(2)(b) of the Code and subdivision (b) of this section. A repayment made pursuant to § 3-709(7) does not prevent the Board from determining that an additional repayment is required.

**(f) Ballot fraud.** Pursuant to § 3-710(3)(a) of the Code, a candidate who has been disqualified by a court on the grounds that the candidate committed fraudulent acts in order to obtain a place on the ballot must pay to the Board an amount equal to the total public funds paid to the candidate. Repayments pursuant to this subdivision must be made promptly upon the court's determination of disqualification. No repayment required if the decision is reversed.

**(g) Failure to actively campaign.** Pursuant to § 3-710(3)(b) of the Code, a candidate who fails to actively campaign for a covered office may be required to repay an amount equal to the total public funds received.

**(h) Ceasing to campaign.** Pursuant to § 3-710(3)(c) of the Code, a candidate who ceases to actively campaign for a covered office may be required to repay an amount equivalent to the amount of public funds paid to the candidate that were not spent on qualified expenditures. Only expenditures incurred prior to the date on which the candidate ceased actively campaigning may be considered qualified expenditures.

**(i) Other reasons for repayment.** The Board may require a candidate to repay public funds because:

(i) the candidate failed to maintain copies of checks or contribution cards that document matchable contributions;

(ii) the public funds paid were based on contributions that were returned or contribution checks that have not been paid;

(iii) the candidate has failed to demonstrate eligibility for the public funds paid or compliance with Program requirements, including the requirements to appear on the ballot and to be opposed by at least one other candidate on the ballot. The Board may seek immediate repayment of the difference between the amount of public funds received by a candidate and the total amount spent by the candidate as of the date on which the candidate ceases to be on the ballot or ceases to be opposed on the ballot; provided, however, that the candidate may retain public funds previously received for that anticipated election to be used in furtherance of a different election (other than a special election to fill a vacancy) held later in the same calendar year in which the candidate seeks election for the same office, unless the candidate is seeking election exclusively as a write-in candidate in such later election; and further provided that the amount of such public funds retained for a later election will be deducted from the total amount of public funds the candidate is eligible to receive for such later election; or

(iv) a determination pursuant to §§ 3-705(6) or (7) of the Code is reversed following reconsideration pursuant to section 7-10(b)(vii).

**(j) Repayment is largest amount.** Where more than one grounds for repayment exists as provided in this section, the amount to be paid to the Board shall be the largest of the amounts.

# Chapter 10: Audit and Enforcement

### § 10-01 Audits.

(a) The Board shall conduct desk and field audits of participants and non-participants, regardless of whether the candidates receive public funds. Field audits may be conducted before or after an election, as the Board deems appropriate. In conducting audits, the Board may use random sampling of data and other analytic techniques, as appropriate. The Board shall conduct campaign audits in accordance with generally accepted government auditing standards.

(b) Candidates are required to respond to all Board requests for information and documentation during the audit process. Failure to respond in a timely fashion may cause delay in the issuance of a final audit report. In addition, the Board may assess penalties for failing to respond or responding late to requests for documentation or information pursuant to § 3-711 of the Code.

### § 10-02 Audit deadlines; optional post-election training.

The Board shall issue all draft and final audit reports in accordance with the deadlines provided in § 3-710(1)(a) and (b) of the Code subject to any applicable exceptions to those deadlines provided in § 3-710(1)(d), (e), and (f) of the Code.

**(a) Candidates who attend a post-election training.** Pursuant to § 3-710(1) of the Code, where the candidate, the campaign manager, or the treasurer has attended a post-election audit training provided by the Board, the Board will issue the candidate's enforcement notice or final audit report within 14 months after the deadline for submission of the final disclosure report for the covered election, in the case of city council and borough-wide races, and within 16 months after the deadline for submission of the final disclosure report for the covered election in the case of citywide races.

**(b) Candidates who do not attend a post-election training.** For candidates who do not attend a post-election training, the Board will issue an enforcement notice or final audit report:

(i) For City Council and borough-wide races, within 16 months after the deadline for submission of the final disclosure report for the covered election; and

(ii) For citywide races, within 18 months after the deadline for submission of the final disclosure report for the covered election.

**(c) Deadline for attending post-election training.** To be subject to the deadlines provided in subdivision (a) of this section, candidates must attend a post-election training on or before the earlier of 20 days following issuance of the candidate's draft audit report or one year after the deadline for submission of the final disclosure report for the covered election.

## § 10-03 Board determinations concerning violations, infractions, penalties, and repayment of public funds.

**(a) Notice and opportunity to contest.** The Board will notify the candidate, the TIE, or the independent spender and its authorized representative, as applicable, in writing of any infractions or violations alleged to have been committed by such party, as well as any corresponding recommended penalties, and any recommended public funds repayment. Such notice shall:

(i) set forth in detail the factual and legal basis for staff's recommendation that a violation, infraction, or public funds repayment obligation be found;

(ii) inform the party that hearings are conducted in accordance with the requirements for adjudications contained in § 1046 of the Charter unless such procedures are waived by, as applicable: the participant or nonparticipant, the elected candidate, the independent spender or authorized representative, or an agent thereof;

(iii) notify the party of the opportunity to submit information and documentation for the Board's consideration within a time period to be specified in such notice; and

(iv) notify the party of the opportunity to appear at a hearing before the Board or an administrative law judge to contest the alleged violations or infractions, penalties, and public funds repayment obligation.

**(b) Response to the notice.**

(i) The noticed party must submit a complete response to the notice by the due date. Extensions may be granted for good cause shown. Extension requests must be made in writing and must be submitted prior to the deadline.

(ii) Unless specifically notified to the contrary by the Board, the opportunity to submit information and documentation in response to the notice shall be the only such opportunity, and any information and documentation that is not timely received by the Board shall be disregarded. Under extraordinary circumstances, the Board may, at its sole discretion, choose to accept information or documentation not timely received.

**(c) Final Board determination.** Based on the evidence, the Board will make a final Board determination as to the party's violations or infractions, penalties, and public funds repayment obligation, and shall provide the party with a written copy of its determination. Such determination shall notify the party that it may be appealed within four months as set forth in Article 78 of the Civil Practice Law and Rules.

**(d) Payment.** If the Board has determined that the party must pay penalties or repay public funds, the party must make payment by the deadline set forth in the final Board determination. If these amounts are not paid by the payment deadline, they may be sought through appropriate legal action or, in the case of civil penalties against participants, by deduction from any public funds otherwise due for any election.

**(e) Penalty Guidelines.** The Board shall publicize staff guidelines for presumptive penalties to be recommended for certain violations of the Charter, Act, and these rules, subject to consideration of aggravating and mitigating factors that may be considered in determining the appropriate penalty assessment for the violation.

## § 10-04 Submission of false information.

If the Board has reason to believe that any individual or entity has knowingly submitted false information or fabricated evidence or has knowingly withheld or concealed information in a written or oral submission or representation to the Board, the Board may refer the matter to the appropriate agency for criminal prosecution and may commence a civil action to recover public funds and/or civil penalties, if appropriate.

# Chapter 11: Procedural Rules for Formal Adjudications

## § 11-01 Definitions.

Except as otherwise provided, the definitions set forth in section 1-02 apply in this chapter. In addition, the following terms mean:

**"Case"** means an adjudication pursuant to CAPA, § 1046 of the Charter.

**"Filing"** means submitting papers to the hearing officer, whether in person, by mail, or by electronic means, for inclusion in the record of proceedings in a case.

**"Petition"** means a document filed by the Board, analogous to a complaint in a civil action, which states the claims to be adjudicated.

**"Petitioner"** means the Board.

**"Respondent"** means a party against whom claims are asserted by the Board.

### § 11-02 Applicability.

(a) This chapter applies solely to cases that are subject to CAPA, including hearings, pre-hearing and post-hearing matters, brought by the Board pursuant to the Act or the Charter.

(b) In the event of any inconsistency between this chapter, other chapters of this title, and the rules of OATH, this chapter shall govern.

### § 11-03 Proceedings before designation of hearing officer.

Proceedings before the case is referred to a hearing officer shall be governed by § 1046 of the Charter and Chapters 9 and 10 of the Board rules.

### § 11-04 Designation of hearing officer.

The Board shall designate, at its sole discretion, one or more hearing officers to preside over cases pursuant to this chapter. The designated hearing officer(s) shall be: (i) one or more members of the Board; (ii) another person or persons assigned by the Board; or (iii) the chief administrative law judge of OATH or such administrative law judge as the chief administrative law judge may assign.

### § 11-05 Commencement of proceedings and pleadings.

**(a) The petition.**

(i) The Board shall institute proceedings pursuant to this chapter by serving a petition, sworn to or affirmed as to the truth thereof, on the respondent(s). The petition shall comply with the requirements in OATH Rules of Practice § 1-22. The petition shall set forth the facts which, if proved, constitute violations of the Act or these rules or require repayment of public funds.

(ii) The petition shall be accompanied by the following: notice of the respondent's right to file an answer, the deadline to file an answer, and the place(s) to serve and file an answer;

notice that failure to serve and file a timely answer shall be deemed an admission of all allegations contained in the petition; notice of the respondent's right to representation by an attorney or other representative; and notice that a person representing the respondent(s) must file a notice of appearance with the hearing officer.

**(b) Service of the petition.**

(i) The Board shall serve the petition upon the respondent(s).

(ii) Service of the petition may be made by regular first-class mail or electronic means to the respondent's last known residential or business address or last known email address or fax number.

(iii) Service of the petition shall be complete upon mailing, if service was by first-class mail, or upon the date of transmission, if service was by electronic means.

**(c) Answer.**

(i) The respondent(s) must file an answer to the petition with the hearing officer and serve the same answer on the Board.

(ii) If the petition was served on the respondent(s) by regular first-class mail, the answer must be filed and served within 26 calendar days of the date the petition was postmarked. If the petition was served on the respondent(s) by electronic means, the answer must be filed and served within 21 calendar days of the date of the transmission of the petition.

(iii) The answer may include affidavits or affirmations, documentary exhibits, or other evidentiary material in rebuttal of the petition. The answer may be accompanied by a memorandum of law.

(iv) If the respondent fails to serve and file a timely answer, all allegations of the petition shall be deemed admitted, and the case shall proceed as scheduled. If the answer fails to specifically address any allegation in the petition, such allegation shall be deemed admitted.

(v) The time to serve and file an answer may be extended only upon the consent of all parties or upon application to the hearing officer for good cause shown.

**(d) Amendment of Pleadings.** Pleadings shall be amended in accordance with OATH Rules of Practice § 1-25.

## § 11-06 Filing of Papers.

**(a) Generally.** The notice accompanying the petition shall notify the parties of the designated hearing officer(s) and of the place to file papers. Papers may be filed with the hearing officer in person, by mail or by electronic means.

**(b) Headings.** If an OATH index number has been assigned pursuant to section 11-07(c), the subject matter heading for each document must indicate the OATH index number.

**(c) Means of service on adversary.** Submission of papers to the hearing officer by electronic means, mail, or personal delivery without providing equivalent method of service to all other parties shall be deemed to be an ex parte communication.

**(d) Proof of service.** Proof of service must be maintained by the parties for all papers filed with the hearing officer. Proof of service must be in the form of an affidavit by the person effecting service, or in the form of a signed acknowledgement of receipt by the person receiving the papers. A written acknowledgment of service by the person served is adequate proof of service. Proof of service for papers served by electronic means, in addition to the foregoing, may be in the form of a record confirming delivery or acknowledging receipt of the electronic transmission.

## § 11-07 Docketing the Case at OATH.

(a) Only cases referred to OATH must be docketed, and only the Board may docket a case at OATH.

(b) Following service of the petition upon the respondent, the Board shall docket a case by delivering to OATH a completed intake sheet, with a petition and appropriate proof of service of the petition.

(c) When a case is docketed, OATH shall place it on the trial calendar, the conference calendar, or on open status. Cases involving the same respondent(s) shall be scheduled for joint hearings or conferences. The case shall be given an index number and assigned to a hearing officer pursuant to OATH Rules of Practice § 1-26(b).

(d) After docketing the case at OATH and selecting a hearing or conference date, the Board shall serve a notice of hearing or notice of conference on the respondent within five business days. The notice shall be served by first class mail or electronic means, and appropriate proof of service shall be maintained by the Board.

(e) A conference or hearing shall be scheduled for a date that is at least two weeks after the date the answer must be served and filed.



(f) The administrative law judge may determine that the case is not ready for a conference or hearing and may adjourn the conference or hearing, or may remove the case from the conference or hearing calendar and place it on open status.

## § 11-08 Disqualification of hearing officers.

Motions for disqualification of administrative law judges serving as hearing officers must be filed in accordance with OATH Rules of Practice § 1-27.

## § 11-09 Conferences.

(a) Only cases referred to OATH are eligible for conferences.

(b) Conferences may be held for the formulation and simplification of issues, the possibility of obtaining admissions or stipulations of fact and of admissibility and authenticity of documents, the order of proof and of witnesses, discovery issues, legal issues, pre-hearing applications, scheduling, and settlement of the case.

(c) Conferences may be scheduled at the discretion of the administrative law judge, whether or not a case has been placed on the OATH conference calendar, on the application of either party or sua sponte. At the discretion of the administrative law judge, conferences may be conducted by telephone.

(d) All parties are required to attend conferences as scheduled unless timely application for additional time is made to the administrative law judge.

(e) Settlement conferences and agreements must be conducted in accordance with OATH Rules of Practice § 1-31.

(f) If the case is not settled at the conference, outstanding pre-hearing matters, including discovery issues, must be raised during the conference. If the case is not settled at the conference, a hearing date may be set. The parties must know their availability and the availability of their witnesses for a hearing.

## § 11-10 Notice of conference or hearing.

(a) When a case is placed on either the conference calendar or the trial calendar, the Board shall serve the respondent(s) with notice in accordance with OATH Rules of Practice § 1-28.

(b) The notice of conference or hearing shall be served by first class mail or electronic means, and appropriate proof of service shall be maintained.

**§ 11-11 Adjournments.**

Applications for adjournments of conferences or hearings before OATH shall be governed by OATH Rules of Practice § 1-32.

**§ 11-12 Discovery.**

Discovery in OATH proceedings shall be conducted in accordance with OATH Rules of Practice § 1-33.

**§ 11-13 Pre-hearing motions.**

Pre-hearing motions pursuant to OATH proceedings shall be filed in accordance with OATH Rules of Practice § 1-34.

**§ 11-14 Appearances at OATH.**

Appearances at OATH shall comply with the requirements set forth in OATH Rules of Practice § 1-11.

**§ 11-15 Ex-parte communications.**

No ex parte communications, other than those related to ministerial matters regarding a conference or hearing, shall be made to a hearing officer.

**§ 11-16 Role of the hearing officer.**

In the conduct of an adjudication, a hearing officer may:

(a) administer oaths and affirmations, examine witnesses, rule upon offers of proof, receive written and oral testimony, and oversee and regulate discovery procedures;

(b) upon the request of any party, or subject to the hearing officer's discretion, subpoena the attendance of witnesses and the production of books, records, or other information;

(c) regulate the course of the hearing in accordance with section 11-20;

(d) dispose of procedural requests or similar matters;

(e) make findings of fact or decisions, determinations or orders, as authorized by law; and

(f) take any other action authorized by law or agency rule consistent therewith.

### § 11-17 Consolidation; separate hearings.

All or portions of separate cases may be consolidated for the hearing, or portions of a single case may be severed for separate hearings, in accordance with OATH Rules of Practice § 1-41.

### § 11-18 Witnesses and documents.

The parties must have all of their witnesses available on the hearing date. A party intending to introduce documents into evidence must bring to the hearing copies of those documents for the hearing officer, the witness, and the other parties. Repeated failure to comply with this section may be cause for sanctions, as set forth in OATH Rules of Practice § 1-13(e).

### § 11-19 Subpoenas.

Subpoenas may be issued in accordance with OATH Rules of Practice § 1-43.

### § 11-20 Order of proceedings.

Testimony and argument on the law and facts shall be presented in the following order: petitioner; witnesses called by the petitioner, if any; cross-examination; the respondent(s); witnesses called by the respondent(s); cross-examination; and closing statements. Each party shall be afforded an opportunity to present rebuttal testimony, if deemed appropriate by the hearing officer. Closing statements, if any, shall be made first by petitioner. The order of proceedings may be modified at the discretion of the hearing officer.

### § 11-21 Interpreters.

The hearing officer will make reasonable efforts to provide language assistance services to a party or its witnesses who are in need of an interpreter to communicate at a hearing or conference.

### § 11-22 Failure to appear.

All parties, counsel and other representatives are required to be present at the hearing and prepared to proceed at the time scheduled for commencement of the hearing, subject to the requirements set forth in OATH Rules of Practice § 1-45.

### § 11-23 Evidence at the hearing.

Evidence shall be governed by OATH Rules of Practice §§ 1-46 and 1-47.

### § 11-24 Official notice.

(a) In reaching a decision, the hearing officer may take official notice, before or after submission of the case for decision, on request of a party or sua sponte on notice to the parties,

of any fact which may be judicially noticed by the courts of this state, pursuant to OATH Rules of Practice § 1-48(a).

(b) Official notice may be taken, without notice to the parties, of rules published in the Rules of the City of New York or in The City Record, pursuant to OATH Rules of Practice § 1-48(b).

### § 11-25 Public access to proceedings.

Other than conferences, all proceedings shall be open to the public, in accordance with OATH Rules of Practice § 1-49.

### § 11-26 Hearing motions.

Motions may be made during the hearing orally or in writing, in accordance with OATH Rules of Practice § 1-50.

### § 11-27 Transcript.

Hearings shall be stenographically or electronically recorded, and the recordings shall be transcribed, in accordance with OATH Rules of Practice § 1-51.

### § 11-28 Decision made on the record.

The hearing officer may conclude a case by making a report and recommendation on the record.

### § 11-29 Written comments.

Once the hearing officer has issued a recommended final determination, each party shall have 20 days from issuance of the recommendation to submit written comments to the Board. The comments should raise any objections to the recommended determination, and objections not raised in the comments will be deemed waived in any further proceedings. Comments shall be limited to the record of the adjudicatory proceeding. Comments shall be served upon all other parties. Upon application filed with the Board's General Counsel, the General Counsel may shorten or extend the time for comments for good cause shown. No personal appearances shall be made before the Board unless the Board specifically requests that the parties appear.

### § 11-30 Final determination.

The Board shall provide a final determination affirming, rejecting, or modifying the hearing officer's recommended final determination within 30 days of the conclusion of the written comments period, or as soon thereafter as is practicable. The final determination shall notify the candidate of the commencement of the four-month period during which a special proceeding may be brought to challenge the Board's determination pursuant to Article 78 of the Civil Practice Law

and Rules. If the Board rejects or modifies the hearing officer's recommended final determination, the Board shall provide a written determination stating the basis for any assessed penalty or public funds determination, including any findings of fact and conclusions of law. Determinations made by the Board pursuant to this chapter may not be appealed to the Board unless the Board specifically provides otherwise in its determination.

# Chapter 12: Investigations and Complaints

### § 12-01 Investigations.

The Board may conduct an investigation into possible violations of the Charter, Act, or these rules. In its investigation, the Board may use its investigative powers pursuant to § 1052(a)(5) of the Charter and §§ 3-708(5) and 3-710(1) of the Code. An investigation may include, but is not limited to, field investigations, desk and field audits, the issuance of subpoenas, the taking of sworn testimony, the issuance of document requests and interrogatories, and other methods of information gathering.

### § 12-02 Complaints.

**(a) Filing a complaint.** A complaint must be filed by hand delivery, mail, fax, or scanned and sent as an attachment via email to the Board's offices.

**(b) Complaint requirements.** Complaints must:

(i) be made in writing;

(ii) be sworn to or affirmed;

(iii) be based on personal knowledge, if possible, and if a complaint is based on information and belief, the complainant must state the source of that information and belief;

(iv) specify the conduct alleged to be in violation of the Charter, Act, or these rules, and to the extent known:

(A) the date(s) and time(s) of the conduct,

(B) the place(s) the conduct occurred, and

(C) the names of witnesses, if any.

(v) be accompanied by copies of all documentary evidence available to the complainant; and

(vi) contain the complainant's full name, current address, telephone number, and email address.

**(c) Initial review of complaint.**

**(i) If in compliance.** Upon receipt, the complaint will be reviewed for substantial compliance with the above requirements. If the complaint is in compliance, the Board shall, within 10 days of receipt, send each party complained about a copy of the complaint.

**(ii) Deficient complaints.**

(A) If the complaint is moot, facially meritless, or not in substantial compliance, it may be rejected and the complainant so notified.

(B) The Board may investigate the subject matter of the complaint, but need not follow the procedural requirements of this chapter.

**(d) Response to complaint; possible dismissal.**

(i) The party complained about may submit an answer to the complaint:

(A) within 20 days of the date the complaint was sent by the Board, or

(B) within such lesser time as may be specified by the Board for complaints received less than 90 days before an election.

(ii) The answer must:

(A) be sworn to and affirmed,

(B) set forth a response to the allegations contained in the complaint, including any reasons why the Board should dismiss the complaint in full or in part, if applicable, and

(C) be accompanied by copies of all documentary evidence available to the respondent.

(iii) Based on the answer, a complaint may be dismissed as moot.

**(e) Board action.** Based on its review of the complaint and any answer filed, and of any investigation it chooses to conduct, the Board may:

(i) determine the complaint to be moot or lacking in merit and dismiss the complaint; or

(ii) determine that violations or infractions of the Charter, Act, or these rules have been substantiated, and initiate an enforcement proceeding pursuant to the procedures outlined in Chapter 10.

# Chapter 13: Transition and Inauguration Entities

## § 13-01 Registration.

(a) Before any private funds are raised or spent for transition or inauguration into office, the elected candidate must register a TIE with the Board; provided, however, that donations may be accepted prior to the registration of the TIE for the purpose of paying fees and depositing any minimum balance required to open a bank account for the TIE.

(b) The registration may be submitted at any time between the day after the general election and the due date of the first disclosure statement following the date of the candidate's election, at such time as the form is made available by the Board; provided, however, that a candidate who wins the primary election and is unopposed on the ballot in the general election may register a TIE beginning on the day after the date on which the results of such primary election are certified by the Board of Elections or when the general election ballot is set, whichever is later.

(c) The elected candidate must register no more than one TIE per election, and such TIE must have no more than one bank account. The elected candidate may not use any other bank accounts, including those of the candidate or any political committee.

(d) The registration must be submitted in such form and manner as shall be provided by the Board and must contain all information required by the Board, including: (i) the name and address of the elected candidate and of the TIE; (ii) the name, address, and employment information of the treasurer and of the liaison, if any; (iii) information about the TIE's bank account and merchant account; and (iv) any signatures and notarizations as may be required by the Board.

## § 13-02 Periodic disclosure reports.

**(a) Required information.** Disclosure reports must contain all information for the reporting period required by the Board, including:

(i) the cash balance at the beginning and end of the reporting period;

(ii) total itemized and unitemized donations, loans, and other receipts accepted during the reporting period;

(iii) total itemized and unitemized expenditures made during the reporting period;

(iv) for each donation accepted in excess of $99, the contributor's and intermediary's (if any) full name, residential address, occupation, employer, and business address;

(v) the date and amount of each donation accepted or other receipt;

(vi) the form of the donation (cash, check, cashier's check, money order, credit card, text, or other);

(vii) the number of the check, cashier's check, or money order, if applicable;

(viii) the date and amount of each donation returned to a donor, the account from which the funds used to make the return originated, and, if applicable, the number of the check used to issue the return of funds;

(ix) each previously reported donation for which the check was returned unpaid;

(x) for each loan accepted, the lender's, guarantor's or other obligor's full name, residential address, occupation, employer, and business address;

(xi) the date and amount of each loan, guarantee, or other security for a loan accepted;

(xii) for each loan repayment made, the date, amount, check number, name of bank account or credit card, and name of any third party payor;

(xiii) the date and amount of any portion of a loan which has been forgiven;

(xiv) the bill or invoice date and amount, name and address of the vendor or payee, the purpose code and explanation of each expenditure;

(xv) the date and amount of each payment;

(xvi) the payment method, including check number and committee bank account;

(xvii) the amount of remaining outstanding liability to the vendor or payee;

(xviii) for each in-kind donation, the date the donation was made, the name and residential address of the donor, a detailed description of the goods or services provided, the amount of the fair market value of the donation, and such further information and documentation as necessary to show how the fair market value of the donation was determined; and

(xix) such other information as the Board may require.

**(b) Unitemized expenditures.** Expenditures of less than $50 do not need to be separately itemized in a disclosure statement.

(c) All information reported in disclosure reports and amendments must be accurate as of the last day of the reporting period.

**(d) Electronic submissions.** Disclosure report submissions must follow the submission standards applicable to candidates under Chapter 4 of these rules.

**(e) Monthly reports.**

(i) The first report is due on the fifth business day of the month immediately following the month during which the TIE first registers.

(ii) The first report must cover the period from the day of the first financial activity of the TIE through the last day of the calendar month immediately preceding the month in which the report is due. Each subsequent report shall cover the next consecutive calendar month, and shall be due on the fifth business day of the subsequent month.

(iii) The final report must cover the period from the day after the conclusion of the preceding report through the day the TIE terminates its activities and must be filed within five business days of such termination.

(iv) Disclosure reports that fail to comply substantially with the disclosure requirements described in the Act or these rules will not be accepted by the Board. Amendments to disclosure reports are prohibited unless expressly authorized or requested by the Board.

(v) The disclosure report must contain a verification from the elected candidate, treasurer, or other officer designated in the registration that the disclosure report is true and complete to the best of such elected candidate, treasurer, or other designee's knowledge, information, and belief, and must contain such signatures as may be required by the Board.

## § 13-03 Limits and requirements.

The following limits and requirements apply pursuant to § 3-801 of the Code.

**(a) Donations and receipts.**

(i) An elected candidate must not: (A) authorize or register a political committee to raise or spend funds for transition or inauguration into office; (B) use funds accepted by a political committee authorized by the candidate for transition or inauguration into office; (C) authorize or register a previously existing entity to raise or spend funds for transition or inauguration into office; (D) continue a TIE in existence after it has paid all liabilities it incurred for transition and inauguration into office and otherwise has disposed of all funds pursuant to paragraph (ii) of subdivision (c) below; or (E) continue in existence an entity registered under section 13-01 after (1) April 30 in the year following the year of the election, or (2) in the case of a special election, 60 days after inauguration.

(ii) A TIE must not:

(A) accept donations or other receipts from any political committee authorized by the elected candidate;

(B) accept donations from a political committee that has not registered with the Board under § 3-801(3) of the Code on a form that includes the information set forth in section 5-04(a) (political committees registered for an election cycle pursuant to § 3-707 of the Code shall be deemed registered for purposes of § 3-801(3) of the Code with respect to transition and inauguration expenditures immediately following an election held in that cycle);

(C) accept donations in excess of the donation limits set forth in § 3-801(2)(b) of the Code;

(D) accept cash donations totaling more than $100 from a single donor;

(E) accept any donations after all liabilities are paid;

(F) accept any donations from any corporation, limited liability company, limited liability partnership, or partnership;

(G) accept any donations from any individual or entity whose name appears in the doing business database as of the date of such donation; provided, however, that this limitation on donations shall not apply to any donation made by a natural person who has business dealings with the city where such donation is from the elected candidate, or from the elected candidate's parent, spouse, domestic partner, sibling, child, grandchild, aunt, uncle, cousin, niece or nephew by blood or by marriage; or

(H) commingle receipts in any account with personal or business funds, or funds accepted for an election.

(iii) An elected candidate may donate to such elected candidate's TIE with such elected candidate's personal funds or property, make in-kind donations to such elected candidate's TIEs with such elected candidate's personal funds or property, and make advances to such TIE with such elected candidate's personal funds or property, without regard to the donation limits of § 3-801(2)(b) of the Code. An elected candidate's personal funds or property shall include such elected candidate's funds or property jointly held with such elected candidate's spouse, domestic partner, or unemancipated children.

(iv) In determining compliance with the donation limits of § 3-801(2)(b) of the Code, the Board shall total all donations from a single source to the TIE, using the definition of "single source," and the factors for so determining, pursuant to sections 1-02 and 5-10(b).

(v) Any donation, loan, or other receipt received by a TIE after January 31 in the year following the date of a regularly scheduled general election shall be presumed to be for the next election in which the elected candidate is a candidate following the day that it is received, and not received for the purposes of transition or inauguration.

(vi) Loans are deemed to be donations, subject to the limits and restrictions of the Act, to the extent the loan is not repaid by, or is made after, the date of the elected candidate's inauguration into office.

**(b) Expenditures.**

(i) Funds raised for a TIE may not be used for any purpose other than transition or inauguration expenses. Expenses related to the holding of office, or related to any past or future election, are prohibited. The following are examples of types of expenditures that are presumed to be TIE-related:

(A) Transition.

(1) Conferences and seminars related to city government and elected service;

(2) Costs related to seeking and selecting city office staff;

(3) Payroll and consulting fees directly related to transition;

(4) Costs related to fundraising to pay for transition expenses; and

(5) Expenditures made for the purpose of furthering the elected candidate's selection as Speaker of the City Council.

**(B) Inauguration.**

(1) Payroll and consulting fees directly related to holding an inauguration event;

(2) Printing and postage for inauguration event invitations;

(3) Inauguration event site and equipment rental;

(4) Inauguration event catering, decoration, entertainment, and photography; and

(5) Costs related to fundraising to pay for inauguration event.

(ii) There is a rebuttable presumption that the purchase of durable goods is not TIE-related.

(iii) Transition expenditures may not be incurred after the elected candidate assumes office, and inauguration expenditures may not be incurred after January 31 in the year after the year of the election, except for:

(A) expenditures related to fundraising to satisfy transition liabilities incurred on or before the elected candidate assumes office or inauguration liabilities incurred on or before January 31, and

(B) routine and nominal expenditures associated with and necessary for satisfying such liabilities, terminating the entity, and responding to the post-election audit.

(iv) Unless permitted by paragraph (iii) of subdivision (b) above, any expenditure incurred after January 31 in the year following the date of a regularly scheduled general election by a TIE shall be presumed to be for the next election in which the elected candidate is a candidate following the day that it is incurred, and not incurred for the purposes of transition or inauguration.

(v) A TIE may maintain a petty cash fund of no more than $500 out of which it may make disbursements not in excess of $100 per transaction. The TIE must maintain a petty cash journal including the name of every individual or entity to whom any disbursement is made, as well as the date, amount, and purpose of the disbursement.

**(vi) Single inaugural event.** No more than one inaugural event shall be presumed to be TIE-related.

**(c) Termination.**

(i) The TIE must be terminated after it has paid all liabilities and otherwise disposed of all funds pursuant to paragraph (ii) below and, in any event, no later than April 30 in the year following the election.

(ii) If a TIE has funds remaining after all liabilities have been paid, it shall refund such funds to one or more of its donors, or if that is impracticable, issue a payment to the Fund.

## § 13-04 Records and audit.

(a) Each TIE must keep records that enable the Board to verify the accuracy of disclosure reports and compliance with all requirements of § 3-801 of the Code and this chapter. The records kept must be clear, accurate, and sufficient to demonstrate compliance. The records must be made and maintained contemporaneously with the transactions recorded, and maintained and organized in a manner that facilitates expeditious review by the Board.

(b) The records that must be kept include:

(i) Copies of all deposit slips;

(ii) A copy of each check or other monetary instrument, other than cash, representing a donation or other monetary receipt;

(iii) For each cash, credit card, cashier's check, or money order donation received, a written record containing (i) the donor's residential address, employer, business address, and occupation, (ii) the date and amount of the donation, (iii) if any, the intermediary's name,

address, employer, business address, and occupation, and (iv) for cash, cashier's check, and money order donations, the donor's signature;

(iv) For each in-kind donation, a receipt or other written record showing how the value of the donation was determined;

(v) Each contract, invoice, bill, and receipt for goods or services provided;

(vi) Written documentation for each loan received, loan repayment, and loan forgiven;

(vii) A monthly billing statement or customer receipt for each disbursement to a TIE credit card account showing vendors underlying the disbursement; and

(viii) The following from banks and other depositories relating to accounts:

(A) all periodic bank or other depository statements in chronological order, maintained with any other related correspondence received with those statements, such as credit and debit memos and donation checks returned because of insufficient funds; and

(B) the front and back of all returned and cancelled disbursement checks.

(c) All of the TIE's records are subject to Board review and must be made available to the Board upon its request, within such time as shall be specified by the Board.

(d) Each TIE must retain all records and documents required to be kept pursuant to section 13-04 for five years after the date of its registration.

## § 13-05 Other provisions concerning TIEs.

*See* sections 9-02(c)(i) (Final bank balance); 10-03 (Enforcement); 15-07 (Special elections); Chapter 12 (Complaints).

# Chapter 14: Disclosure of Independent Expenditures

## § 14-01 Definitions.

Except as otherwise provided, the definitions set forth in section 1-02 apply in this chapter. In addition, the following terms mean:

**"Authorized representative"** means an officer or owner of an independent spender who is authorized to submit, and is jointly responsible with the spender for, independent expenditure reports.

**"Ballot proposal"** means a municipal ballot proposal, initiative, measure, or referendum. Activities associated with ballot proposals initiated by petition include the circulation of petitions

to place the proposal on the ballot. Activities associated with ballot proposals not initiated by petition include those conducted after the measure or language is filed with the City Clerk.

**"Clearly identified"** means: (1) the name of the candidate or ballot proposal appears; (2) a photograph or drawing of the candidate appears; or (3) the identity of the candidate or ballot proposal is otherwise apparent by unambiguous reference.

**"Contribution"** means any monetary gift made to an entity. Contributions do not include membership dues paid by an individual or revenue from goods and services.

**"Covered communication"** means an express advocacy communication or electioneering communication.

**"Covered election"** means a covered election as defined in § 1052(a)(15)(a)(iii) of the Charter.

**"Covered expenditure"** means an expenditure directly related to the design, production, or distribution of a covered communication. An expenditure made during the ordinary conduct of business in connection with covering or carrying a news story, commentary, or editorial by any broadcasting station (including a cable television operator, programmer, or producer), website, newspaper, magazine, or other periodical publication, including any internet or electronic publication, is not a covered expenditure.

**"Electioneering communication"** means a communication that: (1) is disseminated by radio, television, cable, internet, or satellite transmission; or is a paid advertisement; or is a communication that is delivered or served in any medium to specific individuals if 500 or more messages of substantially similar nature are transmitted within a 30-day period; (2) is disseminated within 60 days of a covered primary, general, or special election; and (3) refers to one or more clearly identified ballot proposals or candidates for a covered election. Electioneering communication does not include a candidate-related communication made by an organization operating and remaining in good standing under § 501(c)(3) of the Internal Revenue Code of 1986.

**"Entity"** means an entity as defined in § 1052(a)(15)(a)(ii) of the Charter.

**"Express advocacy communication"** means a communication disseminated in any written, audio, or video format that contains a phrase including, but not limited to, "vote for," "re-elect," "support," "cast your ballot for," "(Candidate) for (elected office)," "vote against," "defeat," "reject," or "sign the petition for," or a campaign slogan or words that in context and with limited reference to external events, such as the proximity to the election, can have no reasonable meaning other than to advocate the election, passage, or defeat of one or more clearly identified ballot proposals or candidates in a covered election and is (1) distributed to the general public in any medium or (2) delivered or served to individuals if 500 or more messages of a substantially similar nature are transmitted within any 30-day period.

**"Independent expenditure"** means an independent expenditure as defined in § 1052(a)(15)(a)(i) of the Charter.

---

"**Independent spender**" means an individual or entity that makes an independent expenditure, or an agent of such individual or entity.

"**Principal owner**" means an individual or entity that owns or controls 10% or more of an entity, including stockholders and partners.

## § 14-02 Disclosure statements.

Each disclosure statement must include the following information:

**(a) Filer information.**

(i) All independent spenders must provide their:

(A) name, mailing address, telephone number, email address, and employer information;

(B) contact person's name, mailing address, email address, telephone number, and employer information; and

(C) other similar information that may be required by the Board.

(ii) Independent spenders that are entities must also provide their:

(A) website URL;

(B) authorized representative's name, mailing address, email address, telephone number, and employer information;

(C) type of organization;

(D) name(s) of principal owners, and employer information for any such owners who are individuals; and

(E) name and employer information of board members and officers or their equivalents.

(iii) Independent spenders that are individuals must also provide their occupation and employer information.

**(b) Communications.**

(i) When an independent spender makes covered expenditures aggregating $1,000 or more during an election cycle for communications that refer to a specific candidate or ballot proposal, it must report these communications and each future communication associated with an expenditure of $100 or more that refers to that candidate or ballot proposal. Aggregate expenditures to a single vendor of less than $100 shall not be covered

Back to TOC

expenditures for the purposes of this subdivision. Each communication must be disclosed in the reporting period in which it is first published, aired, or otherwise distributed, except that no communication is required to be disclosed before the $1,000 threshold has been reached. For each communication, the independent spender must provide:

(A) The type of communication;

(B) Its distribution date;

(C) The names of the candidates and/or ballot proposals referred to in the communication;

(D) For a visual communication, an electronic or paper copy of the communication as it was distributed to the public;

(E) For an audio or video communication, a copy of the communication as it was distributed to the public, except for a live telephone call or an audio communication of which recording is not available, a script will be accepted;

(F) For any communication containing a website link, the URL and an image of the link destination; and

(G) Such other similar information as the Board may require.

(ii) A mass mailing shall be considered to have been distributed on the date on which it was postmarked, or accepted by a common carrier.

**(c) Expenditures.**

(i) When a covered communication has been reported, each covered expenditure of $100 or more associated with that communication must be reported. If the communication refers to more than one candidate or ballot proposal, only those expenditures for candidates or ballot proposals that have met the $1,000 threshold need be reported. Each expenditure must be disclosed in the reporting period in which the expenditure is incurred, except that no expenditure is required to be disclosed prior to the reporting of its associated communication. For each expenditure, the independent spender must provide:

(A) The names of the candidates or ballot proposals referred to by the associated communication;

(B) The name of the vendor;

(C) The date, amount, and purpose;

(D) The names of the individuals or entities paying for the expenditure, if not the independent spender;

(E) The itemized invoice detailing the expenditure, when it becomes available; and

(F) Such other similar information as the Board may require.

**(ii) Valuation.** All expenditures must be reported at their fair market value. If it is not practicable to obtain an invoice, the independent spender must use a reasonable estimate of fair market value and must provide a written record supporting the estimate.

**(iii) Apportionment.** For reporting purposes, an expenditure associated with a communication that refers to more than one candidate or ballot proposal shall be apportioned among the candidates or ballot proposals based on the following factors:

(A) The focus of the communication;

(B) The geographic distribution or location of the communication;

(C) The subject matter of the communication;

(D) The relative prominence of references to or the appearance of a candidate or ballot proposal in the communication, including the size and location of references to the candidate or ballot proposal and any photographs of the candidate;

(E) The timing of the communication; and

(F) Other circumstances of the communication.

**(d) Contributions.**

(i) When an independent spender that is an entity makes covered expenditures of $100 or more aggregating $5,000 or more in the 12 months preceding the election for communications that refer to any single candidate, it is required to report:

(A) All contributions accepted from other entities since the first day of the calendar year preceding the year of the covered election; and

(B) All contributions aggregating $1,000 or more accepted from an individual during the 12 months preceding the election.

(ii) Each contribution must be disclosed in the reporting period in which it was received. For each contribution, the independent spender must provide:

(A) For each contribution accepted from another entity, the entity's name, address, and type of organization and the names of the entity's principal owners, partners, board members and officers, or their equivalents, or, if no natural persons exist in any such role, the name of at least one natural person who exercises control over the activities of such entity;

(B) For each entity from which contributions aggregating $50,000 or more have been accepted in the 12 months preceding the election (the "major contributor"), (A) the name, address, and type of each entity that contributed $25,000 or more to the major contributor in the 12 months preceding the election; and (B) the name, residential address, occupation, and employer of each individual who contributed $25,000 or more to the major contributor in the 12 months preceding the election;

(C) For each contribution accepted from an individual, the individual's name, residential address, occupation, and employer;

(D) The date of receipt and amount of each such contribution accepted by the independent spender or the major contributor; and

(E) Such other similar information as the Board may require.

(iii) Exemption for earmarked contributions. Contributions to independent spenders or major contributors that are earmarked for an election that is not a covered election, or for an explicitly stated non-electoral purpose, are not required to be reported; provided, however that records of such contributions to independent spenders must be maintained and may be requested by the Board to verify their qualification for this exemption.

**(e) Verification.** Each independent spender filing a disclosure statement must verify that each reported expenditure referring to a candidate was not authorized, requested, suggested, fostered, or cooperated in by such candidate, an agent of such candidate, an opponent of such candidate, or an agent of such opponent. The independent spender must verify that the disclosure statement is true and complete to the best of the filer's knowledge, information, and belief. The disclosure statement must contain such signatures or notarizations and other verifications as may be required by the Board.

**(f) Format.** All disclosure statements must be submitted electronically as specified by the Board. Supporting documents must be submitted electronically, by hand, or by common carrier.

## § 14-03 Disclosure dates.

**(a) Filing dates.**

(i) Disclosure statements are due every Monday of the election year until and including the fourth Monday after the general election.

(ii) During the 14 days before a primary or general election, an independent spender must submit a disclosure statement to the Board within 24 hours of distributing any reportable communication, making any reportable expenditure, or receiving any reportable contribution.

(iii) An independent spender that has not distributed any reportable communications, made any reportable expenditures, or received any reportable contributions within a reporting period is not required to file a disclosure statement for that period.

**(b) Reporting periods.**

**(i) First disclosure statement.**

(A) The reporting period for the first disclosure statement containing communications or expenditures related to candidates in a primary or general election begins on the first day of the election cycle.

(B) The reporting period for the first disclosure statement for communications or expenditures related to ballot proposals begins on the first day of January in the year in which the proposal appears on the ballot.

**(ii) Each subsequent disclosure statement.** The reporting period for each subsequent disclosure statement begins on the preceding Monday.

**(iii) Conclusion of reporting period.** The reporting period for all disclosure statements concludes on and includes the day before the filing due date.

## § 14-04 Identification of communications.

**(a) Independent spender identification.** When an independent spender makes covered expenditures of $100 or more aggregating $1,000 or more during an election cycle, the communication associated with the expenditure that meets the $1,000 threshold and all subsequent communications, regardless of dollar value, must include:

**(i) Visual communications.** For visual, non-video communication in any medium, the words "Paid for by" must appear, followed by (A) the name of the independent spender; (B) if the spender is an entity: (1) the name of any individual or entity that owns or controls more than 50% of the independent spender, (2) the name of the independent spender's chief executive officer or equivalent, if any, and (3) the independent spender's top donors as described in subdivision (b) of this section; and (C) the words "Not expressly or otherwise authorized or requested by any candidate or the candidate's committee or agent. More information at nyc.gov/FollowTheMoney". Such words must appear in a conspicuous size and style and must be enclosed in a box within the borders of the communication.

**(ii) Video communications.** For a video communication in any medium, the words "Paid for by" followed by the name of the independent spender must be clearly spoken at the beginning or end of the communication in a pitch and tone substantially similar to the rest of the communication. Additionally, simultaneous with the spoken disclosure, in a conspicuous size and style and enclosed in a box, the words "Paid for by" must appear followed by: (A) the name of the independent spender; (B) if the spender is an entity, the

spender's top donors as described in subdivision (b) of this section; and (C) the words "Not expressly or otherwise authorized or requested by any candidate or the candidate's committee or agent. More information at nyc.gov/FollowTheMoney".

**(iii) Audio communications.** For an audio communication in any medium, including automated telephone calls, the words "Paid for by" followed by (A) the name of the independent spender; (B) if the spender is an entity, the spender's top donors as described in subdivision (b) of this section; and (C) the words "Not expressly or otherwise authorized or requested by any candidate or the candidate's committee or agent. More information at nyc.gov/FollowTheMoney", must be clearly spoken at the end of the communication in a pitch and tone substantially similar to the rest of the communication. For radio and internet audio communications of 30 seconds in duration or shorter, except for telephone calls, subparagraph (B) of this paragraph may be omitted.

**(iv) Non-automated telephone calls longer than 10 seconds.** For non-automated telephone calls lasting longer than 10 seconds, the words "This call is paid for by" followed by the name of the independent spender and the words "Not expressly or otherwise authorized or requested by any candidate or the candidate's committee or agent. More information is available at nyc.gov/FollowTheMoney" must be clearly spoken during the call in a pitch and tone substantially similar to the rest of the call.

**(v) Impracticability.** If it is impracticable to display a clearly readable notice in an online communication that contains a link to a location controlled by the independent spender, the communication may contain the words "Paid for by" followed by the name of the independent spender, provided that the full text of the required notice must appear at the redirected location.

**(b) "Top donor(s)" identification.** Identification of an independent spender's top donors in a communication shall be as follows:

(i) A spender's top donors are its largest aggregate contributors during the 12 months preceding the election, in descending order by aggregate amount, who have contributed at least $5,000.

(ii) If there are at least three such donors:

(A) Written identification shall be the words "Top Three Donors" followed by the names of such donors;

(B) Video identification shall be the words "The top three donors to the organization responsible for this advertisement are" followed by the names of such donors;

(C) Audio identification shall be the words "with funding provided by" followed by the names of such donors;

(D) If the third largest donor has donated the same amount as the fourth largest donor, the independent spender may choose which three donors to include, so long as no donor is included that has donated less than any other donor that is not included.

(iii) If there are only two such donors, the words "Top Donors" must replace "Top Three Donors."

(iv) If there is only one such donor, the words "Top Donor" must replace "Top Three Donors."

(v) If there are no such donors, all references to donors must be removed from the identification.

**(c) Languages other than English.** All written or spoken identification required by this section must be in the primary language of the communication, except that the web address nyc.gov/FollowTheMoney, if required to be written or spoken in the identification, must be in English.

**(d) Modification.** The requirements of this section may be modified by the Board concerning items upon which identification would be impracticable, pursuant to § 1052(a)(15)(c)(i) of the Charter or any other items whose disclosures are not otherwise provided for in § 1052(a)(15)(c) of the Charter.

(e) This section shall not apply to communications required to include a disclosure pursuant to § 3-703(16) of the Code.

## § 14-05 Non-independent expenditures.

An expenditure by an individual or entity referring to a candidate, that was authorized, requested, suggested, fostered by, or cooperated in by such candidate or the opponent of such candidate, or their agents, is not an independent expenditure and is not governed by this Chapter. Factors used by the Board to determine whether an expenditure is independent or non-independent are referenced in section 6-04(a).

## § 14-06 Guidance for independent spenders.

Prior to dissemination of a communication, an individual or entity may seek guidance regarding whether the communication would be subject to these rules by submitting a written request in the form and manner prescribed by the Board, including a description or sample of the proposed communication and a description of its proposed dissemination. If the request is received more than 14 days before the election, guidance shall be provided within seven days, and if such request is received during the 14 days prior to the election, guidance shall be provided within 24 hours. Such guidance applies only to the communication exactly as submitted and disseminated

Back to TOC

exactly as described, and constitutes neither approval nor disapproval of the content, appropriateness, or accuracy of the communication.

### § 14-07 Document retention.

Independent spenders must provide documentation to the Board upon request, and must maintain for three years after the date of the election to which they apply:

(a) records that enable the Board to verify the accuracy of disclosure statements, including bills for goods or services used to produce and disseminate a communication, as well as records of all contributions received by independent spenders that are entities; and

(b) copies of all advertisements, pamphlets, circulars, flyers, brochures, and other printed communications disseminated, and a schedule of all radio or television time purchased, and scripts used therein or the audio or video source files. Documents previously provided to and received by the Board do not need to be maintained by the independent spender.

### § 14-08 Penalties.

Any independent spender who violates any provision of this chapter, and any agent of an independent spender who commits such a violation, shall be subject to a civil penalty in an amount not in excess of $10,000.

### § 14-09 Other provisions concerning independent expenditures.

*See* sections 15-06 (Special elections); 10-03 (Enforcement); Chapter 12 (Complaints).

## Chapter 15: Special Elections

### § 15-01 Special requirements and procedures.

If a special election to fill a vacancy is declared, the Board, after considering the date of the election and any other relevant factors, may provide for special requirements and procedures for candidates, including:

(a) a standard by which contributions, loans, and expenditures are presumed to be accepted or made for the special election, notwithstanding sections 5-10(a), 5-09(h), and 6-01(h)(i); and

(b) such other requirements and procedures as the Board may deem necessary to implement the provisions of the Act in the special election fully and effectively.

**§ 15-02 Filing requirements.**

**(a) Certification.** Candidates who wish to participate in the Program for a special election must file a Certification with the Board specifically for such election. The Certification must be filed on or before the 14th day after the proclamation of such election and may not be rescinded.

**(b) Filer Registration.** Candidates who do not wish to participate in the Program are not required to file a Certification, but must file a Filer Registration specifically for the special election with the Board.

**(c) Candidates raising funds for other elections within the same election cycle.** Candidates who have already been raising funds for other elections occurring after the special election, but within the same election cycle, may use their existing committee bank accounts in the special election, provided that they submit a new Filer Registration or Certification with the Board to reflect the change in election, and further provided that once such committee and account have been used for the special election, they must not be used for any future election, including any other elections during the same election cycle.

**(d) Disclosure statements.**

**(i) Post-election financial activity.** Financial activity that occurred after a candidate's most recent election prior to a special election will be considered to be for such special election.

**(ii) First disclosure statement.** The first disclosure statement for a special election is due 32 days before the election unless otherwise provided by New York State Election Law. As provided pursuant to New York State Election Law, if the first disclosure statement for a special election is otherwise due within a period of five days of a required semi-annual disclosure statement, the candidate may file a single combined statement on the date on which the latter of the two separate statements is required to be filed.

(A) The reporting period for the first disclosure statement shall conclude on the 36th day before the election, unless otherwise provided pursuant to New York State Election Law. If a candidate is already registered for a future election and an intervening special election is called, the candidate is required to re-register with the Board for the special election and re-submit all of the candidate's financial activity with such candidate's first special election disclosure statement.

(B) Submissions required by paragraph (ii) above shall cover the reporting periods of the missing disclosure.

**(iii) Semi-annual disclosure statements.** Semi-annual disclosure statements are due on January 15 and July 15 in each year of the election cycle and in each year thereafter, until

the candidate files a disclosure statement showing satisfaction of all liabilities and disposition of all assets.

**(iv) Daily disclosures during the two weeks preceding the election.** If a candidate, during the 14 days preceding an election, accepts aggregate contributions and/or loans from a single source in excess of $1,000 or makes aggregate expenditures to a single vendor in excess of $20,000, the candidate must report, in a disclosure to the Board, all contributions and loans accepted from such source or expenditures made to such vendor during that 14-day period. The first such disclosure must be received by the Board within 24 hours after the contribution or loan that causes the total to exceed $1,000 is accepted or the expenditure that causes the total to exceed $20,000 is made. Each subsequent disclosure must be received by the Board within 24 hours after any additional contribution or loan is accepted or expenditure is made. Information reported in these disclosures must also be included in the candidate's next post-election disclosure statement.

**(v) Post-election disclosure statements.** Post-election disclosure statements must be filed 27 days after the special election and on each January 15 and July 15 following the election until the candidate files a final statement showing satisfaction of all liabilities and disposition of all assets. If the disclosure statement due 27 days after the special election is otherwise due within five days of a required disclosure statement, a single combined statement may be filed on the date on which the latter of the two separate disclosure statements is required to be filed.

**(vi) Disclosure statement amendments.** The Board shall not make payments based on disclosure statement amendments filed after the final disclosure statement; provided, however, that the Board may make payments based upon such amendments solely if they are made in response to invalid matching claims reports to which the Board has requested a response after the final disclosure statement.

**(vii) Bank statements.** Each disclosure statement submitted by the candidate must include a copy of the most recent bank statements for the candidate's special election account.

**(viii) Special election due dates for compliance with § 12-110 of the Code.** The candidate's compliance with the requirements in § 12-110 of the Code shall be considered timely demonstrated to the Board if the Board receives confirmation of the candidate's compliance on or prior to the due date of the first disclosure statement required to be filed with the Board pursuant to section 15-02(d)(ii).

## § 15-03 Expenditures.

**(a) Limit.** The expenditure limit for a special election is the same as the limit for a primary or general election.

(b) Expenditures are presumed to be subject to the special election expenditure limit on and after the date a special election was first reasonably anticipated, as determined by the Board. Expenditures incurred prior to the date such election was reasonably anticipated may also be presumed to be subject to the special election expenditure limit beginning when a candidate committee has already registered for the covered office that is the subject of such special election, or has begun raising or spending funds.

(c) Candidates may present evidence to the Board demonstrating the date a special election was first reasonably anticipated.

(d) Candidates who have received public funds for a special election may not make expenditures after such election, except for narrowly defined purposes as provided in section 9-02(c), until any required public funds repayments are made to the Board. Expenditures made after a special election by the special election committee are presumed to be for the next election and are covered by the expenditure limit applicable to such election, pursuant to section 6-01(h)(i).

**(e) Qualified expenditures.**

(i) Public funds received for a special election to fill a vacancy may be used only for expenditures made by a candidate to further the candidate's nomination or election to fill such vacancy, and may not be used for any expenditure that is not qualified as defined in § 3-704 of the Code and section 6-02(a). An expenditure made prior to the date on which a vacancy was declared shall be presumed not to be in furtherance of the candidate's nomination or election, unless the candidate provides evidence demonstrating that the vacancy was reasonably anticipated when the expenditure was made.

(ii) Expenditures incurred outside of the calendar year in which the special election is held are presumed not to be qualified, unless the proclamation and the special election occur in different calendar years.

(iii) It is presumed that the following bills for goods and services are not qualified campaign expenditures:

(A) bills for a special election that are first reported in a disclosure statement submitted later than the first post-election disclosure statement applicable to that special election; and

(B) bills first reported in an amendment to a disclosure statement that is made after the special election.

## § 15-04 Contributions.

**(a) Limit.** The contribution limit for a special election is one half of the contribution limit applicable to the office for which the special election is occurring.

(b) Contributions received after a candidate's most recent election and prior to a special election are presumed to be for such special election, except that contributions received on or before the date the special election was first reasonably anticipated, which do not exceed the applicable contribution limit, will not be presumed to be for the special election.

(c) For contributions received on or before the date the special election was first reasonably anticipated which are in excess of the contribution limit for the special election, the authorized committee established for such special election must refund the excess portion to the contributor.

(d) Candidates may present evidence to the Board demonstrating the date a special election was first reasonably anticipated.

(e) **Public funds.** To receive public matching funds, candidates in a special election must meet the same threshold and eligibility requirements as candidates in a primary or general election; provided, however, that the threshold dollar amount of summed matchable contributions shall be halved in a special election for mayor, public advocate, or comptroller. A candidate in a special election must respond to an invalid matching claims report no later than the deadline set by the Board. The Board shall schedule at least three payment dates in the 30 days prior to a special election.

(f) **Bank account.** Candidates must use a special election account.

(g) Receipts accepted for a special election may not be commingled in any account with receipts accepted for another election, with receipts accepted for a TIE, or with personal or business funds, and may not be used for any other election until after the special election is actually held.

## § 15-05 Training.

(a) Candidates and treasurers must complete training in accordance with Rule 2-06(a).

(b) For any candidate to be eligible to receive a public funds payment, such training must be completed on or before the 15th business day before the payment is scheduled to be made, or for a post-election payment, but the last day of the reporting period of the January semi-annual disclosure statement in the year following the election.

## § 15-06 Independent expenditure disclosure.

(a) Disclosure statements are due every Monday until and including the fourth Monday after the special election.

(b) **Reporting period.**

**(i) Candidate elections.** For candidates anticipated to be voted on in a special election, the reporting period for the first independent expenditure disclosure statement begins on the day the vacancy is declared. The reporting period for each subsequent disclosure statement begins on the preceding Monday.

**(ii) Ballot proposals.** For ballot proposals anticipated to be voted on in a special election, the reporting period for the first independent expenditure disclosure statement begins on the date the first reportable expenditure is incurred. The reporting period for each subsequent disclosure statement begins on the preceding Monday.

**(iii) Conclusion of reporting period.** The reporting period for all disclosure statements concludes on and includes the day before the filing due date.

**(c) Daily disclosure.** During the 14 days before the election, an independent spender must submit a disclosure statement to the Board within 24 hours of distributing any reportable communication, making any reportable expenditure, or receiving any reportable contribution.

(d) An independent spender that has not distributed any reportable communications, made any reportable expenditures, or received any reportable contributions within a reporting period is not required to file a disclosure statement for that period.

## § 15-07 Transition and inauguration entities.

(a) A special election TIE must not make expenditures after 30 days following the candidate's inauguration, except for expenditures related to fundraising to satisfy liabilities incurred within 30 days of inauguration, or expenditures related to terminating the entity or responding to the post-election audit.

(b) Unless permitted by subdivision (a) above, any donation or other receipt received after 30 days following the date of the elected candidate's inauguration by a TIE shall be presumed to be for the next election in which the elected candidate is a candidate following the day that it is received, and not received for the purposes of transition or inauguration.

(c) Unless permitted by subdivision (a) above, any expenditure incurred after 30 days following the date of the elected candidate's inauguration by a TIE shall be presumed to be for the next election in which the elected candidate is a candidate following the day that it is incurred, and not incurred for the purposes of transition or inauguration.

(d) The TIE must be terminated after it has paid all liabilities and otherwise disposed of all funds pursuant to the requirements set forth in this chapter and, in any event, no later than 60 days after inauguration.

Back to TOC

# Chapter 16: Voter Education and Engagement

## § 16-01 Definitions.

Except as otherwise provided, the definitions set forth in section 1-02 apply in this chapter. In addition:

**"Ballot proposal"** means any proposition, referendum, or other question submitted to New York City voters pursuant to the Charter, the New York Municipal Home Rule Law, or any other law.

**"Candidate print statement"** means the document filed by a candidate containing biographical and other information requested by the Board, and a photograph of the candidate, for inclusion in the printed or online Voter Guide.

**"Candidate video statement"** means a video-recorded statement by the candidate for inclusion in the video and online edition of the Voter Guide.

**"Election"** means any election for the office of mayor, public advocate, comptroller, borough president, or Council member, or a general election in which a ballot proposal is on the ballot, and does not include any election held pursuant to court order.

**"Registered candidate"** means an individual who has registered or filed a Certification with the Board pursuant to section 2-01 or 2-02 and § 3-703 of the Code.

## § 16-02 Contents of the Voter Guide.

**(a) Generally.** In addition to any information that the Board determines to be useful for promoting public awareness of the voting process, city government, and the candidates and ballot proposals in an election, the printed and online Voter Guides for an election will contain: (1) the date of the election; (2) the hours during which the polls will be open; (3) an explanation of the voter registration process, including deadlines to register for both the primary and general elections; (4) an explanation of how to obtain and cast or mark an absentee ballot; (5) an explanation of how to cast a vote, including write-in votes; (6) information about the boundaries of City Council districts to aid voters in determining their appropriate district; and (7) tables of contents, graphics, and other materials which the Board determines will make the Voter Guide easier to understand or more useful for the average voter.

**(b) Candidate statements.**

**(i) Candidate print statements.**

(A) Candidate print statements contain the following biographical information:

(1) the name of the candidate;

---

(2) the political party, if any, in which the candidate is enrolled, and for which party lines the candidate's name will appear on the ballot;

(3) the previous and current public offices held by the candidate;

(4) the current occupation and employer of the candidate;

(5) prior employment and positions held by the candidate;

(6) the experience the candidate has had in public service;

(7) the educational background of the candidate;

(8) a list of the candidate's major organizational affiliations;

(9) information about the candidate's principles, platform, or views, in a form prescribed by the Board; and

(10) such other information as may be determined by the Board and requested of the candidate.

(B) The candidate print statement must be submitted in English.

(C) The photograph of the candidate submitted as part of a candidate print statement must:

(1) be a recent photograph;

(2) have a plain background;

(3) show only the face or the head, neck, and shoulders of the candidate;

(4) not include the hands or anything held in the hands of the candidate;

(5) not show the candidate wearing any distinctive uniform, including a judicial robe, or a military, police, or fraternal uniform; and

(6) comply with the size and resolution requirements as determined by the Board.

(D) Candidate print statements may not:

(1) refer to any opposing candidate by name;

(2) contain profanity or statements that are patently offensive, obscene, libelous, or defamatory;

(3) assert facts that the candidate knows or should know to be false; or

(4) violate any city, state, or federal law, including regulations of the New York State Public Service Commission.

(E) A candidate print statement that violates any of the requirements outlined in this chapter, as determined by the Board at its sole discretion, will not be included in the Voter Guide.

**(F) Timing of submission.**

(1) In the election year, all registered candidates considering filing designating petitions must submit their complete and final print statements in accordance with a deadline set by the Board.

(2) A candidate not named in a filed designating petition who anticipates filing an independent nominating petition for the general election must submit a candidate print statement on or before the "independent candidates" submission deadline set by the Board.

**(ii) Candidate video statements.**

(A) Candidate video statements must contain the same biographical information as the candidate print statements, and may contain such other information as the candidate may choose, including a concise audio description of the candidate; provided, however, that the candidate may not:

(1) refer to any opposing candidate by name;

(2) use profanity, or statements, gestures, or materials that are patently offensive, obscene, or pornographic;

(3) make statements that are slanderous, or defamatory, or assert facts that the candidate knows or should know to be false;

(4) engage in any commercial programming or advertising;

(5) display any literature, graphs, or props; or

(6) violate any city, state, or federal law, including regulations of the New York State Public Service Commission and the Federal Communications Commission.

(B) Candidates recording video statements may dress as they choose and are responsible for their own clothing, make-up and hairdressing, except that when recording a video statement, candidates may not:

(1) be fully or partially nude;

(2) wear any distinctive uniform, including a judicial robe, or a military, police, or fraternal uniform; or

(3) violate any city, state or federal law, including regulations of the New York State Public Service Commission and the Federal Communications Commission.

(C) To ensure that candidate scripts meet the requirements of this section, candidate video statement scripts must be submitted for Board approval before the candidate's scheduled recording session, and on or before the script submission deadline set by the Board. Candidates must follow their approved video statement script during the recording. Recorded statements will not be edited by the Board or any entity participating in the production of the video edition of the Voter Guide, except that candidate identification and other election information may be displayed.

(D) Only the candidate may appear on camera, and only the candidate may record a candidate video statement.

(E) Candidates may sit or stand while recording statements. Reasonable accommodations for candidates with special needs will be made.

(F) **Video statements shall be recorded in English.** Candidates may record a portion of their video statements in a language other than English if the script submitted for Board approval contains both the English and non-English text and an English translation of all non-English text. No additional time will be allotted for statements recorded in multiple languages. The Board will take such measures as it deems reasonable and necessary to ensure that an American Sign Language translation is available for each video statement and that captions are available for each video statement in English and other languages required by law.

(G) Candidate video statements that violate any of the requirements outlined in this chapter, as determined by the Board as its sole discretion, will not be included in the Voter Guide.

(H) **Timing of candidate video statement recordings.** In the election year, the recording schedule for candidates' video statements will be given to registered candidates in advance. Appointments for candidate video statement recordings will be during the production schedule. A candidate who fails to appear at the scheduled time waives participation in the video edition of the Voter Guide.

(I) The Board will take such measures as it deems reasonable and necessary to ensure that candidate video statements included in the Voter Guide are accessible to individuals with vision disabilities.

**(iii) Inclusion of candidate statements in Voter Guide editions.**

**(A) Primary election edition.** Only registered candidates who have met the requirements of this chapter and who are on the ballot in a contested primary will have their candidate print and video statements included in primary election editions of the Voter Guide. Candidates anticipated to appear on the ballot in a contested primary on the date that the primary election print edition goes to press, based on the Board's assessment of information available from the Board of Elections, will have their print statements included in printed editions of the Voter Guide.

**(B) General election edition.** Only registered candidates who have met the requirements of this chapter and who are on the general election ballot will have their candidate print and video statements included in general election editions of the Voter Guide. Candidates who are seeking nomination or election exclusively as write-in candidates will not be included in the Voter Guide. Candidates anticipated to appear on the general election ballot on the date that the general election print edition goes to press, based on the Board's assessment of information available from the Board of Elections, will have their print statements included in printed editions of the Voter Guide. Candidates running unopposed in the general election will be included in general election editions of the Voter Guide, except where the only election being covered is uncontested, in which case the Board will not produce or distribute print or video editions of the Voter Guide, but will produce an online Voter Guide.

(C) If a candidate in the general election was included in the primary election Voter Guide, then that candidate's primary election Voter Guide statement will be included in the general election Voter Guide, unless the candidate submits a general election Voter Guide statement on or before the deadline set by the Board.

(D) Candidates' print statements will be included in the primary and general election online editions following the requirements in paragraphs (i), (ii), and (iii).

(E) The Board will not accept a candidate print or video statement unless it is submitted in the form required by the Board, including any signatures or notarizations, and unless the candidate has verified that the contents of the submission are true to the best of the candidate's knowledge. The Board may reject any portion of a candidate's print or video statement that it decides is obscene, libelous, slanderous, defamatory, or otherwise in violation of these rules.

(iv) Candidate statements must not exceed the length and space limitations provided by the Board. The Board may require that candidate print statements follow a consistent format, and may edit statements to make them similar in presentation and length and consistent with existing law. Candidate video statements that exceed their allotted statement time, as determined by the Board, will be cut off at the time limit.

(v) A candidate print statement or video script is a written instrument which becomes part of the Board's records when filed. A candidate may not include any false information in

---

the print statement or video script. The candidate must verify that the print statement and video script are true, to the best of the candidate's knowledge.

(vi) The Board will publish one of the following notices with each candidate print statement:

(A) In the case of a participant: "Participant in the Campaign Finance Program" or similar language.

(B) In the case of a non-participant: "Not a participant in the Campaign Finance Program" or similar language.

**(c) Ballot proposals.**

(i) The print and online editions of the Voter Guide for a general election in which a city ballot proposal is anticipated to appear on the ballot will contain: (A) the form of each ballot proposal as it will appear on the ballot in the general election; (B) a plain-language abstract of each ballot proposal; and (C) to the extent feasible, clearly-labeled major arguments for and against the passage of each ballot proposal. If feasible, the Board will solicit public statements for and against passage of each ballot proposal for possible inclusion in the Voter Guide for the general election.

(ii) A public statement will not be accepted by the Board unless it: (A) is submitted in a form the Board requires, including any signatures; (B) conforms to the length and space limitations; (C) identifies the organization, if any, on whose behalf the statement is made; and (D) clearly argues for or against passage of the proposal. No person may submit more than one statement per ballot proposal.

**(iii) Board determines whether to publish statements for and against ballot proposals.** With respect to statements for or against passage of ballot proposals, the Board may determine: (A) not to publish any such statements; (B) not to publish any statement submitted pursuant to paragraph (i) of subdivision (c); (C) to publish any portion of a statement submitted pursuant to paragraph (i) of subdivision (c); and (D) to compose and publish such statements as it deems appropriate

**(iv) State ballot proposals.** The Board will include information about state ballot proposals in Voter Guides for a covered office or a city ballot proposal. The Board may produce an online Voter Guide to provide information about state ballot proposals during an election for which no print Voter Guide is produced.

## § 16-03 Voter Guide publication and distribution.

(a) The Board will publish printed Voter Guides in English and Spanish, and in other languages required by law. The Voter Guide will be distributed by mail to each city household in which

there is at least one registered voter eligible to vote in the primary or general election, as applicable.

(b) The Board will produce an online Voter Guide in English and Spanish, and in other languages required by law.

(c) The Board may produce a video edition of the Voter Guide for citywide elections. The Board will seek partners for the production, marketing, and broadcasting of video editions of the Voter Guide. The Board will post online the scripts provided pursuant to section 16-02(b)(ii)(C), along with translations of those scripts into Spanish and other languages required by law.

(d) Any conflicts related to the submission or public release of candidate print or video statements will be decided by the Board.

(e) All decisions made by the Board with respect to any edition of the Voter Guide, including resolution of conflicts, are final.

(f) The Board has ownership of and distribution rights to all Voter Guide content, including candidate statements. Unedited candidate statements may be republished or broadcast with the Board's permission.

## § 16-04 Elections not held as scheduled.

Notwithstanding any other provision of this chapter, the Board will take such actions as are practicable to prepare, publish, and distribute a Voter Guide in a timely manner for an election that is not held as initially scheduled.

# Chapter 17: Public Access to Information

## § 17-01 Records available to the public.

The New York State Freedom of Information Law (FOIL) (Public Officers Law, Article 6, § 84 et seq.) governs public access to the Board's records. The Board may deny access to records or portions of records that are exempted from disclosure by state or federal law.

## § 17-02 Records access officer.

The Board's records access officer is designated by the Executive Director and is responsible for ensuring appropriate agency response to public requests for access to records.

**§ 17-03 Requesting records.**

(a) A candidate may request access to records such candidate submitted to the Board by contacting the Candidate Guidance and Policy Unit, which may provide access to such records without a FOIL request.

(b) To request access to Board records, a member of the public must:

(i) make a written FOIL request in person, by mail, or by email, addressed to the Board's records access officer;

(ii) reasonably describe the records sought;

(iii) provide the requestor's name and mailing or email address; and

(iv) specify preference for inspection of records or copies of records.

(c) Within five business days of receipt of a FOIL request made in accordance with subdivision (b) above, the Board will:

(i) grant or deny the request, in whole or in part, in writing; or

(ii) provide:

(A) a written acknowledgment of the request and state the approximate date on which the request will be granted or denied; or

(B) where circumstances prevent granting or denying the request within 20 business days of the written acknowledgment,

(1) a written statement of the reasons for the delay in making a determination; and

(2) a date, within a reasonable period depending on the circumstances, when the request will be granted or denied.

(d) Where the Board is unable to locate records responsive to the request, the Board, upon request, will certify that:

(i) the Board is not the custodian of such records; or

(ii) such records cannot be found after a diligent search.

(e) Where the request is granted, the Board will:

(i) make records available for inspection:

(A) between the hours of 10:00 a.m. and 4:00 p.m., on business days, Monday through Friday;

(B) at the offices of the Board or another location chosen by the Board;

(C) in quantities that may be limited to the amount available at the time; and

(D) contingent on the requester's promise that the records will not be removed, damaged, marked, or changed in any way during the inspection; or

(ii) make copies of records available in the medium requested, where practicable, upon payment of fees as described in this Chapter, and provide, on request, a certification that the copies are true copies;

(f) Where a request is denied, the Board will explain the reasons for the denial in writing and set forth the right to appeal.

### § 17-04 Appealing a denial of access to records.

(a) To appeal a denial of access to records, the requester must, within 30 days of the denial, submit a written appeal to the Board's General Counsel including:

(i) a copy of the original request;

(ii) a reasonable description of the records to which access was denied; and

(iii) the name and address of the requester.

(b) Upon receipt of an appeal, the Board's General Counsel shall, within 10 business days:

(i) decide the appeal and send a copy of the written decision to the requester; and

(ii) send a copy of the appeal and a copy of the written decision to the Committee on Open Government of the Department of State of the State of New York.

### § 17-05 Fees.

The Board may require payment for copies of records, as follows:

(a) 25 cents per page for photocopies not exceeding 8-1/2 inches by 14 inches; or

(b) the actual cost of reproducing any other record, in accordance with § 87 of the New York Public Officers Law.

# Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

ERIC ADAMS,

Defendant.

**SEALED INDICTMENT**

24 Cr.

**24 CRIM 556**

## Overview

1.      In 2014, ERIC ADAMS, the defendant, became Brooklyn Borough President. Thereafter, for nearly a decade, ADAMS sought and accepted improper valuable benefits, such as luxury international travel, including from wealthy foreign businesspeople and at least one Turkish government official seeking to gain influence over him. By 2018, ADAMS—who had by then made known his plans to run for Mayor of New York City—not only accepted, but sought illegal campaign contributions to his 2021 mayoral campaign, as well as other things of value, from foreign nationals. As ADAMS's prominence and power grew, his foreign-national benefactors sought to cash in on their corrupt relationships with him, particularly when, in 2021, it became clear that ADAMS would become New York City's mayor. ADAMS agreed, providing favorable treatment in exchange for the illicit benefits he received. After his inauguration as Mayor of New York City, ADAMS soon began preparing for his next election, including by planning to solicit more illegal contributions and granting requests from those who supported his 2021 mayoral campaign with such donations.

2.      ERIC ADAMS, the defendant, sought and accepted illegal campaign contributions in the form of "nominee" or "straw" contributions, meaning that the true contributors conveyed their money through nominal donors, who falsely certified they were contributing their own

money.   By smuggling their contributions to ADAMS through U.S.-based straw donors, ADAMS's overseas contributors defeated federal laws that serve to prevent foreign influence on U.S. elections.   Wealthy individuals evaded laws designed to limit their power over elected officials by restricting the amount any one person can donate to a candidate.   And businesses circumvented New York City's ban on corporate contributions by funneling their donations through multiple employees, frustrating a law that seeks to reduce corporate power in politics. ADAMS increased his fundraising by accepting these concealed, illegal donations—at the cost of giving his secret patrons the undue influence over him that the law tries to prevent.

3.    ERIC ADAMS, the defendant, compounded his gains from the straw contributions by using them to defraud New York City and steal public funds.  New York City has a matching funds program that matches small-dollar contributions from individual City residents with up to eight times their amount in public funds, to give New Yorkers a greater voice in elections. ADAMS's campaigns applied for matching funds based on known straw donations, fraudulently obtaining as much as $2,000 in public funds for each illegal contribution.  ADAMS and those working at his direction falsely certified compliance with applicable campaign finance regulations despite ADAMS's repeated acceptance of straw donations, relying on the concealed nature of these illegal contributions to falsely portray his campaigns as law-abiding.  As a result of those false certifications, ADAMS's 2021 mayoral campaign received more than $10,000,000 in public funds.

4.    ERIC ADAMS, the defendant, also sought and received other improper benefits from some of the same co-conspirators who funneled straw donations to his campaigns.  In particular, a senior official in the Turkish diplomatic establishment (the "Turkish Official"), who facilitated many straw donations to ADAMS, also arranged for ADAMS and his companions to receive free or discounted travel on Turkey's national airline (the "Turkish Airline"), which is

2

owned in significant part by the Turkish government, to destinations including France, China, Sri Lanka, India, Hungary, and Turkey itself. The Turkish Official and other Turkish nationals further arranged for ADAMS and his companions to receive, among other things, free rooms at opulent hotels, free meals at high-end restaurants, and free luxurious entertainment while in Turkey.

5.    ERIC ADAMS, the defendant, and others working at his direction, repeatedly took steps to shield his solicitation and acceptance of these benefits from public scrutiny. ADAMS did not disclose the travel benefits he had obtained in annual financial disclosures he was required to file as a New York City employee. Sometimes, ADAMS agreed to pay a nominal fee to create the appearance of having paid for travel that was in fact heavily discounted. Other times, ADAMS created and instructed others to create fake paper trails, falsely suggesting that he had paid, or planned to pay, for travel benefits that were actually free. And ADAMS deleted messages with others involved in his misconduct, including, in one instance, assuring a co-conspirator in writing that he "always" deleted her messages.

6.    In September 2021, the Turkish Official told ERIC ADAMS, the defendant, that it was his turn to repay the Turkish Official, by pressuring the New York City Fire Department ("FDNY") to facilitate the opening of a new Turkish consular building—a 36-story skyscraper—without a fire inspection, in time for a high-profile visit by Turkey's president. At the time, the building would have failed an FDNY inspection. In exchange for free travel and other travel-related bribes in 2021 and 2022 arranged by the Turkish Official, ADAMS did as instructed. Because of ADAMS's pressure on the FDNY, the FDNY official responsible for the FDNY's assessment of the skyscraper's fire safety was told that he would lose his job if he failed to acquiesce, and, after ADAMS intervened, the skyscraper opened as requested by the Turkish Official.

## New York City's Public Matching Funds Program

7.    The New York City Campaign Finance Board ("CFB") oversees and administers a publicly funded campaign finance system for municipal elections in New York City, including a matching funds program (the "Matching Funds Program") that provides eligible candidates with public funds to match small-dollar contributions from New York City residents ("Matching Funds"). The Matching Funds Program is intended to incentivize candidates to finance their campaigns by engaging with average New Yorkers, instead of seeking large contributions from a limited number of influential donors, and to empower more candidates to run for office, even without access to wealth. For mayoral candidates in the 2021 and 2025 election cycles, the Matching Funds Program operated, as relevant here, in the following manner:

a.    Candidates that collected a minimum number of contributions and raised a minimum amount of qualifying contributions from New York City residents were eligible to opt into the Matching Funds Program.

b.    Candidates that opted into the Matching Funds Program were required to file a signed and notarized certification attesting, among other things, that they understood that they were responsible for reading, understanding, and complying with, and ensuring their campaigns' compliance with, various statutes and rules; that submitting fraudulent claims for Matching Funds or otherwise furnishing false information to the CFB would constitute a fundamental breach of the obligations affirmed as part of the certification; and that, in the event of such a breach, they would be ineligible to receive additional Matching Funds and would be required to return all Matching Funds previously received.

c.    The Matching Funds Program would provide up to $8 in Matching Funds for each $1 of eligible contributions up to $250 from New York City residents. In other words,

4

for each eligible contribution of at least $250, a participating candidate could collect up to $2,000 in Matching Funds. The Matching Funds Program would provide up to $12,952,888 in Matching Funds for qualifying mayoral candidates during the primary and general elections in the 2021 election cycle, and up to $14,101,334 in Matching Funds for qualifying mayoral candidates during the primary and general elections in the 2025 election cycle.

        d.    Certain kinds of contributions were prohibited entirely, including (i) straw contributions; (ii) contributions from a person who was not a United States citizen or a lawful permanent resident of the United States; (iii) contributions from foreign entities and organizations; (iv) contributions from corporations; and (v) contributions that were made, received, solicited, or otherwise obtained in violation of any local, state, or federal law.

        e.    Through its Campaign Finance Handbook, the CFB informed candidates and their campaign staff that straw contributions were not only prohibited, but also illegal.

        f.    Candidates that opted into the Matching Funds Program were required to regularly submit to the CFB disclosure statements that, among other things, identified all contributions received during a particular reporting period, regardless of whether those contributions were eligible for matching funds. These disclosure statements were required to be submitted electronically by either the candidate or the campaign's treasurer using a unique login. In order to submit a disclosure statement, the filer was required to (i) identify him or herself as either the candidate or the treasurer and (ii) electronically sign a verification stating, "This disclosure statement is true and correct to the best of my knowledge, information and belief and I understand that by clicking 'Verify' below I am electronically signing my disclosure statement, which shall have the same validity and effect as a signature affixed by hand."

8.     ERIC ADAMS, the defendant, was aware that the law prohibited foreign, conduit, and corporate contributions.  At least as early as 2018, ADAMS, began raising money to fund his first mayoral campaign (the "2021 Campaign").  In September 2019, ADAMS submitted the required certification to opt into the Matching Funds Program.  During the 2021 election cycle, ADAMS and persons acting at his direction regularly submitted and signed disclosure statements attesting to the veracity of the information being provided to the CFB.  ADAMS won his party's primary election in July 2021, and was elected Mayor in November 2021.  While serving as Mayor, ADAMS again opted into the Matching Funds Program and began fundraising for his 2025 reelection campaign (the "2025 Campaign," and together with the 2021 Campaign, the "Adams Campaigns"), continuing at least to the date of this Indictment.

## ADAMS Travels to Turkey and Begins Accepting Illegal Campaign Contributions and Personal Benefits

9.     Within a year of becoming Brooklyn Borough President, ERIC ADAMS, the defendant, began building relationships with foreign nationals who were seeking influence with him.  In the years that followed, ADAMS solicited and knowingly accepted illegal campaign contributions and improper personal benefits from those foreign nationals.

### *In 2015, ADAMS travels to Turkey and establishes corrupt relationships*

10.     In 2015, ERIC ADAMS, the defendant, took two official trips to Turkey.  His first trip, in August 2015, was arranged by the Turkish Consulate General in New York City (the "Turkish Consulate") and paid for in part by the Turkish Consulate and in part by a for-profit educational conglomerate based in Istanbul (the "Turkish University").  The second trip, in December 2015, was arranged by the Turkish Official and a Turkish entrepreneur (the "Promoter") whose business includes organizing events to introduce Turkish corporations and businesspeople to politicians, celebrities, and others whose influence may benefit the corporations and

6

businesspeople. For both trips, ADAMS received free business class tickets on the Turkish Airline. Unlike ADAMS's subsequent travel with the Turkish Airline, ADAMS reported his 2015 travel to Turkey on financial disclosure forms filed with the New York City Conflict of Interest Board (the "COIB"), as he was required to do annually at all times relevant to this Indictment.

11.    The 2015 travel to Turkey by ERIC ADAMS, the defendant, involved several people relevant to events described in this Indictment, including:

a.    The Turkish Official, who helped arrange ADAMS's travel to and within Turkey in 2015, and who later steered illegal contributions and improper gifts to ADAMS to gain influence with and, eventually, to obtain corrupt official action from ADAMS.

b.    The Promoter, who arranged straw contributions to both of the Adams Campaigns and favorable treatment in Turkey for ADAMS in 2017 and 2019, hoping to leverage ADAMS's considerable fame in Turkey to benefit the Promoter's clients.

c.    The owner and chairman of the Turkish University ("Businessman-1"), who met with ADAMS in Istanbul in 2015 and again in Brooklyn, New York in 2018. Businessman-1, who was considering a business venture in Brooklyn, and also sought to enhance his own status by befriending ADAMS, later made illegal contributions to the 2021 Campaign.

d.    A volunteer at Brooklyn Borough Hall (the "Adams Staffer"), who then served as ADAMS's "Liaison to Eastern Europe Muslim Countries," including Turkey. The Adams Staffer subsequently became a paid member of ADAMS's staff at Borough Hall and, later, City Hall. The Adams Staffer accompanied ADAMS on his 2015 travel to Turkey, and later, at ADAMS's direction, coordinated many of the illegal campaign contributions and improper personal travel benefits relevant to this Indictment.

e.     A wealthy Turkish businesswoman (the "Businesswoman"), who later gave

ADAMS multiple free or steeply discounted stays in a luxury hotel she owned, and organized

contributions to the 2021 Campaign.

*In 2016, ADAMS secretly begins accepting free luxury travel*

12.     After ERIC ADAMS, the defendant, first traveled to Turkey in 2015, the Turkish

Official introduced ADAMS to the Turkish Airline's general manager in the New York City area

(the "Airline Manager").  In 2016 and twice in 2017, ADAMS solicited and accepted free and

heavily discounted luxury air travel from the Turkish Airline, as part of the Turkish Official's

efforts to gain influence over ADAMS, on three separate trips:

a.     In October 2016, ADAMS and his domestic partner ("Adams's Partner")

traveled to India.  Adams's Partner purchased economy class tickets for herself and ADAMS on

the Turkish Airline for approximately $2,286.  Two days before their flight was scheduled to

depart, ADAMS accepted upgrades for himself and his partner by the Turkish Airline to business

class at no cost.  Business class is the highest class offered by the Turkish Airline.  Had ADAMS

and his partner purchased their business class tickets, the tickets would have cost approximately

$15,000 total.

b.     In July and August 2017, ADAMS, a close relative of ADAMS (the "Adams

Relative"), and a member of ADAMS's staff who has served as ADAMS's liaison to the Asian-

American communities in New York City (the "Adams Liaison") traveled to Nice, France;

Istanbul, Turkey; Columbo, Sri Lanka; and Beijing, China.  ADAMS accepted free business class

tickets from the Turkish Airline, worth more than $35,000 total, for himself and his companions.

c.     In October 2017, ADAMS and the Adams Liaison traveled to Nepal through

Istanbul and Beijing.  ADAMS accepted free business class tickets from the Turkish Airline for

8

himself and the Adams Liaison for the flights from New York to Istanbul and Istanbul to Beijing,

and for the corresponding return flights, worth more than $16,000 total.

13.    Because the Turkish Airline provided free travel benefits worth tens of thousands

of dollars to ERIC ADAMS, the defendant, he flew the Turkish Airline even when doing so was

otherwise inconvenient. For example, during the July and August 2017 trip, Adams's Partner was

surprised to learn that ADAMS was in Turkey when she had understood him to be flying from

New York to France. ADAMS responded, in a text message, "Transferring here. You know first

stop is always instanbul [sic]." When Adams's Partner later inquired about planning a trip to

Easter Island, Chile, ADAMS repeatedly asked her whether the Turkish Airline could be used for

their flights, requiring her to call the Turkish Airline to confirm that they did not have routes

between New York and Chile.

14.    ERIC ADAMS, the defendant, also accepted valuable travel and hospitality

benefits for himself and his companions during their time in Turkey. For example, during a stay

in Istanbul during the July and August 2017 trip, ADAMS, the Adams Relative, and the Adams

Liaison accepted a heavily discounted stay at the St. Regis Istanbul, arranged by the Promoter.

The St. Regis Istanbul is owned by the Businesswoman, who sought to ingratiate herself with

ADAMS. ADAMS stayed in the "Bentley Suite," portions of which are depicted here:



*Bentley Suite Bedroom*



*Bentley Suite Bathroom*

Although booking the Bentley Suite for two nights would have cost approximately $7,000, ADAMS paid a total of less than $600.

15.     In order to conceal the valuable flight, hotel, and other travel benefits that ERIC

ADAMS, the defendant, accepted from foreign nationals seeking influence over him, he did not

disclose any of these trips on his annual disclosure forms, despite a legal requirement to do so.

a.     By law, certain New York City elected officials and candidates for elected

office are required to file annual reports with the COIB disclosing their financial information and

outside positions and interests, as well as those of their spouses or domestic partners and

unemancipated children.  The purpose of the annual disclosure law is to provide transparency to

ensure that there are no prohibited conflicts of interest between public servants' official duties and

their private interests.

b.     At all times relevant to this Indictment, ADAMS was an elected New York

City official required to file annual disclosure forms with the COIB.

c.     On his 2016 and 2017 COIB Annual Disclosure Forms, ADAMS was asked

whether he had received "any gift or gifts from the same person, entity or donor or affiliated donors

who had no business dealings with the City, other than a relative, in the total amount or with a total

value of $1,000 or more during" the year.  ADAMS answered "no."  ADAMS also answered "no"

to a similar question asking whether he had received any gifts worth $50 or more from "a person,

entity, donor, or affiliated donors" who did have business with New York City.

d.     The valuable travel benefits ADAMS solicited and accepted—including the

free business class upgrade for two for travel from New York to India; the free business class

tickets for three from New York to France, Turkey, Sri Lanka, and China; the heavily discounted

stay in the Bentley Suite; and the free business class tickets for two from New York to China

through Turkey—for each of the 2016 and 2017 trips described in paragraphs 12 through 14 each

11

exceed $1,000 in value, as would be obvious to anyone who, like ADAMS, had extensive experience traveling overseas.

16.    ERIC ADAMS, the defendant, also sought to conceal the luxury travel benefits he solicited and accepted from foreign nationals by creating fake paper trails, which members of ADAMS's staff assisted in at his direction. For example, ADAMS attempted to create a fake paper trail suggesting he had paid for his 2017 flights on the Turkish Airline, when in fact he had not.

a.    As Brooklyn Borough President, ADAMS employed a scheduler (the "Adams Scheduler") who managed his appointments, meetings, and other official events. Despite her status as a New York City employee, the Adams Scheduler was used by ADAMS to perform personal tasks for him, such as collecting rent at a Brooklyn property he owned. ADAMS also assigned the Adams Scheduler to pay various personal expenses for him, after which ADAMS would reimburse the Adams Scheduler in cash.

b.    In 2017, ADAMS sent a series of emails to the Adams Scheduler, directing the Adams Scheduler to pay for the free 2017 flights he and his companions had already taken on the Turkish Airline. But the emails provided inconsistent explanations: in some, ADAMS suggested that the Adams Scheduler should pay by using ADAMS's credit card, while in others, ADAMS claimed to have left cash in an envelope for the Adams Scheduler to send to the Turkish Airline.

c.    For example, on November 25, 2017, ADAMS sent an email to the Adams Scheduler saying that with respect to the "July trip," meaning the July and August 2017 trip on the Turkish Airline, "I left you the money for the international airline in an envelope in your top desk draw. [sic] Please send it to them." Given the cost of the international business class tickets for ADAMS alone, ADAMS's email suggested that he left, at a minimum, well over $10,000 in cash

12

in the Adams Scheduler's desk drawer to "send" to the Turkish Airline as payment for flights taken months earlier. He did not do that, as records from the Turkish Airline confirm that ADAMS did not pay the airline, in cash or otherwise, because the tickets were complimentary.

17.     In return for travel benefits the Turkish Official provided or arranged in or about 2015 and 2016, ERIC ADAMS, the defendant, granted a political request from the Turkish Official. Prior to ADAMS's 2015 travel to Turkey—which ADAMS knew, and disclosed to the COIB, had been funded by, among other entities, the Turkish Consulate, the Turkish Airline, and three separate municipalities in Turkey—ADAMS had maintained a relationship with a Turkish community center in Brooklyn (the "Community Center"). In or about 2016, the Turkish Official told ADAMS that the Community Center was affiliated with a Turkish political movement that was hostile to Turkey's government, and that if ADAMS wished to continue receiving support from the Turkish government, ADAMS could no longer associate with the Community Center. ADAMS acquiesced.

*ADAMS begins accepting straw contributions and continues to receive luxury travel benefits*

18.     By 2018, ERIC ADAMS, the defendant, began raising funds for the 2021 Campaign. ADAMS was closely involved in the details of fundraising, which he regarded as vital to his success. As he texted a close supporter later in the campaign: "You win the race by raising money . . . . Have to raise money. Everything else is fluff." ADAMS further explained, "I have a 7 million dollar race. I have a clear plan to raise it and each night we are out executing the plan." Throughout the 2021 Campaign, ADAMS solicited and knowingly accepted straw donations, including from foreign sources, while continuing to secretly accept free and heavily discounted travel benefits from the Turkish Official, the Promoter, and the Airline Manager.

19.     As part of these efforts, ERIC ADAMS, the defendant, solicited and knowingly accepted straw donations to the 2021 Campaign that were facilitated by the Turkish Official and the Airline Manager, among others.

a.     Beginning at least as early as April 2018, ADAMS asked the Airline Manager to fundraise for the 2021 Campaign, and the Airline Manager sought to organize a fundraiser.

b.     On June 14, 2018, the Turkish Official exchanged messages with the Adams Staffer, asking "how much can companies donate?"[1]  The Adams Staffer explained that only individuals could donate to the 2021 Campaign.

c.     On June 22, 2018, ADAMS attended a fundraiser for the 2021 Campaign. The Airline Manager, among others, organized and attended the event.  Following the event, the Turkish Official messaged the Adams Staffer, asking for the "list of the participants of the June 22 meeting."  The Adams Staffer then sent the Turkish Official "The list for 6/22/18," which included the names of various persons who donated to the 2021 Campaign in the preceding days or who donated in the following days, raising in excess of $15,000.

d.     A promotional flyer for the June 22, 2018 fundraiser listed as one of the fundraiser's hosts a friend of the Airline Manager who owned an airport transportation business ("Businessman-2").  In a series of messages exchanged with the Adams Staffer, Businessman-2 stated that he had facilitated a straw donation through an associate.  Records from the CFB show that the associate ultimately donated $3,000 in his own name and described himself as unemployed.

---

[1]     Many of the conversations quoted in this Indictment, including this conversation between the Adams Staffer and the Turkish Official, were held in a language other than English.

14

20.    ERIC ADAMS, the defendant, also sought to arrange for his campaigns to receive unlawful contributions from Turkish nationals, which would be routed through U.S.-based straw donors.

a.    On June 22, 2018—the same day as the fundraising event just described—the Adams Staffer and the Promoter discussed by text message a possible trip by ADAMS to Turkey. The Promoter stated, in part, "Fund Raising in Turkey is not legal, but I think I can raise money for your campaign off the record." The Adams Staffer inquired, "How will [ADAMS] declare that money here?" The Promoter responded, "He won't declare it . . . Or . . . We'll make the donation through an American citizen in the U.S. . . . A Turk . . . I'll give cash to him in Turkey . . . Or I'll send it to an American . . . He will make a donation to you." The Adams Staffer replied, "I think he wouldn't get involved in such games. They might cause a big stink later on," but "I'll ask anyways." The Adams Staffer then asked, "how much do you think would come from you? $?" The Promoter responded, "Max $100K." The Adams Staffer wrote, "100K? Do you have a chance to transfer that here? . . . We can't do it while Eric is in Turkey," to which the Promoter replied, "Let's think." After this conversation, the Adams Staffer asked ADAMS whether the Adams Staffer should pursue the unlawful foreign contributions offered by the Promoter, and contrary to the Adams Staffer's expectations, ADAMS directed that the Adams Staffer pursue the Promoter's illegal scheme.

b.    In November 2018, Businessman-1—the wealthy Turkish national who owned the Turkish University, a for-profit educational conglomerate in Turkey, and whom ADAMS met there in 2015—visited New York City. ADAMS and the Adams Staffer met with Businessman-1 at Brooklyn Borough Hall. At the close of the meeting, Businessman-1 offered to contribute funds to the 2021 Campaign. Although ADAMS knew that Businessman-1 was a

15

Turkish national who could not lawfully contribute to U.S. elections, ADAMS directed the Adams

Staffer to obtain the illegal contributions offered by Businessman-1. Following up on this

directive, ADAMS wrote to the Adams Staffer that Businessman-1 "is ready to help. I don't want

his willing to help be waisted [sic]." As ADAMS directed, the Adams Staffer maintained contact

with Businessman-1 through intermediaries, culminating in ADAMS accepting straw donations of

Businessman-1's money, discussed below.

21.    In 2018, ERIC ADAMS, the defendant, also continued to secretly solicit and accept

free and heavily discounted luxury travel benefits provided by the Turkish Official and the Airline

Manager. In January 2018, ADAMS and Adams's Partner traveled to Budapest, Hungary, through

Istanbul. Several months earlier, Adams's Partner had purchased two economy class tickets on

the Turkish Airline for approximately $560 each. In December 2017, the Adams Staffer, acting at

ADAMS's direction, asked the Airline Manager to upgrade the tickets to business class, which he

did for free. Had ADAMS and Adams's Partner purchased their business class tickets, the tickets

would have cost more than $14,000 total. Consistent with his prior actions, ADAMS concealed

this free and heavily discounted travel the Turkish Airline provided by omitting it from his 2018

COIB disclosure form, despite the requirement to report it.

### As the 2021 Mayoral Election Approaches, ADAMS Continues to Solicit and Accept Illegal Campaign Contributions

#### *In 2019, ADAMS travels to Istanbul and solicits foreign contributions*

22.    In January 2019, ERIC ADAMS, the defendant, and Adams's Partner traveled to

Turkey, Jordan, and Oman with the assistance of the Promoter. Because ADAMS made his travel

arrangements through the Promoter and not through the Airline Manager, the Airline Manager did

not upgrade ADAMS's economy class tickets on the Turkish Airline, instead arranging a full

upgrade only for Adams's Partner. Had Adams's Partner purchased her business class ticket, it

16

would have cost at least approximately $7,000. In an effort to monopolize flight travel as a method of gaining influence with ADAMS, the Airline Manager observed that difficulty arose in upgrading ADAMS because the arrangements had been made through others. When exchanging messages about another potential trip later in 2019, the Adams Staffer requested an upgrade for ADAMS from the Airline Manager and explained, in part, that "He learned his lesson last time. We're writing directly to you this time." After the 2019 trip, ADAMS exclusively arranged his flights on the Turkish Airline through the Airline Manager, allowing the Airline Manager, the Turkish Official, and the Turkish government to increase their influence over ADAMS.

23.    During his 2019 trip, ERIC ADAMS, the defendant, solicited and accepted travel benefits from the Promoter—the Turkish entrepreneur who, as described above, facilitated ADAMS's second 2015 trip to Turkey and in 2018 proposed to ADAMS via the Adams Staffer raising campaign contributions illegally in Turkey. Specifically, ADAMS solicited and accepted free hotel stays, dinners, and a boat trip, among other things, from the Promoter, including a free two-night stay in the Cosmopolitan Suite of the St. Regis Istanbul, depicted below:



*Cosmopolitan Suite Living Room*

17



*Cosmopolitan Suite Bedroom*

Had ADAMS paid for a two-day stay in this luxury suite, the cost would have been approximately $3,000 total. ADAMS also solicited and accepted from the Promoter free transportation, meals, and entertainment, including a car and driver, a boat tour to the Princes' Islands in the Sea of Marmara, a Turkish bath at a seaside hotel, and at least one meal at a high-end restaurant.

24.     ERIC ADAMS, the defendant, did not report any of the free travel benefits he received during his 2019 stay in Istanbul on his 2019 COIB disclosure form.

25.     ERIC ADAMS, the defendant, also solicited unlawful foreign campaign contributions while in Istanbul in January 2019. During ADAMS's trip, the Promoter arranged for ADAMS to meet a wealthy Turkish businessman ("Businessman-3"). The Turkish Official, through the Adams Staffer, discouraged ADAMS from meeting Businessman-3, who was then under suspicion of wrongdoing. ADAMS did so nonethless. During their meeting, ADAMS and the Promoter solicited campaign contributions from Businessman-3, who as a Turkish national could not lawfully contribute to any U.S. campaign. During the meeting, Businessman-3 agreed

18

to contribute $50,000 or more to the 2021 Campaign, believing that ADAMS might one day be the President of the United States and hoping to gain influence with ADAMS. In subsequent messages, the Promoter and the Adams Staffer discussed how to funnel Businessman-3's planned contributions to the 2021 Campaign through U.S. straw donors. Before any of the discussed straw donations could occur, however, Businessman-3's legal troubles in Turkey and the United States became more public. ADAMS declined to meet with Businessman-3 when Businessman-3 later visited New York, and Businessman-3 did not ultimately contribute to the 2021 Campaign.

26.     Businessman-3 was not the only wealthy Turkish national from whom ERIC ADAMS, the defendant, sought illegal campaign contributions. Also in January 2019, ADAMS continued to seek the illegal foreign contributions promised by Businessman-1 (the Turkish national who owned the Turkish University), telling the Adams Staffer in a text message to confirm Businessman-1's continued willingness to support the 2021 Campaign.

27.     ERIC ADAMS, the defendant, continued to conceal the benefits he received from foreign nationals seeking to gain influence over him. ADAMS did not report any of the 2019 gifts he received from the Airline Manager or the Promoter on his annual disclosure form. In addition, in March 2019, while exchanging text messages to plan another possible to trip to Turkey in which the Airline Manager would arrange travel for ADAMS, the Adams Staffer texted ADAMS, "To be o[n the] safe side Please Delete all messages you send me." ADAMS responded, "Always do."

### *In December 2020, ADAMS solicits and accepts straw contributions from a New York construction company*

28.     In 2020, ERIC ADAMS, the defendant, solicited and received straw donations from a businessman who operated a construction company in the New York City area ("Businessman-4"). Although Businessman-4 was not part of New York's Turkish community, his contributions were sought and made for similar reasons to the many Turkish nationals and

19

Turkish Americans whom the Turkish Official and the Promoter induced to make illegal contributions to the 2021 Campaign: Businessman-4 was a prominent member of a different ethnic community in New York City, and he was told by ADAMS's representatives that straw contributions would increase Businessman-4's influence, and the standing of his community, with ADAMS.

          a.      In December 2020, two volunteers for the 2021 Campaign who later became employees of ADAMS at City Hall ("Adams Employee-1" and "Adams Employee-2", and together, the "Adams Employees") asked Businessman-4 to contribute $10,000 to the 2021 Campaign. The Adams Employees were liaisons to Businessman-4's community, playing roles similar to the Adams Staffer's role in the Turkish community. The Adams Employees told Businessman-4, among other things, that donating $10,000 would give Businessman-4 influence with ADAMS, which would help Businessman-4's business interests and his community when ADAMS became mayor, and that gaining such influence with ADAMS would be more expensive at a later date.

          b.      Businessman-4 agreed to contribute and offered to write a $10,000 check from his company's bank account. The Adams Employees informed Businessman-4 that he could not donate through his corporate bank account.

          c.      Businessman-4 then offered to write a $10,000 check from his personal bank account. The Adams Employees informed Businessman-4 that he could not donate more than $2,000. The Adams Employees then explained that Businessman-4 should instead direct his employees to contribute to the 2021 Campaign and then reimburse the employees.

          d.      Businessman-4 followed the Adams Employees' directions. Businessman-4 personally contributed $2,000 to the 2021 Campaign and reimbursed four of his

employees for their $2,000 contributions to the 2021 Campaign.  Businessman-4 and his employees made these contributions at a fundraiser that ADAMS personally attended, which was held at Businessman-4's offices.

e.    The 2021 Campaign requested, and received, Matching Funds for these straw donations.

f.    After ADAMS was elected mayor, Businessman-4 sought to benefit from the influence with ADAMS that the Adams Employees assured Businessman-4 would result from the straw contributions.  Among other things, Businessman-4 sought assistance from ADAMS and the Adams Employees with arranging events celebrating the national heritage of Businessman-4's ethnic community, and ADAMS and the Adams Employees worked with Businessman-4 to arrange such events with City sponsorship.

g.    Businessman-4 also sought and received assistance resolving issues with the New York City Department of Buildings ("DOB"), including from ADAMS himself.  On February 5, 2023, Businessman-4 sent a text message to ADAMS saying, among other things, "I always supported you," but that Businessman-4 was "having a hard time with DOB" getting a stop-work order lifted, and that although ADAMS's staff had assisted, "we reached a certain limit that only you can lift."  ADAMS responded, "Let me look into this."  Approximately a week and a half later, Businessman-4 replied to ADAMS "Mayor, brother I want to thank you for your help. DOB issue partially resolved and they promised to expedite the process.  Thank you, you have my continued support."

### In May 2021, ADAMS receives straw contributions from another New York construction company, as arranged by the Turkish Official

29.    ERIC ADAMS, the defendant, accepted support from the Turkish Official throughout the 2021 Campaign, and the Turkish Official repeatedly informed ADAMS that he was

providing such support. When a fundraising effort organized or facilitated by the Turkish Official failed to raise the amount of funds that the Turkish Official had promised ADAMS, the Turkish Official told ADAMS and the Adams Staffer that he would "close the gap" by obtaining sufficient funds from other sources to reach the promised amount.

30.     In May 2021, ERIC ADAMS, the defendant, sought and accepted straw donations from another businessman ("Businessman-5") who operated another construction company in the New York City area. Businessman-5 is a prominent member of New York City's Turkish community and made these donations at the behest of the Turkish Official.

a.     In January 2021, the Turkish Official messaged the Adams Staffer, asking for a meeting with ADAMS. The Turkish Official and the Adams Staffer then exchanged the following messages:

| | |
|---|---|
| Adams Staffer: | What will the topic be? |
| Turkish Official: | The election<br>that's what |
| Adams Staffer: | okay |
| Turkish Official: | Nov 2nd 2021 [the date of the 2021 mayoral election] |
| Adams Staffer: | His favorite topic |
| Turkish Official: | Turkish community support to him<br>What can we do, let's talk |
| Adams Staffer: | okay |

b.     ADAMS, the Turkish Official, the Airline Manager, the Adams Staffer, and the lead fundraiser for the 2021 Campaign (the "Adams Fundraiser") met at a restaurant for dinner on February 14, 2021. At the dinner, the Turkish Official committed to "support" the 2021 Campaign.

22

c.    The Turkish Official then organized a larger dinner to plan specific donations to the 2021 Campaign. Businessman-5, the Turkish Official, ADAMS, the Adams Fundraiser, and the Adams Staffer attended that dinner, which occurred on April 2, 2021. At the dinner, ADAMS explained the Matching Funds Program and solicited contributions from Businessman-5. The Turkish Official told ADAMS, "we are supporting you."

d.    After the April 2, 2021 dinner, Businessman-5 worked with the Turkish Official, the Adams Fundraiser, and the Adams Staffer, among others, to plan a fundraiser for ADAMS. Businessman-5 attempted to recruit others in the construction industry and the Turkish community, writing, in part, this "may feel like swimming against the current but unfortunately this is how things work in this country." The day before the scheduled fundraiser, the Turkish Official sent Businessman-5 at least one check, and Businessman-5 sent the Turkish Official a message confirming that "As of now, the checks that reached us are 17,000."

e.    On May 7, 2021, Businessman-5 held a fundraiser for the 2021 Campaign at his construction company's offices. ADAMS, Businessman-5, the Adams Fundraiser, and the Adams Staffer attended. The Turkish Official did not attend but sent his driver to deliver several additional contribution checks. Prior to the fundraiser, Businessman-5's construction company, at the direction of Businessman-5, had provided $1,250 per employee to ten of its employees. Each of those employees then contributed that amount to the 2021 Campaign, with the exception of one employee who donated in his wife's name, and another who donated $1,200 of the funds. The Adams Staffer sent the Turkish Official a list of the contributions collected at the fundraiser.

f.    Following the fundraiser, the Turkish Official sent Businessman-5 a message asking, "how much is the total?" to which Businessman-5 replied, "I think I got to 22[.] He just left[.] The girls, [ADAMS's] assistants, were very happy[.]" The Turkish Official

23

subsequently asked the Adams Staffer to tell ADAMS, "we will continue supporting you," which the Adams Staffer did.

g.      The 2021 Campaign requested Matching Funds for eight of these straw donations that were made in the names of New York City residents, fraudulently obtaining public funds to which the campaign was not entitled.

### *In September 2021, ADAMS accepts straw contributions from a Turkish national*

31.     In 2021, Businessman-1—the Turkish national who owned the Turkish University, as described above—attempted to make good on his earlier commitments to contribute to ERIC ADAMS, the defendant. ADAMS and Businessman-1 used the Promoter and the Adams Staffer, among others, to devise and execute a plan to funnel Businessman-1's money to the 2021 Campaign, knowing full well that these donations would violate the law against U.S. political campaigns receiving contributions from foreign nationals.

a.      On July 9, 2021, the Adams Staffer exchanged messages with ADAMS about raising funds from the Turkish University, among other sources. ADAMS explained that he was "Not doing [an] in person fundraiser for less than $25K."

b.      On July 11, 2021, the Adams Staffer asked the Promoter how much would be donated, explaining in a message that she needed to "tell [ADAMS] a net number." When the Promoter estimated between $35,000 and $50,000, the Adams Staffer replied that the Promoter earlier "had mentioned 200K." When the Promoter explained that the requisite number of straw donors could not be gathered, the Adams Staffer offered to help with that aspect of the scheme. The Promoter responded, "Hmmm then great," and when the Adams Staffer then wrote "From what I gathered you'll distribute the money," the Promoter responded "Yes." The Adams Staffer later told ADAMS that the estimated total amount of the foreign donations would be $45,000.

24

c.    In August 2021, the Promoter, the Adams Staffer, and the president of the

Turkish University's American campus (the "University President") exchanged messages and

voice notes explicitly discussing the plan to funnel Businessman-1's contribution to the 2021

Campaign through the Turkish University's U.S.-based employees.  The Promoter assured the

Adams Staffer that those employees are "[U.S.] citizens and green card holders."  The Adams

Staffer told ADAMS about the plan to funnel Businessman-1's contribution through U.S.-based

straw donors, and ADAMS approved the plan, knowing that Businessman-1 was a Turkish citizen.

d.    On August 27, 2021, the University President messaged the Adams Staffer

that the Turkish University would donate $20,000 to the 2021 Campaign by "dividing it amongst

our employees in appropriate amounts."  The Adams Staffer responded that "if the donation is not

more than $25K, then Mr. President"—referring to ADAMS, who was then Brooklyn Borough

President—"does not participate in person."  The University President then informed the Adams

Staffer that in addition to the Turkish University's contribution, others would donate to reach the

$25,000 threshold.

e.    On August 27, 2021, the University President informed the Adams Staffer

that the Turkish University would donate only $10,000.  Because that meant that ADAMS would

no longer appear at an in-person event, the Adams Staffer asked the Adams Fundraiser to create

an internet link through which the Turkish University's straw donors could contribute.  In a series

of messages with ADAMS and the Adams Staffer, the Adams Fundraiser sent the link to the

Adams Staffer.  To remind the Adams Staffer of the mechanics of the plan they had discussed—

that the foreign donations would be concealed by routing them through U.S.-based straw donors

who could lawfully contribute in their own names—ADAMS wrote to the Adams Staffer and the

Adams Fundraiser, "We can't take any money from people who are not US citizens."  The Adams

25

Staffer inquired, "What about green card holders?" The Adams Fundraiser responded, "Yes we can," confirming that the Promoter's plan to use green card holders as straw donors would work.

        f.     The Turkish University ultimately made its straw contributions on September 27, 2021, when three U.S.-based employees of the Turkish University made $2,000 contributions to the 2021 Campaign and were then reimbursed, as directed by Businessman-1 and the University President. The University President and another U.S.-based employee of the Turkish University each also made $2,000 contributions from their own funds. The contributions occurred during a period when the 2021 Campaign had begun to wind down fundraising and were ultimately refunded by the campaign, but not before ADAMS submitted a disclosure statement to the CFB that falsely claimed the U.S.-based Turkish University employees were the true donors.

        g.     On November 2, 2021, ADAMS was declared the winner of the 2021 mayoral election. The next day, Businessman-1 and the Promoter exchanged the following messages:

| | |
|---|---|
| Promoter: | Good morning<br>The president is our brother from now on, sir. |
| Businessman-1: | Good morning |
| Promoter: | May it be auspicious for all of us.<br>We messaged each other. |
| Businessman-1: | Are the elections over? |
| Promoter: | It was yesterday, sir<br>Everyone messaged me that he was elected.<br>Congratulations messages<br>He is most likely going to assign me as a representative, sir.<br>I'm going to go and talk to our elders in Ankara about how we can turn this into an advantage for our country's lobby. |
| Businessman-1: | That would be nice |

h.    The Promoter also celebrated ADAMS's prospects with additional people, telling others—including ADAMS himself—that ADAMS would soon be President of the United States.  Similarly, the Turkish Official wrote to the Adams Staffer that given ADAMS's increasing prominence, "at this point," the Foreign Minister of Turkey "is personally paying attention to him" and ADAMS "should not bother with" his other Turkish benefactors.

32.    All told, the 2021 Campaign reaped over $10 million in Matching Funds based on the false certifications that the campaign complied with the law, when in fact ERIC ADAMS, the defendant, knowingly and repeatedly relied on illegal contributions.

## In 2021, ADAMS Accepts Bribes From the Turkish Official and Intervenes on the Turkish Official's Behalf with the Fire Prevention Chief

33.    In 2021, ERIC ADAMS, the defendant, intervened with the FDNY to permit the Turkish Consulate to occupy a skyscraper that had not passed a fire safety inspection, in exchange for, among other things, luxury travel benefits provided by the Turkish Official and the Airline Manager.

34.    In late June 2021, ERIC ADAMS, the defendant, sought luxury travel to Turkey arranged by the Turkish Official and the Airline Manager.  When the Adams Staffer began coordinating this travel for ADAMS, at ADAMS's direction, ADAMS again attempted to create a false record suggesting that he would pay his own way, when, in fact, ADAMS had the Adams Staffer coordinate with the Airline Manager to provide ADAMS with free and steeply discounted travel benefits.  ADAMS approved the itinerary, and, to create the false impression of payment, the Turkish Official, ADAMS, and the Adams Staffer agreed that ADAMS would collect invoices from vendors in Turkey regardless of whether he actually paid and would make some small credit card payments to conceal the fact that he was taking a vacation that was mostly paid for by the Turkish government.

a. On June 22, 2021, ADAMS, through the Adams Staffer, requested that the Airline Manager book flights to Istanbul for ADAMS. In order to conceal the favorable treatment, the Adams Staffer requested that the Airline Manager charge ADAMS what would appear to be a "real" price:

| Adams Staffer: | How much does he owe?<br>Please, let them call me and I will make the payment. |
| --- | --- |
| Airline Manager: | It is very expensive because it is last minute. I am working on a discount |
| Adams Staffer: | Okay.<br><br>Thank you. |
| . . . | |
| Airline Manager: | I am going to charge $50 |
| Adams Staffer: | No |
| Airline Manager: | That would work wouldn't it |
| Adams Staffer: | No, dear. $50? What?<br>Quote a proper price. |
| Airline Manager: | How much should I charge? :) |
| Adams Staffer: | His every step is being watched right now<br>$1,000 or so<br>Let it be somewhat real.<br>We don't want them to say he is flying for free.<br>At the moment, the media's attention is on Eric. |

ADAMS paid approximately $1,100 each for roundtrip economy tickets on the Turkish Airline for himself and Adams's Partner, which were immediately upgraded to business class at no cost. Had ADAMS purchased business class tickets on the open market, they would have cost more than $15,000 total.

28

b.    At ADAMS's direction, the Adams Staffer also coordinated luxury lodging for ADAMS and Adams's Partner, which would be secretly provided at no cost to ADAMS, as the Adams Staffer and the Airline Manager discussed:

| | |
|---|---|
| Adams Staffer: | He is also asking where else they can go in Turkey Do you have a recommendation? |
| Airline Manager: | Four Seasons |
| Adams Staffer: | It's too expensive |
| Airline Manager: | Why does he care? He is not going to pay His name will not be on anything either |
| Adams Staffer: | Super |

c.    The Turkish Official also arranged an itinerary for ADAMS and Adams's Partner in Turkey, which, in addition to the stay at the Four Seasons, would include a yacht tour, a three-day stay at a luxury beach resort, and a car and driver, as well as a domestic flight between Istanbul and the resort. The Adams Staffer forwarded details of this itinerary to ADAMS. To assist ADAMS in concealing the nature and extent of the travel benefits he was soliciting and accepting, the Turkish Official suggested a nominal price of approximately $720, although the true price of this itinerary would in fact have been approximately $8,500 or more. ADAMS approved the itinerary and the nominal price.

d.    On June 26, 2021 (the same day the trip was supposed to start), the Adams Staffer informed the Turkish Official and the Airline Manager that ADAMS was cancelling his trip. The Turkish Airline refunded ADAMS's payment for economy class tickets—the only payment ADAMS had made for the late June 2021 trip to Istanbul.

29

35.    At around the time of this cancellation, ERIC ADAMS, the defendant, solicited various travel benefits for the Adams Fundraiser—the 2021 Campaign's chief fundraiser who, as noted above, helped coordinate the straw contributions from Businessman-5's construction company one month earlier in May 2021—from the Turkish Official and the Airline Manager. Continuing their efforts to influence ADAMS, the Turkish Official and the Airline Manager ultimately provided the Adams Fundraiser with transportation from the airport, a free hotel, and free use of a VIP room in the Turkish Airline's business class lounge.

a.    On June 27, 2021, when the Adams Fundraiser was scheduled to travel to Istanbul, ADAMS created a message thread between himself, the Adams Fundraiser, and the Turkish Official. ADAMS informed the Turkish Official that the Adams Fundraiser would be arriving in Istanbul shortly and needed transportation from the airport and a hotel, which the Turkish Official promptly arranged. When ADAMS suggested that ADAMS would pay for the Adams Fundraiser's expenses, the Turkish Official told ADAMS, "Eric no prob, it was set through Turkish Hospitality Services. I hope she enjoyed her stay." ADAMS responded, "It was amazing. Thanks for all the coordination and attention." In the same message thread with ADAMS, the Turkish Official also provided the Adams Fundraiser with a fake bill for the hotel stay, to allow ADAMS and the Adams Fundraiser to create the appearance that the Adams Fundraiser had paid for her hotel stay, when in fact, as ADAMS knew, she had not.

b.    On the day the Adams Fundraiser was scheduled to depart Istanbul, ADAMS created a message thread between himself, the Adams Fundraiser, and the Airline Manager. ADAMS wrote, "[Adams Fundraiser] this is [the Airline Manager]. 1. He will try to help the issue with the form[.] 2. He can see about a hotel or the business class lounge." The Airline Manager then arranged for the Adams Fundraiser—who was otherwise flying on an

economy ticket—to have access not only to the Turkish Airline's business lounge, but also to an exclusive private suite inside the lounge, complete with a bed and free food. The Airline Manager explained, "This is our suite for our VIPs [a]nd we want you to feel your self [sic] Vip :) ." At another point in this exchange, ADAMS wrote, "Thanks a million [Airline Manager]. My Brother," to which the Airline Manager responded, "Anytime brother."

36.    ERIC ADAMS, the defendant, and the Turkish Official understood that in exchange for the benefits described in paragraphs 34 and 35, and future travel benefits for ADAMS, ADAMS was expected to assist the Turkish Official in the operation of the Turkish Consulate in New York.

37.    On July 6, 2021, ERIC ADAMS, the defendant, declared victory in his party's mayoral primary. On the morning of July 7, 2021, the Airline Manager sent ADAMS the following text message: "Brother congratulations." ADAMS responded, "Cannot thank you enough."

38.    In September 2021, ERIC ADAMS, the defendant, agreed to pressure a New York City agency to help the Turkish Consulate secure a temporary certificate of occupancy ("TCO") for a building it owned and operated.

a.    As Brooklyn Borough President, ADAMS had authority under the New York City Charter to affect the administration of City services within his Borough, such as those provided by the FDNY and other city agencies, including through: holding public hearings; introducing legislation before the City Council; overseeing the coordination of a borough-wide public service complaint program; and consulting with the Mayor of the City of New York on the executive capital budget and other budget recommendations. In addition to, or in the course of, the performance of these duties, as Brooklyn Borough President, ADAMS met with members of the FDNY from time to time.

b.      In 2017, construction began on a 36-story building located at 821 United Nations Plaza, New York, New York, and referred to as the Turkish House or Turkevi Center (the "Turkish House"). The Turkish House was designed to serve as, and now serves as, the headquarters of multiple Turkish diplomatic missions, including the Turkish Consulate. The cost of the Turkish House was significant and was a topic of political debate in Turkey.



*The Turkish House*

c.      The Turkish Consulate planned to open the Turkish House on September 20, 2021, so that Turkey's President could formally open the building during his visit for that year's opening of the United Nations General Assembly. Ensuring the Turkish House

32

opened on schedule was a priority for the Turkish Official, who was at this time Turkey's Consul General in New York.

         d.     As of August 31, 2021, construction on the Turkish House was complete, but the DOB had not yet issued a TCO for the building. Without a TCO, the Turkish House could not open during the Turkish President's impending visit.

         e.     The DOB had not issued a TCO because the FDNY had not yet conducted an inspection and issued what the FDNY refers to as a "letter of defect," which was a prerequisite to the issuance of a TCO for the Turkish House. Issuing a letter of defect is a regular FDNY procedure which, in substance, identifies remaining defects in a building's fire safety systems, but also serves to signal that the defects are sufficiently limited that the building can be safely occupied.

         f.     From on or about August 31, 2021, through on or about September 9, 2021, various New York City officials and employees, among others, sought to help the Turkish Official obtain a TCO for the Turkish House by lobbying the chief of the FDNY's Bureau of Fire Prevention (the "Fire Prevention Chief") to provide a letter of defect. The Fire Prevention Chief refused, citing numerous reported fire safety defects, some of which were serious, at the Turkish House, and the likelihood that the building would fail any FDNY inspection.

         g.     On or about September 5, 2021, the Turkish Official began asking ADAMS, both directly and through the Adams Staffer, to intervene with the Commissioner of the FDNY (the "FDNY Commissioner") in order to secure a TCO for the Turkish House. ADAMS, the Turkish Official, and the Adams Staffer discussed these requests through phone calls and electronic messages. In a phone call to the Adams Staffer, the Turkish Official stated that because

33

Turkey had supported ADAMS, it was now "his turn" to support Turkey. The Adams Staffer relayed this message to ADAMS, and ADAMS responded, "I know."

        h.     On September 6, 2021, ADAMS messaged the Adams Staffer that he would contact the FDNY Commissioner.

        i.     On September 7, 2021, ADAMS messaged the Adams Staffer that he had a scheduled call with the FDNY Commissioner later that day.

        j.     On September 8, 2021, ADAMS messaged the FDNY Commissioner, asking him to call ADAMS. Until that point, the messages between the FDNY Commissioner and ADAMS had consisted of (i) an August 3, 2021 message from the FDNY Commissioner to ADAMS, requesting to continue serving as FDNY commissioner after ADAMS became mayor, and stressing that he was "loyal and trustworthy," to which ADAMS sent a noncommittal response, and (ii) a September 5, 2021 invitation to a September 11 memorial service from the FDNY Commissioner to ADAMS, to which ADAMS responded that he would try to attend and wished to speak with the FDNY Commissioner for "a half hour . . . about FDNY."

        k.     Also on September 8, 2021, ADAMS messaged the FDNY Commissioner, stating, in part, "They said they needed a letter of Defect from FDNY to DOB. They know they have some issues but according to them with the letter the DOB wi[ll] give the TCO." The FDNY Commissioner responded, "We will get on it tomorrow." Through the Adams Staffer, ADAMS assured the Turkish Official, "Don't worry," "I am on top of this."

        l.     On September 9, 2021, after a contractor working for the Turkish Consulate sent the FDNY a letter describing the status of the Turkish House's fire alarm system, an FDNY employee with responsibility for inspecting the system sent the Fire Prevention Chief the following email:

34

From:
Sent: Thursday, September 9, 2021 11:51 AM
To:
Subject: FW: Turkish Embassy - Fire Alarm Request - 821 1st Avenue (21021)

Chief,
After reviewing the letter, I do not see any way we would be willing to accept it. They have some major issues like central
station and fan shutdowns which would be an automatic violation order. Aside from that, he gave us a list with over 60
defects and some of them list 5-10 problems in each one. FAIU would not go beyond 20 defects without issuing a
violation order. In my opinion, this document does not take any liability that we would be comfortable with. I believe it
actually tells us this building is not safe to occupy. Feel free to reach out to discuss further.
Thanks

m.      On the morning of September 10, 2021, ADAMS messaged the FDNY

Commissioner, stating that the Turkish Official had understood that the FDNY was going to

inspect the Turkish House the previous day, and "They really need someone . . . by today if

possible. If it is[ im]possible please let me know and I will manage their expectation." The FDNY

Commissioner wrote back that "There seems to be a difference of opinion between the inspector"

and the private alarm engineer responsible for the building, but that the FDNY Commissioner was

"trying to iron it out."

n.      Shortly after noon on September 10, 2021, ADAMS messaged the FDNY

Commissioner, "They said the hire [sic] ups at FDNY did not give the inspector authorization to

come. The inspector indicated he needs authority to come to day [sic]." The FDNY Commissioner

responded, "Working on that as we speak." At approximately 2:06 p.m., ADAMS messaged the

Adams Staffer that ADAMS had again spoken with the FDNY Commissioner, and "He again told

me he is on the phone as we speak to try and resolve this."

o.      Also on the afternoon of September 10, 2021, the FDNY Chief of

Department summoned the Fire Prevention Chief to a meeting. The Chief of Department was the

FDNY Commissioner's direct subordinate and the Fire Prevention Chief's superior. The Chief of

Department informed the Fire Prevention Chief, in substance, that if the FDNY did not assist the

Turkish Consulate in obtaining a TCO, both the Chief of Department and the Fire Prevention Chief

would lose their jobs. The Fire Prevention Chief then drafted a "conditional letter of no objection"

35

for the Turkish House. The Fire Prevention Chief had never before written a "conditional letter of no objection," which was not standard FDNY procedure. Instead, the Fire Prevention Chief wrote this letter, which he later described as "unprecedented," to inform the DOB that FDNY did not object to issuing the TCO, provided that the private engineers affirmed that the fire alarm system functioned properly, and "assum[ing] the Department of Buildings has inspected, tested and approved the installed water-based fire suppression systems."

      p.    At 2:17 pm on September 10, 2021, the FDNY Commissioner wrote ADAMS, "Letter being drafted now. Everything should be good to go Monday morning." Four minutes later, ADAMS messaged the Turkish Official, "From the commissioner: Letter being drafted now. Everything should be good to go Monday morning." The Turkish Official responded, "You are Great Eric, we are so happy to hear that 🙏🙏. You are a true friend of Turkey." ADAMS replied, "Yes even more a true friend of yours. You are my brother. I am hear [sic] to help." At 2:30 pm, the Turkish Official confirmed, "You are such a friend 🙏." At 2:31 p.m., the Fire Prevention Chief sent the "conditional letter of no objection" to the private alarm engineer.

    39.    After ERIC ADAMS, the defendant, pressured the FDNY to permit a TCO to be issued for the Turkish House, the Turkish Official continued to fulfill his end of the bargain, by providing additional luxury travel benefits to ADAMS. These benefits, which ADAMS accepted, were worth more than $14,000.

      a.    On September 14, 2021—four days after ADAMS caused the FDNY to acquiesce in the TCO—ADAMS messaged the Adams Staffer, directing her to secure tickets to Pakistan for a trip from November 30 to December 8, 2021. The Adams Staffer relayed the request to the Airline Manager, stating, "He'll pay the economy class price," but asking, "Can we upgrade later?" The Airline Manager replied, "Of course."

b.      On September 21, 2021, the Turkish Official messaged the Adams Staffer,
seeking a meeting at a particular time between ADAMS and a Turkish Deputy Minister.  The
Turkish Official wrote, "This is very important. He"—the Deputy Minister—"is the person who
makes all the arrangements with one phone call in Turkey.  Flight, yacht tour, hotels, rental cars...."
The meeting did not occur, because ADAMS was scheduled to meet with a former President of
the United States at the time requested for the meeting with the Deputy Minister.

c.      After the Airline Manager and the Adams Staffer further discussed the price
and timing of ADAMS's tickets, on September 28, 2021, ADAMS purchased two roundtrip
economy class tickets on the Turkish Airline from New York to Pakistan—arriving in Lahore and
departing from Islamabad—for a total price of $1,436.  On November 17, 2021, the Adams Staffer
messaged ADAMS to confirm that he still intended to travel and that she should therefore have his
tickets upgraded to business class.  ADAMS responded, "Ok, do so."  On November 18, 2021, the
Adams Staffer messaged the Airline Manager, requesting the upgrade.  The Turkish Airline
upgraded ADAMS's tickets to business class at no cost to ADAMS.

d.      On November 25, 2021—four days before he was scheduled to depart for
Pakistan—ADAMS asked that his destination be changed to Ghana.  The Airline Manager changed
ADAMS's and Adams's Partner's tickets to business class flights to Ghana at no cost to ADAMS.
Had ADAMS paid full price for the business class tickets to Ghana, they would have cost more
than $14,000 total.

e.      On November 26, 2021, the Turkish Official informed the Adams Staffer
that "we will take care of the layover in Istanbul," referring to a nine-hour layover in Istanbul
during ADAMS's just-scheduled flight from New York to Ghana.  The Turkish Official then
offered various arrangements for ADAMS, including an escort to meet ADAMS and Adams's

Partner at the gate of the Istanbul airport, pickup at the Istanbul airport by "luxury vehicle"—later specified as a "BMW 7"—with a driver, dinner at a high-end restaurant where ADAMS would meet a Turkish government official, drinks at a separate location, a boat tour of the Bosporus Strait, and return to the airport in time for ADAMS's business class flight from Istanbul to Ghana. ADAMS selected the airport escort, driver, and dinner, but declined the Bosporus Strait cruise, explaining that he has "done the boat tour a few times." In touting the benefits he provided, the Turkish Official messaged the Adams Staffer, "don't let [the Airline Manager] and others confuse [ADAMS]. We are the state."

   f.  On November 30, 2021, the Adams Staffer relayed to the Turkish Official requests by ADAMS that his excursion into Istanbul receive no media attention, including social media. The Turkish Official agreed that it would be "confidential." Accordingly, the Turkish Official confirmed that during ADAMS's dinner at the Istanbul restaurant, the Turkish Official's "team did not let anyone take any pictures." This was in stark contrast to the Ghana portion of ADAMS's trip, for which ADAMS actively sought and obtained press coverage, and which ADAMS posted about on his social media account.

   g.  After ADAMS completed the layover, the Turkish Official and the Adams Staffer exchanged the following messages:

| Turkish Official: | Was Eric satisfied? |
| --- | --- |
| Adams Staffer: | It was great. Thank you for everything. |
| Turkish Official: | 👍👍<br>it's okay if he is happy<br>. . .<br>Is Eric happy then? |
| Adams Staffer: | He is very happy. He is sending you his thanks. |

40.    During and shortly after the travel to Ghana and Istanbul described in the preceding paragraphs, ERIC ADAMS, the defendant, took additional actions for those who provided him travel benefits, in exchange for those benefits.

a.    In early December 2021, ADAMS announced the members of his transition committees, which were established to advise the mayor-elect and his team on policies and appointments before he took office. Initially, there were no members of the Turkish community on any of the committees.

b.    On December 8, 2021, the Adams Staffer sent the Airline Manager a link to a list of ADAMS's transition committees and asked the Airline Manager, "Have you looked at the list?" The Airline Manager responded, "It would suit me well to be lead Or Senior Advisor." Two days later, the Airline Manager sent a message reiterating, "Lead Plz :) Otherwise seat number 52 is empty ... On the way back," meaning that if the Airline Manager was not given a position on a transition committee, it would affect ADAMS's travel benefits from the Turkish Airline.

c.    On December 17, 2021, the Adams Staffer sent ADAMS a list of members of the Turkish community to add to ADAMS's transition committees, with the Airline Manager as the top name. ADAMS informed the Adams Staffer that he had sent the list to the persons responsible for organizing his transition committees. ADAMS sent the list to a staff member with the direction "Add to transition." The Airline Manager was subsequently added to ADAMS's Infrastructure, Climate and Sustainability Committee transition committee.

d.    On December 23, 2021, a senior Turkish government official sent the Airline Manager a series of text messages, noting the Airline Manager's membership on ADAMS's Infrastructure, Climate and Sustainability Committee and sending applause emojis. The Airline Manager responded that his membership on the transition committee was in service of

Turkey: "Thank you, brother. We are doing our best to serve our country adequately. Your support gives us strength here. Thank you. You are always there for us, and we're trying to be worthy."

41.    ERIC ADAMS, the defendant, continued to conceal the luxury travel benefits he accepted in exchange for taking actions favorable to the Turkish Official, the Airline Manager, and others, by once again not reporting these gifts on his 2021 annual disclosure form. In total, from 2016 through 2021, ADAMS received the following benefits from the Turkish Official, the Airline Manager, the Promoter, and others, none of which he reported on annual disclosure forms:

| Year | Destination | Benefits | Value | Disclosed? |
|------|-------------|----------|-------|------------|
| 2016 | India (via Turkey) | Free upgrade to business class for two on roundtrip from New York to India | $12,000+ | No |
| 2017 | France, Turkey, China | Free business class tickets for three on roundtrip from New York to France, Turkey, and China; heavily discounted stay in Bentley Suite of St. Regis Istanbul | $41,000+ | No |
| 2017 | China (via Turkey) | Free business class tickets for two on roundtrip from New York to China | $16,000+ | No |
| 2018 | Hungary (via Turkey) | Free upgrade to business class for two on roundtrip from New York to Hungary | $12,000+ | No |
| 2019 | Turkey | Free upgrade to business class for one on flight from New York to Turkey; free stay at Cosmopolitan Suite of St. Regis Istanbul; free meals, transportation, and entertainment in Istanbul | $9,000+ | No |
| 2021 | Turkey (solicited and accepted but then canceled) | Free upgrade to business class for two on roundtrip from New York to Turkey; free or steeply discounted luxury hotel and resort stays, transportation, entertainment, and meals | $21,000+ | No |
| 2021 | Ghana (via Turkey) | Free upgrade to business class for two on roundtrip from New York to Ghana; free meal and transportation during Istanbul layover | $12,000+ | No |

**ADAMS Continues His Corrupt Relationships After Becoming Mayor**

*After his inauguration, ADAMS favors those who provided him with illegal benefits over those who fell short*

42.    On January 1, 2022, ERIC ADAMS, the defendant, was inaugurated as Mayor of New York City. ADAMS soon began preparing for his next election, in part by planning to solicit more straw contributions, and in part by granting requests by those who supported the 2021 Campaign with significant straw donations, while denying requests from those who fell short.

a.    On January 11, 2022, ADAMS met the Promoter, the Adams Staffer, and others at a high-end New York City restaurant frequented by ADAMS. At one point during the meeting, ADAMS, the Promoter, and the Adams Staffer met separately in a private area. There, the Promoter discussed his prior efforts to collect campaign contributions for ADAMS in Turkey, stated that he could collect more foreign contributions in the future, and indicated that he would be able to raise more money for the 2025 Campaign if ADAMS visited Turkey and met with Turkish businesspeople. ADAMS welcomed the offer of foreign contributions and told the Promoter to coordinate with the Adams Staffer to arrange the contributions.

b.    On April 21, 2022, the Turkish Official messaged the Adams Staffer, noting that Armenian Genocide Remembrance Day was approaching, and repeatedly asked the Adams Staffer for assurances that ADAMS would not make any statement about the Armenian Genocide. The Adams Staffer confirmed that ADAMS would not make a statement about the Armenian Genocide. ADAMS did not make such a statement.

c.    On November 21, 2022, the Promoter messaged the Adams Staffer that Businessman-1 was visiting New York, and asked that ADAMS meet with Businessman-1. In support of the requested meeting, the Promoter stated that the Turkish University "gave support, albeit a little." ADAMS declined the meeting, stating that "they didn't keep their word," meaning

42

that Businessman-1 and the Turkish University had failed to fulfill their commitment to make at least $25,000 in donations to the 2021 Campaign.

43.     ERIC ADAMS, the defendant, also continued his agreement with the Turkish Official to assist in New York City's regulation of the Turkish House in exchange for free or heavily discounted travel benefits from the Turkish Airline for ADAMS and his associates.

a.     From on or about July 8, 2022, to on or about July 12, 2022, the Turkish Official exchanged messages with the Adams Staffer concerning business class upgrades on the Turkish Airline for international travel by four of ADAMS's close associates.

b.     On July 11, 2022, the Turkish Official met with ADAMS's senior advisor and the Adams Staffer, among others, at the Turkish House.  In a message, the Adams Staffer referred the Turkish Official to ADAMS's senior advisor, telling the Turkish Official, "ask [the senior advisor] all your pending problems regarding this building [that is, the Turkish House] … Like FDNY approvals . . . ."

### In 2023 and 2024, ADAMS solicits and accepts straw contributions for his 2025 re-election campaign

44.     In 2023 and 2024, ERIC ADAMS, the defendant, again solicited and knowingly accepted straw and foreign contributions, as part of his efforts to raise funds for the 2025 Campaign.

45.     In 2023, ERIC ADAMS, the defendant, directed his staff to devise a plan for ADAMS to secretly obtain illegal foreign donations offered by the Promoter, and then knowingly accepted donations of foreign money through straw donors.  ADAMS then attended a fundraiser where he thanked the true donors, who he knew to be wealthy foreign nationals.

a.     In the summer of 2023, the Promoter informed the Adams Staffer that he could secure contributions to the 2025 Campaign from Turkish nationals if ADAMS would attend

43

an event with the foreign donors. The Adams Staffer brought this opportunity to ADAMS, who directed the Adams Staffer to work with the Adams Fundraiser to devise a plan to obtain the illegal donations.

b.    The Adams Fundraiser suggested that the true foreign donors make their contributions through straw donors considerably in advance of the event at which ADAMS would meet the true foreign donors, so that the event did not appear connected to the contributions. As the Adams Staffer explained to the Adams Fundraiser in a text message regarding the planned attendees, "Mayor knows most of them from turkey[.] The People who has business here as well." The Adams Staffer and the Promoter agreed to execute this plan, which ADAMS approved.

c.    The Adams Fundraiser, the Promoter, and the Adams Staffer scheduled an event for September 20, 2023 in a private room at a Manhattan hotel. To conceal the event's true purpose, the Promoter provided a PowerPoint presentation billing the event as a dinner hosted by "International Sustainability Leaders" with the subject "Sustainable Destinations" and an attendance price of $5,000. The event was not publicized or listed on ADAMS's public calendar. The Adams Fundraiser entered the event on ADAMS's private calendar as a "Fundraiser for Eric Adams 2025," with the host listed as the Promoter, a goal of "25k," and the note "Total Submitted before the event: $22,800."

d.    Prior to the scheduled fundraiser, the Promoter collected payments of $5,000 or more from attendees, many of whom were foreign nationals. The Promoter then used a portion of the attendees' payments to make straw donations to the 2025 Campaign, by sending cash from the foreign national donors to the Adams Staffer. The Adams Staffer then distributed $2,100 in cash to at least three straw donors who each made an online $2,100 contribution to the 2025 Campaign.

e.    On September 20, 2023, the Promoter hosted the fundraiser, which ADAMS, the Adams Fundraiser, the Adams Staffer, and foreign nationals who had contributed to the 2025 Campaign via straw donors attended. In one video of the event, the Promoter introduced a foreign-national attendee to ADAMS, explaining that the attendee owned a business and lived in London and Istanbul. ADAMS proceeded to thank the attendee.

46.    On October 9, 2023, ERIC ADAMS, the defendant, attended a fundraiser at which attendees agreed to make, and ADAMS agreed to accept, straw donations. The fundraiser was organized by a Turkish American public relations representative (the "PR Representative") and the publisher of a magazine targeted at Turkish Americans (the "Publisher"), both of whom were associates of the Turkish Official, and hosted by the owner of a logistics company ("Businessman-6"), who is part of the Turkish-American community in the New York City area.

a.    From late August 2023 through early September 2023, the Adams Staffer and the Adams Fundraiser discussed the particulars of the fundraiser, including the creation of a unique fundraising link for the event, which the Adams Fundraiser ultimately created.

b.    On September 12, 2023, the PR Representative and the Publisher instructed Businessman-6 on how to make straw donations to the 2025 Campaign, using a system under which the 2025 Campaign routed foreign donations through U.S. citizens, to make it appear that the contribution came from a lawful source.

c.    Beginning at least as early as September 29, 2023, the Adams Staffer sent the Adams Fundraiser updates regarding how much money was being raised in connection with the planned fundraiser. On October 8, 2023, the day before the event, the Adams Staffer and the Adams Fundraiser exchanged the following messages:

Adams Fundraiser:    And okay are they going to make the limit?

Adams Staffer:          Yes[.] They said as agreed we will collect the 25K

Adams Fundraiser:       Ok perfect

d.      Also on October 8, 2023, the Airline Manager sent the Turkish Official the unique fundraising link for the event.

e.      At the October 9, 2023 fundraiser, Businessman-6 told ADAMS that Businessman-6 owned a large corporation and wished to contribute significant amounts of money to the 2025 Campaign. ADAMS told Businessman-6 to coordinate with the Adams Staffer. Businessman-6 then explained to the Adams Staffer that his company employed many drivers and that Businessman-6 would contribute to the 2025 Campaign through those employees. ADAMS scheduled a dinner with Businessman-6 for early November, which was canceled after the federal investigation into ADAMS's conduct became public.

**ADAMS and His Co-Conspirators Attempt to Conceal Their Criminal Conduct**

47.     Throughout the commission of the conduct described in paragraphs 1 through 46 of this Indictment, ERIC ADAMS, the defendant, and his agents and co-conspirators sought to conceal their wrongful conduct from scrutiny by the public and law enforcement. As described above, ADAMS repeatedly did not disclose the free and heavily discounted travel benefits he accepted from the Turkish Official, the Promoter, and the Airline Manager; created a false paper trail to suggest he had paid for this travel when, in fact, he had not; assured the Adams Staffer that he had a practice of deleting all his messages with the Adams Staffer; and directed the Adams Staffer to ensure that his activities in Turkey in 2021 were shielded from public view. In addition, the purpose of conducting the straw donations discussed throughout this Indictment was to allow ADAMS to benefit from illegal campaign contributions by concealing their true source.

48.     ERIC ADAMS, the defendant, and his co-conspirators and agents continued their efforts to defeat scrutiny of their criminal conduct after the federal investigation into those crimes became known to them.  On November 2, 2023, Special Agents of the Federal Bureau of Investigation (the "FBI") executed search warrants at, among other locations, the residences of the Adams Fundraiser, Businessman-5, and the Adams Staffer.  Each took actions to conceal the criminal conduct they had committed with ADAMS.

a.     After learning that FBI agents had arrived at her residence, but before answering their repeated knocks at her door, the Adams Fundraiser called ADAMS five times, even though the agents had not yet given the Adams Fundraiser any indication of the purpose for their visit.  When the Adams Fundraiser then spoke with the FBI agents, she agreed to discuss many subjects, but refused to say who had paid for her 2021 travel to Turkey.  As the FBI agents departed the Adams Fundraiser's residence, ADAMS attempted to call the Adams Fundraiser's phone.  On the morning that the FBI agents executed this search, ADAMS had flown to Washington, D.C. for a publicized official meeting, but upon learning about the search, ADAMS canceled the meeting and immediately returned to New York City.

b.     Businessman-5 also agreed to speak with FBI agents and acknowledged that he and his employees had contributed to the 2021 Campaign.  Businessman-5 further acknowledged that he had spoken with the Turkish Official about his construction company's fundraiser for the 2021 Campaign.  But Businessman-5 lied in order to conceal the straw donations he orchestrated, falsely denying that he caused his construction company to reimburse his employees for their contributions and that he knew why the company had issued identical checks to ten employees for the amount of their contributions shortly before the fundraiser.

c.     The Adams Staffer also agreed to speak with FBI agents and falsely denied the criminal conduct of herself and ADAMS, among others. At one point during her voluntary interview, the Adams Staffer excused herself to a bathroom and, while there, deleted the encrypted messaging applications she had used to communicate with ADAMS, the Promoter, the Turkish Official, the Airline Manager, and others.

d.     On November 6, 2023, FBI agents executed a search warrant for the electronic devices used by ERIC ADAMS, the defendant. Although ADAMS was carrying several electronic devices, including two cellphones, he was not carrying his personal cellphone, which is the device he used to communicate about the conduct described in this indictment. When ADAMS produced his personal cellphone the next day in response to a subpoena, it was "locked," such that the device required a password to open. ADAMS claimed that after he learned about the investigation into his conduct, he changed the password on November 5, 2024, and increased the complexity of his password from four digits to six. ADAMS had done this, he claimed, to prevent members of his staff from inadvertently or intentionally deleting the contents of his phone because, according to ADAMS, he wished to preserve the contents of his phone due to the investigation. But, ADAMS further claimed, he had forgotten the password he had just set, and thus was unable to provide the FBI with a password that would unlock the phone.

49.     As the federal investigation into the criminal conduct of ERIC ADAMS, the defendant, continued, so did efforts to frustrate that investigation.

a.     On June 13, 2024, FBI agents interviewed Businessman-4 and the four employees of his company through whom Businessman-4 had made straw donations to the 2021 Campaign, most of whom denied making straw contributions. Businessman-4 then contacted Adams Employee-1, who, as discussed above, had asked Businessman-4 to make the straw

donations to the 2021 Campaign. Later that day, Adams Employee-1 visited Businessman-4 at his

company's offices. Adams Employee-1 stated that he had just met with ADAMS at City Hall.

Adams Employee-1 proceeded to discuss with Businessman-4 what had happened with the FBI

and encouraged Businessman-4 to lie to federal investigators. Adams Employee-1 then asked to

address Businessman-4's four employees who had made straw donations to the 2021 Campaign

and encouraged them to lie to federal investigators as well. Adams Employee-1 then took

photographs of the subpoena that had been issued to Businessman-4 to send to ADAMS.

      b.    On the following day, Businessman-4 met again with Adams Employee-1.

Adams Employee-1 told Businessman-4 that he had met with ADAMS at City Hall earlier that day

and that they had left their cellphones outside the room in which they met so that it would be "safe"

to talk. Adams Employee-1 explained to Businessman-4 that although ADAMS was upset that

law enforcement had approached Businessman-4, ADAMS believed that Businessman-4 would

not cooperate with law enforcement.

## STATUTORY ALLEGATIONS

### COUNT ONE
**(Conspiracy to Commit Wire Fraud, Federal Program Bribery, and to Receive Campaign
Contributions By Foreign Nationals)**

The Grand Jury charges:

50.    The allegations contained in paragraphs 1 through 49 of this Indictment are

repeated and realleged as if set forth fully herein.

51.    From at least in or about 2015 through at least in or about 2024, in the Southern

District of New York and elsewhere, ERIC ADAMS, the defendant, and others known and

unknown, willfully and knowingly combined, conspired, confederated, and agreed together and

with each other to commit offenses against the United States, to wit:

   a. wire fraud, in violation of Title 18, United States Code, Section 1343;

   b. soliciting, accepting, and receiving a campaign contribution by a foreign national, in violation of Title 52, United States Code, Section 30121(a)(2); and

   c. bribery, in violation of Title 18, United States Code, Section 666(a)(1)(B).

  52. It was a part and object of the conspiracy that ERIC ADAMS, the defendant, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

  53. It was further a part and object of the conspiracy that ERIC ADAMS, the defendant, and others known and unknown, would and did knowingly and willfully solicit, accept, and receive, directly and indirectly, a contribution and donation from a foreign national, and express and implied promises to make a contribution and donation, in connection with a local election, to wit, mayoral elections in the City of New York, aggregating $25,000 and more in a calendar year, in violation of Title 52, United States Code, Sections 30121(a)(2) and 30109(d)(1)(A)(i).

  54. It was further a part and object of the conspiracy that ERIC ADAMS, the defendant, being an agent of a local government, to wit, the City of New York, which, in a one-year period, received benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, a thing of value from a person, intending to be influenced and rewarded in connection with business, a transaction, and a series

of transactions of the City of New York involving a thing of value of $5,000 and more, in violation of Title 18, United States Code, Section 666(a)(1)(B).

Overt Acts

55.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed by ERIC ADAMS, the defendant, in the Southern District of New York and elsewhere:

a.    In 2016, ADAMS accepted free upgrades to business class for himself and a companion on roundtrip flights from New York to India.

b.    In July 2017, ADAMS accepted free business tickets for himself and two companions on roundtrip flights from New York to France, Turkey, Sri Lanka, and China.

c.    In July 2017, ADAMS accepted a steeply discounted stay at the Bentley Suite of the St. Regis Istanbul.

d.    In October 2017, ADAMS accepted free business tickets for himself and a companion on roundtrip flights from New York to China.

e.    In January 2018, ADAMS accepted free upgrades to business class for himself and a companion on roundtrip flights from New York to Hungary.

f.    In November 2018, ADAMS directed the Adams Staffer to arrange to accept contributions of foreign funds from Businessman-1.

g.    In January 2019, ADAMS accepted a free stay at the Cosmopolitan Suite of a luxury hotel in Istanbul.

h.    In January 2019, ADAMS met with Businessman-3 in Istanbul, where ADAMS agreed to accept campaign contributions of foreign money.

    i.      In December 2020, the Adams Employees solicited straw donations to ADAMS's campaign from Businessman-4.

    j.      In May 2021, ADAMS attended a fundraiser organized by the Turkish Official, among others, where ADAMS accepted straw donations from Businessman-5.

    k.      In May 2021, ADAMS submitted a false disclosure statement to the CFB that concealed the straw donations from Businessman-5.

    l.      In June 2021 ADAMS solicited steeply discounted business class tickets, stays at a luxury hotel and luxury resort, and transportation (including a domestic flight and a car and driver).

    m.      In June 2021, ADAMS solicited a free hotel stay and free use of a VIP room in a business class lounge of the Turkish Airlines for the Adams Fundraiser.

    n.      In or about August 2021, ADAMS directed the Adams Staffer to obtain contributions of foreign funds from the Turkish University.

    o.      In September 2021, ADAMS caused the FDNY to issue a letter acquiescing in the occupation of the Turkish House.

    p.      In September 2021, ADAMS solicited and accepted steeply discounted business class tickets for himself and a companion on roundtrip flights from New York to Pakistan.

    q.      In October 2021, ADAMS submitted a false disclosure statement to the CFB that concealed the straw donations from the Turkish University.

    r.      In November 2021, ADAMS solicited and accepted a free car and driver and meal at a luxury restaurant for himself and his companion in Istanbul.

    s.      In January 2022, ADAMS attended a meeting with the Promoter, among others, where he agreed to accept contributions of foreign money to the 2025 Campaign.

t.      In July 2022, ADAMS's senior advisor and the Adams Staffer met the Turkish Official at the Turkish House, and the Adams Staffer identified ADAMS's senior official as the point of contact for the Turkish Official's "pending problems regarding" the Turkish House such as "FDNY approvals."

u.      In July 2022, the Turkish Official arranged to provide business class upgrades on the Turkish Airline for four of ADAMS's close associates.

v.      In September 2023, ADAMS attended a fundraiser where he thanked foreign donors for contributions of foreign money to the 2025 Campaign made through straw donors.

w.      In October 2023, ADAMS attended a fundraiser where he directed the Adams Staffer to coordinate the receipt of straw donations from Businessman-6.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Wire Fraud)

The Grand Jury further charges:

56.     The allegations contained in paragraphs 1 through 49 of this Indictment are repeated and realleged as if set forth fully herein.

57.     From at least in or about 2018 through at least in or about 2024, in the Southern District of New York and elsewhere, ERIC ADAMS, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, ADAMS participated in a scheme to fraudulently obtain Matching Funds for

the Adams Campaigns by falsely claiming that contributions qualified for Matching Funds when, in fact those contributions did not.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
### (Solicitation of a Contribution by a Foreign National)

The Grand Jury further charges:

58.    The allegations contained in paragraphs 1 through 49 of this Indictment are repeated and realleged as if set forth fully herein.

59.    In or about 2021, in the Southern District of New Yok and elsewhere, ERIC ADAMS, the defendant, knowingly and willfully solicited, accepted, and received, and aided and abetted and willfully caused the solicitation, acceptance and receipt of, a contribution and donation from a foreign national, and express and implied promises to make a contribution and donation, in connection with a local election, to wit, mayoral elections in the City of New York, aggregating $25,000 and more in a calendar year.

(Title 52, United States Code, Sections 30121 and 30109(d)(1)(A), and
Title 18, United States Code, Section 2.)

## COUNT FOUR
### (Solicitation of a Contribution by a Foreign National)

The Grand Jury further charges:

60.    The allegations contained in paragraphs 1 through 49 of this Indictment are repeated and realleged as if set forth fully herein.

61.    In or about 2023, in the Southern District of New York and elsewhere, ERIC ADAMS, the defendant, knowingly and willfully solicited, accepted, and received, and aided and abetted and willfully caused the solicitation, acceptance and receipt of, a contribution and donation

54

from a foreign national, and express and implied promises to make a contribution and donation, in

connection with a local election, to wit, mayoral elections in the City of New York, aggregating

$25,000 and more in a calendar year.

(Title 52, United States Code, Sections 30121 and 30109(d)(1)(A), and
Title 18, United States Code, Section 2.)

## COUNT FIVE
### (Bribery)

The Grand Jury further charges:

62.    The allegations contained in paragraphs 1 through 49 of this Indictment are

repeated and realleged as if set forth fully herein.

63.    From at least in or about the summer of 2021, through at least in or about the

summer of 2022, in the Southern District of New York and elsewhere, ERIC ADAMS, the

defendant, being an agent of a local government, to wit, the City of New York, which, in a one-

year period, received benefits in excess of $10,000 under a federal program involving a grant,

contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, corruptly

solicited and demanded for the benefit of a person, and accepted and agreed to accept, a thing of

value from a person, intending to be influenced and rewarded in connection with business, a

transaction, and a series of transactions of the City of New York involving a thing of value of

$5,000 and more, to wit, ADAMS solicited and accepted free and heavily discounted luxury travel

benefits from the Turkish Official and others in exchange for intending to be influenced in

connection with the City of New York's regulation of the Turkish House, located at 821 United

Nations Plaza, New York, New York.

(Title 18, United States Code, Sections 666(a)(1)(B) and 2.)

## FORFEITURE ALLEGATIONS

64.    As a result of committing one or more of the offenses alleged in Counts One, Two, and Five of this Indictment, ERIC ADAMS, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

## Substitute Assets Provision

65.     If any of the above-described forfeitable property, as a result of any act or omission

of the defendant:

      a.    cannot be located upon the exercise of due diligence;

      b.    has been transferred or sold to, or deposited with, a third person;

      c.    has been placed beyond the jurisdiction of the Court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be subdivided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and

Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the

defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

FOREPERSON

Damian Williams
DAMIAN WILLIAMS
United States Attorney

57

# Exhibit 4

**New York City Campaign Finance Board**
100 Church Street, 12th Floor, New York, NY 10007
212.409.1800 | www.nyccfb.info

Frederick P. Schaffer
Chair

Gregory T. Camp
Richard J. Davis
Lawrence Moskowitz
Dawn Smalls
Members

Paul Seamus Ryan
Executive Director

November 15, 2024
By CFB Portal

Vito Pitta
Eric Adams 2021
Eric Adams 2025

Dear Vito Pitta:

The Campaign Finance Board (CFB) requires information from the 2021 and 2025 campaigns of Eric Adams (the 2021 Campaign and 2025 Campaign; collectively the Campaigns). As you are counsel to both campaigns, we are making a single request and sending it to both Portal accounts. Please respond jointly or individually as you prefer. A response is required by Friday, December 6, 2024.

CFB staff has reviewed the indictment of Eric Adams (24 CR 556). Based on the indictment, there is reason to believe that the Campaigns committed violations of various federal statutes, Campaign Finance Act provisions, and Board Rules, which would make the 2025 Campaign ineligible to receive a public funds payment on December 16, 2024.

In connection with the Board's consideration of this issue, please provide the documents listed below, as well as any other documents, affidavits or arguments that support the 2025 Campaign's eligibility to receive public funds.

Regarding the alleged June 20, 2018 fundraiser referenced in ¶19 of the indictment, which was not reported to the CFB:

- Documents associated with the event, including promotional materials, fundraiser documentation, and a list of contributions associated with the event. In addition, state whether any of the contributions were intermediated and if so, provide an intermediary statement.
- All campaign communications relating to the event, including but not limited to those to or from the Turkish Official (Reyhan Ozgur), the Airline Manager (Cenk Ocal) and/or the Adams Staffer (Rana Abbasova).

Regarding the alleged December 10, 2020 fundraiser referenced in ¶28, which was not reported to the CFB:

- Documents associated with the event, including promotional materials, fundraiser documentation, and a list of contributions associated with the event. In addition, state whether any of the contributions were intermediated and if so, provide an intermediary statement.
- All campaign communications relating to the event, including but not limited to those to or from Adams Employee-1 (Mohamad Bali) and Adams Employee-2 (Ahsan Chughtai).

Regarding the May 7, 2021 fundraiser referenced in ¶30:

- All campaign communications relating to the event, including but not limited to those to or from the Adams Staffer (Rana Abbasova), the Turkish Official (Reyhan Ozgur) and/or Businessman-5 (Erden Arkan).

Regarding contributions from employees of Bay Atlantic University referenced in ¶31:

- All campaign communications to or from the Adams Staffer (Rana Abbasova) and/or Businessman-1 (Enver Yucel) relating to contributions received from employees of Bay Atlantic University on or around September 27, 2021.

Regarding the Sept 20, 2023 fundraiser referenced in ¶45:

- All campaign communications relating to the event, including but not limited to those to or from the Promoter (Arda Sayiner).

Regarding the October 9, 2023 fundraiser referenced in ¶46:

- All campaign communications relating to the event, including but not limited to those to or from Businessman-6 (Eyup "Peter" Ulu) and the Adams Staffer (Rana Abbasova).
- All communications with Abbasova regarding Ulu and/or fundraising by employees or owners of PortX Transportation Company.

Please submit this information by Friday, December 6, 2024 via email to jschaffer@nyccfb.info. Failure to respond timely or adequately may result in suspension of public funds payments.

As you are aware, campaigns are required to maintain and provide records to the CFB per both the Campaign Finance Act and Board Rules. If you have any questions about this request, please contact me. Thank you.

Sincerely,

Jesse Schaffer
Director of Special Compliance

# Exhibit 5

**Jesse Schaffer**

| | |
|---|---|
| **From:** | Jesse Schaffer |
| **Sent:** | Thursday, December 5, 2024 3:56 PM |
| **To:** | Vito R. Pitta |
| **Cc:** | Ardian Tagani; Joshua Beckett Flores |
| **Subject:** | Re: Eric Adams 2021/Eric Adams 2025-November 15, 2024 Request |

Vito,

I'm confirming that I received your voice mail and no have no questions at present. And you'll be hearing from Jennifer shortly regarding the other matter.

Jesse

---

**From:** Vito R. Pitta <vrpitta@pittabishop.com>
**Sent:** Thursday, December 5, 2024 14:59
**To:** Jesse Schaffer <JSchaffer@NYCCFB.INFO>
**Cc:** Ardian Tagani <atagani@pittabishop.com>; Joshua Beckett Flores <JFlores@pittalaw.com>
**Subject:** Eric Adams 2021/Eric Adams 2025-November 15, 2024 Request

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Jesse,

I hope all is well.

I just tried you on your office line and left a message regarding the above-referenced issue. Please let me know if you would like to discuss.

Best,

Vito

Vito R. Pitta, Esq.

Co-Managing Partner
Pitta LLP
Attorneys at Law

Co-Managing Member
Pitta Bishop & Del Giorno LLC
Consulting & Government Relations

120 Broadway, 28th Floor
New York, NY 10271
(212) 652-3890 (Main)
(212) 652-3881 (Direct)
(212) 652-3891 (Facsimile)

1

(917) 545-7160 (Cellular)
vrpitta@pittalaw.com
vrpitta@pittabishop.com

# Exhibit 6

Case 1:25-cv-03380-NCC-JKF Document 11-2 Filed 06/23/25 Page 346 of 593
PageID #: 744

Select Language | ▼    About the CFB    News & Media    CFB Portal    IEDS    CFB System Notices    CFB Accessibility

   

# NYC Campaign Finance Board Approves Matching Funds Payments to 2025 Candidates

## 12/16/2024

**December 16, 2024** – Today, the NYC Campaign Finance Board (CFB) voted to approve public matching funds payments totaling $4,844,084 to 19 candidates for the 2025 elections. Today's payment is the first payment of the 2025 elections.

New York City's matching funds program eliminates barriers to participation by providing access to resources New Yorkers in every community can use to run for office. The candidates receiving payment today have met all the requirements of the Campaign Finance Act and Board Rules, have at least one opponent, and achieved a threshold level of public support by raising small-dollar contributions from the city residents they are seeking to represent.

Please visit the CFB website to find information on the two-part threshold candidates must meet to qualify for public funds, as well as additional information on the legal requirements to qualify for public funds.

The Board also voted on non-payment determinations for participating candidates who have not yet demonstrated eligibility to receive a public funds payment, as of today's meeting. Candidates not receiving funds in today's payment can demonstrate their eligibility for a future payment. After today, there are seven additional payment dates before the primary election in June 2025, and five payment dates before the general election in November 2025.

During the meeting, Campaign Finance Board Chair Frederick Schaffer made the following statement regarding the payment determination for the campaign of Eric Adams:

**"After thoroughly reviewing all available information, including the details of the indictment of Mayor Adams, the Board has determined there is reason to believe the Adams campaign has engaged in conduct detrimental to the matching funds program, in violation of law, including the Campaign Finance Act and Board Rules. His campaign also failed to provide documents and information requested by the Board. Accordingly, Mayor Adams' campaign for reelection has failed to demonstrate eligibility for public funds payment at this time,"** said Frederick Schaffer, Chair of the New York City Campaign Finance Board. **"Our priority remains achieving an equitable and transparent democracy that is accountable to all New Yorkers."**

Case 1:25-cv-03380-NGG-KE Document 11-2 Filed 06/23/25 Page 347 of 593
PageID #: 745

The table below lists all candidates who have received a public funds payment for the 2025 elections.

## 2025 PUBLIC FUNDS PAYMENTS CHART

| Candidate | Office | Today's Payment | Total Payments to Date | Total Amount Raised | Percent In-District | Percent Small Donors |
|---|---|---|---|---|---|---|
| Stringer, Scott | Mayor | $2,088,571 | $2,088,571 | $587,416 | 90.4% | 89.4% |
| Powers, Keith | Manhattan Borough President | $314,435 | $314,435 | $126,941 | 61.0% | 70.4% |
| Gibson, Vanessa | Bronx Borough President | $365,898 | $365,898 | $260,842 | 55.7% | 64.4% |
| Batchu, Sarah * † | City Council (District 02) | $174,800 | $174,800 | $60,082 | 28.1% | 85.1% |
| Epstein, Harvey * † | City Council (District 02) | $174,800 | $174,800 | $49,763 | 46.9% | 90.7% |
| Gordillo, Andrea * | City Council (District 02) | $169,974 | $169,974 | $52,106 | 20.2% | 88.0% |

Case 1:25-cv-03380-NCC-JE    Document 11-2    Filed 06/23/25    Page 348 of 593
PageID #: 746

| Aronson, Vanessa | City Council (District 04) | $130,538 | $130,538 | $39,758 | 45.6% | 79.6% |
|---|---|---|---|---|---|---|
| Bondy, Faith * | City Council (District 04) | $147,972 | $147,972 | $40,324 | 64.2% | 68.8% |
| Wetzler, Benjamin * † | City Council (District 04) | $174,800 | $174,800 | $37,641 | 28.7% | 89.1% |
| Okporo, Edafe * | City Council (District 07) | $117,055 | $117,055 | $27,060 | 33.0% | 93.8% |
| Cabrera, Fernando | City Council (District 14) | $152,950 | $152,950 | $27,915 | 42.5% | 95.1% |
| Hodge Vasquez, Bryan * | City Council (District 14) | $96,360 | $96,360 | $16,563 | 34.9% | 94.8% |
| Sanchez, Pierina † | City Council (District 14) | $174,800 | $174,800 | $62,764 | 25.1% | 87.2% |
| Sanchez, Justin | City Council (District 17) | $102,600 | $102,600 | $27,621 | 27.3% | 89.2% |

6/16/25, 12:19 PM NYC Campaign Finance Board Approves Matching Funds Payments to 2025 Candidates | New York City Campaign Finance Board

Case 1:25-cv-03380-NGG-LKE    Document 11-2    Filed 06/23/25    Page 349 of 593 PageID #: 747

| Hankerson, Tyrell * | City Council (District 28) | $82,445 | $82,445 | $21,390 | 42.9% | 92.1% |
| Hitlall, Romeo * | City Council (District 28) | $92,606 | $92,606 | $14,186 | 83.2% | 96.6% |
| Ashman, Dion * | City Council (District 35) | $115,748 | $115,748 | $26,211 | 56.2% | 72.6% |
| Kornberg, Maya * | City Council (District 39) | $116,804 | $116,804 | $38,375 | 51.1% | 81.7% |
| Willabus, Dimple | City Council (District 46) | $50,928 | $50,928 | $10,951 | 56.8% | 91.7% |
| All Candidates | All Offices | $4,844,084 | $4,844,084 | $1,527,909 | | |

\* indicates candidate has not received public funds in any previous election

† indicates the candidate has received the maximum public funds payment

## Key to the Candidates Receiving Public Funds Payments Table:

- **Today's Payment:** The amount of public funds paid to the candidate on December 16th.
- **Total Payments to Date:** The total amount of public funds paid to the candidate for the 2025 elections. The maximum public funds payment for each election can be found here.

Case 1:25-cv-03380-NCC-KE   Document 11-2   Filed 06/23/25   Page 350 of 593
PageID #: 748

- **Total Amount Raised:** The total dollar amount raised from individual, organizational, and all other contribution sources, as of October 16th.
- **Percent In-District:** The percent of the number of contributions reported from individual residents in the candidate's council district, as of October 16th, excluding organizational and other contribution sources.
- **Percent Small Donors:** The percent of aggregate contributions from individuals that totaled $250 or less (for candidates for Mayor, Public Advocate, or Comptroller), or $175 or less (for candidates for Borough President or City Council) as of October 16th, excluding organizational and other contribution sources. Aggregate contributions refer to the total dollar value of all contributions reported from a donor. For example, the aggregate contribution from a donor who made two $5 contributions is $10.

Complete information about candidates' fundraising and spending is available on the CFB website, through the Follow the Money Database and the Campaign Finance Summary.

### PARTICIPATING CANDIDATES NOT RECEIVING PUBLIC FUNDS PAYMENTS

The table below lists candidates who are participating in the matching funds program and have filed a disclosure statement with the CFB, but have not yet demonstrated their eligibility for payment, as of today. The table also lists candidates who have declined to accept public funds in today's payment. Explanations of the reasons for ineligibility for payment can be found in the key below.

| Candidate | Office | Reason(s) for Ineligibility |
|---|---|---|
| Adams, Eric | Mayor | COM |
| Alny, Joe | Mayor | THR, VAE |
| Aquino, Darren | Mayor | PFD, SON, THR |
| Armstead, Eric | Mayor | PFD, SON, THR, TRA, VAR, VAE, MDS |

Case 1:25-cv-03380-NCC-KE    Document 11-2    Filed 06/23/25    Page 351 of 593 PageID #: 749

| Armstrong, Claire | Mayor | PFD, SON, THR, VAE, MEI |
| Del Valle, Von | Mayor | PFD, SON, THR |
| Harris, John | Mayor | PFD, SON, THR |
| Huq, Md | Mayor | SON, THR, MEI |
| Lander, Brad | Mayor | SON |
| Morales, Salvador | Mayor | PFD, SON, THR, TRA |
| Myrie, Zellnor | Mayor | THR |
| Nouinou, Fatimazohra | Mayor | PFD, SON, THR |
| Ramos, Jessica | Mayor | PFD, SON, THR, ERR |
| Sifontes, Stephen | Mayor | PFD, SON, THR, TRA |
| Aquino, Angela | Public Advocate | SON, THR, VAR, VAE, ERR |

Case 1:25-cv-03380-NCC-KE    Document 11-2    Filed 06/23/25    Page 352 of 593
PageID #: 750

| | | |
|---|---|---|
| Dolan, Martin | Public Advocate | PFD, SON, THR, VAR |
| Medina, Sarah | Public Advocate | PFD, SON, THR, VAE, MEI |
| Pieters, Austin | Public Advocate | PFD, SON, THR, VAR |
| Sun, Calvin | Public Advocate | PFD, SON, THR, TRA |
| Williams, Jumaane | Public Advocate | PFD, SON, THR |
| Brannan, Justin | Comptroller | PFD, THR |
| Levine, Mark | Comptroller | DPF |
| Maio, Danniel | Comptroller | PFD, THR, ERR |
| Malave, Ismael | Comptroller | PFD, THR |
| Parker, Kevin | Comptroller | THR, TRA |
| Rajkumar, Jenifer | Comptroller | PFD, THR |

Case 1:25-cv-03380-NGG-LKE    Document 11-2    Filed 06/23/25    Page 353 of 593
PageID #: 751

| Salamanca, Rafael | Bronx Borough President | PFD, SON, THR |
| McPhatter, Shanduke | Brooklyn Borough President | PFD, SON, THR |
| Edwards, Khari | Brooklyn Borough President | SON, THR |
| Reynoso, Antonio | Brooklyn Borough President | SON, THR, OUT |
| Grimes, Bashek | Queens Borough President | PFD, SON, THR |
| Ikezi, Henry | Queens Borough President | PFD, SON, THR |
| Richards, Donovan | Queens Borough President | PFD, SON, THR |
| Fossella, Vito | Staten Island Borough President | PFD, SON, THR, TRA, VAR, ERR, MEI |
| Coleman, Jess | City Council (District 01) | SON, THR |
| Marte, Christopher | City Council (District 01) | SON |
| Murillo, Jason | City Council (District 02) | PFD, THR |

Case 1:25-cv-03380-NCC-KE    Document 11-2    Filed 06/23/25    Page 354 of 593
PageID #: 752

| Bottcher, Erik | City Council (District 03) | SON |
| Flores, Louis | City Council (District 03) | PFD, SON, THR |
| Florczak, Lukas | City Council (District 04) | PFD, THR, TRA |
| Abreu, Shaun | City Council (District 07) | SON |
| Alayeto, Clarisa | City Council (District 08) | PFD, THR |
| Aulbach-Sidibe, Daniel | City Council (District 08) | PFD, THR, TRA |
| Encarnacion, Elsie | City Council (District 08) | THR |
| Lopez, Wilfredo | City Council (District 08) | THR |
| De La Rosa, Carmen | City Council (District 10) | PFD, SON, UNP |
| Dinowitz, Eric | City Council (District 11) | PFD, SON, THR |
| Riley, Kevin | City Council (District 12) | SON, THR, UNP |

Case 1:25-cv-03380-NGG-LKE Document 11-2 Filed 06/23/25 Page 355 of 593 PageID #: 753

| Marmorato, Kristy | City Council (District 13) | SON, THR, VAR, ERR |
| Feliz, Oswald | City Council (District 15) | PFD, SON, THR, OUT, UNP |
| Perez Jr., Freddy | City Council (District 17) | PFD, VAR |
| Santana, Elvis | City Council (District 17) | THR, VAR, ERR |
| Farias, Amanda | City Council (District 18) | PFD, SON, THR, UNP |
| Caruso, Alexander | City Council (District 19) | PFD, THR |
| Paladino, Vickie | City Council (District 19) | PFD, SON, THR, VAR |
| Ung, Sandra | City Council (District 20) | PFD, SON, THR, UNP |
| Henriquez, Yanna | City Council (District 21) | PFD, THR |
| Monserrate, Hiram | City Council (District 21) | THR, VAR, VAE, ERR, MEI |
| Montoya, Erycka | City Council (District 21) | PFD, THR, VAE |

Case 1:25-cv-03380-NCC-KE   Document 11-2   Filed 06/23/25   Page 356 of 593
PageID #: 754

| | | |
|---|---|---|
| Caban, Tiffany | City Council (District 22) | SON, THR, UNP |
| Lee, Linda | City Council (District 23) | SON, THR, UNP |
| Haque, Shah | City Council (District 25) | PFD, SON, THR, VAR, ERR, MEI |
| Krishnan, Shekar | City Council (District 25) | SON, THR |
| Pacheco, Ricardo | City Council (District 25) | SON, THR |
| Won, Julie | City Council (District 26) | PFD, SON, THR, UNP |
| Daniels, Vera | City Council (District 27) | THR, ERR |
| Williams, Nantasha | City Council (District 27) | PFD, SON, THR |
| LeGrand, Latoya | City Council (District 28) | THR |
| Miller, Constance | City Council (District 28) | PFD, THR, TRA |
| Schulman, Lynn | City Council (District 29) | SON |

Case 1:25-cv-03380-NCC-KE    Document 11-2    Filed 06/23/25    Page 357 of 593
PageID #: 755

| | | |
|---|---|---|
| Rinaldi, Jonathan | City Council (District 30) | PFD, THR, VAR, VAE, ERR |
| Smyth, Dermot | City Council (District 30) | THR |
| Ariola, Joann | City Council (District 32) | SON, UNP |
| Restler, Lincoln | City Council (District 33) | SON, UNP |
| Gutierrez, Jennifer | City Council (District 34) | PFD, SON, THR, UNP |
| Hudson, Crystal | City Council (District 35) | PFD, SON |
| Wedderburn, Sharon | City Council (District 35) | PFD, SON, THR |
| Osse, Chi | City Council (District 36) | PFD, SON, UNP |
| Nurse, Sandy | City Council (District 37) | PFD, SON, THR, UNP |
| Aviles, Alexa | City Council (District 38) | SON, THR |
| Hanif, Shahana | City Council (District 39) | SON |

Case 1:25-cv-03380-NGG-LKE    Document 11-2    Filed 06/23/25    Page 358 of 593 PageID #: 756

| | | |
|---|---|---|
| Saghir, Luke | City Council (District 39) | PFD, SON, THR |
| Joseph, Rita | City Council (District 40) | SON |
| Arnwine, Dante | City Council (District 41) | PFD, SON, THR |
| Lynch, Lawman | City Council (District 41) | THR |
| Mealy, Darlene | City Council (District 41) | PFD, SON, THR, VAE |
| Thompson, Jammel | City Council (District 41) | PFD, SON, THR, TRA |
| Zhuang, Susan | City Council (District 43) | SON, THR |
| Louis, Farah | City Council (District 45) | PFD, SON, THR, VAR |
| Narcisse, Mercedes | City Council (District 46) | SON, THR |
| Batista, Anthony | City Council (District 47) | PFD, THR, TRA, VAE |
| Vernikov, Inna | City Council (District 48) | PFD, SON, THR, UNP |

Case 1:25-cv-03380-NGG-LKE    Document 11-2    Filed 06/23/25    Page 359 of 593
PageID #: 757

| Hanks, Kamillah | City Council (District 49) | PFD, SON, THR, TRA |
| --- | --- | --- |
| Carr, David | City Council (District 50) | PFD, SON, THR, UNP, DPF |

### Key to Ineligibility Reasons

- **COM:** Withholding for non-compliance
- **DPF:** Declined public funds
- **ERR:** High percentage (20% or more) of documentation errors for contributions
- **MDS:** Missing disclosure statement
- **MAX:** Already received maximum payment
- **MEI:** Missing employer information for 25% or more of contributions greater than $99
- **NAC:** Not actively campaigning
- **OUT:** Outstanding penalties or repayment obligations from a previous election
- **PFD:** Did not submit personal financial disclosure to COIB before Nov. 22
- **SON:** Did not submit Statement of Need before Nov. 22
- **THR:** Did not meet threshold
- **TRA:** Did not complete compliance training before Nov. 22
- **UNP:** Unopposed
- **VAE:** Variance between reported and documented expenditures greater than 40%
- **VAR:** Variance between reported and documented receipts greater than 10%
- **XPL:** Exceeded expenditure limit

## DISCLOSURE AND PAYMENT CALENDAR

Candidates in the 2025 New York City elections filed their disclosures with the CFB on October 16th. The above payments are based on campaign financial data provided by this deadline. The next filing disclosure reports are due on January 15th.

## HOW THE CAMPAIGN FINANCE PROGRAM WORKS

The CFB provides matching funds out of the city's General Fund to qualifying candidates at a rate of $8 for every $1 received from New York City residents, up to the first $175 for donations to City Council candidates and $250 for citywide offices.

To qualify for matching funds, candidates must demonstrate support from within their communities by meeting a two-part fundraising threshold and abide by the other requirements set in the Campaign Finance Act. For instance, to qualify for public funding in City Council races, candidates must raise at least $5,000 from city residents. Only the first $175 contributed per city resident counts towards meeting the threshold. Additionally, City

Case 1:25-cv-03380-NCC-LKE    Document 11-2    Filed 06/23/25    Page 360 of 593
PageID #: 758

Council candidates must receive at least 75 contributions from residents of the district where they are running. Candidates also must comply with all program rules, including individual contribution limits and a prohibition on collecting contributions from corporations, limited liability companies, and partnerships.

## CANDIDATE SERVICES

The CFB's Candidate Services staff offers candidates extensive support by providing access to trainings, resources, and one-on-one guidance to help campaigns navigate their disclosure requirements and compliance obligations. For the 2025 elections, the agency published a detailed guidance documents with the payment schedule, requirements, and applicable deadlines for candidates to follow.

## FOLLOW THE MONEY

More information about the candidates' campaign finance data is available on the CFB website in the Campaign Finance Summary portal. Individual contributions, campaign spending, intermediaries, and independent PAC expenditures are available in the CFB's Follow the Money database.

--30--

# Exhibit 7

December 16, 2024                                        New York City Campaign Finance Board

CANDIDATE:   ADAMS, ERIC L (ID: 1545)
COMMITTEE:  ERIC ADAMS 2025
2025 EARLY PUBLIC FUNDS NONPAYMENT DETERMINATION

   Based on a preliminary analysis, the Campaign Finance Board has determined that your campaign does not qualify for a public funds payment at this time.  The specifics of our calculation are described in the attached Detail Payment Report.  Please keep this notification and any attached report(s) for your records.  If you have any questions, please contact the Payment Coordinators Maria Alvarez and Alyson Joa-Perez at PaymentCoordinator@nyccfb.info.

   The reason(s) for nonpayment are as follows:

   The Campaign is not eligible for payment because of preliminary findings of substantial violations which may result in penalties.  Details regarding these findings will be sent to you shortly.  See generally Admin.  Code §§ 3-703; 3-705(1), 3-711; Board Rules 3-01(d)(i)(G), (ii)(H), 3-01(e).

   This nonpayment of public funds is not a final determination by the Board, but rather is a preliminary determination subject to review of ongoing financial activity and final audit.  See Admin. Code §§3-710; Board Rule 3-01(c).

     YOU MAY PETITION THE BOARD IN WRITING for reconsideration of this public funds determination.  Your petition must state the grounds for reconsideration and may include a request to appear before the Board.  Do not include any documentation or information not already submitted to the Board, unless the Board specifically requests it or you can show in your petition a good reason for failing to submit it previously. The Board will review the petition within five business days of receiving it and issue a timely written determination.  If the Board denies your petition, you may appeal, within four months, to the New York State Supreme Court pursuant to Article 78 of the Civil Practice Law and Rules.  See Admin. Code § 3-705(4); Board Rules 7-09.

Case 1:25-cv-03380-NGG-LKE     Document 11-2     Filed 06/23/25     Page 363 of 593
PageID #: 761

**New York City Campaign Finance Board**
**Campaign Finance Information System**
**Detail Payment Report for 2025 Early Payment**

**Run:** 1     **Payment Date:** 12/16/2024

**Candidate:** Adams, Eric L (ID: 1545)
**Office:** Mayor

| | Statement Date | Claimed Matchable | Invalid Claims | Gross Matchable | Payment |
|---|---|---|---|---|---|
| *Detail* | | | | | |
| | 1 (07/15/2022) | 68,597 | 17,890 | 50,707 | |
| | 2 (01/17/2023) | 37,350 | 9,200 | 28,150 | |
| | 3 (07/17/2023) | 118,776 | 24,150 | 94,626 | |
| | 4 (01/16/2024) | 61,271 | 15,826 | 45,445 | |
| | 5 (07/15/2024) | 195,968 | 41,367 | 154,601 | |
| | 6 (10/11/2024) | 61,664 | 31,051 | 30,613 | |
| | Total: | 543,626 | 139,484 | 404,142 | |
| | | 543,626 | 139,484 | 404,142 | |
| Matchable Adjustment: | | | - | 0 | |
| Adjusted Gross Matchable: | | | | 404,142 | |
| *Regular Payment Calculation* | | | | | |
| Adjusted Gross Matchable: | | | | 404,142 | |
| General Regular Matchable: | | | - | 0 | |
| Net Matchable: ( Threshold Met ) | | | | 404,142 | |
| Matching Factor: | | | x | 8.0 | |
| **EXTENDED NET REGULAR PAYABLE:  (Limit: 7,050,667)** | | | | 3,233,136 | 3,233,136 |
| Total Previous Regular Payable: | | | | | - 0 |
| Early Payment: | | | | | - 0 |
| **REGULAR PAYABLE:** | | | | | 3,233,136 |
| **MAX PAYABLE:** | | | | | 3,233,136 |
| Net Withholding: ( See Notes Below ) | | | | | - 16,771 |
| Reserve Amount:  ( 5.00 % ) | | | | | - 160,818 |
| Reserve Applied: | | | | | + 0 |
| **ADJUSTED AMOUNT ELIGIBLE:** | | | | | 3,055,547 |
| Amount Payable: | | | | | 0 |
| Penalty Deduction: | | | | | - 0 |
| **PAYMENT DUE:** | | | | | **0** |

Case 1:25-cv-03380-NGG-LKE     Document 11-2     Filed 06/23/25     Page 364 of 593
PageID #: 762

**New York City Campaign Finance Board**
**Campaign Finance Information System**
**Detail Payment Report for 2025 Early Payment**

**Run:** 1     **Payment Date:** 12/16/2024

**Candidate:** Adams, Eric L (ID: 1545)
**Office:** Mayor

| *Net Withholding* | | |
|---|---|---|
| Total Withholding: | | 16,771 |
| Previous Withholding: | - | 0 |
| Previous Unapplied Withholding: | + | 0 |
| **Net Withholding:** | | **16,771** |

| *Notes* | Withholding |
|---|---|
| Withholding for Excess Doing Business Contributions | ( 9300 ) |
| OTL Contribution(s) | ( 7471 ) |
| Withholding For Non Compliance | |

# Exhibit 8



**New York City Campaign Finance Board**
100 Church Street, 12ᵗʰ Floor, New York, NY 10007
212.409.1800 | www.nyccfb.info

Frederick P. Schaffer
*Chair*

Gregory T. Camp
Richard J. Davis
Lawrence Moskowitz
Dawn Smalls
*Members*

Paul Seamus Ryan
*Executive Director*

December 18, 2024

Sharon Adams
Eric Adams 2025
1043 E 101 Street
Brooklyn, NY 11236

**RE: 2025 Public Funds Payment Determination Supplemental Notice**

Based on a preliminary analysis, and as set forth in the Public Funds Nonpayment Determination and the Detail Payment Report, which you have already received, pursuant to Board Rules 3-01(d)(i)(B), (G), (ii)(I), the Campaign Finance Board (the "Board") has determined that the Eric Adams 2025 campaign (the "Campaign") has not demonstrated eligibility for a public funds payment. This letter provides the Campaign with additional information regarding the nonpayment determination.

The Board has reason to believe that Eric Adams (the "Candidate") has, in the course of public funds program (the "Program") participation, engaged in conduct detrimental to the Program that is in violation of federal and City law, including the Campaign Finance Act and Board Rules, as described in the September 26, 2024 indictment of Eric Adams (*see United States v. Adams*, 24 CR 556), and is therefore ineligible for a public funds payment. Pursuant to Board Rules 3-01(d)(i)(G) and (ii)(I), the Board's reason to believe that the Candidate has violated federal and City laws is a basis for ineligibility for public funds.

The indictment details and establishes probable cause that the Candidate committed the federal law crimes alleged in the indictment and, therefore, establishes reason to believe that, in the course of Program participation in the 2021 and 2025 election cycles, the Candidate engaged in conduct detrimental to the Program in violation of applicable laws, including:

- Conspiracy to commit wire fraud to obtain matching funds, accept a campaign contribution by a foreign national, and commit bribery.
- Wire fraud to obtain matching funds.
- Solicitation, acceptance or receipt of contributions by foreign nationals.
- Bribery.

The indictment details New York City law violations that were necessary predicates to the alleged federal crimes and, therefore, establishes reason to believe that, in the course of Program participation in the 2021 and 2025 election cycles, the Candidate engaged in conduct detrimental to the Program in

Page 2

violation of the Campaign Finance Act and Board Rules. Campaigns are required to report and document contributions accurately and completely and file accurate disclosure statements, and are prohibited from accepting contributions in violation of amount limits and source restrictions. The indictment details instances of the Adams campaigns concealing straw donations and contributions from foreign nationals, submitting these contributions for match, and filing false disclosure statements. Therefore, there is reason to believe that the Candidate and his campaigns were in violation of numerous provisions of the Campaign Finance Act and Board Rules, among other City laws.

Furthermore, Campaigns must provide to the Board, upon its request, documents, records, or other information that verifies campaign activity and failure to respond can make a campaign ineligible for public funds pursuant to Board Rule 3-01(d)(i)(B). On November 15, 2024, CFB staff made a request for documentation and information related to allegations in the indictment from the Campaign with a response deadline of December 6, 2024. On December 5, 2024, an attorney for the Campaign called CFB Staff and left a voicemail stating that the Campaign would not respond to the CFB staff's request at this time because the requests were related to incidents referenced in the indictment. This failure to respond to a request for information is a basis for ineligibility for public funds.

Please be aware that certain types of activities can lead the Board to find a candidate in breach of certification. The issues raised in this letter may cause the Board to consider whether the Campaign has submitted a disclosure statement which the participant knew or should have known includes substantial fraudulent matchable contribution claims, which is one of the activities that can lead to a finding of breach of certification.[1] In addition, the Campaign may be assessed financial penalties and may be found ineligible to receive public funds based on a finding of fraud or material misrepresentation, whether or not it is found in breach.[2]

These preliminary findings are not a final determination by the Board, but rather, a preliminary determination subject to review of ongoing financial activity and final audit.

**You may petition the Board in writing** for reconsideration of this public funds determination. Your petition must state the grounds for reconsideration and may include a request to appear before the Board. The Board will review the petition and issue a written determination within 5 business days of receiving it, unless the Campaign wishes to appear at the next scheduled Board meeting. Do not include any documentation or information not already submitted to the Board, unless the Board specifically requests it or you can show in your petition a good reason for failing to submit it previously.[3] If the Board denies your petition, you have four months to challenge the Board's determination in New York State Supreme Court pursuant to Article 78 of the Civil Practice Law and Rules.

---

[1] *See* Admin. Code § 3-711; Board Rule 3-01(e).
[2] *See* Admin. Code § 3-711; Board Rule 3-01(d).
[3] *See* Admin. Code § 3-705(4); Board Rule 7-09.

Page 3

If you have any questions, please contact me at dwillemin@nyccfb.info.

Sincerely,

Danielle Willemin
Director of Auditing and Accounting

# Exhibit 9

January 15, 2025                                          New York City Campaign Finance Board

CANDIDATE:   ADAMS, ERIC L (ID: 1545)
COMMITTEE:  ERIC ADAMS 2025
2025 EARLY PUBLIC FUNDS NONPAYMENT DETERMINATION

     Based on a preliminary analysis, the Campaign Finance Board has determined that your campaign does not qualify for a public funds payment at this time.  The specifics of our calculation are described in the attached Detail Payment Report.  Please keep this notification and any attached report(s) for your records.  If you have any questions, please contact the Payment Coordinators Maria Alvarez and Alyson Joa-Perez at PaymentCoordinator@nyccfb.info.

     The reason(s) for nonpayment are as follows:

     The Campaign is not eligible for payment because of preliminary findings of substantial violations which may result in penalties.  Details regarding these findings will be sent to you shortly.  See generally Admin.  Code §§ 3-703; 3-705(1), 3-711; Board Rules 3-01(d)(i)(G), (ii)(H), 3-01(e).

     This nonpayment of public funds is not a final determination by the Board, but rather is a preliminary determination subject to review of ongoing financial activity and final audit.  See Admin. Code §§3-710; Board Rule 3-01(c).

     YOU MAY PETITION THE BOARD IN WRITING for reconsideration of this public funds determination.  Your petition must state the grounds for reconsideration and may include a request to appear before the Board.  Do not include any documentation or information not already submitted to the Board, unless the Board specifically requests it or you can show in your petition a good reason for failing to submit it previously. The Board will review the petition within five business days of receiving it and issue a timely written determination.  If the Board denies your petition, you may appeal, within four months, to the New York State Supreme Court pursuant to Article 78 of the Civil Practice Law and Rules.  See Admin. Code § 3-705(4); Board Rules 7-09.

Case 1:25-cv-03380-NGG-LKE    Document 11-2    Filed 06/23/25    Page 371 of 593
PageID #: 769

**New York City Campaign Finance Board**
**Campaign Finance Information System**
**Detail Payment Report for 2025 Early Payment**
**Run:** 2    **Payment Date:** 01/15/2025

**Candidate:** Adams, Eric L (ID: 1545)
**Office:** Mayor

| | Statement Date | Claimed Matchable | Invalid Claims | Gross Matchable | Payment |
|---|---|---|---|---|---|
| *Detail* | | | | | |
| | 1 (07/15/2022) | 68,597 | 17,890 | 50,707 | |
| | 2 (01/17/2023) | 37,350 | 9,200 | 28,150 | |
| | 3 (07/17/2023) | 118,776 | 24,150 | 94,626 | |
| | 4 (01/16/2024) | 61,271 | 15,826 | 45,445 | |
| | 5 (07/15/2024) | 195,968 | 41,367 | 154,601 | |
| | 6 (10/11/2024) | 61,664 | 31,051 | 30,613 | |
| | Total: | 543,626 | 139,484 | 404,142 | |
| | | 543,626 | 139,484 | 404,142 | |
| Matchable Adjustment: | | | - | 0 | |
| Adjusted Gross Matchable: | | | | 404,142 | |
| *Regular Payment Calculation* | | | | | |
| Adjusted Gross Matchable: | | | | 404,142 | |
| General Regular Matchable: | | | - | 0 | |
| Net Matchable: ( Threshold Met ) | | | | 404,142 | |
| Matching Factor: | | | x | 8.0 | |
| **EXTENDED NET REGULAR PAYABLE:  (Limit: 7,050,667)** | | | | **3,233,136** | **3,233,136** |
| Total Previous Regular Payable: | | | | - | 0 |
| Early Payment: | | | | - | 0 |
| **REGULAR PAYABLE:** | | | | | **3,233,136** |
| **MAX PAYABLE:** | | | | | **3,233,136** |
| Net Withholding: ( See Notes Below ) | | | | - | 16,771 |
| Reserve Amount:  (   5.00 % ) | | | | - | 160,818 |
| Reserve Applied: | | | | + | 0 |
| **ADJUSTED AMOUNT ELIGIBLE:** | | | | | 3,055,547 |
| Amount Payable: | | | | | 0 |
| Penalty Deduction: | | | | - | 0 |
| **PAYMENT DUE:** | | | | | **0** |

Case 1:25-cv-03380-NGG-LKE    Document 11-2    Filed 06/23/25    Page 372 of 593 PageID #: 770

01/15/2025 6:54 PM

**New York City Campaign Finance Board**
**Campaign Finance Information System**
**Detail Payment Report for 2025 Early Payment**

Page 2 of 2

**Run:** 2    **Payment Date:** 01/15/2025

**Candidate:** Adams, Eric L (ID: 1545)
**Office:** Mayor

### *Net Withholding*

| | | |
|---|---|---|
| Total Withholding: | | 16,771 |
| Previous Withholding: | - | 16,771 |
| Previous Unapplied Withholding: | + | 16,771 |
| **Net Withholding:** | | **16,771** |

### *Notes*

| | Withholding |
|---|---|
| Withholding for Excess Doing Business Contributions | ( 9300 ) |
| OTL Contribution(s) | ( 7471 ) |
| Withholding For Non Compliance | |

# Exhibit 10



**New York City Campaign Finance Board**
100 Church Street, 12ᵗʰ Floor, New York, NY 10007
212.409.1800 | www.nyccfb.info

Frederick P. Schaffer
*Chair*

Gregory T. Camp
Richard J. Davis
Lawrence Moskowitz
Dawn Smalls
*Members*

Paul Seamus Ryan
*Executive Director*

January 16, 2025

Sharon Adams
Eric Adams 2025
1043 E 101 Street
Brooklyn, NY 11236

**RE: 2025 Public Funds Payment Determination Supplemental Notice**

Based on a preliminary analysis, and as set forth in the Public Funds Nonpayment Determination and the Detail Payment Report, which you have already received, pursuant to Board Rules 3-01(d)(i)(B), (G), (ii)(I), the Campaign Finance Board (the "Board") has determined that the Eric Adams 2025 campaign (the "Campaign") has not demonstrated eligibility for a public funds payment.

Please see the letter dated December 18, 2024, for more information.

These preliminary findings are not a final determination by the Board, but rather, a preliminary determination subject to review of ongoing financial activity and final audit.

**You may petition the Board in writing** for reconsideration of this public funds determination. Your petition must state the grounds for reconsideration and may include a request to appear before the Board. The Board will review the petition and issue a written determination within 5 business days of receiving it, unless the Campaign wishes to appear at the next scheduled Board meeting. Do not include any documentation or information not already submitted to the Board, unless the Board specifically requests it or you can show in your petition a good reason for failing to submit it previously.[1] If the Board denies your petition, you have four months to challenge the Board's determination in New York State Supreme Court pursuant to Article 78 of the Civil Practice Law and Rules.

---

[1] *See* Admin. Code § 3-705(4); Board Rule 7-09.

Page 2

If you have any questions, please contact me at dwillemin@nyccfb.info.

Sincerely,

Danielle Willemin
Director of Auditing and Accounting

# Exhibit 11

February 18, 2025                                    New York City Campaign Finance Board

CANDIDATE:   ADAMS, ERIC L (ID: 1545)
COMMITTEE:  ERIC ADAMS 2025
2025 EARLY PUBLIC FUNDS NONPAYMENT DETERMINATION

Based on a preliminary analysis, the Campaign Finance Board has determined that your campaign does not qualify for a public funds payment at this time.  The specifics of our calculation are described in the attached Detail Payment Report.  Please keep this notification and any attached report(s) for your records.  If you have any questions, please contact the Payment Coordinators Maria Alvarez and Alyson Joa-Perez at PaymentCoordinator@nyccfb.info.

The reason(s) for nonpayment are as follows:

The Campaign is not eligible for payment because it has not demonstrated compliance with Admin. Code § 12-110, as determined by the Conflicts of Interest Board.  See Admin. Code §§ 3-703(1)(m), 12-110; Board Rules 3-01(d)(ii)(D), 3-05.

The Campaign is not eligible for payment because the difference between the Campaign's reported receipts and documented receipts is equal to or greater than 10%.  See Admin. Code §§ 3-703(1)(d), (6); Board Rules 3-01(d)(i)(C), 4-01(a), 4-04.

The Campaign is not eligible for payment because of preliminary findings of substantial violations which may result in penalties.  Details regarding these findings will be sent to you shortly.  See generally Admin.  Code §§ 3-703; 3-705(1), 3-711; Board Rules 3-01(d)(i)(G), (ii)(H), 3-01(e).

This nonpayment of public funds is not a final determination by the Board, but rather is a preliminary determination subject to review of ongoing financial activity and final audit.  See Admin. Code §§3-710; Board Rule 3-01(c).

YOU MAY PETITION THE BOARD IN WRITING for reconsideration of this public funds determination.  Your petition must state the grounds for reconsideration and may include a request to appear before the Board.  Do not include any documentation or information not already submitted to the Board, unless the Board specifically requests it or you can show in your petition a good reason for failing to submit it previously. The Board will review the petition within five business days of receiving it and issue a timely written determination.  If the Board denies your petition, you may appeal, within four months, to the New York State Supreme Court pursuant to Article 78 of the Civil Practice Law and Rules.  See Admin. Code § 3-705(4); Board Rules 7-09.

02/18/2025 6:27 PM

**New York City Campaign Finance Board**
**Campaign Finance Information System**
**Detail Payment Report for 2025 Early Payment**
**Run:** 3     **Payment Date:** 02/18/2025

Page 1 of 2

**Candidate:** Adams, Eric L (ID: 1545)
**Office:** Mayor

| | Statement Date | Claimed Matchable | Invalid Claims | Gross Matchable | Payment |
|---|---|---|---|---|---|
| *Detail* | | | | | |
| | 1 (07/15/2022) | 68,347 | 17,640 | 50,707 | |
| | 2 (01/17/2023) | 37,100 | 8,950 | 28,150 | |
| | 3 (07/17/2023) | 118,026 | 23,900 | 94,126 | |
| | 4 (01/16/2024) | 61,021 | 15,576 | 45,445 | |
| | 5 (07/15/2024) | 193,468 | 39,117 | 154,351 | |
| | 6 (10/11/2024) | 57,391 | 27,276 | 30,115 | |
| | 7 (01/15/2025) | 22,650 | 8,500 | 14,150 | |
| | Total: | 558,003 | 140,959 | 417,044 | |
| | | 558,003 | 140,959 | 417,044 | |
| Matchable Adjustment: | | | | - 0 | |
| Adjusted Gross Matchable: | | | | 417,044 | |
| *Regular Payment Calculation* | | | | | |
| Adjusted Gross Matchable: | | | | 417,044 | |
| General Regular Matchable: | | | | - 0 | |
| Net Matchable: ( Threshold Met ) | | | | 417,044 | |
| Matching Factor: | | | | x 8.0 | |
| **EXTENDED NET REGULAR PAYABLE:  (Limit: 7,050,667)** | | | | **3,336,352** | **3,336,352** |
| Total Previous Regular Payable: | | | | | - 0 |
| Early Payment: | | | | | - 0 |
| **REGULAR PAYABLE:** | | | | | **3,336,352** |
| **MAX PAYABLE:** | | | | | **3,336,352** |
| Net Withholding: ( See Notes Below ) | | | | | - 26,150 |
| Reserve Amount:  ( 5.00 % ) | | | | | - 165,510 |
| Reserve Applied: | | | | | + 0 |
| **ADJUSTED AMOUNT ELIGIBLE:** | | | | | 3,144,692 |
| Amount Payable: | | | | | 0 |
| Penalty Deduction: | | | | | - 0 |
| **PAYMENT DUE:** | | | | | **0** |

02/18/2025 6:27 PM

**New York City Campaign Finance Board**
**Campaign Finance Information System**
**Detail Payment Report for 2025 Early Payment**
**Run:** 3    **Payment Date:** 02/18/2025

Page 2 of 2

**Candidate:** Adams, Eric L (ID: 1545)
**Office:** Mayor

| *Net Withholding* | | |
|---|---|---|
| Total Withholding: | | 26,150 |
| Previous Withholding: | - | 16,771 |
| Previous Unapplied Withholding: | + | 16,771 |
| **Net Withholding:** | | **26,150** |

| *Notes* | Withholding |
|---|---|
| OTL Contribution(s) | ( 22850 ) |
| Withholding for Excess Doing Business Contributions | ( 3300 ) |
| Credit Variance | |
| Withholding For Non Compliance | |

# Exhibit 12



**New York City Campaign Finance Board**
100 Church Street, 12th Floor, New York, NY 10007
212.409.1800 | www.nyccfb.info

Frederick P. Schaffer
*Chair*

Gregory T. Camp
Richard J. Davis
Lawrence Moskowitz
Dawn Smalls
*Members*

Paul Seamus Ryan
*Executive Director*

February 18, 2025

Sharon Adams
Eric Adams 2025
1043 E 101 Street
Brooklyn, NY 11236

**RE: 2025 Public Funds Payment Determination Supplemental Notice**

Based on a preliminary analysis, and as set forth in the Public Funds Nonpayment Determination and the Detail Payment Report, which you have already received, pursuant to Board Rules 3-01(d)(i)(B), (G), (ii)(I), the Campaign Finance Board (the "Board") has determined that the Eric Adams 2025 campaign (the "Campaign") has not demonstrated eligibility for a public funds payment.

Please see the letter dated December 18, 2024, for more information.

These preliminary findings are not a final determination by the Board, but rather, a preliminary determination subject to review of ongoing financial activity and final audit.

**You may petition the Board in writing** for reconsideration of this public funds determination. Your petition must state the grounds for reconsideration and may include a request to appear before the Board. The Board will review the petition and issue a written determination within 5 business days of receiving it, unless the Campaign wishes to appear at the next scheduled Board meeting. Do not include any documentation or information not already submitted to the Board, unless the Board specifically requests it or you can show in your petition a good reason for failing to submit it previously.[1] If the Board denies your petition, you have four months to challenge the Board's determination in New York State Supreme Court pursuant to Article 78 of the Civil Practice Law and Rules.

---

[1] *See* Admin. Code § 3-705(4); Board Rule 7-09.

Page 2

If you have any questions, please contact me at dwillemin@nyccfb.info.

Sincerely,

*on behalf of Danielle M. Willemin*

Danielle Willemin
Director of Auditing and Accounting

# Exhibit 13

March 17, 2025                                    New York City Campaign Finance Board

CANDIDATE:   ADAMS, ERIC L (ID: 1545)
COMMITTEE:  ERIC ADAMS 2025
2025 EARLY PUBLIC FUNDS NONPAYMENT DETERMINATION

　　　Based on a preliminary analysis, the Campaign Finance Board has determined that your campaign does not qualify for a public funds payment at this time.  The specifics of our calculation are described in the attached Detail Payment Report.  Please keep this notification and any attached report(s) for your records.  If you have any questions, please contact the Payment Coordinators Maria Alvarez and Alyson Joa-Perez at PaymentCoordinator@nyccfb.info.

　　　The reason(s) for nonpayment are as follows:

　　　The Campaign is not eligible for payment because it has not demonstrated compliance with Admin. Code § 12-110, as determined by the Conflicts of Interest Board.  See Admin. Code §§ 3-703(1)(m), 12-110; Board Rules 3-01(d)(ii)(D), 3-05.

　　　The Campaign is not eligible for payment because the difference between the Campaign's reported receipts and documented receipts is equal to or greater than 10%.  See Admin. Code §§ 3-703(1)(d), (6); Board Rules 3-01(d)(i)(C), 4-01(a), 4-04.

　　　The Campaign is not eligible for payment because of preliminary findings of substantial violations which may result in penalties.  Details regarding these findings will be sent to you shortly.  See generally Admin.  Code §§ 3-703; 3-705(1), 3-711; Board Rules 3-01(d)(i)(G), (ii)(H), 3-01(e).

　　　This nonpayment of public funds is not a final determination by the Board, but rather is a preliminary determination subject to review of ongoing financial activity and final audit.  See Admin. Code §§3-710; Board Rule 3-01(c).

　　　　YOU MAY PETITION THE BOARD IN WRITING for reconsideration of this public funds determination.  Your petition must state the grounds for reconsideration and may include a request to appear before the Board.  Do not include any documentation or information not already submitted to the Board, unless the Board specifically requests it or you can show in your petition a good reason for failing to submit it previously. The Board will review the petition within five business days of receiving it and issue a timely written determination.  If the Board denies your petition, you may appeal, within four months, to the New York State Supreme Court pursuant to Article 78 of the Civil Practice Law and Rules.  See Admin. Code § 3-705(4); Board Rules 7-09.

03/17/2025 8:49 PM

**New York City Campaign Finance Board**
**Campaign Finance Information System**
**Detail Payment Report for 2025 Early Payment**
**Run:** 5    **Payment Date:** 03/17/2025

Page 1 of 2

**Candidate:** Adams, Eric L (ID: 1545)
**Office:** Mayor

| | Statement Date | Claimed Matchable | Invalid Claims | Gross Matchable | Payment |
|---|---|---|---|---|---|
| *Detail* | | | | | |
| | 1 (07/15/2022) | 68,347 | 17,640 | 50,707 | |
| | 2 (01/17/2023) | 37,100 | 8,950 | 28,150 | |
| | 3 (07/17/2023) | 118,026 | 23,900 | 94,126 | |
| | 4 (01/16/2024) | 61,021 | 15,576 | 45,445 | |
| | 5 (07/15/2024) | 193,468 | 39,117 | 154,351 | |
| | 6 (10/11/2024) | 57,391 | 27,276 | 30,115 | |
| | 7 (01/15/2025) | 22,650 | 8,500 | 14,150 | |
| | Total: | 558,003 | 140,959 | 417,044 | |
| | | 558,003 | 140,959 | 417,044 | |

| | | |
|---|---|---|
| Matchable Adjustment: | - | 0 |
| Adjusted Gross Matchable: | | 417,044 |
| *Regular Payment Calculation* | | |
| Adjusted Gross Matchable: | | 417,044 |
| General Regular Matchable: | - | 0 |
| Net Matchable: ( Threshold Met ) | | 417,044 |
| Matching Factor: | x | 8.0 |
| **EXTENDED NET REGULAR PAYABLE:  (Limit: 7,050,667)** | **3,336,352** | **3,336,352** |
| Total Previous Regular Payable: | - | 0 |
| Early Payment: | - | 0 |
| **REGULAR PAYABLE:** | | **3,336,352** |
| **MAX PAYABLE:** | | **3,336,352** |
| Net Withholding: ( See Notes Below ) | - | 31,600 |
| Reserve Amount:  (   5.00 % ) | - | 165,238 |
| Reserve Applied: | + | 0 |
| **ADJUSTED AMOUNT ELIGIBLE:** | | **3,139,514** |
| Amount Payable: | | 0 |
| Penalty Deduction: | - | 0 |
| **PAYMENT DUE:** | | **0** |

Case 1:25-cv-03380-NGG-LKE     Document 11-2     Filed 06/23/25     Page 388 of 593
PageID #: 786

**New York City Campaign Finance Board**
**Campaign Finance Information System**
**Detail Payment Report for 2025 Early Payment**
**Run:** 5     **Payment Date:** 03/17/2025

**Candidate:** Adams, Eric L (ID: 1545)
**Office:** Mayor

### *Net Withholding*

| | | |
|---|---|---|
| Total Withholding: | | 31,600 |
| Previous Withholding: | - | 26,150 |
| Previous Unapplied Withholding: | + | 26,150 |
| **Net Withholding:** | | **31,600** |

### *Notes*                                              Withholding

| | |
|---|---|
| OTL Contribution(s) | ( 22850 ) |
| Withholding for Excess Doing Business Contributions | ( 8750 ) |
| Credit Variance | |
| Withholding For Non Compliance | |

# Exhibit 14

AUSAs: Celia Cohen, Andrew Rohrbach, Hagan Scotten, Derek Wikstrom

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 24 MAG 3535

| | |
|---|---|
| UNITED STATES OF AMERICA | <u>**SEALED COMPLAINT**</u> |
| v. | Violations of 18 U.S.C. §§ 1512 and 1519 |
| MOHAMED BAHI, | |
| Defendant. | COUNTY OF OFFENSE: NEW YORK |

SOUTHERN DISTRICT OF NEW YORK, ss.:

JACOB BALOG, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation, and charges as follows:

<u>**COUNT ONE**</u>
**(Witness Tampering)**

1.      In or about June 2024, in the Southern District of New York and elsewhere, MOHAMED BAHI, the defendant, knowingly used intimidation, threatened, and corruptly persuaded another person, and attempted to do the same, with the intent to hinder, delay, and prevent the communication to a law enforcement officer of information relating to the commission and possible commission of a federal offense, to wit, BAHI met with five potential witnesses and directed them to lie to law enforcement officers in connection with a federal criminal investigation being conducted by the Federal Bureau of Investigation.

(Title 18, United States Code, Section 1512(b)(3).)

<u>**COUNT TWO**</u>
**(Destruction of Records)**

2.      On or about July 24, 2024, in the Southern District of New York and elsewhere, MOHAMED BAHI, the defendant, knowingly altered, destroyed, mutilated, concealed, covered up, falsified, and made a false entry in a record, document, and tangible object with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, and in relation to and in contemplation of such a matter, to wit, BAHI deleted the encrypted-messaging application Signal from his cellphone upon the Federal Bureau of Investigation's arrival at his home to execute a court-issued warrant authorizing the search of BAHI's home and the seizure of his cellphone.

(Title 18, United States Code, Section 1519.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

3.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and I have been personally involved in the investigation of this matter, which has been jointly investigated

with the New York City Department of Investigation ("DOI"). This affidavit is based upon my personal participation in the investigation of this matter, my conversations with other law enforcement personnel, and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my participation in the investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

<u>Background</u>

4.     From approximately 2022 through the present, MOHAMED BAHI, the defendant, has worked as a Senior Liaison in the Community Affairs Unit of the New York City mayoral administration of a certain public official ("Official-1").

5.     Beginning at least in or about 2018, Official-1 campaigned to be New York City Mayor, in connection with an election to be held in 2021 (the "2021 Official-1 Campaign"). In or about 2020, MOHAMED BAHI, the defendant, solicited campaign contributions for the 2021 Official-1 Campaign.

6.     Since in or about 2021, the FBI and DOI have been investigating, among other things, the receipt of so-called "straw" contributions by the 2021 Official-1 Campaign (the "Federal Investigation"). A straw contribution to a political campaign is a contribution that is made in the name of one donor, for which the donated funds in fact came from a different person. The knowing solicitation and acceptance of straw contributions can violate federal law when, for example, a political campaign makes false statements about straw contributions to a public entity to fraudulently obtain public matching funds based on the contributions, or when the straw contributions are used to smuggle foreign money into a campaign. I am one of the FBI Special Agents conducting the Federal Investigation.

7.     As explained in greater detail below, in or about December 2020, MOHAMED BAHI, the defendant, was involved in organizing a fundraiser for the 2021 Official-1 Campaign at which the donors made straw contributions. In or about 2024, when the FBI was investigating the 2021 Official-1 Campaign's solicitation and acceptance of straw contributions, BAHI took steps to obstruct the Federal Investigation by tampering with multiple witnesses and destroying evidence.

<u>The December 2020 Fundraiser</u>

8.     Based on my review of records from the New York City Campaign Finance Board (the "CFB"), I know, among other things, the following:

       a.     On or about December 10, 2020, four individuals (each a "Donor," and collectively, the "Donors") associated with the same employer (the "Construction Company") made contributions to the 2021 Official-1 Campaign. Contribution cards for each of the Donors were submitted to the CFB by the 2021 Official-1 Campaign. Each of the Donors' contribution cards listed the Construction Company in the field "employer."

       b.     A fifth person (the "Businessman") also contributed to the 2021 Official-1 Campaign, on the same date and in the same amount as each of the Donors. The Businessman's

2

contribution card, submitted to the CFB by the 2021 Official-1 Campaign, listed the Businessman's employer as "Self," and his occupation as "President." Based on, among other things, my review of open-source information, I know that the Businessman is the founder and chief executive officer of the Construction Company.

      c.    Each of the four Donors, and the Businessman, contributed to the 2021 Official-1 Campaign by check, in the amount of $2,000.

      d.    All five of the contribution cards submitted by the Donors and the Businessman in connection with these December 10, 2020 contributions had matching, pre-typed information, including the recipient, the names and addresses of the respective Donors, and their employer.

      e.    Each of the five relevant contribution cards contained a signature on a line reading "Contributor's Signature." Above the signature line, each contribution card stated: "I understand that State law requires that a contribution be in my name and be from my own funds. I hereby affirm that I was not, nor, to my knowledge, was anyone else, reimbursed in any manner for this contribution; that this contribution is not being made as a loan; and that this contribution is being made from my personal funds or my personal account, which has no corporate or business affiliation."

      9.    I have reviewed text messages from electronic devices and accounts belonging to the Businessman, which were obtained pursuant to court-authorized search warrants. Based on that review, I have learned, among other things, the following:

      a.    On or about November 19, 2020, a telephone number saved to the Businessman's phone contacts as a variant of the name of MOHAMED BAHI,[1] the defendant, texted the Businessman: "Dec 10th - Thursday 7pm - Your Office," "Private Fundraiser and Dinner for [Official-1]."

      b.    On or about December 9, 2020, BAHI texted the Businessman: "…he moved it tomorrow to 5pm. Is that ok?" The Businessman responded: "yes even better."

      c.    On or about December 10, 2020, at approximately 4:57 p.m., BAHI texted the Businessman: "im coming now," "i think he is about 15 mins away." Less than ten minutes later, BAHI texted the Businessman: "he's outside," "bringing him in."

      10.    Law enforcement has interviewed each of the Donors and the Businessman.[2] Based on my participation in some of those interviews, my discussions with other law enforcement agents

---

[1] Specifically, the number was saved in the Businessman's contacts as "Muhammad Bahi."

[2] Each of these five witnesses was interviewed by the FBI on or about June 13, 2024, and, in sum and substance, denied having been involved in straw donations. Each of these witnesses was subsequently interviewed, pursuant to proffer agreements and while represented by counsel, and it is these counseled, proffer-protected interviews that are described in this paragraph. Each of these witnesses agreed to speak with law enforcement in the hopes of receiving leniency in connection with this investigation. In the course of proffering with the Government, the Businessman admitted his involvement in straw donations to Official-1's mayoral campaigns and

3

who participated in the interviews, and my review of related reports, I know, among other things, that multiple witnesses confirmed each of the following facts:

      a.    The Donors and the Businessman attended a fundraiser for the 2021 Official-1 Campaign held at the Brooklyn headquarters of the Construction Company on December 10, 2020;

      b.    Official-1 attended the fundraiser;

      c.    MOHAMED BAHI, the defendant, organized and attended the fundraiser, and suggested that the Businessman should reimburse donations by his employees;

      d.    Each of the Donors made straw contributions: each of their $2,000 contributions was either reimbursed by, or paid for in advance by, the Construction Company.

<u>The June 13, 2024 Interviews and BAHI's Witness Tampering</u>

    11.    On or about June 13, 2024, in connection with the Federal Investigation, FBI agents executed a court-authorized search warrant at the home of the Businessman, and also served him with a subpoena issued by a grand jury in the Southern District of New York. Around the same time the search warrant was executed, FBI agents also approached each of the four Donors with subpoenas issued by a grand jury in the Southern District of New York, and attempted to interview each of them.

    12.    Based on my participation in certain interviews, my discussions with other law enforcement officers who interviewed the Donors and the Businessman as discussed above, and my review of related reports, I have learned, in substance and in part, that:

      a.    On or about June 13, 2024, the Businessman called MOHAMED BAHI, the defendant, and informed BAHI that the FBI had executed a search warrant at the Businessman's home that morning.

      b.    In the afternoon on or about June 13, 2024, BAHI went to the offices of the Construction Company, where he met privately with the Businessman, and then met with the Businessman and the four Donors.

      c.    During the private meeting between BAHI and the Businessman on or about June 13, 2024, BAHI told the Businessman that he had just spoken with Official-1. BAHI then asked the Businessman to describe his interactions with the FBI. After the Businessman told BAHI that the Businessman had denied having funded straw donations to Official-1 when questioned by the FBI, BAHI advised the Businessman that if he continued to tell that lie to federal investigators the Businessman would be ok.

---

in an unrelated fraud offense. The information these witnesses have provided has proven reliable and is corroborated by other evidence.

d.    BAHI then met with the Businessman and the four Donors. BAHI asked each of them to describe their interactions with the FBI. BAHI took photographs of the grand jury subpoenas that had been served on the Donors and the Businessman.

e.    During the meeting between BAHI, the Businessman, and the four Donors, BAHI encouraged the Donors to lie to federal investigators by denying that they had made straw donations to the 2021 Official-1 Campaign, and remarked that because the Donors' contributions to the 2021 Official-1 Campaign had been reimbursed in cash, the FBI would be unable to prove that the reimbursements had occurred.

f.    On or about June 14, 2024, BAHI again met with the Businessman. During that meeting, BAHI indicated to the Businessman, in substance and in part, that BAHI had met with Official-1, and that Official-1 believed that the Businessman would not cooperate with law enforcement.

<u>BAHI's Destruction of Evidence</u>

13.    Based on my training and experience, including my experience in the Federal Investigation, I know that Signal is an encrypted-messaging application that allows users to set the application to automatically delete messages at certain intervals. Based on my involvement in the Federal Investigation, and my review of both open-source information and the contents of devices and accounts seized pursuant to court-authorized search warrants, I know that Official-1 used Signal to communicate and sometimes encouraged others to do so, and that people who—like MOHAMED BAHI, the defendant—work for Official-1 also used Signal to communicate with Official-1 and others.

14.    On July 24, 2024, in connection with the Federal Investigation, FBI agents executed a court-authorized search warrant at the home of MOHAMED BAHI, the defendant. Based on my discussions with FBI agents who participated in the search, I have learned, among other things, the following:

a.    On July 24, 2024, at approximately 6:00 a.m., FBI agents began knocking on the door of BAHI's home, and calling a phone number known to be used by BAHI to announce that they were present to execute a search warrant. No one answered the door, and BAHI did not answer multiple calls from the agents.

b.    FBI agents then called BAHI's former spouse, who lives at BAHI's home. She answered the phone, and FBI agents identified themselves as federal agents, and told her that they were at the door and wanted to speak with BAHI. BAHI's former spouse initially claimed not to be home. She eventually came to the door, but initially refused to open it.

c.    Some time after BAHI's former spouse came to the door, BAHI himself came to the door, and let the FBI into his home to execute the search warrant.

d.    Once FBI agents were inside BAHI's home executing the search warrant, an agent mentioned to BAHI that the agent had repeatedly called BAHI. This prompted BAHI to take a cellphone (the "Bahi Cellphone") out of his pocket, which the agent then seized pursuant to the warrant. Thus, BAHI had uninhibited access to his cellphone between learning that the FBI was present at his home and the FBI entering his home.

5

e.    During an interview with FBI agents who were executing the search warrant, BAHI stated, in substance and in part, that he had used the Bahi Cellphone as his personal cellphone for approximately the last few months. BAHI also stated that he was planning to travel to Egypt that evening.

15.    Based on my review of information from the forensic extraction of the Bahi Cellphone, which was performed after the Bahi Cellphone was seized by FBI agents, I have learned, among other things, that Signal was not on the Bahi Cellphone at the time it was forensically searched. Activity logs for the Bahi Cellphone indicated, however, that the Bahi Cellphone had been used to access the Signal application as recently as approximately 12:04 a.m. on July 24, 2024, the day that BAHI's home was searched and the Bahi Cellphone was seized by FBI agents. In other words, the Signal application was deleted from the Bahi Cellphone sometime between approximately midnight and shortly after 6:00 a.m., when the Bahi Cellphone was seized by FBI agents on July 24, 2024.

16.    In the afternoon of July 24, 2024, FBI agents called MOHAMED BAHI, the defendant, to ask him follow-up questions about the Bahi Cellphone. I participated in that call, along with other agents. During the call, BAHI admitted, in substance and in part, that he had recently deleted the Signal application. When agents asked BAHI when that day he had deleted Signal, BAHI stated that he would not disclose when he deleted Signal.

17.    During the interview described in the preceding paragraph, MOHAMED BAHI, the defendant, claimed, in substance and in part, that he had a practice of deleting applications that were suspicious before traveling internationally, in case he was questioned by authorities during that travel. That statement appears to be false. From my review of travel records, I have learned that BAHI traveled to Egypt on or about February 15, 2024, returning to New York on or about February 23, 2024.[3] And, based on my review of the contents of the Bahi Cellphone, I know that BAHI did not delete Signal on that trip, but instead continued to use Signal, including to exchange messages with Official-1 via Signal. Specifically, the Bahi Cellphone contains a screenshot of messages BAHI and Official-1 exchanged during BAHI's travel to Egypt and Yemen, and metadata for the screenshot indicates that the screenshot was created on or about February 19, 2024, during that trip.

---

[3] Based on my review of the contents of the Bahi Cellphone, I believe that BAHI traveled to Yemen by way of Egypt during this trip.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of MOHAMED BAHI, the defendant, and that he be imprisoned or bailed, as the case may be.

_S/ by the Court with permission_
_____
JACOB BALOG
Special Agent
Federal Bureau of Investigation

Sworn to me through the transmission of this Affidavit
by reliable electronic means, pursuant to
Federal Rules of Criminal Procedure 41(d)(3) and 4.1,

this _7th_ day of October, 2024.

_____
THE HONORABLE ROBERT W. LEHRBURGER
United States Magistrate Judge
Southern District of New York

7

# Exhibit 15





**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

February 7, 2025

**BY EMAIL & ECF**

The Honorable Analisa Torres          The Honorable Dale E. Ho
United States District Judge          United States District Judge
Southern District of New York         Southern District of New York
500 Pearl Street                      40 Foley Square
New York, New York 10007              New York, New York 10007

> Re:   *United States v. Eric Adams*, 24 Cr. 556 (DEH)
>        *United States v. Erden Arkan*, 25 Cr. 13 (DEH)
>        *United States v. Mohamed Bahi*, 25 Cr. ___ (AT)

Dear Judge Torres and Judge Ho:

The Government respectfully submits this letter regarding the three above-referenced cases, which arise out of related conduct and concern co-conspirators.

On September 27, 2024, a grand jury in this District returned Indictment 24 Cr. 556 (DEH), charging defendant Eric Adams in five counts. Count One charges Adams with conspiracy to commit an offense against the United States, in violation of 18 U.S.C. § 371. Count Two charges Adams with wire fraud, in violation of 18 U.S.C. § 1343. Counts Three and Four charge Adams with soliciting campaign contributions by foreign nationals, in violation of 52 U.S.C. § 30121(a)(2). Count Five charges Adams with soliciting and accepting bribes, in violation of 18 U.S.C. § 666. The conspiracy charged in Count One has multiple objects, of which one object is committing wire fraud through the collection of campaign contributions made under the name of someone other than the true contributor, and the subsequent request for public funds based on the misrepresentation that those contributions originated from the named contributor. *Adams* was assigned to Judge Ho. Two public conferences and multiple *ex parte* proceedings pursuant to the Classified Information Procedures Act have taken place before Judge Ho, defense motions have been filed and resolved, and a trial date has been set for April 21, 2025.

On January 10, 2025, the Government filed Information 25 Cr. 13 (DEH), charging defendant Erden Arkan in one count with conspiracy to violate the laws of the United States, in violation of 18 U.S.C. § 371. The charged object of that conspiracy is committing wire fraud through the collection of campaign contributions made under the name of someone other than the true contributor, and the subsequent request for public funds based on the misrepresentation that those contributions originated from the named contributor. *Arkan* was initially assigned to Judge

Vargas, but was transferred to Judge Ho pursuant to the District's related case procedures. Also on January 10, 2025, Arkan pled guilty before Judge Ho to the sole count of the Information. The conduct for which Arkan pled guilty forms a part of the conduct charged in Counts One and Two of the *Adams* Indictment, and Arkan is identified in the *Adams* Indictment as "Businessman-5." (*See United States v. Adams*, 24 Cr. 556 (DEH), Dkt. 1 ¶ 30).

On February 6, 2025, the Government filed a notice of intent to file an information charging Mohamed Bahi in a single count with conspiracy to violate the laws of the United States, in violation of 18 U.S.C. § 371. The charged object of that conspiracy, as in *Arkan*, is committing wire fraud through the collection of campaign contributions made under the name of someone other than the true contributor, and the subsequent request for public funds based on the misrepresentation that those contributions originated from the named contributor. The conduct charged in the *Bahi* information forms part of the conduct charged in Counts One and Two of the *Adams* Indictment, and Bahi is identified in the *Adams* Indictment as "Adams Employee-1." (*See United States v. Adams*, 24 Cr. 556 (DEH), Dkt. 1 ¶ 28.a). In connection with that case, Bahi has indicated that he intends to plead guilty to the sole count of the Information against him.

*Bahi* has been assigned to Judge Torres. No proceedings have yet been held.

Respectfully Submitted,

DANIELLE R. SASSOON
United States Attorney

by: _____/s/_____
Celia V. Cohen
Andrew Rohrbach
Hagan Scotten
Derek Wikstrom
Assistant United States Attorneys
(914) 993-1921 / (212) 637-1944 / 2410 / 1085

cc:    Counsel of Record (by ECF)

# Exhibit 16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **INFORMATION** |
| v. | 24 Cr. ___  (  ) |
| ERDEN ARKAN, | |
| Defendant. | **25cr13** |

### COUNT ONE
### (Conspiracy to Commit Wire Fraud)

The Acting United States Attorney charges:

1.      In or about 2021, in the Southern District of New York and elsewhere, ERDEN ARKAN, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, wire fraud, in violation of Title 18, United States Code, Section 1343.

2.      It was a part and object of the conspiracy that ERDEN ARKAN, the defendant, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, ARKAN agreed to and did direct certain of his employees to make contributions to the 2021 Campaign for New York City Mayor (the "2021 Campaign") of a New York City public official ("Official-1"), while also directing that those employees be reimbursed for their contributions, understanding that the 2021 Campaign

would seek public funds from New York City based on the misrepresentation that the employees were the true contributors, and transmitted and caused to be transmitted electronic communications to and from the Southern District of New York and elsewhere in furtherance of that scheme.

Overt Acts

3.      In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed by ERDEN ARKAN, the defendant, and others known and unknown, in the Southern District of New York and elsewhere:

        a.      In April 2021, ARKAN attended an event with Official-1, an official of the Turkish Government (the "Turkish Official"), and others known and unknown, at which Official-1 solicited contributions to the 2021 Campaign.

        b.      In April 2021, ARKAN directed that employees of a corporation where ARKAN served as a principal receive funds from the corporation which the employees would contribute to the 2021 Campaign under the employees' own names, even though the funds in fact originated from the corporation (the "Straw Donations").

        c.      In May 2021, ARKAN hosted a fundraiser also organized by the Turkish Official, among others, where Official-1 knowingly accepted the Straw Donations.

        d.      In May 2021, Official-1 submitted a false disclosure statement to the New York City Campaign Finance Board for the purpose of obtaining public funds from New York City for the 2021 Campaign, based in part on the false statements that the Straw Donations were funded by ARKAN's employees.

(Title 18, United States Code, Section 371.)

*Edward Y. Kim*

EDWARD Y. KIM
Acting United States Attorney

2

# Exhibit 17

P1aWarkP

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4              v.                          25 Cr. 13 (DEH)

 5    ERDEN ARKAN,

 6              Defendant.
                                            Plea
 7    ------------------------------x

 8                                          New York, N.Y.
                                            January 10, 2025
 9                                          12:00 p.m.

10    Before:

11
                        HON. DALE E. HO,
12
                                            District Judge
13
                          APPEARANCES
14
      EDWARD Y. KIM
15         Acting United States Attorney for
           the Southern District of New York
16    BY:  CELIA V. COHEN
           HAGAN C. SCOTTEN
17         Assistant United States Attorneys

18    POTOMAC LAW GROUP
           Attorneys for Defendant
19    BY:  JONATHAN ROSEN

20
      Also Present:  Cansu Kaptaner, Interpreter (Turkish)
21                   Special Agent Jacob Balog, FBI

22

23

24

25
```

P1aWarkP

```
 1              (Case called; appearances noted)

 2              THE COURT:  Good afternoon.

 3              Good afternoon, Mr. Arkan.  Please have a seat.

 4              Before we get underway, my understanding is that we

 5    have an interpreter present today, so I will ask Ms. Morales,

 6    my courtroom deputy, to swear her in.

 7              (Interpreter sworn)

 8              THE COURT:  OK.  I understand that we're here today

 9    because Mr. Arkan wishes to plead guilty to Count One of the

10    information in this case.  Is that correct?

11              MR. ROSEN:  Yes, your Honor.

12              THE COURT:  OK.  Before I do that, I understand,

13    Mr. Rosen, you have submitted a motion for admission *pro hac*

14    *vice*.

15              MR. ROSEN:  Your Honor, it's a prospective motion.

16    Technically, I cannot have one filed until I have a case

17    number.  Thus, I provided the Court with a draft order for the

18    Court to consider, and once a case -- assuming the motion's

19    granted, the oral motion, I will perfect that by having the

20    paperwork filed forthwith.

21              THE COURT:  OK.  Thank you, Mr. Rosen.  I'll grant the

22    oral motion for purposes of today --

23              MR. ROSEN:  Thank you.

24              THE COURT:  -- provisionally.

25              MR. ROSEN:  Yes.
```

P1aWarkP

```
1              THE COURT:  And then once we have a case number, you
2    can file the appropriate paperwork.
3              MR. ROSEN:  Thank you, your Honor.
4              THE COURT:  OK.  Thank you.
5              OK.  Now, Mr. Arkan, before I can accept a plea of
6    guilty from you today, I have to ask a certain number of
7    questions so that I can establish to my satisfaction that you
8    wish to plead guilty because you are guilty and not for some
9    other reason and also to establish that you know what you'll be
10   giving up by pleading guilty.  If you don't understand any of
11   my questions or if you want to consult with your lawyer at any
12   time for any reason, just let me know, and I will give you as
13   much time as you need, because it is essential in order to have
14   a valid plea that you understand each of my questions before
15   you answer them.
16             Is that OK?  Do you understand?
17             THE DEFENDANT:  Yes, your Honor.
18             THE COURT:  OK.  Ms. Morales, would you please swear
19   in Mr. Arkan.
20             (Defendant sworn)
21             THE COURT:  Mr. Arkan, you're now under oath, which
22   means that if you answer any of my questions falsely, you may
23   be prosecuted for the separate crime of perjury.
24             Do you understand that?
25             THE DEFENDANT:  Yes, your Honor.
```

4

1          THE COURT:  What is your full name?

2          THE DEFENDANT:  Erden Arkan.  (in English)

3          THE COURT:  Would you spell that, please.

4          THE DEFENDANT:  E-R-D-E-N A-R-K-A-N.  (in English)

5          THE COURT:  And how old are you?

6          THE DEFENDANT:  As of today, 76.  (in English)

7          THE COURT:  Are you a United States citizen?

8          THE DEFENDANT:  Yes.  (in English)

9          THE COURT:  OK.  I have to ask that question because

10    there are certain possible consequences for noncitizens that I

11    will have to go over.

12          Are you a natural-born United States citizen; that is,

13    were you born here?  Or were you born elsewhere and then did

14    you become a citizen via naturalization?

15          THE DEFENDANT:  I'm a naturalized U.S. citizen.

16          THE COURT:  OK.  So there are some potential

17    consequences for naturalized citizens for a guilty judgment

18    that I will have to go over with you later, but before that,

19    how far did you go in school?

20          THE DEFENDANT:  Four years' college degree.  (in

21    English)

22          THE COURT:  And where?

23          THE DEFENDANT:  Turkey.  (in English)

24          THE COURT:  Have you ever been hospitalized or treated

25    for any mental illness?

P1aWarkP

1          THE DEFENDANT:  No.

2          THE COURT:  Are you now or have you recently been

3     under the care of a doctor or a mental health professional,

4     such as a psychiatrist or a psychologist?

5          THE DEFENDANT:  No.  No, I'm not.

6          THE COURT:  Have you ever been treated or hospitalized

7     for any type of addiction, including drug or alcohol addiction?

8          THE DEFENDANT:  No, your Honor.

9          THE COURT:  Have you taken any drugs, medicine or

10    pills or drunk any alcoholic beverages in the last two days?

11         THE DEFENDANT:  No, your Honor.  (in English)

12         THE COURT:  Is your mind clear today?

13         THE DEFENDANT:  Yes, it is.  (in English)

14         THE COURT:  And do you understand what is happening in

15    these proceedings today?

16         THE DEFENDANT:  Yes, I understand.

17         THE COURT:  Mr. Rosen, have you discussed this matter

18    with your client -- Mr. Arkan?

19         MR. ROSEN:  Yes, your Honor.

20         THE COURT:  And does he understand the rights he would

21    be waiving by pleading guilty?

22         MR. ROSEN:  Absolutely.

23         THE COURT:  And is he capable of understanding today's

24    proceedings?

25         MR. ROSEN:  Absolutely.

P1aWarkP

 1              THE COURT:  Does counsel for either side have any

 2      doubt as to Mr. Arkan's competence to plead at this time?

 3              MR. ROSEN:  None by the defense.

 4              MS. COHEN:  No, your Honor.

 5              THE COURT:  On the basis of Mr. Arkan's responses to

 6      my questions, my observations of his demeanor here in court and

 7      the representations of counsel, I find that Mr. Arkan is fully

 8      competent to enter an informed plea of guilty at this time.

 9              Now, Mr. Arkan, have you received a copy of the

10      information which contains the charge against you?

11              THE DEFENDANT:  Yes, your Honor.

12              THE COURT:  Was it translated for you, or did you read

13      it?

14              THE DEFENDANT:  Yes, but I read it.  (in English)

15      Yes, I read it.

16              THE COURT:  Do you waive public reading of it, or

17      would you like to have me read it aloud in open court?

18              (Counsel conferred with defendant)

19              THE DEFENDANT:  I waive the reading.

20              THE COURT:  Have you had enough of a chance to discuss

21      with Mr. Rosen the charge to which you intend to plead guilty

22      and any possible defenses to that charge?

23              THE DEFENDANT:  Yes.  (in English)  Yes.

24              THE COURT:  Has your lawyer explained to you the

25      consequences of entering a plea of guilty?

P1aWarkP

1          THE DEFENDANT:  Yes, he did.  (in English)

2          THE COURT:  Are you satisfied with Mr. Rosen's

3    representation of you?

4          THE DEFENDANT:  Yes.  Yes, your Honor.  (in English)

5          THE COURT:  OK.  I have a waiver-of-indictment form

6    here, which appears to have been signed by you.

7          Is this your signature which appears on the form?

8          (Counsel conferred with defendant)

9          THE DEFENDANT:  Yes, your Honor.  (in English)

10          THE COURT:  And before you signed it, did you discuss

11    it with your lawyer?

12          THE DEFENDANT:  Yes.  (in English)

13          THE COURT:  And did Mr. Rosen explain it to you?

14          THE DEFENDANT:  Yes, your Honor.  (in English)

15          THE COURT:  And you understand that you have no

16    obligation to waive indictment.

17          THE DEFENDANT:  Yes, I know.  (in English)

18          THE COURT:  Now, you understand that if you did not

19    waive indictment and if the government wanted to prosecute you,

20    it would have to present your case to a grand jury, which could

21    choose whether or not to indict you.

22          THE DEFENDANT:  Yes, I know.  (in English)

23          THE COURT:  And you understand that by waiving

24    indictment you're giving up your right to have this case

25    presented to a grand jury.

P1aWarkP

1          THE DEFENDANT:  Yes, your Honor.  (in English)

2          THE COURT:  And you understand what a grand jury is;

3     it's a body composed of 23 people of which at least 16 must be

4     present and a grand jury cannot charge a defendant unless at

5     least 12 of them vote for an indictment based on probable

6     cause.

7          Do you understand that?

8          THE DEFENDANT:  Yes, your Honor.  (in English)

9          THE COURT:  Does either counsel know of any reason

10     that I should not find that the defendant has knowingly and

11     voluntarily waived his right to be indicted by a grand jury?

12          MS. COHEN:  No, your Honor.

13          MR. ROSEN:  No, your Honor.

14          THE COURT:  OK.  I find that the defendant has

15     knowingly and voluntarily waived his right to be indicted by a

16     grand jury, and I authorize the filing of the information in

17     this case.

18          Mr. Arkan, I'm going to go over certain rights that

19     you have.  These are rights that you are giving up by entering

20     a guilty plea.  Now, again, you have the right to change your

21     mind about your plea after I've gone over everything with you,

22     so just please listen carefully to what I'm about to say.  And

23     if you don't understand anything, stop me and your lawyer or I

24     will explain it more fully to you.  OK?

25          THE DEFENDANT:  Yes, your Honor.  (in English)

P1aWarkP

1          THE COURT:  Under the Constitution and laws of the

2     United States, you have a right to plead not guilty to the

3     charge in the information.

4          Do you understand that?

5          THE DEFENDANT:  Yes, I know.  (in English)

6          THE COURT:  And if you did plead not guilty, you would

7     be entitled to a speedy and public trial by a jury on the

8     charge contained in the information.

9          Do you understand that?

10          THE DEFENDANT:  Yes, I know.  (in English)

11          THE COURT:  And at the trial, you would be presumed to

12     be innocent.  What that means is you would not have to prove

13     that you were innocent.  Instead, the government would be

14     required to prove that you were guilty with competent evidence

15     beyond a reasonable doubt before a jury could find you guilty.

16          Do you understand that?

17          THE DEFENDANT:  Yes, I know.  (in English)

18          THE COURT:  Now, in order to find you guilty, a jury

19     of 12 people would have to agree unanimously -- that means all

20     of them would have to agree -- that you were, in fact, guilty.

21          Do you understand that?

22          THE DEFENDANT:  Yes, I know.  (in English)

23          THE COURT:  At that trial and at every stage of your

24     case, you would be entitled to be represented by a lawyer, and

25     if you couldn't afford a lawyer, one would be appointed at

P1aWarkP

1    public expense, free of cost, to represent you.

2         Do you understand that?

3         THE DEFENDANT:  Yes, I know, your Honor.  (in English)

4         THE COURT:  Now, during a trial, witnesses for the

5    government would have to come here to court and testify in your

6    presence.  Your lawyer could cross-examine witnesses for the

7    government, object to any evidence offered by the government

8    and also offer evidence on your own behalf if you so desired.

9    And you'd have the right to use the court's power to have

10   subpoenas issued or other process used to compel witnesses to

11   testify on your behalf, in your defense, if you so chose.

12        Do you understand that?

13        THE DEFENDANT:  Yes, your Honor.  (in English)

14        THE COURT:  Now, at trial, you'd have the right to

15   testify if you chose to do so, and you'd also have the right

16   not to testify.  And if you decided not to testify, no one,

17   including the jury, could draw any inference or suggestion of

18   guilt from the fact that you chose not to testify.

19        Do you understand that?

20        THE DEFENDANT:  Yes, your Honor.  (in English)

21        THE COURT:  Now, before the trial, you would have an

22   opportunity to seek suppression of some or all of the evidence

23   the government might use against you at trial on the ground

24   that your constitutional rights were violated.

25        Do you understand that?

P1aWarkP

1            THE DEFENDANT:  Yes, your Honor.  (in English)

2            THE COURT:  Now, I understand that as a part of your

3     plea agreement, you're waiving the right to receive what are

4     called discovery materials before trial, but you have a right

5     to those materials.  Those materials include all information,

6     whether admissible or not, that is favorable to you, material

7     either to guilt or to punishment and known to the prosecution.

8     This includes what's called impeachment material, which means

9     any information that could tend to undermine the credibility of

10    any witnesses for the prosecution.

11            Under normal circumstances, the government must make a

12    good faith effort to disclose that information to you and your

13    attorney as soon as reasonably possible, and a failure by the

14    prosecution to do so could result in a number of consequences,

15    including a continuance -- that's a delay; sanctions,

16    dismissal; or vacatur of conviction.

17            Do you understand that you're giving up your right to

18    receive those materials before trial?

19            THE DEFENDANT:  Yes, I do.  (in English)

20            THE COURT:  If you were convicted at trial, you would

21    have the right to appeal the verdict and any pretrial rulings

22    that I made.

23            Do you understand that?

24            THE DEFENDANT:  Yes.  (in English)

25            THE COURT:  If you plead guilty, you will also have to

P1aWarkP

1    give up your right not to incriminate yourself, because I may

2    ask you questions about what you did in order to satisfy myself

3    that you are, in fact, guilty as charged, and you will have to

4    admit and acknowledge your guilt.

5              Do you understand that?

6              THE DEFENDANT:  Yes, I do, your Honor.  (in English)

7              THE COURT:  Now, if you plead guilty and if I accept

8    your plea, you will give up your right to a trial and all the

9    other rights that I discussed other than your right to a

10   lawyer.  You have that right whether or not you plead guilty,

11   but there will be no trial, and I will enter a judgment of

12   guilty and sentence you on the basis of your plea after I have

13   considered what's called a presentence report.  That's a

14   document prepared by the department of probation.  And I'll

15   also consider whatever submissions I get from your lawyer and

16   from the government, but there will be no appeal with respect

17   to whether the government could use the evidence it has against

18   you or with respect to whether or not you did or did not commit

19   the crime.

20             Do you understand that?

21             THE DEFENDANT:  Yes, your Honor.  (in English)

22             THE COURT:  OK.  Even now, as you're entering your

23   plea, you still have the right to change your mind and plead

24   not guilty and to go to trial on the charge contained in the

25   information.

P1aWarkP

1              Do you understand that?

2              THE DEFENDANT:  Yes, your Honor.  (in English)

3              THE COURT:  Do you understand each and every one of

4    the rights that I have explained to you?

5              THE DEFENDANT:  Yes, I do.  (in English)

6              THE COURT:  And Mr. Arkan, are you willing to give up

7    your right to trial and all of the other rights that I have

8    just described to you?

9              THE DEFENDANT:  Yes, I accept.  (in English)

10             THE COURT:  OK.

11             I'm now going to go over the offense to which you're

12   pleading guilty and the possible consequences of a guilty plea.

13             Counsel, I invite you to interrupt me at any time if

14   you think I've misstated anything.

15             Mr. Arkan, do you understand that you are charged on

16   Count One with conspiracy to commit an offense against the

17   United States in connection with straw donations, in violation

18   of 18 U.S.C., Section 371?

19             (Counsel conferred with defendant)

20             THE DEFENDANT:  I know, your Honor, yes.  (in English)

21             THE COURT:  Ms. Cohen could, would you please state

22   the elements of the offense in question.

23             MS. COHEN:  Yes, your Honor.

24             If this matter were to proceed to trial, the

25   government would have to establish beyond a reasonable doubt

P1aWarkP

1    the following:

2            First, the existence of the conspiracy charged in

3    Count One of the information -- that is, a mutual

4    understanding, either spoken or unspoken, between two or more

5    people, to commit wire fraud;

6            Second, the defendant knowingly and willfully became a

7    member of and joined in the conspiracy; and

8            Third, the commission of an overt act in furtherance

9    of the conspiracy by at least one of the conspirators.

10           Today, the defendant need not allocute to the elements

11   of substantive wire fraud, but for the Court's information the

12   elements of that offense are a scheme or artifice to defraud or

13   to obtain money or property by materially false and fraudulent

14   pretenses, representations or promises, knowing and willful

15   participation in the scheme or artifice to defraud with

16   knowledge of its fraudulent nature and with specific intent to

17   defraud, and use of interstate wires in execution of that

18   scheme.

19           The government would also have to establish by a

20   preponderance of the evidence venue in the Southern District of

21   New York.

22           THE COURT:  Thank you, Ms. Cohen.

23           Now, Mr. Arkan, do you understand that if you were to

24   go to trial, the government would have to prove all of those

25   elements that Ms. Cohen just listed beyond a reasonable doubt

P1aWarkP

1    and also that venue is proper here in the Southern District of

2    New York by a preponderance of the evidence?

3         THE DEFENDANT:  Yes, your Honor, I do understand.  (in

4    English)

5         THE COURT:  Now I'm going to tell you about the

6    maximum possible penalty for this crime.  The maximum means the

7    most that you could possibly receive.  It doesn't mean that's

8    what you necessarily will receive, but you have to understand

9    that by pleading guilty, you're exposing yourself to the

10   possibility of receiving any combination of punishments up to

11   the maximum that I am about to describe.

12        Do you understand that?

13        THE DEFENDANT:  I do.  Yes, your Honor.  (in English)

14        THE COURT:  OK.  First I'm going to tell you about the

15   possible restrictions on your liberty.

16        The maximum term of imprisonment for this crime is

17   five years of imprisonment which could be followed by up to a

18   maximum term of three years of supervised release.

19        Supervised release means you will be subject to

20   supervision by the probation department.  There will be rules

21   of supervised release that you'll have to follow, and if you

22   violate those rules, you can be returned to prison without a

23   jury trial to serve additional time with no credit for time you

24   served in prison as a result of your sentence and no credit for

25   any time spent on postrelease supervision.

P1aWarkP

1           Do you understand that?

2           THE DEFENDANT:  Yes, your Honor.  (in English)

3           THE COURT:  You should also understand that there's no

4    parole in the federal system, and so if you're sentenced to

5    prison, you will not be released early on parole.  There is a

6    limited opportunity, however, to receive credit for good

7    behavior, but you will have to serve at least 85 percent of the

8    time that you're sentenced to.

9           Do you understand that?

10          THE DEFENDANT:  Yes, your Honor.  (in English)

11          THE COURT:  In addition to these restrictions on your

12   liberty, the maximum possible punishment also includes certain

13   financial penalties.

14          The maximum allowable fine here is $250,000, or twice

15   the gross pecuniary gain derived from the offense or twice the

16   gross pecuniary loss to other persons resulting from the

17   offense, whichever is greater.

18          In addition, the Court must order restitution to any

19   person or entity injured as a result of your criminal conduct,

20   and I understand that your agreement includes a provision to

21   make restitution in this case.

22          The Court can also order you to forfeit all property

23   derived from the offense or used to facilitate the offense.

24          Finally, I must also order a mandatory assessment of

25   $100.

P1aWarkP

1              Do you understand that these are the possible maximum

2    financial penalties for this offense?

3              THE DEFENDANT:  Yes, your Honor, I do.  (in English)

4              THE COURT:  Now, I asked before, Mr. Arkan, if you're

5    a United States citizen.

6              THE DEFENDANT:  Yes, I am U.S. citizen.  (in English)

7              THE COURT:  And I believe you said you're a

8    naturalized citizen.  Is that correct?

9              THE DEFENDANT:  Yes.  Yes, your Honor.  (in English)

10             THE COURT:  OK.  So do you understand that as a result

11   of your guilty plea, there could be adverse effects on your

12   immigration status?

13             You or anyone who obtained derivative citizenship

14   through you may be denaturalized and then detained by

15   immigration authorities following completion of your sentence,

16   removed or deported from the United States, denied citizenship

17   and denied admission to the United States in the future.

18             THE DEFENDANT:  Yes.  Yes, your Honor.  (in English)

19             THE COURT:  Did you discuss these possible immigration

20   consequences of your plea with your attorney?

21             THE DEFENDANT:  Yes, your Honor.  (in English)

22             THE COURT:  OK.  And do you understand that as a

23   result of your guilty plea, you may also lose certain valuable

24   civil rights, to the extent that you have them or could

25   otherwise obtain them, such as the right to vote, the right to

P1aWarkP

1    hold office, the right to serve on a jury and the right to

2    possess any kind of firearm?

3            THE DEFENDANT:  Yes, your Honor.  (in English)

4            THE COURT:  Are you currently serving any other

5    sentence, state or federal, or being prosecuted in any state

6    court for any crime?

7            THE DEFENDANT:  No.  No, your Honor.  (in English)

8            THE COURT:  Do you understand that if your lawyer or

9    anyone else has attempted to predict what your sentence will

10   be, that their prediction could be wrong?

11           That's because no one, not your lawyer, not the

12   government's lawyer -- no one -- can give you any assurance of

13   what your sentence will be, because I am the one who is going

14   to decide your sentence.  I'm not going to do that now.  I'm

15   going to wait until I receive a presentence report -- that's

16   the document I mentioned earlier prepared by the probation

17   department.  I have to do my own, independent calculation of

18   the sentencing guidelines range that applies here.  I have to

19   consider that and any possible departures from it, and I also

20   have to determine ultimately what a reasonable sentence is for

21   you based on the submissions from your lawyer, the submissions

22   from the government, everything that I've described, and the

23   sentencing factors that are set forth under federal law, a

24   statute found at 18 U.S.C. Section 3553(a).

25           Do you understand that?

P1aWarkP

1          THE DEFENDANT:  I do.  Yes, your Honor.  (in English)

2          THE COURT:  And have you discussed this with your

3   lawyer?

4          THE DEFENDANT:  Yes, I do.  (in English)

5          THE COURT:  Now, even if your sentence is different

6   from what your lawyer or anyone else has told you it might be,

7   even if it's different from what you expect or what's contained

8   in your written plea agreement with the government, you will

9   still be bound by your guilty plea after today, and you will

10  not be allowed to withdraw your plea of guilty.

11         Do you understand that?

12         THE DEFENDANT:  Yes, your Honor.  (in English)

13         THE COURT:  Now, I understand there's a written plea

14  agreement entered into between you and your lawyer and the

15  lawyer for the government.  Is that correct?

16         (Counsel conferred with defendant)

17         THE DEFENDANT:  Yes.  Yes, your Honor.  (in English)

18         THE COURT:  I have a copy of it here, Mr. Arkan.  It's

19  dated December 19, 2024.  It's signed by your lawyer,

20  Mr. Rosen, by you and one of the lawyers for the government,

21  Mr. Rohrbach.

22         Did you sign the original of the plea agreement on the

23  last page?

24         (Counsel conferred with defendant)

25         THE DEFENDANT:  Yes, I did.  (in English)

P1aWarkP

1        THE COURT:  And did you do that in the presence of

2   your attorney?

3            (Counsel conferred with defendant)

4        THE DEFENDANT:  Yes.  Yes, your Honor.  (in English)

5        THE COURT:  And did you read it before you signed it,

6   or was it translated for you?

7        THE DEFENDANT:  Yes, I read it.  (in English)

8        THE COURT:  You read it yourself.

9        THE DEFENDANT:  Yes.  (in English)

10       THE COURT:  And did you discuss it with Mr. Rosen

11   before you signed it?

12       THE DEFENDANT:  Yes, I did, your Honor.  (in English)

13       THE COURT:  OK.  Did you fully understand it before

14   you signed it.

15       THE DEFENDANT:  Yes, I understand.  (in English)

16       THE COURT:  Now, one of the features of your agreement

17   with the government is that you've agreed on the sentencing

18   guidelines range that applies in this case.  Again, that

19   agreement is binding on you and it's binding on the government,

20   but it's not binding on me.  I have my own obligation to

21   determine what the correct sentencing guidelines range is here

22   and ultimately what the appropriate sentence is in your case.

23   I'm not saying that I'm going to come up with anything

24   different from what you've agreed on with the government, but

25   even if I do, I will not let you withdraw your plea even if I

P1aWarkP

1    determine that the range is different or higher than the one to

2    which you agreed.

3            Do you understand that?

4            THE DEFENDANT:  Yes, your Honor.  (in English)

5            THE COURT:  Now, another feature of your agreement is

6    that you agree to make restitution payments in the amount of

7    $18,000.

8            Is that correct, and do you understand that?

9            THE DEFENDANT:  Yes, your Honor.  (in English)

10           THE COURT:  Now, in your plea agreement, you have

11   waived your right to appeal or otherwise challenge any sentence

12   that is within or below the stipulated guidelines range of zero

13   to six months of imprisonment.  In other words, if I sentence

14   you to six months or anything less than that, you would have no

15   right to appeal or otherwise try to challenge that sentence.

16           Do you understand that?

17           (Counsel conferred with defendant)

18           THE DEFENDANT:  Yes, I do.  (in English)

19           THE COURT:  Your plea agreement also specifies a

20   stipulated guidelines fine range of between 1,000 to $9,500.

21   In other words, if I impose a fine of $9,500 or anything less

22   than that, you'd have no right to appeal or otherwise try to

23   challenge that fine.

24           Do you understand that?

25           THE DEFENDANT:  Yes, I do.  (in English)

P1aWarkP

```
1              (Counsel conferred with defendant)
2              THE COURT:  Does the written plea agreement constitute
3     your complete and total understanding of the entire agreement
4     between you and the government?
5              (Counsel conferred with defendant)
6              THE DEFENDANT:  Yes, I did, your Honor.  (in English)
7              THE COURT:  Has anything been left out of that
8     agreement?
9              THE DEFENDANT:  No, your Honor.  (in English)
10             THE COURT:  Other than what is written in the
11    agreement, has anyone made any promise to you or offered you
12    anything or any inducement to plead guilty or to sign the
13    agreement?
14             THE DEFENDANT:  No, your Honor.  (in English)
15             THE COURT:  Has anyone threatened you or forced you to
16    plead guilty or to sign the plea agreement?
17             THE DEFENDANT:  No, your Honor.  (in English)
18             THE COURT:  Has anyone made a promise to you as to
19    what your sentence will be?
20             THE DEFENDANT:  No, your Honor.  (in English)
21             THE COURT:  OK.  Now, Mr. Arkan, would you please tell
22    me in your own words what you did that makes you believe that
23    you are guilty of the charge in the information.
24             THE DEFENDANT:  In April 2021, I used funds from the
25    corporation where I served as a principal to write checks to
```

P1aWarkP

1    employees.  I wrote the checks to fund the contributions by the

2    employees to Eric Adams's campaign for New York City mayors

3    2021.  The checks which I wrote the employees were given to the

4    campaign.  When I wrote the checks, I knew that the Adams

5    campaign would use the checks to apply for public matching

6    program.

7              THE COURT:  OK.  Thank you, Mr. Arkan.

8              Do we have any kind of representation or stipulation

9    as to the venue?

10             MR. ROSEN:  Yes, your Honor.  We stipulate that the

11   venue for this offense is in the Southern District of New York.

12             THE COURT:  OK.

13             Ms. Cohen, are there any questions you'd like me to

14   possess to Mr. Arkan?

15             MS. COHEN:  Your Honor, the government would proffer

16   that there were interstate wires used as part of the

17   conspiracy; that is, to include electronic communications and

18   the submission of an application for matching funds.

19             THE COURT:  Mr. Rosen.

20             MR. ROSEN:  We'll stipulate, your Honor, to those

21   facts.

22             THE COURT:  OK.  Thank you.

23             Anything else, Ms. Cohen?

24             MS. COHEN:  No, your Honor.

25             THE COURT:  Mr. Arkan, when you did these things, did

P1aWarkP

1    you know that what you were doing was wrong and illegal?

2              (Counsel conferred with defendant)

3              THE DEFENDANT:  Yes.  (in English)

4              THE COURT:  And having discussed everything that we've

5    gone over today, do you still wish to plead guilty?

6              THE DEFENDANT:  Yes, I do.  (in English)

7              THE COURT:  Mr. Rosen, do you know of any valid

8    defense that would prevail at trial, or do you know of any

9    reason why your client should not be permitted to plead guilty?

10             MR. ROSEN:  No, your Honor.

11             THE COURT:  Ms. Cohen, would you summarize what the

12   government's evidence would be and what it would prove if

13   Mr. Arkan were to go to trial.

14             MS. COHEN:  Yes, your Honor.

15             At trial, the government would establish that the

16   defendant agreed to, and did, orchestrate straw contributions

17   to official-1's 2021 campaign for New York City mayor,

18   understanding that official-1's campaign would seek public

19   funds from New York City based on a misrepresentation that the

20   listed contributors were the true contributors and that the

21   defendant transmitted and caused to be transmitted electronic

22   communications to and from the Southern District of New York

23   and elsewhere in furtherance of that scheme.

24             This scheme was planned in consultation with a Turkish

25   consular official in New York, including at a meeting at a

P1aWarkP

1    restaurant during which official-1 solicited donations from the

2    defendant.  The defendant then arranged to host a fund-raiser

3    for official-1 at the offices of the defendant's construction

4    company.

5              Prior to the fund-raiser, the defendant directed that

6    his company provide $1,250 per employee to ten of its

7    employees.  Each of those employees then contributed that

8    amount to official 1's 2021 campaign, with the exception of one

9    employee who donated in his wife's name and another who donated

10   $1,200 of the funds.

11             In an effort to meet official-1's fund-raising

12   expectations, the Turkish consular official also sent checks to

13   the defendant in advance of the fund-raiser.  The defendant

14   kept the consular official apprised of the total dollar amount

15   raised and told him after the fund-raiser that official-1's

16   assistants were very happy.

17             Based on eight of these straw donations that were made

18   in the names of New York City residents, official-1's 2021

19   campaign requested public funds from the New York City Campaign

20   Finance Board in Manhattan and fraudulently obtained public

21   funds to which the campaign was not entitled.

22             The government would establish these facts at trial

23   through witness testimony, photographs and video, electronic

24   messages, bank records and records from the New York City

25   Campaign Finance Board.

P1aWarkP

1    THE COURT:  Thank you.

2         Does either counsel know of any reason -- I'm sorry.

3         Do both counsel agree that there is a sufficient

4    factual predicate for the guilty plea?

5         MS. COHEN:  Yes, your Honor.

6         MR. ROSEN:  Yes, your Honor?

7         THE COURT:  Does either counsel know of any reason

8    that I should not accept Mr. Arkan's guilty plea?

9         MS. COHEN:  No, your Honor.

10        MR. ROSEN:  No, your Honor.

11        THE COURT:  OK.

12        Mr. Arkan, because you acknowledge that you are, in

13   fact, guilty as charged in the information; because I am

14   satisfied that you know of your rights, including your right to

15   go to trial, and that you are aware of the consequences of your

16   plea, including the sentence which may be imposed; and because

17   I find that you are knowingly and voluntarily pleading guilty,

18   I accept your guilty plea and enter a judgment of guilty on

19   Count One of the information.

20        Now, the next step is that the probation department is

21   going to want to interview you in connection with a presentence

22   report that it will prepare.  If you choose to speak to the

23   probation department, please make sure that everything you say

24   is truthful and accurate.  I'm going to read that report very

25   carefully, and it's important to me in deciding what sentence

P1aWarkP

1    to impose.

2         You and your counsel will have the right to examine

3    the report and to comment on it, both when it's in a draft form

4    and then again before and at the time of sentencing.  So I urge

5    you to read that report carefully and discuss it with your

6    lawyer before sentencing.  If there are any mistakes in it,

7    please point them out to your lawyer so that Mr. Rosen can

8    bring them to the attention of the probation department or to

9    my attention before sentence.

10         Mr. Rosen, do you wish to be present for any interview

11   in connection with the report?

12         MR. ROSEN:  Yes, sir.

13         THE COURT:  OK.  I'll order that there will be no

14   interview unless counsel for Mr. Arkan is present.

15         Now, I understand that the parties have a request as

16   to when sentencing should occur.

17         MS. COHEN:  That's correct, your Honor.  The parties

18   propose that the sentencing occur after the related -- the

19   trial in the related case, and we would propose a date in

20   August or September.

21         THE COURT:  OK.  Give me one moment.

22         I'm looking at the week of August 11, and I'll propose

23   August 15.  I'll give you some time to consult your calendars.

24         MR. ROSEN:  Thank you, your Honor.

25         Acceptable to the defense, your Honor.

P1aWarkP

1          MS. COHEN:  That's fine for the government, your
2     Honor.
3          THE COURT:  OK.  We'll set the sentencing for 11 a.m.
4     on Friday, August 15.
5          Normally, I would direct the government to provide the
6     probation office with a factual statement within seven days.  I
7     don't know if there's any reason why it might be appropriate
8     for a longer period of time here.
9          MS. COHEN:  Yes, your Honor.
10          The proposed sentencing date is in contemplation of
11     having 90 days between the conclusion of the trial in the
12     related case and sentencing here, which is generally enough
13     time to conduct the PSR process.  So we would propose that the
14     PSR be prepared after conclusion of the trial as well, so in
15     May.
16          THE COURT:  OK.  Why don't I say that the government
17     shall provide the probation office with a factual statement by
18     May 30.
19          MS. COHEN:  That's fine, your Honor.
20          THE COURT:  Thank you.
21          Mr. Rosen, I'll say that you should make Mr. Arkan
22     available for an interview with the probation department by
23     June 13, two weeks after the factual statement from the
24     government.  Obviously, that's a ways out and if anything
25     changes between now and then --

P1aWarkP

```
 1              MR. ROSEN:  Thank you, your Honor.

 2              THE COURT:  -- you all just let me know; we can adjust

 3    those dates accordingly.

 4              I will refer counsel to my individual rules and

 5    practices for criminal cases, available on the court's website.

 6    There are some rules there for sentencing submissions.  In

 7    accordance with those rules, defense submissions are due two

 8    weeks prior to sentencing.  Here, that's August 1.

 9              The government's submissions are due one week prior to

10    sentencing.  If we have to move the date of sentencing, for

11    whatever reason, those dates move automatically.  So they don't

12    stay the same.

13              If either side does not intend to make a substantive

14    sentencing submission, just file a letter on ECF to that

15    effect.

16              I don't believe I have a restitution order at this

17    time.  Is that right?

18              MS. COHEN:  That's correct, your Honor.  We'll provide

19    the Court one in advance of sentencing, if that's acceptable.

20              THE COURT:  Yes, that's fine, Ms. Cohen.

21              If there are any victims that wish to be heard at

22    sentencing, please notify my chambers.

23              And then I understand there's a conversation to be had

24    about bail for Mr. Arkan.

25              MS. COHEN:  That's right, your Honor.  The parties
```

P1aWarkP

```
 1    have a jointly proposed package for the Court's consideration.

 2              It would be a $100,000 unsecured bond; the defendant

 3    to surrender his passport and no new applications; travel

 4    restricted to the District of New Jersey, the Eastern District

 5    of New York and the Southern District of New York unless he

 6    receives permission from pretrial services; supervision as

 7    directed by pretrial services, and all other standard

 8    conditions.

 9              THE COURT:  Mr. Rosen, I just want to confirm that

10    that's agreed upon.

11              MR. ROSEN:  Yes.  Yes, sir.

12              THE COURT:  OK.  I'll approve the bail package.

13              Is there anything else that either side would like to

14    raise today?

15              Ms. Cohen.

16              MS. COHEN:  Not from the government.  Thank you, your

17    Honor.

18              THE COURT:  Mr. Rosen.

19              MR. ROSEN:  No, sir.  Thank you.

20              THE COURT:  OK.  Thank you all very much.

21              We're adjourned for today.

22              (Adjourned)

23

24

25
```

# Exhibit 18

**U.S. Department of Justice**

Office of the Deputy Attorney General

*Washington, DC  20530*

February 10, 2025

MEMORANDUM FOR      ACTING UNITED STATES ATTORNEY, UNITED STATES ATTORNEY'S OFFICE FOR THE SOUTHERN DISTRICT OF NEW YORK

FROM:      THE ACTING DEPUTY ATTORNEY GENERAL *463 2/10/25*

SUBJECT:      Dismissal Without Prejudice of Prosecution of Mayor Eric Adams

You are directed, as authorized by the Attorney General, to dismiss the pending charges in *United States v. Adams*, No. 24 Cr. 556 (SDNY) as soon as is practicable, subject to the following conditions: (1) the defendant must agree in writing to dismissal without prejudice; (2) the defendant must agree in writing that he is not a prevailing party under the Hyde Amendment, Pub. L. 105-119 (Nov. 26, 1997); and (3) the matter shall be reviewed by the confirmed U.S. Attorney in the Southern District of New York, following the November 2025 mayoral election, based on consideration of all relevant factors (including those set forth below). There shall be no further targeting of Mayor Adams or additional investigative steps prior to that review, and you are further directed to take all steps within your power to cause Mayor Adams' security clearances to be restored.

The Justice Department has reached this conclusion without assessing the strength of the evidence or the legal theories on which the case is based, which are issues on which we defer to the U.S. Attorney's Office at this time.  Moreover, as I said during our recent meetings, this directive in no way calls into question the integrity and efforts of the line prosecutors responsible for the case, or your efforts in leading those prosecutors in connection with a matter you inherited.  However, the Justice Department has determined that dismissal subject to the above-described conditions is necessary for two independent reasons.

First, the timing of the charges and more recent public actions by the former U.S. Attorney responsible for initiating the case have threatened the integrity of the proceedings, including by increasing prejudicial pretrial publicity that risks impacting potential witnesses and the jury pool.  It cannot be ignored that Mayor Adams criticized the prior Administration's immigration policies before the charges were filed, and the former U.S. Attorney's public actions created appearances of impropriety that implicate the concerns raised in the Attorney General's February 5, 2025 memorandum regarding *Restoring The Integrity and Credibility of the Department of Justice*, as well as in Executive Order 14147, entitled *Ending The Weaponization*

*Of The Federal Government.* These actions and the underlying case have also improperly interfered with Mayor Adams' campaign in the 2025 mayoral election. *See* Justice Manual § 9-85.500, entitled *Actions that May Have an Impact on an Election.*

   Second, the pending prosecution has unduly restricted Mayor Adams' ability to devote full attention and resources to the illegal immigration and violent crime that escalated under the policies of the prior Administration. We are particularly concerned about the impact of the prosecution on Mayor Adams' ability to support critical, ongoing federal efforts "to protect the American people from the disastrous effects of unlawful mass migration and resettlement," as described in Executive Order 14165.[1] Accomplishing the immigration objectives established by President Trump and the Attorney General is every bit as important—if not more so—as the objectives that the prior Administration pursued by releasing violent criminals such as Viktor Bout, the "Merchant of Death."[2] Accordingly, based on these additional concerns that are distinct from the weaponization problems, dismissal without prejudice is also necessary at this time.

---

[1] Your Office correctly noted in a February 3, 2025 memorandum, "as Mr. Bove clearly stated to defense counsel during our meeting [on January 31, 2025], the Government is not offering to exchange dismissal of a criminal case for Adams's assistance on immigration enforcement."

[2] According to an October 2024 *Wall Street Journal* article, Bout has already started to participate in arms deals again, including negotiations with representatives of Ansar Allah, also known as the Houthis. https://www.wsj.com/world/russia/putins-merchant-of-death-is-back-in-the-arms-business-this-time-selling-to-the-houthis-10b7f521.

# Exhibit 19



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

February 12, 2025

**BY EMAIL**
The Honorable Pamela Jo Bondi
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530

       Re:    **United States v. Eric Adams, 24 Cr. 556 (DEH)**

Dear Attorney General Bondi:

On February 10, 2025, I received a memorandum from acting Deputy Attorney General Emil Bove, directing me to dismiss the indictment against Mayor Eric Adams without prejudice, subject to certain conditions, which would require leave of court. I do not repeat here the evidence against Adams that proves beyond a reasonable doubt that he committed federal crimes; Mr. Bove rightly has never called into question that the case team conducted this investigation with integrity and that the charges against Adams are serious and supported by fact and law. Mr. Bove's memo, however, which directs me to dismiss an indictment returned by a duly constituted grand jury for reasons having nothing to do with the strength of the case, raises serious concerns that render the contemplated dismissal inconsistent with my ability and duty to prosecute federal crimes without fear or favor and to advance good-faith arguments before the courts.

When I took my oath of office three weeks ago, I vowed to well and faithfully discharge the duties of the office on which I was about to enter. In carrying out that responsibility, I am guided by, among other things, the Principles of Federal Prosecution set forth in the Justice Manual and your recent memoranda instructing attorneys for the Department of Justice to make only good-faith arguments and not to use the criminal enforcement authority of the United States to achieve political objectives or other improper aims. I am also guided by the values that have defined my over ten years of public service. You and I have yet to meet, let alone discuss this case. But as you may know, I clerked for the Honorable J. Harvie Wilkinson III on the U.S. Court of Appeals for the Fourth Circuit, and for Justice Antonin Scalia on the U.S. Supreme Court. Both men instilled in me a sense of duty to contribute to the public good and uphold the rule of law, and a commitment to reasoned and thorough analysis. I have always considered it my obligation to pursue justice impartially, without favor to the wealthy or those who occupy important public office, or harsher treatment for the less powerful.

I therefore deem it necessary to the faithful discharge of my duties to raise the concerns expressed in this letter with you and to request an opportunity to meet to discuss them further. I cannot fulfill my obligations, effectively lead my office in carrying out the Department's priorities,

or credibly represent the Government before the courts, if I seek to dismiss the Adams case on this record.

### A.    The Government Does Not Have a Valid Basis To Seek Dismissal

Mr. Bove's memorandum identifies two grounds for the contemplated dismissal. I cannot advance either argument in good faith. As you know, the Government "may, with leave of court, dismiss an indictment" under Federal Rule of Criminal Procedure 48(a). "The principal object of the 'leave of court' requirement is apparently to protect a defendant against prosecutorial harassment, *e.g.*, charging, dismissing, and recharging, when the Government moves to dismiss an indictment over the defendant's objection." *Rinaldi v. United States*, 434 U.S. 22, 30 n.15 (1977). "But the Rule has also been held to permit the court to deny a Government dismissal motion to which the defendant has consented if the motion is prompted by considerations clearly contrary to the public interest." *Id.*; *see also* JM § 9-2.050 (reflecting Department's position that a "court may decline leave to dismiss if the manifest public interest requires it"). The reasons advanced by Mr. Bove for dismissing the indictment are not ones I can in good faith defend as in the public interest and as consistent with the principles of impartiality and fairness that guide my decision-making.

*First*, Mr. Bove proposes dismissing the charges against Adams in return for his assistance in enforcing the federal immigration laws, analogizing to the prisoner exchange in which the United States freed notorious Russian arms dealer Victor Bout in return for an American prisoner in Russia. Such an exchange with Adams violates commonsense beliefs in the equal administration of justice, the Justice Manual, and the Rules of Professional Conduct. The "commitment to the rule of law is nowhere more profoundly manifest" than in criminal justice. *Cheney v. United States Dist. Ct.*, 542 U.S. 367, 384 (2004) (alterations and citation omitted). Impartial enforcement of the law is the bedrock of federal prosecutions. *See* Robert H. Jackson, *The Federal Prosecutor*, 24 J. Am. Jud. Soc'y 18 (1940). As the Justice Manual has long recognized, "the rule of law depends upon the evenhanded administration of justice. The legal judgments of the Department of Justice must be impartial and insulated from political influence." JM § 1-8.100. But Adams has argued in substance—and Mr. Bove appears prepared to concede—that Adams should receive leniency for federal crimes solely because he occupies an important public position and can use that position to assist in the Administration's policy priorities.

Federal prosecutors may not consider a potential defendant's "political associations, activities, or beliefs." *Id.* § 9-27.260; *see also Wayte v. United States*, 470 U.S. 598, 608 (1985) (politically motivated prosecutions violate the Constitution). If a criminal prosecution cannot be used to punish political activity, it likewise cannot be used to induce or coerce such activity. Threatening criminal prosecution even to gain an advantage in civil litigation is considered misconduct for an attorney. *See, e.g.*, D.C. Bar Ethics Opinion 339; ABA Criminal Justice Standard 3-1.6 ("A prosecutor should not use other improper considerations, such as partisan or political or personal considerations, in exercising prosecutorial discretion."). In your words, "the Department of Justice will not tolerate abuses of the criminal justice process, coercive behavior, or other forms of misconduct." Dismissal of the indictment for no other reason than to influence Adams's mayoral decision-making would be all three.

The memo suggests that the issue is merely removing an obstacle to Adams's ability to assist with federal immigration enforcement, but that does not bear scrutiny. It does not grapple with the differential treatment Adams would receive compared to other elected officials, much less other criminal defendants. And it is unclear why Adams would be better able to aid in immigration enforcement when the threat of future conviction is due to the possibility of reinstatement of the indictment followed by conviction at trial, rather than merely the possibility of conviction at trial. On this point, the possibility of trial before or after the election cannot be relevant, because Adams has selected the timing of his trial.

Rather than be rewarded, Adams's advocacy should be called out for what it is: an improper offer of immigration enforcement assistance in exchange for a dismissal of his case. Although Mr. Bove disclaimed any intention to exchange leniency in this case for Adams's assistance in enforcing federal law,[1] that is the nature of the bargain laid bare in Mr. Bove's memo. That is especially so given Mr. Bove's comparison to the Bout prisoner exchange, which was quite expressly a *quid pro quo*, but one carried out by the White House, and not the prosecutors in charge of Bout's case.

The comparison to the Bout exchange is particularly alarming. That prisoner swap was an exchange of official acts between separate sovereigns (the United States and Russia), neither of which had any claim that the other should obey its laws. By contrast, Adams is an American citizen, and a local elected official, who is seeking a personal benefit—immunity from federal laws to which he is undoubtedly subject—in exchange for an act—enforcement of federal law—he has no right to refuse. Moreover, the Bout exchange was a widely criticized sacrifice of a valid American interest (the punishment of an infamous arms dealer) which Russia was able to extract only through a patently selective prosecution of a famous American athlete.[2] It is difficult to imagine that the Department wishes to emulate that episode by granting Adams leverage over it akin to Russia's influence in international affairs. It is a breathtaking and dangerous precedent to reward Adams's opportunistic and shifting commitments on immigration and other policy matters with dismissal of a criminal indictment. Nor will a court likely find that such an improper exchange is consistent with the public interest. *See United States v. N.V. Nederlandsche Combinatie Voor Chemische Industrie ("Nederlandsche Combinatie"),* 428 F. Supp. 114, 116-17 (S.D.N.Y. 1977) (denying Government's motion to dismiss where Government had agreed to dismiss charges against certain defendants in exchange for guilty pleas by others); *cf. In re United States*, 345 F.3d 450, 453 (7th Cir. 2003) (describing a prosecutor's acceptance of a bribe as a clear example of a dismissal that should not be granted as contrary to the public interest).

---

[1] I attended a meeting on January 31, 2025, with Mr. Bove, Adams's counsel, and members of my office. Adams's attorneys repeatedly urged what amounted to a *quid pro quo*, indicating that Adams would be in a position to assist with the Department's enforcement priorities only if the indictment were dismissed. Mr. Bove admonished a member of my team who took notes during that meeting and directed the collection of those notes at the meeting's conclusion.

[2] *See, e.g.*, https://thehill.com/homenews/3767785-trump-pans-prisoner-swap-brittney-griner-hates-our-country/.

*Second*, Mr. Bove states that dismissal is warranted because of the conduct of this office's former U.S. Attorney, Damian Williams, which, according to Mr. Bove's memo, constituted weaponization of government as defined by the relevant orders of the President and the Department. The generalized concerns expressed by Mr. Bove are not a basis to dismiss an indictment returned by a duly constituted grand jury, at least where, as here, the Government has no doubt in its evidence or the integrity of its investigation.

As Mr. Bove's memo acknowledges, and as he stated in our meeting of January 31, 2025, the Department has no concerns about the conduct or integrity of the line prosecutors who investigated and charged this case, and it does not question the merits of the case itself. Still, it bears emphasis that I have only known the line prosecutors on this case to act with integrity and in the pursuit of justice, and nothing I have learned since becoming U.S. Attorney has demonstrated otherwise. If anything, I have learned that Mr. Williams's role in the investigation and oversight of this case was even more minimal than I had assumed. The investigation began before Mr. Williams took office, he did not manage the day-to-day investigation, and the charges in this case were recommended or approved by four experienced career prosecutors, the Chiefs of the SDNY Public Corruption Unit, and career prosecutors at the Public Integrity Section of the Justice Department. Mr. Williams's decision to ratify their recommendations does not taint the charging decision. And notably, Adams has not brought a vindictive or selective prosecution motion, nor would one be successful. *See United States v. Stewart*, 590 F.3d 93, 121-23 (2d Cir. 2009); *cf. United States v. Biden*, 728 F. Supp. 3d 1054, 1092 (C.D. Cal. 2024) (rejecting argument that political public statements disturb the "'presumption of regularity' that attaches to prosecutorial decisions").

Regarding the timing of the indictment, the decision to charge in September 2024—nine months before the June 2025 Democratic Mayoral Primary and more than a year before the November 2025 Mayoral Election—complied in every respect with longstanding Department policy regarding election year sensitivities and the applicable Justice Manual provisions. The Justice Manual requires that when investigative steps and charges involving a public official could be seen as affecting an election the prosecuting office must consult with the Public Integrity Section, and, if directed to do so, the Office of the Deputy Attorney General or Attorney General. *See* JM §§ 9-85.210, 9-85.500. As you are aware, this office followed this requirement. Further, the Justice Department's concurrence was unquestionably consistent with the established policies of the Public Integrity Section. *See, e.g.*, Public Integrity Section, Federal Prosecution of Election Offenses 85 (2017) (pre-election action may be appropriate where "it is possible to both complete an investigation and file criminal charges against an offender prior to the period immediately before an election"). The Department of Justice correctly concluded that bringing charges nine months before a primary election was entirely appropriate.

The timing of the charges in this case is also consistent with charging timelines of other cases involving elected officials, both in this District and elsewhere. *See, e.g.*, *United States v. Robert Menendez*, 23 Cr. 490 (SHS) (S.D.N.Y.) (indictment in September 2023); *United States v. Duncan Hunter*, 18 Cr. 3677 (S.D. Cal.) (indictment in August 2018). I am not aware of any instance in which the Department has concluded that an indictment brought this far in advance of an election is improper because it may be pending during an electoral cycle, let alone that a validly returned and factually supported indictment should be dismissed on this basis.

When first setting the trial date, the District Court and the parties agreed on the importance of completing the trial *before* the upcoming mayoral election—including before the Democratic primary in which Adams is a candidate—so that the voters would know how the case resolved before casting their votes. (*See* Dkt. 31 at 38-44). Adams has decided that he would prefer the trial to take place before rather than after the June 2025 primary, notwithstanding the burden trial preparation would place on his ability to govern the City or campaign for re-election. But that is his choice, and the District Court has made clear that Adams is free to seek a continuance. (*See* Dkt. 113 at 18 n.6). The parties therefore cannot argue with candor that dismissing serious charges before an election, but holding open the possibility that those charges could be reinstated if Adams were re-elected, would now be other than "clearly contrary to the manifest public interest." *United States v. Blaszczak*, 56 F.4th 230, 238-39 (2d Cir. 2022) (internal quotation marks omitted).

Mr. Bove's memo also refers to recent public actions by Mr. Williams. It is not my role to defend Mr. Williams's motives or conduct. Given the appropriate chronology of this investigation and the strength of the case, Mr. Williams's conduct since leaving government service cannot justify dismissal here. With respect to pretrial publicity, the District Court has already determined that Mr. Williams's statements have not prejudiced the jury pool. The District Court has also repeatedly explained that there is no evidence that any leaks to the media came from the prosecution team—although there is evidence media leaks came from the defense team—and no basis for any relief. (*See* Dkt. 103 at 3-6; Dkt. 49 at 4-21). Mr. Williams's recent op-ed, the Court concluded, generally talks about bribery in New York *State*, and so is not a comment on the case. (Dkt. 103 at 6 n.5). Mr. Williams's website does not even reference Adams except in the news articles linked there. (*See* Dkt. 99 at 3). And it is well settled that the U.S. Attorneys in this and other districts regularly conduct post-arrest press conferences. *See United States v. Avenatti*, 433 F. Supp. 3d 552, 567-69 (S.D.N.Y. 2020) (describing the practice); *see also, e.g.*, "New Jersey U.S. Attorney's Office press conference on violent crime," YouTube, https://www.youtube.com/watch?v=oAEDHQCE91A (announcing criminal charges against 42 defendants). In short, because there is in fact nothing about this prosecution that meaningfully differs from other cases that generate substantial pretrial publicity, a court is likely to view the weaponization rationale as pretextual.

Moreover, dismissing the case will amplify, rather than abate, concerns about weaponization of the Department. Despite Mr. Bove's observation that the directive to dismiss the case has been reached without assessing the strength of the evidence against Adams, Adams has already seized on the memo to publicly assert that he is innocent and that the accusations against him were unsupported by the evidence and based only on "fanfare and sensational claims." Confidence in the Department would best be restored by means well short of a dismissal. As you know, our office is prepared to seek a superseding indictment from a new grand jury under my leadership. We have proposed a superseding indictment that would add an obstruction conspiracy count based on evidence that Adams destroyed and instructed others to destroy evidence and provide false information to the FBI, and that would add further factual allegations regarding his participation in a fraudulent straw donor scheme.

That is more than enough to address any perception of impropriety created by Mr. Williams's personal conduct. The Bove memo acknowledges as much, leaving open the possibility

of refiling charges after the November 2025 New York City Mayoral Election. Nor is conditioning the dismissal on the incoming U.S. Attorney's ability to re-assess the charges consistent with either the weaponization rationale or the law concerning motions under Rule 48(a). To the contrary, keeping Adams under the threat of prosecution while the Government determines its next steps is a recognized reason for the *denial* of a Rule 48(a) motion. *See United States v. Poindexter*, 719 F. Supp. 6, 11-12 (D.D.C. 1989) (allowing Government to "to keep open the option of trying [certain] counts" would effectively keep the defendant "under public obloquy for an indefinite period of time until the government decided that, somehow, for some reason, the time had become more propitious for proceeding with a trial").

## B.    Adams's Consent Will Not Aid the Department's Arguments

Mr. Bove specifies that Adams must consent in writing to dismissal without prejudice. To be sure, in the typical case, the defendant's consent makes it significantly more likely for courts to grant motions to dismiss under Rule 48(a). *See United States v. Welborn*, 849 F.2d 980, 983 (5th Cir. 1988) ("If the motion is uncontested, the court should ordinarily presume that the prosecutor is acting in good faith and dismiss the indictment without prejudice."). But Adams's consent—which was negotiated without my office's awareness or participation—would not guarantee a successful motion, given the basic flaws in the stated rationales for dismissal. *See Nederlandsche Combinatie,* 428 F. Supp. at 116-17 (declining to "rubber stamp" dismissal because although defendant did not appear to object, "the court is vested with the responsibility of protecting the interests of the public on whose behalf the criminal action is brought"). Seeking leave of court to dismiss a properly returned indictment based on Mr. Bove's stated rationales is also likely to backfire by inviting skepticism and scrutiny from the court that will ultimately hinder the Department of Justice's interests. In particular, the court is unlikely to acquiesce in using the criminal process to control the behavior of a political figure.

A brief review of the relevant law demonstrates this point. Although the judiciary "[r]arely will . . . overrule the Executive Branch's exercise of these prosecutorial decisions," *Blaszczak*, 56 F.4th at 238, courts, including the Second Circuit, will nonetheless inquire as to whether dismissal would be clearly contrary to the public interest. *See, e.g.*, *id.* at 238-42 (extended discussion of contrary to public interest standard and cases applying it); *see also* JM § 9-2.050 (requiring "a written motion for leave to dismiss . . . explaining fully the reason for the request" to dismiss for cases of public interest as well as for cases involving bribery). At least one court in our district has rejected a dismissal under Rule 48(a) as contrary to the public interest, regardless of the defendant's consent. *See Nederlandsche Combinatie*, 428 F. Supp. at 116-17 ("After reviewing the entire record, the court has determined that a dismissal of the indictment against Mr. Massaut is not in the public interest. Therefore, the government's motion to dismiss as to Mr. Massaut must be and is denied."). The assigned District Judge, the Honorable Dale E. Ho, appears likely to conduct a searching inquiry in this case. Notably, Judge Ho stressed transparency during this case, specifically explaining his strict requirements for non-public filings at the initial conference. (*See* Dkt. 31 at 48-49). And a rigorous inquiry here would be consistent with precedent and practice in this and other districts.

Nor is there any realistic possibility that Adams's consent will prevent a lengthy judicial inquiry that is detrimental to the Department's reputation, regardless of outcome. In that regard,

although the *Flynn* case may come to mind as a comparator, it is distinct in one important way. In that case, the Government moved to dismiss an indictment with the defendant's consent and faced resistance from a skeptical district judge. But in *Flynn*, the Government sought dismissal with prejudice because it had become convinced that there was insufficient evidence that General Flynn had committed any crime. That ultimately made the Government's rationale defensible, because "[i]nsufficient evidence is a quintessential justification for dismissing charges." *In re Flynn*, 961 F.3d 1215, 1221 (D.C. Cir.), *reh'g en banc granted, order vacated*, No. 20-5143, 2020 WL 4355389 (D.C. Cir. July 30, 2020), and *on reh'g en banc*, 973 F.3d 74 (D.C. Cir. 2020). Here no one in the Department has expressed any doubts as to Adams's guilt, and even in *Flynn*, the President ultimately chose to cut off the extended and embarrassing litigation over dismissal by granting a pardon.

### C.    I Cannot in Good Faith Request the Contemplated Dismissal

Because the law does not support a dismissal, and because I am confident that Adams has committed the crimes with which he is charged, I cannot agree to seek a dismissal driven by improper considerations. As Justice Robert Jackson explained, "the prosecutor at his best is one of the most beneficent forces in our society, when he acts from malice or other base motives, he is one of the worst." The Federal Prosecutor, 24 J. Am. Jud. Soc'y 18 ("This authority has been granted by people who really wanted the right thing done—wanted crime eliminated—but also wanted the best in our American traditions preserved."). I understand my duty as a prosecutor to mean enforcing the law impartially, and that includes prosecuting a validly returned indictment regardless whether its dismissal would be politically advantageous, to the defendant or to those who appointed me. A federal prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all." *Berger v. United States*, 295 U.S. 78, 88 (1935).

For the reasons explained above, I do not believe there are reasonable arguments in support of a Rule 48(a) motion to dismiss a case that is well supported by the evidence and the law. I understand that Mr. Bove disagrees, and I am mindful of your recent order reiterating prosecutors' duty to make good-faith arguments in support of the Executive Branch's positions. *See* Feb. 5, 2025 Mem. "General Policy Regarding Zealous Advocacy on Behalf of the United States." But because I do not see any good-faith basis for the proposed position, I cannot make such arguments consistent with my duty of candor. N.Y.R.P.C. 3.3; *id.* cmt. 2 ("A lawyer acting as an advocate in an adjudicative proceeding has an obligation to present the client's case with persuasive force. Performance of that duty while maintaining confidences of the client, however, is qualified by the advocate's duty of candor to the tribunal.").

In particular, the rationale given by Mr. Bove—an exchange between a criminal defendant and the Department of Justice akin to the Bout exchange with Russia—is, as explained above, a bargain that a prosecutor should not make. Moreover, dismissing without prejudice and with the express option of again indicting Adams in the future creates obvious ethical problems, by implicitly threatening future prosecution if Adams's cooperation with enforcing the immigration laws proves unsatisfactory to the Department. *See In re Christoff*, 690 N.E.2d 1135 (Ind. 1997) (disciplining prosecutor for threatening to renew a dormant criminal investigation against a potential candidate for public office in order to dissuade the candidate from running); Bruce A.

Green & Rebecca Roiphe, *Who Should Police Politicization of the DOJ?*, 35 Notre Dame J.L. Ethics & Pub. Pol'y 671, 681 (2021) (noting that the Arizona Supreme Court disbarred the elected chief prosecutor of Maricopa County, Arizona, and his deputy, in part, for misusing their power to advance the chief prosecutor's partisan political interests). Finally, given the highly generalized accusations of weaponization, weighed against the strength of the evidence against Adams, a court will likely question whether that basis is pretextual. *See, e.g.*, *United States v. Greater Blouse, Skirt & Neckwear Contractors*, 228 F. Supp. 483, 487 (S.D.N.Y. 1964) (courts "should be satisfied that the reasons advanced for the proposed dismissal are substantial and the real grounds upon which the application is based").

I remain baffled by the rushed and superficial process by which this decision was reached, in seeming collaboration with Adams's counsel and without my direct input on the ultimate stated rationales for dismissal. Mr. Bove admonished me to be mindful of my obligation to zealously defend the interests of the United States and to advance good-faith arguments on behalf of the Administration. I hope you share my view that soliciting and considering the concerns of the U.S. Attorney overseeing the case serves rather than hinders that goal, and that we can find time to meet.

In the event you are unwilling to meet or to reconsider the directive in light of the problems raised by Mr. Bove's memo, I am prepared to offer my resignation. It has been, and continues to be, my honor to serve as a prosecutor in the Southern District of New York.

Very truly yours,

DANIELLE R. SASSOON
United States Attorney
Southern District of New York

# Exhibit 20



**U.S. Department of Justice**

Office of the Deputy Attorney General

*Washington, D.C. 20530*

February 13, 2025

<u>Via Email & Hand Delivery</u>
Danielle Sassoon
Acting U.S. Attorney
U.S. Attorney's Office, SDNY

**Re: United States v. Adams, No. 24 Cr. 556 (S.D.N.Y.)**

Ms. Sassoon:

In response to your refusal to comply with my instruction to dismiss the prosecution of Mayor Eric Adams, I write to notify you of the following:

*First*, your resignation is accepted. This decision is based on your choice to continue pursuing a politically motivated prosecution despite an express instruction to dismiss the case. You lost sight of the oath that you took when you started at the Department of Justice by suggesting that you retain discretion to interpret the Constitution in a manner inconsistent with the policies of a democratically elected President and a Senate-confirmed Attorney General.

*Second*, you indicated that the prosecution team is aware of your communications with the Justice Department, is supportive of your approach, and is unwilling to comply with the order to dismiss the case. Accordingly, the AUSAs principally responsible for this case are being placed on off-duty, administrative leave[1] pending investigations by the Office of the Attorney General[2] and the Office of Professional Responsibility, both of which will also evaluate your conduct. At

---

[1] This leave status will remain in effect until further notice. This is not a disciplinary or adverse action, and the AUSAs will continue to receive full salary and benefits during administrative leave. While the AUSAs are in an off-duty status, they are not to use their government-issued laptop, phone, and ID badge/PIV card to access duty stations or any other Federal facility unless explicitly directed to do so. While on administrative leave, if contacted by management, the AUSAs must respond by phone or email no later than the close of business the following business day.

[2] The investigation by the Office of the Attorney General will be conducted pursuant to, *inter alia*, Executive Order 14147, entitled *Ending the Weaponization of the Federal Government*, and on the basis of the Attorney General's February 5, 2025 memorandum regarding *Restoring the Integrity and Credibility of the Department of Justice*.

Danielle Sassoon                                                                   Page 2
Acting U.S. Attorney
U.S. Attorney's Office, SDNY

the conclusion of these investigations, the Attorney General will determine whether termination or some other action is appropriate.

Based on attendance at our recent meetings, I understand the relevant AUSAs to be Hagan Scotten and Derek Wikstrom. If either of these AUSAs wished to comply with my directive but was prohibited from doing so by you or the management of your office, or if these AUSAs wish to make me aware of other mitigating considerations they believe are relevant, they can contact my office directly. The Justice Management Division and EOUSA have taken steps to remove access to electronic devices, and I ask that you and the AUSAs cooperate with those efforts and preserve all electronic and hard copy records relating to this matter whether they are stored on official or personal devices.

*Third*, under your leadership, the office has demonstrated itself to be incapable of fairly and impartially reviewing the circumstances of this prosecution. Therefore, the prosecution of Mayor Adams is transferred to the Justice Department, which will file a motion to dismiss the charges pursuant to Rule 48 of the Federal Rules of Criminal Procedure. My prior directive regarding no further targeting of Mayor Adams or additional investigative steps related to this matter remains in place.

## I.    Background

On January 20, 2025, in Executive Order 14147, President Trump established the following policy: "It is the policy of the United States to identify and take appropriate action to correct past misconduct by the Federal Government related to the weaponization of law enforcement." In a February 5, 2025 memorandum setting forth the Department's general policy regarding zealous advocacy on behalf of the United States, the Attorney General stated:

> [A]ny attorney who because of their personal political views or judgments declines to sign a brief or appear in court, refuses to advance good-faith arguments on behalf of the Administration, or otherwise delays or impedes the Department's mission will be subject to discipline and potentially termination, consistent with applicable law.

Your Office was not exempted from the President's policy or the Attorney General's memorandum.

On February 10, 2025, I directed you to dismiss the prosecution of Mayor Adams based on well-founded concerns regarding weaponization, election interference, and the impediments that the case has imposed on Mayor Adams' ability to govern and cooperate with federal law enforcement to keep New York City safe. My February 10, 2025 memorandum indicated that I acted pursuant to the authorization of the Attorney General. The mechanism for seeking dismissal is Rule 48 of the Federal Rules of Criminal Procedure. Note 2 to Rule 48 explains that "[t]he rule confers *the power to file a dismissal by leave of court on the Attorney General*, as well as on the United States attorney, since under existing law the Attorney General exercises 'general superintendence and direction' over the United States attorneys." *See* 28 U.S.C. § 509 ("All

Danielle Sassoon                                                                        Page 3
Acting U.S. Attorney
U.S. Attorney's Office, SDNY

functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General . . . ."); *see also* 28 C.F.R. § 0.15(b).

Prior to issuing the February 10, 2025 memorandum, I reviewed public filings in this matter, and your office's prosecution memoranda and classified submissions. I met with you and the prosecution team, held a separate meeting that involved you, the prosecution team, and defense counsel, and then met with you privately in my office.[3]  During those meetings, I invited written submissions from both sides, and I carefully reviewed those submissions. Thus, your recent suggestions about a lack of process around the Justice Department's decision are not grounded in reality.

You have not complied with the clear directives in my February 10, 2025 memorandum. Further, you made clear that you did not intend to do so during telephone calls with myself and Chad Mizelle, the Attorney General's Chief of Staff, on February 11, 2025, as well as in a written submission to the Attorney General that day.  You also stated that the prosecution team had reviewed your letter to the Attorney General, and that they would not file a motion to dismiss the case.

At approximately 1:50 p.m. today, you tendered your resignation via email.

## II.    Discussion

The weaponization finding in my February 10, 2025 memorandum was made pursuant to a policy set forth by President Trump, who is the only elected official in the Executive Branch, in connection with a decision that was authorized by the Senate-confirmed Attorney General of the United States, and entirely consistent with guidance issued by the Attorney General shortly after that confirmation.  Your Office has no authority to contest the weaponization finding, or the second independent basis requiring dismissal set forth in my memorandum.  The Justice Department will not tolerate the insubordination and apparent misconduct reflected in the approach that you and your office have taken in this matter.

### A.   Improper Weaponization

You are well aware of the Department's weaponization concerns regarding the handling of the investigation and prosecution of Mayor Adams.  Those concerns include behavior that supports, at minimum, unacceptable appearances of impropriety and the politicization of your office.  The investigation was accelerated after Mayor Adams publicly criticized President Biden's failed immigration policies, and led by a former U.S. Attorney with deep connections to the former

---

[3] You correctly noted in your letter to the Attorney General that during the second meeting I questioned why a member of the prosecution team appeared to have been brought for the sole purpose of transcribing our discussion.  You failed to note, however, that I made those comments in the context of a conversation about leaks relating to our deliberations.

Danielle Sassoon                                                                                    Page 4
Acting U.S. Attorney
U.S. Attorney's Office, SDNY

Attorney General who oversaw the weaponization of the Justice Department. Based on my review and our meetings, the charging decision was rushed as the 2024 Presidential election approached, and as the former U.S. Attorney appears to have been pursuing potential political appointments in the event Kamala Harris won that election.

After President Trump won the election, in late-December 2024, the former U.S. Attorney launched a personal website—which closely resembles a campaign website—that touts articles about the ongoing prosecution of Mayor Adams with titles such as "U.S. Attorney Damian Williams has come for the kings," "A mayor, a rapper, a senator, a billionaire: Meet the man who has prosecuted them all," and "Federal Prosecutor Damian Williams Flexes SDNY Power Against Eric Adams and Sean Combs." The former U.S. Attorney increased the appearances of impropriety by releasing an op-ed on January 16, 2025 entitled, "An indictment of the sad state of New York government." In that piece, he disparaged Mayor Adams with the following comment: "America's most vital city is being led with a broken ethical compass." The former U.S. Attorney also made what I reasonably interpreted as a reference to himself in that piece when he suggested that there was a need for "elected officials" willing to "disrupt the status quo."

You did not directly defend the former U.S. Attorney's behavior in response to a recent defense motion. Nor could you. His actions inappropriately politicized and tainted your office's prosecution, potentially permanently. Instead of addressing these concerns with the district court, you simply claimed that these actions were "beside the point." ECF No. 102 at 1. Not true. The actions by the former U.S. Attorney implicate the concerns that President Trump raised in Executive Order 14147, in connection with the prosecution of an elected official "who voiced opposition to the prior administration's policies." *Id.* The fact that the district court denied the defense motion does not establish that continuing the prosecution of Mayor Adams reflects an appropriate exercise of prosecutorial discretion. Similarly, the fact that AUSAs convinced a grand jury to return an indictment based on a one-sided and inherently partial presentation of the evidence does not establish that the case was appropriate at the time, much less that it would be appropriate to continue to pursue the case based on events that occurred after the True Bill was returned.

The Justice Department will not ignore the fact that the timing of charges authorized by a former U.S. Attorney with apparent political aspirations interferes with Mayor Adams' ability to run a campaign in the 2025 election. Your reference to the schedule underlying the prosecution of Senator Robert Menendez is not in any way persuasive in light of the evidence-handling issues that arose in connection with that trial. If anything, that experience counsels in favor of more caution in these matters, not less. But the record does not reflect such caution. In October 2024, an AUSA responsible for the prosecution of Mayor Adams represented that the "first batch" of discovery in the case included "about 560 gigabytes" of data. ECF No. 31 at 18. Thus, as a trial date was negotiated, Mayor Adams was faced with an impossible choice between seeking to defend himself at a pre-election trial in the hopes that he could campaign based on exoneration, and taking

Danielle Sassoon                                                                 Page 5
Acting U.S. Attorney
U.S. Attorney's Office, SDNY

a reasonable amount of time to review the discovery and prepare his defense at a post-election trial. His acquiescence in the former option does not justify your office's decision.

In your letter to the Attorney General, you made the dubious choice to invoke Justice Scalia. As you are likely aware from your professional experience, Justice Scalia fully understood the risks of weaponization and lawfare:

> Nothing is so politically effective as the ability to charge that one's opponent and his associates are not merely wrongheaded, naive, ineffective, but, in all probability, "crooks." And nothing so effectively gives an appearance of validity to such charges as a Justice Department investigation and, even better, prosecution.

*Morrison v. Olson*, 487 U.S. 654, 713 (1988) (Scalia, J., dissenting). While the former U.S. Attorney is not a special counsel, Justice Scalia's *Morrison* dissent aptly summarized the Department's weaponization concerns here.

There is also great irony in your invocation of the famous speech by former Attorney General Robert Jackson. His remarks are unquestionably relevant here, but not in the way you have suggested. Jackson warned that "some measure of centralized control" over federal prosecutors was "necessary." Robert H. Jackson, *The Federal Prosecutor*, 24 J. Am. Jud. Soc'y 18, 18 (1940). The senior leadership of the Justice Department exercises that control. Moreover, one of Jackson's concerns was that "the most dangerous power of the prosecutor" arises from the risk that the prosecutor would "pick people that he thinks he should get, rather than pick cases that need to be prosecuted." *Id.* at 19.

> It is in this realm—in which the prosecutor picks some person whom he dislikes or desires to embarrass . . . that the greatest danger of abuse of prosecuting power lies. It is here that law enforcement becomes personal, and the real crime becomes that of being unpopular with the predominant or governing group, being attached to the wrong political views, or being personally obnoxious to or in the way of the prosecutor himself.

*Id.* Regardless of how the investigation of Mayor Adams was initiated, by 2024 your office's work on the case was extremely problematic in that regard.

Finally, your suggestion that President Trump should issue a pardon to Mayor Adams reveals that your office's insubordination is little more than a preference to avoid a duty that you regard as unpleasant and politically inconvenient. Your oath to uphold the Constitution does not permit you to substitute your policy judgment for that of the President or senior leadership of the Justice Department, and you are in no position to suggest that the President exercise his exclusive Article II authority to make your job easier.

Danielle Sassoon                                                                 Page 6
Acting U.S. Attorney
U.S. Attorney's Office, SDNY

For all of these reasons, dismissal is necessary in the interests of justice. Your refusal to recognize that fact and comply with my directive has only exacerbated the concerns I raised initially.

### B. Interference With Mayor Adams' Ability To Govern

Your objections to the second basis for my February 10, 2025 directive—that the "pending prosecution has unduly restricted Mayor Adams' ability to devote full attention and resources to illegal immigration and violence crime"—are based on exaggerated claims that further illustrate your office's inability to grapple with the problems that this case actually presents.

As a result of the pending prosecution, Mayor Adams is unable to communicate directly and candidly with City officials he is responsible for managing, as well as federal agencies trying to protect the public from national security threats and violent crime. Mayor Adams has been denied a security clearance that limits his access to details of national security issues in the City he was elected to govern and protect. He cannot speak to federal officials regarding imminent security threats to the City. And he cannot fully cooperate with the federal government in the manner he deems appropriate to keep the City and its residents safe. This situation is unacceptable and directly endangers the lives of millions of New Yorkers. My directive to you reflected a determination by the Justice Department that these public safety risks greatly outweigh any interest you have identified. It is not for local federal officials such as yourself, who lack access to all relevant information, to question these judgments within the Justice Department's chain of command.

You claim to find my reference to Viktor Bout to be "alarming," but you have missed the fundamental point. Presidents frequently make policy decisions that the Justice Department is charged with implementing. In connection with the case against Bout, President Biden made a questionable decision to release the "Merchant of Death" from prison. Once the decision was made, it was the responsibility of the Department and your office to execute it. Regardless of anyone's personal views of the policy choice, an AUSA from your office filed a motion to assist in effectuating the decision. *See* ECF No. 130, *United States v. Bout*, No. 08 Cr. 365 (S.D.N.Y. Nov. 29, 2022). That was your job here, and the job of the AUSAs assigned to the case. You have all violated your oaths by failing to do it. In no valid sense do you uphold the Constitution by disobeying direct orders implementing the policy of a duly elected President, and anyone romanticizing that behavior does a disservice to the nature of this work and the public's perception of our efforts.

You have also strained, unsuccessfully, to suggest that some kind of *quid pro quo* arises from my directive. This is false, as you acknowledged previously in writing. The Justice Department is charged with keeping people safe across the country. Your office's job is to help keep the City safe. But your actions have endangered it.

Danielle Sassoon                                                                      Page 7
Acting U.S. Attorney
U.S. Attorney's Office, SDNY

### C.  Rule 48 Dismissal

More broadly, you are simply incorrect to contend that there is no "valid" basis to seek dismissal.  The contention is a dereliction of your duty to advocate zealously on behalf of the United States.

The main citation you have offered, *United States v. N.V. Nederlandsche Combinatie Voor Chemische Industrie*, 428 F. Supp. 114 (S.D.N.Y. 1977), involved a motion based on "expense and inconvenience."  *Id.* at 117.  Those issues are not the drivers of this decision, as you know. Moreover, as you and your team undoubtedly learned during the research that led you to rely on a 57-year-old district court case:

> The government may elect to eschew or discontinue prosecutions for any number of reasons.  Rarely will the judiciary overrule the Executive Branch's exercise of these prosecutorial decisions.

*United States v. Blaszczak*, 56 F.4th 230, 238 (2d Cir. 2022).  In other words, the Attorney General has "a virtually absolute right" to dismiss this case.  *United States v. Salim*, 2020 WL 2420517, at *1 (S.D.N.Y. 2020).  Any judicial discretion conferred by Rule 48(a) is "severely cabined" and likely limited to instances of "bad faith."  *United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 141 (2d Cir. 2017) (cleaned up); *see also In re Richards,* 213 F.3d 773, 786 (2000) ("[T]he substantive reach of . . . [R]ule [48] appears to be effectively curtailed by the fact that even if the judge denies the motion to dismiss, there seems to be no way to compel the prosecutor to proceed.").  Accordingly, any concerns that you and your office had about the prospects of a Rule 48 motion were not a valid basis for insubordination.

### D.  Additional Issues To Be Addressed

Finally, and to be clear, while I elected to address two particular dispositive concerns in my February 10, 2025 memorandum, I have many other concerns about this case.

The case turns on factual and legal theories that are, at best, extremely aggressive.  For example, the district court explained that "[i]t is not inconceivable that the Second Circuit or the Supreme Court might, at some point in the future, hold that an 'official act' as defined in *McDonnell* is necessary under § 666, at least as to government actors."  ECF No. 68 at 18-19.  The district court also acknowledged that there is "some force" to Mayor Adams' challenges to the office's *quo* theories in the case.  The "thing[s] of value" in this case are campaign contributions, which require heightened proof under *McCormick*, as the office knows from the challenges you encountered in connection with the decision to dismiss the *Benjamin* case.

There is also questionable behavior reflected in certain of the prosecution team's decisions, which will be addressed in the forthcoming investigations.  Witnesses in the case do not appear to have been treated in a manner that is consistent with your claims about the seriousness of your

Danielle Sassoon                                                                                      Page 8
Acting U.S. Attorney
U.S. Attorney's Office, SDNY

allegations against Mayor Adams.  It is my understanding that, around the time the charges were filed, the prosecution team made representations to defense counsel regarding Mayor Adams' status in the investigation that are inconsistent with the Justice Manual's definitions of "target" and "subject."  Justice Manual § 9-11.151.  In the same period, despite having already started to draft a prosecution memo proposing to charge Mayor Adams, the prosecution team invited Mayor Adams to a proffer—in effect, baiting him to make unprotected statements after the line prosecutors had already decided to try to move forward with the case.

*      *      *

I take no pleasure in imposing these measures, initiating investigations, and requiring personnel from the Justice Department to come to your District to do work that your team should have done and was required to do.  In this instance, however, that is what is necessary to continue the process of reconciliation and restoration of the Department of Justice's core values, as the Attorney General explained on February 5, 2025.

Respectfully,

/s/ *Emil Bove*

Emil Bove
Acting Deputy Attorney General

Cc:    Matthew Podolsky
       (Via Email)

       Hagan Scotten
       Derek Wikstrom
       (By Hand Delivery)

# Exhibit 21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

ERIC ADAMS,

Defendant.

24-CR-556 (DEH)

OPINION AND ORDER

---

DALE E. HO, United States District Judge:

On February 14, 2025, the Department of Justice ("DOJ") filed a motion seeking to dismiss without prejudice the Indictment against New York City Mayor Eric Adams, pursuant to Federal Rule of Criminal Procedure 48(a).[1]  ECF No. 122 (the "Rule 48(a) Motion").  DOJ's Motion states that dismissal of this case is justified for several reasons, including because "continuing these proceedings would interfere with" the Mayor's ability to govern, thereby threatening "federal immigration initiatives and policies."  *Id.* ¶ 6.  A critical feature of DOJ's Motion is that it seeks dismissal *without prejudice*—that is, DOJ seeks to abandon its prosecution of Mayor Adams at this time, while reserving the right to reinitiate the case in the future.  DOJ does not seek to end this case once and for all.  Rather, its request, if granted, would leave Mayor Adams under the specter of reindictment at essentially any time, and for essentially any reason.

The Court declines, in its limited discretion under Rule 48(a), to endorse that outcome.  Instead, it dismisses this case *with prejudice*—meaning that the Government may not bring the charges in the Indictment against Mayor Adams in the future.  In light of DOJ's rationales, dismissing the case without prejudice would create the unavoidable perception that the Mayor's

---

[1] All subsequent references to Rules are to the Federal Rules of Criminal Procedure.  In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

freedom depends on his ability to carry out the immigration enforcement priorities of the administration, and that he might be more beholden to the demands of the federal government than to the wishes of his own constituents. That appearance is inevitable, and it counsels in favor of dismissal with prejudice. Notably, Mayor Adams has filed his own motion seeking dismissal with prejudice on other grounds, and DOJ has not opposed his motion, effectively waiving any objection to permanent dismissal of this case. The parties offer the Court no basis to dismiss this case in a manner that would allow DOJ to reinitiate it in the future, and the Court declines to do so.

Various groups that have submitted friend-of-the-court briefs urge this Court to go further and deny DOJ's Motion altogether, arguing that the reasons DOJ has given to justify dismissing this case are unsubstantiated or contrary to the public interest. The Court ultimately declines their invitation to deny the Motion. But it concludes that many of their arguments have merit. DOJ's first asserted rationale for dismissing this case—that it has been tainted by "appearances of impropriety," Rule 48(a) Mot. ¶ 5—is unsupported by any objective evidence. Rather, the record before the Court indicates that the U.S. Attorney's Office for the Southern District of New York prosecutors who worked on this case followed all appropriate Justice Department guidelines. There is no evidence—zero—that they had any improper motives. Indeed, DOJ's memorandum directing dismissal of this case took care to note that it did not "call[] into question the integrity and efforts of the line prosecutors responsible for the case," or the efforts of the U.S. Attorney leading the office at the time of the memorandum.[2] And DOJ's assertion that this case—which was brought nine months before the 2025 New York City mayoral primary election—somehow amounts to election interference lacks any support in Justice Department guidelines or past

---

[2] Letter from Emil Bove, Acting Deputy Att'y Gen., to Danielle Sassoon, U.S. Att'y, S.D.N.Y. (Feb. 10, 2025) (the "February 10 Decisional Memo") at 1, ECF No. 150-7.

practice.  In fact, the timing of this case is entirely consistent with prior public corruption prosecutions.  All of this suggests that the "appearances of impropriety" rationale is not just thin, but pretextual.

As for the immigration enforcement rationale, to the extent that DOJ suggests that Mayor Adams is unable to assist with immigration enforcement while this case is ongoing, such an assertion is similarly unsubstantiated.  Indeed, shortly after DOJ made the decision to seek dismissal of the case—and while the Indictment was still pending—the Mayor announced that he would permit Immigration and Customs Enforcement (ICE) to operate at the Rikers Island Jail Complex, an act that appears to be contrary to New York City law.  In other words, the record does not show that this case has impaired Mayor Adams in his immigration enforcement efforts. Instead, it shows that after DOJ decided to seek dismissal of his case, the Mayor took at least one *new* immigration-related action consistent with the preferences of the new administration. Everything here smacks of a bargain: dismissal of the Indictment in exchange for immigration policy concessions.

Taking a step back from the particulars of this case, DOJ's immigration enforcement rationale is both unprecedented and breathtaking in its sweep.  DOJ cites no examples, and the Court is unable to find any, of the government dismissing charges against an elected official because doing so would enable the official to facilitate federal policy goals.  And DOJ's assertion that it has "virtually unreviewable" license to dismiss charges on this basis is disturbing in its breadth, implying that public officials may receive special dispensation if they are compliant with the incumbent administration's policy priorities.  That suggestion is fundamentally incompatible with the basic promise of equal justice under law.

Ultimately, however, there are two reasons why these points do not support outright denial of DOJ's Motion to Dismiss Mayor Adams's case.  The first is that a court's principal role in

deciding a motion of this nature is to protect the rights of the defendant—and denying dismissal of the case would not do so here.  In fact, to the extent that the Government may be seeking to extract policy concessions from the Mayor, dismissal with prejudice rather than continuation of the prosecution best addresses that concern.  It ensures that, going forward, the charges in the Indictment cannot be used as leverage over Mayor Adams or the City of New York.

The second and perhaps more fundamental reason is that a court, if it were so inclined, would have no way to compel the government to prosecute a case in circumstances like those presented here.  If an individual prosecutor seeks to dismiss a case for improper reasons, a court can deny the motion and send the matter back to the government, which can then reassign the case to another prosecutor.  But where, as here, a court has substantive concerns about the reasons for dismissal offered by the Justice Department itself, the court does not have the same option.  A court cannot force the Department of Justice to prosecute a defendant.  That is by design.  In our constitutional system of separation of powers, a court's role in a criminal case is to preside over the matter—not to decide whether the defendant should be prosecuted.  The Court is not aware of any authority that would empower it to appoint an independent prosecutor outside of the limited context of criminal contempt.  Consistent with that understanding, and in light of the particular facts of this case, the Court finds no basis to deny DOJ's Motion altogether.

Finally, it is important to clarify that the Court's decision today is not about whether Mayor Adams is innocent or guilty.  Mayor Adams, like any person accused of a crime, is presumed innocent until proven guilty.  If this case were to proceed to trial, it would be the Government's burden to prove, beyond a reasonable doubt, each element of the offenses with which he is charged.  Because of DOJ's decision to abandon this case, that trial will not occur.  But unlike many (if not most) motions under Rule 48(a), the Government's Motion to Dismiss this case is expressly *not* based on the strength of the case against Mayor Adams.  Neither the dismissal of the Indictment,

nor the length of this Opinion, should be understood as any kind of statement about the merits of the allegations against the Mayor in the Indictment.

The Court's decision is also not about, and the Court expresses no opinion on, whether the case against Mayor Adams "should" continue based on the kinds of factors that a prosecutor might typically consider in bringing a case—including "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan." *Wayte v. United States*, 470 U.S. 598, 607 (1985). Courts are "particularly ill-suited" to weigh such factors, *id.*, and this Court declines to wander into that thicket. In our constitutional system, that decision is left to a political branch of our government, which is ultimately accountable for its actions to the people. Part of this Court's limited role under Rule 48(a) is to shine a light on the reasons that DOJ has decided to dismiss this case, leaving the most important judgment to the public.

Accordingly, and for the reasons set forth in more detail below, the Government's motion is **GRANTED IN PART AND DENIED IN PART**. The Indictment in this case is **DISMISSED WITH PREJUDICE**.

## BACKGROUND

Unless otherwise noted, the facts described below are taken from the parties' filings, transcripts of proceedings held before the Court, and the Court's prior decisions in this case.

### A. The Investigation and Indictment

The investigation of then–Brooklyn Borough President Eric Adams began in the summer of 2021. Oct. 2 Hr'g Tr. at 15:2-3, ECF No. 31; *see also* Gov't Opp'n Def.'s Mot. Sanctions ("Gov't First Sanctions Opp'n") at 1, ECF No. 38. It concerned travel benefits and campaign contributions that he allegedly received from Turkish nationals. *See* Indictment ("Ind.") ¶¶ 1-6,

ECF No. 2.  Approximately three years later, on September 24, 2024, a grand jury returned a five-

count indictment, charging him with:

- One count of conspiracy to commit wire fraud and federal program bribery, and to receive campaign contributions by foreign nationals, in violation of 18 U.S.C. § 371;

- One count of wire fraud in violation of 18 U.S.C. §§ 1343 and 2;

- Two counts of solicitation of a contribution by a foreign national in violation of 52 U.S.C. §§ 30121 and 30109(d)(1)(A), and 18 U.S.C. § 2; and

- One count of bribery in violation of 18 U.S.C. § 666(a)(1)(B)(2).

Ind. ¶¶ 50-63.  DOJ officials were aware of the investigation and of the timing of the Indictment;

consistent with DOJ policy, attorneys at the U.S. Attorney's Office for the Southern District of

New York ("USAO-SDNY") informed DOJ leadership that if the grand jury voted to indict Mayor

Adams on September 24, they intended to, among other things, unseal the indictment and hold a

press conference announcing the charges.  *See* Gov't First Sanctions Opp'n at 7.[3]

**B.  Initial Proceedings and Motions Practice**

1.  Initial Conference and Trial Date

On October 2, 2024, Mayor Adams appeared before this Court for an initial conference.

During the conference, the Government stated it was "quite likely" that it would file a superseding

indictment, later clarifying that that it was "possible" that additional charges would be added and

"likely" that "additional defendants w[ould] be charged in connection with this scheme."  Oct. 2

Hr'g Tr. at 4:2-12.  The Court acknowledged that "the public and Mayor Adams have an interest

---

[3] This case was filed and initially prosecuted by USAO-SDNY.  On February 14, 2024, attorneys from DOJ "replaced AUSAs from the U.S. Attorney's Office for the Southern District of New York as counsel of record in this case" and stated that they would "handle this matter and any related decision-making" going forward.  Rule 48(a) Mot. at 1 n.1.  Where helpful to the reader, this Opinion distinguishes between the USAO-SDNY and DOJ by referring to them specifically; otherwise, references to the "Government" for actions taken prior to February 14 are to USAO-SDNY, and references to actions after February 14 are to Main Justice.

in a speedy trial," which was "heightened in the context of the elections calendar." *Id.* at 38:17-19. The Court also noted that this "is obviously a case of significant public interest," *id.* at 48:20-21, and consequently directed the parties to, whenever possible, file documents on the public docket.

At a subsequent conference on November 1, 2024, the Court again noted the public's and Mayor Adams's interests in a speedy trial, particularly "given the election cycle." Nov. 1 Hr'g Tr. at 55:19-23, ECF No. 57. The Court ultimately set trial for April 21, 2025, explaining that it took into account a variety of factors, including: the likely need for proceedings with respect to classified information, the time it would take Mayor Adams's counsel to review the "significant" volume of discovery, the trial schedules of other cases involving public officials tried in this District,[4] and the parties' competing proposals. *Id.* at 60:19-61:21; 62:16-20.

2. Early Motions Practice: Mayor Adams's First Motion to Dismiss and First Rule 6 Motion

*First Motion to Dismiss.* On September 30, 2024, Mayor Adams filed a motion to dismiss the bribery count of the Indictment. *See* Def.'s Mem. Supp. Mot. Dismiss Count V ("Mayor Adams's First Mot. to Dismiss"), ECF No. 14. His principal argument was that the Government's theory that he accepted travel benefits in exchange for assistance with the "regulation" of a Turkish consular building (the "Turkish House") was insufficient to state a charge of bribery under the relevant statute, 18 U.S.C. § 666 ("Section 666"). *See* Mayor Adams's First Mot. to Dismiss at 7-8. In essence, Mayor Adams argued that a charge of bribery requires that the defendant agree to accept something of value in exchange for a discrete exercise of governmental power, and that assistance with the "regulation" of the Turkish House was "too vague and broad." *Id.* at 11. The

---

[4] *See, e.g.*, *United States v. Menendez*, No. 23 Crim. 490 (S.D.N.Y.); *United States v. Silver*, No. 15 Crim. 93 (S.D.N.Y.); *United States v. Benjamin*, No. 21 Crim. 706 (S.D.N.Y.).

Court rejected that argument, concluding that under binding Second Circuit precedent the Indictment's allegations were sufficiently specific to constitute bribery under Section 666. *See* Op. & Order ("First MTD Opinion") at 16-22 (citing *United States v. Ng Lap Seng*, 934 F.3d 110, 133 (2d Cir. 2019), and *United States v. Dawkins*, 999 F.3d 767 (2d Cir. 2021)), ECF No. 68.

*First Rule 6 Motion*. On October 1, 2024, Mayor Adams filed a motion seeking an evidentiary hearing and sanctions, under Rule 6(e), based on alleged unlawful disclosures of matters occurring before a grand jury. *See* Def.'s Mem. Supp. Mot. Evid. Hr'g & Sanctions ("Mayor Adams's First Rule 6 Mot."), ECF No. 19. After full briefing from the parties, the Court denied the motion. Am. Op. and Order ("First Rule 6 Order") at 1, ECF No. 49.

3. Additional Motions Practice: Mayor Adams's Motion for a Bill of Particulars, The Government's Rule 23.1 Motion, and Mayor Adams's Second Rule 6 Motion

*Motion for a Bill of Particulars*. On December 18, 2024, Mayor Adams filed a Motion for Leave to File a Bill of Particulars. ECF No. 72. He argued that the Indictment "omits critical information about the bribery and campaign finance charges against him." Def.'s Mem. Supp. Mot. for Bill of Particulars at 1-2, ECF No. 73. In its opposition, the Government argued, among other things, that disclosing additional details at that time would be prejudicial to its ongoing investigation and noted that "law enforcement has continued to identify additional individuals involved in Adams's conduct, and to uncover additional criminal conduct by Adams." Gov't Opp'n Mot. Bill of Particulars at 22, ECF No. 89. The Court ultimately denied Mayor Adams's request. *See* Op. & Order, ECF No. 113.

*Local Rule 23 Motion.* On December 19, 2024, the Government filed a letter motion "request[ing] that the Court direct counsel for the parties to comply with" Local Criminal Rule 23.1 ("Local Rule 23.1"), which, among other things, prohibits lawyers from making extrajudicial statements concerning "[a]ny opinion as to the accused's guilt or innocence or as to the merits of

the case or the evidence in the case." *See* Gov't Rule 23.1 Letter Mot. at 1, ECF No. 76 (citing

S.D.N.Y. & E.D.N.Y. L. Crim. R. 23.1(d)(7)).  The Court issued an Order on January 23, 2025

that memorialized the parties' respective obligations under the Local Rule.  Order at 2, ECF No.

93.

 *Second Rule 6 Motion*.  On December 24, 2024, Mayor Adams filed a second Rule 6

Motion, making allegations similar to those in his First Rule 6 Motion.  *See* Mem. Supp. Renewed

Mot. Evid. Hr'g & Sanctions ("Mayor Adams's Second Rule 6 Mot.") at 1, ECF No. 83.  After the

motion was fully briefed, Mayor Adams filed a letter identifying a new issue: former U.S. Attorney

Damian Williams had recently published an op-ed containing statements—most relevantly, that

"America's most vital city is being led with a broken ethical compass"—which Mayor Adams

argued were "especially prejudicial," had "irrevocabl[y]" tainted the jury pool, and violated Local

Rule 23.1.  Def.'s Jan. 18, 2025 Letter, ECF No. 99.  The Government argued in response that,

among other things, "Williams did not cause Adams to be investigated.  The evidence of Adams's

crimes was uncovered by career law enforcement officers performing their duties, in an

investigation that began before Williams took office and [that] continued after he left."  Gov't Jan.

22, 2025 Letter, ECF No. 102.

 In a Memorandum Order dated January 22, 2025, the Court denied Mayor Adams's Second

Rule 6 Motion.  *See* Mem. Order ("Second Rule 6 Order"), ECF No. 103.  In so ruling, the Court

held that there was no violation of Rule 6, because "[n]either Mr. Williams's op-ed itself nor the

media it incorporates by reference so much as allude[d] to the grand jury proceedings that led to

Mayor Adams's indictment, let alone disclose[d] protected information from those proceedings."

Second Rule 6 Order at 5-6.  And regarding Local Rule 23.1, the Court held that Williams's op-ed

did not contain prohibited statements because it primarily referred to New York *State*, rather than

New York *City*, politics, and because the one statement that plausibly referred to City politics did

not "constitute opinions as to the Defendant's guilt, and [wa]s not otherwise the type of statement proscribed by the rule." *Id.* at 6 n.5. The Court, however, reiterated prosecutors' duties to "respect both the power of their words and their office, and ensure that their public comments are carefully tailored solely to further valid law enforcement interests and to steer far clear of violating a defendant's fundamental right to a fair trial." *Id.* (quoting *United States v. Smith*, 985 F. Supp. 2d 506, 541 (S.D.N.Y. 2013) (citing Local Rule 23.1(b)).

### C. The Government's Pending Motion to Dismiss

1. Factual Background

   *a. January 31 Meeting at the Justice Department and Follow-Up Letters*

On January 31, 2025, members of Mayor Adams's legal team, including Alex Spiro; staff at DOJ, including then-Acting Deputy Attorney General (DAG) Emil Bove; and staff from the USAO-SDNY, including then-U.S. Attorney Danielle Sassoon attended a meeting together. *See* Def.'s Feb. 18, 2025 Letter at 1-2, ECF No. 130. According to a letter filed on the docket by defense counsel, the meeting was at Acting DAG Bove's "invitation" to discuss, among other things, "how the case might be affecting Mayor Adams's ability to do his job and whether there was evidence of politicization." *Id.* at 1.[5] Defense counsel's letter to the Court states that, at the end of the meeting, Acting DAG Bove "asked [Mayor Adams's lawyers] and the S.D.N.Y. lawyers to memorialize [their] respective positions in writing." *Id.* at 2.

---

[5] An article attached as an exhibit to an *amicus* brief submitted by former federal judges states that other attorneys in attendance at this meeting included William Burck, one of Mayor Adams's other attorneys; Assistant U.S. Attorney Hagan Scotten, one of the prosecutors formerly assigned to this matter; and two unnamed USAO-SDNY attorneys. *See* Former Federal Jurists' Mot. Leave to File Amicus Brief, ECF No. 150 (appending, as exhibit, a CNN article describing the January 31 meeting between Acting DAG Bove, USAO-SDNY prosecutors, and Mayor Adams's counsel, ECF No. 150-2).

Case 1:25-cv-01144-JMF   Document 177-2   Filed 04/02/25   Page 148 of 278
Case 1:24-cr-00556-DEH   Document 177   Filed 04/02/25   Page 11 of 78
PageID #: 870

The follow-up letter from Mayor Adams's counsel to Acting DAG Bove, dated February 3, 2025, was also filed on the docket by counsel. *See* Letter from Alex Spiro & William A. Burck, Counsel for Mayor Adams, to Emil Bove, Acting Deputy Att'y Gen. ("Letter from Adams's Counsel to DOJ") (Feb. 3, 2025), ECF No. 130-1.  The letter stated that the criminal case against Mayor Adams had prevented him from being "in lockstep with federal law enforcement, federal agency heads, and federal prosecutors" with respect to immigration enforcement, particularly the administration's efforts to "aggressively enforce immigration laws and remove undocumented immigrants who pose a threat to Americans' safety." *Id.* at 2.  The letter identified, "[a]s one prominent example of the indictment's impact," the fact that "Mayor Adams's security clearance was revoked following his indictment." *Id.*  The letter went on to state that "Mayor Adams's independent abilities to exercise his powers ha[d] also been complicated by his indictment," referencing his authority to "prevent[] the Office of the Corporation Counsel from litigating challenges to immigration enforcement, prevent[] appointed city employees from taking public stances against enforcement efforts, re-open[] the ICE office on Rikers Island, and direct[] the NYPD to supply manpower to assist federal immigration agents." *Id.* at 2.

The USAO-SDNY follow-up letter was not filed on the docket by any parties or *amici*, and it does not appear to be publicly available otherwise.

### b. February 10, 2025 Decisional Memorandum

On February 10, 2025, Acting DAG Bove sent a memorandum (the "February 10 Decisional Memo") to U.S. Attorney Sassoon directing her to dismiss this case "as soon as is practicable."  Letter from Emil Bove, Acting Deputy Att'y Gen., to Danielle Sassoon, U.S. Att'y,

Case 1:25-cv-00566-DEH    Document 177-2    Filed 04/02/25    Page 240 of 378
Case 1:24-cr-00556-DEH    Document 122    Filed 04/02/25    Page 12 of 18
PageID #: 871

S.D.N.Y. (Feb. 10, 2025), ECF No. 150-7.[6]  It started by noting that dismissal would be subject to

certain conditions, including that Mayor Adams "agree in writing to dismissal without prejudice."

*Id.* at 1.  It then explained that DOJ "reached this conclusion without assessing the strength of the

evidence or the legal theories on which [the case] is based, which are issues on which [it] defer[ed]

to the U.S. Attorney's Office at this time."  *Id.*  It also noted that "this directive in no way call[ed]

into question the integrity and efforts of the line prosecutors responsible for the case, or [U.S.

Attorney Sassoon's] efforts in leading those prosecutors in connection with a matter [she]

inherited."  *Id.*

The February 10 Decisional Memo then stated that the Justice Department "determined

that dismissal . . . is necessary for two independent reasons."  *Id.* at 1.  First, it said the "timing of

the charges and more recent public actions by the former U.S. Attorney" had "threatened the

integrity of the proceedings, including by increasing prejudicial pretrial publicity that risks

impacting potential witnesses and the jury pool."  *Id.*  The Memo also stated that "Mayor Adams

criticized the prior Administration's immigration policies before the charges were filed," and it

asserted that former U.S. Attorney Williams's "public actions created appearances of impropriety

that implicate the concerns raised in the Attorney General's February 5, 2025 memorandum

regarding *Restoring the Integrity and Credibility of the Department of Justice*[7] as well as in

---

[6] The February 10 Decisional Memo is attached as an exhibit to multiple *amicus* briefs that
have been filed in this case, including the *amicus* brief filed by former federal judges.  *See* Former
Jurists' Amicus Br. (appending Memo as an exhibit, ECF No. 150-7); *see also* Common Cause,
State Democracy Defenders Brs. (appending the same, ECF No. 125-1).  At a conference before
the Court, Acting DAG Bove confirmed that he wrote the memo, that he sent it to U.S. Attorney
Sassoon, and that copies of it on the docket at that point were "authentic."  Feb. 19 Conf. Tr. at
41:4-42:6, ECF No. 145.

[7] Memorandum from the U.S. Attorney General on Restoring the Integrity and Credibility
of the Department of Justice (Feb. 5, 2025), https://www.justice.gov/ag/media/1388506/dl?inline
[https://perma.cc/QN7T-NE8Q].

Case 1:24-cr-00556-DEH   Document 122   Filed 04/02/25   Page 34 of 78
Case 1:24-cr-00556-DEH   Document 117-2   Filed 04/02/25   Page 341 of 593
PageID #: 872

Executive Order 14147, entitled *Ending the Weaponization of the Federal Government*."[8]  *Id.* at

1-2.  It further stated that "[t]hese actions and the underlying case have also improperly interfered

with Mayor Adams' campaign in the 2025 mayoral election."  *Id.* at 2 (citing U.S. Dep't of Just.,

Just. Manual § 9-85.500 (2022)).

Second, the February 10 Decisional Memo stated that the "pending prosecution has unduly

restricted Mayor Adams' ability to devote full attention and resources to the illegal immigration

and violent crime that escalated under the policies of the prior Administration."  *Id.*  The Memo

noted "the impact of the prosecution on Mayor Adams' ability to support critical, ongoing federal

efforts 'to protect the American people from the disastrous effects of unlawful mass migration and

resettlement,' as described in Executive Order 14165," entitled *Securing Our Borders*.[9]  *Id.*  It also

drew a comparison between DOJ's decision to dismiss the Adams case and the prior

administration's decision to "release[] violent criminals such as Viktor Bout, the 'Merchant of

Death,'" in pursuit of its foreign policy goals.  *Id.*  In a footnote, the Memo referred to a follow-

up letter submitted by U.S. Attorney Sassoon after the January 31 meeting, purporting to quote it

as acknowledging that "the Government is not offering to exchange dismissal of a criminal case

for Adams's assistance on immigration enforcement."  *Id.* at 2 n.1.  As noted above, this letter has

not been filed on ECF and is not otherwise publicly available.  The February 10 Decisional Memo

---

[8]  Exec. Order No. 14147, 90 Fed. Reg. 8235 (Jan. 28, 2025), https://www.govinfo.gov/content/pkg/FR-2025-01-28/pdf/2025-01900.pdf [https://perma.cc/JM7B-GN32] (declaring that "[i]t is the policy of the United States . . . to correct past misconduct by the Federal Government related to the weaponization of law enforcement and the weaponization of the Intelligence Community").

[9]  Exec. Order No. 14165, 90 Fed. Reg. 8467 (Jan. 20, 2025), https://www.govinfo.gov/content/pkg/FR-2025-01-30/pdf/2025-02015.pdf [https://perma.cc/6DCV-XU7U] (describing federal efforts "to protect the American people from the disastrous effects of unlawful mass migration and resettlement").

also stated that Mayor Adams's case would "be reviewed by the confirmed U.S. Attorney in the Southern District of New York following the November 2025 mayoral election."  *Id.* at 1.

### c.   *Subsequent Letters*

The February 10 Decisional Memo triggered a remarkable exchange of letters between USAO-SDNY and DOJ, followed by a sequence of unusual events at DOJ that were reported in news articles that have been submitted as exhibits to various *amicus* briefs, including one filed by former federal judges.  *See* Amicus Br. of Former Federal Jurists ("Former Federal Jurists Br.") at 1, ECF No. 150-1.

On February 12, 2025, U.S. Attorney Sassoon sent a nine-page letter to the Attorney General stating that Acting DAG "Bove's memo . . . raises serious concerns that render the contemplated dismissal inconsistent with [her] ability and duty to prosecute federal crimes without fear or favor and to advance good-faith arguments before the courts."  Letter from Danielle Sassoon, U.S. Att'y, S.D.N.Y., to Pamela Jo Bondi, Att'y Gen. (Feb. 12, 2025) (the "Sassoon Letter") at 1, ECF No. 150-3.[10]  U.S. Attorney Sassoon further stated, "I cannot fulfill my obligations, effectively lead my office in carrying out the Department's priorities, or credibly represent the Government before the courts, if I seek to dismiss the Adams case on this record." *Id.* at 1-2.

The Sassoon Letter then proceeded to address the rationales for dismissal set forth in the February 10 Decisional Memo.  First, with respect to recent conduct by former U.S. Attorney Williams, the Sassoon Letter explained:

> The investigation began before Mr. Williams took office, he did not manage the day-to-day investigation, and the charges in this case were recommended or approved by four experienced career prosecutors, the Chiefs of the SDNY Public

---

[10] The February 12 Sassoon Letter is referenced in the February 18, 2025 letter filed on the docket by Mayor Adams's counsel at ECF No. 130.  It is also attached as an exhibit to various *amicus* briefs, including the brief filed by former federal judges.  *See* ECF No. 150-3.

14

Corruption Unit, and career prosecutors at the Public Integrity Section of the Justice
Department. Mr. Williams's decision to ratify their recommendations does not taint
the charging decision. And notably, Adams has not brought a vindictive or selective
prosecution motion, nor would one be successful.

*Id.* at 4. Without attempting "to defend Mr. Williams's motives or conduct," the Sassoon Letter
concluded that "the appropriate chronology of this investigation and the strength of the case
[showed that] Mr. Williams's conduct since leaving government service cannot justify dismissal
here." *Id.* at 5.

Next, regarding the timing of the Indictment in relation to the 2025 New York City mayoral
elections, the Sassoon Letter stated that

the decision to charge [Mayor Adams] in September 2024—nine months before the
June 2025 Democratic Mayoral Primary and more than a year before the November
2025 Mayoral Election—complied in every respect with longstanding [Justice]
Department policy regarding election year sensitivities and the applicable Justice
Manual provisions.

*Id.* at 4. The Letter noted that "[t]he timing of the charges in this case is . . . consistent with
charging timelines of other cases involving elected officials, both in this District and elsewhere."
*Id.* (citing *United States v. Menendez*, No. 23 Crim. 490 (S.D.N.Y.) (indictment in September
2023, primary in June 2024) and *United States v. Hunter*, No. 18 Crim. 3677 (S.D. Cal.)
(indictment in August 2018, general election in November)). It further stated: "I am not aware of
any instance in which the Department has concluded that an indictment brought this far in advance
of an election is improper because it may be pending during an electoral cycle, let alone that a
validly returned and factually supported indictment should be dismissed on this basis." *Id.* The
Letter further noted that "the Justice Manual requires that when investigative steps and charges
involving a public official could be seen as affecting an election[,] the prosecuting office must
consult with the Public Integrity Section, and, if directed to do so, the Office of the Deputy
Attorney General or Attorney General," and that the USAO-SDNY "followed this requirement."

15

Case 1:24-cr-00556-DEH   Document 177-2   Filed 04/02/25   Page 164 of 178
Case 1:25-cr-00556-DEH   Document 172   Filed 04/02/25   Page 164 of 178
PageID #: 875

*Id.* (citing U.S. Dep't of Just., Just. Manual §§ 9-85.210 (2022) & 9-85.500 (2022)). It also expressed the concern that "dismissing the case will amplify, rather than abate, concerns about weaponization of the Department," and it noted that the USAO-SDNY was "prepared to seek a superseding indictment from a new grand jury . . . that would add an obstruction conspiracy count based on evidence that Adams destroyed and instructed others to destroy evidence and provide false information to the FBI, and that would add further factual allegations regarding his participation in a fraudulent straw donor scheme." *Id.* at 5.

The Sassoon Letter further stated that Mayor Adams's "advocacy" to the DOJ regarding immigration enforcement "should be called out for what it is: an improper offer of immigration enforcement assistance in exchange for dismissal of his case." *Id.* at 3. It asserted that, in the January 31 meeting, "Adams's attorneys repeatedly urged what amounted to a *quid pro quo*, indicating that Adams would be in a position to assist with the Department's enforcement priorities only if the indictment were dismissed." *Id.* at 3 n.1. It further stated that it would be "a breathtaking and dangerous precedent to reward Adams's opportunistic and shifting commitments on immigration and other policy matters with dismissal of a criminal indictment." *Id.* at 3.

The Sassoon Letter also noted that "a member of [the USAO-SDNY] team who took notes during th[e] meeting" was "admonished" by Acting DAG Bove, who then "directed the collection of those notes at the meeting's conclusion." *Id.* at 3 n.1. The Letter also noted that Sassoon was "baffled by the rushed and superficial process by which this decision was reached, in seeming collaboration with Adams's counsel and without [her] direct input on the ultimate stated rationales for dismissal." *Id.* at 8. It ended with a statement that Sassoon was "prepared to offer [her] resignation" should the Attorney General be "unwilling to meet or to reconsider the directive" to dismiss the case. *Id.*

16

On February 13, 2025, Acting Deputy AG Bove sent an eight-page letter response to Sassoon.  Letter from Emil Bove, Acting Deputy Att'y Gen. (Feb. 13, 2025) (the "Feb. 13 Bove Letter"), ECF No. 150-10.  First, Acting DAG Bove accepted Sassoon's resignation and stated: "You lost sight of the oath that you took when you started at the Department of Justice by suggesting that you retain discretion to interpret the Constitution in a manner inconsistent with the policies of a democratically elected President and a Senate-confirmed Attorney General." *Id.* at 1. He then stated that DOJ would be placing two of the Assistant U.S. Attorneys ("AUSAs") "principally responsible for [the Adams] case" on "off-duty, administrative leave," and that "the prosecution of Mayor Adams [was being] transferred to the Justice Department, which w[ould] file a motion to dismiss the charges pursuant to Rule 48 of the Federal Rules of Criminal Procedure." *Id.* at 1-2.  He then reiterated DOJ's reasons for its decision to dismiss the Adams case, and he added additional points not raised in the February 10 Decisional Memo.  *Id.* at 3-5. For instance, he alluded to "many other concerns about [the Adams] case," noting that "[t]he case turns on factual and legal theories that are, at best, extremely aggressive." *Id.* at 7.  The letter also raised a concern about "questionable behavior reflected in certain of the prosecution team's decisions," including how certain witnesses and Mayor Adams had been treated. *Id.* at 7-8.

On or around February 14, 2025, SDNY AUSA Hagan Scotten—a member of the prosecution team—sent an email to Acting DAG Bove tendering his resignation.  In the email, AUSA Scotten stated that DOJ's first justification for seeking dismissal—regarding purported appearances of impropriety—was "so weak as to be transparently pretextual."  Email from Hagan Scotten, Assistant U.S. Att'y, S.D.N.Y., to Emil Bove, Acting Deputy Att'y Gen. (Feb. 14, 2025), ECF No. 150-8.  He then described the second justification—regarding immigration enforcement and national security—as being "worse" because "[n]o system of ordered liberty can allow the Government to use the carrot of dismissing charges, or the stick of threatening to bring them again,

to induce an elected official to support its policy objectives."  *Id.*  Later that day, the Government filed a motion requesting that the Court notice the withdrawal of AUSA Scotten, as well as the other AUSAs assigned to the case—Celia V. Cohen, Andrew Rohrbach, and Derek Wikstrom— as counsel for the United States.  Gov't Withdrawal Request, ECF No. 123.

d.   *Other Events*

News articles attached to an *amicus* brief submitted by former federal judges report various related events concerning Mayor Adams and DOJ at around the same time.

On February 13, three days after the date of DOJ's Decisional Memo instructing USAO-SDNY to dismiss this case, Mayor Adams announced that he would be "implementing an executive order" that would allow federal immigration officials to operate at Rikers Island, a decision in apparent tension with a 2014 New York City law that "removed ICE from the jail complex."  ECF No. 150-4 at 1-2.[11]  That day, Mayor Adams met with the administration's "border czar"; the following day, the two made a joint television appearance, during which the latter stated, "I came to New York City and I wasn't going to leave with nothing," adding, "[i]f [Adams] doesn't come through, I'll be back in New York City . . . . I'll be in his office, up his butt saying, 'Where the hell is the agreement we came to?'"  ECF No. 150-5 at 2, 4.[12]  The Mayor later released a statement after his television appearance, stating, "I want to be crystal clear with New Yorkers: I

---

[11] Eric Levenson et al., NYC Mayor and Trump Border Czar Meet as Feds Turn Eyes Toward Sanctuary Cities Like New York, CNN (Feb. 14, 2025), https://www.cnn.com/2025/02/13/us/nyc-adams-border-czar-immigration/index.html [https://perma.cc/9HM6-XCXX].

[12] Rich Schapiro & Tom Winter, *Trump's Border Czar Tells NYC Mayor He'll Be "Up His Butt" If He Breaks Vow to Help ICE*, NBC (Feb. 14, 2025), https://www.nbcnews.com/politics/justice-department/trumps-border-czar-tells-eric-adams-butt-nyc-mayor-breaks-vow-help-ice-rcna192201 [https://perma.cc/W525-TASP].

never offered—nor did anyone offer on my behalf—any trade of my authority as your mayor for an end to my case. Never." ECF No. 150-6 at 2.[13]

Meanwhile at DOJ, on February 13, five attorneys—including the Deputy Assistant Attorney General who oversaw the Public Integrity Section, the acting head of the Public Integrity Section, and three other Public Integrity Section attorneys—resigned. ECF No. 150-2 at 5-6.[14] The next day, on February 14, Acting DAG Bove "told the [remaining DOJ] career public integrity prosecutors in a meeting . . . that they had an hour to decide among themselves who would file the motion." ECF No. 150-9 at 2.[15] Ultimately, an attorney in the Public Integrity Section agreed to file the motion. *Id.*

### 2. The Government's Rule 48(a) Motion to Dismiss

On the evening of February 14, 2025, the Government filed a Motion "seeking dismissal without prejudice of the charges in this case, with leave of the Court, pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure." Rule 48(a) Motion ¶ 1. The Motion was signed by Acting DAG Bove, Antoinette T. Bacon (Supervisory Official in DOJ's Criminal Division), and Edward Sullivan (Senior Litigation Counsel in DOJ's Public Integrity Section), who "replaced AUSAs . . . as counsel of record in this case." *Id.* at 3 n.1.

---

[13] Cedar Attanasio, *Trump Border Czar and NYC Mayor Interview with "Fox & Friends" on Immigration Commitments*, AP (Feb. 14, 2025), https://apnews.com/article/adams-resignation-sassoon-letter-rikers 2fb5bf918b40fca294daed75e7676098 [https://perma.cc/99CV-Z8Y3].

[14] Kara Scannell et al., *"It Was Never Going to Be Me": How Trump's DOJ Sparked a Crisis and Mass Resignations Over the Eric Adams Case*, CNN (Feb. 15, 2025), https://www.cnn.com/2025/02/14/politics/eric-adams-justice-department-tick-tock/index.html [https://perma.cc/PK4Q-NB4M].

[15] Sarah N. Lynch, *US Prosecutor Agrees to Seek Dismissal of Adams Charges Under Pressure, Sources Say*, Reuters (Feb. 14, 2025), https://www.reuters.com/world/us/federal-prosecutor-will-sign-motion-dismiss-adams-charges-bid-save-colleagues-2025-02-14/ [https://perma.cc/9YLA-B842].

Case 1:24-cr-00556-DEH   Document 177-2   Filed 04/02/25   Page 206 of 178
Case 1:24-cr-00556-DEH   Document 122   Filed 04/02/25   Page 206 of 593
PageID #: 879

The Motion indicates that, "[t]hrough counsel," Mayor Adams "consented in writing to th[e] motion." *Id.* ¶ 2.  The Motion further states that Acting DAG Bove "determined . . . that dismissal is necessary and appropriate . . . based on the unique facts and circumstances of this case." *Id.* ¶ 4.  Specifically, the Motion provides two bases for seeking dismissal of the Indictment. *See id.* ¶¶ 5-6.  First, the motion states that "dismissal is necessary because of appearances of impropriety and risks of interference with the 2025 [mayoral] election in New York City, which implicate Executive Order 14147."[16]  *Id.* ¶ 5.  Acting DAG Bove "reached that conclusion," the Motion explains, "based on, among other things, review of a website maintained by a former U.S. Attorney for the Southern District of New York"—*i.e.*, Damian Williams—and "an op-ed" published by the same.  *Id.*

Second, the Motion states that Acting DAG Bove "concluded that continuing these proceedings would interfere with the defendant's ability to govern in New York City, which poses unacceptable threats to public safety, national security, and related federal immigration initiatives and policies," implicating Executive Orders 14159[17] and 14165.[18]  *Id.* ¶ 6.  Acting DAG Bove "reached that conclusion after learning, among other things, that as a result of these proceedings, Adams has been denied access to sensitive information that [Bove] believes is necessary for

---

[16]    Exec. Order No. 1417414147, 90 Fed. Reg. 8235 (Jan. 20, 2025), https://www.govinfo.gov/content/pkg/FR-2025-01-28/pdf/2025-01900.pdf [https://perma.cc/D2W4-A77V] (declaring it "the policy of the United States to identify and take appropriate action to correct past misconduct by the Federal Government related to the weaponization of law enforcement and the weaponization of the Intelligence Community").

[17]    Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025), https://www.govinfo.gov/content/pkg/FR-2025-01-29/pdf/2025-02006.pdf [https://perma.cc/EG8A-TVQQ] (describing the current presidential administration's intention to "faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people").

[18]    Exec. Order No. 14165, 90 Fed. Reg. 8467 (Jan. 20, 2025), https://www.govinfo.gov/content/pkg/FR-2025-01-30/pdf/2025-02015.pdf [https://perma.cc/DK27-W49Y] (outlining efforts to "secure the borders of our Nation").

Adams to govern and to help protect the City." *Id.*  In conclusion, the Motion requests that "th[is] Court enter an order of *nolle prosequi* pursuant to Rule 48(a), without prejudice, with respect to all of the charges in [the] Indictment." *Id.* ¶ 7.

On the next business day, February 18, 2025, this Court issued an Order instructing the parties to appear for a conference on February 19, 2025.  Order at 2, ECF No. 129.  The Court informed the parties that they should be "prepared to address, *inter alia*, the reasons for the Government's motion, the scope and effect of Mayor Adams's 'consent[] in writing,' . . . and the procedure for resolution of the motion." *Id.*  The Court further instructed Mayor Adams to "file his 'consent[] in writing' on the docket" by 5:00 pm that day.  *Id.*  Mayor Adams complied with the Court's request and filed his written consent, a two-sentence letter signed by his counsel, Mr. Spiro.  *See* Letter from Alex Spiro, Counsel for Mayor Adams, to Emil Bove, Acting Deputy Att'y Gen. (Feb. 14, 2025), ECF No. 131-1.

At around the same time on February 18, Mayor Adams's counsel filed a letter on ECF, described above, responding to several motions for leave to file *amicus* briefs.  *See* Def.'s Feb. 18, 2025 Letter, ECF No. 130.  In the letter, Mayor Adams's counsel denied having engaged in a *quid pro quo* concerning immigration enforcement, stating, "we never said or suggested to anyone . . . that Mayor Adams would do X in exchange for Y, and no one said or suggested to us that they would do Y in exchange for X." *Id.* at 2.  The Letter concluded by offering "sworn declarations" to "confirm these points." *Id.*[19]

---

[19] As noted, Mayor Adams's counsel also attached and filed a copy of the letter that they had sent to DOJ on February 3 as a follow-up to the January 31 meeting.  *See* Letter from Alex Spiro & William A. Burck, Counsel for Mayor Adams, to Emil Bove, Acting Deputy Att'y Gen. (Feb. 3, 2025), ECF No. 130-1.

The Court held a conference on February 19, 2025.  Acting DAG Bove appeared for the Government;[20] Mr. Spiro and Mr. Burck appeared for Mayor Adams.  *See* Feb. 19 Conf. Tr. at 2:5-9.  During the conference, Mayor Adams swore under oath that nothing had been left out of the written, two-sentence consent to dismissal signed by his attorney, Mr. Spiro; that he had not entered into any other agreements, written or otherwise, with the Government; that nothing else had been promised to him to induce his consent to DOJ's Rule 48(a) Motion; and that no one had threatened him in any way to consent to it.  *Id.* at 20:17-21:8.  Mr. Spiro also reiterated his offer to swear under oath as to the absence of an "X in exchange for Y" arrangement.  *Id.* at 44:17-45:18.

With respect to the rationales for the Rule 48(a) Motion, DOJ confirmed that the Motion contains no statement about the strength of the case in terms of the facts or the legal theory, and that "[t]here are two" bases for the Motion, which were "laid out and . . . articulated at paragraphs five and six of the motion."   *Id.* at 22:18-23:2.  While Acting DAG Bove added that he "do[es] have other concerns" about the case, he expressly disclaimed reliance on them for purposes of the Rule 48(a) Motion, explaining that DOJ is "not asking the court to rely on any" reasons for dismissal beyond what is stated in the Rule 48(a) Motion itself.  *Id.* at 22:5-17.  As to whether there was any sort of agreement between DOJ and Mayor Adams with respect to immigration enforcement, Acting DAG Bove stated, "you have a record undisputed that there is no quid pro quo," but added, "I don't think it's correct, that even if there was a quid pro quo, there would be any issue with this motion."  *Id.* at 49:3-7.

---

[20] Despite appearing on the Rule 48(a) Motion and entering appearances on the docket, Ms. Bacon and Mr. Sullivan did not appear at the conference and have not signed subsequent filings in the case.

The Court noted the parties' alignment on DOJ's Rule 48(a) Motion and that, in such situations, it is "sometimes helpful" to have "adversarial testing" to "assist in the Court's decision making process." *Id.* at 48:3-12. Acting DAG Bove acknowledged that "the Court has broad discretion about if, how, and when to invite amicus participation," but objected to a motion for leave to file an *amicus* brief by former U.S. Attorneys based on their counsel. *Id.* at 50:4-15. Counsel for Mayor Adams registered the same objection. Neither party objected to an *amicus* motion filed by the organization Common Cause. *Id.* at 49:18-20 (DOJ "has no objection" to Common Cause motion); 54:15-55:9 (Mayor Adams objecting to Former U.S. Attorneys motion and taking no position on Common Cause motion).

### 3. Subsequent Orders and Mayor Adams's Second Motion to Dismiss

After the conference, on February 21, 2025, the Court issued an Order that directed next steps for resolution of the Rule 48(a) Motion. "In light of the Government's motion and the representations of the parties during the conference," the Court adjourned *sine dine* Mayor Adams's trial and all other deadlines set forth in the previous Order setting a pretrial schedule. Feb. 21 Order at 1, ECF No. 136. "[T]o assist with its decision-making via an adversarial process," the Court also "exercise[d] its inherent authority to appoint Paul Clement of Clement & Murphy PLLC as *amicus curiae* to present arguments on the Government's Motion to Dismiss." *Id.* at 3.[21] Specifically, the Court ordered *amicus* and the parties to address:

1) The legal standard for leave to dismiss an indictment under Rule 48(a);

2) Whether, and to what extent, a court may consider materials other than the Rule 48(a) motion itself;

3) Under what circumstances, if any, additional procedural steps and/or further inquiry would be appropriate before resolving a Rule 48(a) motion;

---

[21] The Court extends its gratitude to Mr. Clement for his service, and for his thorough, careful, and thoughtful analysis. He has ably discharged his responsibilities.

Case 1:24-cr-00556-DEH   Document 177-2   Filed 04/02/25   Page 246 of 578
Case 1:24-cr-00556-DEH   Document 172   Filed 04/02/25   Page 24 of 57
PageID #: 883

> 4) Under what circumstances, if leave is granted, dismissal should be with or without prejudice;
>
> 5) If leave were denied under Rule 48(a), what practical consequences would follow . . . ; and
>
> 6) Any other issues the parties or *amicus* consider relevant to the Court's resolution of the Government's motion.

*Id.* at 3-4. Given "concerns raised by the parties regarding the Mayor's responsibilities and the burden of continued court appearances," the Court informed Mayor Adams that, while he "has a right to appear at any future proceedings, he need not do so given the current procedural posture" of his case. *Id.* at 4 (citing Rule 43(b)(3)).

Later that day, Mayor Adams filed a letter describing "recent out-of-court statements" by the Attorney General and DOJ Chief of Staff Chad Mizelle that Adams says "constitute admissions of a party opponent under the Federal Rules of Evidence." Def.'s Feb. 21, 2025 Letter at 1, ECF No. 137 (citing Fed. R. Evid. 801(d)(2)). According to the letter, the Attorney General "described the indictment in this case as 'incredibly weak,' and said that the charges against the Mayor were so weak she doubted prosecutors could secure a guilty verdict." *Id.* Mr. Mizelle likewise stated in a post on social media that "[t]he case against Mayor Adams was just one in a long history of past DOJ actions that represent grave errors of judgement" and that "[d]ismissing the prosecution was absolutely the right call." *Id.*

On February 26, 2025, Mayor Adams filed a motion seeking an "order dismissing the indictment with prejudice." ECF No. 140 at 1. In support of his motion, Mayor Adams argues that the publication of the Sassoon Letter caused him "extreme prejudice" because, among other things, it "disclosed that Southern District prosecutors were seeking to reindict" him. Def.'s Mem. Supp. Mot. to Dismiss for Prosecutorial Misconduct ("Adams's Second Mot. to Dismiss") at 1, 4-5, ECF No. 141. Adams described publication of the Sassoon Letter as "constitut[ing] grave prosecutorial misconduct" warranting dismissal with prejudice. *Id.* at 1, 8, 15. In response, this

24

Case 1:24-cr-00556-DEH   Document 177-2   Filed 04/02/25   Page 486 of 593
Case 1:24-cr-00556-DEH   Document 177-2   Filed 04/02/25   Page 25 of 57
PageID #: 884

Court issued an Order on February 27, 2025 instructing DOJ to file any opposition to Mayor Adams's motion by March 7, 2025. Order, ECF No. 144. No such opposition was filed.

On March 7, 2025, DOJ, Mayor Adams, and Court-appointed *amicus* Mr. Clement submitted their respective briefs. *See* ECF Nos. 159, 160, and 162. DOJ also submitted a motion seeking to seal various exhibits appended to its brief. *See* Letter Mot. to Seal, ECF No. 161. DOJ represented that the exhibits, which consist of communications involving former members of the USAO-SDNY prosecution team, show "troubling conduct at the U.S. Attorney's Office for the Southern District of New York." DOJ's Response in Further Supp. of Mot. to Dismiss Pursuant to Rule 48(a) ("DOJ Br.") at 1, ECF No. 160.[22]

On March 11, 2025, the Court issued an Order granting leave to file *amicus* briefs by various represented individuals and entities[23] and denying such motions submitted by *pro se* individuals. *See* Order, ECF No. 166. A Scheduling Order issued the same day adjourned oral argument as unnecessary. *See* Scheduling Order, ECF No. 167.

On March 18, the Court issued an Order granting in part and denying in part DOJ's Motion to Seal and directing DOJ to file the exhibits to its brief on the public docket with only phone numbers and email addresses redacted. *See* Order, ECF No. 174. On March 25, DOJ did so. *See* ECF No. 175.

---

[22] A letter filed on the docket by Common Cause indicates that, on the same day that Acting DAG Bove filed this brief, the New York Times reported that the remaining AUSAs on the case, Celia Cohen and Andrew Rohrbach, "were put on administrative leave by the Justice Department." ECF No. 164 at 2.

[23] These motions were filed by: Common Cause (ECF Nos. 124, 125, 127); Former United States Attorneys (ECF No. 128); the Separation of Powers Clinic at The Catholic University of America's Columbus School of Law (ECF No. 143); Lt. General Michael Flynn (ret.), *et al*. (ECF No. 147); Former Federal Court Jurists (ECF No. 150); and State Democracy Defenders Fund, *et al*. (ECF No. 152). The parties did not object to these motions, with the exception of the motion filed by Former United States Attorneys. Order at 1, ECF No. 166. The Court appreciates the perspectives expressed by all *amici.*

## LEGAL STANDARD

"Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought." *Newman v. United States*, 382 F.2d 479, 480 (D.C. Cir. 1967) (Burger, J.). "Subject to constitutional constraints, such as prohibitions against invidious discrimination or vindictive prosecution," the decision to bring a prosecution generally rests entirely within the executive's discretion. *United States v. Blaszczak*, 56 F.4th 230, 237 (2d Cir. 2022). But "once the [executive] has involved the judiciary by obtaining an indictment or a conviction, its discretion is tempered by the courts' independent obligations." *Id.* at 259 (Sullivan, J., dissenting).

By requiring "leave of court" for dismissals by the government, the Federal Rules of Criminal Procedure deliberately altered the common-law rule, under which a prosecutor could "enter a *nolle prosequi* in his discretion, without any action by the court." Fed. R. Crim. P. 48(a) advisory committee's note to 1944 adoption 1.[24]  "Rule 48(a)'s requirement of judicial leave,

---

[24] The Advisory Committee tasked with drafting the Rules initially proposed a minor variation on the common-law rule, adding only that the government must state its reasons for dismissal. *See United States v. Ammidown*, 497 F.2d 615, 620 (D.C. Cir. 1973). But the Justices ultimately "substituted the requirement that dismissal be obtained only by leave of court." *Id.* The Court did not publicly explain its rationale for adding the "leave of court" requirement, *see Rinaldi v. United States*, 434 U.S. 22, 29 n.15 (1977), but internal memoranda offer some insight into its thinking. In a memorandum in response to the preliminary draft of the Rules, the Justices noted that the draft rule "apparently gives the Attorney General or the United States Attorney unqualified authority to *nolle pros* a case without consent of the court," and asked: "Is this now the law, and in any event should it be the law, any more than that the Government can confess error in a criminal case without the consent of the court?" *Memorandum from the Sup. Ct. to the Advisory Comm. on the Fed. Rules of Crim. Proc.* 7 (June 10, 1942) (citing *Young v. United States*, 315 U.S. 257 (1942)), *in* 1 *Drafting History of the Federal Rules of Criminal Procedure* at 13, 19 (Madeleine J. Wilken & Nicholas Triffin eds., 1991). A later memorandum, in response to the second preliminary draft, noted that "[t]wo members of the Court think that the United States Attorney should not be permitted to dismiss an indictment without the consent of the court." *Memorandum with Suggestions with Reference to the Proposed Rules of Criminal Procedure* 5 (Apr. 11, 1944), *in* 7 *Drafting History of the Federal Rules of Criminal Procedure*, *supra*, at 5, 9.

26

Case 1:24-cr-00556-DEH   Document 177-2   Filed 04/02/25   Page 74 of 87
Case 1:24-cr-00556-DEH   Document 127-2   Filed 04/02/25   Page 27 of 78
PageID #: 886

theretofore known in state practice, gives the court a role in dismissals following indictment." *United States v. Ammidown*, 497 F.2d 615, 620 (D.C. Cir. 1973). As explained below, the Rule has both procedural and substantive dimensions, both of which inform a court's decision to grant or deny dismissal and, if dismissal is granted, whether it should be with or without prejudice.

### A. Background on Rule 48(a)

The Supreme Court has addressed the contours of Rule 48(a) on only one occasion: in a summary disposition in *Rinaldi v. United States*, 434 U.S. 22 (1977).[25] There, in a footnote, the Court explained that the words "leave of court" "obviously vest some discretion in the court," but noted that the precise scope of that discretion had "not been delineated." *Id.* at 29 n.15. The Court observed that "[t]he principal object of the 'leave of court' requirement is apparently to protect a defendant against prosecutorial harassment, *e.g.*, charging, dismissing, and recharging, when the Government moves to dismiss an indictment over the defendant's objection." *Id.* (first citing *United States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965), and then citing *Woodring v. United States*, 311 F.2d 417, 424 (8th Cir. 1963)). But the Court also noted that some lower courts had held Rule 48(a) "to permit the court to deny a Government dismissal motion to which the defendant has consented if the motion is prompted by considerations clearly contrary to the public interest." *Id.* (first citing *United States v. Cowan*, 524 F.2d 504, 512 (5th Cir. 1975); and then citing *Ammidown*,

---

[25] In *Rinaldi*, the government moved to dismiss the petitioner's indictment after conviction, arguing that the prosecution had been initiated in violation of the longstanding federal policy against duplicative state and federal prosecutions. 434 U.S. at 24-25 (citing *Petite v. United States*, 361 U.S. 529 (1960), after which the government maintained its policy against duplicative prosecutions). The district court denied the motion to dismiss, and the court of appeals affirmed, reasoning that the prosecutor's misrepresentations regarding his authorization to pursue the case were incompatible with the public interest. *Id.* at 25-27, 30. The Supreme Court disagreed and reversed, explaining that "[t]he salient issue . . . is not whether the decision to maintain the federal prosecution was made in bad faith but rather whether the Government's later efforts to terminate the prosecution were similarly tainted with impropriety." *Id.* at 30.

497 F.2d at 620). The Court ultimately found it "unnecessary to decide whether the court has

discretion under these circumstances," as it would not have affected the outcome in the case. *Id.*[26]

Lower courts before and after *Rinaldi* have taken care to acknowledge the narrow scope of

their discretion under Rule 48(a), stressing that a court is "not free to substitute its judgment for

that of the prosecutor," *United States v. Poindexter*, 719 F. Supp. 6, 10 (D.D.C. 1989), who is

entitled to a "presumption that he is acting in good faith and in the proper discharge of his duties,"

*United States v. Greater Blouse, Skirt & Neckwear Contractors Ass'n*, 228 F. Supp. 483, 486

(S.D.N.Y. 1964). But that presumption "is not conclusive upon the Court; otherwise there would

be no purpose to Rule 48(a)." *Id.* Courts—including the Second Circuit—have therefore agreed

that Rule 48(a) requires more of a court than to "serve merely as a rubber stamp for the prosecutor's

decision." *Ammidown*, 497 F.2d at 622; *see also United States v. HSBC Bank USA, N.A.*, 863 F.3d

125, 141 (2d Cir. 2017) (quoting *Ammidown*, 497 F.2d at 622). Rule 48(a) asks courts to strike a

delicate balance—deferring to executive discretion where appropriate but protecting against

executive overreach in limited circumstances. As the Fifth Circuit explained in its influential

decision in *Cowan*, later quoted by the Fourth and Second Circuits:

> Rule [48(a)] was not promulgated to shift absolute power from the Executive to the
> Judicial Branch. Rather, it was intended as a power to check power. The Executive
> remains the absolute judge of whether a prosecution should be initiated and the first
> and presumptively the best judge of whether a pending prosecution should be
> terminated. The exercise of its discretion with respect to the termination of pending
> prosecutions should not be judicially disturbed unless clearly contrary to manifest
> public interest. In this way, the essential function of each branch is synchronized to
> achieve a balance that serves both practical and constitutional values.

*Blaszczak*, 56 F.4th at 240 (quoting *United States v. Smith*, 55 F.3d 157, 158-59 (4th Cir. 1995) (in

turn quoting *Cowan*, 524 F.2d at 513)). Rule 48(a) thus contemplates a division of labor consistent

---

[26] In dissent, Justice Rehnquist, joined by Justice White, expressed his view that the "leave
of court" proviso "would seem clearly directed toward an independent judicial assessment of the
public interest in dismissing the indictment." *Id.* at 34 (Rehnquist, J., dissenting).

with the constitutional design, which "enjoins upon its branches separateness but interdependence, autonomy but reciprocity," *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring).

## B.      Rule 48(a)'s Requirements

"Because the Second Circuit has had no opportunity to analyze the scope and discretion afforded by Rule 48(a), courts in this district have relied heavily on the holdings of other Circuits." *United States v. Doody*, No. 01 Crim. 1059, 2002 WL 562644, at *2 (S.D.N.Y. Apr. 16, 2002). The D.C. Circuit in *Ammidown*, synthesizing much of the early caselaw on Rule 48(a), explained that the Rule contains both procedural and substantive components. As a matter of procedure, "the court will not be content with a mere conclusory statement by the prosecutor that dismissal is in the public interest, but will require a statement of reasons and underlying factual basis." 497 F.2d at 620. And as a matter of substance, "the court does not have primary responsibility, but rather the role of guarding against abuse of prosecutorial discretion." *Id.*

Ultimately, a court's inquiry is narrow. Only "[r]arely will the judiciary overrule the Executive Branch's exercise" of its discretion "to eschew or discontinue prosecutions." *Blaszczak*, 56 F.4th at 238. But critically, courts have noted that whether a defendant consents to dismissal is not dispositive. *See, e.g.*, *United States v. Hamm*, 659 F.2d 624, 629 (5th Cir. 1981) (holding that a court may deny dismissal "even when the defendant consents to the motion to dismiss").[27]

### 1.      Procedural Requirements

Rule 48(a) requires that the government set forth the basis for its motion to dismiss. As Judge Weinfeld explained,

---

[27] *But see In re United States*, 345 F.3d 450, 453 (7th Cir. 2003) ("[I]t is hard to see . . . how [a court] could properly refuse to dismiss a prosecution merely because [it] was convinced that the prosecutor was acting in bad faith or contrary to the public interest.").

the Rule contemplates public exposure of the reasons for the abandonment of an indictment, information or complaint in order to prevent abuse of the uncontrolled power of dismissal previously enjoyed by prosecutors. Accordingly, to gain the Court's favorable discretion, it should be satisfied that the reasons advanced for the proposed dismissal are substantial and the real grounds upon which the application is based.

*Greater Blouse*, 228 F. Supp. at 486; *see also United States v. Rosenberg*, 108 F. Supp. 2d 191, 204-05 (S.D.N.Y. 2000) (same). Numerous courts of appeals have adopted similar reasoning. *See In re Richards*, 213 F.3d 773, 788 (3d Cir. 2000) (acknowledging that "a judge's discretion under Rule 48(a) is severely cabined," but describing "Rule 48(a) as a 'sunshine' provision that exposes the reasons for prosecutorial decisions"); *United States v. Salinas*, 693 F.2d 348, 352 (5th Cir. 1982) ("Although the burden of proof is not on the prosecutor to prove that dismissal is in the public interest, the prosecutor is under an obligation to supply sufficient reasons—reasons that constitute more than a mere conclusory interest [supporting dismissal]."); *United States v. Derr*, 726 F.2d 617, 619 (10th Cir. 1984) ("[T]o honor the purpose of the rule, the trial court at the very least must know the prosecutor's reasons for seeking to dismiss the indictment and the facts underlying the prosecutor's decision."); *Ammidown*, 497 F.2d at 620 ("Rule 48(a)'s requirement of judicial leave . . . contemplates exposure of the reasons for dismissal.").

The reason for requiring the government to state its actual reasons for seeking dismissal is simple: "Since the court must exercise sound judicial discretion in considering a request for dismissal, it must have sufficient factual information supporting the recommendation." 3B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 802 (4th ed. June 2024 update). Put another way, a district court abuses its discretion if it does not articulate its reasons for granting or denying leave, and it cannot discharge its duties properly unless the underlying motion accurately states the government's reasons for dismissal. *See Derr*, 726 F.2d at 619 ("If the record contains no reasons or facts explaining the trial court's decision, the trial court's decision

is effectively unreviewable."). Thus, although the court must presume good faith on the part of

the prosecutor, it need not accept an "an unsupported conclusory reason" for seeking dismissal.

*Salinas*, 693 F.2d at 352. Courts may deny Rule 48(a) motions on that basis, or if the proffered

reason is not the real reason for dismissal. *See, e.g.*, *United States v. Olmos-Gonzales*, 993 F.

Supp. 2d 1234, 1236 (S.D. Cal. 2014) (denying Rule 48(a) motion without prejudice to refiling

where government had provided only conclusory reasons for dismissal); *Rosenberg*, 108 F. Supp.

2d at 208 (inquiring into whether proffered reasons for dismissal were the real reasons).

Consistent with the procedural requirements of Rule 48(a), courts have looked beyond the

four corners of the motion to consider the entire record before the court—occasionally even

conducting hearings—to determine if dismissal is warranted. *See, e.g.*, *Rinaldi*, 434 U.S. at 30

(finding no bad faith on the part of the government after conducting an "examination of the

record"[28]); *see also id.* at 23 (concluding that summary disposition was appropriate based on

---

[28] The proceedings below in *Rinaldi* included various hearings at which the district court questioned the government on its reasons for bringing the prosecution and later requesting dismissal. *See, e.g.*, 434 U.S. at 24 (noting that "the District Court questioned Government counsel regarding the need for another trial in view of petitioner's state convictions" and "Government counsel responded that he had been instructed by his superiors at the Department of Justice to pursue the federal prosecution vigorously because of their concern that the state convictions might be reversed on appeal"). As the district court described the record:

> At the hearing on the motion to dismiss the indictments, the government reported that the policy statement is not contained in either the United States Code or in the Federal Register, but rather is found in the United States Attorney's Manual. The Manual is only available to government attorneys, and the court and defense counsel do not have access to its contents. The government also stated at the hearing that at no time during the first trial, which ended in a mistrial, or during the second trial, which resulted in the conviction of these defendants, was the policy, or its violation, ever brought to the court's attention. In fact, the court specifically inquired of the special trial attorney sent to Miami from Washington by the Department of Justice to try this case, why the government was insisting on a federal trial of these defendants. Government's trial counsel advised the court that the Department of Justice was adamant in their decision that the federal trial proceed because there was grave concern that the state convictions would be reversed on appeal. The Department of Justice trial attorney, at a special conference

"independent evaluation of the unusual circumstances disclosed by this record"); *HSBC*, 863 F.3d at 141 (noting that a monitor's report could "indeed be relevant in determining whether to grant an eventual Rule 48(a) motion," for example if there were "circumstances that suggest that the motion is being made in bad faith, thereby raising a question as to whether dismiss[al] . . . would be 'clearly contrary to manifest public interest'" (quoting *United States v. Pimentel*, 932 F.2d 1029, 1033 n.5 (2d Cir. 1991))); *Salinas*, 693 F.2d at 352 ("We turn to the record for evidence of the prosecutor's motivation."); *In re Richards*, 213 F.3d at 787-88 (holding that territorial court considering Rule 48(a) motion "had discretion to hold a hearing on the parties' claims, especially in light of the checkered course of the case up to that point").

### 2. Substantive Requirements

With respect to Rule 48(a)'s substantive requirements, courts have cited the protection of a defendant's rights, a prosecutor's bad faith, and the public interest as relevant concerns. Courts have "agreed that the primary purpose of the rule is protection of a defendant's rights." *Salinas*, 693 F.2d at 351.[29] The Second Circuit, for example, has twice quoted *Rinaldi*'s language that the

---

called for the purpose of discussing the offer of at least one defendant to plead guilty, stated that the Department's position was that it could not agree to any plea involving concurrent confinement, and he had been instructed to proceed with the trial. Under those circumstances, it is clear the Department of Justice was completely aware of the proceedings in the Southern District of Florida.

*United States v. Washington*, 390 F. Supp. 842, 843 (S.D. Fla. 1975), *aff'd sub nom. In re Washington*, 531 F.2d 1297 (5th Cir. 1976), *aff'd on reh'g*, 544 F.2d 203 (5th Cir. 1976), *cert. granted, judgment vacated sub nom. Rinaldi*, 434 U.S. 22 (1977).

[29] Some have disputed that protection against harassment was the principal purpose of the "leave of court" requirement. *See* Thomas Ward Frampton, *Why Do Rule 48(a) Dismissals Require "Leave of Court"?*, 73 Stan. L. Rev. Online 28, 29 (2020) ("In fact, the 'principal object' of Rule 48(a)'s 'leave of court' requirement was not to protect the interests of individual defendants, but rather to guard against dubious dismissals of criminal cases that would benefit powerful and well-connected defendants." (footnote omitted)). The precise origin of the now-prevalent idea that the principal purpose is "to protect a defendant against prosecutorial harassment" is unclear: The footnote in *Rinaldi* cited two courts of appeals opinions that had

32

"principal object" of the Rule is "apparently to protect a defendant against prosecutorial harassment." *See HSBC*, 863 F.3d at 141; *Blaszczak*, 56 F.4th at 238.

But lower courts have disagreed about the extent to which considerations of "bad faith" or the "public interest" can also inform the decision whether to grant leave under Rule 48(a). Courts addressing these factors generally fall into two camps:

- The Fourth, Fifth, and the Eighth Circuits have treated prosecutorial bad faith and the public interest as two sides of the same coin. *See, e.g.*, *Smith*, 55 F.3d at 159 (stating that "[a] motion that is not motivated by bad faith is not clearly contrary to manifest public interest, and it must be granted," and that "[t]he disservice to the public interest must be found, if at all, in the motive of the prosecutor"); *United States v. Bernard*, 42 F.4th 905, 909 (8th Cir. 2022) ("For a dismissal to be 'clearly contrary to manifest public interest,' the prosecutor must have had an illegitimate motive rising to the level of bad faith."); *Hamm*, 659 F.2d at 629-631 (explaining that "the trial judge must look to the motivation of the prosecutor at the time of the decision to dismiss" and that "[a]s long as it is not apparent that the prosecutor was motivated by considerations clearly contrary to the public interest, his motion must be granted").

- The Tenth Circuit and some district courts, including in this District, have spoken of the public interest in terms that go beyond the motive of the prosecutor. *See, e.g.*, *United States v. Carrigan*, 778 F.2d 1454, 1463 (10th Cir. 1985) ("Rule 48(a) . . . permits courts faced with dismissal motions to consider the public interest in the fair administration of criminal justice and the need to preserve the integrity of the courts."); *Rosenberg*, 108 F. Supp. 2d at 206 (considering "the motivations of the prosecutor, the effects of dismissal, including whether the dismissal is with or without prejudice, on the defendant, and the public interest, more generally, when evaluating the nolle"); *United States v. Flynn*, 507 F. Supp. 3d 116, 129-30 (D.D.C. 2020) (holding that, "consistent with our system of checks and balances, courts are tasked with making their own determination on whether dismissal would be in the 'public interest'" (quoting *Rinaldi*, 434 U.S. at 29 n.15)).

---

reached that conclusion via minimal analysis. *See* 434 U.S. at 29 n.15. *Rinaldi*'s first citation, *United States v. Cox*, declared that "[t]he purpose of the Rule is to prevent harassment of a defendant by charging, dismissing and re-charging without placing a defendant in jeopardy," citing only *Woodring v. United States*—the other case cited by *Rinaldi*—as authority for that proposition. 342 F.2d at 171. *Woodring*, in turn, made that same pronouncement without citing to any authority. *See* 311 F.2d at 424. By contrast, *United States v. Cowan* conducted a far more in-depth analysis of Rule 48(a)'s drafting, concluding that "the history of the Rule belies the notion that its only scope and purpose is the protection of the defendant." 524 F.2d at 512, 515 (reversing district court's decision to deny motion to dismiss).

While DOJ argues that the Second Circuit is in the first camp (*i.e.*, that the public interest and good faith prongs are identical), *see* DOJ Br. at 5-6, the Circuit has not definitively ruled out either of the above approaches. In *Pimentel*, the Second Circuit "suggested (in dictum) that any authority a court might have to deny a Rule 48(a) motion would be limited to cases in which dismissal is 'clearly contrary to manifest public interest.'" *HSBC*, 863 F.3d at 141 (quoting *Pimentel*, 932 F.2d at 1033 n.5). In a subsequent case, *HSBC*, the Circuit noted that *other* courts had "'equat[ed] a dismissal that is clearly contrary to the public interest with one in which the prosecutor appears motivated by bribery, animus towards the victim, or a desire to attend a social event rather than trial'—in other words, bad faith." *Id.* (quoting *In re Richards*, 213 F.3d at 787-88); s*ee also Blaszczak*, 56 F.4th at 240-41 (quoting *Smith*, 55 F.3d at 159, for the proposition that "[t]he disservice to the public interest must be found, if at all, in the motive of the prosecutor"). But *HSBC* made clear that it ultimately declined to define "the precise contours of a district court's authority in resolving a Rule 48(a) motion." 863 F.3d at 141; *see also Blaszczak*, 56 F.4th at 258 (Sullivan, J., dissenting) (describing the majority's lengthy discussion of prosecutorial discretion (including, presumably, its discussion of Rule 48(a)) as "dicta")

For his part, Mayor Adams argues that courts are not authorized to consider the public interest in adjudicating a Rule 48(a) motion because "[n]othing in the language of the rule states that a district court is empowered to undertake a general inquiry into the public interest." Mayor Adams's Mem. Supp. Gov't Mot. Dismiss ("Adams Br.") at 10, ECF No. 162. That argument goes too far. The text of the Rule does not specify *any* factors to guide the Court's decision whether to grant or deny leave—even the rights of the defendant, which all agree is a relevant consideration under Rule 48(a). In any event, Mayor Adams's argument finds no support in caselaw, and it runs counter to judicial interpretations of the Rule, including the Supreme Court's decision in *Rinaldi*,

referencing the public interest as a factor that courts have considered in ruling on Rule 48(a) motions.  434 U.S. at 29 n.15.

Whatever the precise relevance of the "public interest" to a court's inquiry under Rule 48(a),  there is broad agreement that any judicial authority here is exceedingly narrow, and the requirement of leave of court is not a license for free-wheeling oversight of prosecutorial discretion.  Few courts have denied a Rule 48(a) motion based on the court's independent assessment of the public interest—indeed, there appears to be only one decision in this District doing so.  *See United States v. N.V. Nederlandsche Combinatie Voor Chemische Industrie*, 75 F.R.D. 473, 474-75 (S.D.N.Y. 1977) (denying Rule 48(a) motion on basis that "to allow the government unilaterally to terminate a nine-year[-]old indictment of the greatest public significance would be 'clearly contrary to manifest public interest'" (quoting *Cowan*, 524 F.2d at 513)); *see also United States v. Freedberg*, 724 F. Supp. 851, 854 (D. Utah 1989) (declining to grant leave under Rule 48(a) where "dismissal of the charges against the individual defendant would be contrary to the manifest public interest").

Ultimately, the Court does not in this Opinion attempt to define the boundaries of permissible inquiry into the public interest, which, as explained below, is unnecessary to the Court's decision given the unique facts of this case.

### D.    Remedies for a Substantively Deficient Motion under Rule 48

We now come to the question of what remedies a court has at its disposal if the government's motion to dismiss is found wanting.  Where a substantively deficient Rule 48(a) motion is brought by an individual prosecutor, a court's denial of the motion could presumably cause the government to make a new determination as to whether the prosecution should continue. For example, if a line prosecutor were "motivated by bribery, animus towards the victim, or a desire to attend a social event rather than trial," *HSBC*, 863 F.3d at 141 (quoting *In re Richards*,

Case 1:24-cv-03365-DEH   Document 177-2   Filed 04/02/25   Page 36 of 78
Case 1:24-cv-03365-DEH   Document 177-2   Filed 04/22/25   Page 640 of 593
PageID #: 895

213 F.3d at 787-88), judicial exposure of such substantively invalid reasons might prompt

reassignment of the matter to another attorney or division. *See In re United States*, 345 F.3d 450,

454 (7th Cir. 2003). After a reassessment of the case, the prosecution might then continue; or, if

a fresh look reveals legitimate reasons for dismissal, it might not. But in denying the motion, the

court would play a fundamentally judicial role, reviewing "the reasons advanced for the proposed

dismissal" and determining whether they are "substantial." *Greater Blouse*, 228 F. Supp. at 486-

87. The executive, in turn, would decide, based on the record exposed by the court, whether to

continue the prosecution. Such a division of responsibilities respects the role of each branch in

our constitutional system.

But it is a different story when the executive branch has decided, at the highest levels of

DOJ, to abandon a prosecution. Although courts have discretion to deny dismissal altogether, they

are "nevertheless constitutionally powerless to compel the government to proceed." *Cowan*, 524

F.2d at 511. "If a Rule 48(a) motion is denied, the government can refuse to bring the case to trial

within the time limits of the Speedy Trial Act, in which case the court has no choice except to

dismiss." 3B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 802 n.5

(4th ed. June 2024 update) (citing *United States v. N.V. Nederlandsche Combinatie Voor

Chemische Industrie*, 453 F. Supp. 462, 462-63 (S.D.N.Y. 1978)). As Judge Weinfeld explained:

> Should the motion be denied, what next? The Attorney General is the head of the
> Department of Justice, a part of the Executive branch of the Government. Even
> were leave of Court to the dismissal of the indictment denied, the Attorney General
> would still have the right to adhere to the Department's view that the indictment
> cannot be supported by proof upon a trial of the merits, and accordingly, in the
> exercise of his discretion, decline to move the case for trial. The Court in that
> circumstance would be without power to issue a mandamus or other order to compel
> prosecution of the indictment, since such a direction would invade the traditional
> separation of powers doctrine. And if the indictment continues to remain in status
> quo, each defendant would be in a position to move for dismissal of the indictment
> under Rule 48(b).

*Greater Blouse*, 228 F. Supp. at 489-90. Where an unequivocal decision to dismiss has been made at the highest institutional levels, "a judge could not possibly win a confrontation with the executive branch over its refusal to prosecute." *In re United States*, 345 F.3d at 454.

That precise scenario played out in *Nederlandsche*, the one case in this District in which a court denied a Rule 48(a) motion on public interest grounds. There, the government—after denial of its motion to dismiss—simply chose not to further prosecute the defendant. *Nederlandsche*, 453 F. Supp. at 462-63. Around one year later, the defendant moved to dismiss the indictment on, essentially, speedy trial grounds. *Id.* at 462. The court reluctantly granted the defendant's motion to dismiss, stating that it did so "despite its continuing conviction that the interests of justice ha[d] been here ill-served." *Id.* at 463.

The possibility of such an impasse is a product of design. In our system of separation of powers, the role of the judiciary is to "say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803), not to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3. More specifically, courts are "particularly ill-suited" to weigh the factors typically relevant in determining whether to pursue prosecution, such as "as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan." *Wayte*, 470 U.S. at 607. The judicial role is to preside over a case; it is not to decide whether the case "should" continue. This is not simply a matter of comparative institutional competence. It also reflects "[t]he structural principles secured by the separation of powers," which "protect the individual as well." *Bond v. United States*, 564 U.S. 211, 222 (2011).

This is why, "[e]ven if a federal judge could properly deny . . . a motion to dismiss a criminal charge, it would not follow that he could appoint a prosecutor." *In re United States*, 345 F.3d at 454. Although various *amici* argue that a court can appoint a special prosecutor upon

denial of a Rule 48(a) motion, *see* Br. of *Amici* Former United States Att'ys at 14, ECF No. 128-1; Former Federal Jurists Br. at 12-13, they generally rely on authority in the contempt-of-court context, which presents markedly different considerations. The Supreme Court has explained that "courts possess *inherent authority* to initiate contempt proceedings for disobedience to their orders, authority which necessarily encompasses the ability to appoint a private attorney to prosecute the contempt." *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 793 (1987) (emphasis added).[30]  *Amici* cite no authority for, or examples of, a district court appointing a private prosecutor in a criminal case outside the contempt context.[31]

Thus, while a court could, in theory, deny a Rule 48(a) motion even when made at the direction of DOJ leadership, such a denial would almost certainly be an exercise in futility. The court cannot appoint its own prosecutor; absent a sudden change of heart at DOJ, such a denial would produce only a staring contest, followed by an inevitable dismissal on speedy trial grounds after seventy days. *See* 18 U.S.C. § 3161(c)(1) ("In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days.").

---

[30] *Accord United States v. Donziger*, 38 F.4th 290, 304 (2d Cir. 2022) (upholding appointment of a special prosecutor in contempt proceeding); Fed. R. Crim. P. 42(a)(2) ("The court must request that the contempt be prosecuted by an attorney for the government, unless the interest of justice requires the appointment of another attorney. If the government declines the request, the court must appoint another attorney to prosecute the contempt.").

[31] In *Morrison v. Olson*, the Supreme Court held that it was not "impermissible for Congress to vest the power to appoint independent counsel in a specially created federal court" through the short-lived Independent Counsel Act, and specifically rejected the contention that "there is an inherent incongruity about a court having the power to appoint prosecutorial officers." 487 U.S. 654, 676 (1988); *see also* Former Federal Jurists Br. at 12.  But it does not follow that a court has *inherent* power to appoint a special prosecutor in a criminal case absent such a congressional grant of authority.

Case 1:25-cv-00556-DKE   Document 17-2   Filed 04/02/25   Page 50 of 78
Case 1:24-cr-00556-DKE   Document 177   Filed 04/07/25   Page 39 of 78
PageID #: 898

### F.    Dismissal With or Without Prejudice

Notwithstanding the significant limitations on a court's authority to deny a Rule 48(a) motion to dismiss altogether, a court retains discretion to determine whether a dismissal should be with or without prejudice.  Typically, a dismissal under Rule 48(a) "is without prejudice to the government's right to reindict for the same offense, unless the contrary is expressly stated." *United States v. Ortega-Alvarez*, 506 F.2d 455, 458 (2d Cir. 1974).  But if appropriate in light of the purposes of Rule 48(a), a court can grant the motion on the condition that dismissal be *with prejudice*—ensuring that the charges, once dropped, cannot be resurrected.  The First, Seventh, and Tenth Circuits have either affirmed such dismissals or otherwise endorsed the practice.  *See In re United States*, 345 F.3d at 453 (observing that in a case of prosecutorial harassment under Rule 48(a), "the judge might rightly condition dismissal on its being with prejudice"); *United States v. Raineri*, 42 F.3d 36, 43 (1st Cir. 1994) (given concerns that a future reindictment would constitute harassment, considering "itself order[ing] that the dismissal be modified to reflect that it is a dismissal with prejudice," and citing another court's explanation "that a court may dismiss under Rule 48(a) with prejudice if retrial would be fundamentally unfair"); *Derr*, 726 F.2d at 619 (affirming district court's decision to dismiss a successive indictment following earlier dismissal without prejudice under Rule 48(a), "in effect altering the first dismissal to one with prejudice").[32] Numerous district courts have dismissed prosecutions with prejudice, even when the government seeks dismissal without it, to protect defendants from the unwarranted or inappropriate threat of re-indictment.[33]  *See* Adams Br. at 12 (arguing that "the most natural understanding of the function

---

[32] The Eleventh Circuit has disapproved this practice.  *See United States v. B.G.G.*, 53 F.4th 1353, 1367-69 (11th Cir. 2022).

[33] *See, e.g.*, *United States v. Erickson*, No. 19 Crim. 53-3, 2024 WL 81290, at *5, 10 (D.V.I. Jan. 8, 2024); *United States v. Madzarac*, 678 F. Supp. 3d 42, 44 (D.D.C. 2023); *United States v. Pitts*, 331 F.R.D. 199, 202, 206 (D.D.C. 2019); *United States v. Borges*, 153 F. Supp. 3d 216, 218-

of the leave-of-court requirement in Rule 48(a) is to enable a court to inquire into whether the dismissal should be with prejudice").

The Second Circuit has thus far declined to "rule out discretionary dismissals with prejudice" in similar contexts. *Hilbert v. Dooling*, 476 F.2d 355, 361 (2d Cir. 1973); *see also id.* at 363 (Friendly, C.J., dissenting) (stressing "the district judge's discretion" under Rule 48(b) "to dismiss either with or without prejudice as he deemed appropriate"). But the "Circuit has not specifically addressed" under what circumstances, if any, a court may dismiss an indictment with prejudice notwithstanding the government's request that dismissal be without prejudice. *United States v. Hernandez-Hernandez*, No. 18 Crim. 30, 2018 WL 4765129, at *2 (W.D.N.Y. Sept. 13, 2018), *report and recommendation adopted*, 2018 WL 4762255 (W.D.N.Y. Oct. 2, 2018).

In exercising their discretion to dismiss with prejudice under Rule 48(a), courts have generally looked to the same principles that motivate the "leave of court" requirement. In district courts for the District of Columbia, where Rule 48(a) is "routinely applied . . . to consider dismissal with prejudice," courts "take into account (1) the purpose of the government's dismissal, (2) the presence or absence of good faith, and (3) the objective effect that dismissal without prejudice would have on the defendant." *United States v. Madzarac*, 678 F. Supp. 3d 42, 48 (D.D.C. 2023). Courts in this District have had less occasion to consider the question, but they have tended to look to whether there is a risk of prosecutorial harassment from re-charging of the offense(s) or whether there is evidence of bad faith on the part of the prosecution. *See, e.g.*, *Doody*, 2002 WL 562644, at *2 (explaining that "[c]ourts dismiss cases under Rule 48(a) with prejudice or deny such motions

---

19 (D.D.C. 2015); *Poindexter*, 719 F. Supp. at 10-12; *United States v. Angilau*, No. 08 Crim. 431, 2012 WL 346446, at *14 (D. Utah Feb. 1, 2012), *aff'd in part, appeal dismissed in part*, 717 F.3d 781 (10th Cir. 2013); *United States v. Wecht*, No. 06 Crim. 26, 2008 WL 65605, at *5-6 (W.D. Pa. Jan. 4, 2008); *Government of Virgin Islands ex rel. Robinson v. Schneider*, 893 F. Supp. 490, 498 (D.V.I. 1995); *United States v. Rossoff*, 806 F. Supp. 200, 202-03 (C.D. Ill. 1992); *United States v. Fields*, 475 F. Supp. 903, 904, 908 (D.D.C. 1979).

only where the prosecutor acted in 'bad faith,' or where dismissal followed by recharge would amount to 'prosecutorial harassment'"); *see also* Adams Br. at 12 ("[I]t is reasonable to construe the leave-of-court requirement to enable the Court to inquire into . . . whether the dismissal should be with prejudice to prevent the sort of 'prosecutorial harassment' that the Supreme Court identified in *Rinaldi*.").

Thus, while bad faith is a relevant consideration, most courts do not require a finding of bad faith to grant dismissal with prejudice. *See, e.g.*, *Rosenberg*, 108 F. Supp. 2d at 206 (reviewing Rule 48(a) caselaw and concluding that "a finding of bad faith is not required, the defendant's objection to dismissal notwithstanding, but is a relevant, and sometimes determinative, factor in a court's evaluation of a motion to dismiss an indictment"); *Poindexter*, 719 F. Supp. at 11 (dismissing with prejudice and clarifying that "the subjective good faith of" the prosecutor was "not at issue"; rather, "the question is the effect on the defendant of a dismissal of charges followed by their reinstitution at a later date"); *cf. United States v. Goodson*, 204 F.3d 508, 516 (4th Cir. 2000) (holding that, on Rule 48(a) motion seeking dismissal without prejudice, a court can dismiss with prejudice on a finding of "demonstrable prejudice or [the] threat of prejudice" to the defendant, but reversing because the district court made no such finding).[34]

 Converting a dismissal without prejudice to one with prejudice does not raise the same separation-of-powers concerns as outright denial of a Rule 48(a) motion.  Where a court grants the government's motion to dismiss a case, it respects the executive branch's primacy in matters of prosecutorial discretion.  The determination of whether a dismissal should be with or without

---

[34] The Court is aware of decisions in the Ninth Circuit and the Western District of New York suggesting that a request for dismissal without prejudice under Rule 48(a) should only be converted to a dismissal with prejudice on a showing of bad faith.  *See United States v. Hayden*, 860 F.2d 1483, 1488 (9th Cir. 1988); *United States v. Mujahid*, 491 Fed. App'x 859, 860 (9th Cir. 2012); *United States v. Nix*, No. 15 Crim. 6126, 2017 WL 4641257, at *4 (W.D.N.Y. Oct. 13, 2017).

prejudice does not entail the kind of incursion on the executive branch that an order to pursue an unwanted prosecution would. *See* Adams Br. at 17 (arguing that a dismissal with prejudice "does not raise constitutional problems because it neither compels prosecution nor keeps a criminal case open indefinitely"). And deciding whether a dismissal should be with or without prejudice involves weighing considerations that, unlike the factors that are relevant to an exercise of prosecutorial discretion, are well within the judicial wheelhouse as a matter of institutional competence. *Cf. United States v. Giambrone*, 920 F.2d 176, 180 (2d Cir. 1990) (under Speedy Trial Act, "the matter of whether to dismiss with or without prejudice was a matter left to the district court's discretion"). Accordingly, dismissal with prejudice can be an appropriate judicial remedy to vindicate Rule 48(a)'s purposes, including protecting the rights of the defendant.

## DISCUSSION

DOJ seeks "dismissal *without prejudice* of the charges in this case." Rule 48(a) Mot. ¶ 1 (emphasis added). The effect of such a dismissal would not be akin to that of a presidential pardon, which, once accepted, "releases the wrongdoer from punishment and restores the offender's civil rights without qualification." *Flynn*, 507 F. Supp. 3d at 136. Instead, DOJ seeks to terminate the prosecution at this time, but it has confirmed that if its Motion were granted, Mayor Adams could be reindicted on the same charges in the future, with no clear limits on the grounds or timeline for reindictment. *See* Feb 19. Conf. Tr. at 12:14-23 (confirming that the only substantive limits would be "impermissible considerations, protect[ed] classes, things like that," and the only time limits would relate to "statute of limitations" and "speedy trial obligations" without specifying those limits). And the Government has not committed to halting any additional investigative steps with respect to Mayor Adams. *See id.* at 14:8-11. Instead, DOJ has represented that it, "in its discretion,

42

may or may not at some point revisit whether these charges are appropriate." *Id.* at 14:5-6.[35]  The

prospect of reindictment therefore "hangs like the proverbial Sword of Damocles over the

accused."  Am. Br. of Ct.-Appointed *Amicus Curiae* Paul D. Clement ("Clement Br.") at 1, ECF

No. 159.

The Court begins its discussion with the Government's Motion itself, and concludes that

the reasons articulated in it, when assessed in light of the purposes of Rule 48(a), counsel in favor

of dismissal *with prejudice* rather than without it.  The Court then turns to the criticisms of DOJ's

reasons for dismissal raised by various *amici* and concludes that while they have merit, they

ultimately point in favor of the same result: not denial of the Motion, but dismissal with prejudice.

## I.    The Government's Request for Dismissal *Without Prejudice*

The Court has considered the parties' submissions in light of the purposes of Rule 48(a),

and ultimately concludes that the form of relief DOJ seeks is inappropriate.  In reaching this

determination, the Court focuses its analysis on the submissions of the parties—written and

verbal—and does not consider additional factual materials submitted by *amici*.[36]  That is, leaving

---

[35]  During the February 19 Conference, DOJ acknowledged that in its February 10 Decisional Memo, its stated intention at that time was to revisit the matter upon the confirmation of a new U.S. Attorney for SDNY, but it also represented that this was not a condition of the Rule 48(a) Motion and that it does not "have any plans for that at this time."  Feb. 19 Conf. Tr. at 13:19-14:7.

[36]  DOJ's position appears to be that the Court's review of this request should be confined to the four corners of the Motion and "the sworn testimony and representations at the February 19 [conference]."  DOJ Br. at 13.  As discussed below, the Court is not convinced that judicial review under Rule 48(a) should necessarily be so constrained in every case.  Nevertheless, mindful of the presumption of good faith afforded to the Government and the Court's narrow discretion under Rule 48(a), the Court confines its analysis in this section of its Opinion along the lines suggested by DOJ, focusing on the papers filed by the parties—including not only DOJ's Rule 48(a) Motion, but also Mayor Adams's separate motion seeking dismissal of this case *with prejudice*, *see* Adams's Second Mot. to Dismiss—and the parties' representations at the February 19 conference before the Court.

aside factual submissions from various *amici*, the Court concludes that, under a proper application of Rule 48(a), dismissal of this case should be granted only if it is *with prejudice*.

Courts have generally agreed "that the primary purpose of [Rule 48(a)] is protection of a defendant's rights," including the right to be free from prosecutorial harassment. *Salinas*, 693 F.2d at 351. A court's discretion to condition its granting of a Rule 48(a) motion on dismissal being with prejudice is a critical means of fulfilling that purpose. "A court can determine whether the potential for harassment renders a dismissal with prejudice in the public interest by looking at the *purpose* of the government's dismissal and the *effect* it has on the defendant." *Madzarac*, 678 F. Supp. 3d at 46 (emphases added). Here, DOJ's Motion advances two grounds for dismissal: (1) "appearances of impropriety and risks of interference with the 2025 elections in New York City," and (2) "interfere[nce] with the defendant's ability to govern in New York City, which poses unacceptable threats to public safety, national security, and related federal immigration initiatives and policies." Rule 48(a) Mot. ¶¶ 5-6. Both rationales, if taken at face value, counsel in favor of dismissal with prejudice.

As articulated in the Rule 48(a) Motion, the "appearances of impropriety" rationale rests, in part, on allegedly improper statements by former U.S. Attorney Williams on his personal website and in an op-ed. *Id.* ¶ 5. To the extent that DOJ believes that the purported appearance of impropriety here is so severe that it warrants dismissal, then such concerns would be conclusively resolved only by dismissing the case permanently—that is, *with prejudice*. *See* Clement Br. at 22 ("[I]f political considerations improperly influenced the initial decision to seek the defendant's indictment, then dismissal with prejudice would definitively eliminate that taint."); *cf. United States v. Mancuso*, 302 F. Supp. 2d 23, 31 (E.D.N.Y. 2004) (dismissing case with prejudice in light of "significant governmental impropriety").

If, as DOJ asserts, this prosecution has been tainted with appearances of impropriety, it is unclear why the Government should be permitted to reinitiate the case in the future.  To the extent DOJ might argue that any whiff of impropriety could fade over time, such that it could bring a new (and untainted) prosecution based on the charges in the Indictment, that would entail precisely the kind of prosecutorial harassment that Rule 48(a) is meant to guard against.  "[T]he question is not whether the government was acting in bad faith, but rather whether the actions of the government objectively amounted to harassment."  *Madzarac*, 678 F. Supp. 3d at 46 (quoting *United States v. Pitts*, 331 F.R.D. 199, 203 (D.D.C. 2019)).  And it would "objectively amount to harassment . . . to allow the prosecutor to dismiss charges but nevertheless keep them in abeyance for an indefinite period of time in the hope or expectation that something will turn up to remove the complications" of the initial prosecution.  *Poindexter*, 719 F. Supp. at 11; *see also Madzarac*, 678 F. Supp. 3d at 51 (explaining that "the operative question is whether dismissal without prejudice would lead to the government 'commencing another prosecution at a different time or place deemed more favorable to the prosecution'" (quoting *Ammidown*, 497 F.2d at 620)).  Here, although DOJ disclaims any concrete plan to reassess the case, its proposal—which would allow it to hold out the possibility of reindictment in the hopes that the purported taint of impropriety might eventually fade, thereby putting the government in a more favorable position to try a second time— "objectively amount[s] to harassment" under Rule 48(a).  *Poindexter*, 719 F. Supp. at 11.

DOJ's second rationale for dismissal—that the prosecution, by interfering with the Mayor's ability to govern the City, threatens various federal priorities, including "federal immigration initiatives and policies," Rule 48(a) Mot. ¶ 6—similarly points in favor of dismissal with prejudice.  Dismissal without prejudice based on this rationale inevitably creates the appearance that the Mayor may be beholden to the federal government, which holds the prospect of reindictment over him should he fail to adequately effectuate the administration's goals.  Thus,

although dismissal without prejudice always comes with some inchoate risk of reindictment, Mayor Adams's status as a public official raises special concerns.  As Court-appointed *amicus* explains, "[c]oncerns with the appearance that the executive branch was either targeting political opponents or seeking to exert undue influence over other officeholders prompted the creation of the public integrity unit within the Justice Department."  Clement Br. at 10 (citing Press Release, U.S. Dep't of Just., Off. of Pub. Affs. (Jan. 14, 1976), https://perma.cc/ZY5Y-YLJ2).  "Moreover, perhaps as a consequence of the distinct problems posed by even the appearance that the executive branch was exercising leverage over an elected official via the threat of re-indictment," deferred prosecution agreements in the context of prosecutions of public officials are exceedingly rare.  *Id.*

To be clear, "the question is not whether the government was acting in bad faith." *Madzarac*, 678 F. Supp. 3d at 46.  It is the "*effect* [that dismissal without prejudice] has on the defendant."  *Id.* (emphasis added).  And here, the effect of dismissal without prejudice is unavoidable: "the prospect of re-indictment could create the appearance, if not the reality, that the actions of a public official are being driven by concerns about staying in the good graces of the federal executive, rather than the best interests of his constituents."  Clement Br. at 2.  The lack of clarity around any timeline or criteria for reassessment only heightens this concern, leaving Mayor Adams and the broader public in the dark as to what conditions might trigger renewal of the investigation or indictment.  Under these circumstances, "[i]f the government's motion were granted," the Mayor would be prejudiced by having "to wait in a state of uncertainty and under public obloquy for an indefinite period of time," *Poindexter*, 719 F. Supp. at 12.  While that is in some sense true for any defendant whose indictment is dismissed without prejudice, the unique combination of factors here—including this Defendant's status as a local elected official and DOJ's asserted rationale for seeking dismissal on federal public policy grounds—raises unique concerns.  "In the view of this Court, such a process would not be fair to the defendant. The Court

has an obligation to protect him from the uncertainty it entails, and from what, objectively, would be harassment." *Id.* By contrast, dismissal *with prejudice* would put any such fears to rest, at least with respect to the pending charges.

For their part, the parties offer no good reason why dismissal should be without prejudice. To be sure, Mayor Adams consents to it, *see* Adams Br. at 22, and as *Rinaldi* notes, concerns about prosecutorial harassment typically arise "when the Government moves to dismiss an indictment over the defendant's objection," 434 U.S. at 29 n.15. But even where a defendant consents to dismissal under Rule 48(a), courts have an independent obligation to ensure the defendant's rights are protected.[37] "[G]iven the delicate position of a defendant facing criminal indictment, it will often be the case that the defendant gladly acquiesces in a dismissal without prejudice, even though it will always be in the defendant's best interests to push for a dismissal with prejudice to guard against re-indictment." Clement Br. at 20. Here, for the reasons stated above, the Court determines that, in light of DOJ's asserted reasons for dismissal, dismissal with prejudice is the most appropriate result and best aligns with the purposes of Rule 48(a), notwithstanding Mayor Adams's professed consent.

Moreover, although Mayor Adams consents to DOJ's Motion, he has separately moved for dismissal with prejudice on other grounds. *See* Adams's Second Mot. to Dismiss at 1. And throughout his brief, he argues that the Court has the power to grant dismissal with prejudice. *See, e.g.*, Adams Br. at 22 (stating that "Mayor Adams has knowingly agreed to a voluntary dismissal without prejudice . . . subject to the Court's power to condition dismissal on its being with

---

[37] When the government seeks to dismiss an indictment during trial, the defendant's consent is required. Fed. R. Crim. P. 48(a) ("The government may not dismiss the prosecution during trial without the defendant's consent."). The lack of such a requirement when the government moves to dismiss before trial indicates that the defendant's consent is not *necessary* for a pretrial Rule 48(a) motion, but that does not suggest that it is *dispositive*.

prejudice").  Mayor Adams's consent to dismissal without prejudice appears to be equivocal at best.  Even if DOJ's Motion were granted and the Indictment dismissed without prejudice, he would still have a request for additional relief—*i.e.*, dismissal with prejudice—pending before the Court.

Nor does DOJ meaningfully oppose such a resolution.  In response to the Court's direction to address "[u]nder what circumstances, if leave is granted, dismissal should be with or without prejudice," Feb. 21 Order at 1, DOJ offered no reason for dismissal without prejudice other than that it is the "default."  DOJ Br. at 17.  The Court has been offered no reason to think that the rationales offered by the Motion, or the purposes of Rule 48(a), would be better served by dismissal without prejudice.  The parties have offered essentially no basis to conclude that dismissal, if granted, should be without prejudice.  And because DOJ has not opposed Mayor Adams's separate motion to dismiss the indictment with prejudice on other grounds, *see* ECF Nos. 140, 144, it has waived opposition to this form of relief.

In sum, the Court concludes that if dismissal is to be granted, dismissal *with prejudice* best comports with DOJ's asserted rationales for dismissal and is necessary to vindicate Rule 48(a)'s principal object of protecting the defendant.  In reaching that conclusion, the Court need not find any bad faith on the part of DOJ or question the validity of its reasons for dismissal.  Rather, DOJ's own proffered justifications weigh in favor of dismissal with prejudice.

## II.     Whether the Motion Should Be Denied Altogether

Having determined, based on the parties' own submissions, that dismissal of this case should only be with prejudice, the Court now turns to the arguments raised by various *amici* that dismissal should be denied altogether.  Several *amici* argue that, notwithstanding the presumption of good faith and the courts' narrow discretion in reviewing a Rule 48(a) motion, even a cursory review of the record here compels the conclusion that DOJ's rationales are inadequate and that the

Motion should be denied.  *See, e.g.*, Letter Mot. to Appear as *Amicus Curiae* ("Common Cause Br.") at 5, ECF No. 125; Former Federal Jurists Br. at 8-11.  The Court is largely persuaded by the merits of *amici*'s various criticisms of DOJ's rationales.  But for the reasons explained below, the Court concludes that they do not counsel in favor of denial of DOJ's Rule 48(a) Motion under the circumstances presented here.  Instead, they support the same conclusion that the Court has reached taking the Rule 48(a) Motion at face value—that dismissal *with prejudice* is the most appropriate result.

One preliminary matter: It is unclear precisely what materials the Court may consider in resolving a Rule 48(a) motion, particularly in light of the presumption of good faith applicable here.  The parties themselves are not entirely consistent on this point.  At times, they appear to suggest that the Court may not look beyond the four corners of the Rule 48(a) Motion itself.[38]  At other times, they point to their own additional submissions on the docket, including their prior filings, letters submitted in connection with this Motion, and exhibits to their briefs.[39]  During the February 19 Conference, this Court asked Mayor Adams a limited number of questions under oath to ensure his consent was knowing and voluntary, *see* Feb. 19 Conf. Tr. at 5:7-11, 16:17-19; the parties did not object to that questioning and, in fact, rely on Mayor Adams's responses in their respective briefs, *see* Adams Br. at 23; DOJ Br. at 10.  For their part, Mayor Adams's counsel have

---

[38] *See, e.g.*, Feb. 19 Conf. Tr. at 44:7-10 (DOJ stating that "[c]onsidering documents outside the record" is not part of a court's discretion under Rule 48(a)).

[39] *See, e.g.*, Adams Br. at 18 ("[C]ourts have typically examined the motion to dismiss, as well as the government's previous conduct in the case and other materials on the docket"); *id.* at 23 (stating that "the Court can review a wealth of materials" beyond the Rule 48(a) Motion itself, including "hundreds of documents filed on the court's docket"); DOJ Br. at 1-2, 13-16 (referencing numerous external exhibits, consisting of drafts and communications involving USAO-SDNY staff, but noting that it asks the Court to consider these materials only if it looks beyond the Rule 48(a) Motion itself).

Case 1:24-cr-00556-DEH   Document 177-2   Filed 04/02/25   Page 50 of 78
Case 1:24-cr-00556-DEH   Document 122   Filed 04/07/25   Page 50 of 78
PageID #: 909

acknowledged that the Court may consider *amicus* briefs,[40] many of which here include various documents attached as exhibits.  And they have, on several occasions, even offered to supplement the record with their own sworn testimony.[41]

It is inconsistent for the parties to ask this Court to consider materials they have submitted that are extraneous to the Rule 48(a) Motion while ignoring other materials on the docket—especially memoranda and letters between USAO-SDNY and DOJ—the authenticity of which has not been disputed and which are broadly available to the public.  In particular, DOJ authenticated the February 10 Decisional Memo directing dismissal of the case and stating DOJ's reasons for that decision.  *See* Feb. 19 Conf. Tr. at 41:4-42:6.  It is difficult to see how the Court can discharge its duty to ensure "that the reasons advanced for the proposed dismissal are substantial and the real grounds upon which the application is based," *Greater Blouse*, 228 F. Supp. at 486, while ignoring this critical document.  And the parties ultimately cite no authority for the notion that a Court may look only within the four corners of a Rule 48(a) motion when adjudicating it—no cases, for example, holding that a district court erred by considering materials on the docket beyond a Rule 48(a) motion itself.  Rather, there are numerous cases indicating that courts have looked to the entire "record" in a case, and not just the motion papers, in adjudicating a Rule 48(a) motion.  *See, e.g.*, *Rinaldi*, 434 U.S. at 30.  And courts have sometimes held evidentiary hearings to assess the validity of a Rule 48(a) motion.  *See United States v. Ocasio*, 623 F. Supp. 2d 139, 139 (D. Mass. 2009) (holding hearing featuring live testimony on Rule 48(a) motion).  All of this is consistent

---

[40] *See* Adams Br. at 18.

[41] *See, e.g.*, ECF No. 130 (offering, in a Feb. 17 Letter from counsel for Mayor Adams to the Court, to provide additional sworn testimony); Feb. 19 Conf. Tr. at 45:9-15 (offering again, as counsel for Mayor Adams, to provide sworn testimony).

with Rule 48(a)'s procedural requirement that the government's reasons for seeking dismissal be publicly exposed.  *See Greater Blouse*, 228 F. Supp. at 486-87.

It is therefore clear that a court need not confine its review under Rule 48(a) to the motion itself.  But the Court concludes that, in this case, it need not determine the outer boundaries of the range of materials that may be considered.  That is because the Court, even if it were to consider the various factual materials (government letters, memoranda, and the like) that have been put before it by *amici*, arrives at the same conclusion: that dismissal with prejudice is the appropriate outcome here.  Accordingly, for purposes of the discussion below, the Court assumes, without deciding, that it can consider such materials in adjudicating the Rule 48(a) Motion.

The Court now proceeds to an analysis of each rationale put forth by DOJ in support of dismissal.  First, applying a presumption of good faith, the Court addresses Rule 48(a)'s procedural requirements and considers whether each rationale is "substantial" and a "real ground[] upon which the application is based."  *Id.* at 486.  Then, mindful of the limited discretion enjoyed by courts under Rule 48(a), the Court considers whether DOJ's rationales pass muster under the Rule's substantive prongs.  As explained below, the Court ultimately concludes that the appropriate outcome in this case remains dismissal with prejudice.

### A.      The Appearances of Impropriety Rationale

As noted, DOJ's first rationale in its Rule 48(a) Motion concerns "appearances of impropriety and risks of interference with the 2025 elections in New York City."  Rule 48(a) Mot. ¶ 5.  As explained below, DOJ does not point to any objective indicia that could support a conclusion that this case has been tainted with an appearance of impropriety by the prosecutors who worked on it.

At the outset, the Court notes that this rationale, as articulated in the Rule 48(a) Motion, concerns the *appearances* of impropriety, not the *actual purposes* of the prosecutors in this case,

Case 1:24-cr-00556-DEH   Document 177-2   Filed 04/02/25   Page 520 of 78
Case 1:24-cr-00556-DEH   Document 122   Filed 04/22/25   Page 5 of 78
PageID #: 911

which are not referenced in the Motion.  As the February 10 Decisional Memo states, DOJ's determination "in no way call[ed] into question the integrity and efforts of the line prosecutors responsible for this case, or [U.S. Attorney Sassoon's] efforts in leading those prosecutors in connection with a matter [she] inherited."  February 10 Decisional Memo at 1.  And at the February 19 conference before the Court, DOJ made clear that it was not relying on any assertions about the motives behind the prosecution for purposes of its Rule 48(a) Motion.[42]  Accordingly, except where otherwise stated, the Court confines its discussion to purported "appearances" of impropriety, as opposed to the actual intentions of the prosecutors in this case.

The appearance of impropriety—even absent any evidence of improper motives—can be a valid concern.  "[J]ustice must satisfy the appearance of justice, and a prosecutor with conflicting loyalties presents the appearance of precisely the opposite."  *Young*, 481 U.S. at 811-12.  But while a prosecutor should be disinterested, "prosecutors may not necessarily be held to as stringent a standard of disinterest as judges."  *Id.* at 807.  To that end, the Supreme Court has observed that courts "may require a stronger showing for a prosecutor than a judge in order to conclude that a conflict of interest exists," *id.* at 810-11, and the Second Circuit has noted that "[t]rue disinterest on the issue of . . . a defendant's guilt is the domain of the judge and the jury—not the prosecutor," *Wright v. United States*, 732 F.2d 1048, 1056 (2d Cir. 1984) (Friendly, J.).

_____

[42] In response to the Court asking whether the Government was arguing "that the prosecution was actually motivated by improper reasons, has the appearance of being motivated by improper reasons, or both," Acting DAG Bove stated that "what [he] relied on in [the motion] is the appearances" of impropriety.  Feb. 19 Conf. Tr. at 24:22-26:8. Although he referenced the existence other "concerns," he made clear that DOJ is "not asking the court to rely on any" reasons for dismissal beyond what is stated in the Rule 48(a) Motion itself.  *Id.* at 22:5-13.  And while Acting DAG Bove stated that he "believe[s the Adams prosecution] actually goes further than [appearances of impropriety] and it is an abuse of the criminal justice process," *id.* at 23:12-14, he did not represent that DOJ had reached any conclusions in that regard, stating only that "the actual purpose in the prosecution is the subject of a couple ongoing investigations at the Department," *id.* at 25:15-17.

Courts considering allegations that a prosecutor's actions have created an "appearance of impropriety" generally look to whether the prosecutor has a potential conflict of interest that could impede the impartial administration of justice. For example, a financial stake in the outcome of the case, a past representation of an involved party, or a relationship with the adversary or the victim could all constitute such a potential conflict of interest. *See Wright*, 732 F.2d at 1056 (citing cases). A conflict of interest could also arise if the prosecutor, as a result of a longstanding acrimonious relationship, "has, or is under the influence of others who have, an axe to grind against the defendant, as distinguished from the appropriate interest that members of society have in bringing a defendant to justice with respect to the crime with which he is charged." *Id.*; *see also id.* at 1055 (finding appearance of impropriety where the prosecutor's wife was "not merely a political opponent" of the defendant but had "allegedly been assaulted by [his] minions," had "actively petitioned various federal, state and local agencies to investigate [him]," and "almost certainly harbored personal animosity against [him]").

Here, to substantiate its assertion of "appearances of impropriety," DOJ's Rule 48(a) Motion cites former U.S. Attorney Williams's website and op-ed and references the proximity of the 2025 New York City mayoral election. *See* Rule 48(a) Mot. ¶ 5 & nn.2-3. The Court considers each in turn.

First, Williams's op-ed and website do not establish the kind of conflict of interest that courts have held could give rise to an appearance of impropriety by a prosecutor, such as a financial stake in the case, a prior representation, or a past acrimonious relationship with the defendant. *See Wright*, 732 F.2d at 1055-56; *cf. Azzone v. United States*, 341 F.2d 417 (8th Cir. 1965), *cert. denied*, 381 U.S. 943 (1965) (application for writ of error coram nobis denied where defendant alleged, among other things, that his indictment had been motivated by U.S. Attorney's political ambitions). And as the Government noted in a letter to the Court, "Williams did not cause Adams

53

to be investigated"; rather, "[t]he evidence of Adams's crimes was uncovered by career law enforcement officers performing their duties, in an investigation that began before Williams took office and . . . continued after he left."  Gov't Jan. 22, 2025 Letter at 2; *see also* Sassoon Letter at 4 ("The investigation began before Mr. Williams took office . . . .").[43]

The Court previously credited the Government's arguments in this regard.  *See* Second Rule 6 Order.  It reviewed the Williams materials carefully, and it concluded that "the majority of statements in the op-ed that Mayor Adams claims are problematic concern New York *State* rather than New York *City* politics"—meaning that they had nothing to do whatsoever with the Mayor. *Id.* at 6 n.5.  The Court noted that one sentence in Williams's op-ed could plausibly be read to refer to Mayor Adams—that "America's most vital city is being led with a broken ethical compass"— but determined that it did not run afoul of Rule 6(e) or Local Rule 23.1.  *Id.*  It therefore concluded that Williams did not violate any duty to ensure "a defendant's fundamental right to a fair trial." *Id.*[44]  While the Government, with the intervening change in administrations and the transfer of the case from UASO-SDNY to DOJ, has changed its views regarding these materials, it offers this

---

[43] The investigation began in summer of 2021.  *See* Gov't Opp'n to Mayor Adams's First Rule 6 Motion at 1, ECF No. 38; Oct. 2 Hr'g Tr. at 15:2-3.  Williams became U.S. Attorney in October of that year.  *See* Press Release, SDNY, U.S. Att'y Damian Williams Appointed to Chair Att'y Gen. Merrick B. Garland's Advisory Comm. (Mar. 30, 2022), https://www.justice.gov/usao-sdny/pr/us-attorney-damian-williams-appointed-chair-attorney-general-merrick-b-garland-s [https://perma.cc/BE7M-RT5L] ("The Senate confirmed Damian Williams' appointment as U.S. Attorney for the Southern District of New York in October 2021.").

[44] To be sure, it is fair to question the prudence of Williams's decision to publish such statements before Mayor Adams's case had been adjudicated.  This is particularly true given how much attention Williams's words have commanded in this litigation.  But a statement may be ill-advised without rising to the level of being "improper."  In any event, the Court reiterates that it sees nothing suggesting a violation by Williams of the Federal Rules, the Local Rules, or an attorney's ethical duties more broadly.

Court no reason to reconsider its earlier conclusion that Williams's statements were not improper.[45]

Second, there is no support for the notion that timing of the Indictment—approximately nine months before the 2025 New York City mayoral primary election—creates a risk of election interference. A section of the DOJ's Justice Manual provides that "[f]ederal prosecutors and agents may never select the timing of any action . . . for the *purpose* of affecting any election, or for the *purpose* of giving an advantage or disadvantage to any candidate or political party." U.S. Dep't of Just., Just. Manual § 9-85.500 (Actions that May Have an Impact on an Election) (2022) (emphases added).[46] That prohibition on improper purposes is inapposite here: As noted, neither the Rule 48(a) Motion itself nor the February 10 Decisional Memo calls into question the integrity or the motives of the prosecutors who worked on this case. The Justice Manual also specifies certain procedural requirements in this context, stating that "[a]ny action likely to raise an issue or the perception of an issue under this provision requires consultation with the Public Integrity

---

[45] To the extent that Mayor Adams argues that he has been prejudiced from extrajudicial statements about the case, *see* Adams Br. at 19-20, the Court has rejected two prior motions under Rule 6 raising these issues. *See* First Rule 6 Order; Second Rule 6 Order. Moreover, the Government itself has, until the filing of the Rule 48(a) Motion, denied that Mayor Adams has suffered any prejudice from any pretrial publicity throughout this litigation. For example, in response to Mayor Adams's First Rule 6 Motion, the Government observed that there was no evidence that news articles about the investigation into his alleged illegal activity "put pressure on senior Justice Department officials to approve the indictment," induced any grand jury witness to testify, or affected the grand jury's decision to indict the Mayor. Gov't First Sanctions Opp'n at 21-23. The Government also argued that Mayor Adams "ha[d] not established reason to believe that a future trial jury w[ould] be prejudiced by the news coverage of this case." *Id.* at 23. The existence of such prejudice is typically uncovered through voir dire, which obviously has not happened here (nor will it). *See United States v. Zichettello*, 208 F.3d 72, 106 (2d Cir. 2000) ("When a trial court determines that media coverage has the potential for unfair prejudice, it is obligated to canvass the jury to find out if they have learned of the potentially prejudicial publicity and, if necessary, voir dire the jury to ascertain how much they know of the distracting publicity and what effect, if any, it has had on that juror's ability to decide the case fairly.").

[46] This provision is cited in the February 10 Decisional Memo, but not in DOJ's Rule 48(a) Motion itself.

Section, and such action shall not be taken if the Public Integrity Section advises that further consultation is required with the Deputy Attorney General or Attorney General." *Id.* The Sassoon Letter states that USAO-SDNY "followed this requirement," and there is nothing in the record to suggest otherwise. Sassoon Letter at 4.

While some other Justice Department sources have described an unwritten norm that, regardless of purpose, prosecutions should not be brought against candidates for office within sixty days of an election due to the risk of affecting the election,[47] this case was brought in September 2024, approximately *nine months* before the June 2025 New York City mayoral primary. In their briefs, neither DOJ nor the Mayor cites any authority—no guideline, rule, or case—suggesting that it is improper to indict a candidate for office nine months before an election. It is also difficult to imagine how such a rule could work in practice without effectively gutting public corruption laws. For example, congressional elections occur every two years in November, and primary elections are typically held at least six months beforehand. In New York, state assemblymembers are similarly elected every two years, *see* N.Y. Const., art. III, § 2, with primaries typically held in June, *see* N.Y. Elec. § 8-100(1)(a) (2024). That leaves about nineteen months between when New York's state assemblymembers and congressional representatives are elected and when they must to stand for re-election in a primary. DOJ's proposed rule prohibiting prosecutions from being initiated within nine months of an election would leave a ten-month window every two years in which a case could be brought (and perhaps completed) against an assemblymember or

---

[47]   *See, e.g.*, U.S. Dep't of Just., Office of the Inspector General, A Review of Various Actions by the Federal Bureau of Investigations and Department of Justice in Advance of the 2016 Election at 17 (June 2018) (describing "'60-Day Rule,' under which prosecutors avoid public disclosure of investigative steps related to electoral matters or the return of indictments against a candidate for office within 60 days of a primary or general election"). This is sometimes characterized as a ninety, not sixty, day rule, where the same prohibitions apply three months before an election.

congressperson in New York.[48]  Such a rule would effectively immunize many elected officials from public corruption laws.

In fact, the timing of this case in relation to the 2025 New York City mayoral election appears unexceptional.  Other prosecutions of elected officials have taken place on similar or even shorter timeframes.  For example, New Jersey Senator Robert Menendez was indicted in this District in September 2023, approximately nine months before the June 2024 New Jersey primary elections.  *See United States v. Menendez*, No. 23 Crim. 490 (S.D.N.Y.); *see also United States v. Hunter*, No. 18 Crim. 3677 (S.D. Cal.) (indictment of Representative Duncan Hunter in August 2018, approximately three months before November general election).  The Court has been unable to locate any cases where a prosecution was deemed inappropriate because it was brought approximately nine months before an election.  And here, mindful of the election calendar, the parties and the Court attempted to select a trial schedule that would balance the need for time for the parties to prepare while also ensuring resolution of this matter before the June 2025 primary.  The Court ultimately adopted a compromise, in which trial would have commenced on April 21.  *See* Nov. 1 Hr'g Tr. at 62:16-20.

Finally, the parties raise related issues in their briefs that do not appear in DOJ's Rule 48(a) Motion.  For reasons explained below, a court cannot properly grant a Rule 48(a) motion on the basis of rationales that were not raised in the motion.  But even considering these additional points on the merits, the Court finds them either inapposite or unsupported by the record.  For example, DOJ attaches various exhibits to its brief consisting of communications involving the former

---

[48]  That window would be even shorter in a state that holds its primary elections earlier than New York.  For example, in Alabama, where primary elections are held as early as March, DOJ's proposed rule would leave only a seven-month window every two years for prosecutions.  *See* Ala. Code § 17-13-3(b) (2022) ("In years in which a presidential primary is conducted, the primary election shall be the first Tuesday in March.").

prosecution team and asserts that they show "troubling conduct" at USAO-SDNY.  DOJ Br. at 1.

But these communications were not public until DOJ sought to rely on them; as a matter of logic,

they could not have affected "appearances" in this case.  Moreover, the notion that DOJ sought

dismissal because of improper conduct by the USAO-SDNY prosecution team is belied by the

February 10 Decisional Memo itself, which makes clear that DOJ, in reaching its decision, "in no

way call[ed] into question the integrity and efforts of the line prosecutors responsible for the case."

February 10 Decisional Memo at 1.  At any rate, the Court has reviewed these communications

carefully and finds that they do not show any improper motives or violations of ethics canons or

the Justice Manual by the USAO-SDNY prosecution team or by former U.S. Attorney Sassoon.[49]

For his part, Mayor Adams returns to the assertion that he was indicted in retaliation for

"publicly br[eaking] with the Biden Administration on the contentious issue of immigration

enforcement" in "April 2023."  Adams Br. at 1.[50]  But he cites no evidence supporting this

---

[49] The Justice Department's Principles of Federal Prosecution state, in relevant part, that "the attorney for the government should commence or recommend federal prosecution if he/she believes that the person's conduct constitutes a federal offense, and that the admissible evidence will probably be sufficient to obtain and sustain a conviction, unless (1) the prosecution would serve no substantial federal interest; (2) the person is subject to effective prosecution in another jurisdiction; or (3) there exists an adequate non-criminal alternative to prosecution."  U.S. Dep't of Just., Just. Manual § 9-27.220 (2023).  There is nothing in the USAO-SDNY communications indicating a violation of these principles.  For example, one communication indicates that a friend of AUSA Scotten believed that he would make a good federal judge.  *See* ECF No. 175-4.  The Court has reviewed this communication and finds that it shows nothing noteworthy, only that AUSA Scotten was focused on his current job "first," rather than on any possible future opportunities.  *Id.*  Another communication—an email circulating a draft letter to the Court—refers to the Williams op-ed as a "scandal," ECF No. 175-3, but the use of that informal shorthand in an email does not suggest that any of the individual AUSAs on the case, or the U.S. Attorney at the time, had any inappropriate motives or otherwise violated Justice Department policy or guidelines.

[50] DOJ's Rule 48(a) Motion gestures at this notion without articulating it.  *See* Rule 48(a) Mot. ¶ 5 (citing Executive Order 14147, "Ending the Weaponization of the Federal Government," which in turn describes a purported "systematic campaign" by the previous administration "against its perceived political opponents").  DOJ's brief also references purported "improper weaponization of the criminal justice system."  DOJ Br. at 6.  As noted *supra*, however, DOJ has,

contention.  Despite repeating this claim throughout this litigation, he has not filed a motion for

selective or vindictive prosecution.[51]  *Cf. United States v. Stewart*, 590 F.3d 93, 121-23 (2d Cir.

2009) (describing elements of a vindictive prosecution claim); *United States v. Avenatti*, 433 F.

Supp. 3d 552, 562-63 (S.D.N.Y. 2020) (same).  And, as noted, the investigation into Adams began

during the summer of 2021, almost two years before his criticism of the prior administration.  *See*

Gov't First Sanctions Opp'n at 1.

Ultimately, DOJ does not point to any objective criteria that would suggest an appearance

of impropriety here.  To be sure, "appearances," in their colloquial sense, are often in the eye of

the beholder.  But the phrase "appearance of impropriety" is generally understood as a term of art

with an objective standard.  *See People v. Adams*, 987 N.E.2d 272, 275 (N.Y. 2013) ("[A]n

appearance of impropriety may arise when the record provides an objective basis to question

whether the prosecutor is exercising pretrial prosecutorial discretion in an evenhanded manner,

based on the merits of the case or other legitimate prosecutorial concerns."); *cf. United States v.*

*Bayless*, 201 F.3d 116, 126-27 (2d Cir. 2000) (explaining, in the context of a judicial recusal

motion, that "the existence of the appearance of impropriety" is determined "not by considering

what a straw poll of the only partly informed man-in-the-street would show[,] but by examining

the record facts and the law, and then deciding whether a reasonable person knowing and

---

for purposes of its Rule 48(a) Motion, disclaimed any reliance on the suggestion of improper
purposes in *this* prosecution.

[51] Mayor Adams has, as noted, filed a motion to dismiss based on alleged prosecutorial
misconduct.  *See* Adams's Second Mot. to Dismiss.  But the Mayor's allegations in that motion
center on "[t]he leak of the February 12 letter" written by Sassoon, which he says violates internal
Justice Department regulations, Local Rule 23.1, and Federal Rule of Criminal Procedure 6(e).
*See id.* at 8-11.  Mayor Adams makes no legal argument in his latest motion, and has not made any
motion throughout this litigation, seeking dismissal under either a vindictive or selection
prosecution theory.

understanding all the relevant facts would recuse the judge"), *cert. denied*, 529 U.S. 1061 (2000). Here, DOJ cites no rule broken and no guidance or principle ignored.

The absence of any substantiation for this rationale matters, because the justifications for dismissal put forth by the government must be "substantial." *Greater Blouse*, 228 F. Supp. at 486. While the government's decision to dismiss a prosecution is entitled to a presumption of good faith under Rule 48(a), a presumption is just that; it is not an inexorable command. If the presumption were conclusive, "there would be no purpose to Rule 48(a)." *Id.* And while a court's review of that decision is exceedingly deferential, a court is "not required to exhibit a naivete from which ordinary citizens are free." *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.). Here, the incongruity between the Government's proffered "appearances of impropriety" rationale and the record suggests that "[w]hat was provided here was more of a distraction" than a legitimate explanation. *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

## B. The Immigration Enforcement Rationale

The second rationale in DOJ's Rule 48(a) Motion concerns "federal immigration initiatives and policies." Rule 48(a) Mot. ¶ 6. As explained below, neither DOJ nor Mayor Adams substantiates the assertion that the Mayor's immigration enforcement efforts have been hampered by this case. The record does show, however, that shortly after DOJ decided to seek dismissal, the Mayor made at least one policy choice in alignment with the administration's immigration enforcement goals—to permit ICE to operate at the Rikers Island jail complex. Thus, while DOJ's immigration enforcement rationale is supported to some extent by the record, it points towards an uncomfortable conclusion: that the decision to dismiss this case was apparently premised on the Mayor taking subsequent immigration-related actions in conformity with the administration's policy preferences.

Case 1:24-cr-00556-DEH   Document 177-2   Filed 04/02/25   Page 6 of 78
Case 1:24-cr-00556-DEH   Document 122   Filed 04/02/25   Page 61 of 78
PageID #: 920

As an initial matter, it is indisputable that the President has broad authority over foreign affairs. *See, e.g.*, *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936). Here, however, DOJ's decision to seek dismissal of the indictment is not a *direct* exercise of the President's authority in matters of either national security or immigration. Rather, DOJ's argument—that this case is hindering Mayor Adams's "ability to govern in New York City," which, in turn, "poses unacceptable threats to public safety, national security, and related federal immigration initiatives and policies," Rule 48(a) Mot. ¶ 6—concerns *Mayor Adams's* authority as a local official. Whether or how the Indictment is dismissed will have no bearing on the President's ability to exercise his own national security or immigration authority.

Turning to the immigration enforcement rationale itself, certain *amici* argue that this rationale is unsubstantiated, noting that Mayor Adams himself has "publicly argued that the indictment has not interfered with his official mayoral duties." Common Cause Br. at 4. That said, the Motion does point to one specific way in which Mayor Adams has purportedly been hampered, noting that "as a result of these proceedings, Adams has been denied access to sensitive information that the Acting [DAG] believes is necessary for Adams to govern and to help protect the City." Rule 48(a) Mot. ¶ 6. This is apparently a reference to Mayor Adams's loss of a security clearance following his indictment. *See* Feb. 19 Conf. Tr. at 27:3-7. But DOJ's own representations at the February 19 conference contradict its proffered example. When asked about the security clearance, Acting DAG Bove stated that restoring Mayor Adams's security clearance does not, in fact, "hinge[] on the resolution of this motion [to dismiss]" because the President has "separate authority to grant a security clearance" at any time, solely as a matter of "executive power." *Id.* at 29:16-30:1. Thus, to the extent the executive branch has determined that Mayor Adams needs a security clearance, whether he remains under indictment appears to be wholly irrelevant.

The same appears to be true with respect to other examples offered by the parties of purported impediments to the Mayor's ability to govern, such as "his [in]ability to serve on a joint taskforce on firearms alongside agents from the Southern District of New York."  Adams Br. at 20.  To the extent these issues concern cooperation or coordination with federal authorities, the parties offer no explanation as to how they are any different from the issuance of a security clearance.  That is, if the executive branch can simply restore Mayor Adams's security clearance, it is unclear why it cannot also enable him to participate in a "joint taskforce on firearms," or otherwise facilitate his coordination with federal officials about matters of public safety, national security, and immigration.

Given the absence of evidence that the Indictment has impeded the Mayor's past or current efforts related to immigration, various *amici*, citing the Sassoon Letter, describe the immigration enforcement rationale not as an effort to remove barriers to the Mayor's existing work but instead as a bargain to extract future policy concessions.  *See* Former Federal Jurists Br. at 10 (arguing that DOJ's "request for dismissal so that Adams can carry out the administration's immigration efforts[] reflect[s] a *quid pro quo*"); Common Cause Br. at 2 (stating "there is overwhelming evidence from DOJ's own internal documents showing that the dismissal of the Adams indictment is not in the public interest and is part of a corrupt *quid pro quo*").

For their part, DOJ and Mayor Adams vehemently deny any *quid pro quo*.  *See* Adams Br. at 22; DOJ Br. at 10.  During a conference before the Court, Mayor Adams was unequivocal that the two-sentence written consent to dismissal without prejudice signed by his counsel was the sum total of his agreement with DOJ, that no one made any other promise to him, and that no one threatened him to induce his consent to dismissal without prejudice.  *See* Feb. 19 Conf. Tr. at 20:17-21:8.  Mayor Adams's counsel explain it this way: "Ms. Sassoon . . . appears to have simply mischaracterized defense counsel's explanation that the charges were *in fact* impeding Mayor

Adams's ability to help carry out federal law as 'amount[ing] to a *quid pro quo*.'"  Adams Br. at 22.

The dispute here, however, seems to be more about how to interpret the facts than what the facts are.  In a February 3, 2025 letter to DOJ (which they filed on the docket without prompting from the Court), Mayor Adams's counsel asserted that the Mayor's "independent abilities to exercise his powers have also been complicated by his indictment."  *See* Letter from Adams's Counsel to DOJ.  Specifically, they noted that

> [the Mayor's] powers allow him to take actions such as preventing the Office of the Corporation Counsel from litigating challenges to immigration enforcement, preventing appointed city employees from taking public stances against enforcement efforts, re-opening the ICE office on Rikers Island, and directing the NYPD to supply manpower to assist federal immigration agents.

*Id.*  Mayor Adams's counsel did not explain how the Mayor's exercise of these powers had been "complicated" by this case.  Instead, they provided a list of discrete policy options that the Mayor could choose to exercise.  And then, three days after DOJ issued the February 10 Decisional Memo directing SDNY to move to dismiss the Indictment (and one day before the Rule 48(a) Motion was ultimately filed), Mayor Adams decided to take one of these official acts, announcing that "he would issue an executive order allowing federal immigration authorities into the Rikers Island jail complex."  Br. of *Amicus Curiae* State Democracy Defenders Fund et al. at 5, ECF No. 152-2; *see also* ECF No. 150-4 at 1[52] (news article stating that "New York City Mayor Eric Adams said Thursday he will use his executive powers to allow federal immigration authorities back into the city's sprawling Rikers Island jail complex, marking a substantial shift in the city's sanctuary

---

[52] Eric Levenson et al., NYC Mayor and Trump Border Czar Meet as Feds Turn Eyes Toward Sanctuary Cities Like New York, CNN (Feb. 14, 2025), https://www.cnn.com/2025/02/13/us/nyc-adams-border-czar-immigration/index.html [https://perma.cc/9HM6-XCXX].

policies that prevent it from enforcing immigration law").  It seems that the Indictment was not, in fact, a barrier to that particular policy decision.

The parties deny that Mayor Adams's Rikers Island decision—which appears to be contrary to New York City Code[53]—reflects a *quid pro quo*.  The record contains no contemporaneous notes of what was actually said during the January 31 meeting at DOJ,[54] but counsel for Mayor Adams have represented in a letter to the Court that "we never said or suggested to anyone . . . that Mayor Adams would do X in exchange for Y, and no one said or suggested to us that they would do Y in exchange for X," adding: "We are prepared to confirm these points under oath in sworn declarations."  *See* Def.'s Feb. 18, 2025 Letter at 2.  The Court appreciates counsel's willingness to supplement the record and facilitate further inquiry by the Court beyond the materials that they have affirmatively submitted without solicitation.  *E.g.*, Letter from Adams's Counsel to DOJ.

But the Court finds that additional factual investigation—even if permissible—is unnecessary at this time.  Whether anyone expressly incanted the precise words that they "would do X in exchange for Y" is not dispositive.  As the Second Circuit has explained, "[a]n explicit quid pro quo . . . need not be expressly stated but may be inferred from the official's and the payor's words and actions."  *United States v. Benjamin*, 95 F.4th 60, 67 (2d Cir. 2024), *cert. denied*,

---

[53] N.Y.C. Admin. Code § 9-131(h)(2) ("Federal immigration authorities shall not be permitted to maintain an office or quarters on land over which the department exercises jurisdiction, for the purpose of investigating possible violations of civil immigration law; provided, however, that the mayor may, by executive order, authorize federal immigration authorities to maintain an office or quarters on such land for purposes unrelated to the enforcement of civil immigration laws.").

[54] As noted above, the Sassoon Letter states one of her colleagues took contemporaneous notes but that those notes were confiscated at the end of the meeting.  Sassoon Letter at 3 n.1.  The February 13 Bove Letter in response references these events as well.  *See* Feb. 13 Bove Letter at 3 n.3.

No. 24-142, 2024 WL 5112284 (Dec. 16, 2024); *see also Benjamin*, 95 F.4th at 68 (noting that while a "quid pro quo must be clear and unambiguous, there is no reason why it cannot be implied from the official's and the payor's words and actions."); *cf. Evans v. United States*, 504 U.S. 255, 274 (1992) (Kennedy, J., concurring in part and concurring in the judgment) ("The official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods.").

The Court need not and does not make any conclusive findings as to whether there was an explicit bargain here.[55]  It is sufficient to note that the facts, as put into the record by Mayor Adams's legal team, do not support the notion that continuing this case will impede the Mayor's *ongoing* immigration enforcement efforts—they instead suggest that dismissal of the case will facilitate *future* efforts by the Mayor, in alignment with the administration's policy preferences.

## C.    The Strength of the Case

In its brief, DOJ raises "another reason that the Motion is in the public interest"—one that was not raised in the Rule 48(a) Motion itself: "the apparent weakness of SDNY's overly aggressive charging theory."  DOJ Br. at 18.  The Court is mindful of the Supreme Court's admonition that "factors [such] as the strength of the case . . . are not readily susceptible to the kind of analysis the courts are competent to undertake."  *Wayte*, 470 U.S. at 607.[56]  The Court

---

[55] If such factual findings were necessary to the Court's decision, additional evidentiary proceedings could then be appropriate.

[56] As a general matter, courts are not well placed to second-guess the judgment of the government with respect to the strength of the prosecution's case.  However, to the extent that DOJ relies on quotations from this Court's decision on Mayor Adams's First Motion to Dismiss to cast doubt on the viability of the prosecution's legal theory, such reliance is misplaced.  For one thing, Mayor Adams moved to dismiss only one of five counts in the Indictment (bribery under 18 U.S.C. § 666); nothing in his motion, or in the Court's decision on it, relates to the four other counts.  And with respect to the bribery count, the Government alleged two theories of a *quid pro quo*—one concerning the regulation of the Turkish consulate building generally, and one regarding the issuance of a temporary certificate of occupancy ("TCO") specifically.  First MTD Order at 19.

therefore expresses no views as to the merits of the Government's case against Mayor Adams. But the Court nevertheless cannot base its decision here on DOJ's purported concerns in this regard, because they were not an asserted basis for its Rule 48(a) Motion.

The Rule 48(a) Motion does not allude to the possibility of other reasons for dismissal beyond the two set forth on its face. *See* Rule 48(a) Mot. ¶¶ 5-6. To the contrary, the Motion suggests that there are none. *See id.* at 3 (seeking dismissal "[b]ased on the foregoing" reasons). At the February 19 conference, DOJ confirmed that there were no other bases asserted in the Motion. *See* Feb. 19 Conf. Tr. at 22:18-22 (confirming that the Court's "understanding that the motion contains no statement about the government's views regarding the strength of the case in terms of the facts or the legal theory" is "correct"); *id.* at 22:18-25 (stating that "[t]here are two bases for the Motion, neither of which concerned the merits"). While counsel for DOJ stated "I do have other concerns" about the case, he disclaimed reliance on them for purposes of the Rule 48(a) Motion, explaining that the Government is "not asking the court to rely on any" reasons for dismissal beyond what is stated in the Motion itself. *Id.* at 22:5-13. And DOJ's February 10 Decisional Memo is unequivocal in this regard, stating that "[t]he Justice Department has reached this conclusion *without assessing the strength of the evidence or the legal theories on which the case is based*, which are issues on which we defer to the U.S. Attorney's Office at this time." Feb. 10 Decisional Memo at 1 (emphasis added). It was only in response to this Court's Order

---

The Court held that the Government's first theory was permissible under Second Circuit precedent, though it acknowledged that it was "not inconceivable" that the controlling law might change at some point. *Id.* at 19; *see also id.* at 20-22. But that is always in some sense true, and "district courts are obliged to follow Circuit precedent, even if that precedent *might* be overturned in the near future." *Id.* at 19 (citing *Packer ex rel. 1-800-Flowers.Com, Inc. v. Raging Cap. Mgmt., LLC*, 105 F.4th 46, 54 (2d Cir. 2024)). As for the second theory, the Court explained that "there is no real dispute that the issuance of a TCO is a specific and formal exercise of governmental power" sufficient to form the basis of a bribery charge under any legal theory. *Id.* at 21.

requesting further briefing on several questions, none of which concerned the reasons for the Motion, that DOJ raised this additional ground for dismissal.[57]

As a threshold procedural matter, a *post hoc* rationale not stated in the motion itself cannot be a basis for granting it. *See Greater Blouse*, 228 F. Supp. at 486-87; *cf. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020) (holding that, under arbitrary and capricious review in the administrative law context, "[t]he basic rule here is clear: An agency must defend its actions based on the reasons it gave when it acted," not on "impermissible post hoc rationalizations . . . not properly before [the court]"); *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 93-94 (1943) (noting that the government's "action must be measured by what [it] did, not by what it might have done"). As noted, the requirement that the government state its reasons for dismissal is necessary for the Court to exercise its discretion under Rule 48(a). It also promotes public transparency and accountability. As the Third Circuit has explained:

> Even though a judge's discretion under Rule 48(a) is severely cabined, the rule may serve an important interest as an information- and accountability-producing vehicle. A judge who hears a Rule 48(a) motion has independent responsibilities that may bear on his or her decision on the requested dismissal. In other words, there are independent rights, interests,

---

[57] To be sure, in his February 13 letter to U.S. Attorney Sassoon, Acting DAG Bove stated that he has "many other concerns about this case," which he described as turning on "factual and legal theories that are, at best, aggressive." Feb. 13 Letter at 7. Mayor Adams also points to a statement by the Attorney General that the case was "incredibly weak," and has previously referenced similar statements to the same effect by the DOJ Chief of Staff. *See* Adams Br. at 6; Def.'s Feb. 21, 2025 Letter at 1. Assuming these concerns were well founded, they still do not contradict the February 10 Decisional Memo's statement that DOJ reached its determination regarding dismissal without assessing the strength of the case.

Separately, the Court notes that the statements referenced by Mayor Adams appear to violate Local Criminal Rule 23.1, which prohibits extrajudicial statements regarding an "opinion . . . in connection with pending or imminent criminal litigation . . . if there is a substantial likelihood that the dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice." S.D.N.Y. & E.D.N.Y. L. Crim. R. 23.1(a). The Rule provides that "[a]ny opinion as to . . . the merits of the case" "presumptively involve[s] a substantial likelihood that their public dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice within the meaning of this rule." *Id.* at 23.1(d)(7).

and duties that a court may protect . . . through using Rule 48(a) as a "sunshine" provision that exposes the reasons for prosecutorial decisions.

*In re Richards*, 213 F.3d 773, 788 (3d Cir. 2000).

None of this is meant to suggest that it would be wholly impermissible for the government to have, in addition to valid reasons that are expressly stated, other unstated reasons for dropping a prosecution. But if the reasons actually articulated in a Rule 48(a) motion itself are insufficient, and dismissal can be justified only by resort to other grounds, then the omission of those other reasons misleads the court and the public, undermining political accountability. Under such circumstances, it would flout Rule 48(a)'s requirement of leave of court to grant a motion based on belatedly offered rationales. *See Ammidown*, 497 F.2d at 620 ("Rule 48(a)'s requirement of judicial leave . . . contemplates exposure of the reasons for dismissal."). Here, DOJ has affirmatively asked the Court to rely on the reasons in its Rule 48(a) Motion and has argued that these reasons are a sufficient basis for granting the Motion. *See* Feb. 19 Conf. Tr. at 22:5-17. The Court therefore cannot permit DOJ to rely on a *post hoc* rationale not stated in the Motion itself. "[W]hen so much is at stake, . . . the Government should turn square corners in dealing with the people." *Regents*, 140 S. Ct. at 1909. For these reasons, the Court cannot consider DOJ's belated merits-based arguments in adjudicating this motion.

### D.  Application of Rule 48(a) to the Full Record before the Court

In sum, the Court is left with one rationale that is unsubstantiated and appears pretextual (the "appearances of impropriety" rationale), and one that is unprecedented and possibly a *quid pro quo* arrangement (the immigration enforcement rationale). The Court now turns to whether these rationales form a sufficient basis to grant dismissal, starting with Rule 48(a)'s procedural requirements.

Plainly, a pretextual rationale cannot satisfy the Government's obligation to set forth the "real grounds upon which the application is based," *Greater Blouse*, 228 F. Supp. at 486. If it were faced with a motion based solely on a pretextual rationale, a court would be well within its discretion to deny the motion and require the government to come forward with its *actual* reasons for seeking dismissal. Indeed, it seems that a court—which must set forth the basis for a decision to grant leave—could not properly exercise its discretion otherwise. *See Derr*, 726 F.2d at 619 (concluding that "the trial court at the very least must know the prosecutor's reasons for seeking to dismiss the indictment").

Here, however, DOJ has put forward at least one rationale that seems to be a real purpose of the Rule 48(a) Motion: It believes dismissal will facilitate the administration's "immigration initiatives and policies." Rule 48(a) Mot. ¶ 6. There is nothing in the record to suggest that immigration enforcement is *not* a real reason for the Motion. Denial of the Motion on procedural grounds is unnecessary for the Court to uncover that purpose, and for the public to understand it.

The Court therefore turns next to Rule 48(a)'s substantive safeguards, starting with the Rule's apparent principal purpose—that is, to safeguard the rights of the defendant. Plainly, denial of the Motion would not protect Mayor Adams's rights. A dismissal *with prejudice* would better protect his right to be free from prosecutorial harassment, as previously discussed. To be sure, it is not a perfect solution, because such a ruling would apply only to the charges in the Indictment. *Cf.* Oct. 2 Hr'g Tr. at 4:2-12; Gov't Opp'n Mot. Bill of Particulars at 22; Sassoon Letter at 5. But the bottom line is that, if the request for dismissal without prejudice constitutes an effort to obtain policy concessions from the Mayor on immigration enforcement, that is all the more reason to dismiss this case permanently.

That leaves the "bad faith" and "public interest" prongs of Rule 48(a). As an initial matter, a request grounded in pretext cannot be made in good faith. *Cf. Ammidown*, 497 F.2d at 620-21

(contrasting "an application made in good faith" with one where "the assigned reason for dismissal has no basis in fact"); *United States v. Hayden*, 860 F.2d 1483, 1489 (9th Cir. 1988) (explaining that use of "the Rule 48(a) motion as a pretext to bypass [the court's] denial of [a] continuance" would be "a clear act of bad faith"). And some courts have found bad faith and the public interest to be two sides of the same coin. *See, e.g.*, *Smith*, 55 F.3d at 159.

But the disservice to the public interest in this case goes beyond DOJ's reliance on a pretextual rationale. If it is true that DOJ sought to extract a public official's cooperation with the administration's agenda in exchange for dropping a prosecution, that would be "clearly contrary to the public interest," *Cowan*, 524 F.2d at 513, and a grave betrayal of the public trust, because it would violate norms against using prosecutorial power for political ends. *See, e.g.*, Criminal Justice Standards for the Prosecution Function, Standard 3-1.6(a) (Am. Bar. Ass'n 2017) ("A prosecutor should not use other improper considerations, such as partisan or political or personal considerations, in exercising prosecutorial discretion.").

Threatening federal indictment to compel compliance with federal regulatory objectives by a state or local official also raises significant federalism concerns. It is well established that "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997). Although this prohibition has typically been applied to acts of Congress, the principles that underpin it—namely, federalism and political accountability—would similarly preclude an attempt by the federal executive branch to coerce a state or local official into implementing federal policy objectives.[58]

---

[58] That prohibition applies even where state or local officials consent to federal compulsion, because "[t]he interests of public officials . . . may not coincide with the Constitution's intergovernmental allocation of authority." *New York v. United States*, 505 U.S. 144, 183 (1992). "The Constitution does not protect the sovereignty of States for the benefit of the States . . . as abstract political entities, or even for the benefit of the public officials governing the States." *Id.*

*See* U.S. Dep't of Just., Just. Manual § 9-16.110 (2020) (cautioning that "[p]lea bargains with defendants who are elected public officers can present issues of federalism . . . when they require the public officer defendant to take action that affects his or her tenure in office"). Here, the fact that, after DOJ made the decision to seek dismissal of his case, Mayor Adams decided to issue an executive order in alignment with current "federal immigration initiatives and policies," Rule 48(a) Mot. ¶ 6, but in apparent conflict with New York City law, *see* N.Y.C. Admin. Code § 9-131(h)(2), is troubling to say the least. It suggests that the federal government is using the pendency of a federal indictment to override the City's laws in favor of its own policy goals.

And even if there were no *quid pro quo*, the breadth of DOJ's immigration enforcement rationale here is stunning. As DOJ acknowledges, the invocation of this rationale in the context of a public corruption prosecution is without precedent. *See* Feb. 19 Conf. Tr. at 31:13-20 (responding, "I'm not aware of a case where it's a public official at issue," when asked whether "this rationale has been invoked in a decision to dismiss an indictment or to cease a prosecution in some way where the defendant is a public official with important responsibilities with respect to public safety, immigration, or national security, or the like"). The Court is similarly unaware of a single instance in which the Government dismissed a public official's indictment because his position implicated matters of public safety, national security, or immigration.

---

at 181. "Rather, federalism secures to *citizens* the liberties that derive from the diffusion of sovereign power." *Id.* (emphasis added) (quoting *Coleman v. Thompson*, 501 U.S. 722, 759 (1991) (Blackmun, J., dissenting)).

In addition to securing liberty, the prohibition against federal commandeering of state and local officials has been held to promote political transparency and accountability. "[W]here the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision." *New York*, 505 U.S. at 169. The anti-commandeering principle ensures that "state governments remain responsive to the local electorate's preferences; state officials remain accountable to the people." *Id.* at 168.

In arguing that executive policy priorities are sometimes cited in support of dismissal determinations, DOJ cites, as an example, the prior administration's release of Viktor Bout in exchange for Russia's release of a well-known American athlete. *See* DOJ Br. at 7 (citing *United States v. Bout*, No. 08 Crim. 365 (S.D.N.Y. Nov. 29, 2022). This comparison is confusing. First, it is odd that DOJ would analogize its decision to dismiss Mayor Adams's indictment—which it vehemently denies is a *quid pro quo*—to a prisoner exchange that was explicitly a *quid pro quo*. Moreover, it is inapt to compare an exchange negotiated between two sovereign nations, neither of which is beholden to the laws of the other, to the Government's decision to dismiss the indictment of an elected public official who is subject to local, state, and federal laws.

The unprecedented nature of DOJ's rationale is particularly concerning given its view that its decision is "virtually unreviewable" because it "invocates concerns about executive power that go right to the core of Article II of the Constitution." Feb. 19 Conf. Tr. at 23:20-24. If that is correct, DOJ's position has rather broad implications, to put it mildly. For instance, DOJ endorsed the view that the government can apply this rationale to virtually any public official with immigration-related responsibilities—ranging from a local police commissioner to the governor of a border state—and determine that they are essentially immune from criminal liability. *See id.* at 32:22-34:8.

And despite denying that this case involves a *quid pro quo* with Mayor Adams, DOJ argues that there would be nothing wrong with the executive branch explicitly conditioning dismissal of charges against a public official in exchange for his support of the administration's policy agenda. *See id.* at 49:5-7 (arguing that, "even if there was a *quid pro quo*," it would not affect the validity of the Government's Rule 48(a) Motion). DOJ goes so far as to contend that, as a matter of law, a promise to trade dismissal of the Indictment for the Mayor's efforts with respect to immigration enforcement cannot constitute a *quid pro quo*. *See* DOJ Br. at 10 (quoting *United States v.*

*Blagojevich*, 794 F.3d 729, 734 (7th Cir. 2015), for the proposition that "a proposal to trade one public act for another, a form of logrolling, is fundamentally unlike the swap of an official act for a private payment"). DOJ's reliance on *Blagojevich* is misplaced. There, the Seventh Circuit cautioned against "a rule making everyday politics criminal." *Blagojevich*, 794 F.3d at 735. This Court is unaware of any case suggesting that the decision to *prosecute* a public official is the kind of public act that may be horse-traded away in the course of "everyday politics" as "a form of logrolling." To the contrary, ethics rules prohibit such political considerations in the exercise of prosecutorial discretion. *See* ABA Standard 3-1.6(a).

DOJ's arguments trigger concerns regarding political favoritism in prosecutorial decision-making, which Rule 48(a) was designed, in part, to address. *See* Wright & Miller, *supra*, §802 n.2.50 (explaining the adoption of Rule 48(a)'s requirement of leave of court was "motivated by a concern that prosecutors were seeking dismissals of politically well-connected defendants."). More broadly, "[t]he Constitution created a government dedicated to equal justice under law," *Cooper v. Aaron*, 358 U.S. 1, 19 (1958), not one in which criminal liability may depend on the defendant's alignment with the policy preferences of the incumbent administration. The breathtaking implications of DOJ's position—which were apparently well-understood by the numerous attorneys at USAO-SDNY and DOJ who resigned rather than sign this Rule 48(a) Motion—are difficult to square with the words engraved above the front entrance of the United States Supreme Court: "Equal Justice Under Law."

Ultimately, however, the Court would be overreaching if it attempted to force this prosecution to continue. As noted above, a court is not situated—either in terms of institutional competence, or as a matter of its proper role in our constitutional system—to make an assessment as to whether a prosecution "should" continue. A court's role is to preside over cases, not to determine if a case should be prosecuted. If an individual line prosecutor agreed to dismiss a case

73

pursuant to a corrupt bargain, a court could deny the motion as contrary to the public interest, "and a different assistant U.S. attorney [c]ould continue with the prosecution," *In re United States*, 345 F.3d at 454, or make a new determination based on legitimate criteria to dismiss the case.  But it is another matter where, as here, the problematic rationale is put forward by the Justice Department itself, which represents that it will not go forward with the case under any circumstances.  *See* DOJ Br. at 17 (explaining that "the Justice Department has assumed responsibility for this case and determined that it should not be prosecuted," and that if leave were denied the Department would not devote any resources to prosecuting the case); Adams Br. at 19 ("[T]here is zero chance that the current leadership of the Department of Justice would instruct another prosecutor to continue the prosecution.").[59]

Thus, whatever teeth the public interest inquiry might have under Rule 48(a), denying dismissal as contrary to the public interest would be futile as a practical matter where, as here, the Motion was filed by DOJ itself.  *See id.*; *Nederlandsche*, 453 F. Supp. at 463.  While the Court could deny the Motion, allow seventy days to pass, and then dismiss the case on Speedy Trial Act grounds, it is hard to see what good that would accomplish.  And, given that seventy days from the date of this Opinion would take us uncomfortably close to the June 24, 2025 New York City mayoral primary election,[60] the Court concludes that, if dismissal is inevitable, the public interest weighs in favor of its happening now rather than later.

---

[59] The situation would arguably be different after entry of a judgment of conviction (pursuant to either a plea or a trial verdict).  In such a scenario, the government's role in the case would be largely complete; all that would remain would be for the Court to sentence the defendant. At that point, a determination by the court that dismissing the case would be contrary to the public interest might not raise the same separation of powers concerns.  *Cf. Flynn*, 507 F. Supp. 3d 116.

[60] *See* Board of Elections in the City of New York, Primary Election 2025, https://vote.nyc/election/primary-election-2025 [https://perma.cc/S72Q-WQDM].  Seventy days from the date of this decision is June 11, 2025.  Early voting begins on June 14, 2025.  *See id.*

For similar reasons, the Court concludes that further inquiry is not necessary at this time. Various *amici* have urged this Court to hold an evidentiary hearing to unearth more details regarding the events leading up to DOJ's Motion to Dismiss this case. *See, e.g.*, Common Cause Letter at 4 n.3, ECF No. 164; Former Federal Jurists Br. at 11-12. Another *amicus* has counseled against that route, arguing that there is essentially no authority for "[a]ny judicial inquiry into criminal dismissal decisions" "beyond a narrow focus on the defendant's constitutional rights." Separation of Powers Clinic Br. at 2, 6, ECF No. 143-1. There is some precedent indicating that a court may, under some circumstances, hold an evidentiary hearing when considering a Rule 48(a) Motion. *See, e.g.*, *Ocasio*, 623 F. Supp. 2d at 139. As DOJ itself suggested at a conference, further inquiry may be appropriate where there are some indicia of bad faith. *See* Feb 19 Conf. Tr. at 42:23-24 (stating, in response to whether a court may look beyond the four corners of a Rule 48(a) Motion, that it "boils down to whether there's bad faith").

Here, however, the Court concludes that no such further inquiry is necessary. While some questions remain for those seeking a complete picture of how the decision to dismiss unfolded (e.g., what exactly was said at the January 31 meeting between SDNY, DOJ, and Adams's counsel, and what USAO-SDNY said in its follow-up letter to DOJ), the record already makes clear that a least one of the rationales the Department has advanced is in fact a "real" basis for the Motion: DOJ has determined that dismissing this case will advance "federal immigration initiatives and policies." Rule 48(a) Mot. ¶ 6. No further factual development is necessary to arrive at that conclusion. And delving deeper would not change the ultimate outcome here, because the Court—even if it were so inclined—could not force the Government to prosecute this case by denying the Motion.

The discussion above, however, illustrates yet another reason why dismissal *with prejudice* is the most appropriate outcome here. "Rule 48(a) . . . permits courts faced with dismissal motions

75

to consider the public interest in the fair administration of criminal justice and the need to preserve the integrity of the courts." *Carrigan*, 778 F.2d at 1463.  As the court-appointed *amicus* noted, "if improper considerations tainted the decision to seek dismissal, then there is *a fortiori* every reason to protect the defendant from the threat of re-indictment."  Clement Br. at 22.  If in fact DOJ's immigration enforcement rationale amounts to a *quid pro quo* to extract policy concessions from the Mayor, then it is difficult to imagine a more egregious example of the kind of prosecutorial harassment Rule 48(a) is intended to guard against.  Such an arrangement would be bad for Mayor Adams, and it would be bad for the people of New York City.  And the Court cannot be complicit in it.

## CONCLUSION

DOJ's position on this Motion is essentially as follows: the Court should dismiss this prosecution because (1) it is tainted with impropriety; (2) it is detrimental to national security and immigration enforcement; and (3) it was a weak case to begin with—but the Court should also allow DOJ to bring the prosecution back at any time, for essentially any reason.

For the reasons stated above, the Court cannot and will not authorize such a result.  There may or may not be good reasons to drop this prosecution.  But the reasons articulated by DOJ, if taken at face value, are inconsistent with a decision to leave the charges in the Indictment hanging like the proverbial Sword of Damocles over the Mayor.  If dismissal is to be granted, such dismissal should be *with prejudice* in order to vindicate the purposes of Rule 48(a)—most importantly the protection of a defendant's right to be free from prosecutorial harassment.  That is clear from the submissions of the parties alone, without resort to any other factual materials submitted by *amici*.  And there are many reasons to be troubled by DOJ's proffered rationales—further supporting dismissal with prejudice.

Some will undoubtedly find today's decision unsatisfying, wondering why, if DOJ's ostensible reasons for dropping this case are so troubling, the Court does not simply deny the Motion to Dismiss altogether.  But, as explained above, the Court cannot order DOJ to continue the prosecution, and it is aware of no authority (outside of the criminal contempt context) that would empower it, as some have urged, to appoint an independent prosecutor.  Therefore, any decision by this Court to deny the Government's Motion to Dismiss would be futile at best, because DOJ could—and, by all indications, unequivocally would—simply refuse to prosecute the case, inevitably resulting in a dismissal after seventy days for violating the Mayor's right to a speedy trial.  That route would simply postpone finality in this case to a date uncomfortably close to the June 24 mayoral primary.  The public interest would not be served by such an outcome.

To be clear, the Court again emphasizes that it does not express any opinion as to the merits of the case or whether the prosecution of Mayor Adams "should" move forward.  The Court notes only that it has no authority to require that it continue, and that the remedy for what some *amici* characterize as an abuse of power cannot be for the Court to arrogate to itself more power than it may properly wield in our system of government.  It is precisely in the most difficult cases that it is most critical to adhere to constitutional principles.  That includes recognizing the limits of this Court's constitutional authority consistent with the separation of powers.

Ultimately, because the decision to discontinue a prosecution belongs primarily to a political branch of government, it is the public's judgment, and not this Court's, that truly matters. The Court can play only a limited role under Rule 48(a), including by providing a measure of transparency, which in turn may promote public accountability:

> [T]he public has a generalized interest in the processes through which prosecutors make decisions about whom to prosecute that a court can serve by inquiring into the reasons for a requested dismissal. While this interest cannot rise to the substantive ability to compel a prosecution to proceed, it does argue in favor of allowing a court to force prosecutors to publicly reveal their reasons for not proceeding before granting a requested dismissal.

Bringing these decisions into the open may, in turn, lead to attempts by the public to influence these decisions through democratic channels.

*In re Richards*, 213 F.3d at 789 (citation omitted).

In sum, for the reasons above, DOJ's Motion, ECF No. 122, is **GRANTED** to the extent that the Indictment is dismissed.  But it is **DENIED** as to the request that dismissal be "without prejudice."  Accordingly, it is hereby **ORDERED** that the Indictment against Eric Adams, ECF No. 2, is **DISMISSED WITH PREJUDICE**.   The Clerk of Court is respectfully directed to terminate ECF No. 122 and to close this case.

SO ORDERED.

Dated: April 2, 2025

New York, New York

_____
DALE E. HO
United States District Judge

# Exhibit 22

| | |
|---|---|
| **From:** | Ardian Tagani |
| **To:** | Jesse Schaffer |
| **Cc:** | Samantha Perez; Eric Adams (GMail); Sharon Adams; Vito R. Pitta |
| **Subject:** | Eric Adams 2021 & Eric Adams 2025 - November 15th Documentation Request Response |
| **Date:** | Monday, April 14, 2025 10:38:22 PM |
| **Attachments:** | Eric Adams 2025 - 20241115 Documentation Request Response - Signed.pdf |
| **Importance:** | High |

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Good evening,

On behalf of Vito R. Pitta, please see the attached response to the CFB's November 15, 2024 request for documentation.

Please confirm upon receipt and let me know if you have any questions.

Ardian Tagani, Esq.

Associate
Pitta LLP
ATagani@PittaLaw.com
www.pittalaw.com

Senior Government Relations Specialist
Pitta Bishop & Del Giorno LLC
ATagani@PittaBishop.com
http://www.pittabishop.com/

120 Broadway, 28th Floor
New York, New York 10271
(212) 652-3895 (Direct)
(212) 652-3890 (Office Main Line)



# PITTA LLP
### Attorneys at law

120 Broadway, 28th Floor
New York, New York 10271
Tel: (212) 652-3890
Facsimile: (212) 652-3891

**Vito R. Pitta**
**Co-Managing Partner**
Direct Dial: (212) 652-3881
VRPitta@PittaLaw.com

April 14, 2025

**<u>VIA ELECTRONIC MAIL</u>**
Jesse Schaffer
Director of Special Compliance
New York City Campaign Finance Board
100 Church Street, 12th Floor
New York, NY 10007

RE: Eric Adams 2021 & Eric Adams 2025 November 15 Documentation Request

Dear Mr. Schaffer:

This firm is counsel to Eric Adams 2021 ("the 2021 Committee") and Eric Adams 2025 ("the 2025 Committee") (collectively "the Committees"). Please accept this letter as a response to the New York City Campaign Finance Board's ("CFB") November 15, 2024 request for documentation.

The Committees have reviewed their records and have found no documentation responsive to the request that has not already been submitted to the CFB via the C-SMART system. Additionally, in preparing this response to the request for documentation, Counsel to the Committees identified past and current employees, consultants, and agents of the Committees who potentially could be in possession of documentation responsive to the CFB's request and on multiple occasions contacted the same to request the production of any such responsive documentation. These individuals all advised Counsel that they were in possession of no records which have not previously been provided to the CFB by the Committees.

Regarding the purported fundraiser held on either June 20, 2018 or June 22, 2018, the Committees have no records of this fundraiser. The 2021 Committee previously provided the CFB with a list of fundraising events as part of its response to the CFB's Initial Documentation Request. The Committees have no additional documentation beyond what has been previously provided to the CFB. The Committees are not in possession of any communications related to the event, including those to or from Reagan Ozgur, Cenk Ocal, or Rana Abbasova.

New York City Campaign Finance Board
RE: Eric Adams 2021 & Eric Adams 2025 November 15 Documentation Request
April 14, 2025
Page | 2

Regarding the purported fundraiser held on December 10, 2020, the Committees have no records of this fundraiser. The 2021 Committee previously provided the CFB with a list of fundraising events as part of its response to the CFB's Initial Documentation Request. The Committees have no additional documentation beyond what has been previously provided to the CFB. The Committees are not in possession of any communications related to the event, including those to or from Mohamad Bali or Ahsan Chughtai.

Regarding the May 7, 2021 fundraiser, the Committees are not in possession of any communications related to the event, including those to or from Rana Abbasova, Reagan Ozgur, or Erden Arkan.

Regarding Bay Atlantic University, the Committees are not in possession of any communications to or from Rana Abbassova and/or Enver Yucel.

Regarding the September 20, 2023 fundraiser, the Committees are not in possession of any communications related to the event, including those to or from Arda Sayiner.

Regarding the October 9, 2023 fundraiser, the Committees are not in possession of any communications related to the event, including those to or from Eyup "Peter" Ulu or Rana Abbasova, or regarding PortX Transportation Company.

Sincerely

Vito R. Pitta, Esq.


Cc:    Samantha Perez, Deputy Director of Candidate Services
       Hon. Eric L. Adams
       Sharon Adams
       Ardian Tagani, Esq.

# Exhibit 23

April 15, 2025                                          New York City Campaign Finance Board

CANDIDATE:   ADAMS, ERIC L (ID: 1545)
COMMITTEE:  ERIC ADAMS 2025
2025 EARLY PUBLIC FUNDS NONPAYMENT DETERMINATION

Based on a preliminary analysis, the Campaign Finance Board has determined that your campaign does not qualify for a public funds payment at this time.  The specifics of our calculation are described in the attached Detail Payment Report.  Please keep this notification and any attached report(s) for your records.  If you have any questions, please contact the Payment Coordinators Maria Alvarez and Alyson Joa-Perez at PaymentCoordinator@nyccfb.info.

The reason(s) for nonpayment are as follows:

The Campaign is not eligible for payment because it has not demonstrated compliance with Admin. Code § 12-110, as determined by the Conflicts of Interest Board.  See Admin. Code §§ 3-703(1)(m), 12-110; Board Rules 3-01(d)(ii)(D), 3-05.

This nonpayment of public funds is not a final determination by the Board, but rather is a preliminary determination subject to review of ongoing financial activity and final audit.  See Admin. Code §§3-710; Board Rule 3-01(c).

YOU MAY PETITION THE BOARD IN WRITING for reconsideration of this public funds determination.  Your petition must state the grounds for reconsideration and may include a request to appear before the Board.  Do not include any documentation or information not already submitted to the Board, unless the Board specifically requests it or you can show in your petition a good reason for failing to submit it previously. The Board will review the petition within five business days of receiving it and issue a timely written determination.  If the Board denies your petition, you may appeal, within four months, to the New York State Supreme Court pursuant to Article 78 of the Civil Practice Law and Rules.  See Admin. Code § 3-705(4); Board Rules 7-09.

04/15/2025 6:35 PM

**New York City Campaign Finance Board**
**Campaign Finance Information System**
**Detail Payment Report for 2025 Early Payment**
**Run:** 6    **Payment Date:** 04/15/2025

Page 1 of 2

**Candidate:** Adams, Eric L (ID: 1545)
**Office:** Mayor

| | Statement Date | Claimed Matchable | Invalid Claims | Gross Matchable | Payment |
|---|---|---|---|---|---|
| *Detail* | | | | | |
| | 1 (07/15/2022) | 68,347 | 17,390 | 50,957 | |
| | 2 (01/17/2023) | 37,100 | 8,700 | 28,400 | |
| | 3 (07/17/2023) | 118,526 | 22,550 | 95,976 | |
| | 4 (01/16/2024) | 57,276 | 11,826 | 45,450 | |
| | 5 (07/15/2024) | 192,718 | 37,117 | 155,601 | |
| | 6 (10/11/2024) | 43,691 | 10,426 | 33,265 | |
| | 7 (01/15/2025) | 20,777 | 3,000 | 17,777 | |
| | 8 (03/17/2025) | 3,420 | 950 | 2,470 | |
| | Total: | 541,855 | 111,959 | 429,896 | |
| | | 541,855 | 111,959 | 429,896 | |
| Matchable Adjustment: | | | - | 0 | |
| Adjusted Gross Matchable: | | | | 429,896 | |

*Regular Payment Calculation*

| | | |
|---|---|---|
| Adjusted Gross Matchable: | | 429,896 |
| General Regular Matchable: | - | 0 |
| Net Matchable: ( Threshold Met ) | | 429,896 |
| Matching Factor: | x | 8.0 |
| **EXTENDED NET REGULAR PAYABLE:  (Limit: 7,050,667)** | **3,439,168** | **3,439,168** |
| Total Previous Regular Payable: | - | 0 |
| Early Payment: | - | 0 |
| **REGULAR PAYABLE:** | | **3,439,168** |
| **MAX PAYABLE:** | | **3,439,168** |
| Net Withholding: ( See Notes Below ) | - | 17,848 |
| Reserve Amount: (   5.00 % ) | - | 171,066 |
| Reserve Applied: | + | 0 |
| **ADJUSTED AMOUNT ELIGIBLE:** | | 3,250,254 |
| Amount Payable: | | 0 |
| Penalty Deduction: | - | 0 |
| **PAYMENT DUE:** | | **0** |

Case 1:25-cv-03380-NGG-LKE     Document 11-2     Filed 06/23/25     Page 548 of 593
PageID #: 946

**New York City Campaign Finance Board**
**Campaign Finance Information System**
**Detail Payment Report for 2025 Early Payment**

**Run:** 6     **Payment Date:** 04/15/2025

**Candidate:** Adams, Eric L (ID: 1545)
**Office:** Mayor

### *Net Withholding*

| | | |
|---|---|---|
| Total Withholding: | | 17,848 |
| Previous Withholding: | - | 31,600 |
| Previous Unapplied Withholding: | + | 31,600 |
| **Net Withholding:** | | **17,848** |

### *Notes*

| | Withholding |
|---|---|
| OTL Contribution(s) | ( 9198 ) |
| Withholding for Excess Doing Business Contributions | ( 8650 ) |
| Withholding For Non Compliance | |

# Exhibit 24

April 15, 2025                                    New York City Campaign Finance Board

CANDIDATE:   ADAMS, ERIC L (ID: 1545)
COMMITTEE:  ERIC ADAMS 2025
2025 EARLY PUBLIC FUNDS NONPAYMENT DETERMINATION

Based on a preliminary analysis, the Campaign Finance Board has determined that your campaign does not qualify for a public funds payment at this time.  The specifics of our calculation are described in the attached Detail Payment Report.  Please keep this notification and any attached report(s) for your records.  If you have any questions, please contact the Payment Coordinators Maria Alvarez and Alyson Joa-Perez at PaymentCoordinator@nyccfb.info.

The reason(s) for nonpayment are as follows:

The Campaign is not eligible for payment because it has not demonstrated compliance with Admin. Code § 12-110, as determined by the Conflicts of Interest Board.  See Admin. Code §§ 3-703(1)(m), 12-110; Board Rules 3-01(d)(ii)(D), 3-05.

The Campaign is not eligible for payment because of preliminary findings of substantial violations which may result in penalties.  Details regarding these findings will be sent to you shortly.  See generally Admin. Code §§ 3-703; 3-705(1), 3-711; Board Rules 3-01(d)(i)(G), (ii)(H), 3-01(e).

This nonpayment of public funds is not a final determination by the Board, but rather is a preliminary determination subject to review of ongoing financial activity and final audit.  See Admin. Code §§3-710; Board Rule 3-01(c).

YOU MAY PETITION THE BOARD IN WRITING for reconsideration of this public funds determination.  Your petition must state the grounds for reconsideration and may include a request to appear before the Board.  Do not include any documentation or information not already submitted to the Board, unless the Board specifically requests it or you can show in your petition a good reason for failing to submit it previously. The Board will review the petition within five business days of receiving it and issue a timely written determination.  If the Board denies your petition, you may appeal, within four months, to the New York State Supreme Court pursuant to Article 78 of the Civil Practice Law and Rules.  See Admin. Code § 3-705(4); Board Rules 7-09.

04/15/2025 8:28 PM

**New York City Campaign Finance Board**
**Campaign Finance Information System**
**Detail Payment Report for 2025 Early Payment**
**Run:** 6      **Payment Date:** 04/15/2025

Page 1 of 2

**Candidate:** Adams, Eric L (ID: 1545)
**Office:** Mayor

| | Statement Date | Claimed Matchable | Invalid Claims | Gross Matchable | Payment |
|---|---|---|---|---|---|
| *Detail* | | | | | |
| | 1 (07/15/2022) | 68,347 | 17,390 | 50,957 | |
| | 2 (01/17/2023) | 37,100 | 8,700 | 28,400 | |
| | 3 (07/17/2023) | 118,526 | 22,550 | 95,976 | |
| | 4 (01/16/2024) | 57,276 | 11,826 | 45,450 | |
| | 5 (07/15/2024) | 192,718 | 37,117 | 155,601 | |
| | 6 (10/11/2024) | 43,691 | 10,426 | 33,265 | |
| | 7 (01/15/2025) | 20,777 | 3,000 | 17,777 | |
| | 8 (03/17/2025) | 3,420 | 950 | 2,470 | |
| | Total: | 541,855 | 111,959 | 429,896 | |
| | | 541,855 | 111,959 | 429,896 | |
| Matchable Adjustment: | | | - | 0 | |
| Adjusted Gross Matchable: | | | | 429,896 | |
| *Regular Payment Calculation* | | | | | |
| Adjusted Gross Matchable: | | | | 429,896 | |
| General Regular Matchable: | | | - | 0 | |
| Net Matchable: ( Threshold Met ) | | | | 429,896 | |
| Matching Factor: | | | x | 8.0 | |
| **EXTENDED NET REGULAR PAYABLE:  (Limit: 7,050,667)** | | | | 3,439,168 | **3,439,168** |
| Total Previous Regular Payable: | | | | - | 0 |
| Early Payment: | | | | - | 0 |
| **REGULAR PAYABLE:** | | | | | **3,439,168** |
| **MAX PAYABLE:** | | | | | **3,439,168** |
| Net Withholding: ( See Notes Below ) | | | | - | 17,848 |
| Reserve Amount:   ( 5.00 % ) | | | | - | 171,066 |
| Reserve Applied: | | | | + | 0 |
| **ADJUSTED AMOUNT ELIGIBLE:** | | | | | 3,250,254 |
| Amount Payable: | | | | | 0 |
| Penalty Deduction: | | | | - | 0 |
| **PAYMENT DUE:** | | | | | **0** |

Case 1:25-cv-03380-NGG-LKE    Document 11-2    Filed 06/23/25    Page 552 of 593 PageID #: 950

**New York City Campaign Finance Board**
**Campaign Finance Information System**
**Detail Payment Report for 2025 Early Payment**
**Run:** 6    **Payment Date:** 04/15/2025

**Candidate:** Adams, Eric L (ID: 1545)
**Office:** Mayor

| *Net Withholding* | | |
|---|---|---|
| Total Withholding: | | 17,848 |
| Previous Withholding: | - | 31,600 |
| Previous Unapplied Withholding: | + | 31,600 |
| **Net Withholding:** | | **17,848** |

| *Notes* | Withholding |
|---|---|
| OTL Contribution(s) | ( 9198 ) |
| Withholding for Excess Doing Business Contributions | ( 8650 ) |
| Withholding For Non Compliance | |

# Exhibit 25



**New York City Campaign Finance Board**
100 Church Street, 12th Floor, New York, NY 10007
212.409.1800  |  www.nyccfb.info

Frederick P. Schaffer
*Chair*

Gregory T. Camp
Richard J. Davis
Lawrence Moskowitz
Dawn L. Smalls
*Members*

Paul Seamus Ryan
*Executive Director*

April 15, 2025

Sharon Adams
Eric Adams 2025
1043 E 101 Street
Brooklyn, NY 11236

**RE: 2025 Public Funds Payment Determination Supplemental Notice**

Based on a preliminary analysis, and as set forth in the Public Funds Nonpayment Determination and the Detail Payment Report, which you have already received, pursuant to Board Rules 3-01(d)(i)(A)(2), 3-01(d)(ii)(A)(4), and 3-01(d)(ii)(B), the Campaign Finance Board (the "Board") has determined that the Eric Adams 2025 campaign (the "Campaign") has not demonstrated eligibility for a public funds payment. This letter provides the Campaign with additional information regarding the nonpayment determination.

The Board has reviewed the information contained in the September 26, 2024 indictment of Eric Adams (*see United States v. Adams*, 24 CR 556); a complaint alleging crimes committed by Adams' associate Mohamed Bahi in conjunction with an alleged straw donation scheme for Adams' 2021 mayoral campaign; a February 7, 2025 letter from former United States Attorney for the Southern District of New York Danielle Sassoon to Judges Dale E. Ho and Analisa Torres of the Southern District of New York, notifying them of Bahi's alleged intent to plead guilty to conspiracy to commit wire fraud; an information alleging that Adams' associate Erden Arkan committed wire fraud, in conjunction with an alleged straw donation scheme for Adams' 2021 mayoral campaign; the transcript of Arkan's allocution in which he pled guilty to that crime; Acting Deputy Attorney General Emil Bove's February 10, 2025 memorandum to the U.S. Attorney's Office for the Southern District of New York, instructing prosecutors to dismiss the charges against Adams; Sassoon's February 12, 2025 resignation letter; Bove's February 13, 2025 letter accepting Sassoon's resignation; and Judge Ho's April 2, 2025 Opinion and Order dismissing the charges against Adams with prejudice. The Board has reason to believe that Eric Adams has, in the course of public funds program participation, engaged in conduct detrimental to the Program that is in violation of federal, state, and/or City law, including the Campaign Finance Act and Board Rules.

Furthermore, campaigns must provide to the Board, upon its request, documents, records, or other information that verifies campaign activity and failure to respond can make a campaign ineligible for public funds pursuant to Board Rule 3-01(d)(i)(A)(2). On November 15, 2024, CFB staff made a request for documentation and information related to allegations in the indictment from the Campaign with a

response deadline of December 6, 2024. On December 5, 2024, an attorney for the Campaign called CFB Staff and left a voicemail stating that the Campaign would not respond to the CFB staff's request at this time because the requests were related to incidents referenced in the indictment. This failure to respond to a request for information is a basis for ineligibility for public funds. The Campaign sent a response on April 14, 2025 at 10:37 PM. This response was not reviewed prior to the 10 AM meeting of the Board on April 15, 2025.

Please be aware that certain types of activities can lead the Board to find a candidate in breach of certification. The issues raised in this letter may cause the Board to consider whether the Campaign has submitted a disclosure statement which the participant knew or should have known includes substantial fraudulent matchable contribution claims, which is one of the activities that can lead to a finding of breach of certification.[1] In addition, the Campaign may be assessed financial penalties and may be found ineligible to receive public funds based on a finding of fraud or material misrepresentation, whether or not it is found in breach.[2]

These preliminary findings are not a final determination by the Board, but rather, a preliminary determination subject to review of ongoing financial activity and final audit.

**You may petition the Board in writing** for reconsideration of this public funds determination. Your petition must state the grounds for reconsideration and may include a request to appear before the Board. The Board will review the petition and issue a written determination within 5 business days of receiving it, unless the Campaign wishes to appear at the next scheduled Board meeting. Do not include any documentation or information not already submitted to the Board, unless the Board specifically requests it or you can show in your petition a good reason for failing to submit it previously.[3] If the Board denies your petition, you have four months to challenge the Board's determination in New York State Supreme Court pursuant to Article 78 of the Civil Practice Law and Rules.

If you have any questions, please contact me at dwillemin@nyccfb.info.

Sincerely,

Danielle Willemin
Director of Auditing and Accounting

---

[1] *See* Admin. Code § 3-711; Board Rule 3-01(e).
[2] *See* Admin. Code § 3-711; Board Rule 3-01(d).
[3] *See* Admin. Code § 3-705(4); Board Rule 7-09.

# Exhibit 26

| | |
|---|---|
| **From:** | Holli Hellman |
| **To:** | Hannah Egerton |
| **Cc:** | Katherine Miller |
| **Subject:** | RE: Updated list of incumbents who have submitted 2024 annual disclosure reports |
| **Date:** | Monday, April 21, 2025 11:37:01 AM |
| **Attachments:** | 2025-04-21 Incumbent Elected Officials.xlsx |

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Good morning,

Attached is an updated list of incumbent candidates who have filed 2024 annual disclosure reports.
Thank you

Holli R. Hellman
Senior Annual Disclosure Analyst
NYC Conflicts of Interest Board
2 Lafayette St, Rm 1010
New York, NY 10007
212-437-0732 | hellman@coib.nyc.gov

**From:** Hannah Egerton <HEgerton@NYCCFB.INFO>
**Sent:** Monday, April 21, 2025 10:17 AM
**To:** Holli Hellman <Hellman@coib.nyc.gov>
**Cc:** Katherine Miller <kmiller@coib.nyc.gov>
**Subject:** [EXTERNAL] RE: Updated list of incumbents who have submitted 2024 annual disclosure reports

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Report suspected phishing emails with the Phish Alert Button or forward them to phish@oti.nyc.gov as an attachment.

Good morning,

Hope you are doing well. Would you happen to have an updated list of incumbents in compliance with your office? I do not think I received an update last week.

Thank you for your help,

Hannah

**From:** Holli Hellman <Hellman@coib.nyc.gov>
**Sent:** Friday, April 11, 2025 9:51 AM
**To:** Hannah Egerton <HEgerton@NYCCFB.INFO>
**Cc:** Katherine Miller <kmiller@coib.nyc.gov>
**Subject:** Updated list of incumbents who have submitted 2024 annual disclosure reports


CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Hi Hannah,

Attached is an updated list of candidates who have submitted 2024 annual disclosure reports.
Thank you

Holli R. Hellman
Senior Annual Disclosure Analyst
NYC Conflicts of Interest Board
2 Lafayette St, Rm 1010
New York, NY 10007
212-437-0732 | hellman@coib.nyc.gov

| LAST NAME | FIRST NAME | DATE OF INITIAL FILING | STATUS (Accepted, Not Accepted or Amendment Accepted) | DATE ACCEPTED AS COMPLETE |
|---|---|---|---|---|
| Abreu | Shaun | 1/10/2025 | Accepted | 1/10/2025 |
| Adams | Adrienne | 4/13/2025 | Amendment Accepted | 4/17/2025 |
| Adams | Eric | 4/14/2025 | Not Accepted | |
| Ariola | Joann | 1/18/2025 | Amendment Accepted | 2/14/2025 |
| Arnwine | Dante | 3/5/2025 | Amendment Accepted | 3/24/2025 |
| Aviles | Alexa | 1/19/2025 | Accepted | 1/19/2025 |
| Banks | Christopher | 1/29/2025 | Amendment Accepted | 3/21/2025 |
| Bottcher | Erik | 1/21/2025 | Amendment Accepted | 1/24/2025 |
| Brannan | Justin | 1/2/2025 | Amendment Accepted | 1/21/2025 |
| Caban | Tiffany | 1/13/2025 | Accepted | 1/13/2025 |
| Dinowitz | Eric | 1/6/2025 | Amendment Accepted | 1/6/2025 |
| Farias | Amanda | 2/3/2025 | Amendment Accepted | 2/5/2026 |
| Feliz | Oswald | 1/7/2025 | Accepted | 1/7/2025 |
| Gennaro | James | 1/20/2025 | Not Accepted | |
| Gibson | Vanessa | 1/30/2025 | Amendment Accepted | 2/3/2025 |
| Gutierrez | Jennifer | 2/18/2025 | Accepted | 2/18/2025 |
| Hanif | Shahana | 1/11/2025 | Accepted | 1/11/2025 |
| Hanks | Kamillah | 1/10/2025 | Amendment Accepted | 2/19/2025 |
| Hudson | Crystal | 1/11/2025 | Accepted | 1/11/2025 |
| Joseph | Rita | 2/19/2025 | Accepted | 2/19/2025 |
| Krishnan | Shekar | 1/21/2025 | Accepted | 1/21/2025 |
| Lander | Brad | 1/21/2025 | Amendment Accepted | 1/21/2025 |
| Lee | Linda | 1/21/2025 | Accepted | 1/21/2025 |
| Levine | Mark | 1/21/2025 | Amendment Accepted | 1/23/2025 |
| Louis | Farah | 1/17/2025 | Accepted | 1/21/2025 |
| Marmorato | Kristy | 1/14/2025 | Accepted | 1/14/2025 |
| Marte | Christopher | 1/8/2025 | Amendment Accepted | 1/9/2025 |
| Mealy | Darlene | 1/14/2025 | Accepted | 1/14/2025 |
| Menin | Julie | 3/28/2025 | Not Accepted | |
| Narcisse | Mercedes | 1/21/2025 | Accepted | 1/21/2025 |
| Nurse | Sandy | 1/21/2025 | Accepted | 1/21/2025 |
| Osse | Chi | 2/7/2025 | Amendment Accepted | 4/8/2025 |
| Powers | Keith | 1/21/2025 | Amendment Accepted | 1/22/2025 |
| Reynoso | Antonio | 1/21/2025 | Amendment Accepted | 3/3/2025 |
| Restler | Lincoln | 1/15/2025 | Amendment Accepted | 1/17/2025 |
| Richards | Donovan | 1/16/2025 | Amendment Accepted | 1/23/2025 |
| Riley | Kevin | 1/17/2025 | Amendment Accepted | 1/23/2025 |
| Salaam | Yusef | 2/20/2025 | Not Accepted | |
| Salamanca | Rafael | 1/17/2025 | Amendment Accepted | 2/18/2025 |
| Sanchez | Pierina | 1/21/2025 | Not Accepted | |
| Schulman | Lynn | 1/3/2025 | Accepted | 1/3/2025 |
| Stevens | Althea | 2/7/2025 | Accepted | 2/7/2025 |
| Ung | Sandra | 1/13/2025 | Accepted | 1/13/2025 |
| Vernikov | Inna | 3/7/2025 | Accepted | 3/7/2025 |
| Williams | Jumaane | 3/20/2025 | Amendment Accepted | 4/1/2025 |
| Won | Julie | 1/10/2025 | Accepted | 1/10/2025 |
| Zhuang | Susan | 1/6/2025 | Amendment Accepted | 1/8/2025 |
| Malave | Ismael | 1/12/2025 | Accepted | 1/12/2025 |

# Exhibit 27

| | |
|---|---|
| **From:** | Holli Hellman |
| **To:** | Hannah Egerton |
| **Cc:** | Katherine Miller |
| **Subject:** | Updated list of incumbent candidates who have submitted 2024 annual disclosure reports |
| **Date:** | Friday, April 25, 2025 12:25:58 PM |
| **Attachments:** | 2025-04-25 Incumbent Elected Officials.xlsx |

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Hi Hannah,

Attached is an updated list of incumbent candidates who have submitted 2024 annual disclosure reports.
Thank you

Holli R. Hellman
Senior Annual Disclosure Analyst
NYC Conflicts of Interest Board
2 Lafayette St, Rm 1010
New York, NY 10007
212-437-0732 | hellman@coib.nyc.gov

| LAST NAME | FIRST NAME | DATE OF INITIAL FILING | STATUS (Accepted, Not Accepted or Amendment Accepted) | DATE ACCEPTED AS COMPLETE |
|---|---|---|---|---|
| Abreu | Shaun | 1/10/2025 | Accepted | 1/10/2025 |
| Adams | Adrienne | 4/13/2025 | Amendment Accepted | 4/17/2025 |
| Adams | Eric | 4/14/2025 | Not Accepted | |
| Ariola | Joann | 1/18/2025 | Amendment Accepted | 2/14/2025 |
| Arnwine | Dante | 3/5/2025 | Amendment Accepted | 3/24/2025 |
| Aviles | Alexa | 1/19/2025 | Accepted | 1/19/2025 |
| Banks | Christopher | 1/29/2025 | Amendment Accepted | 3/21/2025 |
| Bottcher | Erik | 1/21/2025 | Amendment Accepted | 1/24/2025 |
| Brannan | Justin | 1/2/2025 | Amendment Accepted | 1/21/2025 |
| Caban | Tiffany | 1/13/2025 | Accepted | 1/13/2025 |
| Dinowitz | Eric | 1/6/2025 | Amendment Accepted | 1/6/2025 |
| Farias | Amanda | 2/3/2025 | Amendment Accepted | 2/5/2026 |
| Feliz | Oswald | 1/7/2025 | Accepted | 1/7/2025 |
| Gennaro | James | 1/20/2025 | Not Accepted | |
| Gibson | Vanessa | 1/30/2025 | Amendment Accepted | 2/3/2025 |
| Gutierrez | Jennifer | 2/18/2025 | Accepted | 2/18/2025 |
| Hanif | Shahana | 1/11/2025 | Accepted | 1/11/2025 |
| Hanks | Kamillah | 1/10/2025 | Amendment Accepted | 2/19/2025 |
| Hudson | Crystal | 1/11/2025 | Accepted | 1/11/2025 |
| Joseph | Rita | 2/19/2025 | Accepted | 2/19/2025 |
| Krishnan | Shekar | 1/21/2025 | Accepted | 1/21/2025 |
| Lander | Brad | 1/21/2025 | Amendment Accepted | 1/21/2025 |
| Lee | Linda | 1/21/2025 | Accepted | 1/21/2025 |
| Levine | Mark | 1/21/2025 | Amendment Accepted | 1/23/2025 |
| Louis | Farah | 1/17/2025 | Accepted | 1/21/2025 |
| Marmorato | Kristy | 1/14/2025 | Accepted | 1/14/2025 |
| Marte | Christopher | 1/8/2025 | Amendment Accepted | 1/9/2025 |
| Mealy | Darlene | 1/14/2025 | Accepted | 1/14/2025 |
| Menin | Julie | 3/28/2025 | Amendment Accepted | 4/25/2025 |
| Narcisse | Mercedes | 1/21/2025 | Accepted | 1/21/2025 |
| Nurse | Sandy | 1/21/2025 | Accepted | 1/21/2025 |
| Osse | Chi | 2/7/2025 | Amendment Accepted | 4/8/2025 |
| Paladino | Vickie | 4/22/2025 | Accepted | 4/22/2025 |
| Powers | Keith | 1/21/2025 | Amendment Accepted | 1/22/2025 |
| Reynoso | Antonio | 1/21/2025 | Amendment Accepted | 3/3/2025 |
| Restler | Lincoln | 1/15/2025 | Amendment Accepted | 1/17/2025 |
| Richards | Donovan | 1/16/2025 | Amendment Accepted | 1/23/2025 |
| Riley | Kevin | 1/17/2025 | Amendment Accepted | 1/23/2025 |
| Salaam | Yusef | 2/20/2025 | Amendment Accepted | 4/24/2025 |
| Salamanca | Rafael | 1/17/2025 | Amendment Accepted | 2/18/2025 |
| Sanchez | Pierina | 1/21/2025 | Amendment Accepted | 3/26/2025 |
| Schulman | Lynn | 1/3/2025 | Accepted | 1/3/2025 |
| Stevens | Althea | 2/7/2025 | Accepted | 2/7/2025 |
| Ung | Sandra | 1/13/2025 | Accepted | 1/13/2025 |
| Vernikov | Inna | 3/7/2025 | Accepted | 3/7/2025 |
| Williams | Jumaane | 3/20/2025 | Amendment Accepted | 4/1/2025 |
| Won | Julie | 1/10/2025 | Accepted | 1/10/2025 |
| Zhuang | Susan | 1/6/2025 | Amendment Accepted | 1/8/2025 |

| Malave | Ismael | 1/12/2025 | Accepted | 1/12/2025 |

# Exhibit 28

| From: | Katherine Miller |
|---|---|
| To: | Hannah Egerton |
| Cc: | Holli Hellman |
| Subject: | RE: Updated list of incumbent candidates who have submitted 2024 annual disclosure reports |
| Date: | Friday, April 25, 2025 4:39:13 PM |

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Hi Hannah,

Eric Adams has filed his amendment, which COIB has accepted as complete.

Thanks,
Katherine

**Katherine J. Miller** (she/her)
Director of Annual Disclosure & Special Counsel | NYC Conflicts of Interest Board
2 Lafayette Street, Suite 1010 | New York, New York 10007
(212) 437-0730 | kmiller@coib.nyc.gov

---

**From:** Katherine Miller
**Sent:** Friday, April 25, 2025 1:02 PM
**To:** Hannah Egerton <HEgerton@NYCCFB.INFO>; Holli Hellman <hellman@coib.nyc.gov>
**Subject:** RE: Updated list of incumbent candidates who have submitted 2024 annual disclosure reports

Hi Hannah,

Eric Adams has not submitted his amendment yet.

Thanks,
Katherine

**Katherine J. Miller** (she/her)
Director of Annual Disclosure & Special Counsel | NYC Conflicts of Interest Board
2 Lafayette Street, Suite 1010 | New York, New York 10007
(212) 437-0730 | kmiller@coib.nyc.gov

---

**From:** Hannah Egerton <HEgerton@NYCCFB.INFO>
**Sent:** Friday, April 25, 2025 1:01 PM
**To:** Holli Hellman <Hellman@coib.nyc.gov>
**Cc:** Katherine Miller <kmiller@coib.nyc.gov>
**Subject:** [EXTERNAL] RE: Updated list of incumbent candidates who have submitted 2024 annual disclosure reports

**CAUTION:** This email originated from outside of the organization. Do not click links or open

attachments unless you recognize the sender and know the content is safe. Report suspected phishing emails with the Phish Alert Button or forward them to phish@oti.nyc.gov as an attachment.

Good afternoon,

Thank you for the update! As a follow-up, the Eric Adams campaign reached out saying they submitted an amendment yesterday, could you confirm?

Thank you,

Hannah

---

**From:** Holli Hellman <Hellman@coib.nyc.gov>
**Sent:** Friday, April 25, 2025 12:25 PM
**To:** Hannah Egerton <HEgerton@NYCCFB.INFO>
**Cc:** Katherine Miller <kmiller@coib.nyc.gov>
**Subject:** Updated list of incumbent candidates who have submitted 2024 annual disclosure reports

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Hi Hannah,

Attached is an updated list of incumbent candidates who have submitted 2024 annual disclosure reports.
Thank you

Holli R. Hellman
Senior Annual Disclosure Analyst
NYC Conflicts of Interest Board
2 Lafayette St, Rm 1010
New York, NY 10007
212-437-0732 | hellman@coib.nyc.gov

# Exhibit 29



PITTA LLP
Attorneys at law

120 Broadway, 28th Floor
New York, New York 10271
Tel: (212) 652-3890
Facsimile: (212) 652-3891

**Vito R. Pitta**
**Co-Managing Partner**
Direct Dial: (212) 652-3881
VRPitta@PittaLaw.com

April 25, 2025

<u>**VIA ELECTRONIC MAIL**</u>
Danielle Willemin
Director of Auditing and Accounting
New York City Campaign Finance Board
100 Church Street, 12th Floor
New York, NY 10007

RE: Early Public Funds Nonpayment Determination

Dear Ms. Willemin:

This firm is counsel to Eric Adams 2025 ("the Committee"). Please accept this letter and the documents appended hereto as a response to and a petition for reconsideration, pursuant to CFB Rule §7-09, of the 2025 Early Public Funds Nonpayment Determination ("Nonpayment Determination") and 2025 Public Funds Payment Determination Supplemental Notice ("Supplemental Notice") issued by the New York City Campaign Finance Board ("CFB" or "Board") on April 15, 2025.

The Nonpayment Determination identifies two reasons for the CFB's finding that the Committee is not eligible for payment of early public funds for the 2025 election cycle: (1) noncompliance with Admin. Code §12-110; and (2) "preliminary findings of substantial violations." This petition for reconsideration challenges both of those reasons. Mayor Adams ("Candidate") waives his right to appear before the Board in connection with this petition.

*Administrative Code §12-110*

Mayor Eric Adams electronically filed his full calendar year 2024 Personal Financial Disclosure with the New York City Conflicts of Interest Board on April 14, 2025 at 8:03PM. Attached as Exhibit A is a copy of the filing receipt for the same. This submission supplemented his partial calendar year 2024 Personal Financial Disclosure which previously had been filed prior to the November 1, 2024 deadline. Pursuant to Admin. Code §3-703(m)(iii), submission of this filing satisfies the obligation under Admin. Code §12-110 and demonstrates eligibility for

New York City Campaign Finance Board
RE: Eric Adams 2025 Public Funds Payment Determination Response
April 25, 2025
Page | 2

payment of public funds. Accordingly, the reference to noncompliance with this requirement in the Nonpayment Determination is erroneous and must be reversed.

*Preliminary Findings of Substantial Violations*

Citing Admin. Code §§3-703; 3-705(1); and 3-711, as well as CFB Rules §§3-01(d)(i)(G); 3-01(d)(ii)(H); and 3-01(e),[1] the Nonpayment Determination indicates that the Committee is "not eligible for payment because of preliminary findings of substantial violations which may result in penalties." This vague rationale should have been clarified in the subsequently issued Supplemental Notice, however, the Supplemental Notice, in addition to citing different provisions of the administrative code and CFB Rules than were cited in the Nonpayment Determination, offers not a modicum of detail about the alleged "preliminary findings of substantial violations."[2] Additionally, the Supplemental Notice seems to suggest an additional basis for ineligibility (i.e., failure to respond to CFB inquiry) which is not referenced in the Nonpayment Determination.

While purporting to "provide[] the Campaign with additional information regarding the nonpayment determination,"[3] the Supplemental Notice affords very little in the way of "additional information"—certainly no information which offers the Committee the ability to dispute or challenge the CFB's determination—before concluding that the "Board has reason to believe that Eric Adams has, in the course of public funds program participation, engaged in conduct detrimental to the Program that is in violation of federal, state, and/or City law, including the Campaign Finance Act and Board Rules."[4] The Supplemental Notice only qualifies this conclusion, unsupported by any specific detail, by indicating that the CFB has reviewed:

"…the information contained in the September 26, 2024 indictment of Eric Adams (see United States v. Adams, 24 CR 556); a complaint alleging crimes committed by Adams' associate Mohamed Bahi in conjunction with an alleged straw donation scheme for Adams' 2021 mayoral campaign; a February 7, 2025 letter from former United States Attorney for the Southern District of New York Danielle Sassoon to Judges Dale E. Ho and Analisa Torres of the Southern District of New York, notifying them of Bahi's alleged intent to plead guilty to conspiracy to commit wire fraud; an information alleging that Adams' associate Erden Arkan committed wire fraud, in conjunction with an alleged straw donation scheme for Adams' 2021 mayoral campaign; the transcript of Arkan's allocution in which he pled guilty to that crime; Acting Deputy Attorney General Emil Bove's February 10, 2025 memorandum to the U.S. Attorney's Office for the Southern District of New York, instructing prosecutors to dismiss the charges against Adams; Sassoon's February 12, 2025 resignation letter; Bove's February 13, 2025 letter accepting

---

[1] It appears that reference is made to the version of the rules that was in effect for the 2021 election cycle. The current version of the rules no longer has sections that correspond to a number of these citations.
[2] 2025 Early Public Funds Nonpayment Determination, April 15, 2025, p. 1.
[3] 2025 Public Funds Payment Determination Supplemental Notice, April 15, 2025, p. 1.
[4] *Id.*

New York City Campaign Finance Board
RE: Eric Adams 2025 Public Funds Payment Determination Response
April 25, 2025
Page | 3

Sassoon's resignation; and Judge Ho's April 2, 2025 Opinion and Order dismissing the charges against Adams with prejudice…"[5]

The Supplemental Notice does not provide any further explanation of what, in particular, if anything, contained in the litany of documents identified supports the CFB's purported "reason to believe" that the candidate engaged in conduct in violation of applicable law. The CFB's failure to provide any specificity or factual basis for its preliminary determination of ineligibility to receive public funds frustrates the entire purpose of the requirement in CFB Rule §3-01(c) that the CFB provide "written notification to the candidate [of the preliminary determination of ineligibility]…[so that] the candidate may request reconsideration of such determination pursuant to section 7-09." It is a core principle of due process that a government agency provide sufficient notice and opportunity to be heard. The Committee's ability to petition for reconsideration pursuant to CFB Rule §7-09 is meaningless when the CFB's preliminary determination of ineligibility gives no notice of the alleged unlawful conduct that is the basis for the determination. Indeed, CFB Rule §7-09 requires that a "petition must state *one or more specific grounds* for reconsideration…" (emphasis added). By failing to provide specificity with respect to the alleged violations that are the basis for its determination, the CFB's notice makes it impossible for the Committee to comply with the requirements of CFB Rule §7-09 when seeking to petition the Board to reconsider its determination.

By contrast, this barebones, conclusory determination that the CFB has "reason to believe" that the candidate violated applicable law is a significant departure from the very detailed notices that the CFB provides in connection with its standard enforcement process. Chapter 10 of the CFB Rules provides specific requirements about detailed notice and the ability of a candidate to respond to and contest the same. For example, CFB Rule §10-03 requires that CFB provide a candidate "[n]otice and an opportunity to contest"[6] any alleged infractions or violations. Such notices must: "set forth in detail the factual and legal basis for staff's recommendation that a violation, infraction, or public funds repayment obligation be found."[7]

Notwithstanding the vagueness of the CFB's assertion that it has reason to believe that the candidate violated applicable law, any reliance on allegations contained in an indictment; complaint; or information (or any other unsubstantiated allegation) to reach such a conclusion is entirely inappropriate and should be an insufficient basis to determine ineligibility. Similarly, reliance on assertions of former prosecutors or dicta in a judicial order cannot be a basis for having "reason to believe" a violation has occurred.

The Supplemental Notice also cites CFB Rule §3-01(d)(i)(A)(2), relating to the Committee's obligation to provide to the CFB documents, records, and other information, upon request, and references a November 15, 2024 request made to the Committee for such documents, records, and information. Despite this reference in the Supplemental Notice, the

---

[5] *Id.*
[6] CFB Rule §10-03(a).
[7] *Id.* at §10-03(a)(i).

New York City Campaign Finance Board
RE: Eric Adams 2025 Public Funds Payment Determination Response
April 25, 2025
Page | 4

Nonpayment Determination does not include this as a basis for the determination that the Committee is ineligible for a public funds payment.[8] The inconsistent rationales offered in the Nonpayment Determination and Supplemental notice notwithstanding, inasmuch as this reference suggests that this is an additional basis for nonpayment, the Supplemental Notice acknowledges that the Committee did in fact submit a response to the information request on April 14, 2025. Therefore, its inclusion in the Supplemental Notice is gratuitous.

Ultimately, the entire basis for the CFB's determination is conclusory and insufficiently explained so as to prevent the Committee from challenging the same. The CFB's determination of ineligibility, given the timing of the 2025 election, is significantly detrimental to the Committee's operations and ability of the Candidate to campaign for reelection. It also is not the sole remedy available to the CFB. CFB Rule §7-06 provides the CFB the ability to withhold the payment of public funds for certain matching fund claims. Specifically, CFB Rule §7-06(b)(a) authorizes withholding of a percentage equal to the projected rate of invalid matching claims; Rule §7-06(b)(b) authorizes withholding of an amount equal to any contributions made, received, solicited, or otherwise obtained in violation of law; and Rule §7-06(b)(c) authorizes withholding of an amount up to an additional 5% if the CFB determines that there is reason to believe that the candidate has failed to comply with the Act. Notwithstanding this authority to fashion a narrower remedy for suspected violations, the CFB has determined, without sufficient notice of its basis for the same, that the Committee is entirely ineligible for public funds, during a most critical time of the election cycle. This arbitrary and capricious and overbroad determination, that is based only on a vague and conclusory statement that it has reason to believe violations have occurred, cannot stand.

Sincerely

Vito R. Pitta, Esq.

Cc:     Ms. Samantha Perez, Deputy Director of Candidate Services
        Hon. Eric L. Adams
        Ms. Sharon Adams, Treasurer
        Ardian Tagani, Esq.

---

[8] As noted in the second paragraph of this letter, *supra*, the 2025 Early Public Funds Nonpayment Determination dated April 15, 2025 identifies only two reasons for nonpayment, neither of which is related to CFB Rule §3-01(d)(i)(A)(2).

# EXHIBIT A

## COIB | Electronic Financial Disclosures

### Annual Filing Receipt For  Eric  Adams

| | |
|---|---|
| EMPLOYEE ID NUMBER: | 0382650 |
| FILING YEAR: | 2024 |
| DATE OF FILING: | 04/14/2025 at 8:03:13 PM EDT |

Any intentional violation of the Annual Disclosure Law (NYC Administrative Code Section 12-110), including, but not limited to, failure to include assets or liabilities, and misstatements of assets or liabilities, shall constitute a misdemeanor punishable by imprisonment for not more than one year or by a fine not to exceed $1,000, or by both, and shall constitute grounds for imposition of disciplinary penalties, including removal from office. In addition, any intentional violation of the provisions of the Annual Disclosure Law may subject the person reporting to assessment by the Conflicts of Interest Board of a civil penalty in an amount up to $10,000.

This receipt contains two bar codes that each contain a "digital fingerprint" associated with your Electronic Financial Disclosure Report filed on 04/14/2025 at 8:03:13 PM EDT.



COIB Report Digital Fingerprint



COIB & E091 Combined Report Digital Fingerprint

I, Eric  Adams, have affixed my electronic signature and certify that I have not shared my password with anyone and that I am responsible for the entries made in my COIB Electronic Financial Disclosure Report filed on Apr 14, 2025 at 8:03:13 PM EDT, and that I have personally reviewed all the information contained in that report and it is true, correct and complete to the best of my knowledge.

I, Eric  Adams, have affixed my electronic signature and certify that I have not shared my password with anyone and that I am responsible for the entries made in my Combined COIB and EO91 Electronic Financial Disclosure Report filed on Apr 14, 2025 at 8:03:13 PM EDT, and that I have personally reviewed all the information contained in that report and it is true, correct and complete to the best of my knowledge.

 New York City Campaign Finance Board

# Contact Record

|  |  |
|---|---|
|  | **Contact No:** 106881 |
| **Status:** Submitted | **Status Date:** 04/28/2025 |

| | | | |
|---|---|---|---|
| **Candidate:** Adams, Eric L ( ID: 1545 ) | | **Election Cycle:** 2025 |
| **Contact Person:** Pitta, Vito | | **Contact Phone:** |
| **Contact Email:** | | **Type:** Outgoing Email |
| **CFB Contact:** Joseph Gallagher | | **Unit:** Legal |
| **Contact Date:** 04/28/2025 | | **Original Contact Date:** |

**Primary Category:** Legal          **Other Category:**          **Other Category:**

**Subject:** 7-09 petition confirmation

**Text:** From: Joseph Gallagher
Sent: Monday, April 28, 2025 5:27 PM
To: Vito R. Pitta <vrpitta@pittabishop.com>
Cc: bpericadams@gmail.com; salovespink@gmail.com; Ardian Tagani
<atagani@pittabishop.com>; Danielle Willemin <DWillemin@NYCCFB.INFO>; Samantha
Perez <SPerez@NYCCFB.INFO>
Subject: re: Eric Adams 2025 - Public Funds Payment Determination Petition for
Reconsideration
Importance: High

Good afternoon, Mr. Pitta,

I am confirming receipt of the Eric Adams 2025 Public Funds Payment Determination
Petition for Reconsideration ("7-09 Petition"). I will reach out by Friday, May 2 with a
response to the 7-09 Petition.

Thank you,

Joseph Gallagher
General Counsel
New York City Campaign Finance Board
100 Church Street, 12th floor
New York, NY 10007
212.409.1865
JGallagher@nyccfb.info
www.nyccfb.info | @NYCCFB | Full Disclosure Newsletter |Campaign Finance Handbook

From: Vito R. Pitta <vrpitta@pittabishop.com>
Sent: Friday, April 25, 2025 7:32 PM
To: Danielle Willemin <DWillemin@NYCCFB.INFO>
Cc: Samantha Perez <SPerez@NYCCFB.INFO>; Eric Adams
<bpericadams@gmail.com>; salovespink@gmail.com; Ardian Tagani
<atagani@pittabishop.com>
Subject: Eric Adams 2025 - Public Funds Payment Determination Petition for

CONFIDENTIAL

Reconsideration
Importance: High

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.
Good evening,

On behalf of Eric Adams 2025 and Mayor Adams, please see the attached Petition for Reconsideration pursuant to CFB Rule 7-09.

Best,


Vito R. Pitta, Esq.

Co-Managing Partner
Pitta LLP
Attorneys at Law

Co-Managing Member
Pitta Bishop & Del Giorno LLC
Consulting & Government Relations

120 Broadway, 28th Floor
New York, NY 10271
(212) 652-3890 (Main)
(212) 652-3881 (Direct)
(212) 652-3891 (Facsimile)
(917) 545-7160 (Cellular)
vrpitta@pittalaw.com
vrpitta@pittabishop.com

---

**Follow Up Date:**                                    **Follow Up Complete Date:**

**Update Date:** 4/28/2025 5:27:14 PM            **Update User:** jgall

# Exhibit 30

 New York City Campaign Finance Board

# Contact Record

|  |  |
|---|---|
| | **Contact No:** 107023 |
| **Status:** Submitted | **Status Date:** 05/05/2025 |

---

| | |
|---|---|
| **Candidate:** Adams, Eric L ( ID: 1545 ) | **Election Cycle:** 2025 |
| **Contact Person:** Pitta, Vito R | **Contact Phone:** |
| **Contact Email:** | **Type:** Outgoing Email |
| **CFB Contact:** Joseph Gallagher | **Unit:** Legal |
| **Contact Date:** 05/05/2025 | **Original Contact Date:** |

---

**Primary Category:** Legal      **Other Category:**          **Other Category:**

**Subject:** Chair's Decision on 7-09 petition

**Text:** From: Joseph Gallagher
Sent: Friday, May 2, 2025 4:31 PM
To: Vito R. Pitta <vrpitta@pittabishop.com>
Cc: bpericadams@gmail.com; salovespink@gmail.com; Ardian Tagani
<atagani@pittabishop.com>
Subject: RE: Eric Adams 2025 - Public Funds Payment Determination Petition for
Reconsideration

Hello Mr. Pitta,

Thank you for submitting the Adams 2025 7-09 Petition asking the Board to reconsider its
April 15, 2025 non-payment determination. Because the Campaign has waived its
appearance before the Board to speak to the 7-09 Petition, Chair Frederick Schaffer is
using his authority, delegated by the Board, to deny the Campaign's Petition. The Board
will vote whether to affirm the Chair's decision at the May 12, 2025 Board hearing.

Thank you for pointing out the incorrect Board rules citations in the April 15 non-payment
determination letter. Please find attached a corrected April 15 non-payment determination
that properly cites to the CFB rules which were amended in December 2024.

A Rule 7-09 Petition is not an opportunity for the Campaign to show that they have
resolved their ineligibility for a public funds payment, rather the Petition must demonstrate
that at the time the payment determination was made, April 15, the Campaign was eligible
for payment.

Regarding the Conflicts of Interest Board ("COIB") disclosure, CFB Rule 3-05(b) sets the
due date for demonstrating compliance with the COIB disclosure requirement at "3 days
prior to the next payment date." Further, the rule states that "[f]ailure to demonstrate
compliance may result in a delay of any payment by the Board." The Candidate submitted
an incomplete COIB disclosure on April 14, 2025 at 8:03 PM, not the required three days
prior to the April 15, 2025 payment date.  CFB understands that the disclosure was only
completed on April 25, 2025 – ten days after the payment determination date.
Furthermore, the Campaign did not submit proof of the incomplete April 14th filing until it
submitted the 7-09 Petition on April 25, 2025. The Campaign did not provide an

explanation for the delay nor state reasons why the Board should accept this late demonstration of compliance for the April 15 payment.

Additionally, CFB staff issued the Campaign a request for documentation and explanation on November 15, 2024 with a response deadline of December 6, 2024. On December 5, 2024, the Campaign stated that it would not respond to the CFB staff's request at the time due to the Candidate's ongoing federal litigation. The Campaign submitted a response on April 14, 2025 at 10:37 PM. The response was submitted 130 days after the initial due date and less than 12 hours before the payment determination. This late response gave CFB staff insufficient time to evaluate the sufficiency of the response or whether the contents might have an impact on the Campaign's eligibility, and the Campaign has not offered good cause for why it was unable to comply with the request earlier. Pursuant to Board Rule 3-01(d)(i)(A)(2), a pre-election public funds payment shall not be paid to a candidate if the candidate fails to provide to the Board, upon its request and by the deadline set forth by the Board, documents or records…or other information that verifies campaign activity.

Finally, in its Petition, the Campaign states that the payment determination and supplemental letter are insufficiently detailed for the Campaign to be able to effectively respond to the substance of the determination. New York City Administrative Code § 3-705 (1) prohibits the CFB from making a public funds payment to a Campaign unless the Board has determined that the Campaign has met the eligibility requirements of the Campaign Finance Act. The CFB provided the Campaign with a list of publicly available documents that contain information indicating possible violations of federal, state, and/or City law by the candidate during the 2021 and 2025 election cycles. Pursuant to the Campaign's request, CFB staff is providing the attached amended supplemental non-payment determination notice that provides the Campaign more detail on the violations of law to which the Campaign may respond.

Because the Candidate is not on the primary election ballot, the next opportunity for the Campaign to demonstrate its eligibility for public matching funds is the July 15, 2025 payment date. No campaign is entitled to public matching funds. It is incumbent on a campaign to demonstrate it is eligible to receive public matching funds. CFB staff will continue to review the Campaign's eligibility prior to the July 15 payment date, and welcomes the Campaign to provide any and all documentation and/or explanations to demonstrate to the Board that there is no reason to believe that the Candidate, in the course of public funds program participation, engaged in conduct detrimental to the public funds program that is in violation of Federal, State, and/or City Law, including the Campaign Finance Act and Board Rules.

Thank you,

Joseph Gallagher
General Counsel
New York City Campaign Finance Board
100 Church Street, 12th floor
New York, NY 10007
212.409.1865
JGallagher@nyccfb.info
www.nyccfb.info | @NYCCFB | Full Disclosure Newsletter |Campaign Finance Handbook


From: Vito R. Pitta <vrpitta@pittabishop.com>
Sent: Tuesday, April 29, 2025 2:00 AM
To: Joseph Gallagher <JGallagher@NYCCFB.INFO>
Cc: bpericadams@gmail.com; salovespink@gmail.com; Ardian Tagani <atagani@pittabishop.com>; Danielle Willemin <DWillemin@NYCCFB.INFO>; Samantha Perez <SPerez@NYCCFB.INFO>
Subject: Re: Eric Adams 2025 - Public Funds Payment Determination Petition for Reconsideration

CONFIDENTIAL

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.
Thank you.

Get Outlook for iOS
_____
From: Joseph Gallagher <JGallagher@NYCCFB.INFO>
Sent: Monday, April 28, 2025 2:26:41 PM
To: Vito R. Pitta <vrpitta@pittabishop.com>
Cc: bpericadams@gmail.com <bpericadams@gmail.com>; salovespink@gmail.com <salovespink@gmail.com>; Ardian Tagani <atagani@pittabishop.com>; Danielle Willemin <DWillemin@NYCCFB.INFO>; Samantha Perez <SPerez@NYCCFB.INFO>
Subject: [EXTERNAL] re: Eric Adams 2025 - Public Funds Payment Determination Petition for Reconsideration

Good afternoon, Mr. Pitta,

I am confirming receipt of the Eric Adams 2025 Public Funds Payment Determination Petition for Reconsideration ("7-09 Petition"). I will reach out by Friday, May 2 with a response to the 7-09 Petition.

Thank you,

Joseph Gallagher
General Counsel
New York City Campaign Finance Board
100 Church Street, 12th floor
New York, NY 10007
212.409.1865
JGallagher@nyccfb.info
www.nyccfb.info | @NYCCFB | Full Disclosure Newsletter |Campaign Finance Handbook

---

**Follow Up Date:**                                   **Follow Up Complete Date:**

**Update Date:** 5/5/2025 10:41:30 AM                 **Update User:** jgall

# Exhibit 31

May 2, 2025                                    New York City Campaign Finance Board

CANDIDATE: ADAMS, ERIC L (ID: 1545)
COMMITTEE: ERIC ADAMS 2025

AMENDED 2025 EARLY PUBLIC FUNDS NONPAYMENT DETERMINATION. Based on a preliminary analysis, the Campaign Finance Board has determined that your campaign does not qualify for a public funds payment at this time. See.generally Admin. Code §§ 3-703; 3-705(1). The specifics of our calculation are described in the attached Detail Payment Report. Please keep this notification and any attached report(s) for your records. If you have any questions, please contact the Payment Coordinators Maria Alvarez and Alyson Joa-Perez at PaymentCoordinator@nyccfb.info.

The reasons for nonpayment are as follows:

The Campaign is not eligible for payment because it has not demonstrated compliance with Admin. Code § 12-110, as determined by the Conflicts of Interest Board. See Admin. Code §§ 3-703(1)(m), 12-110; Board Rules 3-01(d)(ii)(A)(4), 3-05.

The Campaign is not eligible for payment because the Board has reason to believe that the Candidate has, in the course of public funds program participation, engaged in conduct detrimental to the Program that is in violation of law, including the Campaign Finance Act and Board Rules. Board Rule 3-01(d)(ii)(B).

The Campaign is not eligible for payment because it failed to provide to the Board, upon its request, documents, records, or other information that verifies campaign activity by the deadline set forth by the Board. Board Rule 3-01(d)(i)(A)(2).

Details regarding these findings will be sent to you shortly.

This nonpayment of public funds is not a final determination by the Board, but rather is a preliminary determination subject to review of ongoing financial activity and final audit. See Admin. Code §§3-710; Board Rule 3-01(c).

YOU MAY PETITION THE BOARD IN WRITING for reconsideration of this public funds determination. Your petition must state the grounds for reconsideration and may include a request to appear before the Board. Do not include any documentation or information not

already submitted to the Board, unless the Board specifically requests it or you can show in your petition a good reason for failing to submit it previously. The Board will review the petition within five business days of receiving it and issue a timely written determination. If the Board denies your petition, you may appeal, within four months, to the New York State Supreme Court pursuant to Article 78 of the Civil Practice Law and Rules. See.Admin. Code § 3-705(4); Board Rules 7-09; NY CPLR § 217.

# Exhibit 32



**New York City Campaign Finance Board**
100 Church Street, 12th Floor, New York, NY 10007
212.409.1800 | www.nyccfb.info

Frederick P. Schaffer
Chair

Gregory T. Camp
Richard J. Davis
Lawrence Moskowitz
Dawn L. Smalls
Members

Paul Seamus Ryan
Executive Director

May 2, 2025

Sharon Adams
Eric Adams 2025
1043 E 101 Street
Brooklyn, NY 11236

**RE: 2025 Public Funds Payment Determination Amended Supplemental Notice**

Based on a preliminary analysis, and as set forth in the Amended Public Funds Nonpayment
Determination and the Detail Payment Report, which you have already received, pursuant to Board
Rules 3-01(d)(i)(A)(2), 3-01(d)(ii)(A)(4), and 3-01(d)(ii)(B), the Campaign Finance Board (the "Board")
has determined that the Eric Adams 2025 campaign (the "Campaign") has not demonstrated eligibility
for a public funds payment. This letter provides the Campaign with additional information regarding the
nonpayment determination.

The Board has reviewed the information contained in the September 26, 2024 indictment of Eric Adams
(*see United States v. Adams*, 24 CR 556); a complaint alleging crimes committed by Adams' associate
Mohamed Bahi in conjunction with an alleged straw donation scheme for Adams' 2021 mayoral
campaign; a February 7, 2025 letter from former United States Attorney for the Southern District of New
York Danielle Sassoon to Judges Dale E. Ho and Analisa Torres of the Southern District of New York,
notifying them of Bahi's alleged intent to plead guilty to conspiracy to commit wire fraud; an
information alleging that Adams' associate Erden Arkan committed wire fraud, in conjunction with an
alleged straw donation scheme for Adams' 2021 mayoral campaign; the transcript of Arkan's allocution
in which he pled guilty to that crime; Acting Deputy Attorney General Emil Bove's February 10, 2025
memorandum to the U.S. Attorney's Office for the Southern District of New York, instructing
prosecutors to dismiss the charges against Adams; Sassoon's February 12, 2025 resignation letter;
Bove's February 13, 2025 letter accepting Sassoon's resignation; and Judge Ho's April 2, 2025 Opinion
and Order dismissing the charges against Adams with prejudice. Based on this information, the Board
has reason to believe that Eric Adams has, in the course of public funds program participation, engaged
in conduct detrimental to the Program that is in violation of federal, state, and/or City law, including the
Campaign Finance Act and Board Rules. Specifically, the Board has reason to believe that Adams
violated one or more of the following:

1. Committed wire fraud, in violation of 18 U.S.C. § 1343;
2. Solicited, accepted, and/or received a contribution by a foreign national, in violation of 52 U.S.C. § 30121;
3. Obstructed justice and/or engaged in a conspiracy to obstruct justice, in violation of 18 U.S.C. §§ 1512(b) and 1512(c)(1), and 18 U.S.C. § 371;
4. Engaged in bribery, in violation of 18 U.S.C. § 666(a)(1)(B);
5. Engaged in a conspiracy to commit wire fraud, commit bribery, and receive contributions from a foreign national, in violation of 18 U.S.C. § 371;
6. Failed to accurately disclose campaign transactions and the true identity of contributors, in violation of NYS Election Law §§ 14–102(1), 14-104(1), 14-108, and 14–120 and NYS BOE Rules §§ 6200.1(a)(2) and 6200.2;
7. Accepted contributions from corporations doing business in New York State, in violation of NYS Election Law §§ 14–116(1);
8. Engaged in a conspiracy to promote his election through unlawful means, in violation of NYS Election Law § 17–152;
9. Defrauded the government, in violation of NYS Penal Law § 195.20;
10. Received bribes, in violation of NYS Penal Law §§ 200.10 and 200.12;
11. Failed to accurately disclose contributor and intermediary information to the Board, in violation of NYC Admin. Code §§ 3-703(1)(d)(i)-(iv), 3-703(1)(g), and 3-703(6) and Board Rules §§ 3-01(e)(i)(A)-(C), 3-01(e)(ii), 4-01(b)(ii), 4-04, and 4-05(c)(ii);
12. Accepted contributions in excess of the applicable limit, in violation of NYC Admin. Code § 3-703(1)(f) and Board Rule § 5-01(a);
13. Accepted corporate contributions, in violation of NYC Admin. Code § 3-703(1)(l) and Board Rule § 5-03(a);
14. Received contributions by a foreign national, in violation of Board Rule § 5-03(d);
15. Engaged in financial transactions in conflict with the proper discharge of his duties as a public official, in violation of NYC Charter § 2604(b)(2);
16. Failed to disclose gifts to the NYC Conflicts of Interest Board, in violation of NYC Admin. Code §§ 12-110(b)-(d) and 12-110(d)(1)(h)(4) and Board Rule § 3-01(d)(ii)(A)(4); and
17. Received prohibited gifts and used his position to obtain personal financial gain, in violation of NYC Charter §§ 2604(b)(3) and 2604(b)(5) and COIB Rules §§ 1-01(a) and 1-01(h)(l).

Furthermore, Campaigns must provide to the Board, upon its request, documents, records, or other information that verifies campaign activity and failure to respond can make a campaign ineligible for public funds pursuant to Board Rule 3-01(d)(i)(A)(2). On November 15, 2024, CFB staff made a request for documentation and information related to allegations in the indictment from the Campaign with a response deadline of December 6, 2024. On December 5, 2024, an attorney for the Campaign called CFB Staff and left a voicemail stating that the Campaign would not respond to the CFB staff's request at this time because the requests were related to incidents referenced in the indictment. This failure to respond to a request for information is a basis for ineligibility for public funds. The Campaign sent a response on April 14, 2025 at 10:37 PM. This response was not reviewed prior to the 10 AM meeting of the Board on April 15, 2025.

Please be aware that certain types of activities can lead the Board to find a candidate in breach of certification. The issues raised in this letter may cause the Board to consider whether the Campaign has submitted a disclosure statement which the participant knew or should have known includes substantial

fraudulent matchable contribution claims, which is one of the activities that can lead to a finding of breach of certification.[1]

In addition, the Campaign may be assessed financial penalties and may be found ineligible to receive public funds based on a finding of fraud or material misrepresentation, whether or not it is found in breach.[2]

These preliminary findings are not a final determination by the Board, but rather, a preliminary determination subject to review of ongoing financial activity and final audit.

**You may petition the Board in writing** for reconsideration of this public funds determination. Your petition must state the grounds for reconsideration and may include a request to appear before the Board. The Board will review the petition and issue a written determination within 5 business days of receiving it, unless the Campaign wishes to appear at the next scheduled Board meeting. Do not include any documentation or information not already submitted to the Board, unless the Board specifically requests it or you can show in your petition a good reason for failing to submit it previously.[3]

If the Board denies your petition, you have four months to challenge the Board's determination in New York State Supreme Court pursuant to Article 78 of the Civil Practice Law and Rules.

If you have any questions, please contact me at jgallagher@nyccfb.info.

Thank you,

_____
Joseph Gallagher
General Counsel

---

[1] *See* Admin. Code § 3-711; Board Rule 3-01(e).
[2] *See* Admin. Code § 3-711; Board Rule 3-01(d)(ii)(A)(9).
[3] *See* Admin. Code § 3-705(4); Board Rule 7-09.

# Exhibit 33



**New York City Campaign Finance Board**
100 Church Street, 12th Floor, New York, NY 10007
212.409.1800 | www.nyccfb.info

Frederick P. Schaffer
Chair

Gregory T. Camp
Richard J. Davis
Lawrence Moskowitz
Dawn L. Smalls
Members

Paul Seamus Ryan
Executive Director

May 13, 2025

**By CFB Portal and Email**

Eric Adams
Bpericadams@gmail.com

Sharon Adams
salovespink@gmail.com

Eric Adams 2025
Vrpitta@pittalaw.com

Vito Pitta
Vrpitta@pittalaw.com

## FINAL BOARD DETERMINATION – EC2025 CAMPAIGN

On April 25, 2025, Eric Adams 2025 (the "Campaign") submitted a petition for reconsideration of the New York City Campaign Finance Board (the "CFB" or "Board") staff's determination, dated April 15, 2025, that the Campaign was not eligible to receive public funds.

Board Rule 7-09 requires that the Board review petitions within five business days. If the Board is unable to convene within that time, the Board may delegate to the Chair or the Chair's designee authority to make a determination regarding the petition. Because the Board did not have a meeting scheduled within five business days of April 25, 2025, the authority to make a determination was delegated to Chair Frederick Schaffer.

Acting on his delegated authority, Chair Schaffer denied the Campaign's petition. The petition did not demonstrate that the nonpayment determination was erroneous based on the information and documentation available to the Board at the time the determination was made. At its May 12, 2025, meeting, the Board voted to ratify Chair Schaffer's determination.

You may challenge this final determination, within four months, in the New York State Supreme Court pursuant to Article 78 of the Civil Practice Law and Rules.

Candidate ID:  1545-P

If you have any questions concerning this Final Board Determination, please contact Joseph Gallagher, General Counsel, at jgallagher@nyccfb.info.

_____
Joseph Gallagher
General Counsel

**NEW YORK CITY
CAMPAIGN FINANCE BOARD**

2

Candidate ID: 1545-P