UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ERIC ADAMS 2025, ERIC ADAMS, SHARON ADAMS, as Treasurer of Eric Adams 2025, MARIETTA ROZENTAL, JOE SHANIE, and MALCOLM ADAMS,

                      Plaintiffs,

          -against-

NEW YORK CITY CAMPAIGN FINANCE BOARD,

                     Defendant.

**MEMORANDUM & ORDER**
**25-CV-3380 (NGG) (LKE)**

NICHOLAS G. GARAUFIS, United States District Judge.

The New York City Campaign Finance Board's (the "Board" or "CFB") Vision Statement provides that "[w]hen every New Yorker is empowered to participate meaningfully in elections, candidates for office will be reflective of the communities they serve, elected leaders will be accountable to the public, and New Yorkers will have a democracy they can trust."[1] And the Board's mission is to make the city's "local democracy more open, transparent, and equitable."[2] In line with its vision and mission statements, the Board provides strong incentives to candidates to "finance their campaigns by engaging with average New Yorkers," rather than "seeking large contributions from special interests."[3] The Board's voluntary public financing program matches small-dollar contributions from individuals residing in

---

[1] See New York City Campaign Finance Board, *About the CFB,* available at https://www.nyccfb.info/about [https://perma.cc/N6VV-7AEB] (last visited July 11, 2025).

[2] See id.

[3] See New York City Campaign Finance Board, *How It Works*, available at https://www.nyccfb.info/program/how-it-works [https://perma.cc/8R9G-4P55] (last visited July 11, 2025).

New York City to help amplify their voices in city elections.[4] New York City Mayor Eric Adams, his reelection campaign, including the campaign treasurer, and individual supporters of Mayor Adams, now come before this court seeking access to New York City's matching funds.

On May 27, 2025, Petitioners-Plaintiffs ("Plaintiffs"), including New York City Mayor Eric Adams, his reelection campaign (the "Adams Campaign"), the Treasurer of the Adams Campaign, Sharon Adams and some individual supporters of Mayor Adams,[5] brought this civil action in the Supreme Court of the State of New York, Kings County, against the CFB. (Not. of Removal (Dkt. 1) ¶ 1.) Plaintiffs' operative Petition[6] alleges that by denying the Adams Campaign public matching funds under the New York City Campaign Finance Program, the CFB committed various state law and federal constitutional violations. (*See generally* Am. Pet.) Specifically, Plaintiffs allege that the CFB "acted arbitrarily, capriciously, illegally, and unconstitutionally" in denying the Adams Campaign $3,439,168 in campaign matching funds to which it is entitled pursuant to the Campaign Finance Act based on the matchable contributions totaling $429,896. (*Id.* ¶¶ 2, 32-34.)

On June 16, 2025, pursuant to 28 U.S.C. §§ 1441 and 1446, the CFB removed the case to this court. (*See* Not. of Removal at 1, 10.) In this hybrid proceeding, pending before the court are

---

[4] *See id.*

[5] Mayor Adams's supporters include Plaintiffs Marietta Rozental, Joe Shanie, and Malcolm Adams, each of whom donated $2,000, $1,100, and $100, respectively, to the Adams Campaign. (*See* Am. Petition-Complaint ("Am. Pet.") (Dkt. 1-1 at ECF p. 111) ¶¶ 20-22.)

[6] For the sake of simplicity, the court refers to the Petition-Complaint as "the Petition" even though this is a hybrid proceeding. And "[i]n a hybrid proceeding, the petitioner is free to pursue Article 78 claims *and* plenary claims for damages; the claims simply proceed on separate procedural tracks." *Whitfield v. City of N.Y.*, 96 F.4th 504, 526 (2d Cir. 2024).

Plaintiffs' request for relief pursuant to New York Civil Practice Law and Rules ("CPLR") Article 78; declaratory judgment under CPLR 3001; money damages pursuant to 42 U.S.C. § 1983; attorneys' fees and litigation expenses under 42 U.S.C. § 1988; and Defendant's fully briefed motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (*See* Am. Pet.; Defendant's Motion for Judgment on the Pleadings ("Mot.") (Dkt. 12-1); Plaintiffs' Opp. ("Opp.") (Dkt. 14); Defendant's Reply ("Reply") (Dkt. 15).) For the reasons explained below, the court DENIES Plaintiffs' petition for relief pursuant to CPLR Article 78 and GRANTS Defendant's motion for judgment on the pleadings. The court further DISMISSES Plaintiffs' declaratory judgment claims, request for money damages, and attorneys' fees and litigation expenses.

## I. FACTUAL BACKGROUND

The following allegations are drawn from Plaintiffs' Amended Petition and exhibits attached thereto, the CFB's Answer and exhibits attached thereto, as well as the public filings on the docket, of which the court takes judicial notice.[7]

---

[7] In reviewing a motion for judgment on the pleadings, courts "draw all facts—which [they] assume to be true unless contradicted by more specific allegations or documentary evidence—from the Complaint and from the exhibits attached thereto." *Kirkendall v. Halliburton, Inc.*, 707 F.3d 173, 175 n.1 (2d Cir. 2013); *see also Lively v. WAFRA Inv. Advisory Grp, Inc.*, 6 F.4th 293, 306 (2d Cir. 2021) ("[O]n a motion for judgment on the pleadings, courts may consider all documents that qualify as part of the non-movant's 'pleading,' including (1) the complaint *or* answer, (2) documents attached to the pleading, (3) documents incorporated by reference in or integral to the pleading, and (4) matters of which the court may take judicial notice."). Courts may also "consider factual allegations in . . . the answer." *F.D.I.C. v. Mortg. Zone, Inc.*, No. 8-CV-3369 (TCP), 2010 WL 4000158, at *5 n.4 (E.D.N.Y. Oct. 12, 2010); *see also Davis v. 2191 Niagara St., LLC*, 351 F. Supp. 3d 394, 399 (W.D.N.Y. 2019) (noting the court may

## A. CFB Matching Funds Program

The CFB is a five-member independent and nonpartisan agency of the City of New York established by the New York City Campaign Finance Act ("CFA"). (Decl. of Paul S. Ryan ("First Ryan Decl.") (Dkt. 11-1) ¶ 2;[8] *see also* Am. Pet. ¶ 23.) The CFB derives its rulemaking authority from the CFA and the New York City Charter. *See* N.Y.C. Admin. Code § 3-708(8); N.Y.C. Charter §§ 1051-52. (First Ryan Decl. ¶ 3; Am. Pet. ¶ 102.) As relevant here, the CFB promulgated the New York City Campaign Finance Board Rules (the "CFB Rules" or "Board Rules") pursuant to its rulemaking authority. (First Ryan Decl. ¶ 3.)

The Board administers the New York City Campaign Finance Program (the "Program"), which provides public matching funds to eligible candidates running for New York City public office who satisfy various eligibility requirements. (First Ryan Decl. ¶ 4; *see also* Am. Pet. ¶ 31.) Participating candidates who qualify for matching funds receive $8 in public funds for every dollar a New York City resident contributes (up to $250 per contributor) to that candidate's campaign. (First Ryan Decl. ¶ 11.) There are 13 payment dates for the 2025 election cycle. (*Id.* ¶ 12; *see also* Second Decl. of Paul S. Ryan ("Second Ryan Decl." (Dkt. 15-1) ¶ 2.) The CFB reassesses the participant's eligibility for public matching funds on each payment date, making the most recent payment determination the operative one by the Board. (First

---

also draw uncontroverted facts from the exhibits attached to the defendant's answer). The court may also take judicial notice of declarations filed in support of parties' briefs that are filed on the public docket. *See Allstate Ins. Co. v. A & F Med. P.C.*, No. 14-CV-6756 (JBW), 2017 WL 4350418, at *7 n.12 (E.D.N.Y. Apr. 24, 2017) ("[T]he Court may consider documents that are relied upon in the pleadings and any matters of which judicial notice may be taken."); *see also Casey v. Odwalla, Inc.*, 338 F. Supp. 3d 284, 294 (S.D.N.Y. 2018) ("Courts may take judicial notice of public documents or matters of public record.").

[8] Ryan is the Executive Director of the CFB. (First Ryan Decl. ¶ 1.)

Ryan Decl. ¶ 13.) As relevant here, participating candidates must file a written certification stating that they are choosing to participate in the Program and comply with various requirements, including: "responding to Board staff's requests for information and documentation" and "fulfilling the requirements of section 12-110 of the Admin. Code, relating to the filing of disclosures with the New York City Conflicts of Interest Board ('COIB')." (*Id.* ¶ 7 (citing Admin. Code §§ 3-703(1)(c), (1)(d), (1)(f), (1)(g), (1)(l), and (6)); *see also* Am. Pet. ¶ 35.)

The CFB Rules establish mandatory eligibility criteria for public matching funds. (First Ryan Decl. ¶ 8.) For example, the mandatory ineligibility criteria under CFB Rules 3-01(d)(i)(A)(2) and (3), provide, respectively, that public funds will not be paid to a candidate (i) who fails to provide the Board, upon the Board's request and by the deadline imposed by the Board, documents or records required by Chapter 4 of the CFB Rules, or other information that verifies campaign activity, and (ii) where the difference between the candidate's reported receipts and documented receipts exceeds 10%. (*Id.*) Similarly, CFB Rule 3-01(d)(ii)(A)(4)'s mandatory ineligibility criterion provides that public funds shall not be paid to a candidate if the candidate fails to demonstrate compliance with Admin. Code § 12-110 as required by § 3-703(1)(m) of the same. (*Id.*) Furthermore, CFB Rule 3-05(b) requires the candidate to demonstrate compliance with Admin. Code § 12-110 three days before the next matching funds payment date. (*Id.*)

The Board can also find candidates ineligible for matching funds on a discretionary basis pursuant to CFB Rules 3-01(d)(i)(B) and (d)(ii)(B). As relevant here, under CFB Rule 3-01(d)(i)(B), the Board may deny a public funds payment to a candidate "if there is reason to believe that the candidate has committed a violation of the [CFA]" or the Board Rules. (*See id.*) CFB Rule 3-01(d)(i)(B) provides that the CFB may deny public funds to a

candidate "if there is reason to believe that, in the course of Program participation, the candidate has engaged in conduct detrimental to the Program that is in violation of any other applicable law." (*Id.*)

Moreover, CFB Rule 3-01(a) provides that the CFB must determine that the candidate has met all eligibility requirements before a candidate can receive matching funds. (*Id.* ¶ 9.) And pursuant to CFB Rule 7-09(a), after the CFB provides a written determination to a candidate with the basis for payment or nonpayment of public funds, the candidate may petition the CFB for reconsideration of the determination. (*See id.* ¶ 10.) A candidate waives his right to appear before the CFB unless the petition includes a request to do so. (*Id.*)

### B. Adams Campaign Matching Fund Denials

The CFB denied the Adams Campaign matching funds in December 2024, January 2025, March 2025, and April 2025. (Am. Pet. ¶¶ 37, 41, 44, 48.) The chart below summarizes the CFB's bases for each denial. (*See id.*)

| | Justification | | | |
|---|---|---|---|---|
| | Reason to Believe Candidate Engaged in Detrimental Conduct | Candidate's Failure to Respond to CFB | Candidate's Failure to File Annual Disclosure | 10% or Greater Variance in Gross Receipts |
| December 2024 | Yes | Yes | No | No |
| January 2025 | Yes | Yes | No | No |
| March 2025 | Yes | Yes | Yes | Yes |
| April 2025 | Yes | Yes | Yes | No |

The court now details the CFB's bases for the denials.

1. Reason to Believe Mayor Adams Engaged in Conduct Detrimental to the Program in Violation of the Law

On September 26, 2024, federal prosecutors in the Southern District of New York ("SDNY") unsealed a five-count indictment (the "Indictment") charging Mayor Adams with various crimes. (First Ryan Decl. ¶ 16.) The Indictment charged Mayor Adams with wire fraud, bribery, campaign finance violations involving contributions from foreign nationals, and conspiracy to commit the aforementioned crimes. (*Id.*) Specifically, it alleged that Mayor Adams was part of a scheme to use straw donors to hide illegal contributions and obtain matching funds. (*Id.*) Thereafter, following the recommendation of the CFB staff, on December 16, 2024, the CFB held a public meeting during which the Board voted to deny the Adams Campaign matching funds. (*Id.* ¶ 22; Am. Pet. ¶ 37.) In a supplemental notice issued to the Adams Campaign on December 18, 2024, the CFB explained:

> The Board has reason to believe that Eric Adams (the "Candidate") has, in the course of public funds program (the "Program") participation, engaged in conduct detrimental to the Program that is in violation of federal and City law, including the Campaign Finance Act and Board Rules, as described in the September 26, 2024 indictment of Eric Adams (*see United States v. Adams*, 24 CR 556), and is therefore ineligible for a public funds payment. Pursuant to Board Rules 3-01(d)(i)(G) and (ii)(I),[9] the Board's reason to believe that the Candidate has violated federal and City laws is a basis for ineligibility for public funds.

(Suppl. Not. Dated 12/18/2024 ("December Not.") (Dkt. 1-1 at ECF p. 59) at ECF pp. 59-60; *see also* Am. Pet. ¶ 40.) In January

---

[9] The CFB notice cites Rules 3-01(d)(i)(G) and (ii)(I), which are substantially identical versions of current Rules 3-01(d)(i)(B) and (ii)(B), respectively, that went into effect on December 19, 2024.

2025 and March 2025, the CFB again denied the Adams Campaign matching funds because, among other reasons, the CFB had reason to believe, based on the Indictment, that Mayor Adams, in the course of Program participation, had engaged in conduct detrimental to the Program and in violation of law, including the CFA and the Board Rules. (First Ryan Decl. ¶¶ 31, 40-43.)

On April 2, 2025, Judge Dale E. Ho of the SDNY dismissed the Indictment against Mayor Adams with prejudice. (*See id.* ¶ 46; *see also* Am. Pet. ¶ 8.) And on the morning of April 15, 2025, CFB staff briefed the CFB and recommended that the CFB deny the Adams Campaign matching funds. (First Ryan Decl. ¶ 49.) Accordingly, later that morning, the CFB held a public meeting and voted to deny the Adams Campaign matching funds. (*Id.* ¶ 50; *see also* Am. Pet. ¶ 48.) In a supplemental notice issued to the Adams Campaign on April 15, 2025, the CFB explained:

> The Board has reviewed the information contained in the September 26, 2024 indictment of Eric Adams (*see United States v. Adams*, 24 CR 556); a complaint alleging crimes committed by Adams' associate Mohamed Bahi in conjunction with an alleged straw donation scheme for Adams' 2021 mayoral campaign; a February 7, 2025 letter from former United States Attorney for the Southern District of New York Danielle Sassoon to Judges Dale E. Ho and Analisa Torres of the Southern District of New York, notifying them of Bahi's alleged intent to plead guilty to conspiracy to commit wire fraud; an information alleging that Adams' associate Erden Arkan committed wire fraud, in conjunction with an alleged straw donation scheme for Adams' 2021 mayoral campaign; the transcript of Arkan's allocution in which he pled guilty to that crime; . . . and Judge Ho's April 2, 2025 Opinion and Order dismissing the charges against Adams with prejudice. The Board has reason to believe that Eric Adams has, in the

course of public funds program participation, engaged in conduct detrimental to the Program that is in violation of federal, state, and/or City law, including the Campaign Finance Act and Board Rules.

(Suppl. Not. Dated 4/15/2025 ("April Not.") (Dkt. 1-1 at ECF p. 78) at ECF p. 78; *see also* Am. Pet. ¶ 51.)

2.  Other Bases

a.  *Failure to Respond to the CFB's Request for Information*

On November 15, 2024, Jesse Schaffer, Director of Special Compliance for the CFB, sent a letter to Vito Pitta, counsel to the Adams Campaign, requesting documents and communications relating to five fundraisers referenced in the Indictment, contributions from employees of Bay Atlantic University also referenced in the Indictment, and "any other documents, affidavits or arguments that support the 2025 Campaign's eligibility to receive public funds." (Schaffer Letter (Dkt. 11-2 at ECF p. 338) at ECF pp. 338-39.) The letter requested the Adams Campaign to submit the requested information by December 6, 2024 and noted that "[f]ailure to respond timely or adequately may result in suspension of public funds payments." (*Id.* at ECF p. 339.) One day before the deadline, Mr. Pitta informed Mr. Schaffer that the Adams Campaign would not be responding to the requests because "the requests relate specifically to events that were referenced in the Indictment." (First Ryan Decl. ¶ 18.)

In its December 2024 supplemental notice to the Adams Campaign regarding the denial of matching funds, the CFB explained:

Campaigns must provide to the Board, upon its request, documents, records, or other information that verifies campaign activity and failure to respond can make a campaign ineligible for public funds pursuant to Board Rule 3-

9

01(d)(i)(B).[10] On November 15, 2024, CFB staff made a request for documentation and information related to allegations in the indictment from the Campaign with a response deadline of December 6, 2024. On December 5, 2024, an attorney for the Campaign called CFB Staff and left a voicemail stating that the Campaign would not respond to the CFB staff's request at this time because the requests were related to incidents referenced in the indictment. This failure to respond to a request for information is a basis for ineligibility for public funds.

(December Not. at ECF p. 60; *see also* Am. Pet. ¶ 40.) The CFB cited the Adams Campaign's failure to provide the requested documentation and information to the CFB as a basis for its denial of matching funds to the Adams Campaign in January 2025 and March 2025[11] as well. (First Ryan Decl. ¶¶ 28, 31, 40-43.)

After Judge Ho dismissed the Indictment with prejudice, at 10:38 p.m. on April 14, 2025, Mr. Pitta responded, via an email letter, to the CFB's November 15, 2024 request for documents and communications. (*Id.* ¶ 48; *see also* Am. Pet. ¶ 52.) Mr. Pitta's letter stated that the Adams Campaign "reviewed [its] records and have found no documentation responsive to the request that has not already been submitted to the CFB." (Pitta Letter (Dkt. 11-2 at ECF p. 543) at ECF p. 543.) The following morning, the CFB voted to deny the Adams Campaign matching funds. (First Ryan Decl. ¶ 49; *see also* Am. Pet. ¶ 48.) In its April 2025 supplemental notice issued to the Adams Campaign, the CFB explained that the campaign's failure to timely respond to the CFB's request for information is a basis for ineligibility for public funds. (April Not.

---

[10] Again, while the CFB notice cites Rule 3-01(d)(i)(B), the current version of this rule, effective as of December 19, 2024, is Rule 3-01(d)(i)(A)(2).

[11] The March 17, 2025 determination mistakenly omitted the Adams Campaign's failure to provide the requested records as a basis. (First Ryan Decl. ¶ 23 n.6.)

at ECF pp. 78-79; *see also* Am. Pet. ¶ 51.) The notice also acknowledged that while the "Campaign sent a response on April 14, 2025 at 10:37 PM," it "was not reviewed prior to the 10 AM meeting of the Board on April 15, 2025." (April Not. at ECF p. 79.)

b.    *Noncompliance With Admin. Code § 12-110*

On March 17, 2025, the CFB held a public meeting during which the Board voted to deny the Adams Campaign matching funds. (First Ryan Decl. ¶¶ 40-41; *see also* Am. Pet. ¶ 44.) In a nonpayment determination issued that same day, the CFB explained that the Adams Campaign was ineligible for payment "because it ha[d] not demonstrated compliance with Admin. Code § 12-110, as determined by the Conflicts of Interest Board," which requires various employees, elected officials, and candidates, including the mayor and mayoral candidates, to file annual disclosures. (Nonpayment Determination Dated 3/17/2025 (Dkt. 1-1 at ECF p. 70).)

Mayor Adams filed his annual disclosure ("COIB disclosure") on April 14, 2025. (Am. Pet. ¶ 47.) On April 15, 2025, the CFB held a public meeting and voted to deny the Adams Campaign matching funds. (First Ryan Decl. ¶ 50; *see also* Am. Pet. ¶ 48.) In a determination issued that same day, the CFB stated that the "Adams Campaign was ineligible for payment "because it ha[d] not demonstrated compliance with Admin. Code. § 12-110, as determined by the Conflicts of Interest Board." (Am. Pet. ¶ 49; *see also* April Not. at ECF p. 78 (citing, *inter alia*, CFB Rule 3-01(d)(ii)(A)(4)).) The New York City Conflicts of Interest Board ("COIB") had not accepted Mayor Adams' disclosure as of April 21, 2025, because "it was not in compliance with Section 12-110 of the Admin. Code, and therefore was not completed." (First Ryan Decl. ¶ 54.) Mayor Adams filed an amendment to his COIB disclosure, and the COIB accepted it as complete on April 25, 2025. (*Id.* ¶¶ 55-56.)

11

c. *Difference Between Reported and Documented Gross Receipts Was Equal to or Greater Than 10%*

On March 17, 2025, the CFB held a public meeting during which the Board voted to deny the Adams Campaign matching funds. (*Id.* ¶¶ 40-41; *see also* Am. Pet. ¶ 44.) In a nonpayment determination issued that same day, the CFB explained that "[t]he Campaign is not eligible for payment because the difference between the Campaign's reported receipts and documented receipts is equal to or greater than 10%." (Am. Pet. ¶ 44 (citing, *inter alia*, Admin. Code §§ 3-703(1)(d) and (6), and CFB Rule 3-01(d)(i)(C)[12].)

## C. Appeal of the April 2025 Nonpayment Determination

The April 2025 nonpayment determination is the "operative determination by the Board" with respect to the Adams Campaign because it is the Board's "most recent payment determination." (First Ryan Decl. ¶ 13.) The CFB denied the Adams Campaign matching funds on April 15, 2025 for three independent reasons. First, "[t]he Adams Campaign had not demonstrated compliance with Admin. Code § 12-110, as determined by the COIB." (*Id.* ¶ 52 (citing Admin. Code § 3-703(1)(m)).) Second, "[t]he Adams Campaign had failed to respond to the November 15th Request by the December 6, 2024 deadline set by the Board and in time for the Board to review the response prior to its April 15th meeting." (*Id.*) And third, the "Board had reason to believe that Mayor Adams had, in the course of public funds program participation, engaged in conduct detrimental to the Program that is in violation of federal, state, and/or city law, including the Act and the Board Rules." (*Id.*)

---

[12] The CFB's determination appears to have referenced a prior version of the current CFB Rule 3-01(d)(i)(A)(3) that went into effect on December 19, 2024.

12

The Adams Campaign responded to the CFB's November 15, 2024 request for certain records on April 14, 2025. (*Id.* ¶ 48; Am. Pet. ¶ 52; *see* Pitta Letter.) Additionally, Mayor Adams submitted an amended COIB disclosure on April 25, 2025, and the COIB accepted it as complete on the same day. (First Ryan Decl. ¶ 56; Am. Pet. ¶ 171.) Also on April 25, 2025, the Adams Campaign filed a petition for reconsideration of the April 15, 2025 nonpayment determination pursuant to CFB Rule 7-09.[13] (First Ryan Decl. ¶ 57; Am. Pet. ¶ 52; Adams Campaign Appeal (Dkt. 1-1 at ECF p. 81).) The petition "advised the CFB that Mayor Adams had satisfied the requirements of Administrative Code § 12-110 by filing his annual disclosure on April 14, 2025, and that the information requested in November 2024 had been submitted on April 14, 2025." (Am. Pet. ¶ 52.) It "also contested the sufficiency of the CFB's determination as a matter of law." (Am. Pet. ¶ 52.) Noting that "[i]t is a core principle of due process that a government agency provide sufficient notice and opportunity to be heard," the Adams Campaign argued that its "ability to petition for reconsideration . . . is meaningless when the CFB's preliminary determination of ineligibility gives no notice of the alleged unlawful conduct that is the basis for the determination." (Adams Campaign Appeal at ECF p. 83.) Mayor Adams waived his right to appear before the Board in connection with the petition. (*Id.* at ECF p. 81.)

The CFB delegated the authority to make a determination regarding the petition to the Chair of the Board, Frederick Schaffer.[14] (First Ryan Decl. ¶ 61; Am. Pet. ¶ 54.) On May, 2,

---

[13] The Adams Campaign did not file a petition for reconsideration of the December 2024, January 2025, or March 2025 nonpayment determinations. (First Ryan Decl. ¶¶ 27, 33, 45.)

[14] CFB Rule 7-09(c)(i) provides that when a candidate waives the right to appear before the CFB, and if the CFB is unable to convene within five business days of receipt of the petition, then the CFB may delegate the

2025, the Chair of the Board denied the Adams Campaign's petition. (First Ryan Decl. ¶ 63; Am. Pet. ¶ 53.) Also on May 2, 2025, Joseph Gallagher, the CFB's General Counsel, emailed the counsel to the Adams Campaign a Corrected April 15 Nonpayment Determination and an Amended April 15 Supplemental Notice ("Amended Notice"). (First Ryan Decl. ¶¶ 64-65; Gallagher Email (Dkt. 1-1 at ECF p. 88); Am. Nonpayment Determination Dated 5/2/2025 ("Am. Nonpayment Determination") (Dkt. 1-1 at ECF p. 91); Am. Suppl. Not. Dated 5/2/2025 ("Am. Not.") (Dkt. 1-1 at ECF p. 94).)

In his email, Mr. Gallagher explained that a "Rule 7-09 Petition is not an opportunity for the Campaign to show that they have resolved their ineligibility for a public funds payment, rather the Petition must demonstrate that at the time the payment determination was made, April 15, the Campaign was eligible for payment." (Gallagher Email at ECF p. 88.) In addition, Mr. Gallagher stated that Mayor Adams' COIB disclosure on April 14, 2025, was both incomplete and not submitted at least three days before the payment date as required by CFB Rule 3-05(b). (*Id.*)

The Amended Notice informed the Adams Campaign that "[b]ased on a preliminary analysis, . . . pursuant to Board Rules 3-01(d)(i)(A)(2), 3-01(d)(ii)(A)(4), and 3-01(d)(ii)(B)," the campaign failed "to demonstrate eligibility for a public funds payment." (Am. Not. at ECF p. 94; *see also* Am. Nonpayment Determination at ECF p. 91 (providing three reasons for denial of matching funds).) With respect to the CFB's reason to believe that Mayor Adams violated federal, state, and/or city laws, the Amended Notice identified a list of such violations based on the Indictment and other public documents. (Am. Not. at ECF pp. 94-95; *see also* Am. Pet. ¶ 58.) As to the November 2024 request, the Amended Notice explained that the Adams Campaign responded

---

authority to make a determination regarding the petition to the Chair of the CFB or the Chair's designee. (First Ryan Decl. ¶ 60.)

to the CFB's November 2024 request on April 14, 2025, at 10:37 p.m., and the response "was not reviewed prior to the 10 AM meeting of the Board on April 15, 2025."[15] (Am. Not. at ECF p. 95; *see also* Am. Pet. ¶ 59.)

On May 12, 2025, the CFB ratified the Chair's denial of the Adams Campaign's petition. (First Ryan Decl. ¶ 69; *see also* Am. Pet. ¶ 60.) The following day, the CFB provided the Adams Campaign with a letter notifying the campaign of the CFB's determination. (First Ryan Decl. ¶ 70; *see also* Am. Pet. ¶ 60.) This lawsuit followed.

## II.  PROCEDURAL HISTORY

Plaintiffs filed this civil action against the CFB on May 27, 2025, in the Supreme Court of the State of New York, Kings County and amended their petition on June 5, 2025.[16] (*See* Not. of Removal ¶ 1.) Plaintiffs seek various forms of relief, including (i) "vacating and setting aside the CFB's determination to deny matching campaign funds to the Adams campaign and directing the CFB to grant matching funds to the Adams Campaign," pursuant to CPLR Article 78; (ii) "declaring that by denying matching campaign funds to the Adams Campaign, the CFB violated the rights of Petitioners-Plaintiffs under the United States Constitution and the New York State Constitution," pursuant to CPLR 3001; and (iii) money damages, and attorneys' fees and litigation expenses,

---

[15] In addition, Mr. Gallagher wrote in his email that the "Campaign submitted a response on April 14, 2025 at 10:37 PM. The response was submitted 130 days after the initial due date and less than 12 hours before the payment determination. This late response gave CFB staff insufficient time to evaluate the sufficiency of the response or whether the contents might have an impact on the Campaign's eligibility, and the Campaign has not offered good cause for why it was unable to comply with the request earlier." (Gallagher Email at ECF p. 88.)

[16] Plaintiffs discontinued their thirteenth and fourteenth causes of action of the Amended Petition pursuant to a stipulation. (Not. of Removal ¶ 1.)

pursuant to 42 U.S.C. §§ 1983 and 1988, respectively. (Am. Pet. at ECF pp. 143-44.)

The CFB removed the case from Supreme Court of the State of New York, Kings County to this court pursuant to 28 U.S.C. §§ 1441 and 1446 on June 16, 2025. (*See* Not. of Removal at 1, 10.) The CFB answered the Amended Petition on June 23, 2025. (*See* Answer (Dkt. 11).) The court now turns to Defendant's fully briefed motion for judgment on the pleadings.

## III.  LEGAL STANDARD

### A.  Judgment on the Pleadings

Under the Federal Rules of Civil Procedure, "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988).[17] Thus, a party is entitled to judgment on the pleadings "only if it has established that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Juster Assocs. v. City of Rutland, Vt.*, 901 F.2d 266, 269 (2d Cir. 1990). Ultimately, when deciding motions under Rule 12(c), courts "employ the same standard applicable to dismissals pursuant to Rule 12(b)(6)." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*,

---

[17] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

16

550 U.S. 544, 570 (2007)). Likewise, "[t]o survive a Rule 12(c) motion, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 550 U.S. at 570. A complaint must contain facts that do more than present a "sheer possibility that a defendant has acted unlawfully." *Id.* In deciding a motion to dismiss, the court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *See Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013). However, allegations that "are no more than conclusions . . . are not entitled to the assumption of truth." *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).

### B.  Sections 1983 and 1988

Section 1983 provides a remedy for the deprivation of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. A Section 1983 claim has two essential elements. *See Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). First, the conduct at issue must have been committed by an actor acting under color of state law. *Id.* Second, the conduct at issue must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Id.* Section 1988 provides that the court may award the attorney's fees to the prevailing party in a Section 1983 proceeding. 42 U.S.C. § 1988(b).

### C.  Article 78, Agency Determination, and Supplemental Jurisdiction

CPLR Article 78 provides an avenue for parties to challenge an administrative agency's determination for various reasons; two of those reasons are when the determination "was affected by an

error of law or was arbitrary and capricious." N.Y. C.P.L.R. § 7803(3); *see also Gudema v. Nassau Cnty.*, 163 F.3d 717, 724 (2d Cir. 1998) (recognizing that "constitutional issues can be decided in Article 78 proceedings"). The court "may not disturb an administrative action unless . . . the challenged action was arbitrary and capricious." *In re Stevens v. N.Y. State Div. of Crim. Just. Servs.*, 40 N.Y.3d 505, 525 (2023). "An action is arbitrary and capricious when it is taken without sound basis in reason or regard to the facts." *In re Peckham v. Calogero*, 12 N.Y.3d 424, 431 (2009). And the court "must sustain" a determination "supported by a rational basis" even if the court "would have reached a different result than the one reached by the agency." *Id.*

An agency may "adopt regulations that go beyond the text of its enabling legislation, so long as those regulations are consistent with the statutory language and underlying purpose." *In re Acevedo v. N.Y. State Dep't of Motor Vehicles*, 29 N.Y.3d 202, 221 (2017). "The standard for judicial review of an administrative regulation is whether the regulation has a rational basis and is not unreasonable, arbitrary or capricious." *Id.* at 226. Judicial review of an agency's determination is limited to the facts and record adduced before the agency. *See In re Rizzo v. N.Y. State. Div. of Hous. & Cmty. Renewal*, 6 N.Y.3d 104, 110 (2005). "As a general rule, 'courts must defer to an administrative agency's rational interpretation of its own regulations in its area of expertise.'" *Andryeyeva v. N.Y. Health Care, Inc.*, 33 N.Y.3d 152, 174 (2019) (quoting *In re Peckham*, 12 N.Y.3d at 431). An agency's regulation should be upheld if it is not "irrational or unreasonable." *Id.*

Furthermore, as relevant here, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action . . . that they form part of the same

18

case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). The Second Circuit has not resolved the question of whether a federal court may exercise supplemental jurisdiction over claims brought pursuant to Article 78. *See DiMartile v. Hochul*, 80 F.4th 443, 446 n.1 (2d Cir. 2023) (acknowledging that "Article 78 is a 'special proceeding' under the . . . CPLR that is intended to provide 'a speedy correction' of improper state administrative action" but declining to settle the intracircuit split); *see also Garofalo v. City of New York*, No. 22-CV-7620 (NRM) (VMS), 2023 WL 3792514, at *5 (E.D.N.Y. June 2, 2023) (collecting cases).

However, "Supreme Court precedent suggests . . . that federal courts do in fact have jurisdiction over Article 78 claims." *Residents and Fams. United to Save Our Adult Homes v. Zucker*, No. 16-CV-1683 (NGG) (RER), 2017 WL 5496277, at *12-13 (E.D.N.Y. Jan. 24, 2017); *see also Carver v. Nassau Cnty. Interim Fin. Auth.*, 730 F.3d 150, 155 (2d Cir. 2013) (noting that Supreme Court precedent "suggest[s]" that Article 78 does not "deprive a federal court of jurisdiction over claims brought under that provision . . . as long as those claims would otherwise fall within the court's pendent jurisdiction"). This is especially true where "both sides consent[]" to it. *See Cartagena v. City of New York*, 345 F. Supp. 2d 414, 426 (S.D.N.Y. 2004) (exercising supplemental jurisdiction over Article 78 claims with the parties' consent "[t]o avoid the inefficiencies that would results from parallel state and federal litigation"); *see also Gala v. Kavanagh*, No. 23-CV-1543 (NRM) (RER), 2023 WL 2356025, at *2 (E.D.N.Y. Mar. 2, 2023) (exercising supplemental jurisdiction over Article 78 claims with the parties' consent because "time is of the essence").

### D.  CPLR 3001

In relevant part, pursuant to CPLR 3001, New York state courts "may render a declaratory judgment having the effect of a final

judgment as to the rights and other legal relations of the parties[.]" C.P.L.R. 3001. However, when plaintiffs bring a "claim under . . . § 3001, New York's equivalent to the federal Declaratory Judgment Act[,]" federal courts can "charitably construe [the] claim as one for a declaratory judgment pursuant to the Declaratory Judgment Act[.]" *Haller v. Usman*, No. 24-CV-977 (KPF), 2025 WL 605572, at *9 (S.D.N.Y. Feb. 25, 2025). Similar to CPLR 3001, the Declaratory Judgment Act is discretionary. *See* 28 U.S.C. § 2201(a) ("In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, *may* declare the rights . . . of any interested party seeking such declaration[.]" (emphasis added)); *see also Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003) (acknowledging that "[c]ourts have consistently interpreted" the Declaratory Judgment Act's "permissive language as a broad grant of discretion to district courts to refuse to exercise jurisdiction").

Where "Plaintiffs' declaratory judgment claim seeks resolution of legal issues that will, of necessity, be resolved in the course of the litigation of the other causes of action[,]" courts dismiss it as "duplicative in that it seeks no relief that is not implicitly sought in the other causes of action." *Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 249 (S.D.N.Y. 2006); *see also Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 301, 311 (S.D.N.Y. 2010) (reasoning that "[t]he fact that a lawsuit has been filed that will necessarily settle the issues for which the declaratory judgment is sought suggests that the declaratory judgment will serve no useful purpose").

## IV. DISCUSSION

The Adams Campaign challenges the CFB's denials of matching funds made in December 2024, January 2025, March 2025, and April 2025. (*See* Am. Pet. ¶ 2.) The April 2025 denial, however, is the operative decision. (First Ryan Decl. ¶ 13.) And for that

20

decision made by the Chair of the Board of the CFB, as well as the ratification of the same made by the full Board, which was later upheld after the Adams Campaign petitioned for review, the CFB has provided three reasons. (*Id.* ¶ 52.) Each one of those three reasons constitutes an independent basis for the CFB's decision to deny matching funds. Plaintiffs raise challenges as to each basis.

The court finds that the CFB provided two independent valid grounds for denying the Adams Campaign public matching funds: (1) failure to timely respond to the CFB's request for information and (2) failure to timely file the COIB disclosure. To that end, the court grants the CFB's motion for judgment on the pleadings and denies Plaintiffs' request for relief pursuant to CPLR Article 78.[18] *See Emps. Ret. Sys. for City of Providence v. Bd. of Governors of Fed. Res. Sys.*, No. 24-MC-349 (AS), 2025 WL 1736602, at *9 (S.D.N.Y. June 23, 2025) ("When an agency offers multiple grounds for a decision, we will affirm the agency so long as any of the grounds is valid, unless it is demonstrated that the agency would not have acted on that basis if the alternative grounds were unavailable.") (citing *BDPCS, Inc. v. FCC*, 351 F.3d 1177, 1183 (D.C. Cir. 2003)); *see also Sher v. Coughlin*, 739 F.2d 77, 82 (2d Cir. 1984) ("[S]tate action taken on the basis of both valid and invalid motivations is not constitutionally tainted by the invalid motive if the action would in any event have been taken on the constitutionally valid basis."). Furthermore, the court's grant of Defendant's motion for judgment on the pleadings and denial of Plaintiffs' request for injunctive relief and money damages "necessarily settle[s] the issues for which the declaratory judgment is sought" and "suggests that the declaratory

---

[18] The court notes that the parties consented to this court's exercise of supplemental jurisdiction over Plaintiffs' claims grounded in CPLR Article 78 during the status conference held on June 24, 2025. (Min. Entry Dated 6/24/2025.)

judgment will serve no useful purpose." *Amusement Indus.*, 693 F. Supp. 2d at 311. Accordingly, Plaintiffs' declaratory judgment claims are also dismissed.

### A. COIB Disclosure

The CFB is entitled to judgment on the pleadings because undisputed material facts demonstrate that Mayor Adams failed to make a timely COIB disclosure before the April 15, 2025 meeting. The CFA requires mayoral candidates to "fulfill the requirements of section 12-110 of the administrative code of the city of New York, including payment of any penalties as determined by the" COIB. Admin. Code § 3-703(1)(m). Furthermore, in pertinent part, the CFA states that:

> A participating candidate shall fulfill the requirements of section 12-110 of the administrative code to the satisfaction of the [COIB] by the twenty-fifth day after the last day for filing his or her designating or independent nominating petitions pursuant to the election law in the year of the covered election, or such other later date as the [CFB] shall provide by rule, . . . provided that a participating candidate seeking public funds for a December 15, January 15, February 15, March 15, or April 15 payment date shall file a report or reports as required by subparagraph (a) of paragraph 2 of subdivision b of section 12-110 and in order for such candidate to receive public funds on any such payment date the participating candidate shall fulfill the requirements of section 12-110 to the satisfaction of the [COIB] *by no less than three days prior to such payment date.*

Admin. Code § 3-703(1)(m)(ii) (emphasis added); *see also* CFB Rule 3-05(b). The relevant election law provides that "[a] petition for an independent nomination for an office to be filled at the time of a general election shall be filed not earlier than twenty-four weeks and not later than twenty-three weeks preceding such election." N.Y. Election L. § 6-158(9). At the same time, the COIB "shall establish by rule the dates, not to exceed

31 days prior to the relevant payment date, by which a person who intends to seek payment on the payment dates of February 15, March 15, or April 15 shall file" a COIB disclosure. Admin. Code § 12-110(b)(2)(a). In turn, the COIB, under its own rules, has determined that "for the payment date of April 15, the [COIB disclosure] must be submitted by March 21." COIB Rule 4-05.

Additionally, a "candidate who fails to adhere to the requirements" of Admin. Code § 3-703(1)(m)(ii) may nevertheless satisfy it by fulfilling the requirements to the COIB's satisfaction if the candidate "make[s] a claim for public funds upon satisfying the requirements of this paragraph and all other applicable law, rules and regulations." Admin. Code § 3-703(1)(m)(iii). However, failure to satisfy Admin. Code § 3-703(1)(m)(ii) to the COIB's satisfaction in a timely fashion "may result in a delay of any payment of public funds." *Id.*

Here, the parties agree that Mayor Adams did not file his COIB disclosure at least three days before the April 15, 2025, payment date to the COIB's satisfaction. (*See* Opp. at 30; Reply at 1.) Indeed, not only did Mayor Adams submit his COIB disclosure on April 14, 2025—the day before the April 15 payment date—but his COIB disclosure was also incomplete and therefore not to the COIB's satisfaction.[19] (Gallagher Email at ECF p. 88; First Ryan Decl. ¶¶ 54-55.) Nevertheless, Plaintiffs contend that because Mayor Adams successfully filed his COIB disclosure on April 25, 2025, the CFB "had no lawful basis for deciding on May 12, 2025 that the Adams Campaign was not eligible for campaign funds." (Opp. at 30.)

Plaintiffs' argument stems from a misunderstanding of the May 12, 2025, decision. This decision was the CFB's ratification of the Chair of the Board's denial of the Adams Campaign's petition

---

[19] The court recognizes that Mayor Adams, before his indictment was dismissed, had other priorities besides filing his COIB disclosure on time.

filed pursuant to CFB Rule 7-09. (First Ryan Decl. ¶¶ 63, 69.) And a "Rule 7-09 Petition is not an opportunity for the Campaign to show that they have resolved their ineligibility for a public funds payment." (Gallagher Email at ECF p. 88; Reply at 2.) Rather, "the Petition must demonstrate **that at the time the payment determination was made**, April 15, the Campaign was eligible for payment." (Gallagher Email at ECF p. 88.) (emphasis added). Here, there is no dispute that the Adams Campaign was not eligible for payment on April 15, 2025 because Mayor Adams did not file his COIB disclosure at least three days before the April 15 date to the COIB's satisfaction.[20]

Plaintiffs argue that "[e]ven assuming the annual disclosure was the basis for the CFB's decision, the deadline for filing the annual disclosure is, at best, unclear." (Opp. at 28.) But the deadlines set forth by New York election law, the COIB Rule 4-05, and the CFB Rules appear to be consistent. The relevant time window for Mayor Adams to file his petition for independent nomination for New York City mayoral general election was between May 20, 2025, and May 27, 2025. N.Y. Election L. § 6-158(9). In compliance with that requirement, Mayor Adams "filed two independent nominating petitions" on May 27, 2025.[21] (Am.

---

[20] Plaintiffs' reliance on *Gerson v. N.Y.C. Campaign Fin. Bd.* is misplaced. (Opp. at 30-31.) *Gerson* held that the CFB's denial of matching funds was arbitrary and capricious because it was based on an informal rule for which the CFB had no justification. 171 A.D.3d 648, 648-49 (1st Dep't 2019). Here, the CFB denied matching funds to the Adams Campaign pursuant to statutory requirement under the CFA. *See* Admin. Code § 3-703(1)(m)(ii).

[21] Plaintiffs appear to confuse the deadline for filing a COIB disclosure pursuant to N.Y.C. Admin. Code § 12-110 with the deadline for filing a petition for independent nomination for New York City mayoral general election. (Opp. at 29 (claiming "Mayor Adams's disclosure was filed on April 25, 2025, well before this deadline," when referring to the deadline of May 27, 2025, for filing a petition for independent nomination).) Again, the deadline for filing the former was within 25 days of May 27, 2025, that is, June 21, 2025. *See* Admin. Code § 3-703(1)(m)(ii); *see also* Election L. § 6-

Pet. ¶ 61.) And ordinarily, he had until June 21, 2025, to file his COIB disclosure. *See* Admin. Code § 3-703(1)(m)(ii); *see also* Election L. § 6-158(9). However, to be eligible for matching funds on April 15, 2025, Mayor Adams had to file his COIB disclosure by March 21, 2025. That is because N.Y.C. Admin. Code § 12-110(b)(2)(a) allows the COIB to sets its own deadline for candidates seeking payment for certain payment dates, including April 15, 2025. *See* COIB Rule 4-05. In addition, CFB Rule 3-05(b) requires the candidate to "demonstrate compliance with the requirements of" CFB Rule 3-05(a) for the April 15, 2025 payment date by April 12, 2025. And Mayor Adams clearly failed to comply with that requirement.

Nevertheless, Mayor Adams's late COIB disclosure is not a complete bar to his claim for matching funds in the future; rather, it "may result in a *delay* of any payment of public funds by the board." Admin. Code § 3-703(1)(m)(iii) (emphasis added). Defendant agrees. (Reply at 3 (acknowledging that "failure to comply with § 12-110 in time for one payment date does not serve as a bar to payment on the *next* payment date").) The court recognizes that Mayor Adams appears to have satisfied the COIB disclosure requirements as of April 25, 2025. (First Ryan Decl. ¶ 56; Am. Pet. ¶ 171.) However, the CFB does not meet between payment dates "on each occasion that a candidate failed to meet eligibility requirements on the last payment date," and "does not want to wait until the next payment date[.]" (Second Ryan Decl. ¶ 5.) Doing so "would not be administrable" considering that "there are more than 200 candidates seeking matching funds" during this campaign cycle. (*Id.*) Indeed, Mayor Adams was one of many candidates who were denied matching funds on April 15, 2025 because they failed to demonstrate compliance with the COIB disclosure requirement. (*Id.* ¶ 26.)

---

158(9). The time window for filing the latter was between May 20, 2025, and May 27, 2025. *See* Election L. § 6-158(9).

The court notes that the "Board staff expects to recommend that the Board, on the next payment date (July 15, 2025), find that Mayor Adams's amendment to his annual disclosure accepted by the COIB as of April 25, 2025, satisfies Board Rule 3-01(d)(ii)(A)(4) and Admin. Code § 3-703(1)(m)." (Reply at 3-4.) However, the CFB is entitled to judgment on the pleadings because undisputed material facts show that on April 15, 2025, the Board properly denied the matching funds to the Adams Campaign for Mayor Adams failed to file his COIB disclosure form on time to comply with Admin. Code § 3-703(1)(m), as well as Admin. Code § 12-110 and CFB Rules 3-01(d)(ii)(A)(4) and 3-05(b).

## B. Failure to Respond to the CFB's Request

The CFB is also entitled to judgment on the pleadings because the Adams Campaign failed to timely respond to the CFB's request for information and documents. The CFA and the CFB Rules provide the CFB with broad authority to seek documents and information. In pertinent part, the CFA states that "[t]o be eligible for optional public financing," a candidate must "obtain and furnish to the campaign finance board, and his or her principal committee or authorized committees must obtain and furnish to the board, any information it may request relating to his or her campaign expenditures or contributions and furnish such documentation and other proof of compliance[.]" Admin. Code § 3-703(1)(d). Similarly, the CFB Rules state that "public funds will not be paid to a candidate" if "the candidate fails to provide to the Board, upon its request and by the deadline set forth by the Board, documents or records required by Chapter 4 of these rules, or other information that verifies campaign activity." CFB Rule 3-01(d)(i)(A)(2).

On November 15, 2024, the CFB sent a letter to counsel to the Adams Campaign, requesting certain records relating to the campaign's activities, including documents and events referenced in

26

the Indictment. (Schaffer Letter at ECF pp. 338-39.) The CFB's letter set the deadline to respond for December 6, 2024, and noted that "[f]ailure to respond timely or adequately may result in suspension of public funds payments." (*Id.* at ECF p. 339.) One day before the deadline, the Adams Campaign indicated to the CFB that it would not be responding to the requests because "the requests relate specifically to events that were referenced in the Indictment." (First Ryan Decl. ¶ 18.)

Judge Ho dismissed the Indictment against Mayor Adams with prejudice on April 2, 2025. (*See id.* ¶ 46; *see also* Am. Pet. ¶ 8.) More than ten days later—around 130 days after the deadline and less than 12 hours before the Board was set to meet for the April 15, 2025 payment date—the Adams Campaign notified the CFB that it "reviewed [its] records and have found no documentation responsive to the request that has not already been submitted to the CFB." (Pitta Letter at ECF p. 543; First Ryan Decl. ¶ 48; Gallagher Email at ECF p. 88; *see also* Am. Pet. ¶ 52.) On April 15, 2025, the CFB voted to deny the Adams Campaign matching funds. (First Ryan Decl. ¶¶ 49-50; *see also* Am. Pet. ¶ 48.) The CFB explained that the campaign's failure to timely respond to the CFB's request for information is a basis for ineligibility for public funds. (April Not. at ECF pp. 78-79; *see also* Am. Pet. ¶ 51.) The notice also acknowledged that while the "Campaign sent a response on April 14, 2025 at 10:37 PM," it "was not reviewed prior to the 10 AM meeting of the Board on April 15, 2025." (April Not. at ECF p. 79.)

The Adams Campaign plainly did not comply with Admin. Code § 3-703(1)(d) and CFB Rule 3-01(d)(i)(A)(2), which instruct that a candidate seeking matching funds <u>must</u> provide documents and records to the CFB before the deadline set forth by the CFB. The court recognizes that the Adams Campaign did not initially comply with the CFB's request because the request sought

27

information related to certain events referenced in the Indict-
ment. (*See* Opp. at 32 (arguing that "privilege against self-
incrimination applies in administrative proceedings").) But the
Indictment has since been dismissed *with prejudice*. The Adams
Campaign had no excuse to wait until less than 12 hours before
the CFB meeting on April 15, 2025 to respond to the Board's
proper request.[22] *See generally Liu v. N.Y.C. Campaign Fin. Bd.*,
No. 14-CV-1687 (RJS), 2015 WL 1514904, at *9 (S.D.N.Y. Mar.
31, 2015) (discussing appropriate steps taken by the CFB in its
investigation). Thus, the court grants Defendant's motion for
judgment on the pleadings on this independent basis.

### C. The CFB's "Reason to Believe" Standard

Plaintiffs raise multiple challenges, including facial and as-ap-
plied constitutional challenges, to the CFB's "reason to believe"
standard in CFB Rule 3-01(d)(ii)(B). The court acknowledges
that when "a case may be resolved on other grounds, courts may
decline to reach a constitutional question to 'avoid deciding con-
stitutional issues needlessly.'" *Kreisberg v. HealthBridge Mgmt.,
LLC*, 732 F.3d 131, 138 (2d Cir. 2013) (quoting *Christopher v.
Harbury*, 536 U.S. 403, 417 (2002)). However, considering the
next payment date of July 15, 2025, and the upcoming mayoral

---

[22] There is nothing in the record suggesting that the Adams Campaign re-
quested an extension from the CFB to respond to the November 2024
request for documents. The Adams Campaign is aware such extensions are
available, as they have obtained at least one extension from the CFB for a
separate request. (*See* Second Ryan Decl. ¶ 19 n.1.)

Furthermore, the CFB contends that there is "a significant gap" in the cam-
paign's eventual response to the November 15, 2024 request because "the
response did not say that Mayor Adams had reviewed his own records for
responsive documents." (Mot. at 11; *see also* Reply at 4.) The court notes
that the CFB addressed its November 15, 2024 request to the "2021 and
2025 campaigns of Eric Adams," and not to Mayor Adams personally.
(Schaffer Letter at ECF pp. 338.) If the Board intends to seek information
from Mayor Adams himself, it should explicitly state so.

election on November 4, 2025, the court finds it pertinent to address the constitutional issues present here.[23] *See Lo Duca v. United States*, 93 F.3d 1100, 1104 (2d Cir. 1996) (addressing a constitutional argument first raised on appeal because "the constitutional issues . . . are sufficiently important that they should be assessed on their merits"); *see also United States ex. rel. Reed v. Anderson*, 461 F.2d 739, 740-41 (3d Cir. 1972) (addressing the "underlying constitutional questions" because "the substantive issue is important enough" even though the court could "decid[e] th[e] case solely" on another basis) (en banc); *United States v. Cain*, No. 5-CR-360A, 2008 WL 11336217, at *3 (W.D.N.Y. Nov. 5, 2008) (addressing the defendant's Sixth Amendment claim despite its untimeliness "because of the importance of the constitutional issue raised in the motion"). As such, the court addresses the constitutional challenges below.

### 1.    First Amendment Free Speech Clause

First, the court concludes that Plaintiffs plausibly allege that CFB Rule 3-01(d)(ii)(B), as applied to the Adams Campaign, violates Plaintiffs' constitutional rights to free speech—political expression and political association—under the First Amendment to the U.S. Constitution and Article I, Section 8 of the New York State Constitution.[24]

The First Amendment to the United States Constitution states that "Congress shall make no law . . . abridging the freedom of

---

[23] In any event, the constitutional avoidance canon is discretionary. *See Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001) (explaining that "canons are not mandatory rules").

[24] The court limits its analysis to the First Amendment of the U.S. Constitution, because "free speech claims under Article 1, Section 8 of the New York State Constitution are subject to the same analysis as free speech claims under the First Amendment." *Carter v. Inc. Vill. of Ocean Beach*, 693 F. Supp. 2d 203, 212 (E.D.N.Y. 2010); *see also Martinez v. Sanders*, 307 F. App'x 467, 468 n.2 (2d Cir. 2008) (summary order) (same). The parties generally agree with this approach. (*See* Mot. at 34; *see* Opp. at 14 n.5.)

speech . . . or the right of the people peaceably to assemble." U.S. CONST. amend I. "The Supreme Court has held that the Fourteenth Amendment incorporates the protections of the First Amendment against state governments." *Slattery v. Hochul*, 61 F.4th 278, 287 n.1 (2d Cir. 2023); *see also Gitlow v. New York*, 268 U.S. 652, 666 (1925) ("For present purposes we may and do assume that freedom of speech and of the press—which are protected by the First Amendment from abridgment by Congress—are among the fundamental personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the States."). "Because it is also well settled that municipal ordinances adopted under state authority constitute state action[,] . . . the First Amendment's protection of free speech applies to the municipal ordinance[s]" too. *Lusk v. Vill. of Cold Spring*, 475 F.3d 480, 485 (2d Cir. 2007).

It is the settled law of this land that any government regulation related to "contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities." *Buckley v. Valeo*, 424 U.S. 1, 14 (1976). And it is also "well established that contributors to political parties and campaigns engage in protected First Amendment activities." *Corren v. Sorrell*, 151 F. Supp. 3d 479, 493 (D. Vt. 2015); *see also Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971) ("[T]he constitutional guarantee [of the First Amendment] has its fullest and most urgent application precisely to the conduct of campaigns for political office.") Thus, "[t]he statutory and regulatory scheme . . . implicates the First Amendment" where it "provides an administrative board with discretion to determine candidates' eligibility for subsidies for speech—that is, public matching funds to political candidates." *Liu*, 2015 WL 1514904, at *9 (concluding that the political campaign suing the CFB for matching funds "alleged sufficient facts to establish standing").

Moreover, "[l]aws that burden political speech are 'subject to strict scrutiny,' which requires the Government to prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) (quoting *Fed. Election Comm'n v. Wis. Right To Life, Inc.*, 551 U.S. 449, 464 (2007)). But in "contrast with a limitation upon *expenditures* with political expression, a limitation upon the amount that any one person or group may *contribute* to a candidate . . . entails only a marginal restriction upon the contributor's ability to engage in free communication." *Buckley*, 424 U.S. at 20 (emphases added). Thus, "the less stringent standard of review" applies where the relevant regulation "does not prevent someone from making a contribution, but it does minimize the value of that contribution." *Ognibene v. Parkes*, 671 F.3d 174, 182-83, 193 (2d Cir. 2011) (recognizing that strict scrutiny applies to restraint on campaign expenditures, "while limits on [campaign contributions] are more leniently reviewed because they pose only indirect constraints on speech"). In other words, "contribution limits and bans are permissible as long as they are closely drawn to address a sufficiently important state interest." *Id.* at 183; *see also Fed. Election Comm'n v. Beaumont*, 539 U.S. 146, 161 (2003) (observing that "restrictions on political contributions have been treated as merely 'marginal' speech restrictions subject to relatively complaisant review under the First Amendment, because contributions lie closer to the edges than to the core of political expression").

Although not exacting as strict scrutiny, this standard of review is nevertheless rigorous. *See Upstate Jobs Party v. Kosinski*, 106 F.4th 232, 249 (2d Cir. 2024). The government "bears the burden of proving the constitutionality of its actions." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 210 (2014) (plurality opinion); *see also United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000) (same). And while "consistently reject[ing] attempts to restrict campaign speech based on other legislative aims[,]"

31

the Supreme Court "has recognized only one permissible ground for restricting political speech: the prevention of *quid pro quo* corruption or its appearance." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 305-06 (2022). After "demonstrat[ing] that a sufficient anticorruption interest motivated its" restrictions, the government "must then show that those [restrictions] are 'closely drawn' to avoid unnecessary burdens on political speech[.]" *Upstate Jobs Party*, 106 F.4th at 249, 256 (holding that the challenged contribution limits were closely drawn in part because they were subject to adjustment for inflation). A closely drawn restriction "to avoid unnecessary abridgment" means "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, that employs not necessarily the least restrictive means but a means narrowly tailored to achieve the desired objective." *McCutcheon*, 572 U.S. at 218.

As an initial matter, the court acknowledges that the "reason to believe" standard set forth in CFB Rule 3-01(d)(ii)(B) "does not prevent" the voters or supporters "from making a contribution"; rather it "minimize[s] the value of that contribution" when the Board denies matching funds pursuant to that rule. *See Ognibene*, 671 F.3d at 193. Put differently, the Board's denial under the rule does not prevent the underlying contribution from reaching the campaign. It logically follows then that when analyzing Plaintiffs' First Amendment challenge here, the court must apply "the less stringent standard of review" of whether the rule is "closely drawn to address a sufficiently important [municipal] interest" in order to survive such challenge. *Id.*

Next, applying the above standard to the facts here, this court finds that although the CFB meets its burden of identifying a sufficiently important interest justifying the "reason to believe" standard, the standard itself is not closely drawn to address that interest. Defendant argues that "the Rule and its application to

Mayor Adams serve a well-established government interest: pre-
venting actual or perceived corruption." (Mot. at 33.) Although
the rule itself does not make an explicit reference to curtailing
corruption as its goal, the court can readily make that inference.
It is no secret that the CFB aims to make New York City's local
democracy more transparent and strives to hold its elected lead-
ers accountable to the public by providing strong incentives to
candidates to finance their campaigns with the help of average
New Yorkers instead of seeking donations from special interest
groups. The Board makes that abundantly clear in its Vision and
Mission Statements.[25] (First Ryan Decl. ¶ 5 ("By increasing the
value of small-donor contributions, the program reduces the pos-
sibility and perception of corruption from large contributions and
unlimited campaign spending[.]").) Therefore, it is reasonable to
infer that in line with those statements, the Board has promul-
gated CFB Rule 3-01(d)(ii)(B) to "prevent[] . . . *quid pro quo*
corruption or its appearance." *Cruz*, 596 U.S. at 305-06. Clearly,
corruption, or even the appearance of it, would be "detrimental
to the Program." CFB Rule 3-01(d)(ii)(B). Thus, the CFB has met
its burden of demonstrating that CFB Rule 3-01(d)(ii)(B) serves
the goal of "eliminating corruption or the appearance thereof"
which "is a sufficiently important governmental interest." *Ogni-
bene*, 671 F.3d at 186.

The CFB further argues that "the Rule is closely drawn because it
is 'reasonable, commensurate with the interest served, and not
necessarily the least restrictive means but a means narrowly tai-
lored to achieve the desired objective.'" (Mot. at 33 (quoting
*Upstate Jobs Party*, 106 F.4th at 254).) Other than arguing that
the rule "only targets candidate conduct that is detrimental to the
Program during Program participation" and claiming that "[i]t

---

[25] *See* New York City Campaign Finance Board, *About the CFB,* available at
https://www.nyccfb.info/about [https://perma.cc/N6VV-7AEB] (last vis-
ited July 11, 2025).

does not inhibit the candidate from seeking private funds to mount a campaign," (*id.*), Defendant does not explain exactly how the rule's application to the Adams Campaign "avoid[s] unnecessary abridgment," is "reasonable; [and] . . . represents not necessarily the single best disposition but one whose scope is in proportion to the interest served," or "employs . . . a means narrowly tailored to achieve the desired objective," *see McCutcheon*, 572 U.S. at 218. The CFB's conclusory statements do not pass constitutional muster.

When applying CFB Rule 3-01(d)(ii)(B) to the Adams Campaign, the Board did not engage in any independent fact-finding. Instead, on November 15, 2024, about 7 weeks after the Indictment was unsealed, the Board requested certain information from the Adams Campaign, having already determined that "[b]ased on the indictment, there is reason to believe that the Campaign[] committed violations of various federal statutes, Campaign Finance Act provisions, and Board Rules[.]" (Schaffer Letter at ECF pp. 338-39.) When the Adams Campaign did not provide the records requested in the CFB's November 2024 letter, on December 18, 2024, the Board issued its first nonpayment determination to the Adams Campaign. (December Not.) Once again, the Board did not engage in any independent fact-finding. Instead, the CFB concluded that it "ha[d] reason to believe that Eric Adams . . . ha[d], in the course of public funds program . . . participation, engaged in conduct detrimental to the Program . . . as described in the September 26, 2025 indictment." (*Id.* at ECF p. 59.) Then, pointing to the Indictment, the CFB concluded that the Adams Campaign was "ineligible for a public funds payment." (*Id.*)

But "an indictment is not evidence of guilt." *United States v. Romano*, 706 F.2d 370, 374 (2d Cir. 1983); *see also United States v. Awadallah*, 457 F. Supp. 2d 246, 255 (S.D.N.Y. 2006) ("An indictment is merely an accusation. It is proof of nothing. You may

34

draw no inference against the defendant from the fact that he has been indicted."). It is "only a finding of probable cause that a crime has been committed, and that the accused is reasonably believed to have committed it." *Romano*, 706 F.2d at 374. And "[a] grand jury proceeding" resulting in an indictment "is not an adversary hearing in which the guilt or innocence of the accused is adjudicated." *United States v. Calandra*, 414 U.S. 338, 343 (1974). "Rather, it is an ex parte investigation to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person." *Id.*

Significantly, even after Judge Ho dismissed it with prejudice, the CFB continued to rely on the Indictment in denying matching funds to the Adams Campaign. (*See* Am. Not. at ECF pp. 94-95.) In its brief, the Board argues that "[t]here is no indication that the DOJ moved for dismissal, or that Judge Ho ordered dismissal of the charges for lack of merit." (Mot. at 18.) The Board is correct: Judge Ho did not dismiss the Indictment for lack of merit. Indeed, in an opinion dismissing the Indictment, he voiced his "substantive concerns about the reasons for dismissal offered by the Justice Department itself," and noted that the dismissal was not "any kind of statement about the merits of the allegations against the Mayor in the Indictment." *United States v. Adams*, --- F. Supp. 3d ---, No. 24-CR-556 (DEH), 2025 WL 978572, at *2 (S.D.N.Y. Apr. 2, 2025). But even then, he emphasized that the "decision . . . [was] not about whether Mayor Adams is innocent or guilty," either, because "Mayor Adams, like any person accused of a crime, is presumed innocent until proven guilty." *Id.* The Board's attempt to shift the burden of proving his innocence to Mayor Adams is inappropriate and goes against the centuries-old American legal principle that presumes the criminal defendant's innocence until proven guilty. *See, e.g., Deck v. Missouri*, 544 U.S. 622, 630 (2007) ("First, the criminal process presumes that the defendant is innocent until proved guilty."); *Powell v. State of Ala.*, 287 U.S. 45, 52 (1932) ("However guilty defendants, upon

due inquiry, might prove to have been, they were, until convicted, presumed to be innocent."); *Prigg v. Commonwealth of Pa.*, 41 U.S. 539, 576 (1842) ("Every man is presumed to be innocent, until proved guilty.").

The court appreciates the unique circumstances of Mayor Adams's indictment, followed by the dismissal of the same with prejudice. But the Board's reliance on the now-dismissed Indictment to exercise its discretionary authority under CFB Rule 3-01(d)(ii)(B) to deny the matching funds is not narrowly tailored to achieve the objective of curtailing corruption. It is not even clear to this court that the Board would not have relied on the Indictment or trial testimony, had Mayor Adams's criminal case proceeded to trial and resulted in full acquittal. Would the CFB still have relied on the Indictment to deny the matching funds? What if Mayor Adams was not indicted at all, but was accused of misconduct based on the same facts in a newspaper article or in a series of social media posts? Would the Board have denied around $3.5 million in matching funds based on those allegations? The court is unable to find answers to these questions in the CFB's briefs or pleadings. And the CFB's consistent reliance on the Indictment from November 2024 (only a few weeks after the Indictment was unsealed) to May 2025 (after Judge Ho dismissed the Indictment with prejudice) does not foreclose those possibilities. That is precisely the problem with the "reason to believe" standard as applied to the Adams Campaign.

To be clear, the Board need not have applied the rule in the least restrictive way possible to survive Plaintiffs' as-applied First Amendment challenge. It simply needed to rely on the rule as "a means narrowly tailored to achieve the desired objective" of preventing corruption or its appearance. *Upstate Jobs Party*, 106 F.4th at 254. But Plaintiffs correctly point out that the rule completely excludes "the Campaign from participating altogether in the City's matching fund[s] program," and does not simply limit

"the size, nature, or number of contributions that a candidate . . . may accept from private donors." (Opp. at 15.) For instance, in its nonpayment determinations, the CFB did not consider the "multiple alternatives available" other than complete denial of matching funds, including, for example, denial of matching funds with respect to certain contributions or fundraisers mentioned in the Indictment. *See McCutcheon*, 572 U.S. at 221 (clarifying that courts "do not mean to opine on the validity of any particular proposal"). Instead, the Board employed a "one size fits all approach," and denied all the matching funds under CFB Rule 3-01(d)(ii)(B) because it had "reason to believe that Eric Adams ha[d], in the course of public funds program participation, engaged in conduct detrimental to the Program that is in violation of federal, state, and/or City law[.]" (April Not. at ECF p. 78.) Thus, by relying on CFB Rule 3-01(d)(ii)(B) to deny the matching funds, the CFB failed to "avoid unnecessary abridgment" of Plaintiffs' First Amendment rights. *Buckley*, 424 U.S. at 25.

The court also notes that Defendant's reliance on *Liu* is misguided. There, the court rejected the plaintiffs' as-applied First Amendment challenge to then-CFB Rule 5-01(f) which—similar to the rule at issue here—provided the Board with authority to deny matching funds based on the "reason to believe" standard. *Liu*, 2015 WL 1514904, at *9. But Judge Richard J. Sullivan in *Liu* examined the following facts that justified the outcome: "given the prosecution and conviction of [the campaign treasurer and candidate's fundraiser], the evidence introduced at their trial, and the separate investigation conducted by the Board and its investigator, Thacher Associates, there was ample basis for the Board to believe that Plaintiffs had violated the [CFA] and Board rules." *Id.* Here, the CFB did not retain a private investigation firm to investigate the Adams Campaign or interview the contributors to the campaign as it did in *Liu*. Nor could it rely on trial

37

evidence, like it did in *Liu*, because Judge Ho dismissed the Indictment against Mayor Adams with prejudice before the case went to trial.

Furthermore, neither the criminal complaint filed against Mohamed Bahi nor Erden Arkan's Plea of Guilty convinces this court otherwise. With respect to the former, Mr. Bahi is entitled to the same presumption of innocence as is Mayor Adams.[26] As to Mr. Arkan, in relevant part, CFB Rule 1-02 defines the term "Candidate" as "every authorized committee of the candidate, the treasurer of each such committee, and any other agent of the candidate." But Mr. Arkan was never a member of the Adams Campaign, Mayor Adams's administration, or otherwise an agent of Mayor Adams. *See United States v. Arkan*, No. 25-CR-13 (S.D.N.Y. 2025) (Information (Dkt. 1) ¶ 2 (alleging that Mr. Arkan "direct[ed] certain of his employees to make contributions to the 2021 Campaign for New York City Mayor").) Ultimately, the relevant rule authorizes the Board to deny matching funds if it has "reason to believe that . . . *the candidate* has engaged in conduct detrimental to the Program *that is in violation of any other applicable law*." CFB Rule 3-01(d)(ii)(B) (emphases added). Because Mr. Arkan is not a "candidate" under CFB Rule 1-02, the Board cannot rely upon Mr. Arkan's Plea of Guilty to support a finding that it had "reason to believe" that Mayor Adams "engaged in conduct detrimental to the Program *that is in violation of any other applicable law*." (*Id.* (emphasis added).) Regardless,

---

[26] On February 7, 2025, the Government informed Judge Ho and Judge Analisa Torres of the Southern District of New York that it "inten[ded] to file an information charging Mohamed Bahi in a single count with conspiracy to violate the laws of the United States, in violation of 18 U.S.C. § 371." (Government Letter Dated 2/7/2025 (Dkt. 11-2 at ECF p. 398) at ECF p. 399.) Although the letter stated that "Bahi ha[d] indicated that he intend[ed] to plead guilty to the sole count of the Information against him," as of the date of the publishing of this decision, there is no pending information against Mr. Bahi in his criminal case. (*Id.*)

the CFB never explained, save for its generic references to Mr. Bahi's and Mr. Arkan's criminal cases, precisely how the charges against Mr. Bahi or Mr. Arkan's Plea of Guilty gave the Board a "reason to believe" that Mayor Adams engaged in conduct detrimental to the Program.

Lastly, it is exactly because of Judge Sullivan's well-reasoned opinion in *Liu* that this court also concludes that Plaintiffs' facial challenge fails. Considering that the language of the rule in *Liu* was almost the same as CFB Rule 3-01(d)(ii)(B), the court finds that the latter is not "unconstitutional in all of its applications." *Upstate Jobs Party*, 106 F.4th at 245 (explaining that "a facial challenge" can only succeed if the plaintiff can "establish[] that no set of circumstances exists under which" the law "would be valid"). For instance, had the CFB denied matching funds to the Adams Campaign after Mayor Adams or his campaign treasurer, Sharon Adams, was convicted of or entered a Plea of Guilty to any relevant criminal charges, neither of which is the case here, the Board's reliance on Rule 3-01(d)(ii)(B) would have been appropriate. *See* CFB Rule 1-02. Similarly, had the CFB engaged in independent fact-finding and investigation after such convictions, as it did in *Liu*, Plaintiffs' as-applied challenge would have likely failed. *See* 2015 WL 1514904, at *9. Because under those circumstances the rule's application would have been reasonable, the court finds that CFB Rule 3-01(d)(ii)(B) is not facially unconstitutional.

To conclude, Plaintiffs plausibly allege that CFB Rule 3-01(d)(ii)(B) as applied to the Adams Campaign is unconstitutional under the First Amendment to the U.S. Constitution and Article I, Section 8 of the New York State Constitution because it is not "closely drawn to address a sufficiently important state interest" of preventing corruption or its appearance. *Ognibene*, 671 F.3d at 193; *see also Buckley*, 424 U.S. at 16 (noting that the "First

Amendment protects political association as well as political expression"); *Liu*, 2015 WL 1514904, at *9 (finding that the determination of a candidate's eligibility for public matching funds implicates that candidate's First Amendment rights).[27] Nevertheless, because the CFB provided two independent valid reasons for its decision to deny matching funds, it is entitled to judgment on the pleadings.

### 2. Fourteenth Amendment Due Process Clause

Second, Plaintiffs also plausibly allege that CFB Rule 3-01(d)(ii)(B), as applied to the Adams Campaign, violates Plaintiffs' constitutional rights to due process of law under the Fourteenth Amendment to the U.S. Constitution and Article I, Section 6 of the New York State Constitution.[28] In relevant part,

---

[27] Although this court finds in favor of Plaintiffs on their as-applied First Amendment challenge, it notes that Plaintiffs' position with respect to the Second Circuit decision in *MacDonald v. Safir* is incorrect. (Opp. at 16.) Plaintiffs argue that "*MacDonald* controls this case." (*Id.*) It does not. The Second Circuit in *MacDonald* held that the "reason to believe standard" of Admin. Code § 10-110(a)(1) directing New York City Police Commissioner to deny parade permits "[was] not sufficiently precise on its face to pass constitutional muster" under the First Amendment. *See MacDonald v. Safir*, 206 F.3d 183, 193 (2d Cir. 2000). *MacDonald* is inapposite because it did not deal with any kind of political campaign contribution issues. Thus, the cases identified above concerning campaign contribution limitations are directly on point, while *MacDonald*'s reasoning is not instructive here.

[28] Similar to its analysis of the First Amendment challenge, the court only discusses the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, because "with some exceptions," not relevant here, "New York courts have interpreted the due-process guarantees of the New York Constitution and the United States Constitution to be coextensive[.]" *Oneida Indian Nation of N.Y. v. Madison Cnty.*, 665 F.3d 408, 427 n.13 (2d Cir. 2011) ("We need not decide . . . whether Article I, section 6 of the New York Constitution provides any greater relief than does the Fourteenth Amendment to the United States Constitution, inasmuch as the [plaintiff] has not asserted that it is entitled to any greater due-process protection under" the former than the latter.") The parties do not contest this approach. (*See* Mot. at 30.)

the Fourteenth Amendment to the U.S. Constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. The Due Process Clause of the Fourteenth Amendment protects a right to substantive and procedural due process. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998) (distinguishing between the procedural due process violation—"a denial of fundamental procedural fairness"—and a substantive due process violation—"the exercise of power without any reasonable justification in the service of a legitimate governmental objective").

Plaintiffs appear to raise a procedural due process claim only. (*See* Am. Pet. ¶ 162 ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972))); *see also* Opp. at 20 (explaining the "void-for-vagueness" doctrine).) The CFB, contradicting itself, interprets Plaintiffs' Equal Protection Clause claim as a substantive Due Process Claim as well. (*Compare* Mot. at 24 (identifying Plaintiffs' Equal Protection Clause claims as "a 'constitutional right to participate in the mayoral election on the same terms as other candidates' and . . . depriv[ation] . . . of their interests in 'the continued availability of the opportunity to participate in the Democratic Party's mayoral primary' and 'to participate in the general election'" (quoting Am. Pet. ¶¶ 138, 142)), *with id.* at 25 (identifying the same claims as "what appear[] to be . . . substantive due process claims").) For the avoidance of the doubt, the court addresses both substantive and procedural Due Process Clause claims, in that order.

      a.   *Substantive Due Process Claims – Free Speech & Property*

Plaintiffs cannot bring a successful substantive due process challenge; while their due process claim based on their free speech

interest is duplicative of their First Amendment challenge discussed above, their due process claim arising out of their property interest in matching funds does not identify a property interest protected by the Fourteenth Amendment's Due Process clause. "To establish a substantive due process violation, a plaintiff must show both (1) that she has an interest protected by the Fourteenth Amendment, and (2) that the . . . ordinance, or regulation in question is not rationally related to a legitimate government interest." *Winston v. City of Syracuse,* 887 F.3d 553, 566 (2d Cir. 2018). As relevant here, property interests "are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understanding that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 577 (1972). "A mere 'unilateral expectation' of receiving a [government] benefit is not, however, enough; a property interest arises only when one has a 'legitimate claim of entitlement' to the benefit." *Kapps v. Wing,* 404 F.3d 105, 113 (2d Cir. 2005) (quoting *Roth,* 408 U.S. at 577).

The Supreme Court has previously "afforded constitutional protection" to certain benefits "as a species of property protected by the federal Due Process Clause." *Id.* (citing *Goldberg v. Kelly,* 397 U.S. 254, 262 & n.8 (1970) (describing "welfare entitlements as more like 'property' than a 'gratuity'")). As a general rule, "[i]n determining whether a given benefits regime creates a property interest protected by the Due Process Clause," the Second Circuit "look[s] to the statutes and regulations governing the distribution of benefits." *Id.* Thus, "[w]here the administrative scheme does not require a certain outcome, but merely *authorizes* particular actions . . ., the scheme does not create 'entitlements' that receive constitutional protection under the Fourteenth Amendment." *Sealed v. Sealed,* 332 F.3d 51, 56 (2d Cir. 2003); *see also Kelly Kare, Ltd. v. O'Rourke,* 930 F.2d 170, 175 (2d Cir. 1991) ("If

the statute, regulation, or contract in issue vests in the state significant discretion over the continued conferral of that benefit, it will be the rare case that the recipient will be able to establish an entitlement to that benefit."); *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 582 (2d Cir. 1989) (expressing a "serious doubt as to the existence of a [property] right" where pursuant to New York's Medicaid laws, "in certain circumstances," the New York State Department of Social Services could terminate a healthcare provider's participation in the program).

Like certain government benefits, "[f]reedom of speech and of the press are fundamental rights which are safeguarded by the due process clause of the Fourteenth Amendment of the Federal Constitution." *De Jonge v. State of Or.*, 299 U.S. 353, 364 (1937). Relatedly, however, "where another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process." *Conn v. Gabbert*, 526 U.S. 286, 293 (1999) (holding that "[c]hallenges to the reasonableness of a search by government agents clearly fall under the Fourth Amendment, and not the Fourteenth," because "[i]n essence[,]" the respondent "argues that the prosecutors searched him in an unreasonable manner"); *see also Hu v. City of New York*, 927 F.3d 81, 103 (2d Cir. 2019) (collecting cases and explaining that "the plaintiffs' substantive Due Process claim is subsumed by their Equal Protection claim" because "the Supreme Court [has] narrowed the scope of substantive Due Process to claims that are not covered by other provisions of the Constitution"). Accordingly, where a due process claim is duplicative of a more specific claim under the federal constitution, it "is either subsumed in [the] more particularized allegations, or must fail." *Velez v. Levy*, 401 F.3d 75, 94 (2d Cir. 2005).

As to establishing the second element of a due process violation here, the local government "is not required to come forth with empirical evidence tending to show that the facts underlying the restrictions are true." *Lange-Kessler v. Dep't of Educ. of the State of N.Y.*, 109 F.3d 137, 140 (2d Cir. 1997). "It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 488 (1955). In other words, "the law need not be in every respect logically consistent with its aims to be constitutional." *Id.* at 487-88.

Here, Plaintiffs identify two kinds of interests allegedly protected by the Fourteenth Amendment's Due Process Clause. Specifically, they argue that the Board's application of CFB Rule 3-01(d)(ii)(B) deprived them of their *liberty* interest, to exercise their right to free speech, and *property* interest, in receiving matching funds, without due process. (Opp. at 20 n.12.) The court addresses each argument in turn.

First, Plaintiffs have a liberty interest in their free speech, as campaign contributions, that is protected by the Fourteenth Amendment's Due Process Clause. *See McCutcheon*, 572 U.S. at 191 ("If the First Amendment protects flag burning, funeral protests, and Nazi parades—despite the profound offense such spectacles cause—it surely protects political campaign speech despite popular opposition."); *see also De Jonge*, 299 U.S. at 364. But the First Amendment already "provides an explicit textual source of constitutional protection" for Plaintiffs' liberty interest. *Gabbert*, 526 U.S. at 293. Accordingly, this court will not assess Plaintiffs' substantive Due Process Clause claim arising out of their liberty interest in their free speech under the "generalized notion of substantive due process." *Id.* That claim is duplicative of and subsumed by their First Amendment challenge this court already addressed above. *See Velez*, 401 F.3d at 94 (explaining

that a due process claim duplicative of a specific federal constitutional claim "must fail").

Second, the CFB's matching funds program provides government benefits to qualified political campaigns. *See Liu*, 2015 WL 1514904, at *10 (describing the CFB's discretion to provide "public matching funds to political candidates" as a process of "determin[ing] candidates' eligibility for subsidies for speech"). But Plaintiffs' expectation of receiving such benefits does not automatically create a property interest in it. *See Kapps*, 404 F.3d at 113. Because the CFB Rules provide "an independent source . . . that secure [these] benefits and that support claims of entitlement to those benefits," *see Roth*, 408 U.S. at 577, the court must look to CFB Rule 3-01(d)(ii)(B) to "determin[e] whether . . . [the matching funds] regime creates a property interest protected by the Due Process Clause," *Kapps*, 404 F.3d at 113.

The Board has promulgated the rule as a rule of "**Discretionary ineligibility**." CFB Rule 3-01(d)(ii)(B). And the rule provides almost unbridled discretion to the Board to deny "public funds payment" to a candidate that it has "reason to believe . . . engaged in conduct detrimental to the Program that is in violation of any other applicable law." *Id.* This rule "does not require a certain outcome"; instead, it "merely *authorizes* particular actions[,]" leaving it outside the "constitutional protection [of] the Fourteenth Amendment." *Sealed*, 332 F.3d at 56. The court finds the Second Circuit's reasoning in *Plaza Health* particularly instructive. There, the Second Circuit closely analyzed "whether the provider of services" in the Medicaid context "had a property right . . . to continue to participate in the program." *Plaza Health*, 878 F.2d at 581-82. In suggesting that the provider likely does not have such a right, the court underlined a provision allowing the New York State Department of Social Services to terminate the provider's participation "if the department f[ound] that the

provider has engaged in an unacceptable practice" under the relevant regulatory scheme. *Id.* at 582. Such language giving discretion to the regulatory authority mirrors CFB Rule 3-01(d)(ii)(B)'s "reason to believe" standard.

Therefore, because CFB Rule 3-01(d)(ii)(B) "vests in the [Board] significant discretion over the continued conferral of [the matching funds] benefit," *O'Rourke*, 930 F.2d at 175, Plaintiffs do not "have a legitimate claim of entitlement" to those funds to establish a property right protected by the Fourteenth Amendment's Due Process Clause, *Roth*, 408 U.S. at 577. Plaintiffs' failure to allege that they have property interest in public matching funds is fatal to their claim.

In sum, the court concludes that while Plaintiffs' first substantive due process claim is duplicative of their First Amendment challenge, their second substantive due process claim is meritless because Plaintiffs do not have a property interest in public matching funds that are protected by the Fourteenth Amendment's Due Process clause.

### b.    *Procedural Due Process – Void for Vagueness*

The court finds that Plaintiffs adequately allege that the CFB violated Plaintiffs' procedural due process rights under the Fourteenth Amendment because CFB Rule 3-01(d)(ii)(B), as applied to the Adams Campaign, is void for vagueness. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the . . . Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Thus, claims based on lack of procedural due process are "composed of two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process." *Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012).

46

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned*, 408 U.S. at 108; *see also Farrell v. Burke*, 449 F.3d 470, 485 (2d Cir. 2006) ("The vagueness doctrine is a component of the right to due process."). To that end, laws must (1) "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly," and (2) "provide explicit standards for those who apply them." *Grayned*, 408 U.S. at 108; *see also Hill v. Colorado*, 530 U.S. 703, 732 (2000) (defining the same as "two independent reasons" that "[a] statute can be impermissibly vague"). The second prong of the test "involves an inquiry into whether: (1) . . . the ordinance as a general matter provides sufficiently clear standards to eliminate the risk of arbitrary enforcement; or (2) even in the absence of such standards, the conduct at issue falls within the core of the ordinance's prohibition[.]" *Cunney v. Bd. of Trs. of Vill. of Grand View, N.Y.*, 660 F.3d 612, 621-22 (2d Cir. 2011).

Because the "void for vagueness" doctrine "is chiefly applied to criminal legislation," civil enactments "receive less exacting vagueness scrutiny." *Arriaga v. Mukasey*, 521 F.3d 219, 222-23 (2d Cir. 2008); *see also Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498-99 (1982) ("The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."). However, "as *Grayned* suggests, vagueness in the law is particularly troubling when First Amendment rights are involved." *Farrell*, 449 F.3d at 485; *see also Smith v. Goguen*, 415 U.S. 566, 573 (1974) ("Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts."). And the Supreme Court "has recognized that a scienter requirement may mitigate a law's vagueness, especially with

respect to the adequacy of notice to the complainant that his conduct is proscribed." *Vill. of Hoffman Ests.*, 455 U.S. at 499; *Hill*, 530 U.S. at 732 (holding that "the first concern is ameliorated," because the statute "contains a scienter requirement," as it "only applies to a person who," among other things, "'knowingly' approaches within eight feet of another").

Plaintiffs raise both as-applied and facial vagueness challenges against CFB Rule 3-01(d)(ii)(B). (Am. Pet. ¶¶ 165-66.) They allege that the rule is void for vagueness because it "fails to identify with any clarity the conduct that resulted in the CFB's decision to deny campaign matching funds to the Adams Campaign," and "is not clearly defined; it is not defined at all." (*Id.* ¶¶ 163-64; *see also* Opp. at 20 (arguing that "the 'reason to believe' standard contained in Rule 3-01(d)(ii)(B) at the very least 'encourages arbitrary and discriminatory enforcement' of the regulation" (quoting *Hill*, 530 U.S. at 732)).) The CFB counters that "Mayor Adams was reasonably on notice that an Indictment charging alleged straw donations and bribery would provide reason to believe that he had engaged in conduct considered contrary to the goals of the Program, and indeed, detrimental" to it. (Mot. at 29.) Likewise, the Board contends that "the Rule has a defined standard preventing arbitrary application," and "[e]ven if the Rule does not provide a clear standard, Mayor Adams's actions as alleged in the Indictment fall directly within the core of the Rule's prohibition on conduct detrimental to the program[.]" (*Id.*) As to the facial challenge, while Plaintiffs do not appear to advance any arguments in the opposition brief, the CFB mainly relies on its arguments regarding the as-applied challenge and Judge Sullivan's reasoning in *Liu*. (Mot. at 29-30.)

The court addresses the as-applied challenge first, because "a finding of facial constitutionality does not foreclose 'as-applied' challenges." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 184 (2d Cir. 2006). Here, Plaintiffs have a liberty interest in their

right to free speech, namely, political expression and political association, under the First Amendment to the U.S. Constitution. *See Buckley*, 424 U.S. at 15 (holding that the "First Amendment protects political association as well as political expression"). Thus, Plaintiffs have satisfied the first element of their procedural due process claim. *See Bryant*, 692 F.3d at 218.

Next, as to the due process element, the court first discusses the notice prong of the void-for-vagueness doctrine. The court notes that the CFB's most recent denial of public matching funds to the Adams Campaign on April 15, 2025, (*see* April Not.), post-dates Judge Ho's dismissal of the Indictment with prejudice on April 2, 2025, *see generally Adams*, --- F. Supp. 3d ---, 2025 WL 978572. Without determining whether the rule adequately put the Adams Campaign on notice that a pending indictment would result in adverse action, the court does not see how the Adams Campaign should have reasonably been on notice of this outcome *after* the criminal charges against Mayor Adams were dismissed. It is not clear how the Adams Campaign could have "act[ed] accordingly" given that after the Indictment was dismissed, no "person of ordinary intelligence [would have] a reasonable opportunity to know what is prohibited." *Grayned*, 408 U.S. at 108. To the contrary, because "Mayor Adams, like any person accused of a crime, is presumed innocent until proven guilty," *see Adams*, --- F. Supp. 3d ---, 2025 WL 978572, at *2, he had no adequate notice that the dismissed indictment would give the Board a "reason to believe" that Mayor Adams engaged in conduct detrimental to the Program, *see also Deck*, 544 U.S. at 630 (acknowledging the presumption of innocence of the criminal defendant); *Powell*, 287 U.S. at 52 (same); *Prigg*, 41 U.S. at 576 (same). Indeed, the CFB Rules do not provide any guidance as to what constitutes "conduct detrimental to the Program that is in violation of any other applicable law." CFB Rule 3-01(d)(ii)(B). Consequently, to the extent the Board relied on the Indictment—after its dismissal

with prejudice—to deny matching funds to the Adams Campaign, the court finds that Plaintiffs adequately allege that CFB Rule 3-01(d)(ii)(B) deprived them of their liberty interest in free speech without due process of law.

The court also emphasizes that because "First Amendment rights are involved" in this case, *see supra* Part IV.C.1, the "vagueness in [Rule 3-01(d)(ii)(B)] is particularly troubling." *Farrell*, 449 F.3d at 485. Although the rule "is capable of reaching expression sheltered by the First Amendment," it does not offer "a greater degree of specificity than in other contexts" to survive the void-for-vagueness challenge as applied to the Adams Campaign. *Smith*, 415 U.S. at 573. And the fact that the rule has no "scienter requirement [that] may mitigate [its] vagueness, especially with respect to the adequacy of notice to [Mayor Adams] that his conduct is proscribed," further cuts in favor of this court's conclusion. *Vill. of Hoffman Ests.*, 455 U.S. at 499.

While Plaintiffs adequately allege an as-applied challenge on the first independent and sufficient prong of the "void-for-vagueness" doctrine, the court finds that the rule, as applied to the Adams Campaign, survives the challenge with respect to the second, enforcement standards, prong of the test. This court need not determine, however, whether the rule "provide[d] sufficiently clear standards to eliminate the risk of arbitrary enforcement," because preventing corruption, which is the targeted conduct at issue here, "falls within the core" of the rule's prohibition. *See Cunney*, 660 F.3d at 621-22. As the court explained above in discussing the First Amendment challenge, *see supra* Part IV.C.1, given the CFB's Vision and Mission Statements, it is reasonable to infer that the Board promulgated CFB Rule 3-01(d)(ii)(B) to "prevent[] . . . *quid pro quo* corruption or its appearance." *Cruz*, 596 U.S. at 305-06. And such conduct, or its appearance, would be "detrimental to the Program." CFB Rule 3-01(d)(ii)(B). Ultimately, however, because the court already

concluded that Plaintiffs plausibly alleged that CFB Rule 3-01(d)(ii)(B) deprived them of their liberty interest in free speech without due process of law, they also plausibly allege that the rule is unconstitutional as applied to the Adams Campaign.

Nevertheless, Plaintiffs' facial due process clause claim fails. For similar reasons that this court concluded that a facial First Amendment challenge to CFB Rule 3-01(d)(ii)(B) fails, it finds that the rule is not void for vagueness "in all of its applications." *Upstate Jobs Party*, 106 F.4th at 245. Again, the *Liu* court's interpretation of the "reason to believe" standard in an almost identical CFB rule is persuasive. *See* 2015 WL 1514904, at *13 (rejecting the plaintiffs' overbreadth challenge under the First Amendment because the "reason to believe" standard "is sufficiently definite to guide the CFB's action"). The court acknowledges that the *Liu* court did not analyze the vagueness of the rule as part of a Fourteenth Amendment procedural due process claim. Even then, the facts in *Liu* convince this court that the language of CFB Rule 3-01(d)(ii)(B) "give[s] the person of ordinary intelligence a reasonable opportunity to know" that the campaign treasurer's and fundraiser's convictions arising out of campaign-related criminal acts would lead to nonpayment decisions as to public matching funds. *See Grayned*, 408 U.S. at 108. As such, the rule is not void for vagueness in all circumstances.

In conclusion, despite the court's findings as to the procedural due process claim, undisputed material facts show that the Board had independently sufficient reasons to deny the Adams Campaign the matching funds. For those reasons, the CFB is entitled to judgment on the pleadings.

### 3.    Fourteenth Amendment Equal Protection Clause

The CFB is entitled to judgment on the pleadings with respect to Plaintiffs' equal protection claim under the Fourteenth Amendment to the U.S. Constitution. The Fourteenth Amendment to the U.S. Constitution provides, in pertinent part, that "[n]o State

shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. And as relevant here, in order to allege a successful "class-of-one" claim under the equal protection clause, Plaintiffs must show "that [they] ha[ve] been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).

To adequately plead a class-of-one claim, "plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (Sotomayor, J.); *see also Hu*, 927 F.3d at 92 (same). Thus, to succeed on a class-of-one claim,

> a plaintiff must establish that he and a comparator are *prima facie* identical by showing that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.

*Hu*, 927 F.3d at 92. Plaintiff also "bear[s] the burden of sufficiently alleging similarly situated comparators" in their pleadings. *See NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177, 204 (2d Cir. 2019).

Plaintiffs claim that the denial of matching funds "violates the right of Mayor Adams, the Adams Campaign, and the Mayor's supporters to participate on an equal basis with all other candidates in the mayoral campaign." (Am. Pet. ¶ 64; *see also id.* ¶¶ 137-43.) However, in their opposition, Plaintiffs present their equal protection claim as a "class-of-one claim" predicated on the notion that Mayor Adams and Andrew Cuomo are "identically

situated" and that the Cuomo Campaign received a "fact-based penalty" while the Board denied the Adams Campaign public matching funds based on unproven allegations. (Opp. at 21-23.) This court need not consider new allegations "raised for the first time in Plaintiff's opposition brief[.]" *Eden Alpha CI LLP v. Polished.com Inc.*, 763 F. Supp. 3d 270, 313 n.11 (E.D.N.Y. 2025) (collecting cases); *see also Russo v. Keough's Turn of the River Hardware, LLC*, No. 11-CV-994 (VB), 2012 WL 4466626, at *6 (S.D.N.Y. Sept. 25, 2012) (reasoning that "[i]t is well-settled that a court is not required to consider new theories of liability raised for the first time in opposition" papers). Plaintiffs' equal protection claim fails on that independent basis.

Additionally, while the CFB denied the Adams Campaign matching funds based on multiple violations of the CFB Rules on multiple occasions since December 2024, it only believed that Mr. Cuomo violated a single CFB Rule. (*See* Reply at 14-15.) Furthermore, the Board initially denied Mr. Cuomo's campaign public matching funds on April 15, 2025 as well based on violations of a different CFB rule. (*See* Second Ryan Decl. ¶ 7.) And it only reversed course after Mr. Cuomo's campaign "successfully provided enough of the[] statements" that the relevant CFB rule demanded (*Id.*)

On July 10, 2025, Plaintiffs, with leave of court, filed a response letter to the Second Declaration of Paul Ryan. (Pls.' Letter (Dkt. 16).) In the letter, among other things, Plaintiffs state that Mr. Ryan's declaration revealed that the CFB "revised the amount of the withholding" from the Cuomo campaign "based on subsequent documentation provided to the Board and in response to a Rule 7-09 petition," while it refused to consider the Adams Campaign's late submissions when it held a meeting on May 12, 2025. (*Id.* at 1.) To that end, Plaintiffs argue that "Mr. Ryan's Second Declaration thus establishes that the Adams Campaign was treated less favorably than the Cuomo Campaign." (*Id.* at 1-2.)

After the court directed the CFB to respond to Plaintiffs' letter, (*see* Text Order Dated July 10, 2025), the CFB explained that "[c]onsistent with Rule 7-09(b), the Cuomo Campaign demonstrated good cause for the previous failure to submit [the] information . . . that . . . was controlled by a third party[.]" (Def.'s Resp. Letter (Dkt. 17).) In other words, "[t]he Board did not allow the Cuomo Campaign to correct a mistake the Cuomo Campaign made; rather, the Board corrected its own determination that had been based on incorrect information from a third party." (*Id.*) Mr. Ryan's Second Declaration supports the Board's position. (Second Ryan Decl. ¶ 4 ("The purpose of Rule 7-09 review is to correct an error made by the Board . . ., not to correct an error made by a campaign[.]").) The court finds that the CFB's explanation is consistent with the "good cause" exception set forth under CFB Rule 7-09(b).[29]

Therefore, Plaintiffs, in their petition, fail to allege any candidates in similar circumstances that the CFB has treated differently. *See, e.g.*, *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59-60 (2d Cir. 2010) (affirming dismissal because the complaint failed to allege specific examples of applications that were made by persons similarly situated); *NRP Holdings*, 916

---

[29] Although it does not change the anlayis or the outcome, the court highlights the inconsistenty between the Board's response and its press release. The CFB's letter notes that "[t]he vote referenced in paragraph 29 of the Second Declaration of Paul S. Ryan took place on June 20, 2025 in response to the Cuomo Campaign's Rule 7-09 Petition for reconsideration of the Board's May 30, 2025 payment determination." (Def.'s Resp. Letter.) But the Board's June 9, 2025 press release appears to directly contradict that; instead, informing the public that the Board "voted Monday to make a payment totaling **$540,482 to the Cuomo for NYC Campaign**." *See* New York City Campaign Finance Board, *NYC Campaign Finance Board Approves Updated Payment, Withholding Amounts for the Cuomo for NYC Campaign,* available at https://www.nyccfb.info/media/press-releases/nyc-campaign-finance-board-approves-updated-payment-withholding-amounts-for-the-cuomo-for-nyc-campaign/ [https://perma.cc/8HRE-3HYF] (last visited July 11, 2025)

F.3d at 198-99 (affirming dismissal because the complaint provided insufficient details about unnamed similarly situated developers). Accordingly, undisputed material facts demonstrate that the CFB is entitled to judgment on the pleadings as to the equal protection claim.

### D. Remaining Issues

#### 1. CFB's Rulemaking Authority

The court concludes that the CFB did not exceed its rulemaking authority under the CFA. The Board has the statutory authority to promulgate CFB Rule 3-01(d)(ii)(B). The CFA sets forth eligibility requirements for "optional public financing." Admin. Code § 3-703. Accordingly, among other things, candidates must meet certain ballot requirements, file a written certification opting into the Program, provide the CFB with requested information regarding campaign contributions or expenditures, and comply with contribution limits. *See* Admin. Code §§ 703(1)(a), (c), (d), (f). In addition to these requirements, the CFA also provides that the CFB "shall have the authority to promulgate such rules and regulations and provide such forms as it deems necessary for the administration of this chapter" and "may take such other actions as are necessary and proper to carry out the purposes of this chapter." Admin. Code §§ 3-708(8), (11).

Under New York law, "an administrative regulation will be upheld only if it has a rational basis, and is not unreasonable, arbitrary or capricious." *N.Y. State Ass'n of Cntys v. Axelrod*, 78 N.Y.2d 158, 166 (1991) (collecting cases). The burden is on "[t]he challenger [to] establish that a regulation is so lacking in reason for its promulgation that it is essentially arbitrary." *Id.* Also relevant here, agencies are "permitted to adopt regulations that go beyond the text of [their] enabling legislation." *In re Acevedo*, 29 N.Y.3d at 221. An agency, "as a creature of the Legislature, is clothed with those powers expressly conferred by its

authorizing statute, as well as those required by necessary implication." *In re City of N.Y. v. N.Y. Comm'n on Cable Television*, 47 N.Y.2d 89, 92 (1979). To that end, New York courts "have not hesitated to uphold reasonable acts on [an agency's] part designed to further the regulatory scheme," so long as such "agency has been endowed with broad power to regulate in the public interest." *Id.*

Here, the CFB has broad rulemaking powers entrusted to it by the CFA. Not only does it "have the authority to promulgate such rules and regulations . . . necessary for the administration of" Chapter 7 of the CFA, *see* Admin. Code § 3-708(8), but it can also "take such other actions as are necessary and proper to carry out the purposes of" of Chapter 7 of the CFA, Admin. Code § 3-708(11). Furthermore, the CFB, like other agencies, "is permitted to adopt regulations that go beyond the text of its enabling legislation." *In re Acevedo*, 29 N.Y.3d at 221. However, the CFB's rulemaking authority is not absolute; its regulations must be "consistent with the statutory language and underlying purpose." *Id.* It "is left to the CFB to interpret the Act's provisions in a manner consistent with its mandate to govern public financing of campaigns and the Act's purpose to level the playing field." *Kurland v. N.Y.C. Campaign Fin. Bd.*, 873 N.Y.S.2d 440, 445 (Sup. Ct. 2009).

The CFA's purpose is to help ensure the ethical conduct of electoral candidates and elected city officials by reducing their reliance on large contributions, enabling them to communicate with the electorate, and keeping voters informed of local campaign issues, and increasing public confidence in the electoral process. *See* Jeffrey D. Friedlander, Stephen E. Louis & Laurence D. Laufer, *The New York City Campaign Finance Act*, 16 HOFSTRA L. REV. 345, 354-55 (1988). Similarly, as the court discussed above, the Board's goals include preventing corruption and the appearance of corruption. Thus, the court finds that the CFB

acted within the contours of its broad rulemaking authority
vested in it by the CFA. To that end, CFB Rule 3-01(d)(ii)(B) "has
a rational basis, and is not unreasonable, arbitrary or capricious."
*Axelrod*, 78 N.Y.2d at 166.

### 2.  New York City Administrative Procedure Act

Plaintiffs' claim under the New York City Administrative Proce-
dure Act ("CAPA") (codified at N.Y.C. Charter § 1041 *et seq.*) is
also unavailing. CAPA Section 1046(f) states that "[w]here any
agency is authorized to conduct an adjudication . . . [a]ny rec-
ommended decision, final decision, determination or order shall
be in writing, or stated in the record if the parties are present,
and shall include findings of fact and conclusions of law." N.Y.C.
Charter § 1046(f). In turn, CAPA Section 1041(1) defines "Adju-
dication" as "a proceeding in which the legal rights, duties or
privileges of named parties are required by law to be determined
by an agency on a record and after an opportunity for a hearing."
N.Y.C. Charter § 1041. Plaintiffs contend that the CFB violated
CAPA when it denied the Adams Campaign public matching
funds without making any findings of fact. (Am. Pet. ¶¶ 89-94
(citing N.Y.C. Charter § 1046).)

However, the CFB did not conduct any hearing before reaching
its decision. Nor was it required to do so under the CFB Rules or
the CFA. While Plaintiffs are correct that CAPA Section 1046 re-
quires that agencies provide "findings of fact" to support their
"conclusions of law," CAPA Section 1046 applies only to deter-
minations made after hearings conducted as part of
adjudications. *See* N.Y.C. Charter § 1046(f). And "[a]djudica-
tions" under CAPA are "proceeding[s] in which the legal rights,
duties or privileges of named parties are *required by law to be
determined by an agency on a record and after an opportunity for
a hearing*." N.Y.C. Charter § 1041(1) (emphasis added); *see also
In re Landmark West! v. Tierney*, No. 107387/05, 2005 WL
2108005, at *2 (Sup. Ct. 2005) ("Charter Section 1046 applies

to a required quasi-judicial hearing presided over by a hearing officer or administrative law judge."), *aff'd*, 25 A.D.3d 319 (1st Dep't 2006). Because no adjudication took place here and none was required, CAPA Section 1046 is inapplicable. Thus, Plaintiffs' CAPA claim is meritless.

### 3.  CFB Rules 7-08 & 7-09

The court finds that the CFB complied with its own rules in providing written explanations to the Adams Campaign in denying the campaign's request for matching funds. In pertinent part, CFB Rule 7-08, titled "**Notice to candidates**," requires the Board to "notify the candidate in writing of any non-payment determination." Such notice must "specify[] the basis for payment or non-payment of public funds[.]" CFB Rule 7-09(a). Plaintiffs allege that the Board "has failed to comply with Rules 7-08, 7-09, and 10-03 in denying campaign matching funds to the Adams Campaign." (Am. Pet. ¶ 81.) In support of this claim, they further allege that the CFB's Amended Notice issued to the Adams Campaign on May 2, 2025 did not provide any specific factual basis for denying matching funds. (*Id.* ¶ 58.)

But the Board correctly points out that CFB Rule 7-09 "addresses the review *process* for non-payment decisions." (Mot. 12 (emphasis added).) Plaintiffs appear to confuse the procedure with substance. The Amended Notice informed the Adams Campaign that it failed "to demonstrate eligibility for a public funds payment." (Am. Not. at ECF p. 94; *see also* Am. Nonpayment Determination at ECF p. 91 (providing three independent reasons for denial of matching funds).) In doing so, the Board notified the Adams Campaign of all the bases, namely, "Board Rules 3-01(d)(i)(A)(2), 3-01(d)(ii)(A)(4), and 3-01(d)(ii)(B)," for its denial of matching funds. (Am. Not. at ECF p. 94.) Furthermore, the Amended Notice listed a full paragraph of records that the Board reviewed in reaching the decision, satisfying CFB

Rules 7-08 and 7-09's procedural requirements. (*Id.*) Thus, the CFB properly followed its own rules.[30]

    4.    Delegation of Authority to the Chair of the CFB

Next, the CFB properly delegated its authority to make determinations to the CFB's Chair of the Board regarding Mayor Adams's petition filed pursuant to CFB Rule 7-09. In relevant part, CFB Rule 7-09(c)(i) provides that the CFB "may delegate to the Chair of the Board . . . authority to make a determination regarding the petition," if (i) a petition for reconsideration is filed; (ii) the candidate waives his right to appear before the Board; and (iii) the Board is unable to convene within five business days of receipt of the petition. Here, the Adams Campaign filed a petition for reconsideration on April 25, 2025. (*See* Adams Campaign Appeal.) And Mayor Adams waived his right to appear before the Board in connection with the petition. (*Id.* at ECF p. 81.) The CFB "was unable to convene within five business days of receipt of the petition and therefore delegated to the Chair of the Board, Frederick Schaffer, the authority to make a determination regarding the petition." (First Ryan Decl. ¶ 61.) Thereafter, the Chair of the Board denied the Adams Campaign's petition. (*Id.* ¶ 63.) Plaintiffs assert that the rule "does not confer on the Chair the authority to act when the CFB cannot meet, it simply allows the CFB to delegate that authority to the chair." (Opp. at 28 n.16.) But this argument ignores the clear language of the text of the relevant rule, which provides that the CFB "may delegate . . . authority *to make a determination* regarding the petition." CFB

---

[30] Plaintiff's Amended Petition also claims that the Board failed to comply with CFB Rule 10-3 in denying matching funds to the Adams Campaign. (Am. Pet. ¶ 81.) But CFB Rule 10-3, titled "**Board determinations concerning violations, infractions, penalties, and repayment of public funds**[,]" is listed under Chapter 10: Audit and Enforcement. Thus, as the Board clarifies, unlike CFB Rules 7-08 and 7-09 under Chapter 7: Pre-Election Public Funds Payments, CFB Rule 10-3 "is only relevant once the Board has already distributed funds to a campaign." (Mot. at 13.)

Rule 7-09(c)(i) (emphasis added). Accordingly, the CFB properly exercised its delegation authority.

\* \* \*

Finally, the court also agrees with Defendant that while the Petition "is styled as containing fourteen causes of action (of which the parties have stipulated to discontinue causes of action thirteen and fourteen), Plaintiffs do not allege fourteen distinct claims." (Mot. at 9.) And because the court grants Defendant's motion for judgment on the pleadings and denies Plaintiffs' request for relief under Article 78 on two independent grounds, to the extent there are outstanding arguments raised by Plaintiffs that the court has not addressed above, it need not reach them. *See Steinberg v. PRT Grp., Inc.*, 88 F. Supp. 2d 294, 299 n.3 (S.D.N.Y. 2000) ("Because I am granting the motions on other grounds, I need not reach the[] [remaining] issues."); *see also Winnik v. Chater*, No. 95-CV-695 (DC), 1998 WL 151041, at \*1 n.2 (S.D.N.Y. Apr. 1, 1998) (taking the same approach).

## V.  CONCLUSION

The CFB provided two independent valid reasons for its decision to deny the Adams Campaign public matching funds: (1) failure to timely respond to the CFB's request for information and (2) failure to timely file the COIB disclosure. Thus, the court GRANTS Defendant's motion for judgment on the pleadings and DENIES Plaintiffs' demand for relief pursuant to CPLR Article 78. The court also DISMISSES Plaintiffs' declaratory judgment claims, request for money damages, and attorneys' fees and litigation expenses. The Clerk of Court is respectfully DIRECTED to enter judgment in favor of Defendant and close this case.

SO ORDERED.

Dated:    Brooklyn, New York
          July 11, 2025

                              s/Nicholas G. Garaufis
                              _____
                              NICHOLAS G. GARAUFIS
                              United States District Judge